# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | |
|---|---|
| **In re FRANKLIN BANK CORP.,** | ) |
| **SECURITIES LITIGATION** | ) **CIVIL FILE NO.** |
| | ) **4:08-CV-01810** |
| | ) |
| | ) |
| | ) **CLASS ACTION** |
| | ) |
| | ) |
| | ) |
| | ) **DEMAND FOR JURY TRIAL** |

## FRANKLIN INVESTOR GROUP'S SECOND CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiff for the Franklin Bank common stockholders, the Franklin Investor Group, by and through its attorneys, on behalf of itself and the Class it seeks to represent, and for its Second Consolidated Amended Complaint, makes the following allegations against Defendants Lewis Ranieri, Anthony Nocella and Russell McCann based upon the investigation conducted by and under the supervision of counsel, which included, *inter alia*, reviewing and analyzing information and financial data relating to the relevant time period obtained from numerous public and non-public sources, including, among others, United States Securities and Exchange Commission ("SEC") filings for Franklin Bank Corp. ("Franklin Bank" or the "Company"), the July 2009 Material Loss Review prepared by the Office of Inspector General of the Federal Deposit Insurance Corporation, annual reports, press releases, published interviews, news articles, securities analysts reports and advisories about the Company, media reports (such as Bloomberg, Dow Jones, and LEXIS-NEXIS), financial information submitted by the Company to financial and banking regulators, interviews with former employees of the Company, and discussions with accounting and damages experts. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     The present action involves a massive financial fraud perpetrated by Defendants which erased hundreds of millions of dollars in shareholder value. While these profound losses caught unsuspecting shareholders off guard, they came as no surprise to Defendants, for Defendants have ***admitted*** that the financial statements published throughout the relevant period contained materially false information. Moreover, this Complaint reveals in particularized detail that the Defendants acted with the requisite scienter in facilitating the illegal scheme.

2.    Between January 31, 2007 and November 26, 2007, from all outward appearances, everything seemed well at Franklin Bank Corp. During this period, after all, Defendants repeatedly emphasized to investors that the Company faced no exposure to the growing storm of subprime loans, and likewise assured the market that it was particularly conservative in accounting for underperforming and non-performing loans.  On various calls with analysts throughout 2007, Defendants Nocella and McCann repeatedly emphasized the Company's conservative lending strategy by stating "we don't have any subprime," subprime loans "wouldn't even touch our balance sheet" and that the Company "refuses to put it [subprime loans] inside" the portfolio.  As a result, shares of the Company's common stock traded at artificially inflated prices.

3.    What investors could not have known, however, is that the financial statements reported by the Defendants about the Company, as well as the purported "safe" nature of the Company's lending practices, were complete works of fiction. In evaluating Defendants' deceptive scheme, it is helpful to keep in mind that first, Franklin Bank added mortgages to its loan portfolio in three ways.  First, the Bank originated loans directly to home buyers and took mortgages as collateral.   Second, Franklin Bank established "warehouse lines of credit" through which the Company would loan money to mortgage brokers who would in turn make loans to the ultimate borrower.  Franklin Bank took these mortgages into its portfolio as collateral.  Third, Franklin Bank purchased pools of mortgages originated by other lenders.  As was ultimately revealed by a Federal Deposit Insurance Corporation ("FDIC") Material Loss Review determining the cause of the Company's collapse, Franklin Bank "failed due to bank management's high-risk business strategy." The Company took great steps to hide this high-risk strategy.  Indeed, during the same time that Defendant Nocella assured investors that Franklin Bank "refused" to allow subprime in Franklin

Bank's loan portfolio and "does not have subprime," the FDIC in fact found that the Company "originated, purchased and sold an array of mortgage products that included nontraditional and subprime mortgages." In another conference call with analysts, Defendant McCann, referring to payment option adjustable rate mortgages, stated "you know we don't have any of those." Again, the FDIC's audit belies that claim, as it revealed that the type of loans offered by Franklin Bank included "payment option adjustable rate mortgages."

4.      Franklin Bank's use of such a high-risk strategy of lending was not happenstance, but rather was the intentional execution of a plan devised by Defendants Ranieri and Nocella. In fact, these two had already traveled this road with a previous acquisition in Texas, Bank United Corp ("Bank United."). Bank United was purchased by Ranieri and Nocella in 1995 and undertook a plan of acquisitions and lending growth that culminated in an acquisition by Washington Mutual in 2001. After expiration of the covenants not to compete executed in connection with the Washington Mutual acquisition, Ranieri and Nocella "got the band back together" by hiring as many former Bank United executives and employees as possible before acquiring Franklin Bank for $11.2 million in April 2002. The intent from the outset was to recreate the rapid growth and quick sale achieved with Bank United.

5.      Faithful to the plan set out by Ranieri and Nocella, Franklin Bank commenced a series of acquisitions and lending expansion that transformed the sleepy state bank. From 2002 until 2007, total assets increased 1,461% from $365 million to $5.7 billion, total deposits increased 1,493% from $182 million to $2.9 billion, and total loans increased 1,236% from $306 million to $4.09 billion. This growth came at a great price however, as the loan portfolio filled with higher risk loans. This transformation was later described by the FDIC as a "high-risk business strategy in which

[Franklin Bank] concentrated assets in 1-4 family residential and ADC loans and funded its loan

growth with wholesale funding, including higher-cost and volatile deposits and borrowings."

6.     By early 2007 the low quality of Franklin Bank's loan portfolio and deteriorating

market conditions caused defaults and late payments to dramatically increase. Rather than disclose

this fact to the market, and thereby admit the high-risk strategy it employed and dampen the ultimate

goal of selling the Bank, Defendants chose to conceal the Bank's true condition by manipulating its

financial statements. The problems within Franklin Bank were so profound that on February 19,

2008 the Vice President of Loss Mitigation sent a letter to the Senior Vice President of Internal Audit

reporting the Company's violations of numerous accounting standards. In the letter, Craig Wolfe

expressed his observations of "Franklin Bank's violations of SEC rules, deficient internal controls

and conflicts of interests."   Mr. Wolfe further described how on three occasions he had refused to

sign a Sarbanes-Oxley Attestation because he "knew that the Bank's accounting of REOs was

misleading, inaccurate, and did not comport with Generally Accepted Accounting Principles." Mr.

Wolfe concluded his letter by stating that "Bank management was in fact aware of the extent of its

losses when 2007 earnings were released, if not much earlier, but denied or hid the extent of these

problems to avoid having to disclose them to shareholders . . . As a result, the Bank has misled the

SEC and shareholders as to the Bank's true financial condition." Mr. Wolfe proved prescient on two

key points in his letter.  He wrote "the 2007 earnings report that Franklin Bank filed should be

restated because it is not accurate and therefore constitutes fraud against shareholders" and that "the

net effect is delay of the inevitable so that losses would be moved into a later accounting period, at

which point the bank will presumably be subject to acquisition by an unwitting investor, or a federal

bailout."

7.     This deception lasted throughout 2007, until it became apparent that the failure to properly and timely reserve for bad loans served as little more than a thin disguise for accounting fraud. As this fraudulent scheme came to light, in large part due to Mr. Wolfe contacting the FDIC, the Company was compelled to admit "that the accounting for certain delinquent single family loans being serviced by third parties, other real estate owned, and the Bank's newly created single family loan modification programs to mitigate foreclosure losses . . . should be revised." Form 8-K, filed May 19, 2008.

8.     By admitting that the Company's financial statements were materially misleading, the Company became obligated to "restate" the financial statements it had previously reported for fiscal years 2006 and 2007. To be sure, a restatement is no minor event. In fact, reporting guidelines mandated by the SEC clarify that a restatement is required for the correction of material errors in previously issued financial statements. Thus, the restatement here *constitutes an unqualified admission that the originally published financial statements contained materially false statements.*

9.     It must be emphasized that the Chief Executive Officer and the Chief Financial Officer of Franklin Bank (Defendants Nocella and McCann) certified time and again during 2007 and 2008 that Franklin Bank had developed internal controls sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external purposes." In fact, no such safeguards existed, and Defendants have now conceded that the Company suffered from material weaknesses and/or significant deficiencies in its internal controls due to the pervasive errors revealed in May 2008.

10.     The facts and circumstances underlying the reality that Defendants knowingly issued financial statements containing material errors are confirmed in particularized detail by the various

confidential witnesses interviewed by counsel for the Franklin Investor Group, all of whom worked at Franklin Bank during the pertinent time frame, and the letter written by Craig Wolfe. The confidential witnesses reveal that all of the Defendants played a direct and personal role in the weekly analysis of delinquent, distressed and nonperforming loans and, in their sole discretion, decided what adjustments would be made to the financial statements. By way of example: (i) despite direct knowledge that the Company faced exposure to subprime loans both directly as a result of the Bank's funding an average of $10-$15 million in subprime loans per month and indirectly due to a warehouse loan to Countrywide Financial, each Defendant repeatedly assured investors that the Company maintained no investment in, or exposure to, loans of this type; and (ii) despite direct knowledge by each Defendant that the default on the Countrywide Financial loan required a $150 million write-off, Franklin Bank never honored this obligation and completely neglected to apprise the market of its existence; and (iii) the Company lacked sufficient internal controls to adequately account for delinquencies in its loan portfolio.

11.     Each Defendant's experience in the banking industry precludes any argument that any of them lacked the requisite knowledge to understand the significance of accounting for a loan in a bank. Indeed, in an Securities and Exchange Commission filing, Franklin Bank referred to Ranieri as an "expert and innovator in both the mortgage and capital markets" and the "father of securitized mortgages."

12.     Naturally, as news of the material falsity of the Company's financial statements reached the market, the price of the Company's stock plummeted, and the Company was ultimately placed into receivership and forced to file for bankruptcy protection. In virtually no time, the Company's stock was rendered worthless.

13.     The preceding summary makes evident what the remainder of this Complaint establishes convincingly: Defendants knowingly and/or recklessly issued false and misleading financial statements during the relevant time frame that were not presented in accordance with Generally Accepted Accounting Principles ("GAAP") and thus, as a matter of law, violated the Securities Exchange Act of 1934 (the "1934 Act") by containing errors and irregularities which led to the Company's announced restatement.  Such failure to accurately report was the result of intentional and reckless conduct by Defendants, and directly caused Lead Plaintiff's losses.

## JURISDICTION AND VENUE

14.     Lead Plaintiff brings this action pursuant to the 1934 Act, as amended (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the 1934 Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16.     Venue is proper in this District pursuant to § 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c).  The Company maintained its principal executive office in this District, and substantial acts in furtherance of the alleged fraud occurred within this District.

17.     Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce in connection with the acts alleged in this complaint, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### THE PARTIES

**A.**    **Lead Plaintiff**

18.    Court-appointed Lead Plaintiff, the Franklin Investor Group, purchased Franklin Bank common stock during the Class Period, as described in the certifications previously filed with the Court, and was damaged thereby.

**B.**    **Franklin Bank**

19.    Franklin Bank was organized under the laws of Delaware and had its principal executive offices at 9800 Richmond Avenue, Suite 680, Houston, Texas. During the Class Period, the Company's shares were listed and actively traded on the NASDAQ under the symbol "FBTX." According to its Form 10-Q filed December 20, 2007 for the period ending September 30, 2007, there were 25,370,936 shares outstanding of the Company's common stock as of November 8, 2007. Due to its pending bankruptcy, neither the Company nor any subsidiary is named as a defendant.

**C.**    **Defendants**

20.    Defendant Lewis S. Ranieri served as a director since the Company was founded in 2001, and as Chairman of the Board during all time relevant to this litigation. He is the prime originator and a founder of Hyperion Partners L.P. and Hyperion Partners II L.P. ("Hyperion") and chairman and/or director of various other entities owned directly and indirectly by Hyperion. Mr. Ranieri also serves as Chairman and President of Ranieri & Co., Inc., a private investment advisor and management corporation, and is Chairman and a member of the Board of Directors of Hyperion Capital Management, Inc., a registered investment advisor. Prior to forming Hyperion Partners, L.P., Mr. Ranieri had been Vice Chairman of Salomon Brothers, Inc. ("Salomon"). He is generally considered to be the "father" of the securitized mortgage market. Mr. Ranieri helped develop the

capital markets as a source of funds for housing and commercial real estate, established Salomon's

leadership position in the mortgage-backed securities area, and also led the effort to obtain federal

legislation to support and build the market.  At Salomon, Mr. Ranieri had responsibility for the

firm's activities in the mortgage, real estate and government guaranteed areas.  Mr. Ranieri was co-

founder and chairman of the Board of Directors of Bank United Corp.

      21.    Defendant Anthony J. Nocella ("Nocella") served as a director of the Company since

April 2002 and served as President since April 2002 and Chief Executive Officer since July 2002.

He served as the Chairman, Chief Executive Officer and President of Franklin Bank, S.S.B., - a

subsidiary of the Company - since April 2002. Nocella was co-founder, Vice Chairman and Director

of Bank United Corp and was Chief Financial Officer of Bank United Corp from its inception in

1988 until its merger with Washington Mutual in February 2001.  He founded and managed

commercial banking and financial markets (mortgage banking and capital markets) and was

Chairman of the brokerage division of that bank.  Mr. Nocella directed the issuance for the first

commercial mortgage-backed bonds (REMIC), and the first single-family residential REMIC issued

by Salomon Brothers and FNMA, and brought three companies public, Bank United Corp. (1996),

PSFS (1983) and Humana, Inc., formerly American Medicorp, Inc. (1970).  From 1988 to 1990,

Nocella provided consulting services to Bank United Corp., as well as other financial institutions as

President of Nocella Management Company, a firm that specialized in asset and liability

management consulting for financial institutions.  From 1981 to 1987, Mr. Nocella served as

Executive Vice President and Chief Financial Officer of Meritor Financial Markets.  During his 13

years at Meritor (1974 to 1987), he also served as President of PSFS Management Company, the

holding company of the Philadelphia Saving Fund Society, the nation's largest savings institution

at the time. Nocella's other positions have included Controller and Director of Financial Services for American Medicorp, Inc., Senior Managing Auditor and Consultant for KPMG Peat Marwick and adjunct professor of finance at St. Joseph's University and Drexel University. Nocella, a Certified Public Accountant, received an undergraduate degree in accounting from LaSalle University and an M.B.A. in computer science and finance from Temple University. He also completed the Graduate Banking Financial Management Program of the Wharton School at the University of Pennsylvania. Nocella is a director and member of the Basel II Committee of America's Community Bankers, past Chairman and a director of the Texas Bankers Association, and delegate and past President and Key Member of the Financial Executives Institute. Nocella also serves on the National Association of Home Builders Mortgage Roundtable. In the Company's 2006 Form 14A, it was revealed that Mr. Nocella's total compensation for the year in question was $1.27 million in cash, an amount which did not include additional benefits he received from stock and/or option grants.

22.    Defendant Russell McCann ("McCann") was the Company's Chief Financial Officer and Treasurer, and was the Chief Financial Officer of Franklin Bank, S.S.B. In such capacity, he was responsible for asset and liability management, financial and managerial accounting, treasury, funding and capital management. Prior to joining the Company, he was Senior Vice President and Treasurer of Bank United Corp., where he was responsible for funding, risk management, capital markets and asset and liability management. He was also a member of the Asset and Liability Committee and Deposit Pricing Committee of Bank United. Prior to joining Bank United in 1989, Mr. McCann was Vice President and Treasury Controller for United Savings. Prior to joining United Savings in 1986, Mr. McCann held various financial positions in investment banking firms. Mr.

McCann received his B.B.A. in Accounting from Stephen F. Austin State University, and is a Certified Public Accountant. In the Company's 2006 Form 14A, it was revealed that Mr. McCann's total compensation for that year was $393,000.

23. Because of the Defendants' positions with the Company and Franklin Bank, S.S.B., each of them had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Indeed, as detailed herein by the confidential witnesses, there is no reasonable dispute to the fact that the Defendants were intimately involved in the day-to-day operations of the Company including, without limitation, the analysis of nonperforming loans and application of relevant accounting principles thereto.

24. Moreover, banking operations are undoubtedly a core component of the Company's corporate structure. As such, Defendants, in their capacities as Chairman of the Board of Directors, Chief Executive Officer and Chief Financial Officer of the Company, are deemed to have intimate knowledge of those operations. *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("Knowledge may be imputed to individual defendants when the disclosures involve the company's core business."). On this very topic, Judge William C. Conner of the Southern District of New York observed,

-11-

> [T]he fact that those statements concerned the core operations of the
> company supports the inference that the defendant[s] knew or should
> have known the statements were false when made. Indeed, if facts that
> contradict a high-level officer's public statements were available when
> the statements were made, it is reasonable to conclude that the speaker
> had intimate knowledge of those facts or should have known of them.
> Accordingly, if a plaintiff can plead that a defendant made false or
> misleading statements when contradictory facts of critical importance
> to the company either were apparent, or should have been apparent, an
> inference arises that high-level officers and directors had knowledge
> of those facts by virtue of their positions with the company.

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). It

cannot be disputed that a bank's loans, and the proper accounting treatment and disclosure of such

loans, "concern[] the core operations of the company."

25.    Given their positions of authority and control within the Company, it is appropriate

to presume that the false, misleading and incomplete information conveyed in the Company's public

filings, press releases and other publications and statements as alleged herein are the collective

actions of those Defendants identified above.  Ranieri, Nocella and McCann, by virtue of their roles

as Chairman of the Board, Chief Executive Officer and Chief Financial Officer, respectively, with

the Company, directly participated in the management of the Company and Franklin Bank, S.S.B.,

were directly involved in the day-to-day operations of the Company at the highest levels and were

privy to confidential proprietary information concerning the Company and its business, operations,

growth, financial statements, and financial condition, as alleged herein.  Said Defendants were

involved in drafting, producing, reviewing and/or disseminating the false and misleading statements

and information alleged herein, were aware, or recklessly disregarded, that the false and misleading

statements were being issued regarding the Company, and approved or ratified these statements, in

violation of the federal securities laws.

26.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the NASDAQ, and governed by the provisions of the federal securities laws, each Defendant had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects. Each Defendant had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violate these specific requirements and obligations.

27.     Defendants participated in the drafting, preparation, presentation and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with the Company, all of the Defendants had access to adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about the Company and its business materially false and misleading.

28.     Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each

-13-

Defendant was provided with copies of the documents alleged herein to be misleading prior to or

shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause

them to be corrected. Accordingly, each of the Defendants is responsible for the accuracy of the

public reports and releases detailed herein and is therefore primarily liable for the representations

contained therein.

29.    Each of the Defendants is liable as a participant in a fraudulent scheme and course

of business that operated as a fraud or deceit on purchasers of the Company common stock by

disseminating materially false and misleading statements and/or concealing material adverse facts.

The scheme: (i) deceived the investing public regarding the Company's business, operations,

management and the intrinsic value of its common stock; and (ii) caused Lead Plaintiff and other

members of the Class to purchase the Company's common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

30.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons who purchased

the common stock of the Company during the period from January 31, 2007 through May 19, 2008

(the "Class Period") and who were damaged thereby. Excluded from the Class are the Defendants

herein, the officers and directors of the Company, members of their immediate families, any affiliate

and/or subsidiary of the Company, any entity in which any excluded person has a controlling interest,

and the legal affiliates, representatives, heirs, controlling persons, successors, and assigns of any

excluded person.

31.    Because the Company had in excess of twenty-five million shares of common stock

outstanding, and because the Company's common stock was actively traded during the Class Period,

members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent.

32.    Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and other Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

33.    Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation. Moreover, Lead Plaintiff has no interests that are contrary to or in conflict with the interests of the members of the Class it seeks to represent.

34.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)      whether Defendants' publicly disseminated releases and statements during the Class Period omitted and misrepresented material facts, and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)      whether Defendants participated in and pursued the fraudulent scheme and course of business complained of;

(d)      whether Defendants acted with scienter;

(e)      whether the market prices of the Company common stock during the Class Period were artificially inflated due to the material nondisclosures and misrepresentations complained of herein; and

(f)      whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

**A.** **Background**

36.      The business strategy executed by Franklin Bank that ultimately caused its failure was determined before Defendants Ranieri and Nocella purchased the Company in 2002. The two first met around 1990 when Nocella was Chief Financial Officer of Meritor Financial Markets ("Meritor"), a Philadelphia, Pennsylvania based bank, and Ranieri assisted in Meritor's transition to a publicly traded company while he was at Soloman Brothers.

37.     In 1995, Ranieri and Nocella purchased Bank United Corp, a Texas based bank.[1] Ranieri was Chairman of the Board of Bank United, and Nocella served as Executive Vice President in charge of Corporate Finance.  In this role, Nocella was in charge of all of Bank United's operations other than retail banking.  According to Confidential Witness 2, Ranieri was involved in the corporate strategy and day to day operations of Bank United.  Ranieri was "very hands on" and as chair of the loan committee, participated in "all conference calls made by the loan committee." After it was acquired by Ranieri and Nocella, Bank United grew quickly via acquisitions of other banks and through expansion of its lending operations.  CW2 described that the goal of Ranieri and Nocella was to grow the bank in order to sell it, and this plan was successful as in 2001 Washington Mutual acquired Bank United.

38.     As is typical, Washington Mutual required Ranieri, Nocella and many other executives to sign covenants not to compete as part of sale of Bank United.  These covenants expired in 2002, and shortly thereafter Ranieri decided to "put the band back together" and purchase another bank.  In April 2002, Ranieri and Nocella purchased Franklin Bank, S.S.B. for $11.2 million. Ranieri and Nocella tried to hire as many former Bank United employees as possible, from executives down to file room clerks.  CW2 revealed that the stated goal of Ranieri was to recreate the experience of Bank United at Franklin Bank.  Specifically, Ranieri wanted to grow Franklin Bank as quickly as possible in preparation to sell it.

39.     The Franklin Bank acquired by Ranieri and Nocella bore little resemblance to the institution it would become by the start of the Class Period.  The Company completed its initial

---

[1]     The summary of Ranieri and Nocella's time at Bank United is provided by Confidential Witness 2, who worked as Vice President at Bank United.  As detailed further in ¶117, CW2 worked closely with both Ranieri and Nocella at Bank United and Franklin Bank.

public offering on December 23, 2003 and received net proceeds of $140.2 million.   In the

Prospectus filed by the Company with the SEC on December 18, 2003, Defendants Ranieri and

Nocella were described as key assets of Franklin Bank.   The Prospectus stated:

> Our Chairman and senior management team have extensive
> experience building high quality, profitable financial services
> franchises in our niche products.   Our Chairman, Lewis S. Ranieri,
> and our President and Chief Executive Officer, Anthony J. Nocella,
> are the former Chairman and Vice Chairman/ Chief Financial Officer,
> respectively, of Bank United Corp., which successfully employed an
> asset strategy similar to ours.   Additionally, most of our executive
> management, including the heads of three of our four main product
> lines, and most of our senior employees, worked together at Bank
> United Corp.

Franklin Bank Prospectus December 18, 2003 at page 1.

40.      The Prospectus also highlighted Ranieri's extensive experience, referring to him as

the "father" of the securitized mortgage market and an "expert" in the mortgage and capital markets:

> LEWIS S. RANIERI.   Mr. Ranieri is our Chairman and has been a
> director since we were founded in 2001.   He is the prime originator
> and a founder of the private investment limited partnerships of
> Hyperion Partners L.P. and Hyperion Partners II L.P ("Hyperion") and
> chairman and/or director of various other entities owned directly and
> indirectly by Hyperion. He is also Chairman and Director of Hyperion
> Capital Management, Inc., a registered investment advisor.   Mr.
> Ranieri also serves as Chairman, Chief Executive Officer and
> President of Ranieri & Co., Inc., a private investment advisor and
> management corporation, as well as Chairman of Five Mile Capital
> Partners LLC, a sponsor and manager of private investment funds. He
> previously served as Chairman and Director of Bank United Corp., a
> publicly-held savings and loan holding company headquartered in
> Houston, Texas, from its inception in 1988 until its merger with
> Washington Mutual, Inc. in February 2001.
>
> Prior to forming Hyperion Partners L.P., Mr. Ranieri was Vice
> Chairman of Salomon Brothers, Inc. and is generally considered by
> many to be the "father" of the securitized mortgage market. Mr.
> Ranieri helped develop the capital markets as a source of funds for
> housing and commercial real estate, established Salomon Brothers'

leadership position in the mortgage-backed securities area, and also led the effort to obtain federal legislation to support and build the market. At Salomon Brothers, Mr. Ranieri had responsibility for the firm's activities in the mortgage, real estate and government-guaranteed areas. Regarded as an expert and innovator in both the mortgage and capital markets, Mr. Ranieri has served on the National Association of Home Builders Mortgage Roundtable continuously since 1986. In recognition of his dedication and lifelong achievements in the housing industry, Mr. Ranieri was inducted into the National Housing Hall of Fame. He is also a recent recipient of the lifetime achievement award given by the Fixed Income Analysts Society, Inc., and was subsequently inducted into their Hall of Fame for outstanding practitioners in the advancement of the analysis of fixed income securities and portfolios.

Franklin Bank Prospectus December 18, 2003, pages 94-95.

41.     Consistent with the Defendants strategy and experience from Bank United, Franklin Bank grew very rapidly as a result of its aggressive growth. From 2002 until 2007, total assets increased 1,461% from $365 million to $5.7 billion, total deposits increased 1,493% from $182 million to $2.9 billion, and total loans increased 1,236% from $306 million to $4.09 billion.

42.     In 2002, Franklin Bank had two branches. As of December 31, 2006, in addition to its corporate offices in Houston, Texas, where it provided many of its banking services, the Company had 38 community banking offices in Texas, seven regional commercial lending offices in Florida, Arizona, Michigan, Pennsylvania, Colorado, California, Washington D.C., and mortgage origination offices in 19 states throughout the United States.

**B.      Materially False And Misleading Statements Issued During the Class Period**

43.     Throughout the Class Period, Defendants made statements to the market which included, though were not limited to, SEC filings, press releases, comments during analyst conference calls and information set forth on the Company's website. As an initial matter, *it is critical to note that despite Defendants' repeated statements that the Company's financial statements*

*were prepared in accordance with GAAP and Regulation S-X, and that the Company possessed internal and reporting controls and procedures sufficient to insure the material accuracy of its financial statements, they now concede that the financial statements issued by the Company for 2006 and 2007 were false and misleading, contained material errors, and were prepared without adequate internal accounting controls.* These facts are not in dispute.

44.     The Class Period begins on January 31, 2007, with the Company filing a Form 8-K with the SEC and issuing a press release announcing the Company's earnings for fiscal year 2006. According to the Form 8-K and the press release detailing the purported results for 2006, the Company's adjusted net income available to common stockholders was $15.5 million, an amount which included interest income from loans of $264.9 million, net interest income of $88.9 million after provision for credit losses of $3.8 million, and non-interest expense from real estate owned of $1.5 million. Additionally, the press release states that Company assets were $5.5 billion, including loans held for investment of $4.0 billion. Further, the Company reported stockholders equity of $433 million, including $67 million of retained earnings. Each of these numbers was repeated in the Company's 2006 Form 10-K filed with the SEC on March 14, 2007, and signed by each of the Defendants. These financial statements were subject to a restatement contained in a Form 8-K issued on August 6, 2008. Thus, there is no dispute that the financial statements presented in the 2006 Form 10-K, including those items identified above, were materially misstated.

45.     During a January 31, 2007 conference call discussing these now admittedly false results, Nocella stated,

> earnings were lower than our expectations for the year primarily as a result of the inverted yield curve and our continued unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market.

-20-

46.     Furthermore, in response to the following question from analyst Jon Arfstrom, Nocella stated,

> Arfstrom:  Okay and just to be clear these - some of the more exotic products are not going on your balance sheet, you just take them in your warehouse and sell them?
>
> Nocella:  Yeah and we know that we never had anything like that but that's - we sell them if we ever do anything except for sale, we'd probably broker it through in fact, it wouldn't even touch our balance sheet.

47.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, the Company's Form 10-K for fiscal year 2006 contained sworn certifications, signed by Defendants Nocella and McCann, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Nocella and McCann each certified that:

1.     I have reviewed this Annual Report on Form 10-K of Franklin Bank Corp.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

-21-

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.    Additionally, Defendants Nocella and McCann each executed the Certification of CEO and CFO Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attests:

In connection with the Annual Report of Franklin Bank Corp. (the "Company") on Form 10-K for the prior period ending December 31, 2006 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

49.      As Chairman of the Board, Defendant Ranieri also signed the Company's Form 10-K.

50.      The statements in the Company's January 31, 2007 press release, conference call, and its 2006 Form 10-K were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)      the Company's income, assets and shareholders equity were materially overstated;

(b)      the Company's financial statements were not prepared in accordance with GAAP;

(c)      the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP;

(d)      the sworn Sarbanes-Oxley certifications signed by Nocella and McCann were plainly false for the reasons set forth in subparagraphs (a) through (c); and

(e)      the statements contain no disclosure of the Company's exposure to higher-risk non-traditional mortgage markets.

51.      On April 26, 2007, the Company filed its Form 8-K with the SEC and issued a press release announcing the Company's earnings for the first quarter of 2007. According to the Form 8-K and press release detailing the purported results for 2007, the Company's adjusted net income available to common stockholders was $6.2 million, an amount which included interest income from loans of $70 million, net interest income of $21.5 million after provision for credit losses of $615,000 and non-interest expense from real estate owned of $521,000. Additionally, the press release states that Company assets were $4.85 billion, including loans held for investment of $3.9 billion. Further, the Company reported stockholders equity of $440 million, including $72 million

of retained earnings. Each of these numbers was repeated in the Company's 2007 Form 10-Q filed with the SEC on May 1, 2007. These financial statements were subject to the restatement contained in the Form 8-K filed August 6, 2008. Thus, there is no dispute that the financial statements presented in the 2007 first quarter Form 10-Q, including those items identified above, were materially misstated.

52.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, the Company's Form 10-Q for the first quarter of 2007 contained sworn certifications, signed by Defendants Nocella and McCann, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Nocella and McCann each certified that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Franklin Bank Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

        (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

-24-

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53.    The statements in the Company's April 26, 2007 press release and its Form 10-Q for the first quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    that the Company's income, assets and shareholders equity were materially overstated;

(b)    that the Company's financial statements were not prepared in accordance with GAAP;

(c)    that the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the

accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP;

(d)    the sworn Sarbanes-Oxley certifications signed by Nocella and McCann were plainly false for the reasons set forth in subparagraphs (a) through (c); and

(e)    the statements contain no disclosure of the Company's exposure to higher-risk non-traditional mortgage markets.

54.    On July 24, 2007, the Company filed its Form 8-K with the SEC and issued a press release announcing the Company's earnings for the second quarter of 2007. According to the Form 8-K and press release detailing the purported results for the second quarter of 2007, the Company's adjusted net income available to common stockholders was $7.1 million, an amount which included interest income from loans of $72.8 million, net interest income of $24.8 million after provision for credit losses of $907,000 and non-interest expense from real estate owned of $406,000. Additionally, the press release states that Company assets were $5.5 billion, including loans held for investment of $4.1 billion. Further, the Company reported stockholders equity of $470 million, including $79 million of retained earnings. Each of these numbers was repeated in the Company's 2007 Form 10-Q for the quarter ending June 30, 2007 filed with the SEC on August 9, 2007. These financial statements were restated in a Form 8-K filed August 6, 2008. Thus, there is no dispute that the financial statements presented in the Form 10-Q for the second quarter of 2007, including those items identified above, were materially misstated.

55.    During a July 25, 2007 conference call discussing these results, Nocella, during the question and answer session with analyst Paul Miller, stated,

> Miller: Hey listen can just a more general question. I missed the first 5 minutes of the call so you might have addressed this, but you saw Countrywide's numbers come out yesterday. They are starting to show some trouble. Like I said, you have been through a lot of cycles and I think this cycle has been defined as very sloppy underwriting,

very easy credit. Are we starting to see some subprime issues? I mean how do you think this cycle is going to play out and, how long do you think it's going to play out?

Nocella: Yeah let me do two things. For the Countrywide side, this is not a Countrywide call, but I would say HELOCs are not a business, first of all I don't think we even had it to our home equity line of credit. That's not our business and you probably know in Texas there is an 80% loan-to-value law for home equity loans. So the circle of 100% home equities and let alone securitized home equities, we don't have any of that but as far as it playing out I think what you are seeing for the first time - at least in his write up, Angelo's write up, was an increase in the prime side of business and I would say that we are, you are seeing some delinquency increase, which I would say it really doesn't make any sense because you are talking about solid 80% loan-to-value even down to 70, 70% loan-to-value with 700 FICO scores from time-to-time being delinquent and I would think that is completely new. I mean it's like cultural difference. And I don't know if that's what Angelo was talking about with the prime side, but on a sort of steady state basis you know, we are running about delinquencies, which are substantially lower than his level, than the level he talked about in the prime side. **We don't have any subprime so I don't know.**

**Miller: No I know you've been very - I think you guys have been one of more conservative underwriters out there. I remember having many discussions with you where you didn't touch this Alt-A stuff and what not but we're concerned more about if this started leaking into the prime could we be going into a credit cycle?**

Nocella: I don't know. I mean, I listen to what he has - - He has such a better database, you know, although our database if you cross the United States in terms of this, the $2 billion we put on it back in '04 and '05, I mean that, those loans that you are looking at they're just a little bit every place. So I, we are not seeing it as significant as he sees it. But remember he did, **Countrywide did pay option ARMs which, you know, Neg-AM and they secondly did a lot of simultaneous seconds, that's 100% CLTVs. They are two characteristics that we stayed away from.**

(Emphasis Added).

56.     In this analyst call, Defendant Nocella stated "we don't have any subprime" when at that very moment, as later discovered by the FDIC and as revealed in the Wolfe letter, Franklin Bank had an "array" of subprime mortgages in its portfolio. Even further, Franklin Bank was manipulating its financial statements and loan documentation to hide the fact that the subprime in its portfolio was performing very poorly. Rather than correct analyst Miller's statement that Franklin Bank had been one of the more "conservative underwriters out there," Defendant Nocella reinforced this misconception. Lastly, Franklin Bank loaned money to Countrywide via its Mortgage Banker Finance Group and took the mortgages created by Countrywide as its own collateral, yet Nocella completely discounted any shared experience with Countrywide.

57.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, the Company's Form 10-Q for the second quarter of 2007 contained sworn certifications, signed by Defendants Nocella and McCann, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Nocella and McCann each certified that:

1.     I have reviewed this Quarterly Report on Form 10-Q of Franklin Bank Corp.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

-28-

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.     The statements in the Company's July 24, 2007 press release, July 25, 2007 conference call, and its Form 10-Q for the second quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)     the Company's income, assets and shareholders' equity were materially overstated;

(b)     the Company's financial statements were not prepared in accordance with GAAP;

-29-

(c)     the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP;

(d)     the sworn Sarbanes-Oxley certifications signed by Nocella and McCann were plainly false for the reasons set forth in subparagraphs (a) through (c);

(e)     the statements contain no disclosure of the Company's exposure to higher-risk non-traditional mortgage markets; and

(f)     the Company allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring, and controls.

59.     On October 29, 2007, the Company filed its Form 8-K with the SEC and issued a press release announcing the Company's earnings for the third quarter of 2007. According to the Form 8-K and press release detailing the purported results for the third quarter of 2007, the Company's income available to common stockholders was $7.5 million, an amount which included interest income from loans of $74.3 million, net interest income of $24.8 million after provision for credit losses of $2.5 million, and non-interest expense from real estate owned of $540,000. Each of these numbers was repeated in the Company's Form 10-Q for the quarter ending September 30, 2007 filed with the SEC on November 8, 2007. These financial statements were restated in a Form 8-K filed August 6, 2008. Thus, there is no dispute that the financial statements presented in the third quarter Form 10-Q, including those items identified above, were materially misstated.

60.     During the October 30, 2007 conference call discussing these results, Nocella, during the question and answer session with analyst James Ellman, stated,

> Ellman: All right, if I could be clear on this. If the real estate market continues to deteriorate so your factors and your models deteriorate so you need to keep a higher amount. If you have to take a higher amount because the market deteriorates, you would take a larger provision and you would call that non-core again?

-30-

Nocella: No we will not.

Cooper: No.

Nocella: Our core loss provision, the way we've done it, our loss provision is based on the factors in the markets that we serve and the deterioration in the markets. Our example, let me just give you an example on our single-family. What we will do is take each subdivision or each marketplace, we will multiply the default times 2.5. Then we will multiply the expected default percentage in that marketplace times 25%. And then we divide that into the factors and that is our balance. We do that basically on a quarterly basis to establish the severity risk of our portfolio and that is how we get our factors. So the deterioration in the marketplace, I think we are pretty darned up-to-date.

61.     Further, during the October 30, 2007 conference call, Nocella and McCann, during the question and answer session with analyst Kris Dillon, stated,

Dillon: Okay. And can you comment on your outlook for loan loss reserves? I know it stands at about 42 basis points of loans right now. What level are you comfortable with and whether there's a target ratio that you're looking for?

Nocella: Yes. I think during the talk we mentioned the factors. Russell? Do you want to handle that?

McCann: Yeah. I think you've got to break it down into our various portfolios. If you look at our single family, right now we have 20 basis points versus that. That's a pretty comfortable level given the characteristics of our portfolio.

62.     Analyst Bruce Allen engaged in the following discussion with Nocella and McCann during the October 30, 2007 conference call,

Good morning gentlemen, thanks for taking the call. I had a couple of questions about the mortgage book and I wanted to understand that a little bit better. I guess maybe first high level if you could just give me some kind of qualitative on the mix of your book fixed floating, GSC eligible and then follow it up with in what percent were originated your correspondence channel and your wholesale channel?

What I'm trying to drive at there is the underwriting and may be any differential performance in those loans?

Nocella: Okay while I'll lap some parts. They are a very, very small percentage less than 1% of the portfolio would it been originated through a wholesale channel. Any loans originated for the wholesale channel generally were sold into the secondary market. So most of the loans in the portfolio were for their corresponding purchases.

McCann: And the correspondence that we're talking about large banks such as Wells Fargo, Bank of America Chase, Countrywide that too originated and we only originated prime level lending. Basically the metrics in the system are 72% loan to value, the FICO scores are approximately 715 across the board, and so very good.

Nocella: And when we purchase these loans, we have a credit model that we would run these loans through. So it really looks at all factor of the loans LTV, tax income, whether its phased income or full income or full dart. And we take all those factors into place and then we run some valuation models behind that and then from there we'll pull out for what the loans we'll do full due diligence on it.

63.    Finally, during the October 30, 2007 conference call, Nocella and McCann,  during

the question and answer session with analyst Brian Klock, stated

Klock: Okay, okay. And I know the question has been asked a few times, too, about the reserve level and I guess when you think about it, I think, Russell, you said 20 basis points is what - - is your factor for the one to four family portfolio. I mean, I guess when you look at your portfolio doesn't have as long a history as say the Washington Mutual does because of your short history as a public company. But their third quarter, their prime mortgage loan portfolio one to four family had charge-offs of 21 basis points.

McCann: Yeah. That was a bummer for them but I don't think you can compare our portfolio to Washington Mutual's. **If you really look at what Washington Mutual's portfolio did, they did pay option ARMs and a large amount. They did a large amount of subprime. You know we don't have any of those in a portfolio.**

**Nocella: I refuse to put it inside. There's almost hardly any loans in their portfolio that met our screen.**

-32-

(Emphasis Added).

64.     In the October 30, 2007 analyst conference call, Defendant Nocella stated that Franklin Bank's loss provision for single-family loans is "pretty darned up-to-date" and that no additional loss provisions will be necessary even if the housing market deteriorated further. In reality, fact that and as discovered by the FDIC, discussed by Wolfe and included in the eventual restatement was the Franklin Bank "incorrectly and perhaps deliberately overstated the value of certain Non-Performing Assets and failed to disclose the existence of others to obfuscate the extent of certain losses that the Bank had suffered or expected to suffer."

65.     In that same call, Defendant McCann stated that Franklin Bank does not "have any of those [pay option ARMs] in a portfolio." The FDIC discovered that at the very time Nocella made this statement, Franklin Bank's "lending program included . . . payment option adjustable rate mortgages."

66.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, the Company's Form 10-Q for the third quarter of 2007 contained sworn certifications, signed by Defendants Nocella and McCann, respectively, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, Defendants Nocella and McCann each certified that:

1.      I have reviewed this Quarterly Report on Form 10-Q of Franklin Bank Corp.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition,

-33-

results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

67.    The statements in the Company's October 29, 2007 press release, the October 30, 2007 conference call, and its Form 10-Q for the third quarter of 2007 were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    the Company's income, assets and shareholders' equity were materially overstated;

(b)    the Company's financial statements were not prepared in accordance with GAAP;

(c)    the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP;

(d)    the sworn Sarbanes-Oxley certifications signed by Nocella and McCann were plainly false for the reasons set forth in subparagraphs (a) through (c);

(e)    the statements contain no disclosure of the Company's exposure to higher-risk non-traditional mortgage markets;

(f)    the Company allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring, and controls; and

(g)    there was no disclosure that Countrywide Financial had defaulted on its line of credit.

## FRANKLIN BANK ANNOUNCES NEED FOR ADDITIONAL ALLOWANCE FOR CREDIT LOSSES

68.    On November 26, 2007, the Company issued a press release and filed a Form 8-K stating,

Franklin Bank Corp. the parent company of Franklin Bank, S.S.B., announced that in response to unprecedented market condition changes in the past few weeks, management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors.

Such evaluation and review included, among other things but not limited to, an analysis of recent market value deterioration of housing by geography, increased Chapter 11 protection filings of national home builders, and worsening liquidity in the mortgage markets.

As a result of such evaluation and review, Franklin elected to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax). This increase is over and above Franklin's annual credit costs. Franklin's management anticipates credit costs for the commercial loan portfolio to range between $5.0 million to $7.5 million for 2008 and believes these actions should ensure the level of future earnings, as annual credit costs will be limited to expected levels within its guidance.

Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91%. The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while the overall commercial loan reserve will increase from 0.61% to 1.33%. Franklin Bank's regulatory capital will remain in excess of the regulatory "well capitalized" requirements.

Real Estate Owned has been marked to market and is carried at net realizable value. This includes selling costs and is not related to the above reserves. Franklin anticipates Real Estate Owned to decrease by year end. Non-performing loans, both existing and potential, were part of the evaluation of Franklin's loan portfolio and are believed to be adequately collateralized, including the costs of acquisition and sale.

Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.

In addition, while conducting the evaluation and review described above, Franklin discovered that four loans related to one borrower totaling $13.5 million should have been categorized in the third quarter Form 10-Q as troubled debt restructurings. As a result, Franklin will revise certain disclosures and file an amendment on Form 10-Q/A to reflect treatment of such loans as troubled debt restructurings. Although this change will increase reported amounts of investment in impaired loans and the allowance for impaired loans, it will not result in any change to reported net income for the period covered by the report.

69.     During a November 26, 2007 conference call Defendants Ranieri and Nocella made the following opening remarks:

Ranieri: Thank you, Tony. My name is Lewis Ranieri and good morning. As you know, the subprime crisis has spread to other sectors of the housing market. Liquidity in the big banks is considerably strained and the mortgage market is struggling to provide adequate financing to all sectors, and even the agency sector this time around is being affected. This is having a significant effect on housing and builders. Home sales are close to historic lows. Housing values have decline significantly in many markets, and as a result, some builders are experiencing liquidity squeeze. And a number of builders, as we stated in our press release, are choosing to file bankruptcy.

We have had two of our builders file bankruptcy in the last couple of weeks. Fortunately, we are - - and we have looked at this hard, **we remain well collateralized in those two positions even after the market declined.** But nonetheless, it is a troubling eventuality. We have evaluated these changes relative to the potential risk inherent in our portfolio and as a result of these changing market conditions have concluded that we are going to increase reserves by approximately $20 million.

**We believe this action that we are taking will ensure the level of future earnings, as the annual credit cost should be limited to the expected levels within our guidance.** What we are trying to do here, **we believe we are adequately reserved,** we have looked at this very hard. But given the circumstances and I will be happy to elaborate on this later that we are seeing, we are trying within the confines of the what the accounting literate will allow us to do. Take this whole issue of the institution's mortgage portfolio, and its lending to builders off the table with the reserve that will carry us not for a period, but into the future because frankly management and the Board does not want to have to do this again.

**These are obviously difficult times, but I and the management are very experienced in this. We have gone through these cycles before. I think you know our backgrounds and we believe that we can shepherd this institution through this cycle as we have done others and do the best for we, the shareholders.**

Nocella: Well, thanks, Lew. I am now going to discuss how we changed our reserve methodology as a result of recent changing market conditions. First, we stretched our entire portfolio using a number of characteristics. We evaluated the builder loan portfolio by

geography in sub markets. We forecast a level of foreclosures to fall and market declines by market. For example, in some markets we estimated as high as a 50% decline in value from appraised values and a 50% default rate and included estimated sales cost as part of the valuation. Then we added a 75 basis point reserve to the allowance, which we have targeted at the estimated reserve level under normal conditions which we commented on - - during the third quarter conference call. We used qualitative factors according to the Financial Accounting Standard No. 5 and peer group data for builder finance, banks, and mortgage originator banks to establish this level of reserves.

We believe that our forecast charge-offs will be limited to our loss factors embedded in our guidance calculations. We estimate commercial loan credit cost in 2008 to be between 5 million and $7.5 million. This means that we should have three to four years of reserves. We evaluated our entire portfolio and increased our reserves for the commercial loan portfolio to 1.33% from 61 basis points and the reserves on a single family portfolio to 43 basis points from 20 basis points.

Our builder finance reserves will stand at 1.72%. Secondly, we tested this result by stretching individual loans by geographies. We stretched the loans by up to 45% of current appraised value, including selling costs of underlying collateral. Then we added 75 basis points against the builder book-of-business. In effect, we boxed the reserves using the peer group data, portfolio aggregate stress test, and an individual loan stress test. The rest of our portfolio was also stressed, for example, the single-family portfolio against qualitative factors to build the reserve levels and help safeguard future earnings levels.

(Emphasis Added).

70.    In the same conference call, Defendants took questions from analysts. In responding, Ranieri emphasized the Company's financial stability stating "we remain well capitalized by all standards." Ranieri went on to emphasize the importance of the experience of management and the board of directors,

we remain well capitalized by all standards

* * *

> The credit committee of the Board - the Board reviews credits. The
> credit committee of the Board meets a number of times every month,
> and it's been doing that since only like the last December. Actually
> before that. But so we meet multiple times month. And we also
> instituted a process where in those meetings, we don't just review
> credits that we are being asked to applying on, we actually go back
> and review what we call, and this is not a legal term, this is a watch
> list, credits that we put on list because we want to watch them, either
> because of markets or absorption or whatever reason, okay?

71.     Ranieri summarized his role as Chairman of the Board as follows: "We don't run this
as sort of employment center for management and board. The object here is for shareholders, me
included." Later in the call, Ranieri stated "my job is to guard the place."

72.     The statements in Franklin Bank's November 26, 2007 press release, the conference
call, and the Form 8-K were materially false and misleading because they failed to disclose and
misrepresented the following adverse facts:

(a)     that Franklin Bank's income, assets and shareholders' equity were materially
        overstated in the 2006 Form 10-K and the Forms 10-Q for each of the first 3Q's of
        2007;

(b)     that the Company's financial statements were not prepared in accordance with
        GAAP;

(c)     that the internal controls at the Company were inadequate because, at a minimum,
        they failed to cause proper accounting for Delinquent Loan Accounting, REO
        Accounting and Loan Modification Accounting, investment securities, and the
        accounting for monthly increases in the cash surrender value of certain bank-owned
        life insurance, which was in violation of GAAP;

(d)     its massive exposure to delinquent loans served by Countrywide Financial, including
        subprime loans, under a warehouse credit line;

(e)     the statements contain no disclosure of the Company's exposure to higher-risk non-
        traditional mortgage markets;

(f)     the Company allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring, and controls.; and

(g)     there was no disclosure that Countrywide Financial had defaulted on its line of credit.

73.     On December 20, 2007, the Company filed its Form 10-Q/A amending its prior third quarter 2007 filing. Net income was not modified in the amended filing, but as noted by JP Morgan in a research report dated the same day, "while the addition of these loans is NOT new news . . . mgmt noted that the $13.5 mil will also be classified as NPLs. This is new information and adversely alters Franklin's reserve coverage and NPA outlook, in our view."

74.     The statements in Franklin Bank's Form 10-Q/A were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)     that Franklin Bank's income, assets and shareholders equity were materially overstated in the 2006 Form 10-K and the Forms 10-Q for each of the first three quarters of 2007;

(b)     that the Company's financial statements were not prepared in accordance with GAAP;

(c)     that the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP;

(d)     its massive exposure to delinquent loans served by Countrywide Financial, including subprime loans, under a warehouse credit line; and

(e)     the statements contain no disclosure of the Company's exposure to higher-risk non-traditional mortgage markets.

75.     On January 31, 2008 the Company issued a press release revealing,

> During the fourth quarter of 2007 we significantly increased our allowance for credit losses by approximately $23.5 million. While this increase obviously had a negative impact on our quarterly and

-40-

yearly earnings, it was necessary and prudent given the turmoil in the housing markets nationwide, which has negatively impacted our home builder customers and many single family borrowers. We believe that this action better positions us to weather the current challenging economic environment," remarked Anthony J. Nocella, President and CEO of Franklin Bank Corp. "We also recorded a $65.0 million goodwill impairment as a result of our low stock price which has been driven by these current market conditions. Franklin Bank continues to be well capitalized under all regulatory capital requirements," Nocella added.

76.     The January 31, 2008 press release further discloses that,

Franklin increased its allowance for loan losses by $23.5 million to $40.3 million at December 31, 2007 from $16.8 million at September 30, 2007. The increase is primarily the result of additional reserves recorded in the fourth quarter based on Franklin's previously announced evaluation of its loan portfolio and a review of appropriate qualitative factors given the unprecedented market conditions prevalent in the industry nationwide. The $29.2 million provision for credit losses recorded during the fourth quarter consisted of $19.6 million for commercial and consumer loans and $9.6 million for single family loans. For 2007, Franklin increased its allowance for loan losses by $28.7 million, or 3.1 times net charge-offs of $9.2 million for the year. Net charge-offs for 2007 were 0.21% of average outstanding loan balances.

77.     The statements in the Company's January 31, 2008 press release, and related Form 8-K were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)     the Company's income, assets and shareholders' equity were materially overstated in the 2006 Form 10-K and the Forms 10-Q for each of the first three quarters of 2007;

(b)     the Company's financial statements were not prepared in accordance with GAAP;

(c)     the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for

-41-

monthly increases in the cash surrender value of certain bank-owned life insurance, which was in violation of GAAP; and

(d)     the statements contain no disclosure of the Company's exposure to higher risk non-traditional mortgage markets, including subprime loans originated by the Company and warehouse lines of credit which included subprime loans; and

(e)     there was no disclosure that Countrywide had defaulted on its line of credit.

78.     In a press release dated March 14, 2008 and related Form 8-K, Franklin Bank announced

that it will delay its filing its Annual Report on Form 10-K for the year ended December 31, 2007. In February 2008, the Company's Board of Directors learned of possible accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned that could affect the Company's 2007 financial statements. Upon learning of these matters, the Company's Audit Committee commenced an independent internal investigation into these issues with the assistance of independent legal and accounting advisors.

The Audit Committee's investigation is not yet complete. The Company and the Audit Committee are working diligently to complete the review and to finalize and file the Form 10-K as promptly as possible.

At this time, Franklin is unable to estimate the potential accounting effects that might result from the investigation. However, Franklin does not believe that the expected results of the investigation will affect the status of Franklin Bank, S.S.B., Franklin's banking subsidiary, as a "well capitalized" institution under regulatory guidelines.

79.     The statements in the Company's March 14, 2008 press release and related Form 8-K were materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

-42-

(a)  the Company's income, assets and shareholders' equity were materially overstated in the 2006 Form 10-K and the Forms 10-Q for each of the first three quarters of 2007;

(b)  the Company's financial statements were not prepared in accordance with GAAP;

(c)  the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, Investment Securities, and the accounting for monthly increases in the Cash Surrender value of certain bank-owned life insurance, which was in violation of GAAP; and

(d)  the statements contain no disclosure of the Company's exposure to higher risk non-traditional mortgage markets, including warehouse lines of credit which included subprime loans; and

(e)  there was no disclosure that Countrywide had defaulted on its line of credit.

80.  On March 26, 2008, Franklin Bank issued a press release and related Form 8-K announcing

> that it has received a letter from the staff of The American Stock Exchange ("AMEX") indicating that Franklin is not in compliance with AMEX Rules 134 and 1101 of the continued listing standards due to the previously announced delayed filing of its annual report on Form 10-K for the year ended December 31, 2007. The AMEX letter requires Franklin to submit a plan by April 3, 2008, advising AMEX of any action Franklin has taken, or will take, to file its Form 10-K for the year ended December 31, 2007, and bring Franklin into compliance by no later than June 17, 2008. Franklin intends to submit a Plan to AMEX by April 3, 2008.

81.  On April 4, 2008, the Company issued a press release and filed a Form 8-K announcing

> that, on April 3rd, it submitted a plan, as required, to The American Stock Exchange ("AMEX") advising AMEX of action Franklin has taken, or will take, to file its Form 10-K for the year ended December 31, 2007, and bring Franklin into compliance by no later than June 17, 2008.

-43-

82.     On April 22, 2008, the Company issued a press release and filed a Form 8-K

announcing

> that the AMEX had accepted the Company's plan to bring it into
> compliance with the AMEX Company Guide and the Company's
> listing agreement (the "Plan"), which Plan had anticipated a delay in
> the Company's filing its Form 10-Q. Subject to the Company
> complying with and making progress under the Plan, the AMEX
> granted the Company an extension until June 30, 2008 to file the
> Form 10-K and until July 31, 2008 to file the Form 10-Q. Provided
> that the Company complies with the Plan and makes progress under
> it, the AMEX will continue to list the Preferred Stock pursuant to
> such extension until July 31, 2008.
>
> The Company is scheduled to appear before the Nasdaq Listing
> Qualifications Panel (the "Panel") on May 22, 2008 to present its
> arguments for continued listing of the Company's common stock
> pending the filing of the Company's Form 10-K and Form 10-Q. The
> NASDAQ Letter provides that the Panel will consider the Additional
> Deficiency in rendering a determination regarding the continued
> listing of the Company's common stock. Pursuant to the NASDAQ
> Letter, the Company must present its views with respect to the
> Additional Deficiency at its Panel hearing for such views to be taken
> into consideration by the Panel in rendering its determination. the
> Company will present its views with respect to the Additional
> Deficiency.
>
> The Bank is required to submit to the FDIC, on a quarterly basis, its
> Consolidated Reports of Condition and Income, referred to herein as
> "call reports." Amendments to previously filed call reports are
> required by the FDIC when changes to the previously filed versions
> become known. The Bank's call reports are prepared in accordance
> with instructions issued by the Federal Financial Institutions
> Examination Council and include a balance sheet, income statement,
> changes in equity capital and other supporting schedules as of the end
> of the period covered by each call report.
>
> The financial results reported in the Bank's call reports submitted to
> the FDIC reflect the operations of the Bank only, and do not include
> holding company operations of Franklin. In addition, financial
> information contained in the Bank's call reports is unaudited and has
> not been reviewed by the Company's independent accountants. As
> previously reported, the Company's filing of its annual report on

-44-

Form 10-K, including its audited financial statements, for the year ended December 31, 2007, has been delayed. While the Bank's call reports submitted on July 1, 2008 reflect the best information available as of the time of their submission, the information in the Bank's call reports is subject to possible revision in connection with the audit of the Company's financial statements since the books and records of the Company for 2007 have not yet been closed. Accordingly, the information contained in the Amended September Call Report, the Amended December Call Report and the Amended March Call Report is subject to these and the other qualifications contained in this press release.

83.     On May 1, 2008, Franklin Bank issued a press release and filed a Form 8-K

announcing

that it had submitted to the Federal Deposit Insurance Corporation (the "FDIC") its call report for the quarter ended March 31, 2008. In addition, the Bank also submitted to the FDIC amended call reports for the periods ended September 30, 2007 and December 31, 2007.

* * *

As previously reported, the Company's filing of its annual report on Form 10-K for the year ended December 31, 2007 has been delayed. Based on Franklin's ongoing review and evaluation of its 2007 financial statements, certain changes to the Bank's previously submitted call reports are necessary.

The findings requiring the amendments to the Bank's call report for the period ended September 30, 2007 will result in an amendment of the Company's Form 10-Q previously filed for that period (the "September Form 10-Q"). Accordingly, the information contained in the September Form 10-Q should no longer be relied upon. Franklin will file an amended Form 10-Q for the quarter ended September 30, 2007 as soon as practicable.

**FRANKLIN BANK ANNOUNCES RESTATEMENT**

84.     On May 19, 2008, Franklin Bank issued a press release and filed a Form 8-K

announcing

-45-

that the Audit Committee of its Board of Directors has completed its previously announced independent investigation into certain accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned that had been brought to the Board's attention in mid-February 2008. The Audit Committee was assisted in its investigation by Baker Botts L.L.P., independent legal counsel. Baker Botts L.L.P. retained an independent accounting firm to advise on accounting matters.

During the course of its 10-week investigation, which was limited to a review of specified areas of the Company's single family residential business, the Audit Committee conducted numerous interviews, reviewed email records for selected periods, and analyzed other documents and information provided by the Company. The Audit Committee identified, among other things, a number of accounting errors in the areas described below:

(1)     Franklin did not properly account for certain single family mortgage loan modification programs developed and implemented as part of an effort to reduce delinquencies and mitigate foreclosure losses.

(2)     Franklin did not charge off certain uncollectable single family second lien loans.

(3)     Franklin did not record, and in some instances did not write-down, certain Real Estate Owned (REO) and in-substance foreclosures in connection with foreclosures in its single family mortgage portfolio.

(4)     Franklin did not properly record certain mark-to-market writedowns on loans transferred from "Held for Sale" to "Held for Investment."

Franklin is in the process of completing the adjustments necessary to correct any of the above accounting errors that were not previously corrected in the call reports submitted by Franklin Bank, S.S.B. on April 30, 2008 as reported by Franklin on May 1, 2008.

85.     In addition, the May 19, 2008 press release further announced,

-46-

> Anthony J. Nocella, Franklin's current Chief Executive Officer, will accelerate his personal plans to retire. Mr. Nocella, a founder and director of Franklin since 2002, will continue as a director of Franklin and will continue to serve as Chairman of the Bank. Through his membership on the Executive Committee of the Bank, as described below, Mr. Nocella will continue in a consultative capacity to assist Franklin until his retirement by December 31, 2008.

86.     As evidenced by the testimony of the confidential witnesses herein, Nocella was in fact terminated and did not simply "accelerate" his retirement. The May 19, 2008 press release further advised that,

> Franklin has been in communication with the FDIC and the Texas Department of Savings and Mortgage Lending ("TDSML") regarding the investigation and related matters. Franklin will continue to cooperate with the FDIC, the TDSML and other agencies.
>
> Franklin reported the commencement of the Audit Committee investigation to the Enforcement Division of the U.S. Securities and Exchange Commission ("SEC"), which has commenced an informal inquiry into the disclosure, accounting and other issues that were investigated. Franklin intends to cooperate fully with the SEC. The SEC's inquiry is ongoing, and there can be no assurance that there will not be additional issues or matters arising from that inquiry.

87.     Finally, the May 19, 2008 press release stated,

> Franklin is working diligently to complete and file its Form 10-K for the fiscal year ended December 31, 2007 and to amend and restate its Form 10-Q for the quarterly period ended September 30, 2007. The timing of these filings is uncertain.
>
> Subject to review of a written plan for the execution of the steps described above to be prepared by Franklin's Board of Directors, Deloitte & Touche, Franklin's independent accountant, is expected to resume the audit of Franklin's financial statements for 2007 so that Franklin's Form 10-K for that year may be completed and filed with the SEC. Preparation of the Form 10-Q for the three months ended March 31, 2008 is expected to begin following completion of the

audit of Franklin's financial statements for 2007. No prediction can
be made at this time as to the completion date for such reports.

88.     On May 20, 2008, the Company issued a press release and filed a Form 8-K

announcing

that on May 14, 2008, the Company received an Additional Staff
Determination letter (the "NASDAQ Letter") from the Listing
Qualifications Staff of The NASDAQ Stock Market (the
"NASDAQ") in connection with the Company's failure to file its
Quarterly Report on Form 10-Q for the period ended March 31, 2008
(the "Form 10-Q") with the Securities and Exchange Commission
(the "SEC") as required by NASDAQ Marketplace Rule 4310(c)(14).
The Company's common stock trades on the Nasdaq Global Select
Market. Additionally, on May 15, 2008,   the Company received a
letter (the "AMEX Letter") from the staff of The American Stock
Exchange (the "AMEX") in connection with the Company's failure
to file its Form 10-Q as required by Sections 134 and 1101 of the
AMEX Company Guide and its listing agreement. As set forth in both
the NASDAQ Letter and AMEX Letter, the Company's failure to file
the Form 10-Q serves as an additional basis for delisting   the
Company's common stock and Preferred Stock, respectively (the
"Additional Deficiency").

89.     On July 23, 2008, the Company Bank issued a press release and filed a Form 8-K

announcing

it had [] received a letter from the NASDAQ Stock Market
("Nasdaq") indicating that, for the prior 30 consecutive business days,
the Company's common stock had not maintained the minimum bid
price of $1.00 per share required for continued listing, as set forth in
Nasdaq Marketplace Rule 4450(a)(5) (the "Minimum Bid Price
Rule"). This notification will not impact the listing of Franklin's
common stock at this time. The Company's common stock will
continue to trade on the NASDAQ Global Select Market under the
symbol "FBTX."

In accordance with Nasdaq Marketplace Rule 4450(e)(2), Franklin
has 180 calendar days from the date of the Nasdaq letter, or until

-48-

January 20, 2009, to regain compliance with the Minimum Bid Price Rule. To regain compliance, the closing bid price of the Company's common stock must meet or exceed $1.00 per share for a minimum of ten consecutive business days. Nasdaq may, in its discretion, require Franklin to maintain a bid price of at least $1.00 per share for a period in excess of ten consecutive business days, but generally no more than 20 consecutive business days, before determining that Franklin has demonstrated an ability to maintain long-term compliance. If the Company does not regain compliance, the Nasdaq staff will notify it of the staff's determination to delist the Company's common stock, which decision may be appealed to a Nasdaq Listings Qualification Panel.

Alternatively, the Company may apply to transfer its common stock to The NASDAQ Capital Market if the Company satisfies all of the requirements, other than the minimum bid price requirement of Marketplace Rule 4310(c)(4), for initial inclusion on this market. If the Company elects to apply for this type of transfer and if the Company's application is approved, it will have available to it the remainder of a second 180 calendar day period to regain compliance with the Minimum Bid Price Rule while listed on The NASDAQ Capital Market.

The Company has previously disclosed receipt from Nasdaq of notifications of noncompliance with Nasdaq Marketplace Rule 4310(c)(14) (the "Reporting Rule") regarding the Company's failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2007 and its Quarterly Report on Form 10-Q for the three months ended March 31, 2008. As previously disclosed, Nasdaq has granted the Company until September 15, 2008 to make these delayed filings. The July 23, 2008 letter from Nasdaq has no effect on the Company's compliance with the Reporting Rule.

90.      On August 6, 2008, the Company issued a Form 8-K that contained restated unaudited financial statements for the quarters ended March 31, 2007; June 30, 2007; September 30, 2007, and for the year ended December 31, 2006. In that Form 8-K, the Company cautioned that the restated

amounts remained subject to revision. The ultimate amount of the required restatements were never

disclosed prior to the Company being taken over by the FDIC in November of 2008.

91.    On August 13, 2008, the Company issued a press release and filed a Form 8-K

announcing that it

> received a letter (the "Nasdaq Letter") from the staff of The
> NASDAQ Stock Market ("Nasdaq") regarding the Company's failure
> to file its Quarterly Report on Form 10-Q for the period ended June
> 30, 2008 (the "June Form 10-Q") with the Securities and Exchange
> Commission (the "SEC") as required by Nasdaq Marketplace Rule
> 4310(c)(14). The Company's common stock is listed on Nasdaq.
> Additionally, on August 19, 2008, the Company received a letter (the
> "AMEX Letter") from the staff of The American Stock Exchange Inc.
> (the "AMEX") in connection with the Company's failure to file the
> June Form 10-Q with the SEC as required by Sections 134 and 1101
> of the AMEX Company Guide and its listing agreement. The
> Company's Series A Non-Cumulative Perpetual Preferred Stock (the
> "Preferred Stock") trades on the AMEX.   The Company has
> previously disclosed receipt of similar letters from the Nasdaq staff
> and AMEX staff, with respect to the Company's failure to file with
> the SEC its Annual Report on Form 10-K for the year ended
> December 31, 2007 and Quarterly Report on Form 10-Q for the
> period ended March 31, 2008, and that such failures constituted a
> basis for delisting the Company's shares of common stock and
> Preferred Stock from trading on their respective exchanges. Under the
> rules of Nasdaq and the AMEX, the failure to file the June Form 10-
> Q serves as an additional basis for delisting the Company's common
> stock and the Preferred Stock, respectively.
>
> Both the Nasdaq Letter and the AMEX Letter were expected as a
> consequence of the failure to file the June Form 10-Q and their
> issuance was in accordance with standard practice of Nasdaq and the
> AMEX, respectively.

92.    Although the Company never filed Form 10-Qs with the SEC regarding its 2008

operations, the Company did continue to file call reports with the Federal Deposit Insurance

Corporation (FDIC). In the call report for the quarter ending September 30, 2008, the Company

admitted that it had charged off over $121 million in bad loans during 2008 and that it had provided

(charged to expense) over $213 million to the loan loss reserve during the same period.

93.     On November 7, 2008, the Company issued a press release and filed a Form 8-K

revealing,

> it was closed today by the Texas Department of Savings and
> Mortgage Lending (the "TDSML") and the Federal Deposit Insurance
> Corporation ("FDIC") was appointed as receiver of the Bank.
>
> The Company's principal asset was its indirect ownership of the
> common stock of the Bank, and, as a result of the receivership of the
> Bank, the Company has very limited remaining tangible assets. As the
> owner of all of the capital stock of the Bank, the Company would be
> entitled to the net recoveries, if any, following the liquidation or sale
> of the Bank or its assets by the FDIC. However, at this time, the
> Company does not expect that it will realize any recovery.
>
> In addition to efforts to file the Company's delayed securities reports,
> the boards of directors and officers of the Bank and the Company
> have worked diligently to recapitalize the Bank at a time of
> unprecedented disruption in the industry. Over the last few months
> the Company has presented several recapitalization proposals to the
> FDIC, TDSML and the Office of Thrift Supervision, including a
> proposal on which the boards of directors and officers of the Bank
> and the Company continued to work through today, that would have
> strengthened the Bank's capital position and addressed other issues
> raised by the regulators. However, the Company and the Bank were
> unable to bring such matters to conclusion prior to closure of the
> Bank.

94.     In July 2009, the Office of Inspector General of the Federal Deposit Insurance

Corporation issued its Material Loss Review of Franklin Bank, S.S.B., Houston, Texas, Report No.

AUD-09-014 ("Material Loss Review").   A copy of this report is attached as Exhibit A and

incorporated herein.   The audit objectives were to (1) determine the causes of Franklin Bank's failure

and (2) evaluate the FDIC's supervision of Franklin Bank.  The Material Loss Review reveals, in

great detail, that Franklin Bank operated in violation of laws and regulations, and had inadequate risk

management and internal controls.

95.     The Material Loss Review painted a picture of Franklin Bank in stark contrast to that

portrayed by the Company to the investing public. In a section titled "Reason for Failure and Material

Loss" the FDIC explains

> Overall, Franklin failed due to bank management's high-risk business
> strategy. The strategy focused on asset growth concentrated in 1-4
> family residential and ADC loans funded with wholesale funding,
> including potentially high-cost and volatile deposits and borrowings.
> Coupled with weak risk management practices and controls, this
> business strategy left the bank unprepared and unable to effectively
> manage operations in a declining economic environment. Franklin's
> asset quality deteriorated significantly as the real estate market and
> economy slowed. For example, adverse loan classifications increased
> from $178.5 million reported in the October 2007 Report of
> Examination (ROE) to $783.7 million reported in the July 2008 ROE.
> Franklin's adverse classifications, including loan losses, resulted
> primarily from its portfolio of 1-4 family residential loans and ADC
> loans. As adverse loan classifications increased, earnings eroded,
> liquidity became strained, and Franklin's capital became increasingly
> deficient. Ultimately, Franklin was closed by the DSML due to the
> bank's inability to meet liquidity needs. The resulting loss to the DIF
> at closing was estimated at $1.5 billion.

96.     The Material Loss Review makes evident that Franklin Bank did not maintain the

"safe" loan portfolio as it claimed to investors. It states

> Franklin's asset quality problems were exacerbated by its emphasis in
> high-growth markets and concentrations in 1-4 family residential loans
> (that contained a significant volume of nontraditional and subprime
> mortgages) and ADC loans, which, as of September 2008 totaled 937
> percent and 736 percent of total capital, respectively. In particular,
> Franklin's management allowed significant loan concentrations to
> exist without adequate risk identification, measurement, monitoring,
> and controls.

* * * *

-52-

Specifically, within its 1-4 family residential loan portfolio, Franklin originated, purchased, and sold an array of mortgage products that included nontraditional and subprime mortgages. The bank's nontraditional mortgage lending program included the following underwriting characteristics:

- interest-only loans;
- no documentation, limited documentation, and stated income loans;
- payment option adjustable rate mortgages;
- simultaneous second-lien loans (not held by the bank);
- high combined loan-to-value ratios, high combined debt-to-income ratios, and loans to borrowers with low credit scores;
- purchased loan pools serviced by others; and
- multiple risk layers.

**As of July 2008, 82 percent of the 1-4 family residential loans held on the bank's books had been originated under reduced documentation or stated income loan programs.** In addition, 16 percent of the residential loans were considered subprime loans, and 72 percent of the bank's residential loans were purchased from and serviced by others. The purchased loans were typically collateralized with first-lien positions; however, many of the homes that collateralized the bank's loans also had second liens in place. As a result, the borrowers had limited equity positions in the homes they purchased or refinanced. Further, these loans were concentrated in markets that had experienced a significant level of appreciation and then deterioration.

Due to the collapse of the subprime mortgage market and the tightening of the mortgage credit market, bank management halted the bank's nontraditional mortgage and subprime operations and, in the first quarter of 2007, began to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans. However, Franklin's curtailment of its nontraditional mortgage and subprime operations was not sufficient to improve the overall performance of its loan portfolio.

(Emphasis Added).

97.    The Material Loss Review also revealed that Franklin Bank manipulated its delinquent loans so that it did not have to report them:

Based on our review of the 2007 and 2008 ROEs and related guidance, we identified instances where Franklin may have inappropriately used interest reserve loans to (1) bring delinquent loans current; (2) modify loans on projects that were experiencing construction delays, funding shortfalls, and deteriorating collateral values/positions; and (3) fund raw land loans.

98.     In addition to its risky lending strategies, Franklin Bank also employed a high-risk strategy on funding sources used to fund its lending activities. The FDIC's audit of Franklin Bank states that a high net non-core dependency ratio "indicated greater risk exposure and a reliance on funding sources that may not be available in times of financial stress or adverse changes in market conditions." In 2007, Franklin Bank was in the "97th percentile" of banks in the ranking of the use of non-core funding sources, indicating an extremely risky strategy to acquire funds for lending purposes.

Volatile Wholesale Funding Sources. Franklin's management employed a funding structure that centered on high-cost volatile funds to fund its growth, which we believe was a significant contributing factor leading to the failure of the institution. The bank's funding structure relied on wholesale funding sources, including FHLB borrowings, brokered deposits, time deposits of $100,000 or greater, and high-rate core deposits to fund asset growth. As stated in the DSC Risk Management Manual of Examination Policies (Examination Manual), a heavy reliance on potentially volatile liabilities to fund asset growth is a risky business strategy because the availability of and access to these funds may be limited in the event of deteriorating financial or economic conditions, and assets may need to be sold at a loss in order to fund deposit withdrawals and other liquidity needs. Management did not establish policies or controls that adequately limited or mitigated the level of risk related to these activities.

A bank's net non-core dependency ratio indicates the degree to which the bank is relying on non-core/volatile liabilities to fund long-term earning assets. Generally, a lower ratio reflects less risk exposure, whereas higher ratios indicate greater risk exposure and a reliance on funding sources that may not be available in times of financial stress or adverse changes in market conditions. For the years ended

December 2003 through September 2008, the bank was heavily dependent on high-cost non-core funding sources, such as FHLB borrowings and brokered deposits, as evidenced by the fact that, as shown in Table 3, during this period, Franklin was consistently in the 97th to 98th percentile ranking of its peer group average for net non-core funding.

99.     The FDIC laid the blame on Franklin Bank's failure directly on the board of directors.

**Franklin's [Board of Directors] allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls.** In addition, management failed to effectively implement audit and examination recommendations or to ensure that, as the bank grew, the sophistication of the bank's risk identification and monitoring systems also expanded to effectively identify, measure, monitor, and control bank operations and risks. Franklin's management did not ensure the accuracy of financial reporting and soundness of related accounting controls, which, to a certain degree, masked the bank's financial deterioration. Franklin's weak risk management practices were exhibited in several areas.

Internal Audit. In the ROEs from September 2003 through July 2008, the FDIC identified weaknesses in the structure and independence of Franklin's internal audit program. The FDIC also noted that the scope and frequency of internal audit coverage was not fully adequate. In the October 2006 ROE, the FDIC cited Franklin's contravention of the Interagency Policy Statement on the Internal Audit Function and Its Outsourcing, dated December 22, 1997. The policy statement identifies key characteristics and sound practices for the internal audit function and management of internal audit outsourcing arrangements. In the July 2008 ROE, the FDIC noted that one Franklin vice president, who was not independent of management, was involved in developing risk assessments, testing programs, and selecting audit samples. The lack of independence was a contravention of the policy statement.

Due Diligence. Franklin's BOD did not implement an adequate due diligence process for purchased pools of 1-4 family residential loans. Specifically, it became apparent upon our review of the ROEs and discussions with FDIC examiners that Franklin purchased such loan pools without a complete understanding of what is was purchasing. Most notable, Franklin was not aware that loans it purchased contained second-lien positions that, in hindsight, made the loans far less

attractive and valuable. In our opinion, the lack of adequate due diligence on these loan pools indicates that Franklin's BOD did not ensure that as the bank grew, the sophistication of the bank's risk identification and monitoring systems expanded to effectively identify, measure, monitor, and control bank operations and risk.

Internal Control and Financial Reporting. Franklin's management did not ensure the accuracy of financial reporting and soundness of related accounting controls. As a result, management was unable to ensure the timely and accurate reporting of the bank's financial condition, and the bank's financial deterioration was masked to a certain degree. As the result of a "whistleblower" complaint, Franklin's BOD arranged for an independent investigation of the bank to be conducted by Baker Botts, Limited Liability Partners, during the first and second quarters of 2008. The investigation revealed significant accounting errors, inappropriate accounting entries, a lack of internal controls, and significant questions regarding the competency of management.

In the July 2008 ROE, the FDIC noted that management and the BOD did not provide for internal controls and information systems that would ensure timely and accurate financial reporting. According to the FDIC, Franklin's management disclosed that financial reporting since December 2006 could not be relied on. The FDIC also noted that management made multiple amendments to the September 2007 through March 2008 Reports of Condition and Income (Call Report). These amendments were the result of major accounting and internal control weaknesses related to 1-4 family residential loans, residential loans serviced by others, other real estate owned, loan modifications, and bank-owned life insurance.

Allowance for Loan and Lease Losses (ALLL) Methodology. Franklin's management did not establish a sufficient ALLL or an adequate ALLL methodology. Specifically, management did not develop an ALLL methodology that fully complied with the Interagency Policy Statement on the Allowance for Loan and Lease Losses (FIL-105- 2006), dated December 13, 2006.[2] According to FIL-105-2006, each institution must analyze the collectibility of its loans and maintain an ALLL at a level that is appropriate and determined to be in accordance with Generally Accepted Accounting

---

[2]Attached as Exhibit B and incorporated herein is the FIL-105-2006.

Principles (GAAP)[3]. An appropriate ALLL covers estimated loan losses on individually evaluated loans that are determined to be impaired as well as estimated loan losses inherent in the remainder of the loan and lease portfolio. As previously discussed, Franklin's adverse loan classifications increased significantly between 2007 and 2008. An effective loan review system and controls (including loan classification and credit grading system) helps ensure asset quality problems are identified and an appropriate ALLL is established.

Beginning with the September 2004 examination, the FDIC repeatedly reported concerns with the bank's ALLL policies and/or methodology for calculating the ALLL, including the need for management to consider and document adjusting qualitative factors (such as industry, geographic, and economic factors) to the industry's loss rates, and to implement and document a methodology for measuring loans for impairment. In the October 2007 ROE, the FDIC reported that Franklin did not provide documented support that showed how the ADC loan portfolio's historical loss rates had been determined. Further, the FDIC stated that Franklin did not consider the impact of current environmental factors in its analysis despite the rapidly deteriorating economic conditions in the bank's primary markets. As Franklin's assets deteriorated, it became apparent that its ALLL was insufficient to absorb loan losses.

Historically, as shown in Table 4, which follows, from 2002 through 2006, Franklin maintained the bank's ratio of ALLL to total loans and leases at levels that were consistently well below its peer group average – ranging from the 3rd to 10th percentile. From 2004 until the bank closed, Franklin also maintained its capital levels below peer.

(Emphasis Added).

100.    The FDIC attempted to rectify Franklin Bank's deficient practices, but the Company failed to implement the recommendations.

---

[3]Interagency Policy Statement on the Allowance for Loan and Lease Losses (FIL-105-2006), dated December 13, 2006, reiterates key concepts and requirements pertaining to the ALLL included in GAAP and existing supervisory guidance. In addition, the policy describes the nature and purpose of the ALLL; the responsibilities of BODs, management, and examiners; factors to be considered in the estimation of the ALLL; and the objectives of an effective loan review system, including a sound loan grading system.

Implementation of Examiner Recommendations. Franklin management did not effectively implement certain recommendations that were repeatedly made in the FDIC's ROEs. Such recommendations included: (1) identification and monitoring of loan concentrations, (2) establishment of liquidity risk limits and contingency liquidity plans (CLP), and (3) enhancement of the internal audit function. In addition, management did not implement corrective actions in a timely manner to adequately address risk management control deficiencies identified by the FDIC in relation to ADC concentrations, internal auditing, accounting, and financial reporting.

Other Matters. Additionally, in our opinion, Franklin's management did not implement a systematic assessment of the economic environment appropriate for the bank's size, complexity, and risk profile, nor did Franklin implement an adequate stress testing model to identify, measure, monitor, and control risk. With respect to the assessment of the economic environment, Franklin did not perform a systematic economic review that utilized key market indicators and was tied to specific strategic action plans in case of deteriorating market conditions. Regarding stress testing, in the October 2007 ROE, the FDIC recommended that Franklin perform a portfolio-level stress test or sensitivity analysis to quantify the impact of changing economic conditions on asset quality, earnings, and capital. In response, Franklin management agreed to implement stress testing by products and geographies. However, Franklin reviewed loans individually and did not implement a portfolio-level stress test, as recommended by the FDIC.

101.    The Material Loss Review makes starkly evident that Franklin Bank did not operate

in the manner represented to the investing public. Indeed, Franklin Bank was a "high-risk" bank that

portrayed itself as a port in the financial storm. It is beyond implausible that each Defendant was not

personally aware, and helped perpetuate, this fraud upon the Company's investors.

### ADDITIONAL FALSE STATEMENTS AND DESCRIPTION OF DEFENDANTS' SCIENTER.

**A.    The Whistleblower Letter of Craig Wolfe Compels a Finding of Scienter.**

102.    Craig Wolfe ("Wolfe") was Vice President of Loss Mitigation at Franklin Bank. On February 19, 2008, Mr. Wolfe sent a letter to Debbie Hale, Senior Vice President of Internal Audit at Franklin Bank, and copy of which was carbon copied to Defendant Nocella. A copy of this letter is attached as Exhibit C. In the letter, Mr. Wolfe explains in great detail the areas of concern he observed at Franklin Bank, including violations of SEC rules, GAAP, and Sarbanes-Oxley. Mr. Wolfe details the process he went through in an attempt to voice his concerns, and states that rather than acknowledge the Company's wrongdoing, Mr. Wolfe was demoted. Mr. Wolfe's letter is demonstrable proof that there was a conscious effort within the Company throughout the Class Period to hide the true nature of the loan portfolio and rising delinquencies, and that the highest levels of Franklin Bank management were aware - if not orchestrating - the scheme.

103.    On three occasions Mr. Wolfe refused to execute a Sarbanes-Oxley Attestation because he believed it to be false. Mr. Wolfe described:

> On January 28, 2008, I declined for a third time to sign the 2007 "SOX Attestation" certifying the Bank's compliance with Sarbanes Oxley ("SOX") policies for single family Real Estate Owned properties (REOs) because **I knew that the Bank's accounting of REOs was misleading, inaccurate, and did not comport with Generally Accepted Accounting Principles (GAAP)**. In addition, I decided not to sign the Attestation based on my knowledge that Franklin Bank had incorrectly and perhaps deliberately overstated the value of certain Non-Performing Assets (NPAs) and failed to disclose the existence of others to obfuscate the extent of certain in-substance REOs that were not properly classified, and that the Bank's stated book value of REO inventory as of December 31, 2007 substantially exceeded the next realizable value. **I was especially concerned that if Franklin Bank submitted a deficient financial statement to the SEC and to shareholders, it would have been exposed to liability for violations of the SEC rules and to claims by shareholders.**

(Emphasis Added).

-59-

104.    In response to Mr. Wolfe's concerns, Franklin Bank demoted him and assigned his loss mitigation responsibilities to the Director of Loan Acquisitions.    Thus, remarkably and in contravention of GAAP's requirement for proper internal controls, the responsibility of loss mitigation was assigned to the very person responsible for creating the loans in the first place. As Mr. Wolfe explained,

> This represents a clear conflict of interest, which is borne out by Ms. Koehl's actions.  Ms. Koehl has focused her efforts on delaying the reporting and recognition of such losses rather than taking meaningful action to mitigate those losses. **The net effect is delay of the inevitable so the losses would be moved into a later accounting period, at which point the bank will presumably be subject to acquisition by an unwitting investor, or a federal bailout.**

(Emphasis Added).

105.    The February 19, 2008 letter was only the latest attempt by Mr. Wolfe to have Franklin Bank address these pressing concerns.  Each previous effort was rebuked.  Mr. Wolfe wrote

> I fully expected that the Bank would investigate the issues that I raised, rather than misleading investors in its January 31, 2008 earnings release for FY 2007, and related conference call February 1, 2008. **It is my opinion that the 2007 earnings report that Franklin Bank filed should be restated because it is not accurate and therefore constitutes fraud against shareholders.**

(Emphasis Added).

106.    Mr. Wolfe's letter sets out numerous "Misrepresentations to Shareholders." He writes

> Franklin Bank has repeatedly affirmed to the media and to Wall Street analysts that the Bank owns "no subprime", or "2% subprime" or "never originated subprime for portfolio" or "avoided subprime because of our expertise in mortgages". **These statements are all public record and are all demonstrably false. Until recently, Franklin bank had an aggressive retail subprime mortgage program, funding an average of $10-$15 million in subprime loans**

-60-

**per month. I played an integral role in creating this program, an accomplishment of which I remain proud.**

Among other bulk acquisitions, the Bank purchased and is now servicing a portfolio of subprime assets from The Winter Group. The Bank also financed subprime loans to Amstar and other subprime lenders through its Mortgage Banker Finance ("MBF") warehouse facilities. In fact, Franklin was forced to purchase many millions of dollars in subprime loans out of the MBF warehouse when First Consolidated and other correspondents went defunct or were unable to sell those subprime mortgages in the secondary market.

**To avoid marking these to market, the Bank apparently transferred subprime loans and other inherently risky loans that were delinquent or unmarketable to portfolio on a routine basis.** As of December 31, 2007, there were at least $13 million of Bank-originated subprime loans in portfolio - half of those subprime loans were 30 or more days delinquent. Throughout 2007, Franklin foreclosed upon and incurred substantial losses on REO and short sales arising from its retail and MBF subprime programs. As noted above, the Bank also underwrote and purchased a large volume of loans in bulk with credit scores below 620 serviced by other financial institutions, such as Countrywide, GMAC, and Chase ("SBO"). There are defaulting at a high rate, just as is occurring throughout the industry. **Nevertheless, Franklin Bank insists upon falsely representing to the public that it had the wisdom and foresight to avoid all involvement with subprime lending.**

(Emphasis Added).

107.   In a section entitled "Accounting Irregularities," Mr. Wolfe wrote

It appears that the Bank concocted a Fresh Start program, wherein seriously delinquent loans were rendered current overnight through highly questionable accounting entries, for the purpose of moving losses from 2007 to 2008. **As a result of these irregular accounting practices, the Bank's net income and shareholder equity was materially overstated in 2007. Many millions of dollars in NPAs were not written down to net realizable value, even thought he Bank is aware of loan-level fair market value based on appraisals obtained as soon as loans reach 90 days delinquent.**

Despite this precise loan-level data, the Bank's explanation for how reserves are calculated on the GAAP level - the formula - is opaque at best and incomprehensible to the average investor. The Bank has assured analysts that loss reserves are 3.1 times out 2007 charge-offs. However, over $400,000 in single family REO devaluations were expensed in 2007 rather than charged to reserves, it was therefore misleading in the February 1, 2008 conference call to state that the Bank "...recognizes potential loss as soon as we see the possibility of it occurring". In fact, the Bank has approved virtually no REO sales or listing price reductions from December 2007 through today's date. **Lacking any other explanation or rationale, this appeared to me to be a deliberate action by the Bank to avoid or delay reporting losses.** This was another reason that I did not sign the Sarbanes Oxley Attestation on January 28, 2008.

- Re-ageing of delinquent accounts

In August 2007, I prepared and distributed a written "$50K" report indicating single family NPAs with projected losses of at least $50,000 per loan. In that report, I projected aggregate losses of over $4 million in portfolio. I believe that my report gave management its first glimpse of the heavy losses the Bank would soon incur. **To my dismay, I recently discovered that a substantial and improbable number of loans I had previously reported on the $50K report as seriously delinquent with large loss exposure had been inexplicably marked "paid-to" November 1, 2007.** Loans for which the Bank had received no payments for six months or more months were inexplicably marked as current with no discernible audit trial.[4] **By manipulating the due dates, the Bank could ensure that these seriously delinquent subprime Alt A loans and equity second mortgages would not become 90 days delinquent again until 2008, thereby misleading shareholders as to the Bank's true financial condition. I believe that the Bank purposefully engaged in fraudulent accounting practices in November 2007 when it changed the status of certain NPAs from delinquent to current, in order to avoid reporting losses when incurred in FY2007 as required by GAAP.**

- Repurchases

---

[4] My understanding is that this is not allowed unless and until borrower makes three consecutive payments on time. Nevertheless, I continue to hear clerical staff refer to "rolling over the due date" and "advancing the P&I" on loans which borrower has made at best one token payment.

The Bank had several million dollars in unresolved and valid repurchase requests pending at the end of 2007, according to my published status report. This contingent liability should have been recognized in our 2007 financial statements. In particular, Countrywide issued a repurchase demand in March 2007 on the $250,000 Refek second mortgage due to alleged fraud and zero payments made. The Bank previously repurchased the related Refek first lien based on its own QC audit, and filed a SAR. **The second lien repurchase was referred in my presence by Max Epperson to Tony Nocella, who stated he would send it to David Jones in the Legal Division for our first lien foreclosure sale and did not refute the validity of the repurchase demand, the $250,000 loss should have been recognized in 2007.**

> •     Indemnifications

Franklin Bank routinely enters into loan sales with "implied" recourse if borrower fails to make a specified number of payments. In lieu of outright repurchase, the Bank from time to time agreed to indemnify Countrywide pursuant to the early payment default ("EPD") clause on our correspondent agreement. These indemnifications required the Bank to reimburse any losses incurred if and when the mortgages were liquidated at a loss. The understanding at the time was that these indemnifications were preferable to outright purchase, and that they were duly authorized. The Bank's VP of Mortgage Accounting received an invoice in December 2007 listing approximately $500,000 in unpaid indemnified losses incurred by Countrywide. **These losses should have been recognized in 2007**.

(Emphasis Added).

108.    Mr. Wolfe concludes his letter with this scathing indictment

> **It appears that Bank Management was in fact aware of the extent of its losses when 2007 earnings were released, if not much earlier, but denied or hid the extent of these problems to avoid having to disclose them to shareholders,** particularly at a time that the stock market is hypersensitive to reports of unrecognized losses buried deep in the balance sheets of mortgage lenders. **As a result, the Bank has misled the SEC and shareholders as to the Bank's true financial condition.**

* * * *

> As an employee tasked with Sarbanes Oxley compliance, I feel
> compelled to demand that Franklin Bank take prompt and thorough
> corrective actions to remedy these violations of securities and other
> laws. **Unless I hear back from you by February 26, 2008 with your
> proposed course of action, I plan to disclose my concerns to the
> Board and to Franklin Bank's auditors and the appropriate
> regulatory agencies.**

(Emphasis Added).

109.    As Vice President of Loss Mitigation, there may not have been any person in a better

position at Franklin Bank to observe the bank's efforts to manipulate its earnings and mislead

investors. After this letter was sent, Mr. Wolfe contacted the FDIC. The FDIC, understanding the

seriousness of the allegations and the legitimacy of Mr. Wolfe's claims, began an investigation of

Franklin Bank which ultimately led to the bank being forced to close.

110.    Mr. Wolfe's letter is compelling evidence that Defendants knew of and participated

in the misleading statements to the market, including the intentional manipulations of the Company's

financial statements.

**B.    Defendants Ranieri and Nocella Were Personally Involved With the Countrywide Loan**

111.    Franklin Bank never did reveal to the market that it loaned hundreds of millions of

dollars to Countrywide Financial under a line of credit arrangement, and that Franklin Bank took the

Countrywide mortgages as collateral. Even when Countrywide defaulted on $150 million owed to

Franklin Bank, the Company did not disclose the arrangement.

112.    Defendants Ranieri and Nocella were aware of the Countrywide loan, and indeed by

virtue of their positions on the loan committee would have had to approve the loan. As a result,

Ranieri and Nocella knew that Franklin Bank had significant exposure to subprime securities in its

-64-

portfolio and that the statements made to the market to the contrary were false. Attached as Exhibit D is a copy of the minutes from a Franklin Bank Corp. and Franklin Bank, S.S.B. combined special meeting of the boards of directors on January 3, 2007. These minutes reveal that Ranieri discussed the loan sale summary report by Countrywide with the full board of directors. As such, as early as at least January 3, 2007, Defendants Ranieri and Nocella were aware that Franklin Bank loaned hundreds of millions of dollars to Countrywide.

**C.** **The Statements of Confidential Witnesses Compel a Finding of Scienter.**

113. In addition to the admittedly false statements detailed above, and the indicia of scienter created thereby, Lead Plaintiff's Counsel interviewed a number of former employees regarding the Company's misconduct. These witnesses confirm that Defendants acted with the requisite scienter.

**Confidential Witness No. 1**

114. CW1 joined Franklin Bank in June 2007 as a senior manager when Franklin Bank acquired Access Lending[5]. CW1 participated in the Company Board Credit Committee Meetings and Credit Committee. CW1 recalled that within a month of his joining Franklin Bank, he had "figured out" through his participation in various executive level meetings that the internal controls and monitoring of the single family residential portfolio "was awful." CW1 stated

> "That area of the bank was really poorly documented. Half the time
> they would say in meetings that we can't rely on this report or the
> other. Nothing ever seemed to reconcile. The whole thing seemed
> like a cluster."

115. CW1 stated with certainty that all of the Company executives were aware of the internal control problems with regard to the single family residential portfolio. Defendant Ranieri

---

[5] Mortgage warehouse lender, Access Lending, became a division of Franklin Bank, S.S.B. headquartered in Houston, Texas as a result of an asset sale to Franklin Bank.

was screaming at them on the phone to get the internal controls in line.   "Ranieri was heavily involved in the committees."

116.   CW1 understood that former Controller Clark Chrietzberg "blew the whistle internally" on the Company's accounting loan loss reserves in the single family residential portfolio, leading to the Company's subsequent announced need to restate financial results.   Chrietzberg told the Franklin Bank management "that our [loan loss reserve] policy is not correct under GAAP."   CW1 noted that this was a big problem "because Nocella and McCann had all signed off on the policy." Chrietzberg discovered that the Company had used an aggregation method to calculate loss reserves. CW1 provided the following example; the Company had two mortgages outstanding, each in the amount of $100,000.   For loan number one, the home appraised at $150,000.   For loan number two, the home appraised at $50,000.   Franklin would not take any reserve for loan number two, and instead, would assume the cushion for the appraised amount of loan number one made up the difference.

**Confidential Witness No. 2**

117.   CW2 started at the Company as a Senior Vice President in 2004.   Prior to joining Franklin Bank, CW2 worked with Ranieri and Nocella at Bank United. CW2 worked personally with both Ranieri and Nocella, and participated in numerous conference calls with each during his years at the Company. CW2 described his responsibility as providing mortgage lending to construction companies such as Toll Brothers, Orleans, and DR Horton.   In the Spring of 2008, CW2 was promoted to Executive Vice President.   During a portion of his tenure as Executive Vice President, CW2 reported to Tony Nocella until Nocella's termination.   Following the termination of Nocella CW2 reported to current Bank President/CEO Andy Black.

-66-

118.   CW2 stated that toward the end of 2007, "we [the Company] got hit with a $150 million write off." The Mortgage and Lending Group of the Company supplied warehouse lines of credit to Countrywide Financial and other entities. The warehouse lines of credit were collateralized by loan portfolios originated by the borrowing entities.

119.   CW2 revealed that Countrywide defaulted on its line of credit in approximately September or October 2007. As a result of the Countrywide default, the Company was forced to take possession of the loans collateralizing the warehouse line of credit. "By the time we got notice of the default, we realized the portfolio was full of sub-prime dog [expletive]." CW2 recalled that Chairman of the Board Lewis Ranieri had often made a point of telling the investing public that the Company did not get into sub-prime mortgages. "We didn't get directly into sub-prime, but Countrywide did and we held those loans as collateral, " said CW2.

120.   CW2 explained that the Company received Compliance Certificates from Countrywide and all other line of credit borrowers which revealed the quality of the loans collateralizing the warehouse line of credit. CW2 stated the Company had the ability to restrict the types of loans that served as collateral for the warehouse lines of credit. Further, CW2 stated that the Company did not have controls in place to actually restrict and monitor the types and quality of the collateral.

121.   CW2 stated that the Company was "supposed to do spot checking and reviews of Countrywide." In light of the problems with Countrywide noted in the national media, CW2 stated that the Company, and specifically Defendant Nocella, should have been aware of the problems in early 2007.

122.   As a result of the "dog [expletive]" portfolios received as a result of the Countrywide default, CW2 stated that the Company "got hit with a $150 million write off overnight."

123.    The Board Credit Meeting took place at least once a month, typically "a couple of hours before the Board [of Directors] meeting." The Board Credit meeting would also meet on an as-needed basis "if something needed to get approved." The purpose of the Board Credit meeting was to review and approve any line of credit over $10 million. The minimum amount subject to review was "different for each division." CW2 explained that the minimum amount of a line of credit in the Commercial Real Estate Division subject to review was $15 million. The minimum amount of a line of credit for the Mortgage Bank Finance Group, which oversaw the Countrywide and other warehouse lines of credit, was $10 million or $12 million.

124.    The Board Credit Committee had six voting members that were responsible for voting on whether the Company would issue credit. Among the voting members were Nocella, Ranieri, Director Alan Master and Chairman of the Board of the Bank Robert Perro. Non-Voting members of the Board Credit Committee included former Executive Vice President Dan Cooper and former Executive Vice President Mike Davitt. Most of the Directors participated in the meeting via conference call. The meeting was held in a conference room on the 7th floor in the Houston headquarters.

125.    Prior to each Board Credit Committee meeting, the participants in the meeting received a "Board Pack." The participants received the Board Pack "a couple of days before the meeting." The Board Pack provided an agenda for the meeting and all topics to be discussed during the meeting. CW2 estimated the Board Pack was approximately 10 to 35 pages, depending on the number of lines of credit to review. The voting members of the Board Credit Committee were sent a hard copy of the Board Pack via overnight delivery.

126.     The Management Loan Committee met every Thursday at 9:00 a.m. Central. Members of the Management Loan Committee included Executive Vice President Mike Davitt, Executive Vice President Dan Cooper, Senior Vice President of the Accounting Department Richard Gudetti, Defendant Nocella, Defendant McCann, then-COO/Current CEO Andy Black and General Counsel David Jones. The purpose of the Management Loan Committee was to go over loans of $10 million and under. "The Management Loan Committee would go over loan extensions, modifications and covenant waivers." Members of the Management Loan Committee received a meeting agenda on the Tuesday prior to the meeting.

127.     The Company's tax strategies and financial accounting "really involved three to five people making the decisions." CW2 identified Nocella, McCann and Ranieri as being completely responsible for "write downs and reserves to specific loans." CW2 recalled that when accounting issues would come up during either the Board Credit or Management Loan Committee meetings, the top executives would state simply that they would deal with it later.

128.     "By the time 2008 came around, and our stock was down to $1, and we were restating our quarterly results, we knew some heads had to roll." CW2 recalled that former Executive Vice President Dan Cooper was terminated approximately 30 days prior to Nocella being terminated.

129.     CW2 was not completely surprised that Franklin Bank had to restate its financials. CW2 remarked "Nocella knows how to cook the books" and that "Nocella is a mathematical genius" that was willing to "massage the financials." With respect to Franklin Bank's practice of delaying the report of non-performing assets, CW2 stated "if there's a mathematical way to push an expense to another period, Nocella would do it."

**Confidential Witness No. 3**

130.    CW3 was employed as a Vice President in the Warehouse Lending Division from 2005 until May 2008. CW3 submitted an Aging Report and Delinquency Report every Friday. CW3 stated these reports were part of his Sarbanes Oxley compliance. CW3 described the reports as "effectively the same data" but that the Delinquency Reports were "specific to accounts" while the Aging Reports reflected the "overall portfolio." The Delinquency and Aging Reports were prepared for former Chief Credit Officer Max Epperson, and his replacement Kelley Lee.

131.    Knowledge regarding the rising delinquencies was presented to the Credit Committee which consisted of several senior executives, including Dan Cooper, COO Andy Black, Executive Vice President and Chief Credit Officer Kelley Lee and Nocella. CW3 stated that Credit Committee met at least two times a week, on Tuesday and Friday, at 8 a.m Central.

132.    During the course of his employment, CW3 acknowledged that "of course" the Company's senior executives knew the bank was facing rising delinquencies in its mortgage portfolio, and that the Company "didn't disclose its delinquent loans."

**Confidential Witness No. 4**

133.    CW4 worked for the Company from June 2007 until June 2008 as a senior member of the Warehouse Lending Division. Prior to working for the Company, CW4 worked for Access Lending ("Access") which was acquired by Franklin Bank in June 2002.

134.    The warehouse line of credit is provided to mortgage originators, collateralized by the mortgages originated.

135.    CW4 confirmed McCann was "responsible for setting reserves for the warehouse lines."

136.    All lending groups at the Company "regularly reported on the portfolio status." CW4 reviewed the Aging Report every week in order to "update with major reviews." The Aging Report of all lending activities was "available every day." CW4 gathered information for the aging report from the Company ACT database, described as a contact database, and also from the Company Warehouse Loan System ("WLS"). CW4 believed other lending divisions gathered their information from the Company FiServ database in order to report aging. The Aging Reports were provided regularly to every member of the Company Credit Committee.

137.    CW4 and Senior Vice President Michael Rae were responsible for reporting on behalf of the Warehouse Lending Division to the Company's Credit Committee. Members of the Credit Committee included several members of the Company's Board of Directors, as well as Defendants McCann and Nocella. The Credit Committee met every Tuesday and occasionally on Friday in a Conference Room on the 7th Floor of the Company headquarters.

138.    CW4 described the process of reviewing aging loans and credit quality as "portfolio management." The Company's portfolio management "came down from Kelley and Tony Nocella." "The directives for portfolio management" were all driven by the senior executives. CW4 was aware of this portfolio management through attendance at the Credit Committee meetings. Every person presenting information at the Credit Committee "would go through the entire lending process with them."

139.    In March 2008, the Company held an "all hands" meeting in the Company Lunch Room on the 6th Floor. Nocella led this meeting. During the meeting, Nocella "brought to our attention that the bank needed to meet federal guidelines." From that point forward, "there were auditors there all the time."

-71-

140.    CW4 specifically recalled the Automated Finance account as it was denied credit while CW4 was at Access.  Because Access had turned it down, CW4 found it "interesting that the Company picked it up."

**Confidential Witness No. 5**

141.    CW5 worked for the Company in a variety of positions with a variety of responsibilities from February 2004 until July 2007. CW5 described the role as essentially providing executive assistance to Executive Vice President Dan Cooper and Senior Vice President of Asset Acquisition Sharon Koehl ("Koehl").  Among the various responsibilities, CW5 recalled working as a "Funder" who put together Real Estate Owned packages, created a delinquent accounts database and provided portfolio analysis.

142.    Koehl was responsible for submitting reports to the Bank's most senior executives regarding the Company's acquisition of loans.  For example, Koehl provided the senior executives with monthly reports regarding due diligence of loans to be acquired, production reports of mortgage officers, reports regarding delinquent loans and reports regarding fraudulent loans.  CW5 recalled that the Company's senior executives met on the first Monday of each month, and that Koehl had to have reports prepared by that date.  The senior executives for which Koehl prepared these reports included Defendants Nocella and McCann, and Former Chief Credit Officer Max Epperson.

143.    Vice President of Loss Mitigation Craig Wolfe oversaw the Company Real Estate Owned ("REO") Group.  Wolfe would "get his hands on the REO when it was acquired from foreclosure."  Wolfe would then receive a BPO or a Broker Price Opinion.  Next, the property would "go into the REO list."

-72-