144.   CW5 created forms to be completed for REO transactions.  The purpose of the forms was "for everyone to be well aware of all of the REO transactions."  As a result, "on every form in the REO file" is a signature from Dan Cooper, Max Epperson and Defendant Nocella.  "Anytime we listed an REO on the MLS, anytime we reduced the list price on the REO, any time we received an offer on the REO – those guys would have to sign a form."  CW5 also created a form that showed the "pay-off amount of the REO property, and how that pay-off amount compared to the amount of the loan – so we could see how much the bank is losing or gaining on the sale."  Nocella, Epperson and Cooper all had to sign this form.

145.   CW5 stated that the Company's top executives received monthly and quarterly reports specifically reporting on the Company's "Held For Sale" portfolio, its "Held For Investment" portfolio and its entire portfolio.  CW5 stated that sections of the report were clearly entitled "Held for Sale" or "Held for Investment."  The report broke down the holdings by general ledger code. CW5 believed the general ledger code for the Held for Sale Portfolio was either 02 or 03.  The Company maintained it's Held for Sale portfolio in an SADE database.  The Company identified its Held for Investment loans as follows:  the first two numbers indicated the first year of the loan.  For example, a loan beginning in 2005 would start with 05.  The Held for Investment loans were then assigned a six digit number, which would indicate each loan the Company had done within a given year.  Therefore, the first loan in 2004 would be labeled 04-000001.

146.   CW5 recalled with certainty that "Tony [Nocella] would have to approve" moving assets between the Held for Sale Portfolio and the Held for Investment Portfolio.  Epperson would also have to approve moving assets.

-73-

**D.**     **The Company Violated GAAP**

147.    During the Class Period, Defendants repeatedly represented that the Company's financial statements were prepared in conformity with GAAP. These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly employed improper accounting practices which falsely inflated the Company's assets reported on the balance sheet, falsely overstated income, and understated expenses during the Class Period. The knowing and/or reckless violations of GAAP are direct evidence of Defendants' scienter. Moreover, each Defendants' experience in the banking industry precludes any argument that any of them lacked the requisite knowledge to understand the significance of accounting for loans made by a bank.

148.    GAAP, as set forth in the Public Company Accounting Oversight Board ("PCAOB") Professional Standards of U.S. Auditing Standards ("AU") AU 411.02, are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

149.    Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

150.    Management is responsible for preparing financial statements that conform with GAAP. As noted by the PCAOB Professional Standards in U.S. Auditing Standards ("AU") Section 110.03:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. The independent auditor may make suggestions about the form or content of the financial statements of draft, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

151.    Despite the clear and unequivocal requirement and obligation that financial statements be prepared in compliance with GAAP, the Defendants caused Franklin Bank, in violation of GAAP, to improperly account for the Company's credit delinquencies; improperly account for the Company's assets impairment; to fail to classify and properly account for real estate owned; and to improperly account for loans on which the original terms of payment for the loan had been modified. As set forth

-75-

below, Franklin Bank was required under GAAP to (i) timely record any loss attributable to uncollectible loans, (ii) timely record any loss attributable to the reduction in realizable value of real estate owned, (iii) properly account for losses and impairments attributable to changes in asset values of investment securities, (iv) properly account for changes in the value of bank owned life insurance cash surrender values, and (v) design, implement, and maintain a system of internal accounting controls that would accurately safeguard its assets and reflect the Company's business. Franklin Bank intentionally failed to fulfill these GAAP requirements.

152.    Defendants cannot, and do not, dispute that they violated GAAP. Indeed, on August 6, 2008, in a press release, Franklin Bank revealed that its financial statements for the year ended December 31, 2006, for the quarter ended March 31, 2007, for the quarter ended June 30, 2007, and for the quarter ended September 30, 2007 required restatement. The financial statements for the year ending December 31, 2007 were substantially delayed to incorporate findings related to the required restatement. Ultimately, the financial statements for the year ended December 31, 2007 were never issued.

153.    Restatements are necessary only in rare and unusual circumstances. Financial Accounting Standards Board Statement No. 154 (FASB 154) Accounting Changes and Error Corrections contains the criteria under which restatements are necessary. Specifically, GAAP dictates that an error in recognition, measurement, presentation or disclosure in financial statements resulting from mathematics mistakes, mistakes in the application of GAAP or oversight or misuse of facts that exist at the time the financial statements were prepared, requires restatement of the previously issued financial statements.

154.    In the facts revealed by Franklin Bank, there has been no change in the reporting entity, and none of the changes in accounting principles specifically identified by FASB 154 requiring retroactive application were employed in the Company's financial reporting. Rather, the reason for restating the financial statements, as revealed by the Company, **is for the sole purpose of correcting material errors**.

155.    The restatement required to correct the previously reported financial position and results of operation of Franklin Bank proves that the Company and its management failed to comply with Section 13(b)(2)(A) of the 1934 Act which requires that issuers "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."

156.    As a result of the accounting improprieties, the Company's reported financial results violated, among other things, the following provisions of GAAP for which Defendants are necessarily responsible:

a.    The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.    The principle of materiality, which provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Concepts Statement No. 2, ¶ 132) (SEC Staff Accounting Bulletin No. 99);

c.    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, ¶ 40);

d.     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶ 50);

e.     The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Concepts Statement No. 1, ¶ 42);

f.     The principle that financial reporting should be reliable in that it represents what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Concepts Statement No. 2, ¶¶ 58-59);

g.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶ 79);

h.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97);

i.     The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies (FASB No.5, *Accounting for Contingencies*);

j.     The principle that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred (SFAS No. 5, ¶ 10) and that financial statements disclose significant risks and uncertainties associated with an entity's operations (AICPA's Statement of Position No. 94-6);

k.     The principle that loss contingencies be recorded in the financial statements when it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonable estimated (SFAS No. 5 ¶ 8);

l.     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, ¶10).

157.   As set forth herein, Defendants violated these fundamental principles of GAAP.

-78-

## 1. Violations of GAAP Relating to Credit Delinquencies and Real Estate Owned

158. As detailed above, the Company disclosed on August 6, 2008 that the bank continued to recognize interest income on certain single family loans serviced by third parties that were delinquent for more than 90 days, on which the payments were made by the servicer to the Company even though the borrower had not made payments to the servicer, rather than placing these loans on non-accrual status. Under GAAP, interest should not be accrued on loans for which payment in full of principle and interest is not expected, or, generally, upon which payment of principle and interest has been in default for a period of 90 days or more.

159. Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS 5") provides the accounting rules which must be followed by financial institutions to properly account allowances for credit losses and allowances for REO losses. Paragraph 8 of SFAS 5 states:

> An estimated loss from a loss contingency (as defined in paragraph 1), shall be accrued by a charge to income if both the following conditions are met:
>
> a.      Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.      The amount of the loss can be reasonably estimated.
>
> Accounting by Creditors for Impairment of a Loan, was issued to standardize the myriad of methods utilized by financial institutions to apply SFAS No. 5 to accounting for the allowance for loan losses. SFAS No. 114 made it clear that accrued interest must be included in the analysis for impairment of assets. It is not sufficient to analyze only the impairment of loan principal, but rather it is required that all terms of the loan contract be considered in the impairment analysis. As such, a borrower's inability to meet interest requirements of a loan agreement must be incorporated into the analysis of impairment of the

loan. Failure to comply with this standard in accounting for accrued interest resulted in the improper recording of interest income, the under-reporting of bad debt expense and the failure to write down the value of impaired assets.

160.    As stated in the Company's Summary of Significant Accounting Policies in its notes to consolidated financial statements in its December 31, 2006 Form 10-K, real estate acquired through foreclosure is accounted for at the lower of carrying value or fair value less estimated costs to sell at the time of foreclosure. Declines in a property's fair value below its carrying value subsequent to foreclosure would be charged to current operations.

161.    SFAS 114 states that this provision is required to be used by financial institutions to ensure that the allowance for loan losses and the expenses related to uncollectible loans is properly determined and disclosed. Consideration of credit delinquencies is an integral part of the analysis used to determine the amount of uncollectible loans.

162.    As disclosed in the press related dated August 6, 2008, which contains unaudited restatements of summarized financial statements for the reporting periods December 31, 2006; March 31, 2007, June 30, 2007, and September 30, 2007, the Company restated the previously issued financial statements to reduce the interest income improperly recognized; increase the amount of reported non-accrual loans (losses related to loans); and increase the reported amount of REO (and reduction in pre-tax income as a result of properly valuing the REO).

**2.    Violations of GAAP Relating to Modification of Loan Terms**

163.    SFAS No. 114 also incorporates the required accounting for loans where the terms of the loan have been modified. Paragraph 8 of SFAS No. 114 states:

A loans is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. As used in the Statement and in

-80-

Statement 5, as amended, all amounts due according to the contractual terms means that both the contractual interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement. For a loan that has been restructured in a troubled debt restructuring, the contractual terms of the loan agreement refers to the contractual terms specified in the original loan agreement, not the contractual terms specified by the restructuring agreement.

164.   As disclosed in a press release dated August 6, 2008, which contained unaudited restatements of summarized financial statements for the reporting periods December 31, 2006; March 31, 2007; June 30, 2007; and September 30, 2007, the Company determined it did not properly account for single family loan modifications in the third and fourth quarters of 2007. As a result the June 30, 2007 and September 30, 2007 interest income and the provision for loan losses required material adjustments.

### 3.   Violations of GAAP Regarding failure to Properly Provide an Allowance for Credit Losses

165.   The Company failed to provide an adequate allowance for credit losses and the corresponding charge off against income related to its impairment in its investment in loans as required by SFAS No. 114. SFAS 114 states that a loan is impaired when, based on current information and events, it is probable that the creditor will be unable to collect all amounts due to the contractual terms of the loan agreement.

166.   As disclosed in a press release dated August 6, 2008, which contained unaudited restatements of summarized financial statements for the reporting periods December 31, 2006; March 31, 2007; June 30, 2007; and September 30, 2007, the Company failed to provide sufficient allowances for credit losses for the year ending 2006 and during each of the quarters in 2007. The insufficient allowances resulted from improper delinquent loan accounting, improper real estate owned accounting and improper loan modification accounting.

4.    **Summary of Significant Accounting Policies (SSAP)**

167.    The Company specifically detailed its accounting policies purportedly used in preparing its consolidated financial statements in the SSAP to Consolidated Financial Statements in its Form 10-K for the year ended December 31, 2006 and the Form 10Q for the first, second and third quarter of 2007.

168.    The Defendants, two of whom are CPA's and the other the self-described "father of securitized mortgages," were aware not only of GAAP requirements, but were also aware of those accounting policies the Company specifically stated were used in preparing its annual and quarterly financial statements.  Defendants Nocella and McCann also signed verifications accompanying all financial statements with the SEC during the Class Period stating that based on their knowledge, the financial statements fairly presented in all material respects the financial conditions, results of operations, and cash flows for the periods presented therein.

169.    The financial statements were materially misstated during the Class Period, and violated both GAAP and the Company's own accounting policies.

170.    The foregoing GAAP and SSAP policies were simple and basic accounting principles and requirements of which Defendants were well aware; were aware that those principles and requirements were being violated; and were aware that such information was being hidden from investors.

171.    The basic accounting methodology for the loans relevant here is not esoteric or complicated.  Rather, it consists of simple and unambiguous principles of which Defendants were well aware.  As evidenced herein, Defendants schemed to subvert the Company's actual financial position and results of operations by, for example, using unacceptable methodology in calculating the

Company's loan loss reserves through utilization of the "Aggregation" method noted by CW1. There is no excuse or explanation for this violation of the federal securities laws.

### 5.      **Lack of Effective Internal Controls**

172.    As discussed above, Defendants were obligated by law to use the generally accepted accounting principles that were appropriate to reflect the business activities of Franklin Bank. Management also had the responsibility to design, implement, and maintain a system of internal accounting controls that would provide accounting records that reflect the transactions that were consummated by the entity.

173.    Additionally, Section 13 of the 1934 Act requires that:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
> A.      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> B.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>
> >    i.       transactions are executed in accordance with management's general or specific authorization;
> >
> >    ii.      transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;
> >
> >    iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

       iv.     the recorded accountability for assets is
compared with the existing assets at reasonable
intervals and appropriate action is taken with
respect to any differences.

174.    The FDIC had made clear to all banks, including Franklin Bank, the importance of

sufficient internal controls. Franklin Bank was required to follow the Interagency Policy Statement

on the Internal Audit Function and Its Outsourcing on December 22, 1997. This Policy Statement

identifies key characteristics and sound practices for the internal audit function and management of

internal audit outsourcing arrangements. In October 2006, the FDIC cited Franklin's contravention

of this Policy Statement. Additionally, from September 2003 through July 2008, the FDIC identified

weaknesses and independence of Franklin Bank's internal audit program, and also noted that the

scope and frequency of internal audit coverage was not fully adequate. Given that the FDIC

highlighted these deficiencies prior to the beginning of the Class Period, it is inarguable that

Defendants knew throughout the Class Period that the statements to the market that the Company had

sufficient internal controls were materially false.

175.    As revealed by the unequivocal testimony of CW1 and in the Wolfe letter, Defendants

were well aware of the lack of adequate internal controls. The Company's Class Period SEC filings

used the following language to fraudulently stated that the Company implemented adequate internal

controls:

> Franklin management is responsible for the preparation, integrity, and
> fair presentation of the consolidated financial statements included in
> this annual report. The consolidated financial statements and notes
> included in this annual report have been prepared in conformity with
> United States generally accepted accounting principles, and as such,
> include some amounts that are based on Management's best estimates
> and judgments.

-84-

> Franklin's Management is responsible for establishing and maintaining effective internal controls over financial reporting. The system of internal control over financial reporting, as it relates to the financial statements, is evaluated for effectiveness by Management and tested for reliability through a program of internal audits and Management testing and review. Actions are taken to correct potential deficiencies as they are identified.

176.    Contrary to such repeated assertions, the myriad of accounting problems recounted herein resulted from, and remained undisclosed due to, the lack of adequate internal controls. This insufficient inferred control environment constitutes a failure of the Company and its management to comply with Section 13(b)(2)(B), which requires that issuers must "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—

> i.      transactions are executed in accordance with management's general or specific authorization;
>
> ii.     transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets;
>
> iii.    access to assets is permitted only in accordance with management's general or specific authorization; and
>
> iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any difference."

177.    Moreover, the SEC has issued an interpretation of the requirements in Financial Reporting Release 28 demanding that a financial institution maintain documentation of the methodology used to determine the allowance for loan losses. Topic 6: Interpretations of Accounting Series Releases and Financial Reporting Releases L.2.b states:

the staff would normally expect to find that registrants maintain written supporting documentation for the following decisions, strategies, and processes:

> Policies and procedures:
> Over the systems and controls that maintain an appropriate loan loss allowance, and
> Over loan loss allowance methodology;
> Loan grading system or process;
> Summary of consolidation of the loan loss allowance balance;
> Validation of the loan loss allowance methodology; and
> Periodic adjustments to the loan loss allowance process.

178.    With regard to internal controls of registrants over maintenance of the allowance for

loan losses, Topic 6: Interpretations of Accounting Series Releases and Financial Reporting Releases

L.2.b states:

in order for a registrant's loan loss allowance methodology to be effective, the registrant's written policies and procedures for the systems and controls that maintain an appropriate loan loss allowance would likely address the following:

> Roles and responsibilities of the registrant's departments and personnel (including the lending function, credit review, financial reporting, internal audit, senior management, audit committee, board of directors, and others, as applicable) who determine or review, as applicable, the loan loss allowance to be reported in the financial statements;
> The registrant's accounting policies for loans and loan losses, including the policies for charge-offs and recoveries and for estimating the fair value of collateral, where applicable;
> The description of the registrant's systematic methodology, which should be consistent with the registrant's accounting policies for determining its loan loss allowance; and
> The system of internal controls used to ensure that the loan loss allowance process is maintained in accordance with GAAP.

The staff would normally expect an internal control system for the loan loss allowance estimation process to:

> Include measures to provide assurance regarding the reliability and integrity of information and compliance

-86-

> with laws, regulations, and internal policies and procedures;
> Reasonably assure that the registrant's financial statements are prepared in accordance with GAAP; and
> Include a well defined loan review process.

179.    Despite Defendants repeatedly certifying to the SEC that the Company had proper internal controls, Franklin Bank's management failed to institute policies outlined in the Staff Accounting Bulletin Interpretations referenced above.

180.    Likewise, had the Company properly maintained an internal control environment as was required by the SEC and certified to the SEC by Defendants, it would have created an environment in which the fraud would not have easily come into existence and which could not have flourished for long, much less years, without detection.

181.    More to the point, Section 302(a) of the Sarbanes-Oxley requires that the signing officers of SEC registrants assume responsibility for the establishment and maintenance of internal controls and that they evaluate them periodically, and within 90 days prior to the issuance of financial reports.

182.    In the Company's Form 10-K for the year ended December 31, 2006, Defendants McCann and Nocella signed certifications which contained representations that they and other certifying officers were responsible for establishing and maintaining disclosure controls and procedures and internal controls over financial reporting for the Company and had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.

183.    By including such certifications, Defendants McCann and Nocella demonstrated complete awareness of the requirements under Sarbanes-Oxley.  Notwithstanding and in direct contravention of Defendants McCann and Nocella representations, the Company's internal controls were not effective "to ensure that material information" was included in the Company's financial reporting.  Similar certifications were executed by Defendants McCann and Nocella with all three of Franklin Bank's 2007 Forms 10-Q.

184.    The number of periods which have been identified as requiring restatement demonstrates the lack of effectiveness, or even the lack of existence, of the internal controls at Franklin Bank.

**E.      Defendants Violated the Company's Code of Ethics.**

185.    The Company's purported Code of Ethics provides:

> The Company and the Bank each have a paramount interest in maintaining the trust, confidence and esteem of its customer and depositors, the general public and regulatory authorities.  The maintenance of such trust, confidence and esteem requires that the Company and its directors, officers, and employees exercise sound judgment and exhibit the utmost integrity in all actions relating to or reflecting upon the activities of the Company.  Therefore, the Company, acting through its Board of Directors, has promulgated and adopted this Code of Ethics and Business Conduct (the "Code").  All references to the "Company" apply to the directors, officers, and employees of the Company and all references to the "Bank" apply only to Franklin Bank, S.S.B.  This Code supplements and does not replace the other polices of the Company that require additional or higher standards of ethical conduct.

> ## GENERAL POLICY

> 1.      STATEMENT OF POLICY.  The Company expects the highest possible standard of ethical conduct from its directors, officers and employees.  Each director, officer and employee of the Company occupies a position of trust and confidence.  Each such person has a fiduciary duty to act for the primary benefit of the Company in all

matters connected with his or her office of employment. Fraud, dishonesty or criminal conduct on the part of any employee, officer or director will not be tolerated. Accordingly, each director, officer and employee must conduct himself or herself in such a manner as to avoid conflict of interest between such person's personal financial interests and the best interests of the Company and the Bank's depositors. Compliance with this Code is a term and condition of employment.

2.     SANCTIONS FOR NONCOMPLIANCE. Compliance with this Code is mandatory for every director, officer and employee of the Company. Those who violate the standards in this Code or direct others to do so will be subject to disciplinary action, up to and including termination of employment. Additionally, the violation of this Code may also be a violation of a legal requirement or prohibition, and may carry civil and/or criminal sanctions.

CODE OF ETHICS

1.     Each director, officer and employee shall carry out his or her responsibilities honestly and with integrity, maintaining and promoting high standards of ethical conduct.

2.     Each director, officer and employee, acting in his or her respective capacity, are responsible for full, fair, accurate, timely and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of directors, officers, and employees promptly to bring to the attention of the Audit Committee any material information by which he or she may become aware that affects the disclosures made by the Company in its public filings or otherwise assist the Audit Committee in fulfilling its responsibilities as specified in the Company's Audit Committee Charter.

3.     Each director, officer and employee shall promptly bring to the attention of the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

-89-

4.      Each director, officer and employee shall promptly bring to the attention of the CEO, the Senior Vice President-Legal or the Senior Vice President-Internal Audit Coordinator and to the Audit Committee any information he or she may have concerning any violation of this Code.

186.    The commitments and statements set forth in the Code of Ethics Charter as described and quoted in the preceding paragraphs were not adhered to because:

(a)     the Company's financial statements were materially overstated;

(b)     the Company's financial statements were not prepared in accordance with GAAP;

(c)     the internal controls at the Company were inadequate because, at a minimum, they failed to cause proper accounting for delinquent loans, real estate owned, loan modifications and cash surrender of life insurance were in violation of GAAP.

## NO SAFE HARBOR

187.    The federal statutory safe harbor which protects forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further, none of the statements pleaded herein which might otherwise be considered forward-looking statements were identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor were any of the arguably forward-looking statements contained in this Complaint accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for any forward-looking statements pleaded because, at the time each of those statements was made, the speaker knew the statement was false and had been authorized and/or approved by an executive officer of Franklin Bank who knew the statement was false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

188.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)     the Company's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)     The Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major news wire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Franklin Bank was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

189.    As a result of the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the Company's stock price.  In these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION

190.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and other members of the Class.

191.    During the Class Period, Defendants' misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Franklin Bank and its business, operations, performance, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices that did not reflect the stock's true value, resulting in damage to Franklin Bank's shareholders when the market reacted adversely to corrective disclosures that later exposed as untrue Defendants representations during the Class Period.

192.    As previously discussed, Franklin Bank concealed the true extent of its financial decline throughout the Class Period through its failure to reveal, at a minimum, (i) the internal controls at the Company were inadequate and (ii) the Company failed to properly account for Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting, investment securities, and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance, which constituted a violation of GAAP.

193.    Franklin Bank's efforts to conceal the true extent of its operating problems began to unravel in the fall of 2007 and spring of 2008, especially after the November 26, 2007 announcement containing additional disclosures regarding problem loans; the disclosure of an additional $20 million increase in allowance for credit losses and the May 19, 2008 restatement announcement.

194.    All told, the final disclosure of the extent of the problems directly related to the fraud set forth in this Complaint was not fully revealed (if at all) until Franklin Bank finally announced the completion of its Audit Committee investigation and the resulting restatement on May 19, 2008.

195.    As a result of these various partial disclosures of the "relevant truth(s)" concealed by the fraud set forth in this Complaint, Franklin Bank's share price fell from $19.00 on January 30, 2007 until it was rendered worthless during 2008.

196.    By comparison, as shown in the attached Exhibit E, the stock price for Franklin Bank's peers, as represented by the ACBQ Index[6], declined on average only 26.5% during the same span. In percentage terms, Franklin Bank's shares lost 46.6% more than the share prices of its two primary peers. These investor losses, therefore, were not attributable to economic or industry forces, but, rather, were primarily caused by the revelations of Franklin Bank's previous overstatement of its financial results.

197.    The extent of Franklin Bank's problems related to the prior misstatements begin to be revealed in the second half of 2007 in a series of progressive, partially corrective disclosure events, including those mentioned above. These disclosures led to significant investor losses that were substantially caused by the market's reaction to revelations making clear the prior overstatement of financial condition.

198.    Through fall/winter 2007 and early 2008, Franklin Bank had begun to reach the limit on its ability to continue to conceal its financial problems and "relevant truth" began to be revealed.

199.    On November 26, 2007, the Company announced it would increase its allowance for credit losses by $13.5 million, after tax. The Company's share price declined 17% on the day, and another 3.5% the following day. A number of analysts, including RBC Capital Markets and Stene

---

[6]The NASDAQ Americas Community Bankers Index is a market value weighted index made up of over 500 NASDAQ listed financial institutions.

Agee lowered their recommendations based upon on this news. Thus, the primary cause for the decline in share price was the result of partial disclosure of the previous fraudulent misstatements.

200.     On December 20, 2007, the Company announced that some $13.5 million in loans were being reclassified as non-performing. On this news, the stock price fell more than 5%.  Thus, the primary cause for the decline in share price was the result of partial disclosure of the previous fraudulent misstatements.

201.     On February 1, 2008, following a conference call, during which Defendants discussed an increase in loan loss allowance, the stock price fell some 13%. Further, on March 17, 2008, the Company announced its internal investigation into accounting disclosure and other areas, causing another stock price drop of almost 19%. Thus, the primary cause for the decline in share price was the result of the partial disclosure of the previous fraudulent misstatements.

202.     In April, 2008, the Company announced its agreement with AMEX to file its Form 10-K, requested a hearing before the NASDAQ listing qualifications panel, and discussed with AMEX its compliance plan. These partial disclosures, which were related to the Company's loan loss problems, caused the stock price to drop 7% on April 4, 2008, 4.5% on April 7, 2008 and 14% on April 22, 2008. Thus, the primary cause for the decline in share price was the result of the partial disclosure of the previous fraudulent misstatements.

203.     On May 2, 2008 and May 5, 2008, the Company's stock price decreased 23% and 18%. Respectively, on analyst reports of erosion in asset quality, and the lowering of EPs targets. Thus, the primary cause for the decline in share price was the result of the partial disclosure of the previous fraudulent misstatements.

204.    On May 19, 2008, the Company announced the conclusion of the Audit Committee investigation and the restatement which caused the stock price to decline some 3%. Thus, the primary cause for the decline in share price was the result of the partial disclosure of the previous fraudulent misstatements.

205.    Shortly thereafter, the Company's stock became worthless. As detailed above, Lead Plaintiff and the Class were damaged when the Company issued a series of partially corrective disclosures which together revealed as false and misleading the representations particularized in paragraphs 43 through 67 of this Complaint.

## COUNT I

### Alleged For Violations Of Section 10(b) Of The 1934 Act And Rule 10b-5 Promulgated Thereunder Against Defendants

206.    Lead Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

207.    During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase the Company's stock at artificially inflated prices that did not reflect the stock's true value. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

208.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated

-95-

as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market price for the Company's common stock in violation of Section 10(b) of the 1934 Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of the Company, as alleged below.

209.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

210.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, performance, operations, and prospects of Franklin Bank as specified herein. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Franklin Bank's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting

-96-

to state material facts necessary in order to make the statements made about Franklin Bank and its business, operations, performance, and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Franklin Bank stock during the Class Period.

211. The Defendants' primary liability, and controlling person liability, arises from the following facts, among other things: (I) each was a high-level executive and director at the Company during the Class Period; (ii) by virtue of their responsibilities and activities as a senior executive officer and director of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and reports; and (iii) each was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

212. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available. Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth regarding the Company's business, operations, performance, and prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were

false or misleading.

213.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased the Company's common stock during the Class Period at artificially inflated high prices and were damaged thereby.

214.    At the time of Defendants' misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding the business, operations, performance, prospects, and intrinsic value of Franklin Bank, which were not disclosed the Company's securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

215.    By virtue of the foregoing, Defendants each violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

216.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

-98-

## COUNT II

**Alleged For Violations Of Section 20(a) Of The 1934 Act Against Defendants**

217.   Lead Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against the Defendants as previously defined.

218.   The Defendants were and acted as controlling persons of Franklin Bank within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their high-level positions with the Company, participation in and awareness of the Company's operations and intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

219.   In addition, the Defendants had direct involvement in the day-to-day operations of the Company at the highest levels and, therefore, are presumed to have had the power to control or influence the particular acts and transactions giving rise to the securities violations as alleged herein, and exercised the same.

220.   As set forth above, each Defendant violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Company, the Individual Defendants also are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members

of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

(i)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(ii)     Awarding plaintiffs and members of the Class damages in an amount to be determined at trial, together with interest thereon;

(iii)    Awarding plaintiffs and members of the Class pre-judgment and post-judgment interest, as allowed by law, as well as attorneys' and experts' fees and other costs; and

(iv)    Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants's assets to assure plaintiffs have an effective remedy.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

Dated: December 22, 2009

Respectfully Submitted,

**CAULEY WILLIAMS BATES**
**BOZEMAN & PULLIAM, PLLC**

_J. Allen Carney by permission_

J. Allen Carney
Arkansas Bar No. 94122
Admitted Pro Hac Vice
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500 telephone
(501) 312-8505 facsimile

***Attorney in Charge for Lead Plaintiff***
***Franklin Investor Group***

Of counsel:

**CAULEY WILLIAMS BATES**
**BOZEMAN & PULLIAM, PLLC**

Darrin Williams
Arkansas Bar No. 94069
Admitted Pro Hac Vice
Randall K. Pulliam
Arkansas Bar No. 98105
Texas Bar No. 24048058
Admitted Pro Hac Vice
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500 telephone
(501) 312-8505 facsimile

and

Liaison Counsel:

**HAGANS BURDINE MONTGOMERY**
**& RUSTAY, PC**

William Fred Hagans
State Bar No. 08685500
Federal Bar No. 2457
Jennifer Rustay
State Bar No. 24002124
Federal Bar No. 23980
3200 Travis, Fourth Floor
Houston, Texas 77006
Telephone: 713.222.2700
Telecopier: 713.547.4950

## CERTIFICATE OF SERVICE

I hereby certify that I have e-filed this pleading and accordingly forwarded a true and correct copy of the foregoing upon all known counsel pursuant to all applicable rules of procedure and/or The Southern District's Administrative Procedures for Electronic Filing in Civil and Criminal Cases.

J. Allen Carney