**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| ------------------------------------------------------------ x | |
| | **C. A. NO.: 4:08-cv-01810** |
| In re FRANKLIN BANK CORP. SECURITIES LITIGATION | **CLASS ACTION** |
| ------------------------------------------------------------ | |
| The HAROLD ROUCHER TRUST U/A DTD 09/21/72, Individually And On Behalf Of All Others Similarly Situated, | |
| Lead Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| RBC CAPITAL MARKETS CORP.; ANTHONY J. NOCELLA; RUSSELL MCCANN; LEWIS S. RANIERI; LAWRENCE CHIMERINE; DAVID M. GOLUSH; JAMES A. HOWARD; ALAN E. MASTER; ROBERT A PERRO; WILLIAM . RHODES; JOHN B. SELMAN; and DELOITTE & TOUCHE LLP, | |
| Defendants. | |
| ------------------------------------------------------------ x | |

## AMENDED CONSOLIDATED PREFERRED STOCK PURCHASER COMPLAINT

Plaintiffs allege the following for their Complaint, brought under the Securities Act of 1933 (the "Securities Act") against certain defendants on behalf of themselves and all other purchasers of Series A Non-Cumulative Perpetual Preferred Stock (the "preferred stock") issued by Franklin Bank Corp. ("Franklin" or the "Bank"), who bought their shares pursuant or traceable to Franklin's May 5, 2006, initial public offering (the "preferred IPO" or the "Offering"), and further brought under the Securities and Exchange Act of 1934 (the "Exchange Act") against certain defendants on behalf of

plaintiff Roucher Trust and all other purchasers of Franklin's preferred stock, who purchased their shares in the period from January 31, 2007 to August 6, 2008 (the "Class Period").  Together, these purchasers of Franklin's preferred stock are referred to herein as the "Class."  Plaintiffs and the Class seek to recover damages resulting from their purchases of Franklin preferred stock, which was marketed and sold to them at inflated prices through the use of a materially false and misleading registration statement (the "Registration Statement"), of which a prospectus (the "Prospectus") formed a part, and subsequently traded in a market that was artificially inflated through misrepresentations and omissions to state material facts.

The allegations contained herein are made upon information and belief, except as to the allegations about plaintiffs and their counsel, which are made upon personal knowledge.  Plaintiffs' information and belief are based on, among other things, the investigation made by and through its attorneys.  Such investigation included, but was not limited to, the review and analysis of: (a) filings made by Franklin with the United States Securities and Exchange Commission (the "SEC") and with state and federal banking regulators; (b) press releases issued by the Bank; (c) newspaper, magazine, and other periodical articles relating to Franklin and the allegations contained herein; (d) reports about Franklin prepared by regulators, including the FDIC; (e) securities analyst reports about Franklin; (f) detailed stock trading data; (g) litigation documents from other cases relating to the collapse of Franklin, including bankruptcy proceedings in Delaware and certain other matters; and (h) other matters of public record.  Numerous items on which the information and belief are based are specifically cited herein.

1.      In May 2006, Franklin offered 3.45 million shares of preferred stock in the preferred IPO pursuant to the Registration Statement. The preferred IPO was priced at $25.00 per share, thus generating net proceeds of $86.25 million for Franklin.  Plaintiffs purchased Franklin preferred stock pursuant or traceable to the Registration Statement, declared effective on May 5, 2006.

2.      Following a series of revelations in the Spring of 2008 and thereafter concerning Franklin's internal controls' weaknesses and other accounting issues that affected its reported results for the third quarter of fiscal year 2007, on August 6, 2008, Franklin disclosed that it needed to restate its previously disclosed financial results not merely for the third quarter of 2007, but for all of fiscal year 2007 and fiscal year 2006.  These shocking disclosures revealed not only that the Bank's financial results for the past several years were unreliable but also that the Bank's accounting procedures and internal controls, as well as its lending practices, were severely deficient and as a result the Bank's financial position was imperiled.  As a result of these disclosures, several disclosures in the Registration Statement filed by Franklin with the Securities and Exchange Commission in connection with its preferred IPO which commenced on or about May 6, 2006, have proved to be materially false and/or misleading, to the injury of investors who purchased preferred shares in or traceable to that May 2006 offering.

3.      In addition, commencing not later than January 30, 2007, defendants issued a series of materially false and misleading statements and reports that overstated the Bank's financial condition, earnings and liquidity, that falsely minimized the balance sheet risks of the Bank and falsely stated that the Bank had little or no exposure to subprime lending, and that failed to disclose numerous

3

material facts concerning the Bank's deficient lending practices, loan portfolio profile, loan loss reserving practices and internal controls.

## Jurisdiction and Venue

4.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a).

5.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

6.     Venue is proper in this District pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that gave rise to the violations of the federal securities laws complained of herein, including the preparation and dissemination of the materially false and misleading statements, occurred in substantial part in this District. In addition, Franklin Bank maintained its principal executive offices in this District at all relevant times and the Individual Defendants, as defined below, and/or principal witnesses regularly transact business and/or reside in this District.

7.     In connection with the conduct complained of herein, Defendants, as defined below, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and interstate telephone communications, the Internet, and the facilities of a national securities exchange.

**Parties**

8.      Plaintiff Harold Roucher Trust U/A DTD 09/21/72 (the "Roucher Trust") purchased shares of Franklin preferred stock pursuant to the Registration Statement filed in connection with and in or traceable to the preferred IPO, as set forth in Exhibit 1 hereto, and was damaged thereby. By Order dated July 27, 2009, plaintiff was appointed Lead Plaintiff on behalf of the Preferred Stock Purchaser Class (*i.e.*, the class defined herein).

9      Plaintiff Joseph Pribyl purchased shares of Franklin preferred stock pursuant to the Registration Statement filed in connection with and in or traceable to the preferred IPO, as set forth in Exhibit 1 hereto, and was damaged thereby.

10.     Nonparty Franklin was a Texas-based bank holding corporation and the issuer of the preferred stock. At all relevant times, Franklin was headquartered in Houston, Texas, and it held as its principal asset a multi-branch savings bank institution, Franklin Bank, S.S.B., which was headquartered in this District and with its branches predominantly located in this District. Together, these entities are referred to herein as the "Bank" or "Franklin." The Bank is presently being liquidated under Chapter 7 of the United States Bankruptcy Code, in proceedings captioned *In re Franklin Bank Corp.*, Case No. 08-12924-CSS, pending in the District of Delaware.

11.     Defendant Lewis S. Ranieri ("Ranieri") served as a director since the Bank was founded in 2001, and as Chairman of the Board during all time relevant to this litigation. He is the founder of Hyperion Partners L.P. and Hyperion Partners II L.P. and chairman and/or director of various other entities owned directly and indirectly by Hyperion. Ranieri also serves as Chairman and President of Ranieri & Co., Inc., a private investment advisor and management corporation, and

is Chairman and a member of the Board of Directors of Hyperion Capital Management, Inc., a registered investment advisor. Prior to forming Hyperion Partners, L.P., Ranieri was a past Vice Chairman of Salomon Brothers, Inc., where he had responsibility for the firm's activities in the mortgage, real estate and government guaranteed areas. In 2002, Franklin granted Ranieri & Co. a 10-year option to purchase 570,000 shares of Franklin common stock at an exercise price of $10.00 per share.

12.     Defendant Anthony J. Nocella ("Nocella") served as a director of the Bank since April 2002 and served as President since April 2002 and Chief Executive Officer since July 2002. He served as the Chairman, Chief Executive Officer and President of Franklin Bank, S.S.B. – the operating subsidiary of the Bank – since April 2002. In May 2008, Nocella was forced to accept an accelerated retirement from the Bank in lieu of being terminated, but he continued to serve as a director. Nocella served on the Bank's Credit Committee at all relevant times, which provided oversight to the Bank's credit review and risk management process. Nocella was co-founder, Vice Chairman and Director of Bank United Corp. and was Chief Financial Officer of Bank United Corp. from its inception in 1988 until its merger with Washington Mutual, Inc. in February 2001. He founded and managed commercial banking and financial markets (mortgage banking and capital markets) and was chairman of the brokerage division of that bank. Nocella directed the issuance of the first commercial mortgage-backed bonds (REMIC) and the first single-family residential REMIC issued by Salomon Brothers and FNMA, and previously brought public Bank United Corp. (1996), PSFS (1983) and Humana, Inc., formerly American Medicorp, Inc. (1970). From 1988 to 1990, Nocella provided consulting services to Bank United Corp., as well as other financial institutions as

6

President of Nocella Management Company, a firm that specialized in asset and liability management consulting for financial institutions. From 1981 to 1987, Nocella served as Executive Vice President and Chief Financial Officer of Meritor Financial Markets. During his 13 years at Meritor (1974 to 1987), he also served as President of PSFS Management Company, the holding company of the Philadelphia Saving Fund Society, the nation's largest savings institution at the time. Nocella's other positions have included Controller and Director of Financial Services for American Medicorp, Inc., Senior Managing Auditor and Consultant for KPMG Peat Marwick and adjunct professor of finance at St. Joseph's University and Drexel University. Nocella, a Certified Public Accountant, received an undergraduate degree in accounting from LaSalle University and an M.B.A. in computer science and finance from Temple University. He also completed the Graduate Banking Financial Management Program of the Wharton School at the University of Pennsylvania. Nocella is a director and member of the Basel II Committee of the America's Community Bankers, Past Chairman and a director of the Texas Bankers Association, and delegate and Past President and Key Member of the Financial Executives Institute. Nocella also serves on the National Association of Home Builders Mortgage Roundtable. The Bank's 2006 Report Form 14A disclosed that Nocella's total compensation for the year in question was $1.27 million. He was similarly compensated in 2007.

13.      Defendant Russell McCann ("McCann") was the Bank's Chief Financial Officer and Treasurer. In such capacity, he was responsible for asset and liability management, financial and managerial accounting, treasury, funding and capital management. McCann served on the Bank's risk management committee at all relevant times, which provided oversight to the Bank's credit

review and risk management process.  Prior to joining the Bank, he was Senior Vice President and

Treasurer of Bank United Corp., where he was responsible for funding, risk management, capital

markets and asset and liability management.  He was also a member of the Asset and Liability

Committee and Deposit Pricing Committee of Bank United.  Prior to joining Bank United in 1989,

McCann was Vice President and Treasury Controller for United Savings.  Prior to joining United

Savings in 1986, McCann held various financial positions in investment banking firms.  He is a

Certified Public Accountant.  The Bank's 2006 Report on Form 14A disclosed that Mr. McCann's

total compensation in 2006 was at least $393,535.

   14. Defendants Lawrence Chimerine ("Chimerine"), David M. Golush ("Golush"), James

A. Howard ("Howard"), Alan E. Master ("Master"), Robert A. Perro ("Perro"), William Rhodes

("Rhodes") and John B. Selman ("Selman") were each directors of Franklin during the relevant time

and during the preferred IPO and each was a signer of the Registration Statement for the preferred

IPO.

   15. Defendants Ranieri, Nocella, McCann, Chimerine, Golush, Howard, Master, Perro,

Rhodes and Selman are referred to herein collectively as the "Individual Defendants."  Each of the

Individual Defendants signed the Registration Statement for the preferred IPO.

   16. At all relevant times, defendants Howard, Chimerine, Golush and Master served on

the Audit Committee of the Bank's Board of Directors.  According to the Bank's 2007 Proxy

Statement, the purpose of the Audit Committee was to assist the Board in monitoring the integrity of

Franklin's financial statements, its independent auditor's qualifications and independence, the

performance of the Bank's audit function and independent auditors, and its compliance with legal

and regulatory requirements. The Audit Committee has direct responsibility for the appointment, compensation, retention (including termination) and oversight of Franklin's independent auditors, and its independent auditors reported directly to the Audit Committee. Audit Committee members received substantial additional compensation for attendance at Audit Committee meetings.

17.     At all relevant times, defendants Ranieri, Master, Selman, Golush and Nocella served on the Credit Committee of the Bank's Board of Directors.  According to statements made by defendant Ranieri in November 2007, the Board's Credit Committee met a number of times every month at least since December 2006, and followed a process of reviewing credits on a "very big" "watch list," a list of credits the committee wanted to watch because of their risk profile.  Credit Committee Board members received additional compensation for their attendance at Credit Committee meetings.

18.     Defendant RBC Capital Markets Corp. ("RBC") is one of the world's largest financial management and advisory companies. RBC is a global underwriter of debt and equity securities and is a strategic advisor to corporations, governments, institutions, and individuals worldwide.  RBC served as the manager and lead underwriter of the preferred IPO.  RBC is headquartered at One Liberty Plaza, New York, New York 10006-1404.  RBC received in excess of $2.7 million in connection with its underwriting activities associated with the preferred IPO.  RBC enjoyed a longstanding and close relationship with Franklin, including serving as Co-Manager of its common stock initial public offering in December 2003, and acting as financial advisor on several corporate transactions predating the preferred IPO.

9

19.     RBC helped to orchestrate the preferred stock IPO, by, among other things, preparing the Registration Statement, selling Franklin preferred stock to the public, and/or conducting due diligence for the Offering.   RBC helped Franklin plan the IPO, ostensibly by launching an investigation into the business, operations, products, and future business prospects of Franklin, known as a "due diligence" investigation, which was required of them before participating in the preferred Offering.  During the course of their "due diligence," RBC had full and complete access to confidential corporate information about Franklin's business, financial condition, accounting practices and procedures, its products and services, and future business plans and prospects.  As part of ordinary and prudent due diligence, RBC in the exercise of reasonable care would have requested and reviewed audit reports, audit reviews and summary documents from auditors concerning the quality and condition of Franklin's financial reporting and internal controls, along with regulatory examination reports and any other exceptional reports about the Bank's financial reporting and internal controls.  Ordinary due diligence likewise would have entailed a review of Franklin's lending practices and its loan categorization and loan loss accounting procedures.  In addition, RBC had direct access to--and frequently communicated with--Franklin's management.  Due to the many contacts and communications between RBC and Franklin, RBC knew of or should have known of Franklin's existing financial and accounting issues, as set forth elsewhere herein.

20.     As a result of their investigation of and communications with Franklin, RBC met with Franklin representatives in the weeks before the issuance of the Registration Statement.  During these meetings, including those known as "drafting sessions," the participants met to discuss the preferred IPO's timing and the contents of the Registration Statement, and devised, agreed upon, and

10

otherwise developed the actions necessary for the consummation of the preferred IPO.  These parties discussed and reached understandings about the timing and strategy to best accomplish the IPO, the terms of the IPO, the language to be used in the Registration Statement, what disclosures about Franklin would be made in the Registration Statement, and what responses would be made to the Securities and Exchange Commission (the "SEC") in connection with its review of the Registration Statement.  RBC thereafter caused the Registration Statement to be delivered to potential and actual purchasers of Franklin preferred stock.

21.     Because of the communications between RBC and Franklin, and their access to adverse internal information about the Bank's actual accounting practices and procedures and business performance, RBC knew or should have known that the complained of statements were misleading when made and had the effect of inflating the price of Franklin's preferred stock.

22.     Defendant Deloitte & Touche LLP ("Deloitte") was the Bank's outside auditor at all relevant times.  Deloitte is an international accounting firm and one of the "Big Four," a term used to described the four largest accounting firms in the world.  Deloitte maintains its worldwide headquarters at 1633 Broadway, New York, New York 10019, and it maintains a large office at 1111 Bagby Street, Houston, Texas 77002.  Throughout the Class Period, Deloitte auditors, including Wendy Fletcher and Cindy Lopez, were present on-site at Franklin's facilities.  Based on a limited review of Board of Directors meeting minutes, it is apparent that certain of the lead liaison auditors also routinely reviewed drafts of earnings-related press releases before they were disseminated to the public, they provided comments on such releases and they approved them for dissemination.

11

**Class Action Allegations**

23.     Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and (b)(3), on behalf of a class consisting of all persons who purchased Franklin preferred stock in or traceable to the preferred IPO and/or all persons who purchased Franklin preferred stock in the period from January 31, 2007 through August 6, 2008, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, executive officers and/or directors of the corporate Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

24.     The Class is so numerous that joinder of all members is impracticable. Approximately 3.45 million shares of Franklin preferred stock were offered pursuant to the preferred IPO.  Following the preferred IPO, these shares commenced trading on the American Stock Exchange, where thousands of shares routinely changed hands.  It is believed that thousands of investors purchased Franklin preferred stock pursuant or traceable to the Registration Statement, rendering joinder of all such purchasers impracticable.

25.     The names and addresses of the record owners of Franklin preferred stock purchased pursuant to the preferred IPO are available from RBC, the Bank's transfer agent or agents and other sources.  Notice can be provided to such record owners using the techniques and forms of notice similar to those customarily used in class actions of this type.

26.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class sustained damages as a result of the conduct complained of herein.

27.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the members of the Class that Plaintiffs seek to represent.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely effecting individual members of the Class. Among the questions of law and fact common to the Class include whether:

a.     Defendants violated Sections 11 and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act, as alleged herein;

b.     The Registration Statement contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.     The statements made in the period from January 31, 2007 through August 6, 2008 were materially false and misleading and whether such statements artificially inflated the price of Franklin's preferred stock or served to maintain artificially inflated prices of such stock;

13

        d.      The price of Franklin preferred stock in the preferred IPO was inflated due to the non-disclosures and misstatements complained of herein; and

        e.      The members of the Class have sustained damages and, if so, the appropriate measure thereof.

    30.    Plaintiffs know of no difficulties that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

**Substantive Allegations**

*The Materially Misleading Preferred Stock IPO*

    31.    In connection with the preferred IPO, the Bank filed a Registration Statement and the Prospectus, which forms a part of the Registration Statement, on May 5, 2006. The Registration Statement was required to set forth all material facts about Franklin's business and financial condition, as well as any relevant risk factors. According to the Bank's disclosures, the offering was priced on May 5, 2006.

    32.    The statements made by Defendants in the Registration Statement and Prospectus were false and misleading when made because they did not accurately and fully advise investors that, among other things:

        a.      The Bank's accounting practices and internal controls were materially deficient;

        b.      The Bank did not adequately reserve for loan losses;

        c.      The Bank did not properly account for or reserve for loan losses;

14

     d.      The Bank's delinquent loan accounting, real estate owned ("REO") accounting, loan modification accounting, investment securities accounting and bank-owned life insurance ("BOLI") accounting were all deficient and/or impaired such that the Bank's financial reporting could not be relied upon;

     e.      The Bank's Allowance for Loan and Lease Losses (ALLL) methodology repeatedly had been the subject of concern in nonpublic FDIC examination reports sent to the Bank starting no later than September 2004 [FDIC OIG Report (July 2009) (defined infra) at 9];

     f.      The Bank had repeatedly failed to implement FDIC examiner recommendations (including those made in a November 2005 report) regarding improving the Bank's liquidity policies and establishing a CLP [Contingency Liquidity Plan] and volatile liability risk limits [FDIC OIG Report at 16], thereby exposing the Bank to a heightened risk of failure;

     g.      The Bank directly and indirectly engaged in risky, poorly documented, and/or exotic low quality and subprime lending; and

     h.      As a result of the foregoing, the Bank's results of operations, reported earnings, earnings per share, retained earnings and shareholders' equity, among other things, were materially overstated; and, as a further result, the Bank's ability to pay its regular dividend was severely impaired.

     33.     In many places throughout the Registration Statement, Defendants made the following false and misleading statements and set forth the facts that follow. These statements among numerous others were false and misleading because they omitted the material facts alleged *supra*, which were necessary to make the statements made in the Registration Statement truthful:

15

      a.      In its recitation of its business operations, the Bank repeatedly characterized its lending practices as conservative, repeatedly asserting that the Bank had "established" and "utilized" "lending practices to reduce risks" (Prospectus at 26);

      b.      In its description of its Builder Finance business, the Prospectus stated at pages 26 and 27:

> In order to be approved for a builder line, we require that customers satisfy specific qualification requirements, including reputation in the community, unsold inventory levels, geographic area concentration and other factors. ...
>
> We utilize certain lending practices to reduce these risks, including pricing all builder lines based on a risk adjusted return on capital and underwriting them based on debt/net worth, cash flow coverage, loan-to-value and loan-to-cost ratios, interest rate coverage, experience of management, inventory turnover by subdivision and guarantees. We monitor the ongoing financial condition of the builder and the status of construction by regular review of periodic builder reports and financials and site inspection of the actual construction. We approve draws only after third party on-site inspections and review of subdivision performance and borrowers' inventory. We believe these requirements reduce the potential for misdirected advances to other areas of the builder's business.
>
> Commercial Real Estate. ... We have established certain lending practices to reduce our risks relating to these types of loans. These include, but are not limited to, maximum loan-to-value, minimum debt service coverage, physical inspections and the operating experience of the borrower.
>
> Mortgage Banker Finance. ... To reduce [] risks we have assembled a team of experienced mortgage banker finance professionals to manage this business. We have established the necessary procedures, controls, and systems to operate this business, including taking control of the mortgage collateral, monitoring the age of the collateral supporting the line and requiring paydowns on the line when the collateral on the line exceeds a specified age. ...
>
> Single Family Mortgage Portfolio
>
> Our single family mortgage portfolio provides high quality liquid assets for us while we develop our community banking and commercial product lines.

c.      The Prospectus, at page 3, also stated that "[o]ur single family mortgage portfolio provides high quality liquid assets for us ....";

d.      Under a section entitled "Recent Developments," the Bank's Prospectus stated that "[f]or the three months ended March 31, 2006, our net income was $6.6 million or $0.28 per diluted share, compared to $6.9 million or $0.31 per diluted share for the quarter ended March 31, 2005.  Total assets increased $297.2 million to $4.8 billion at March 31, 2006, from $4.5 billion at December 31, 2005.  The increase in assets was primarily attributable to the growth in mortgage backed securities and commercial loans that grew $189.6 million and $153.5 million, respectively." (Prospectus at 2);

e.      The Bank's Financial Summary, on page 1 of the Prospectus, reported, among other things, net income of $26.296 million in fiscal 2005 and diluted earnings per share of $1.13, and a nonperforming assets to total assets ratio of 0.69;

f.      The Bank's Selected Historical Financial Information, on pages 22 and 23 of the Prospectus, included the above figures and related figures pertaining to asset quality; and

g.      Related historical financial information incorporated by reference into the Registration Statement and Prospectus, including financial results from fiscal year 2005 and from the first quarter of fiscal 2006; and including without limitation all statements to the effect that the Bank's financial results had been prepared in conformity with generally accepted accounting principles ("GAAP") and that the Bank's financial accounting function possessed working and adequate internal controls.

17

34.    Immediately after the Bank commenced its bona fide sale of the preferred stock, it went on a road show, in which officers of the Bank, including certain of the defendants herein, with the assistance of RBC, repeated the foregoing materially false and misleading information and further stated that the Bank's commercial loans had "increased 58% from December 31, 2004," that the Bank acquired "high quality mortgages" and that the Bank "Ranked #1 in revenue growth within the *Houston Chronicle's* Houston 100 list."

35.    In the Spring of 2008, Franklin disclosed that its third quarter 2007 financial reporting could not be relied upon and that it was conducting an investigation into certain accounting practices at the Bank.  At that time, Franklin attempted to characterize the issues as isolated as to time.  In May 2008, however, Franklin suggested that additional periods would be impacted.  On August 6, 2008, Franklin filed a Report on Form 8-K disclosing for the first time that as a result of the investigations into accounting deficiencies and problems associated with fiscal year 2007 and interim reporting periods in that year, the Bank "has undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005 and 2004" and that Franklin had engaged an accounting firm to serve as Special Accounting Master to review its accounting practices and financial disclosures.  Since the time of that disclosure, Franklin has made no further financial disclosures via the SEC's EDGAR filing system.

36.    Among numerous other disclosures, the August 6, 2008 Report on Form 8-K disclosed that the Bank's previously disclosed assets in 2006 were overstated by at least $22 million and that its diluted earnings per share were overstated by at least $0.05, or almost 10%.  As a result of these and other deficiencies outlined in the filing, the Bank reported that it would take a loss of

18

$102 million in the second quarter of 2008, including a $70 million goodwill impairment charge. None of these figures were finalized, however, and the Bank never filed another quarterly or annual report on Form 10-Q or 10-K, and it never took the opportunity to amend prior reports for 2006 through 2008, as to which the Bank then disclaimed reliability.

37.     On November 7, 2008, Franklin Bank, S.S.B, the principal asset held by the Bank, was closed by the Texas Department of Savings and Mortgage Lending, and the Federal Deposit Insurance Corporation (FDIC) was appointed as Receiver of the Bank. Franklin entered liquidation proceedings shortly thereafter. As a result of the liquidation proceedings, all further restatement efforts and any forensic accounting efforts of any purported "Special Accounting Master" or other person or entity assigned to determine the Bank's actual historical financial information appear to have been suspended. The value of the preferred shares, which are now essentially worthless, declined precipitously upon disclosure of various accounting issues set forth herein.

38.     On July 2, 2009, the FDIC's Office of Inspector General issued an Audit Report concerning its Material Loss Review of Franklin (the FDIC's "OIG Report"). The Audit Report reviewed numerous instances in which FDIC examiners brought material deficiencies to the attention of Franklin and its management, but which deficiency alerts went unheeded. In particular, for example, in each of four FDIC examinations, in September 2003, September 2004, November 2005 and October 2006, the FDIC examination reports – which were contemporaneously furnished to Franklin and its management – concluded, *inter alia*:

> - Franklin had internal audit weaknesses and/or inadequacies.
>
> - Franklin's ALLL methodology had weaknesses and/or inadequacies.

19

- Franklin needed to improve its internal audit function.

By November 2005, the FDIC's examination report noted:

- Accounting and financial reporting concerns at Franklin;

- Concentrations of loans in several high risk categories, including high risk geographies and subprime loans; and

- Franklin did not have adequate risk management to identify, measure, monitor and control risk.

39.     According to a Fall 2008 Examination Report prepared by the FDIC, the Bank's single family mortgage loans were vastly overconcentrated in California.  The report stated that "[o]nly 18 percent of the portfolio is considered a 'fully-documented' product, with the balance originated under various 'limited documentation' or stated income programs."  It also stated that "[t]he primary risk factors leading to performance problems are the existence of piggy-back second liens, limited documentation/no documentation of income, and geographic location."  The report noted "continued" deficiencies, highlighting a history of such problems, stating that the Bank's Commercial Real Estate "program continues to have significant deficiencies and overall risk management practices remain unsatisfactory ...."  The examination report also stated, *inter alia*, the following concerning the Bank's multi-billion dollar mortgage transactions business:

> The current Compliance Examination identified notable concerns involving the Board and senior management's inadequate oversight of its mortgage purchase and servicing transactions involving third parties.  These types of activities involve a majority of the institution's activities.  Examiners determined that Franklin Bank's asset acquisition policies and procedures do not include compliance due diligence prior to acquiring loan packages.  Interviews with management confirmed they relied solely on compliance regulation warranties and representations included in the purchase agreements.

20

In addition, the bank does not have policies and procedures regarding oversight of serviced loans. Interviews with management revealed the bank *never* performed any compliance-related reviews of any of their loan servicers. Management had no knowledge of whether any consumer complaints existed or how the servicers handled oversight responsibilities regarding third-party services even though the bank's service agreements provided access rights to information and documentation, including the right to examine and audit servicer compliance with applicable regulations regarding mortgage loans. ...

In most instances, the lack of available documentation, coupled with the institution's full attention to its potential risk management issues, prevented identification of specific violations. However, given the volume of the bank's multi-billion dollar involvement in mortgage lending activities and management's acknowledgment of its lack of supervision and oversight, the issue remains a significant one.

(Emphasis added.)

40.     None of these findings in the nonpublic examination reports (which are exempt from FOIA disclosure but which were available to all defendants, including RBC during its due diligence examination) were disclosed to Franklin's investors during the relevant time.

*Materially False and Misleading Class Period Statements:*

*The False and Misleading 2006 Year-End Reports and Data*

41.     On January 30, 2007, after the market closed, Franklin issued a press release announcing its fiscal year 2006 earnings. Franklin announced that it had earned income of $15,517,000, or $0.65 per share, for the 12 months ended December 31, 2006. These figures were materially overstated by at least $1,122,000, or $0.05 per share, as reflected in Franklin's Report on Form 8-K filed with the SEC on August 6, 2008.

42.     The January 30 press release also included various other financial data which was materially misstated, including reporting Real Estate Owned (*i.e.*, real estate in foreclosure) as of

December 31, 2006 of $22,031,000, which was restated in the August 6, 2008 Report on Form 8-K to $24,172,000, reflecting an understatement at the time of the press release of $2,141,000; Nonperforming Loans (NPLs) of $13,260,000 as of December 31, 2006, which was restated in the August 6, 2008 Report on Form 8-K to $33,761,000, reflecting an understatement of nonperforming loans at the time of the press release of $20,501,000; and Nonperforming Assets (NPAs) of $34,523,000 as of December 31, 2006, which was restated in the August 6, 2008 Report on Form 8-K to $57,165,000, reflecting an understatement at the time of the press release of $22,642,000. These misrepresentations naturally caused numerous other metrics reported by the Bank to be misrepresented as well, including NPLs as a percentage of loans and NPAs as a percentage of assets, both of which investors use to gauge to the financial condition of financial institutions.

43.     On January 31, 2007, the Bank held a conference call for investors in which much of the above-described financial data was again provided to investors. During this conference call, defendant Nocella misleadingly referred to the Bank's "continued unwillingness to compromise our credit standards by participating in the higher-risk, non-traditional mortgage market," and during a question-and-answer portion of the call, in response to a question about whether the Bank had any "exotic products" on its balance sheet, Nocella expressly denied that the Bank ever had any such assets ("we never had anything like that") and stated that if they ever did, "it wouldn't even touch our balance sheet." These remarks falsely downplayed the level of risk in the Bank's balance sheet, falsely implying that its loan portfolio was less risky. These remarks also misleadingly failed to disclose that the Bank made subprime and limited documentation and other exotic loans, which carried great risks to the Bank's balance sheet and liquidity. Indeed, according to the FDIC, by

22

October 2007, at which time defendants continued to deny that Franklin engaged in subprime lending or owned subprime loans, "subprime loans represented approximately 67 percent" of the Bank's Tier 1 Capital. By July 2008, that number had risen to 171 percent. The FDIC OIG Report also confirmed that "Franklin originated, purchased and sold an array of mortgage products that included nontraditional and subprime mortgages." The FDIC reported that Franklin's portfolio included interest-only loans, no documentation, low documentation and stated income loans; payment option adjustable rate mortgages, and several other high-risk categories of loans.

44.     On March 14, 2007, Franklin filed its annual Report on Form 10-K for the twelve months ended December 31, 2006, with the SEC. In addition to repeating all of the financial data included in the January 30, 2007 press release, the Report on Form 10-K stated in the notes to the financial statements:

> We maintain our allowance for credit losses at the amount estimated by management to be sufficient to absorb probable losses based on available information. Our estimates of credit losses meet the criteria for accrual of loss contingencies in accordance with SFAS No. 5, "Accounting for Contingencies," as amended by SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."
>
> ...While it is possible that the bank may sustain losses which are substantial relative to the allowance for credit losses, it is the judgment of management that the allowance for credit losses is adequate to absorb losses which may exist in the current loan portfolio.

In truth, the Bank's reserves for credit losses did not meet the criteria set forth in the applicable accounting literature, as set forth more fully *infra*.

45.     The March 14, 2007 Report on Form 10-K included a Report of Independent Registered Public Accounting Firm dated March 12, 2007 (the "2006 10-K Audit Report"), and

signed by Deloitte & Touche LLP.   The 2006 10-K Audit Report, which was addressed to

shareholders, stated:

> We have audited the accompanying consolidated balance sheets of Franklin Bank Corp. and subsidiaries (the "company") as of December 31, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2006.  These financial statements are the responsibility of management.  Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement.  An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such financial statements present fairly, in all material respects, the financial position of Franklin Bank Corp. and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.
>
> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the company's internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 12, 2007, expressed an unqualified opinion on management's assessment of the effectiveness of the company's internal control over financial reporting and an unqualified opinion on the effectiveness of the company's internal control over financial reporting.

As explained *infra*, Deloitte's audits were not conducted in conformity with the standards of the

Public Company Accounting Oversight Board (PCAOB), generally accepted auditing standards

24

(GAAS) and the applicable standards set forth above. Its statement that the Bank's financial statements presented fairly in all material respects the financial position of Franklin was untrue and misleading. Deloitte's unqualified audit report was materially false and misleading and served to further mask the materially false and misleading financial information described herein.

46.     The March 14, 2007 Report on Form 10-K included in Item 9A to the Notes to the Consolidated Financial Statements a section relating to Controls and Procedures, which also included Management's Report on Internal Control Over Financial Reporting and an Attestation Report of Independent Registered Public Accounting Firm. Note 9A states that management of the Bank conducted an evaluation of the effectiveness of the Bank's disclosure controls and procedures as of December 31, 2006, and that "[b]ased on this evaluation, the company's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the company's disclosure controls and procedures were effective." Management's Report on Internal Control Over Financial Reporting likewise concluded that, "[b]ased on the assessment [of the effectiveness of the company's internal control over financial reporting], management determined that the company maintained effective internal control over financial reporting as of December 31, 2006, based on those criteria" set forth in "Internal Control - Integrated Framework," issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission.

47.     Deloitte's Attestation Report, dated March 12, 2007, which purported to reflect an audit of the foregoing assessment by management, and which Attestation Report was included in the 2006 Report on Form 10-K, likewise stated:

> In our opinion, management's assessment that the company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in

25

all material respects, based on the criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

48.     All of the foregoing statements concerning financial condition and internal controls contained in the 2006 Report on Form 10-K were materially false and misleading because defendants knew or recklessly disregarded that, *inter alia*:

(i)  Franklin materially overstated its revenues, earnings per share, shareholders' equity, and related financial figures, as reflected above;

(ii) Franklin's credit loss reserves were not maintained at an adequate level in light of the deteriorating circumstances of its loan portfolio, the economic conditions prevailing in certain areas of loan concentration and concomitant high risk of noncollectibility of a large portion of such loans and the reckless and imprudent lending practices (such as limited documentation and subprime lending) which exposed the Bank and its shareholders to high and increasing risks of noncollectibility;

(iii) Franklin's income, assets and net worth were materially inflated because of Franklin's failure to make adequate and timely provisions for prospective credit losses;

(iv) Regulatory examinations had repeatedly shown that the Bank's internal controls were materially deficient and in need of improvement;

26

(v) Franklin's method for identifying foreclosures or real-estate owned was inadequate and caused the Bank to materially understate REO, as admitted in the Bank's Report on Form 8-K on August 6, 2008; and

(vi) Deloitte's audit of Franklin's fiscal 2006 financial statements was not made in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") or generally accepted auditing standards ("GAAS") and its certification of those financial statements was improper because such statements were not presented in conformity with generally accepted accounting principles ("GAAP"), as set forth herein.

49.     On March 29, 2007, Franklin filed its Definitive Section 14A Proxy Statement (the "Proxy Statement") with the SEC and distributed copies of the Proxy Statement by United States Mail to shareholders and preferred stockholders of record.  Among other things, the Proxy Statement included a materially false and misleading Report of the Audit Committee of Franklin's Board of Directors, signed by defendants Howard (Chair of the Committee), Chimerine, Golush and Master on March 26, 2007.  This report stated *inter alia*:

> As part of its oversight of the Company's financial statements, the Audit Committee reviewed and discussed with both management and the Company's independent auditors the audited financial statements prior to their issuance. These reviews included discussion with Deloitte & Touche LLP, the independent auditors, of matters required to be discussed pursuant to Statement on Auditing Standards No. 61 (Communication with Audit Committees). The Audit Committee also discussed with Deloitte & Touche LLP matters relating to its independence, including a review of the written disclosures and letter from Deloitte & Touche LLP to the Audit Committee pursuant to Independence Standards Board Standard No. 1 (Independence Discussions with Audit Committees).
>
> Taking all of these reviews and discussions into account, the Audit Committee on March 8, 2007 recommended to the Board that the Board approve the inclusion of the

27

Company's audited financial statements in the Company's Annual Report on Form
10-K for the fiscal year ended December 31, 2006, for filing with the Commission.

50.    Also on or about March 29, 2007, at the same time that Franklin disseminated its

Proxy Statement, Franklin mailed to stockholders (including preferred stockholders) and other

members of the investment community a 16-page color brochure-style Annual Report, separate and

apart from the Annual Report on Form 10-K. This standalone brochure did not contain any "safe

harbor" disclosures and contained no meaningful cautionary information. This brochure-style

Annual Report included much of the same misleading summary financial data as highlighted above,

including the untrue reported net income of $0.65 per share, and net income available to Common

Stockholders of $15,517,000. These figures were materially overstated at least by the amounts as

indicated by the restatement contained in the August 6, 2008 Report on Form 8-K.

51.    The March 2007 brochure-style Annual Report, which included a letter to

stockholders over the signatures of defendants Ranieri and Nocella, also misleadingly stated:

> We anticipate 2007 will be a year of record earnings for Franklin. The remixing of
> the balance sheet toward commercial and community banking lending will transform
> our image into a community based commercial bank. In addition, this will allow for
> improved valuation and more stable earnings for our stockholders.

This document also included other narrative, approved by defendants Nocella and Ranieri, among

others, that falsely overstated the Bank's success and future prospects and falsely portrayed the

Bank's lending practices as conservative, safe and sound, stating for example:

> Michael Davitt, Executive Vice President and Managing Director – Commercial
> Lending, foresees continued commercial loan growth in certain markets across the
> United States. Texas continues to be one of those markets. "We expect our growth
> in the commercial loan portfolio to come from the addition of new officers and the
> new customers they bring, while maintaining sound credit quality standards."

28

*The False and Misleading First Quarter 2007 Reports and Data*

52.     On April 19, 2007, Franklin issued a press release pre-announcing its first quarter earnings for 2007.  Franklin announced that it had earned income of $6,200,000, or $0.26 per share, for the three months ended March 31, 2007.  Franklin stated that these earnings per share were "in-line with the Company's guidance for the first quarter of 2007."  These figures were materially overstated by at least $410,000 or $0.02 per share, as reflected in Franklin's Report on Form 8-K filed with the SEC on August 6, 2008.  Had the correct information been disclosed, Franklin would have reported an earnings shortfall or a negative earnings surprise, and thus the data was material.

53.     On April 26, 2007, Franklin issued a press release announcing its first quarter earnings for 2007.  Franklin again reported that it had earned income of $6,200,000, or $0.26 per share, for the three months ended March 31, 2007.  These figures were materially overstated by at least $410,000 or $0.02 per share, as reflected in Franklin's Report on Form 8-K filed with the SEC on August 6, 2008.  Franklin also reported that Nonperforming Assets (NPAs) of $41,815,000 as of March 31, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $78,096,000, reflecting an understatement at the time of the press release of $36,281,000.  The April 26, 2007 press release also "reaffirmed" Franklin's annual earnings guidance for 2007 of $1.34 to $1.44 per diluted share, stating, "[o]n a quarterly basis earnings are expected to be as follows: second quarter $.30 to $.33, the third quarter $.37 to $.41 per diluted share, and the fourth quarter $.41 to $.44 per diluted share."

54.     On May 10, 2007, Franklin filed its quarterly Report on Form 10-Q for the first quarter of 2007, the period ended March 31, 2007.  The Report on Form 10-Q repeated the foregoing

earnings data, and also included various other financial data which was materially misstated, including reporting Real Estate Owned (*i.e.*, real estate in foreclosure) as of March 31, 2007 of $24,431,000, which was restated in the August 6, 2008 Report on Form 8-K to $32,100,000, reflecting an understatement at the time of the Report on Form 10-Q of $7,669,000; Nonperforming Loans (NPLs) of $17,929,000 as of March 31, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $46,541,000, reflecting an understatement of nonperforming loans at the time of the Report on Form 10-Q of $28,612,000; and Nonperforming Assets (NPAs) of $41,815,000 as of March 31, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $78,096,000, reflecting an understatement at the time of the Report on Form 10-Q of $36,281,000. These misrepresentations naturally caused numerous other metrics reported by the Bank to be misrepresented as well, including NPLs as a percentage of loans and NPAs as a percentage of assets, both of which investors use to gauge the financial condition of financial institutions.

55.    Also in this time period, on April 12, 2007, Franklin conducted a public offering of $100,000,000 of 4% Contingent Convertible Senior Notes due 2027 at $1,000 per note. The notes were convertible under certain circumstances at a conversion price of $22.00 per share, which, according to the Bank, represented a 40% conversion premium over the April 12 [2007] closing price of Franklin's common stock of $15.70 per share." RBC and Bear Stearns & Co. were the underwriters of the notes offering.

*The False and Misleading Second Quarter 2007 Reports and Data*

56.    On July 24, 2007, Franklin issued a press release announcing its second quarter earnings for 2007. Franklin announced that it had earned income of $7,101,000, or $0.30 per share,

for the three months ended June 30, 2007. These figures were materially overstated by at least $1,607,000, or $0.07 per share, as reflected in Franklin's Report on Form 8-K filed with the SEC on August 6, 2008. The press release also included updated earnings guidance for the remaining two quarters of fiscal 2007, stating, "Franklin's quarterly earnings are expected to be as follows: for the third quarter, $.32 to $.34 per diluted share, and the fourth quarter, $.34 to $.36 per diluted share."

57.     On July 25, 2007, Franklin conducted a conference call with the investment community, during which defendants McCann and Nocella repeated the foregoing reported earnings results, as well as its earning guidance for the third and fourth quarters of 2007. Also during the call, in colloquy with Paul Miller of the investment firm Friedman Billings Ramsay during the "Q and A" portion of the call, Miller asked about subprime lending issues that were emerging at other banks, and especially at Countrywide Financial Corp. In response, defendant Nocella gave a rambling response, but stated unequivocally (but falsely) that "we don't have any subprime ... ."

58.     On July 31, 2007 and August 1, 2007, defendant Selman sold 20,000 shares of common stock at prices ranging from $10.07 to $11.37 per share.

59.     On August 9, 2007, Franklin filed its Report on Form 10-Q for the quarterly period ended June 30, 2007, which repeated the false and misleading earnings data recited in the July 24, 2007 press release. The Report on Form 10-Q also included various other financial data which was materially misstated, including reporting Real Estate Owned (*i.e.*, real estate in foreclosure) as of June 30, 2007 of $31,199,000, which was restated in the August 6, 2008 Report on Form 8-K to $40,870,000, reflecting an understatement at the time of the press release of $9,671,000; Nonperforming Loans (NPLs) of $16,324,000 as of June 30, 2007, which was restated in the August

31

6, 2008 Report on Form 8-K to $52,640,000, reflecting an understatement of nonperforming loans at the time of the press release of $36,316,000; and Nonperforming Assets (NPAs) of $47,194,000 as of June 30, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $93,181,000, reflecting an understatement at the time of the press release of $45,987,000. These misrepresentations naturally caused numerous other metrics reported by the Bank to be misrepresented as well, including NPLs as a percentage of loans and NPAs as a percentage of assets, both of which investors use to gauge the financial condition of financial institutions.

*The False and Misleading Third Quarter Reports and Data*

60.    On each of August 20, 2007, September 10, 2007, and October 30, 2007, Franklin filed with the SEC as attachments to Reports on Form 8-K, copies of powerpoint "investor presentations" reflecting statements and presentations made to gatherings of investors in or around the time of the filing.  These presentations included the then-most recent false and misleading financial information and earnings guidance (i.e., the July 24, 2007 statements *supra*), as well as textual slides that falsely stated, among other things, that Franklin had a "low risk balance sheet with minimal sub prime exposure."

61.    On October 29, 2007, Franklin issued a press release announcing its fiscal year 2006 earnings. Franklin announced that it had earned income of $7,549,000, or $0.30 per share, for the three months ended September 30, 2007. These figures were materially overstated by at least $8,946,000, or $0.36 per share, as reflected in Franklin's Report on Form 8-K filed with the SEC on August 6, 2008.  Thus, if the correct figures had been reported, Franklin would have reported a loss

32

of at least $0.06 per share. The press release also stated that "Franklin still expects earnings for the fourth quarter to be $.34 to $.36 per diluted share."

62.    On October 30, 2007, Franklin conducted a conference call with the investment community, during which defendant Nocella repeated the foregoing false and misleading reported earnings results, as well as its misleading earnings guidance for the fourth quarter of 2007.

63.    On November 9, 2007, Franklin filed its Report on Form 10-Q for the quarterly period ended September 30, 2007, which repeated the earnings data recited in the October 29, 2007 press release. The Report on Form 10-Q also included various other financial data which was materially misstated, including reporting Real Estate Owned (*i.e.*, real estate in foreclosure) as of September 30, 2007 of $39,032,000, which was restated in the August 6, 2008 Report on Form 8-K to $44,558,000, reflecting an understatement at the time of the press release of $5,526,000; Nonperforming Loans (NPLs) of $30,166,000 as of September 30, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $91,153,000, reflecting an understatement of nonperforming loans at the time of the press release of $60,987,000; and Nonperforming Assets (NPAs) of $68,905,000 as of September 30, 2007, which was restated in the August 6, 2008 Report on Form 8-K to $135,711,000, reflecting an understatement at the time of the press release of $66,806,000. These misrepresentations naturally caused numerous other metrics reported by the Bank to be misrepresented as well, including NPLs as a percentage of loans and NPAs as a percentage of assets, both of which investors use to gauge the financial condition of financial institutions.

64.    On November 26, 2007, Franklin issued a press release that stated:

Franklin Bank Corp. (Franklin or Company), the parent company of Franklin Bank, S.S.B., today announced that, in response to unprecedented market condition changes

33

in the past few weeks, management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors.

Such evaluation and review included, among other things but not limited to, an analysis of recent market value deterioration of housing by geography, increased Chapter 11 protection filings of national home builders, and worsening liquidity in the mortgage markets.

As a result of such evaluation and review, Franklin *elected* to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax). This increase is over and above Franklin's annual credit costs.

Franklin's management anticipates credit costs for the commercial loan portfolio to range between $5.0 million to $7.5 million for 2008 and believes *these actions should ensure the level of future earnings*, as annual credit costs will be limited to expected levels within its guidance.

Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91%. The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while the overall commercial loan reserve will increase from 0.61% to 1.33%. *Franklin Bank's regulatory capital will remain in excess of the regulatory "well capitalized" requirements.*

*Real Estate Owned has been marked to market and is carried at net realizable value.* This includes selling costs and is not related to the above reserves. *Franklin anticipates Real Estate Owned to decrease by year end.* Non-performing loans, both existing and potential, were part of the evaluation of Franklin's loan portfolio and are believed to be adequately collateralized, including the costs of acquisition and sale.

Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.

In addition, while conducting the evaluation and review described above, Franklin discovered that four loans related to one borrower totaling $13.5 million should have been categorized in the third quarter Form 10Q as troubled debt restructurings. As a result, Franklin will revise certain disclosures and file an amendment on Form 10Q/A to reflect treatment of such loans as troubled debt restructurings. Although this change will increase reported amounts of investment in impaired loans and the allowance for impaired loans, it will not result in any change to reported net income for the period covered by the report.

34

(Emphasis added.) Among other things, the November 26, 2007 press release was materially false and misleading because: (i) it falsely portrayed the increase in reserves as a voluntary internal decision driven by conservatism rather than admitting that it was a requirement forced on it by the bank's regulators; (ii) the Bank was not well capitalized as represented; (iii) the Bank's statements about "ensuring the level of future earnings" and that the Bank "anticipates Real Estate Owned to decrease by year end" had no basis in fact. In fact, based on the FDIC Examination Report, it is clear that in October 2007 regulators imposed a set of urgent actions on Franklin requiring it to seek to improve its capital structure and ALLL methodology and address a variety of internal controls issues. The increase in loan loss reserves was the direct result of this mandatory action plan imposed by regulators and not a result of a voluntary assumption of prudent banking practices. Indeed, the action plan imposed by regulators also required various steps to maintain a "Well-Capitalized" designation under the Prompt Corrective Action provisions of Part 325 of the FDIC Rules and Regulations. According to the Examination Report, a plan was not even approved until April 2008, which was subsequently revised in July 2008. All of this shows that the Bank was not considered "well capitalized" or that its "well capitalized" designation was in peril at least as of October 2007.

65.     Although the October 2007 Report of Examination by the FDIC has not been made public, the FDIC OIG Report confirms that the mandatory action plan was a response to examination findings documented in the October 2007 Report of Examination, "including apparent violations of laws and regulations, inadequate risk management and internal controls, and other safety and soundness issues...." The severity of the problems was so great that the Dallas Regional Office of the

35

FDIC provided a continual on-site presence at the Bank and was actively investigating accounting issues from at least that time forward. None of this was disclosed to investors at the time.

66.     Thereafter, on November 26, 2007, Franklin conducted a conference call with the investment community, during which it repeatedly emphasized the decision to increase loan loss reserves as one motivated by following conservative accounting principles rather than regulatory pressures. During the conference call, defendant Ranieri downplayed market risk to the Bank and emphasized that its reserving practices were conservative, stating:

> Fortunately, we are – and we have looked at this hard, we remain well collateralized in those positions [two loans to builders that declared bankruptcy in the quarter] even after the market declined. But nonetheless, it is a troubling eventuality. We have evaluated these changes relative to the potential risk inherent in our portfolio and as a result of these changing market conditions have concluded that we are going to increase reserves by approximately $20 million. We believe this action that we are taking will ensure the level of future earnings, as the annual credit cost should be limited to the expected levels within our guidance. What we are trying to do here, we believe we are adequately reserved, we have looked at this very hard. But given the circumstances and I will be happy to elaborate on this later that we are seeing, we are trying within the confines of what the accounting literature will allow us to do. Take this whole issue of the institution's mortgage portfolio, and its lending to builders off the table with the reserve that will carry us not for a period, but into the future because frankly management and the Board does not want to have to do this again. These are obviously difficult times, but I and the management are very experienced in this.

Further, defendant Ranieri engaged in the following colloquy during the question and answer portion of the call:

> Q (by James Ellman of Seacliff): Has there been any conversation that you have had regarding this change in your provisioning with the regulators and any additional need to raise capital?
>
> A (Ranieri): No, I – the first part, this is Lewis. As you know we can't comment on conversations with the regulators. But neither are we stupid, and I would leave it at that. And we remain well capitalized by all standards. And we have access to

> capital, but we would not choose at this stock price. ... But we have no desire, given that we remain well capitalized by all ratios, to think about diluting shareholders.

At defendant Nocella's request during the call, Andy Black, who served as president of the underlying savings bank commented that "our community bank business in Texas is strong" and that "[l]oans have also grown in the community banks, year-over-year, while maintaining a solid credit quality." None of the remarks made during the conference call were accompanied by cautionary language. In truth, the Bank was not well capitalized and its credit standards were not high. Likewise, the assertions that purported to characterize the addition of $20 million in loan loss reserves as conservative were materially false and misleading as set forth above and as these provisions were materially inadequate.

67.    On November 28, 2007, defendant Selman sold 10,000 shares of Franklin stock at $4.29 to $4.30 per share. On December 7, 2007, defendant Selman sold 5,300 shares at $5.14 to $5.29 per share.

*False and Misleading Year-End 2007 Reports*

68.    On January 31, 2008, after the market closed, Franklin disseminated a press release that purported to announce its earnings and financial results for the year ended December 31, 2007. The press release announced a net loss for the year of approximately $45.2 million, or a loss of $1.85 per diluted share, and a net loss for the quarter ended December 31, 2007 of $66.1 million, or $2.64 per diluted share. The Bank attributed these figures to a one-time goodwill impairment charge of $65 million and a $23.5 million addition to loan loss reserves. As explained below, the Bank never filed an official quarterly or annual report with the SEC confirming these figures, which materially

37

understated the losses suffered by the Bank's investors. In fact, based on subsequent call reports and the August 6, 2008 Report on Form 8-K, it is now clear that, among other things, rather than taking a $23.5 million addition to loan loss reserves in that quarter, the Bank restated that figure to $49,854,000, thereby increasing the loss by more than $2.00 per diluted share.

69.     The January 31, 2008 press release also included numerous materially false and misleading statements. For example, commenting on the then-claimed addition to loan loss reserves of $23.5 million, defendant Nocella characterized this provision as "prudent" and stated that "this action better positions us to weather the current challenging economic environment." In fact, this reserve was grossly inadequate, as defendant Nocella knew or recklessly disregarded, and had to be increased by more than double as a result of the later restatement. Defendant Nocella also falsely stated that "Franklin Bank continues to be well capitalized under all regulatory capital requirements."

70.     The Bank also reported that nonperforming loans at December 31, 2007 were $86.031 million, and that total real estate owned at December 31, 2007 was $38.538 million. Both of these figures were materially understated by many millions of dollars, which amounts were never quantified because of the Bank's failure to ever complete the final preparation of its year-end financial statements.

71.     On February 1, 2008, the Bank held a conference call with the investment community. During this call, many of these items were again falsely portrayed, including the repetition of the false and misleading earnings and earnings per share data. Defendant McCann falsely stated that, "[w]e continue to be well capitalized under all regulatory guidelines." He also falsely stated that "[o]ur tangible book value increased in the fourth quarter to $5.32 from $5.15 per share at

September. We believe that we have the capital levels required to support our business now, and into the future." Defendants also repeatedly referred to the Bank as "strong" and Franklin representatives falsely stated that "[l]oans have also grown year-over-year while maintaining solid credit quality."

72.     On March 14, 2008, Franklin issued a press release announcing that it was delaying the filing of its Annual Report on Form 10-K with the SEC for the year ended December 31, 2007. According to the press release:

> In February 2008, Franklin's Board of Directors learned of possible accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned that could affect Franklin's 2007 financial statements. Upon learning of these matters, Franklin's Audit Committee commenced an independent internal investigation into these issues with the assistance of independent legal and accounting advisors.

> The Audit Committee's investigation is not yet complete. Franklin and the Audit Committee are working diligently to complete the review and to finalize and file the Form 10-K as promptly as possible.

> At this time, Franklin is unable to estimate the potential accounting effects that might result from the investigation. However, Franklin does not believe that the expected results of the investigation will affect the status of Franklin Bank, S.S.B., Franklin's banking subsidiary, as a "well capitalized" institution under regulatory guidelines.

73.     On May 1, 2008, after the market closed, Franklin announced that it had submitted certain amended call reports to the FDIC and a call report for the quarter ended March 31, 2008. The press release disclosed pertinently:

> As previously reported, Franklin's filing of its annual report on Form 10-K for the year ended December 31, 2007 has been delayed. Based on Franklin's ongoing review and evaluation of its 2007 financial statements, certain changes to the Bank's previously submitted call reports are necessary.

39

The findings requiring the amendments to the Bank's call report for the period ended September 30, 2007 will result in an amendment of Franklin's Form 10-Q previously filed for that period (the "September Form 10-Q"). Accordingly, the information contained in the September Form 10-Q should no longer be relied upon. Franklin will file an amended Form 10-Q for the quarter ended September 30, 2007 as soon as practicable.

On January 31, 2008, Franklin made a press release reporting its results of operation for the three months and year ended December 31, 2007. In light of the amendments to the Bank's call report for the period ended December 31, 2007, the information contained in the January 31, 2008 press release should no longer be relied upon.

The financial results reported in the Bank's call reports submitted to the FDIC reflect the operations of the Bank only, and do not include holding company operations of Franklin. In addition, financial information contained in the Bank's call reports is unaudited and, in accordance with Franklin's customary practice, has not been reviewed by Franklin's independent accountants. While the Bank's call reports submitted yesterday reflect the best information available as of the time of their submission, in accordance with generally accepted accounting principles, the information in the Bank's call reports is subject to possible revision as a result of events that occur subsequent to the submission of these call reports since the books and records of Franklin for 2007 have not yet been closed. Furthermore, the call reports submitted yesterday may be amended upon the outcome of the board audit committee investigation previously reported or the audit of Franklin's financial statements. Accordingly, the information contained in the following discussion of the Bank's amended call reports for the nine months ended September 30, 2007 (the "Amended September Call Report") and for the twelve months ended December 31, 2007 (the "Amended December Call Report"), and the Bank's call report for the three months ended March 31, 2008 (the "March 2008 Call Report"), is subject to these and the other qualifications contained in this press release.

Subsequent to the initial submission of the September 2007 call report and December 2007 call report, the Bank determined that the accounting for certain delinquent single family loans being serviced by third parties, other real estate owned, and the Bank's newly created single family loan modification programs to mitigate foreclosure losses (established pursuant to a proposal by President Bush in August 2007) should be revised. The revisions have been made and are reflected in the amended call reports submitted yesterday.

...

40

Amended September Call Report

Including the changes discussed above, the Bank reported, in the Amended September Call Report for the nine month period then ended, net income of $22.4 million, net interest income of $83.0 million, and non-interest expense of $56.3 million, an allowance for loan and lease losses of $21.9 million, a provision of $11.7 million, and net charge-offs of $6.1 million. The Bank also reported, in the Amended September Call Report, total loans of $4.2 billion, total assets of $5.7 billion, and nonperforming assets of $134.8 million, including $44.5 million in REO and $90.3 million in nonperforming loans.

Amended December Call Report

Including the changes discussed above, the Bank reported, in the Amended December Call Report for the twelve month period then ended, a net loss of $52.1 million, net interest income of $109.7 million, and non-interest expense of $143.8 million, an allowance for loan and lease losses of $52.2 million, a provision of $52.5 million, and net charge-offs of $16.6 million. The Bank also reported, in the Amended December Call Report, total loans of $4.1 billion, total assets of $5.7 billion, and nonperforming assets of $228.7 million, including $52.1 million in REO and $176.6 million in nonperforming loans.

March 2008 Call Report

In the March 2008 Call Report, the Bank reported for the three months ended March 31, 2008 a net loss of $35.2 million, net interest income of $19.8 million, and non-interest expense of $46.4 million, an allowance for credit losses of $63.4 million, a provision of $19.8 million, and net charge-off of $8.5 million. The Bank also reported, in the March 2008 Call Report, total loans of $3.9 billion, total assets of $5.9 billion, and nonperforming assets of $356.4 million, including $81.7 million in REO and $274.7 million in nonperforming loans.

Total Capital

As of March 31, 2008 the Bank remains well capitalized under standard rules and regulations of the FDIC with a Leverage Ratio of 6.35%, a Tier 1 Risk-Based Capital Ratio of 9.03%, and a Total Risk-Based capital ratio of 10.66%. Notwithstanding the Bank's well capitalized position, Franklin is actively pursuing additional capital to augment its present capital position and to enhance long-term shareholder value.

74.     On May 19, 2008, Franklin announced the completion of the investigation conducted by the Audit Committee of the Board of Directors, its legal counsel (Baker Botts LLP), and an independent accounting firm (Ernst & Young LLP).  The press release continued:

> During the course of its 10-week investigation, which was limited to a review of specified areas of Franklin's single family residential business, the Audit Committee conducted numerous interviews, reviewed email records for selected periods, and analyzed other documents and information provided by Franklin. The Audit Committee identified, among other things, a number of accounting errors in the areas described below:
>
> > (1) Franklin did not properly account for certain single family mortgage loan modification programs developed and implemented as part of an effort to reduce delinquencies and mitigate foreclosure losses.
> >
> > (2) Franklin did not charge off certain uncollectible single family second lien loans.
> >
> > (3) Franklin did not record, and in some instances did not write-down, certain Real Estate Owned (REO) and in-substance foreclosures in connection with foreclosures in its single family mortgage portfolio.
> >
> > (4) Franklin did not properly record certain mark-to-market writedowns on loans transferred from "Held for Sale" to "Held for Investment."
>
> Franklin is in the process of completing the adjustments necessary to correct any of the above accounting errors that were not previously corrected in the call reports submitted by its subsidiary Franklin Bank, S.S.B. on April 30, 2008 as reported by Franklin on May 1, 2008.
>
> Recommendations of the Audit Committee
>
> The Audit Committee made various recommendations to the Board of Directors regarding Franklin's leadership, finance and accounting functions, public disclosure process, and policies, procedures and controls. The Board of Directors has accepted the findings of the Audit Committee and is beginning to implement the Audit Committee's recommendations.

42

Implementation of the Recommendations

"Franklin's Board of Directors fully accepts the findings of the independent review," said Lewis Ranieri, Chairman of the Board of Franklin Bank Corp. "Completion of the investigation is an important milestone for all shareholders as we take the necessary steps to implement the recommendations of the Audit Committee." To begin the implementation of the recommendations, Franklin announced the following steps, effective immediately:

* Lewis S. Ranieri will continue in his role as Chairman of the Board of Directors of Franklin and will assume the role of Chief Executive Officer of Franklin until a new chief executive officer is identified and retained.

* Anthony J. Nocella, Franklin's current Chief Executive Officer, will accelerate his personal plans to retire. Mr. Nocella, a founder and director of Franklin since 2002, will continue as a director of Franklin and will continue to serve as Chairman of the Bank. Through his membership on the Executive Committee of the Bank, as described below, Mr. Nocella will continue in a consultative capacity to assist Franklin until his retirement by December 31, 2008.

* Alan E. Master, a director of Franklin since 2002 and with more than 40 years experience in banking, will assume the role as President of Franklin until a new chief executive officer is identified and retained. Mr. Master will resign his memberships on the Board's Audit, Compensation and Nominating and Corporate Governance Committees.

...

Corporate Cooperation with Regulatory Inquiries

Franklin has been in communication with the FDIC and the Texas Department of Savings and Mortgage Lending ("TDSML") regarding the investigation and related matters. Franklin will continue to cooperate with the FDIC, the TDSML and other agencies.

Franklin reported the commencement of the Audit Committee investigation to the Enforcement Division of the U.S. Securities and Exchange Commission ("SEC"), which has commenced an informal inquiry into the disclosure, accounting and other issues that were investigated.

43

Franklin intends to cooperate fully with the SEC. The SEC's inquiry is ongoing, and there can be no assurance that there will not be additional issues or matters arising from that inquiry.

Form 10-K and Form 10-Qs

Franklin is working diligently to complete and file its Form 10-K for the fiscal year ended December 31, 2007 and to amend and restate its Form 10-Q for the quarterly period ended September 30, 2007. The timing of these filings is uncertain.

Subject to review of a written plan for the execution of the steps described above to be prepared by Franklin's Board of Directors, Deloitte & Touche, Franklin's independent accountant, is expected to resume the audit of Franklin's financial statements for 2007 so that Franklin's Form 10-K for that year may be completed and filed with the SEC. Preparation of the Form 10-Q for the three months ended March 31, 2008 is expected to begin following completion of the audit of Franklin's financial statements for 2007. No prediction can be made at this time as to the completion date for such reports.

Minutes from Franklin's Board of Directors meeting of May 16, 2008, reveal that the Board considered defendants Nocella and McCann responsible, among others, for the lack of oversight and for certain "tone at the top" concerns raised by the investigation which fostered a tone that undermined or was contrary to a "culture of compliance."

75.     Although the Baker Botts investigation has not been release to the public, Baker Botts representatives did meet with the FDIC and SEC in May 2008 to report their findings. The SEC commenced an investigation into the Bank. The FDIC has reported in its FDIC OIG Report that "[t]he investigation revealed significant accounting errors, inappropriate accounting entries, a lack of internal controls, and significant questions regarding the competency of management."

76.     On August 6, 2008, after the market closed, Franklin filed a Report on Form 8-K, in which it described in detail restatements it intended to make to certain of its prior Reports on Form

10-Q and 10-K. In particular, it dramatically restated numerous items, including earnings and earnings per share, real estate owned and various data relating to nonperforming loans and nonperforming assets, and ultimately loan loss reserves, for each of the Reports on Form 10-K for the year ended December 31, 2006, and Form 10-Q for the quarterly periods ended March 31, 2007, June 30, 2007, and September 30, 2007. Reflecting the extraordinary depth of the accounting problems, the Report on Form 8-K also stated that these restatements "remain subject to revision" and that the "restatement process may result in additional adjustments."

77.    The Report on Form 8-K, which was signed by defendant Ranieri, provided a brief section of Background and Overview, which stated:

> In its Current Report on Form 8-K filed on May 2, 2008, Franklin disclosed that it had determined that the accounting for (i) certain delinquent single family loans serviced by third parties ("Delinquent Loan Accounting"), (ii) other real estate owned ("REO Accounting") and (iii) the newly created single family loan modification programs to mitigate foreclosure losses ("Loan Modification Accounting") should be revised. That report also disclosed Franklin's determination that the foregoing accounting issues required the restatement of the financial statements contained in Franklin's Quarterly Report on Form 10-Q for the period ended September 30, 2007 (the "September 2007 Form 10-Q"), and such financial statements should no longer be relied upon.

> Subsequently, Franklin has undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005 and 2004 in order to determine whether the impact of the foregoing accounting issues was limited to the third quarter of 2007. In addition to its internal review, Franklin has engaged an accounting firm to serve as a Special Accounting Master to assist in the review of Franklin's financial information for such periods and accounting matters generally.

> As a result of this review, Franklin has discovered that the revisions necessitated by Delinquent Loan Accounting, REO Accounting and Loan Modification Accounting are not limited to the three months ended September 30, 2007. Additionally, Franklin has discovered that the accounting for certain investment securities ("Investment Securities Accounting") and the accounting for monthly increases in the cash surrender value of certain bank-owned life insurance ("BOLI Accounting")

45

should also be revised. The Delinquent Loan Accounting, REO Accounting, Loan Modification Accounting, Investment Securities Accounting and BOLI Accounting issues are referred to in this report as the "Accounting Issues."

In light of the revisions necessary to address the Accounting Issues and the expected impact thereof, on July 31, 2008, the Board of Directors of Franklin (the "Board"), after discussions with management, the Special Accounting Master and other special accounting advisors, concluded that Franklin's financial statements as of and for the three months ended June 30, 2007 and March 31, 2007 and the year ended December 31, 2006, contained in Franklin's Quarterly Reports on Form 10-Q for the periods ended June 30, 2007 (the "June 2007 Form 10-Q") and March 31, 2007 (the "March 2007 Form 10-Q") and Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), respectively, are required to be restated and such financial statements and the corresponding report of Franklin's independent registered public accounting firm, Deloitte & Touche LLP, included in the 2006 Form 10-K should no longer be relied upon.

Franklin intends to restate the financial statements as of and for the year ended December 31, 2006 on a prospective basis in its Annual Report on Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"). Franklin intends to restate the financial statements as of and for the periods ended September 30, 2007, June 30, 2007 and March 31, 2007 on a prospective basis within Franklin's respective Quarterly Reports on Form 10-Q for 2008. See "Item 8.01 Other Events — Estimated Dates for SEC filings" for a list of target dates for these filings.

Thus, in addition to confirming the unreliability of financial data in all prior public disclosures going back to the Report on Form 10-K for the twelve months ended December 31, 2006, this Report on Form 8-K also made clear that financial disclosures going back to 2004 were now also subject to revision. The revision process was extended beyond the deadlines described in this report, however, and the revisions and restatement process was simply abandoned without further clarification, as described *infra*.

78.      Notwithstanding the extraordinary restatements presented in this Report on Form 8-K, the report also stated that, "[a]ccording to the June [2008] Call Report [prepared by the Bank and

46

filed with the FDIC], as of June 30, 2008 the Bank was well capitalized." As subsequently became clear, the Bank was not well capitalized as of June 30, 2008, but it was instead on the verge of failure.

79.    On August 8, 2008, Franklin announced that it would not declare or pay the dividend due on the preferred stock on September 15, 2008.

80.    On September 11, 2008, Franklin announced that it would file its restated financial statements on or before November 28, 2008. This was contrary to a prior commitment to make such filings by September 15, 2008.

81.    On Friday, November 7, 2008, the FDIC and the Texas Department of Savings and Mortgage Lending (TDSML) closed Franklin, and the Bank's deposits were sold to Prosperity Bank of El Campo, Texas. A receivership was thereafter placed over Franklin, and its parent corporation thereafter filed for bankruptcy protection in Delaware.

*Defendants Knew or Recklessly Disregarded*
*Accounting Problems, Weaknesses in Internal Controls*
*And The Falsity of Public Statements About Loan Quality*

82.    On February 19, 2008, Craig Wolfe, the Vice President of Loss Mitigation at Franklin, sent a letter to Debbie Hale, Senior Vice President of Internal Audit at the Bank, detailing a number of accounting issues at the Bank and that thereafter served as the basis for the institution of a special investigation by the Audit Committee of the Board of Directors at the Bank. Defendant Nocella was copied on the letter, among others. The letter remained unavailable to the public and was treated as a confidential whistleblower communication until 2009. The letter is attached hereto

47

as Exhibit 2.  It details numerous instances in which accounting misconduct at the Bank was deliberately undertaken.  Highlights include:

> Franklin Bank has repeatedly affirmed to the media and to Wall Street analysts that the Bank owns "No subprime", or "2% subprime" or "never originated subprime for portfolio" or "avoided subprime because of our expertise in mortgages".  These statements are all public record and are all demonstrably false.  Until recently, Franklin Bank had an aggressive retail subprime mortgage program, funding an average of $10-15 million in subprime loans per month.  I played an integral role in creating this program, an accomplishment of which I remain proud.

> Among other bulk acquisitions, the Bank purchased and is now servicing a portfolio of subprime assets from The Winter Group.  The Bank also financed subprime loans to Amstar and other subprime lenders through its Mortgage Banker Finance ("MBF") warehouse facilities.  In fact, Franklin was forced to purchase many millions of dollars in subprime loans out of the MBF warehouse when First Consolidated and other correspondents went defunct or were unable to sell those subprime mortgages in the secondary market.

> To avoid marking these to market, the Bank apparently transferred subprime loans and other inherently risky loans that were delinquent or unmarketable to portfolio on a routine basis. ... As noted above, the Bank also underwrote and purchased a large volume of loans in bulk with credit scores below 620 services by other financial institutions, such as Countrywide, GMAC and Chase ("SBO").  These are defaulting at a high rate, just as is occurring throughout the industry.  Nevertheless, Franklin Bank insists upon falsely representing to the public that it had the wisdom and foresight to avoid all involvement with subprime lending.

Evidencing defendants' efforts at concealing the fraud at Franklin, the letter explains that on January 28, 2008, Mr. Wolfe advised senior officers at the Bank that he would not provide a certification required under the Sarbanes-Oxley Act of 2002 attesting to the quality of the Bank's reporting of Real Estate Owned.  In response, bank officers repeatedly attempted to obtain his signature, then simply relieved Wolfe of this responsibility.  The February 19, 2008 letter followed.  Rather than just some disgruntled employee, Mr. Wolfe was an officer of the Bank from August 2003 to November

2008, he is a past president of REOMAC, one of the leading trade associations in the foreclosure services industry, and he has served as an industry expert in court proceedings.

83. The Wolfe letter also explains that in early 2007 he served on a committee that regularly met with others at the Bank and immediately identified numerous serious problems with real estate owned and nonperforming assets, yet his documented efforts to address these serious problems as well as underlying internal controls problems repeatedly went unheeded by management.

84. In 2009, the FDIC made available an Examination Report concerning Franklin Bank with an "Examination As Of Date" of March 31, 2008. The report indicated, among other things, that on July 14, 2008, the Bank received unsatisfactory ratings for its Risk Management, earning unsatisfactory marks for its capital, asset quality, management, earnings and liquidity. The report's summary stated:

> The institution's overall condition is unsatisfactory. Severe asset quality problems have eroded capital protection to a critically deficient level. Operating losses are substantial. Absent a recapitalization that returns the bank to a "Well Capitalized" status, a near term liquidity failure is inevitable. Management and Board performance is critically deficient as accounting and financial reporting problems persist and reserves are substantially underfunded. Immediate outside financial assistance is required in order for the institution to be viable.

In a section discussing capital adequacy, the following was noted, among other things:

> The level of capital is critically deficient and the institution's viability is threatened. Severe asset quality problems have eroded the capital position and losses are rapidly depleting capital. Absent a recapitalization failure of the bank is highly probable. ... The examination capital ratios reflect the following adjustments to reported regulatory capital as of March 31, 2008:
> > -> An adjustment of $164,850,000 for required provisions for loan losses, which reflects all of the net charge-offs and provision expenses recorded by the bank during the second quarter of 2008,

plus an additional $130,000,000 provision for loan loss which is required based on examination findings.

The FDIC Examination Report continued with an extensive litany of deficiencies at the Bank, and they are recited at length below because they highlight the breadth and continuing nature of the weaknesses at the Bank and the magnitude of the misreporting of financial and other information to the investment community:

An immediate capital infusion is required for the institution's survival. Based on examination findings, a capital injection of approximately $165,000,000 is necessary to allow the institution to achieve a "Well-Capitalized" designation under Prompt Corrective Action provisions.

...

Franklin Bank Corporation engaged RBC Capital Markets Corporation to assist in developing strategic capital alternatives. On July 31, 2008, the Board approved a Capital Maintenance Plan which included sales of targeted assets in the third and fourth quarters of 2008 in an effort to maintain a "Well-Capitalized" designation while the parent attempted to attract up to $175,000,000 in additional capital. The Board authorized bank management to implement the Capital Management plan; however, the proposed asset sales were not implemented due to the illiquidity of targeted assets and the elevated losses that would be incurred. In addition, management determined that additional capital of greater than $175,000,000 was needed.

...

Concentrations of credit are excessive and unsupported by the capital position. As of June 30, 2008, construction, land development and other land loans amount to 403 percent of Tier 1 Capital. A concentration in California single family residential loans amounts to 163 percent of Tier 1 Capital. Loans within these two concentrations account for approximately 75 percent of total adversely classified loans.

Asset quality is critically deficient and presents an imminent threat to the institution's viability. The level of asset quality problems is unmanageable given the bank's current capital position. In addition, critical weaknesses in credit administration practices continue and staffing within the credit administration and special assets

50

areas is not sufficient to effectively address the substantial volume of asset quality problems.

Adversely classified items total $886,859,000, which represents an extremely high 223 percent of Tier One Capital and reserves. Adversely classified items are comprised of loans of $783,734,000, and other real estate owned of $54,485,000, other assets of $3,450,000, securities of $924,000, and contingent liabilities of $44,266,000. Assets classified Loss total $104,435,000 and are comprised of loans of $93,264,000, other real estate owned of $8,321,000, securities of $924,000, and other assets of $1,926,000. Approximately $52,000,000 of the losses identified have been reported in the bank's June 30, 2008 Report on Condition and Income.

...

The allowance for loan and lease losses (ALLL) is deemed to be substantially deficient. ...

The ALLL methodology is unsatisfactory and is in contravention to the 2006 Interagency Policy Statement on ALLL and the 2001 Policy Statement on ALLL Methodologies and Documentation for Banks and Savings Institutions. The severe underfunding of the ALLL is primarily attributed to a combination of inadequate FAS 114 reserves for impairment as well as significant deficiencies in FAS 5 methodologies for the ADC and residential mortgage portfolios; however, additional criticisms are noted. The Contraventions to Policy Statements on the ALLL are repeat criticisms from the last examination.

...

Improvement is required in identifying problem ADC credits. The internal watch list is extensive; however, there was still a large volume of adversely classified loans that were not correctly identified on the bank's watch list. The greatest discrepancy noted was in management's reluctance in timely recognizing losses on impairment of collateral dependent loans. In addition, a significant number of internally identified watch list credits were graded more severely by examiners.

...

51

The residential mortgage portfolio totals approximately $1,650,000,000 as of July 31, 2008. Purchased loans serviced by others (SBOs) aggregate $1,186,000,000 and bank loans (those originated and/or serviced by the bank) total $464,000,000. Mortgage loans identified as "non-traditional" under regulatory guidance total 1,917 loans at $686,000,000 and consist almost entirely of interest only adjustable-rate and fixed-rate mortgages. Approximately $532,000,000 or 32 percent of the portfolio is comprised of first lien loans that have been identified as having "piggy-back" second-lien loans, although the bank holds the second lien on only $19,000,000 of these loans. Only 18 percent of the portfolio is considered "fully-documented" product, with the balance originated under various "limited-documentation" or stated income programs.

...

The overall quality of the portfolio is poor.

...

Management has been reluctant in properly recognizing losses in the residential mortgage portfolio.

...

Major weaknesses exist in the bank's accounting for loan modifications. The Board has not adopted a formal loan modification (loss mitigation) policy; only low-level procedures have been approved. Although informal accounting policies have been developed, they are not consistent with FAS 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings, as amended, and FAS 114, Accounting by Creditors for Impairment of a Loan, as amended. The weaknesses, which are described below, have resulted in a significant understatement of impairment calculations for evaluating the adequacy of the allowance for loan and lease losses.

Internal processes for determining whether a loan is a troubled debt restructuring (TDR) are flawed. Out of the 104 loans serviced by Countrywide Home Loans, Inc. that were modified between November 1, 2007, and June 30, 2008, management determined that only 65 of these loans met the definition of a TDR. In contrast, 103 were determined by examiners to be TDRs. ...

The methodology for measuring impairment of TDRs under FAS 114 is also flawed.

...

Management information systems for residential loan modifications are poor. ...

Since the last examination [in October 2007], there has been some improvement in the calculation and reporting of CRE (commercial real estate) exposure to the Board. However, the program continues to have significant deficiencies and overall risk management practices remain unsatisfactory, which is a repeat criticism from the last examination.

...

Management and Board performance is critically deficient. Failure to appropriately measure, monitor and control risk in the ADC concentration and weaknesses in the underwriting of residential mortgage loans have led to substantial asset quality problems that jeopardize the institution's survival. Accounting and controls over financial reporting are unsatisfactory and have resulted in the inability to meet external audit requirements and the public parent holding company's consolidated regulatory reporting requirements. In addition, Call Report filings have been inaccurate and numerous amendments have been required. Financial reporting problems continue and the bank is directed to amend its June 30, 2008 Call report to accurately reflect the findings of the examination. The depth of asset quality and liquidity problems far exceed management's ability to control without a substantial equity injection. ...

An independent investigation was commissioned by the Audit Committee based on allegations of an employee "whistleblower". The investigation, which was conducted by Baker Botts, LLP during the first and second quarters of 2008, revealed significant accounting errors, inappropriate accounting entries, lack of internal controls, and also raised significant questions about the competency of management. The investigation findings contributed to the forced early retirement of former Chairman and CEO Anthony J. Nocella immediately prior to the start of this examination, and Executive Vice President and Managing Director – Mortgage Banking Daniel E. Cooper's forced resignation during the examination. ... CFO Russell McCann remains in his position despite substantial accounting and financial reporting errors. ...

Audit Committee oversight has been ineffective. Actions taken by the Audit Committee are not commensurate with the size, activities, and risk profile of the institution. In addition, actions are not well-documented. The committee regularly adjourns into "executive sessions" with little if any documentation of actions taken.

Therefore, there is not a system in place that provides for:

> Timely and accurate financial, operational and regulatory reports;
> Full compliance with applicable laws and regulations;

53

> Adequate monitoring of the system of internal controls through an internal audit function;
> Adequate documentation of tests and findings and any corrective actions;
> Verification ad review of management actions to address material weaknesses;
> Review by the institution's audit committee or board of directors of the effectiveness of the internal audit systems.

Furthermore, major weaknesses in internal controls over accounting for single-family residential mortgages, single-family loans serviced by others, other real estate, loan modifications, securities, and bank owned life insurance have resulted in multiple amendments to Call Reports filed for reporting periods from September 2007 through March 2008.   Reporting errors were either identified by external consultants or examiners, not by internal audit.

...

Certain securities purchased during the second half of 2007 raise significant questions about the quality of oversight provided by the Board and management's Asset/Liability Committee.  Purchases included eight securities with an aggregate book value of approximately $93,000,000 consisting of two private label collateralized mortgage obligations, two corporate bonds which are collateralized debt obligations holding investments in trust preferred securities, and four asset-backed securities consisting of pools of home equity loans.  A majority of the underlying home equity loans involve borrowers having credit scores of less than 660 [i.e., subprime] and there is heavy geographic exposure in the high risk states of California, Arizona and Florida. ... According to CFO McCann, the securities were purchased for their high yields.  However, at the time they were purchased, *it was already apparent that the bank was facing significant asset quality issues* and liquidity concerns should have been paramount. [Emphasis added.]

Director Ranieri acknowledged these criticisms, but stated any assessment is always clearer in hindsight.

...

Documentation for Board meetings is inadequate. ... Prior to recent events that involve the investigation and departure of executive officers, there is little documented discussion in board minutes of the bank's severe financial problems.  In addition, until recently, board minutes were not prepared for "executive sessions" convened by the Board.  The lack of documented, in-depth discussions regarding the

54

bank's financial condition, accounting problems, and management deficiencies raises questions about depth of information covered at Board meetings.

...

Extreme losses year-to-date are attributed primarily to provision for loan losses totaling $65,743,000 and goodwill impairment of $93,000,000. The net loss reflected above does not include the $110,000,000 additional provision for loan loss required by the examination ....

The current Compliance Examination identified notable concerns involving the Board and senior management's inadequate oversight of its mortgage purchase and servicing transactions involving third parties. These types of activities involve a majority of the institution's activities. Examiners determined that Franklin Bank's asset acquisition policies and procedures do not include compliance due diligence prior to acquiring loan packages. Interviews with management confirmed they relied solely on compliance regulation warranties and representations included in the purchase agreements.

In addition, the bank does not have policies and procedures regarding oversight of serviced loans. Interviews with management revealed the bank never performed any compliance-related reviews of any of their loan servicers. Management had no knowledge of whether any consumer complaints existed or of how the servicers handled any such complaints, including the resolutions of any complaints. Management never executed its oversight responsibilities regarding third-party servicers even though the bank's servicing agreements provide for access rights to information and documentation, including the right to examine and audit servicer compliance with applicable regulations regarding mortgage loans.

85.     The Bank's severe problems with internal controls, asset quality and impairment did

not emerge suddenly within the Bank in 2008. They were known to or recklessly disregarded by

each of the defendants (other than RBC) since well before the Class Period began. In numerous

places, the FDIC Examination Report referred to "repeat" deficiencies, and noted that even in 2007,

when certain high-risk securities were purchased, it was "apparent that the bank was facing

significant asset quality issues ...." In fact, the examination report reveals that an October 2007

examination disclosed many of the same issues highlighted above, and the Bank was required to implement numerous internal controls procedures, accounting procedures, loan documentation procedures and other safeguards described above, and the 2008 examination report found that most of these obligations of the Bank simply were not met, or were only implemented or begun to be implemented following the Baker Botts investigation in the Spring of 2008. Indeed, the FDIC OIG Report found that concerns relating to deficiencies in the Bank's internal audit function had been noted repeatedly since September 2003, yet the Bank failed to implement recommendations and improvements to that function, a function that later proved to be virtually nonexistent.

86.     On July 2, 2009, the Office of Inspector General of the FDIC disseminated a "Material Loss Review of Franklin Bank, SSB, Houston, Texas" (sometimes referred to herein as the FDIC "OIG Report"). Although the report is critical of the FDIC, the criticism is not based on any failure by the FDIC to identify weaknesses and problems in the Bank. Instead, the report is critical of the FDIC's failure to do more after it repeatedly – and over a period of several years – identified the numerous deficiencies in internal controls and concentrations in risks described herein that ultimately caused the Bank's failure.

87.     The FDIC OIG Report stated with respect to the Bank, its management and its board of directors:

> Franklin's BOD [board of directors] allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls. In addition, management failed to effectively implement audit and examination recommendations or to ensure that, as the bank grew, the sophistication of the bank's risk identification and monitoring systems also expanded to effectively identify, measure, monitor, and control bank operations and risks. Franklin's management did not ensure the accuracy of financial reporting and soundness of related accounting controls, which, to a certain degree, masked the bank's financial deterioration.

56

The FDIC OIG Report proceeded to list several areas in which such management and board of directors failures had been repeated subjects of concern in prior examinations, including: internal audit, in which the FDIC's examinations had identified numerous material weaknesses in examinations dating to 2003, ALLL methodology, as to which the FDIC had repeatedly reported concerns since 2004, and volatile liability dependence and excessive dependence on non-core funding sources, which had been highlighted since at least 2004.

88.     Defendants also routinely relied on the presence and active participation of defendant Ranieri on the Board. Ranieri has had a lengthy history in the industry and is regarded as something of a leading expert on banking matters. Others on the Board were similarly long-time bank executives or accountants whose credentials bolstered the impression of expert management. Prior to and during the Class Period, Ranieri repeatedly made statements to the market about the financial crisis, such as: (1) in a February 2007 interview with Bloomberg news service, defendant Ranieri stated with regard to the financial crisis, "This is the leading edge of the storm. If you think this is bad, imagine what it's going to be like in the middle of this crisis."; (2) according to an article written by Rachel Beck and distributed by AP, in December 2006, at an industry conference, Ranieri gave a speech in which he stated, "Mandated level of disclosure for capital markets has not kept up with the mortgage-product innovation, making the risk level in residential mortgage-backed securities not readily available or easily transparent. This stuff doesn't just get sold to money managers. It gets sold to the public and to foreign investors who don't have a clue what to look for." Defendant Ranieri held himself out and was regarded by the investment community as someone who knew what

to look for and he routinely vouched for Franklin's financial condition.  By simultaneously vouching for Franklin while accurately decrying the financial crisis, Ranieri highlighted his own culpability for the failure of Franklin and the injury his misstatements and those of his colleagues caused to investors.

*Franklin Bank's Financial Results Were*
*Not Stated in Compliance With GAAP*

89.    The Bank failed to properly account for the material increases in risk associated with its lending practices.  As set forth above, during the Class Period, Franklin had, among other things, (1) few or no effective risk management practices; and (2) weakened underwriting guidelines.  By not taking these high-risk practices into consideration when accounting for the Bank's incurred and probable loan losses, Franklin's financial statements violated GAAP.

90.    Specifically, the Bank violated Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" (defined above as "SFAS 5").  SFAS 5, a fundamental GAAP principle which was issued over thirty years ago, states that:

> An estimated loss for loss contingency . . . shall be accrued by a charge to income if *both* of the following conditions are met:
>
> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b.    The amount of loss can be reasonably estimated.

(Emphasis in original.)

58

91.     The SEC provides further guidance on the proper accounting for credit risk and loan

losses. SEC Staff Accounting Bulletin No. 102, "Selected Loan Loss Allowance Methodology and

Documentation Issues" (defined above as "SAB 102"), which was issued in July 2001, states in

pertinent part: "It is critical that loan loss allowance methodologies incorporate management's current

judgments about the credit quality of the loan portfolio through a disciplined and consistently applied

process .... A registrant's loan loss allowance methodology generally should ... [c]onsider all known

relevant internal and external factors that may affect loan collectability ... [and] be based on current

and reliable data[.]"

92.     In violation of GAAP and SEC guidelines, Franklin failed to take into account the

undisclosed, poor quality, and high-risk nature of the Bank loan portfolio as well as all known

internal factors that would affect loan collectability, including the Bank's dubious underwriting and

appraisal activities, when provisioning its ALLL.

93.     According to the FDIC's July 2009 OIG Report:

Beginning with the September 2004 examination [by the FDIC], the FDIC repeatedly
reported concerns with the bank's ALLL policies and/or methodology for calculating
the ALLL, including the need for management to consider and document adjusting
qualitative factors (such as industry, geographic, and economic factors) to the
industry's loss rates, and to implement and document a methodology for measuring
loans for impairment. In the October 2007 ROE, the FDIC reported that Franklin did
not provide documented support that showed how the ADC loan portfolio's historical
loss rates had been determined. Further, the FDIC stated that Franklin did not
consider the impact of current environmental factors in its analysis despite the rapidly
deteriorating economic conditions in the bank's primary markets. As Franklin's
assets deteriorated, it became apparent that its ALLL was insufficient to absorb loan
losses.

Historically ... , from 2002 through 2006, Franklin maintained the bank's ratio of
ALLL to total loans and leases at levels that were consistently well below its peer

59

group average – ranging from the 3rd to 10th percentile. From 2004 until the bank closed, Franklin also maintained its capital levels below peer.

94.     Further, Franklin did not account for deteriorating loan performance during the Class Period at all. Defaults, delinquencies, and foreclosures, all of which rose steadily during the Class Period, were thus not properly or adequately considered when provisioning the ALLL.

95.     These failures to account for deteriorating loan performance exacerbated the already deficient and improper accounting for the Bank's loan portfolio. Defendants' improper risk management, underwriting, and appraisal practices during the Class Period (1) caused the Bank's ALLL or loan loss reserves to be materially understated during the Class Period; (2) caused Franklin to report financial results that were in violation of GAAP; (3) caused certain of the Bank's reported financial information, including net income, earnings per share and assets to be materially overstated throughout the Class Period; and (4) rendered Defendants' statements about the adequacy of the Bank's internal controls materially false and misleading.

96.     Defendants Nocella and McCann each signed "Sarbanes-Oxley Certifications" in connection with the filing of each of the Reports on Form 10-K and 10-Q described above with the SEC. In connection with the 2007 Report on Form 10-K, defendants Nocella and McCann each affirmed:

> 1. I have reviewed this annual report on Form 10-K of Franklin Bank Corp.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition,

results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

In addition, each signed statements pursuant to 15 U.S.C. § 1350 confirming that "[t]he information in this Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Virtually identical certifications were filed with respect to each of the Reports on Form 10-Q filed during the Class Period, and with respect to the Report on Form 10-K for the year ended December 31, 2005, the financial statements of which were incorporated by reference into the Prospectus for the preferred Offering.  In addition to demonstrating that it was within their scope of responsibility to assure the market of adequate internal controls at the Bank, these certifications were in and of themselves materially false and misleading.

*Deloitte Failed to Audit Franklin in*
*Accordance with GAAS*

97.     In addition to Franklin's false representations regarding the Bank's compliance with GAAP, Deloitte also falsely represented that the Bank's financial results were presented in compliance with GAAP.  Specifically, in certifying Franklin's financial statements Deloitte falsely represented that those financial statements were prepared in accordance with GAAP and that Deloitte's audits were conducted in accordance with Generally Accepted Auditing Standards ("GAAS").[1]  When an auditor represents that a company's financial statements conform in all material

---

[1]  The Public Company Accounting Oversight Board ("PCAOB"), established by the Sarbanes-Oxley Act of 2002, is responsible for the development of auditing and related professional practice standards that are required to be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted as its interim standards GAAS as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards,*

respects with GAAP, the auditor "indicates [his] belief that the financial statements taken as a whole are not materially misstated." AU § 312.[2] Indeed, "[f]inancial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with [GAAP]." AU § 312.

98.     Deloitte's statements were untrue because its audits did not conform to GAAS and, therefore, Deloitte had no reasonable basis to represent that Franklin's financial statements fairly presented the Bank's financial position and results of operations in conformity with GAAP. In issuing unqualified audit opinions on Franklin's financial statements, Deloitte failed to comply with the professional standards dictated by GAAS.

99.     GAAS General Standard No. 3 requires an auditor to exercise due professional care in the performance of the audit and preparation of the report (AU § 150.01). Deloitte violated General Standard No. 3 by, among other things, disregarding the Bank's relegation of its credit risk management to a secondary role, all of which reduced the quality of loans in Franklin's portfolio, significantly increased Franklin's loss exposure and necessitated the establishment of a much higher ALLL and provisions for loan losses. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Bank's ALLL and provisions for loan losses

---

and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Accounting Oversight Board (United States)" includes a reference to GAAS in existence as of April 16, 2003. All references to GAAS hereinafter include the standards of the PCAOB and vice versa.

[2] GAAS includes Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"), which are codified in *AICPA Professional Standards* under the prefix "AU."

were insufficient and, consequently, the Bank had overstated its net income, earnings per share, and the value of its assets in violation of GAAP.

100.    GAAS Standard of Fieldwork No. 1 requires an auditor to plan the audit, which "involves developing an overall strategy for the expected conduct and scope of the audit." AU § 311.03. This requires understanding the entity's business sufficiently to identify areas of risk. AU §311.06. Deloitte violated Standard of Fieldwork No. 1 by, among other things, failing to plan and conduct an audit that would include identifying and assessing Franklin's areas of risk, specifically, the quality of its loan originations and lending practices, and the performance of its loans, including rates of delinquencies and foreclosures and levels of nonperforming loans and assets. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have drawn was that the Bank was originating high-risk loans in violation of its underwriting guidelines, that the Bank was inflating appraisal values, and that those loans were frequently and increasingly experiencing increasing rates of delinquencies and foreclosures. Deloitte would have also uncovered that Franklin was experiencing increasing levels of nonperforming assets and negative amortization.

101.    GAAS Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the audited company's internal controls to properly plan the audit, assess audit risk, and to determine the nature, timing and extent of the tests performed. Further, while it is management's responsibility to establish and maintain internal controls, AU § 110.03, the independent auditor is responsible for rendering an opinion on management's assessment of the effectiveness of the company's internal control over reporting. PCAOB Auditing Standards ("AS")

No. 2, An Audit of Internal Control Over Financial Reporting Performed in Conjunction with an Audit of the Financial Statements, ¶ 4.

102.    Deloitte violated Standard of Fieldwork No. 2 and the requirements of AS No. 2 by disregarding the fact that Franklin underwrote poorly and inadequately documented loans. GAAS, specifically, the AICPA Audit & Accounting Guide for Depository and Lending Institutions, Ch. 8 ¶ 132, required that Deloitte review loan origination files to determine the Bank's compliance with those guidelines. In addition, Deloitte violated Standard of Fieldwork No. 2 because it disregarded that Franklin's methodology did not: (i) appropriately analyze and capture the risk of losses in the Bank's credit portfolio; (ii) take into account the actual deterioration that was experienced in the Bank's loan portfolio during the course of 2006; or (iii) consider or heed the repeated warnings of regulators, contained in examination reports, concerning the inadequacy of the Bank's internal controls. For example, inadequacies in the internal audit function and inadequacies and weakness in the ALLL methodology were each repeatedly noted in examination reports dated September 2003, September 2004, November 2005, October 2006, and October 2007; the material presence of subprime loans was noted in each examination starting with November 2005; and exotic hybrid and interest only loans, and geographic concentrations in higher risk areas, were similarly documented in each of the examinations of September 2003, September 2004, November 2005, October 2006, and October 2007. All of these examination reports and findings were contemporaneously available to Deloitte (among other things, pursuant to 12 U.S.C. §1831m(h)(1), all such reports were required to be given to Deloitte) and it was customary for Deloitte to review these in connection with their audits and evaluations of financial institutions such as Franklin. According to the AICPA's *Audits of*

65

*Banks, Savings Institutions, Credit Unions and Other Financial Institutions*, CPE (2009) at 3-21,
failure to take advantage of these materials "may constitute less than a GAAS audit concerning audit
evidence." Had Deloitte complied with GAAS, the only reasonable professional conclusion it could
have drawn was the Franklin's internal controls over financial reporting were so ineffective that the
Bank's financial statements were not fairly presented in accordance with GAAP. Deloitte also failed
to identify or disclose the corporate culture and "tone at the top" issues identified by the Baker Botts
investigation, which necessarily created significant audit and fraud risks, notwithstanding that the
management investigated by Baker Botts was essentially the same management that Deloitte had
audited.

103.   GAAS Standards of Fieldwork Nos. 2 and 3 require that an independent auditor
obtain, through inspection, observation, inquiries and confirmations, competent, sufficient evidential
matter to afford a reasonable basis for its opinion. AU ¢ 150.02. Deloitte violated Standards of
Fieldwork Nos. 2 and 3 by, among other things, failing to obtain evidence that Franklin had
adequately provisioned for its substantial loss exposure that resulted from the Bank's improper and
ineffective risk management. Had Deloitte complied with GAAS, the only reasonable professional
conclusion it could have drawn was that Franklin's reported ALLL and provisions were insufficient
and that the Bank failed to account for the high-risk, low-quality loans it issued, in violation of
GAAP.

104.   GAAS also requires an auditor to evaluate the "reasonableness of accounting
estimates made by management in the context of the financial statements taken as a whole," AU §
342.04, thus requiring Deloitte to review the assumptions and estimates concerning, among other

things, the risks of default, delinquency and foreclosure attendant to Franklin's high-risk loan originations. Deloitte violated this duty by, among other things, disregarding Franklin's failure to take into account its aggressive origination practices and accompanying increase in the Bank's risk of default, delinquency and foreclosures and the repeated warnings of regulatory examiners whose findings were privately shared by Franklin with Deloitte. Had Deloitte complied with GAAS, the only reasonable professional conclusion it could have reached was that the estimates underlying Franklin's accounting were unreasonable.

105. Standard of Reporting No. 4 requires an auditor to express an opinion on the financial statements of a company taken as a whole, or an assertion to the extent that an opinion cannot be expressed. AU § 150.02. As a result of Deloitte's violations of GAAS set forth above, it also violated Standard of Reporting No. 4 because Deloitte had an insufficient basis to express an unqualified opinion in its 2006 audit of Franklin. Accordingly, as set forth herein, Deloitte's public statements concerning those audits and its unqualified March 12, 2007 Attestation Report on Internal Controls were untrue, and contained omissions of material facts.

106. The enormity and breadth of problems cited by the FDIC in its examination reports spanning several years highlights the knowledge or recklessness of Deloitte.

*Applicability of Presumption of Reliance:*
*Fraud-On-The-Market Doctrine*
*And Additional Loss Causation Allegations*

107. At all relevant times, the market for Franklin preferred stock was an efficient market for the following reasons, among others:

67

(a) Franklin preferred stock was listed and actively traded on the AMEX, a highly efficient market;

(b) As a regulated issuer, the Bank filed periodic public reports with the SEC, including using the Registration Statement on Form S-3 for the preferred stock offering;

(c) Franklin securities were actively followed by securities analysts employed by major brokerage firms, including RBC, Friedman Billings Ramsay, JP Morgan, Stephens Inc. and Sanders Morris Harris, that wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms and that were made available over the Internet. Each of these reports was publicly available and promptly entered the public marketplace;

(d) Franklin regularly issued press releases which were carried by national news wires. Each of these releases was publicly available and entered the public marketplace.

108.   As a result, the market for Franklin preferred stock promptly digested current information with respect to the Bank from all publicly-available sources and reflected such information in the Bank's stock price.  Under these circumstances, all purchasers of Franklin preferred stock during the Class Period suffered similar injury through their purchase of such stock at artificially inflated prices and a presumption of reliance applies.

109.   The Bank's preferred stock declined upon each material negative disclosure.  For example, Franklin's preferred stock closed at $10.95 per share on Friday, March 14, 2008.  That evening, Franklin issued a press release disclosing that it would be unable to timely file its 2007 10-K.  On the next day of trading, before the market opened, the Bank filed an 8-K with the SEC

attaching the March 14th press release as an exhibit. Reacting to this news, the preferred shares dipped to $7.50, a decline of over 30%.

110.    With each material negative disclosure throughout 2008 and up to the final collapse of the Bank, Franklin's preferred stock materially declined in value. For example, on May 2, 2008, the Bank's preferred shares suffered a sharp decline: they retreated from $7.55 to $4.85 per share on May 2nd alone, a decline of over 35%. On August 7, 2008, the preferred shares again fell 35% or $1.685 per share from the prior day's close, to $3.05 per share. On November 7, 2008, the preferred shares fell from $2.30 per share to $1.50, after which trading in the shares was suspended, only resuming at a penny per share at the end of November 2008.

*No Safe Harbor*

111.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. With respect to many of the statements, including the glossy Annual Report from March 2007 and several conference calls with the investment community, no attempt was even made to take advantage of the safe harbor. In addition, the specific statements pleaded herein were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false

69

forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Bank who knew that those statements were false when made.

## Count I

### Against All Defendants Except Deloitte
### for Violations of § 11 of the Securities Act

112. Plaintiffs repeat and reallege each and every allegation recited above as if fully set forth herein, except to the extent any allegations assert that any of defendants engaged in fraudulent or intentional conduct.

113. This claim does not sound in fraud.

114. Plaintiff s and the other members of the Class purchased Franklin preferred stock issued pursuant to the Registration Statement filed by the Bank with the SEC and declared effective in May 2006.

115. Each of the Defendants named herein is liable because the Registration Statement was materially false and misleading; contained untrue statements of material fact; omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading; and failed to disclose material facts as alleged hereinbefore.

116. The Bank was the registrant for the preferred IPO and filed the Registration Statement. Franklin is the "issuer" of the stock sold in the IPO as defined in Section 11(a)(5) of the

Securities Act. As the issuer, in the absence of its bankruptcy filing, Franklin would have been liable to Plaintiffs and the other members of the Class for the misstatements in, and the omissions from, the Registration Statement.

117. The Individual Defendants signed the Registration Statement and otherwise caused it to be prepared, filed with the SEC, and circulated to the public. Each of the Individual Defendants is liable to Plaintiffs and the other members of the Class as a "person who signed the registration statement" as defined in Section 11(a)(1) of the Securities Act.

118. The Individual Defendants were directors and/or officers of Franklin when the Registration Statement became effective. Each of the Individual Defendants is liable to Plaintiffs and the other members of the Class as a "director" as defined in Section 11(a)(2) of the Securities Act.

119. RBC issued, caused to be issued, and participated in the issuance of the materially false and misleading Registration Statement. RBC acted as "underwriter" for the preferred IPO, as that term is defined in Section 11(a)(5) of the Securities Act.

120. RBC owed to the purchasers of Franklin preferred stock in or traceable to the preferred Offering, including Plaintiffs and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective, to ensure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading. RBC failed to conduct adequate due diligence.

121.    Each of the Individual Defendants and RBC owed to the purchasers of Franklin preferred stock in or traceable to the preferred IPO, including Plaintiffs and the other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time it became effective.  This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material facts required to be stated in order to make the statements contained in the Registration Statement not misleading.

122.    None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described above, which were contained in the Registration Statement, were accurate and complete in all material respects.

123.    At the time Plaintiffs and the other members of the Class purchased Franklin preferred stock, they did not know and, by the reasonable exercise of due care, they could not have known of the true facts concerning the statements and omissions complained of herein.

124.    In connection with the preferred IPO and the sale of the preferred stock, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States mail.

125.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years after the preferred stock was sold to the public in the preferred IPO.  On May 4, 2009, the date on which this claim was first filed, the reported market price of Franklin preferred stock was $0.001 per share.

126.   By reason of the foregoing, Defendants violated Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Class, each of whom has been damaged by reason of such violations.

**Count II**

**Against the Individual Defendants
for Violations of § 15 of the Securities Act**

127.   Plaintiffs repeat and reallege each and every allegation recited above as if fully set forth herein, except to the extent any allegations assert that any of the defendants engaged in fraudulent or intentional conduct.

128.   This claim does not sound in fraud.

129.   The Individual Defendants were controlling persons of Franklin within the meaning of Section 15 of the Securities Act by virtue of their positions as senior officers and directors of Franklin and their power to control Franklin's corporate actions and the transactions alleged herein, which give rise to Franklin's liability under the securities laws.  In particular, the Individual Defendants directly controlled the contents and the issuance of the false and misleading Registration Statement.

130.   None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and free of any omissions of material fact.  Therefore, by reason of their status as controlling persons of the Bank, as alleged herein, pursuant to Section 15 of the Securities Act, each of these

Defendants is liable jointly and severally with and to the same extent that Franklin is liable to Plaintiffs and the other members of the Class as a result of the wrongful conduct alleged herein.

## Count III

### Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants Except RBC

131. Plaintiff Roucher Trust repeats and realleges each and every allegation contained above.

132. Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about the Bank's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports, and other public representations of and about Franklin.

133. During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134. Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Franklin preferred stock during the Class Period.

74

135.    Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Franklin preferred stock, which subsequently declined in value as a result of the revelations of the misrepresentations and omissions alleged herein. Plaintiff and the Class would not have purchased Franklin preferred stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements.

### Count IV

### Violation Of Section 20(a) Of The Exchange Act
### Against the Individual Defendants

136.    Plaintiff Roucher Trust repeats and realleges each and every allegation contained above.

137.    The Individual Defendants acted as controlling persons of the Bank within the meaning of § 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions they had the power and authority to cause the Bank to engage in the wrongful conduct complained of herein.

138.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Franklin stock during the Class Period.

75

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on their own behalf, and on behalf of the other members of the Class, pray for judgment as follows:

A.    Declaring this action to be a proper class action, and certifying Plaintiffs as Class representatives and their counsel as Class counsel;

B.    Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

C.    Awarding money damages against Defendants, jointly and severally, in favor of Plaintiffs and the other members of the Class for all losses and injuries suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest;

D.    Awarding Plaintiffs their costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

E.    Awarding such other relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 22, 2009

Respectfully submitted,

SCHWARTZ JUNELL GREENBERG
  &amp; OATHOUT, LLP

By:  */s/ Roger B. Greenberg*
Roger S. Greenberg
Texas State Bar No. 08390000
Federal I.D. No. 3932
Thane Tyler Sponsel III
Texas State Bar No. 24056361
Federal I.D. No. 690068
909 Fannin Street, Suite 2700
Houston, Texas 77010
Tel. 713.752.0017
Fax 713.752.0327

*Liaison Counsel for the*
  *Preferred Stock Class*

-and-

SHALOV STONE BONNER & ROCCO LLP
Ralph M. Stone (*pro hac vice*)
Thomas G. Ciarlone
Susan M. Davies
485 Seventh Avenue, Suite 1000
New York, NY 10018
(212) 239-4340
Fax (212) 239-4310

*Lead Counsel for the Preferred Stock Class*

77

## CERTIFICATE OF SERVICE

I certify that on December 22, 2009, a copy of the foregoing *Amended Consolidated Preferred Shareholder Complaint* was served on the following counsel via the Court's ECF system as indicated below:

| | |
|---|---|
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| Cynthia S. Connolly | cconnolly@scoutdoug.com |
| J. Allen Carney | acarney@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | james.farrell@lw.com |
| M. Bryon Wilder | BWilder@gibsondunn.com |
| Jonathan C. Dicket | JDickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |

and on the following parties by U.S. mail:

Robin C. Gibbs
Barrett H. Reasoner
Sam W. Cruse III
Gibbs & Bruns, LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002

James G. Munisteri
Orin H. Lewis
Gardere Wynne Sewell & Riggs
1000 Louisiana, Suite 3400
Houston, Texas 77002

Stephen E. McConnico
SCOTT DOUGLASS & MCCONNICO, LLP
600 Congress, Suite 1500
Austin, Texas 78701-3234

Robert J. Giuffra, Jr.
Brian T. Frawley
William B. Monahan
Andrew J. DeFilippis
125 Broad Street
New York, NY 10004

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Coughlin Stoia Geller
    Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

David C. Walton
Anne L. Box
Coughlin Stoia Geller Rudman
  & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

 

    */s/ Roger B. Greenberg*
      Roger B. Greenberg