UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

IN RE FRANKLIN BANK CORP.     :
SECURITIES LITIGATION        : Civil Action No. 08-1810 (KPE)
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT LEWIS S. RANIERI'S MOTION TO DISMISS
## THE COMPLAINTS AND BRIEF IN SUPPORT

OF COUNSEL:

Robert J. Giuffra, Jr.
Brian T. Frawley
William B. Monahan
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

Steve McConnico
Cynthia Saiter Connolly
SCOTT, DOUGLASS & McCONNICO, LLP
One American Center
600 Congress Avenue, 15th Floor
Austin, Texas 78701-2589
(512) 495-6300

*Attorneys for Defendant*
*Lewis S. Ranieri*

March 5, 2010

694766

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................... 1

SUMMARY OF THE ARGUMENT ......................................... 2

STATEMENT OF THE ISSUE ............................................... 4

ALLEGATIONS OF THE COMPLAINTS ............................... 5

    A.    Franklin and the Bank ........................................... 5

    B.    This Action ........................................................... 7

    C.    The Limited Allegations Against Mr. Ranieri .......... 8

LEGAL STANDARD ........................................................... 9

ARGUMENT ...................................................................... 12

I.    AS A MATTER OF LAW, PLAINTIFFS DO NOT PLEAD
    PARTICULARIZED FACTS DEMONSTRATING THE REQUIRED
    COGENT AND COMPELLING INFERENCE OF FRAUD BY MR. RANIERI ......... 12

    A.    Plaintiffs Do Not Allege That Mr. Ranieri Had Any Motive
        to Commit Fraud ................................................... 13

    B.    Plaintiffs Plead No Circumstantial Facts Raising a Strong
        Inference of Fraud by Mr. Ranieri ........................... 14

        1.    Franklin's Restatement Does Not Establish Mr. Ranieri's Scienter ........ 14

        2.    The "Whistleblower" Letter Refutes Mr. Ranieri's Scienter ................... 15

        3.    The "Confidential Witness" Allegations Do Not Create a Strong
            Inference of Mr. Ranieri's Scienter ........................... 16

        4.    The Complaints Plead No Facts Showing That Mr. Ranieri Knew
            That Countrywide Had Defaulted on a Loan from the Bank ................... 18

    C.    The Facts Pled Refute Any Inference That Mr. Ranieri Acted
        with Scienter ........................................................ 19

        1.    Mr. Ranieri's Trading in Franklin Stock Negates His Scienter .............. 19

        2.    The FDIC Reports Undermine Any Inference of Mr. Ranieri's
            Scienter .............................................................. 20

## TABLE OF CONTENTS
### (continued)

*Page*

3.     Deloitte's Audits Negate Any Inference of Mr. Ranieri's Scienter ......... 23

II.    PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY A MATERIALLY
       MISLEADING STATEMENT BY MR. RANIERI ........................................ 24

       A.    In This Circuit, Mr. Ranieri Cannot Be Held Liable for the
             Misstatements of Others ......................................................... 24

       B.    The Registration Statement Contains No Material
             Misstatement ........................................................................ 25

       C.    Mr. Ranieri's Statements About Franklin's Reserves Were
             Accurate ............................................................................... 27

       D.    Mr. Ranieri Said Nothing About the Countrywide Loan or
             Franklin's Alleged Exposure to "Subprime" Mortgages ..................... 28

       E.    Mr. Ranieri's Public Comments in 2006 and 2007 Were
             Accurate ............................................................................... 29

III.   AS A MATTER OF LAW, PLAINTIFFS FAIL TO PLEAD LOSS
       CAUSATION AS TO ANY OF MR. RANIERI'S ALLEGED
       MISSTATEMENTS ..................................................................... 30

IV.    THE SECURITIES ACT CLAIMS AGAINST ARE TIME-BARRED ......... 33

V.     THE COMPLAINTS DO NOT PLEAD CONTROL PERSON CLAIMS
       AGAINST MR. RANIERI .............................................................. 36

CONCLUSION ................................................................................. 38

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*ABC Arbitrage Plaintiffs Group* v. *Tchuruk*,
291 F.3d 336 (5th Cir. 2002) ................................................................. 10, 17, 26

*Abrams* v. *Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................. 19

*ACA Fin. Guar. Corp.* v. *Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ................................................................. 23

*Acito* v. *IMCERA Group*,
47 F.3d 47 (2d Cir. 1995) ................................................................. 22

*Alamosa Holdings, Inc. Secs. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2003) ................................................................. 26

*Alaska Elec. Pension Fund* v. *Flowserve*,
572 F.3d 221 (5th Cir. 2009) ................................................................. 30, 31

*Allred* v. *Whatley*,
1985 U.S. Dist. LEXIS 19174 (N.D. Ga. June 5, 1985) ................................................................. 34

*Ashcroft* v. *Iqbal*,
129 S. Ct. 1937 (2009) ................................................................. 11

*Bachow* v. *Swank Energy Income Advisers*,
2010 U.S. Dist. LEXIS 1504 (N.D. Tex. Jan. 6, 2010) ................................................................. 37

*Barrie* v. *InterVoice-Brite, Inc.*,
2009 U.S. Dist. LEXIS 99253 (N.D. Tex. Oct. 26, 2009) ................................................................. 31

*Bastian* v. *Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990) ................................................................. 33

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ................................................................. 11

*Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs.*,
497 F.3d 546 (5th Cir. 2007) ................................................................. 14

*Cozzarelli* v. *Inspire Pharms., Inc.*,
549 F.3d 618 (4th Cir. 2008) ................................................................. 11

**TABLE OF AUTHORITIES**
(continued)

*Page(s)*

*Currie* v. *Cayman Res. Corp.*,
  595 F. Supp. 1364 (N.D. Ga. 1984) ................................................................. 33-34

*Dennis* v. *Gen. Imaging, Inc.*,
  918 F.2d 496 (5th Cir. 1990) ................................................................. 37

*Dura Pharms., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ................................................................. 10, 30, 31, 32

*ECA & Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ................................................................. 27

*Feitelberg* v. *Merrill Lynch & Co.*,
  234 F. Supp. 2d 1043 (N.D. Cal. 2002) ................................................................. 11

*Fener* v. *Belo Corp.*,
  425 F. Supp. 2d 788 (N.D. Tex. 2006) ................................................................. 24

*Fin. Acquisition Partners* v. *Blackwell*,
  440 F.3d 278 (5th Cir. 2006) ................................................................. 5, 22

*First Nationwide Bank* v. *Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ................................................................. 33

*Flaherty & Crumrine Preferred Income Fund* v. *TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) ................................................................. 5, 13, 22

*Garber* v. *Legg Mason, Inc.*,
  2009 U.S. App. LEXIS 21404 (2d Cir. Sept. 30, 2009) ................................................................. 25

*Goldstein* v. *MCI Worldcom*,
  340 F.3d 238 (5th Cir. 2003) ................................................................. 14, 17

*Greenberg* v. *Crossroads Sys.*,
  364 F.3d 657 (5th Cir. 2004) ................................................................. 4, 27, 30, 32

*Greenstone* v. *Cambex Corp.*,
  975 F.2d 22 (1st Cir. 1992) ................................................................. 16

*Halaris* v. *Viacom, Inc.*,
  2007 U.S. Dist. LEXIS 85831 (N.D. Tex. Sept. 21, 2007) ................................................................. 10

*Hinerfeld* v. *United Auto Group*,
  1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ................................................................. 28

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

*Ind. State Dist. Council of Laborers* v. *Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ............................................................. 11

*Ind. Elec. Workers' Pension Trust Fund Ibew* v. *Shaw Group*,
537 F.3d 527 (5th Cir. 2008) ......................................................... *passim*

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 402 (S.D.N.Y. 2005) .................................................. 34

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
2007 U.S. Dist. LEXIS 932 (E.D. Pa. Jan. 9, 2007) ............................ 27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................. 19

*In re Browning-Ferris Indus. Sec. Litig.*,
876 F. Supp. 870 (S.D. Tex. 1994) ...................................................... 28

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ...................................................... 19

*In re Commonwealth Oil/Tesoro Petroleum Sec. Litig.*,
484 F. Supp. 253 (W.D. Tex. 1979) ..................................................... 34

*In re Dell Inc., Secs. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) ................................ 16, 17, 18, 32

*In re Dynegy, Inc. Sec. Litig.*,
339 F. Supp. 2d 804 (S.D. Tex. 2004) ...................... 13, 35-36, 37, 38

*In re Flag Telecom Holdings Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ................................................................. 32

*In re Integrated Elec. Servs.*,
2006 U.S. Dist. LEXIS 1425 (S.D. Tex. Jan. 10, 2006),
*aff'd*, 497 F.3d 546 (5th Cir. 2007) ................................................ 17, 18

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................................................. 27

*In re Longhorn Sec. Litig.*,
573 F. Supp. 255 (W.D. Okla. 1983) .................................................... 33

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*In re Novagold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ...................................................... 35

*In re Rhodia SA Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ...................................................... 33

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) .................................................... 27

*In re Sourcecorp Sec. Litig.*,
2006 U.S. Dist. LEXIS 41381 (N.D. Tex. June 6, 2006) ...................... 37

*In re USEC Sec. Litig.*,
190 F. Supp. 2d 808 (D. Md. 2002) ........................................................ 35

*Jensen* v. *Snellings*,
841 F.2d 600 (5th Cir. 1988) .................................................................. 34

*JPA, Inc.* v. *USF Processors Trading Corp.*,
2005 U.S. Dist. LEXIS 45658 (N.D. Tex. July 15, 2005) .................... 10

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001) .................................................................... 13

*Kaltman* v. *Key Energy Servs.*,
447 F. Supp. 2d 648 (W.D. Tex. 2006) ............................................ 24, 37

*Kaplan* v. *Utilicorp United, Inc.*,
9 F.3d 405 (5th Cir. 1993) ................................................................ 28-29

*Krim* v. *Banc Texas Group, Inc.*,
989 F.2d 1435 (5th Cir. 1993) ................................................................ 28

*Kurtzman* v. *Compaq Comp. Corp.*,
2002 U.S. Dist. LEXIS 26569 (S.D. Tex. Mar. 30, 2002) .............. 10, 27

*Lattanzio* v. *Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) .................................................................... 31

*Lentell* v. *Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .................................................................... 32

*Lormand* v. *US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................ 12, 32

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*Lovelace* v. *Software Spectrum,*
   78 F.3d 1015 (5th Cir. 1996) ............................................................. 14

*Magruder* v. *Halliburton Co.,*
   2009 U.S. Dist. LEXIS 27561 (N.D. Tex. Mar. 31, 2009) .............................................. 14, 19

*Melder* v. *Morris,*
   27 F.3d 1097 (5th Cir. 1994) ................................................................. 10, 11, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit,*
   547 U.S. 71 (2006) ................................................................. 10

*Mortensen* v. *AmeriCredit Corp.,*
   123 F. Supp. 2d 1018 (N.D. Tex. 2000) ................................................................. 23

*Nathenson* v. *Zonagen Inc.,*
   267 F.3d 400 (5th Cir. 2001) ................................................................. 1, 13, 20

*Newby* v. *Lay,*
   258 F. Supp. 2d 576 (S.D. Tex. 2003) ........................................................... 13, 20, 22, 23, 36

*PR Diamonds, Inc.* v. *Chandler,*
   364 F.3d 671 (6th Cir. 2004) ................................................................. 13

*Ray* v. *Citigroup Global Mkts., Inc.,*
   482 F.3d 991 (7th Cir. 2007) ................................................................. 31

*Reed* v. *Prudential Secs.,*
   875 F. Supp. 1285 (S.D. Tex. 1995),
   *aff'd*, 87 F.3d 1311 (5th Cir. 1996) ................................................................. 36

*Rombach* v. *Chang,*
   355 F.3d 164 (2d Cir. 2004) ................................................................. 11

*Rosenzweig* v. *Azurix Corp.,*
   332 F.3d 854 (5th Cir. 2003) ................................................................. 16, 20, 27

*R2 Invs.* v. *Phillips,*
   401 F.3d 638 (5th Cir. 2005) ................................................................. 14

*Rubke* v. *Capitol Bancorp, Ltd.,*
   551 F.3d 1156 (9th Cir. 2009) ................................................................. 11

## TABLE OF AUTHORITIES
### (continued)

*Page(s)*

*Searles* v. *Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ............................................... 20

*SEC* v. *Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ............................................. 20

*Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...........................................2, 13, 17, 24, 37

*Teachers' Ret. Sys. of La.* v. *Hunter*,
   477 F.3d 162 (4th Cir. 2007) .............................................. 31

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ....................................................... 2, 12

*Topalian* v. *Ehrman*,
   954 F.2d 1125 (5th Cir. 1992) ............................................ 33

*Tripp* v. *IndyMac Bancorp, Inc.*,
   2007 U.S. Dist. LEXIS 95445 (C.D. Cal. Nov. 29, 2007) ..................... 33

*Truk Int'l Fund LP* v. *Wehlmann*,
   2009 U.S. Dist. LEXIS 112234 (N.D. Tex. Dec. 3, 2009) .................... 5

*Tuchman* v. *DSC Commc'ns Corp.*,
   14 F.3d 1061 (5th Cir. 1994) ............................................. 5, 13, 14

*Weiss* v. *Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007) ..................................... 23

*Williams* v. *WMX Techs.*,
   112 F.3d 175 (5th Cir. 1997) ............................................. 26

*Zagami* v. *Natural Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) .................................... 38

# TABLE OF AUTHORITIES
## (continued)

*Page(s)*

### Statutes

12 U.S.C. § 1831o ........................................................................................... 21

15 U.S.C. § 77k .............................................................................................. 10

15 U.S.C. § 77m ............................................................................................. 33

15 U.S.C. § 78u-4 ................................................................................... 8, 10, 12

### Rules

Fed. R. Civ. P. 8(a) ........................................................................................ 11

Fed. R. Civ. P. 9(b) ......................................................................... 1, 9, 10, 11, 38

Fed. R. Civ. P. 12(b)(6) ................................................................................ 1, 38

12 C.F.R. § 309.6 ........................................................................................... 22

### Other Authorities

Tom Barkley et al., *IMF Sees U.S. Maladies Infecting World Economy*,
WALL ST. J., Apr. 10, 2008, at A9 ................................................................... 4

Damian Paletta et al., *At Moment of Truth, U.S. Forced Big Bankers to Blink*,
WALL ST. J., Oct. 15, 2008, at A1 ................................................................... 4

Pursuant to Rules 9(b) and 12(b)(6), Fed. R. Civ. P., Lewis S. Ranieri submits this motion to dismiss the claims brought against him in Franklin Investor Group's Second Consolidated Amended Complaint (the "CSC") and the Amended Consolidated Preferred Stock Purchaser Complaint (the "PSC"), each filed on December 22, 2009.

## PRELIMINARY STATEMENT

During the recent financial crisis, several hundred banks failed.  Relying on unsupported speculation and impermissible hindsight, Plaintiffs here baselessly seek to allege that Mr. Ranieri, an outside director of Franklin Bank Corp. ("Franklin") and its subsidiary, Franklin Bank, S.S.B. (the "Bank"), committed securities fraud, even though Mr. Ranieri personally lost about $20 million when Franklin went bankrupt and never sold a single share of his Franklin stock at the time he was allegedly engaging in the "fraud." Upon inspection, the complaints in this action are prototypical examples of the sort of "abusive, frivolous strike suits" that the Private Securities Litigation Reform Act of 1995 (the "PSLRA") was designed to root out.  *Nathenson* v. *Zonagen Inc.*, 267 F.3d 400, 407 (5th Cir. 2001).

In trying to exploit Franklin's August 2008 proposed accounting restatement and November 2008 bankruptcy, Plaintiffs studiously ignore the unprecedented financial crisis. Instead, Plaintiffs allege that some or all "Defendants" made material misstatements and omissions in various Franklin SEC filings and analyst conference calls.  Plaintiffs make startlingly few allegations identifying particular statements by Mr. Ranieri, and fewer still alleging why anything he said was false or misleading at the time he made them.

Confirming their impermissible effort to plead fraud-by-hindsight, Plaintiffs collectively devote 179 pages and 358 paragraphs of pleadings to their efforts to connect adverse financial developments in late 2008 in the course of the worsening financial crisis to much

earlier statements by Mr. Ranieri.  As the Fifth Circuit has stated about such securities fraud complaints, a "complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."  *Southland Sec. Corp.* v. *INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).

## SUMMARY OF THE ARGUMENT

Neither of the complaints in this action asserts a claim against Mr. Ranieri, for five reasons:[1]

*First*, Plaintiffs have not pled with particularity any facts to support a "cogent and compelling inference," as required by *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), that Mr. Ranieri acted with the statutorily required fraudulent intent, or scienter. Where, as here, a plaintiff fails to plead that a defendant had any motive to commit the alleged fraud, plaintiff faces a more stringent standard in pleading scienter.

According to Plaintiffs, Mr. Ranieri's scienter is demonstrated by (a) Franklin's August 2008 restatement; (b) a February 2008 letter from a so-called "whistleblower"; (c) certain "confidential witness" allegations; (d) January 2007 Board minutes regarding a Bank loan to Countrywide Financial ("Countrywide"); and (e) certain FDIC examination reports.  In fact, not a single one of these allegations—none—gives rise to any inference of fraud by Mr. Ranieri, much less the strong inference of fraudulent intent required by the PSLRA:

- Franklin's August 2008 restatement cannot establish scienter as a matter of settled Fifth Circuit law;

---

[1] The first complaint, filed by Franklin Investor Group (the "Common Stock Plaintiff"), alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of a putative class of Franklin common stockholders.  The second complaint, filed by The Harold Roucher Trust ("Roucher") and Joseph Pribyl ("Pribyl") (together, the "Preferred Stock Plaintiffs"), alleges similar claims under the Exchange Act and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of a putative class of Franklin preferred stockholders.

- the whistleblower letter was written *after* Mr. Ranieri made any of his allegedly misleading statements, and, in any event, it does not even mention Mr. Ranieri;

- the "confidential witnesses" have little to say about Mr. Ranieri, and their limited allegations as to Mr. Ranieri—which must be discounted (if not ignored) in this Circuit—do not suggest at all that Mr. Ranieri possessed facts contradicting any statement he made at the time of the challenged statement;

- the January 2007 Board minutes show only that the Bank had made a loan to Countrywide, not, as Plaintiffs allege, that Countrywide had *defaulted* on a loan; and

- the FDIC examination reports *undermine* Mr. Ranieri's scienter, because in *every* report that was issued prior to Mr. Ranieri's alleged misstatements, the FDIC examiners concluded that Franklin's Board was "satisfactory/effective."

Moreover, Plaintiffs' scienter allegations are completely "negated" here by the fact that Mr. Ranieri never sold any Franklin stock during the class periods, but rather *purchased over 380,000 shares*.  In total, *Mr. Ranieri lost $20 million in stock* when the share price declined as a result of his alleged "fraud."  (*See infra* at pages 12 to 23.)

*Second*, Plaintiffs do not plead with particularity any material misstatement or omission by Mr. Ranieri.  In fact, the complaints do not allege one single instance where Mr. Ranieri said *anything* related in any way to the primary misstatements on which the complaints rest:  (i) the Countrywide loan, (ii) Franklin's alleged exposure to "subprime" mortgages, or (iii) the effectiveness of Franklin's internal controls.  Moreover, the Preferred Stock Plaintiffs do not even attempt to establish any misstatement in Franklin's May 2006 Registration Statement to support their Section 11 claim.  Instead, the PSC merely recites statements in the Registration Statement, and contends that those statements were inaccurate based upon events that occurred years later.  (*See infra* at pages 24 to 30.)

*Third*, Plaintiffs have failed to plead loss causation—*i.e.*, the statutorily required causal connection between the alleged misrepresentations and the alleged loss.  The alleged "corrective disclosures" issued by Franklin in 2007 and 2008, which Plaintiffs say revealed the

truth and caused a decrease in Franklin's stock prices, did **not relate in any way** to Mr. Ranieri's alleged misstatements. *See Greenberg* v. *Crossroads Sys.*, 364 F.3d 657, 665 (5th Cir. 2004) (plaintiffs may not "simply offer[] evidence of any decrease in price following the release of negative information," but must establish a "causal connection between the allegedly false statement and its effect" on the stock price). Moreover, Plaintiffs have not pled any facts showing that Franklin's stock price declines were caused by the revelation of the supposed Franklin-specific "fraud," as opposed to the unprecedented mortgage crisis beginning in 2007— which Federal Reserve Chairman Ben Bernanke has called the worst financial crisis since the Great Depression.[2] (*See infra* at pages 30 to 33.)

*Fourth*, as a matter of law, the Preferred Stock Plaintiffs' Securities Act claims are time-barred under the applicable one-year limitations period. Indeed, the Preferred Stock Plaintiffs have **admitted that the claims are time-barred**. (*See infra* at pages 33 to 36.)

*Finally*, Plaintiffs' control person claims against Mr. Ranieri under Sections 15 and 20(a) fail, because (a) Plaintiffs' bare allegation that Mr. Ranieri "controlled" Franklin simply by virtue of his position as an outside director is legally insufficient, and (b) Plaintiffs have not alleged any facts showing that Mr. Ranieri induced or participated in any violation of the securities laws by any other Defendant. (*See infra* at pages 36 to 38.)

### STATEMENT OF THE ISSUE

(1)    Should securities fraud claims against an outside director who lost $20 million as a result of his alleged accounting fraud be dismissed with prejudice when (a) Plaintiffs do not allege the necessary particularized facts, or any coherent theory, showing that the outside

---

[2] Tom Barkley et al., *IMF Sees U.S. Maladies Infecting World Economy*, WALL ST. J., Apr. 10, 2008, at A9; Damian Paletta et al., *At Moment of Truth, U.S. Forced Big Bankers to Blink*, WALL ST. J., Oct. 15, 2008, at A1.

director acted with an intent to defraud the stockholders, (b) the outside director's statements were not misleading, and (c) Plaintiffs do not allege any facts demonstrating the required causal connection between the supposed misstatements and Plaintiffs' alleged loss?

(2)     Should Securities Act claims be dismissed with prejudice when (a) the complaint alleges no material misstatement in the Registration Statement, and (b) the complaint fails to plead compliance with the Securities Act's one-year statute of limitations?

## ALLEGATIONS OF THE COMPLAINTS[3]

### A.     Franklin and the Bank

Founded in 2001, Franklin was a bank holding company headquartered in Houston.  (CSC ¶ 19; PSC ¶¶ 10-11; Franklin's 2006 Form 10-K, filed with the SEC on March 14, 2007 ("2006 Form 10-K"), at 2, Joint App. Tab 7.)  By year-end 2006, the Bank had $4.2 billion in loans and total deposits of $2.6 billion.  (2006 Form 10-K at 2, 40.)

Like many financial institutions focused on deposit taking and retail lending, the turbulent financial markets that developed in 2007 took their toll on the Bank.  After fully disclosed financial issues arose at the Bank in late 2007, Franklin ceased making its periodic SEC financial filings as it attempted to address accounting issues within the Bank and seriously deteriorating financial markets.  Following its third quarter 2007 Form 10-Q filed in November

---

[3] On a motion to dismiss, this Court should accept as true only "well-pleaded factual allegations"; "conclusory allegations or unwarranted deductions of fact" should be ignored.  *Tuchman* v. *DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  In deciding this motion, the Court may consider Franklin's SEC filings, "documents incorporated in the [complaints] by reference" and "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit."  *Flaherty & Crumrine Preferred Income Fund* v. *TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009); *Fin. Acquisition Partners* v. *Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).  The Court may also take judicial notice of publicly reported stock prices and broader market conditions.  *Truk Int'l Fund LP* v. *Wehlmann*, 2009 U.S. Dist. LEXIS 112234, *33 n.10 (N.D. Tex. Dec. 3, 2009).  As required by this Court's Individual Rules, defendants in this action are providing the Court with a Joint Appendix (hereinafter, "Joint App.") containing the documents cited in their briefs, along with a Joint Compendium of unreported authorities.

2007, Franklin did not file any Form 10-Q or Form 10-K with the SEC.  The Bank collapsed and was taken over by federal and state regulators on November 7, 2008.  (CSC ¶ 93; PSC ¶ 81.)

A year earlier, on November 26, 2007, Franklin disclosed that "management ha[d] conducted a complete evaluation of [the Bank's] loan portfolio" in "response to unprecedented market condition changes."  (CSC ¶ 68; PSC ¶ 64.)  This evaluation included "an analysis of recent market value deterioration of housing by geography, increased Chapter 11 protection filings of national home builders, and worsening liquidity in the mortgage markets."  (*Id.*)  As a result of this evaluation, Franklin increased its credit loss reserves by $20 million.  (*Id.*)

During a November 26 conference call with analysts, Mr. Ranieri discussed Franklin's decision to increase its reserves.  He noted at the outset of the call that

> the subprime crisis has spread to other sectors of the housing market.  Liquidity in the big banks is considerably strained and the mortgage market is struggling to provide adequate financing to all sectors, and even the agency sector this time around is being affected.  This is having a significant effect on housing and builders.  Home sales are close to historic lows.  Housing values have decline[d] significantly in many markets, and as a result, some builders are experiencing liquidity squeeze.  And a number of builders, as we stated in our press release, are choosing to file bankruptcy.

(CSC ¶ 69; PSC ¶ 66.)  Based on these changing market conditions, Franklin decided to increase its reserves by $20 million:

> We have evaluated these changes relative to the potential risks inherent in our portfolio and as a result of these changing market conditions have concluded that we are going to increase reserves by approximately $20 million.  We believe this action that we are taking will ensure the level of future earnings, as the annual credit cost should be limited to the expected levels within our guidance.  What we are trying to do here, we believe we are adequately reserved, we have looked at this very hard.

(*Id.*)

In March 2008, Franklin disclosed that its Audit Committee had commenced an internal investigation into possible accounting and disclosure issues related to single-family residential mortgages and residential real estate owned ("REO").  (CSC ¶ 78; PSC ¶ 72.)[4]  The Audit Committee, together with outside counsel and independent accounting advisors, extensively reviewed the Bank's business, in the course of which they conducted numerous interviews, reviewed e-mail records and analyzed other documents.  (CSC ¶ 84; PSC ¶ 74.)

On August 6, 2008, Franklin announced that it intended to restate its financial statements for its 2006 fiscal year and for the first three quarters of its fiscal year 2007.  (CSC ¶ 90; PSC ¶¶ 76-77.)  The revised financial statements were unaudited and subject to revision based on an audit by Deloitte, which had not yet been completed.  (*Id.*)  Franklin's restatement addressed accounting errors relating to (1) delinquent loans serviced by third parties; (2) REO; (3) loan modifications; (4) investment securities; and (5) bank-owned life insurance.  (*Id.*)

Like many other banks, the worsening financial crisis caused a liquidity crisis at the Bank that ultimately overwhelmed it.  In November 2008, the Bank was closed by the Texas Department of Savings and Mortgage Lending, the FDIC was appointed as the Bank's receiver and Franklin filed for bankruptcy.  (CSC ¶ 93; PSC ¶ 81.)

**B.    This Action**

This action was first filed on June 6, 2008.  (Docket No. 1.)  The complaint, filed by Roucher, asserted claims under the Exchange Act against Franklin, Mr. Nocella and Mr. McCann.  No claim was alleged against Mr. Ranieri, and no Securities Act claim was asserted in

---

[4] "REO" is property owned by a lender after an unsuccessful sale at a foreclosure auction.  If there are no bidders at the auction, then the lender repossesses the property and lists it on its books as REO, a non-performing asset.

the complaint.  Between June and July 2008, other actions were filed naming as defendants only Franklin, Mr. Nocella and Mr. McCann and asserting claims only under the Exchange Act.

On March 6, 2009, after the actions were consolidated and the Common Stock Plaintiff was appointed lead plaintiff in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B) (Docket Nos. 12, 85, 91), the Common Stock Plaintiff filed a consolidated amended complaint that, for the first time, named Mr. Ranieri as a defendant.  (Docket No. 100.)[5]  That complaint—like all previous complaints—asserted claims only under the Exchange Act.  (*Id*.)

On May 4, 2009, Roucher filed a complaint in a separate action, 09-cv-1348, which also alleged claims against Mr. Ranieri, but, for the first time in any of these proceedings, asserted Securities Act claims.  On July 6, 2009, this Court entered an Order holding that Roucher would act as lead plaintiff for the preferred stockholders and that the Common Stock Plaintiff would act as lead plaintiff for the common stockholders.  (Docket No. 117.)  On December 22, 2009, Plaintiffs filed further amended complaints (*i.e.*, the CSC and the PSC), which are the subject of this motion.  (Docket Nos. 167-68.)

**C.     The Limited Allegations Against Mr. Ranieri**

A private investor who helped found Franklin, Mr. Ranieri was an outside director and Chairman of Franklin's Board from 2001 to November 2008.  (CSC ¶ 20; PSC ¶ 11.)  He also served as an outside director of the Bank (but not as its Chairman) during this period.  (CSC ¶¶ 20-21; PSC ¶¶ 11-12.)  Mr. Ranieri was not an officer or employee of Franklin or the Bank at the time of *any* of his challenged statements.  In May 2008, six months after his last alleged misstatement (in November 2007), he was appointed interim CEO of Franklin (but not the Bank).  (PSC ¶ 74.)

_____

[5] The claims against Franklin were severed and stayed due to its bankruptcy.  (Docket No. 92.)

The Common Stock Plaintiff's claims, insofar as they relate to Mr. Ranieri, are limited to (a) statements made in Franklin's 2006 Form 10-K, and (b) statements during the November 26, 2007 conference call regarding Franklin's decision to increase its reserves.  (CSC ¶¶ 49-50, 69-72.)  The Preferred Stock Plaintiffs challenge the same statements by Mr. Ranieri (PSC ¶¶ 44-48, 66), as well as (a) statements in the May 5, 2006 Registration Statement filed by Franklin in connection with a public offering of preferred stock, and (b) Mr. Ranieri's public statements in 2006 and 2007 warning of the coming financial crisis.  (*Id.* ¶¶ 31-33, 88; *see* Registration Statement and Prospectus, filed with the SEC on May 5, 2006 (collectively, the "Registration Statement"), Joint App. Tabs 5-6.)

Mr. Ranieri did not sign any of the numerous other SEC filings referenced throughout the complaints.  Nor is Mr. Ranieri alleged to have drafted or approved any of management's allegedly inaccurate oral statements or press releases.

## LEGAL STANDARD

To state a cause of action under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, a plaintiff must allege:

> (1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," *i.e.*, a causal connection between the material misrepresentation and the loss.

*Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005).

The PSLRA and Rule 9(b) impose heightened pleading requirements on securities fraud claims.  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  The PSLRA further

insists that securities fraud complaints "specify" each misleading
statement; that they set forth the facts "on which [a] belief" that a
statement is misleading was "formed"; and that they "state with
particularity facts giving rise to a strong inference that the
defendant acted with the required state of mind."

*Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Dabit*, 547 U.S. 71, 81-82 (2006) (quoting

15 U.S.C. § 78u-4(b)(1)-(2)) (alteration in original); *see also ABC Arbitrage Plaintiffs Group* v.

*Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (under Rule 9(b) and the PSLRA, plaintiff must

allege the "who, what, when, where, and how" of each alleged misstatement or omission).

      Section 11 of the Securities Act imposes liability if "any part of the registration

statement, when such part became effective, contained an untrue statement of a material fact or

omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading."  15 U.S.C. § 77k(a).  Where, as here, the Section 11 claim "sounds in

fraud," plaintiff is "required to plead the circumstances constituting the alleged fraud with

particularity under Rule 9(b)."  *Melder* v. *Morris*, 27 F.3d 1097, 1100 n.6, 1102 (5th Cir. 1994).

A Section 11 claim "sounds in fraud" when it "includes allegations of intentional or knowing

misrepresentations or omissions" or "relies on the same misrepresentations as those pled in an

accompanying fraud claim."  *Halaris* v. *Viacom, Inc.*, 2007 U.S. Dist. LEXIS 85831, at *29

(N.D. Tex. Sept. 21, 2007) (Godbey, J.); *JPA, Inc.* v. *USF Processors Trading Corp.*, 2005 U.S.

Dist. LEXIS 45658, at *11 (N.D. Tex. July 15, 2005) (Solis, J.).[6]

      The Preferred Stock Plaintiffs admit at the opening of the PSC that their

Securities Act and Exchange Act claims arise from the same nucleus of facts:  namely, the

---

[6] The Preferred Stock Plaintiffs' "disclaimer" that their Section 11 claim "does not sound in
fraud" (PSC ¶ 113) is legally insufficient.  *See Kurtzman* v. *Compaq Comp. Corp.*, 2002 U.S. Dist.
LEXIS 26569, at *88 (S.D. Tex. Mar. 30, 2002) ("[B]oilerplate disclaimers of fraud are not dispositive of
whether a claim under the 1933 Securities Act sounds in fraud." (citing cases)).

"series of revelations in the Spring of 2008 and thereafter concerning Franklin's internal controls' weaknesses and other accounting issues that affected its reported results for . . . all of fiscal year 2007 and fiscal year 2006." (PSC ¶ 2.) Plaintiffs contend throughout the PSC that the same conduct violated both Acts. (*E.g.*, *id.* ¶¶ 32, 43-44, 48, 54, 59, 63-64, 76-77.) The sufficiency of all of their allegations therefore must be tested under Rule 9(b). *Melder*, 27 F.3d at 1100; *see Rubke* v. *Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud"); *Cozzarelli* v. *Inspire Pharms., Inc.*, 549 F.3d 618, 629 (4th Cir. 2008) (same).

Indeed, courts have routinely held that Section 11 claims against outside directors that are premised on an issuer's accounting fraud are governed by Rule 9(b). *See*, *e.g.*, *Ind. State Dist. Council of Laborers* v. *Omnicare, Inc.*, 583 F.3d 935, 941, 948 (6th Cir. 2009); *Rombach* v. *Chang*, 355 F.3d 164, 168-69, 172 (2d Cir. 2004). As one court stated, "if it looks like a securities fraud claim, sounds like a securities fraud claim and acts like a securities fraud claim, it is a securities fraud claim, no matter how you dress it up." *Feitelberg* v. *Merrill Lynch & Co.*, 234 F. Supp. 2d 1043, 1051 (N.D. Cal. 2002).[7]

---

[7] In any event, even if Rule 9(b) does not apply, the Section 11 claim should still be dismissed. Rule 8(a) demands that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009). As explained below (*see infra* at pages 25 to 27), the PSC does not contain such "factual matter."

**ARGUMENT**

I.   **AS A MATTER OF LAW, PLAINTIFFS DO NOT PLEAD PARTICULARIZED FACTS DEMONSTRATING THE REQUIRED COGENT AND COMPELLING INFERENCE OF FRAUD BY MR. RANIERI.**

Under the PSLRA, a plaintiff claiming securities fraud under Section 10(b) must plead "with particularity" facts giving rise to "a strong inference" that the defendant acted with "an intent to deceive, manipulate, or defraud or severe recklessness" for "each act or omission alleged" to have been misleading.  15 U.S.C. § 78u-4(b)(2); *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Ind. Elec. Workers' Pension Trust Fund Ibew* v. *Shaw Group*, 537 F.3d 527, 533 (5th Cir. 2008).

To qualify as a "strong inference" of scienter, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.  It "does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind."  *Id*.  Rather, the Court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct."  *Id.*  "This evaluation must take into account plausible inferences opposing as well as supporting a strong inference of scienter"

through consideration of "the complaint, documents incorporated in the complaint by reference, and matters subject to judicial notice." *Flaherty*, 565 F.3d at 208.

Plaintiffs must establish fraudulent intent on the part of *each defendant separately*. *Southland*, 365 F.3d at 365. Thus, Plaintiffs must specifically demonstrate Mr. Ranieri's fraudulent intent at the time he published some actionable misstatement.[8]

### A.   Plaintiffs Do Not Allege That Mr. Ranieri Had Any Motive to Commit Fraud.

Allegations that a defendant had motive to commit the alleged fraud are "relevant to pleading scienter" and may be considered in determining whether a strong inference of scienter has been pled. *Nathenson*, 267 F.3d at 411. "[P]laintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).

Tellingly, in two complaints totaling more than 350 paragraphs and 175 pages, ***Plaintiffs do not allege one single reason why Mr. Ranieri would have had any motive to deceive investors***. Nor could they. Courts have held repeatedly that a complaint pleads no motive to commit securities fraud when the defendant, like Mr. Ranieri, failed to profit personally from the fraud, such as by taking advantage of the inflated stock price to sell shares. *Tuchman*, 14 F.3d at 1068; *PR Diamonds, Inc.* v. *Chandler*, 364 F.3d 671, 691 (6th Cir. 2004). Plaintiffs do not allege that Mr. Ranieri sold Franklin stock at an inflated price, was compensated

---

[8] Indeed, courts have routinely rejected scienter allegations that seek to hold directors liable for management's alleged financial fraud. *See, e.g.*, *Nathenson*, 267 F.3d at 425 (strong inference of scienter was pled only as to the company's CEO; "[t]he result, however, is otherwise as to [the outside directors]," as to whom no allegation was made tending to support scienter); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 895-909 (S.D. Tex. 2004) (Lake, J.) (allegations supported only a strong inference of scienter of the company's President, CFO and Chief Operating Officer, not the company's outside Chairman); *Newby* v. *Lay*, 258 F. Supp. 2d 576, 624-38 (S.D. Tex. 2003) (Harmon, J.) (granting outside directors' motion to dismiss Section 10(b) claim in Enron-related class action).

based on the performance of Franklin stock or otherwise capitalized on Franklin's allegedly inflated stock price.  Since no motive is alleged, "the strength of [plaintiff's] circumstantial allegations [of scienter] must be correspondingly greater."  *Tuchman*, 14 F.3d at 1068.

**B.**     **Plaintiffs Plead No Circumstantial Facts Raising a Strong Inference of Fraud by Mr. Ranieri.**

Because "there is no allegation that [Mr. Ranieri] actually personally profited from the allegedly inflated stock values," Plaintiffs "face a tougher standard for establishing [his] fraudulent intent."  *Melder*, 27 F.3d at 1102.  Plaintiffs must meet a "more stringent standard" of scienter, and the strength of their allegations of fraudulent intent "must be correspondingly greater."  *R2 Invs.* v. *Phillips*, 401 F.3d 638, 644 (5th Cir. 2005); *Lovelace* v. *Software Spectrum*, 78 F.3d 1015, 1019 n.3 (5th Cir. 1996).  No such allegations appear here as to Mr. Ranieri.

**1.**     **Franklin's Restatement Does Not Establish Mr. Ranieri's Scienter.**

Plaintiffs cite the corrected accounting figures contained in Franklin's August 2008 restatement as *prima facie* evidence of scienter.  (CSC ¶¶ 147, 184; PSC ¶ 48.)  In fact, it is settled in this Circuit that violations of GAAP and restatements do not establish scienter.  *Shaw Group*, 537 F.3d at 534; *Lovelace*, 78 F.3d at 1020; *see Goldstein* v. *MCI Worldcom*, 340 F.3d 238, 251 (5th Cir. 2003) (allegation that defendants must have known about fraudulent activity because of the magnitude of accounting errors does not suffice under the PSLRA).  Under Plaintiffs' theory, "scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA."  *Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs.*, 497 F.3d 546, 555 (5th Cir. 2007); *see Magruder* v. *Halliburton Co.*, 2009 U.S. Dist. LEXIS 27561, at *48 (N.D. Tex. Mar. 31, 2009) (Lynn, J.) (rejecting allegation identical to Plaintiffs' allegation here that "violations of GAAP are direct evidence" of scienter).

The complaints do not allege any facts—let alone particularized facts—showing that Mr. Ranieri knew of or recklessly disregarded any inaccuracies in Franklin's 2006 Form 10-K when it was issued in March 2007.  Mr. Ranieri is not a Certified Public Accountant and was not a member of Franklin's or the Bank's Audit Committees.  Moreover, neither complaint alleges that Mr. Ranieri, an outside director of the Bank, had any role in devising or implementing any of the Bank's accounting practices.  The fact of a subsequent restatement "cannot substitute for factual assertions connecting [Mr. Ranieri] to specific contracts or accounting or management practices that led to" the restatement.  *Shaw Group*, 537 F.3d at 540.

### 2.     The "Whistleblower" Letter Refutes Mr. Ranieri's Scienter.

The complaints attach a February 19, 2008 letter from a whistleblower to Franklin's Senior Vice President of Internal Audit.  (CSC Ex. C; PSC Ex. 2.)  This letter was written almost ***three months after*** Mr. Ranieri made any of his alleged misstatements.  Additionally, the six-page, single-spaced letter ***does not contain a single mention of Mr. Ranieri***.  The whistleblower's gripe is plainly with Franklin executives, not with Mr. Ranieri or other outside directors.  (*See id.* at 6 (it "appears that Bank *management* was in fact aware of the extent of its losses when 2007 earnings were released"); *id*. at 5 (discussing his alleged "efforts to report exposures to senior *management*"); *see also* PSC ¶ 83 (letter allegedly reveals that "internal controls problems repeatedly went unheeded by *management*") (emphasis added).)

Indeed, on its face, the whistleblower's letter makes clear his belief that Mr. Ranieri and Franklin's other outside directors did not know about the problems cited in his letter, and one purpose of the letter was to inform the Board of these issues.  (*See* CSC Ex. C, at 5 ("To my knowledge, current Loss Mitigation programs and activities have not been approved by the Board . . . ."); *id*. at 6 ("I plan to disclose my concerns to the Board and to Franklin Bank's

auditors and the appropriate regulatory agencies."); *id*. (letter was intended to "provide[] information about accounting and auditing issues to the Audit Committee of the Board").)

Immediately upon receipt of the letter, Franklin's Audit Committee commenced a thorough investigation, and the existence of the letter and the investigation was publicly disclosed.  (CSC ¶ 78; PSC ¶ 72.)  The blunt and timely disclosure by Franklin's Board of accounting issues it first "learned of" in "February 2008" (*id*.) further undermines Mr. Ranieri's alleged scienter.  *See Rosenzweig* v. *Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (no scienter where company timely and voluntarily disclosed the information plaintiffs alleged was fraudulently withheld); *Greenstone* v. *Cambex Corp.*, 975 F.2d 22, 26 (1st Cir. 1992) (defendant "publicized its . . . practice with a candor that seems inconsistent with knowledge of illegality").

### 3. The "Confidential Witness" Allegations Do Not Create a Strong Inference of Mr. Ranieri's Scienter.

The CSC cites various "confidential witnesses," whose stories—almost all of which have nothing to do with Mr. Ranieri—supposedly show that "Defendants" acted with scienter.  (CSC ¶¶ 114-46.)  These allegations are of dubious relevance, at best, to pleading scienter in this Circuit.  *See Shaw Group*, 537 F.3d at 535 (courts "must discount allegations from confidential sources"); *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) (Sparks, J.) ("The fact that these accusations came from confidential sources detracts from their weight in the scienter analysis.").  In any event, these allegations are of no help to Plaintiffs.

One "witness" states that "Nocella, McCann and Ranieri [were] completely responsible for 'write downs and reserves to specific loans,'" and that "when accounting issues would come up during either the Board Credit or Management Loan Committee meetings, the top executives would state simply that they would deal with it later."  (CSC ¶ 127.)  The CSC does not allege that this "witness" was a member of either of those committees, or that he or she

16

ever was present when Mr. Ranieri said or did anything.  Therefore, on their face, these allegations are demonstrably meaningless.  *See ABC Arbitrage*, 291 F.3d at 353 (confidential sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source . . . would possess the information pleaded").

Additionally, as an outside director, Mr. Ranieri, who did not live in Texas, could not have been one of the "top executives" who was present at these meetings or who made this alleged statement.  Moreover, the CSC does not specify the "accounting issues" the "top executives" would allegedly "deal with later."  Thus, the alleged statement cannot contribute to a strong inference of scienter because it is "susceptible to many interpretations, including innocent ones."  *In re Integrated Elec. Servs.*, 2006 U.S. Dist. LEXIS 1425, at *11 (S.D. Tex. Jan. 10, 2006) (Ellison, J.), *aff'd*, 497 F.3d 546 (5th Cir. 2007).  For example, the "top executives" may have done exactly what the statement would seem to suggest:  address the "accounting issues" after the meeting had concluded.  *See id.* (comment by defendant that he "didn't need to hear the details of [a] revenue problem" was too ambiguous to support a strong inference of scienter).[9]

Another "confidential witness" allegedly concluded in June or July 2007 "through his participation in various *executive* level meetings that the internal controls and monitoring of the single family residential portfolio 'was awful.'"  (CSC ¶ 114 (emphasis added).)[10]  This

---

[9] This "witness" also claims that "Board Packs" were distributed to members of the Board Credit Committee, including Mr. Ranieri, prior to each meeting.  (CSC ¶ 125.)  The CSC does not allege what materials were included in those "Board Packs," other than an "agenda."  (*Id.*)  Nor does the CSC allege that the "Board Packs" included any information that would have put Mr. Ranieri on notice that Franklin's financial statements were inaccurate or that its controls were inadequate.  *See Southland*, 365 F.3d at 370 ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss."); *see also Goldstein*, 340 F.3d at 253.

[10] This witness did not start working at the Bank until June 2007, five months after the Common Stock Plaintiff's putative class period began.  (CSC ¶¶ 30, 114.)  *See In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d at 895 (stating that it was "troubling" that certain confidential witnesses were employed by the company for only a portion of the class period).

witness states that "Company executives" were "aware of the internal control problems," and that Mr. Ranieri "was screaming at them on the phone to get the internal controls in line." (*Id.* ¶ 115.) The CSC does not allege when Mr. Ranieri made this alleged statement, to whom he specifically made it or in what context. *See In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d at 895 ("[P]laintiffs must allege with particularity when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred.").

Moreover, Mr. Ranieri's alleged statement is, at best, "susceptible to many interpretations, including innocent ones." *In re Integrated Elec. Servs.*, 2006 U.S. Dist. LEXIS 1425, at *11. In fact, on its face, the statement defeats Plaintiffs' scienter theory against Mr. Ranieri: the fact that he instructed management to improve Franklin's controls confirms that he did not intentionally ignore any control issues. *See Shaw Group*, 537 F.3d at 537-38 (defendant's statement that someone "needed to do something to fix" the company's financials more likely meant that defendant was "pointing out an error that needed to be corrected").

### 4.    The Complaints Plead No Facts Showing That Mr. Ranieri Knew That Countrywide Had Defaulted on a Loan from the Bank.

Much of the complaints focuses on alleged accounting errors concerning Franklin's exposure in connection with a loan to Countrywide. (*E.g.*, CSC ¶¶ 10, 56, 67, 72, 111-12; PSC ¶¶ 57, 82.) There are no allegations in either complaint, however, that prior to making any of his challenged statements Mr. Ranieri received information that Countrywide had defaulted on its loan. Instead, the Common Stock Plaintiff attaches minutes of a January 3, 2007 Franklin Board meeting, during which the Board "reviewed a summary of loans" the Bank had made to Countrywide. (CSC Ex. D, at 2.) Of course, that Mr. Ranieri was aware of the *existence of a loan* to Countrywide does not mean that he was aware of any *default on that loan*. Indeed, the CSC alleges that Countrywide did not default until *nine months later*. (CSC ¶ 119.)

18

Lacking any facts to show that Mr. Ranieri was aware of Countrywide's default, the Common Stock Plaintiff cites district court cases from outside this Circuit for the proposition that all "Defendants" are "deemed to have intimate knowledge" of Franklin's "banking operations," because those operations are "a core component" of Franklin's business.  (CSC ¶ 24.)  Plaintiff's reliance on these cases is misplaced.  The Fifth Circuit has made clear that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company."  *Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *see Shaw Group*, 537 F.3d at 535 (executive's statement that "there is nothing in this company that I don't know" insufficient to support scienter); *Magruder*, 2009 U.S. Dist. LEXIS 27561, at *47-*52 (allegation that defendant, "in his capacity as a key officer and director of the Company, is deemed to have intimate knowledge" of "central components" of the company is insufficient to plead scienter).[11]

**C.    The Facts Pled Refute Any Inference That Mr. Ranieri Acted with Scienter.**

**1.    Mr. Ranieri's Trading in Franklin Stock Negates His Scienter.**

Mr. Ranieri did not sell even one share of his substantial Franklin stockholdings during the class periods.  (*See* Joint App. Tabs 16 & 16(a).)  The Fifth Circuit has made clear that

---

[11] Even the cases cited in the CSC are of no help to Plaintiffs.  In *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, the complaint alleged that six directors and officers artificially inflated the company's financial results.  The court denied motions to dismiss made by five of the six defendants, but granted the Chairman's motion to dismiss.  The court concluded that "plaintiffs ha[d] not pled facts sufficient to create a strong inference that [the Chairman] knew or should have known" about the alleged fraud, because plaintiffs had not pled facts demonstrating that the outside Chairman was "involved in the day-to-day operations of the corporation."  324 F. Supp. 2d 474, 497 (S.D.N.Y. 2004).  In *In re Campbell Soup Co. Sec. Litig.*, plaintiffs alleged claims only against company management and not against any outside director, and pointed to "specifi[c] discussions, phone conversations, and memoranda" showing that the CEO and CFO were aware of the improper practices and had "rejected recommendations that the Company stop" those practices.  145 F. Supp. 2d 574, 581, 595-97 (D.N.J. 2001).

the fact that a defendant "did not sell [his] shares during the relevant class period undermines plaintiffs' [scienter] claim." *Nathenson*, 267 F.3d at 421; *Rosenzweig*, 332 F.3d at 867.[12]

Moreover, an inference of scienter is "negat[ed]" when defendant "actually increased [his] stock holdings" during the class period. *Newby*, 258 F. Supp. 2d at 614, 635-36; *see also Searles* v. *Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995). Here, on the first day of the class periods, Mr. Ranieri beneficially owned 752,241 shares of Franklin common stock. Those shares were valued at that time at approximately $14.3 million. ***Mr. Ranieri then purchased over 380,000 additional shares of Franklin common stock, costing him over $5.1 million in cash.*** (*See* Joint App. Tabs 16 & 16(a).) In the end, Mr. Ranieri lost almost $20 million in Franklin stock alone during the class periods. Put differently, during the class periods, Mr. Ranieri himself lost almost *30 times* the loss of the three Plaintiffs combined.

Mr. Ranieri had every incentive to protect the long-term health of Franklin. To accept the plausibility of Plaintiffs' allegation that Mr. Ranieri perpetrated an orchestrated "fraud" would require this Court "to believe that [he] did so for the sheer joy of it rather than for profit." *SEC* v. *Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

### 2. The FDIC Reports Undermine Any Inference of Mr. Ranieri's Scienter.

Relying on a July 2, 2009 Report of the FDIC's Office of Inspector General (the "OIG Report"), Plaintiffs allege that Defendants were made aware of weaknesses in Franklin's internal controls in FDIC examination reports issued from 2003 to 2008. (PSC ¶¶ 38-40, 65;

---

[12] The PSC alleges that "Franklin granted Ranieri & Co. a 10-year option to purchase 570,000 shares of Franklin common stock at an exercise price of $10.00 per share." (PSC ¶ 11.) Further negating Mr. Ranieri's scienter, Ranieri & Co. never exercised that option, which, at various points during the class periods, was worth as much as $5.6 million.

CSC ¶¶ 94-101.)  In fact, the OIG Report and the exam reports referenced therein refute any inference of Mr. Ranieri's scienter.

By statute, the OIG is required to issue a report "which reviews the [FDIC's] supervision of the institution" if the FDIC's Deposit Insurance Fund incurs a material loss with respect to that institution.  (OIG Report, annexed to the CSC as Ex. A, at 1; *see also* 12 U.S.C. § 1831o(k).)  In its report, the OIG was critical of the FDIC's oversight of Franklin and the FDIC's *failure* to raise any concerns about the Bank's management.  The OIG concluded that "the FDIC could have performed additional analysis, exercised greater supervisory concern, and taken additional action to help prevent the bank's failure."  (OIG Report at 11-12.)  The report included numerous examples of areas "where the FDIC's supervision of Franklin could have been enhanced."  (*Id*. at 12-16.)  For example, the OIG expressly concluded that FDIC examiners "could have better identified and analyzed risk to ensure that Franklin established and appropriately implemented controls and risk limitation and mitigation strategies."  (*Id*. at 12.)

The OIG also outlined several mistakes made by Bank management—***not by any member of the Bank's (or Franklin's) Board***.  In fact, the OIG's "overall" conclusion was that the Bank "failed due to *bank management's* high-risk strategy."  (*Id*. at 3 (emphasis added).)  The OIG makes little mention of the Bank's Board in its report, and ***Mr. Ranieri is not mentioned at all in the report***.  Instead, the OIG concluded that the FDIC failed to identify risks at the Bank, much less bring them to Mr. Ranieri's attention.  Plaintiffs' apparent contention that Mr. Ranieri should have uncovered those risks himself—even though, after comprehensive annual audits and examinations, neither Franklin's auditors nor the FDIC discovered those

problems—"at most . . . give[s] rise to an inference of negligence in Outside Directors' failure to monitor" the actions of management.  *Newby*, 258 F. Supp. 2d at 630.[13]

Moreover, even the OIG Report's discussion of parts of prior examination reports undermines any inference of Mr. Ranieri's scienter:  in ***every exam report*** prior to the one issued on February 14, 2008, the examiners' conclusion regarding the Board's and management's performance was that "*[the Board] and management are satisfactory/effective*."  (OIG Report at 22 (emphasis added).)  This is the *highest* rating the examiners could have given the Board.  (*Id.*)  During each of those examinations, the examiners also gave Franklin the highest ratings in (a) "asset quality," rated as "strong"; (b) "loan underwriting," rated as "conservative"; (c) "liquidity and funds management," rated as "satisfactory/sufficient"; and (d) "internal controls," rated as "appropriate."  (*Id.* at 22-24.)  It was not until February 2008—*almost three months **after** Mr. Ranieri made any of his alleged misstatements*—that FDIC examiners first expressed the view that the Board and management "need[ed] improvement."  (*Id.* at 22.)[14]

Of course, Mr. Ranieri's "lack of clairvoyance" about facts yet to be disclosed to him cannot establish his scienter.  *Acito* v. *IMCERA Group*, 47 F.3d 47, 53 (2d Cir. 1995); *see*

---

[13] As set forth in Section III(C)(3) of the motion to dismiss filed by Messrs. Chimerine, Golush, Howard, Master, Perro, Rhodes and Selman, which Mr. Ranieri incorporates herein by reference, Plaintiffs rely on the unlawful partial disclosure of information contained in certain FDIC exam reports. The reports should be considered in their entirety or not at all.

[14] As a glaring example of Plaintiffs' misuse of the FDIC exam reports, Plaintiffs wrongly suggest that this exam was completed, and the exam report issued, in October 2007.  (*E.g.*, PSC ¶ 65; CSC ¶ 99.)  In fact, the exam *began* in October 2007, but the examiners did not complete the exam until January 14, 2008, and the report was not issued until February 14, 2008.  As a result of certain limitations on disclosure of examination reports, *see* 12 C.F.R. § 309.6(a), this exam report is not attached to this motion, even though it is properly considered here as a "document[] incorporated in the [complaints] by reference" and a "document that the [Plaintiffs] either possessed or knew about and upon which they relied in bringing the suit."  *Flaherty*, 565 F.3d at 208; *Fin. Acquisition Partners*, 440 F.3d at 286.  If Plaintiffs persist in misdescribing the date of this report, subject to the FDIC's approval in accordance with 12 C.F.R. § 309.6(b), Mr. Ranieri will submit this report to the Court for *in camera* review.

*ACA Fin. Guar. Corp.* v. *Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) ("There is nothing in the amended complaint to establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable," and, thus, the complaint alleged "fraud by hindsight"); *Newby*, 258 F. Supp. 2d at 633 (plaintiff "cannot logically argue" that an outside director knowingly "failed to disclose information that plaintiff has not shown that the Outside Director had" when he made his alleged misstatement).  In short, "[w]hat is missing from the [complaints] regarding [Mr. Ranieri's] scienter are factual allegations setting forth what information was presented to [him] about any of the alleged misrepresentations, omissions, GAAP violations, etc. that put [him] on actual or constructive notice of fraudulent activity."  *Weiss* v. *Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 950 (D. Ariz. 2007).

### 3.    Deloitte's Audits Negate Any Inference of Mr. Ranieri's Scienter.

The accounting practices at issue here were audited contemporaneously by Deloitte, which found that Franklin's financial statements "present fairly, in all material respects," Franklin's financial position and results of operations "in conformity with [GAAP]." (PSC ¶ 45.)  Franklin's internal controls were also audited contemporaneously by Deloitte, which gave "an unqualified opinion on the effectiveness of" Franklin's controls.  (*Id.*)

The clean audit opinions by Deloitte "negate" any inference of Mr. Ranieri's scienter.  *See Newby*, 258 F. Supp. 2d at 617 (unqualified financial opinion by company's auditors and approval of financial statements "negated" inference of scienter by outside directors); *Mortensen* v. *AmeriCredit Corp.*, 123 F. Supp. 2d 1018, 1025-27 (N.D. Tex. 2000) (Fitzwater, J.) (no strong inference of scienter where company's independent auditor neither "objected to or even questioned" the accounting practices at issue).

II.   **PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY A MATERIALLY MISLEADING STATEMENT BY MR. RANIERI.**

     A.   **In This Circuit, Mr. Ranieri Cannot Be Held Liable for the Misstatements of Others.**

Plaintiffs allege that "[g]iven their positions of authority and control" at Franklin, "it is appropriate to presume" that the "information conveyed in [Franklin's] public filings, press releases and other publications and statements as alleged herein are [sic] the collective actions" of all "Defendants." (CSC ¶ 25; *accord* PSC ¶¶ 3, 132.) Not so.

In *Southland*, the Fifth Circuit flatly rejected the notion, known as "group pleading," that "statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company" and, thus, a plaintiff "need not allege any facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission." 365 F.3d at 363-64. The Fifth Circuit held that the "group pleading" doctrine could not "withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission.'" *Id.* at 364.

Only two of the SEC filings cited in the complaints were signed by Ranieri: the May 2006 Registration Statement and the 2006 Form 10-K. Mr. Ranieri cannot be liable for any of the supposedly misleading statements contained in any other SEC filings.[15] The complaints also allege that "Defendants" made misleading statements on conference calls held on January

---

[15] *See Kaltman* v. *Key Energy Servs.*, 447 F. Supp. 2d 648, 657-58 (W.D. Tex. 2006) (two of the four director-defendants did not make a "statement" under Section 10(b), because they did not "sign[] any press releases or SEC forms which contained the alleged misstated earnings"); *Fener* v. *Belo Corp.*, 425 F. Supp. 2d 788, 798 (N.D. Tex. 2006) (granting motion to dismiss made by three directors, because they did not sign the relevant SEC filings).

31, July 25, October 30 and November 26, 2007.  In fact, Mr. Ranieri said nothing on the

January 31, July 25 and October 30 calls.  (CSC ¶¶ 45-46, 55-56, 60-65; PSC ¶¶ 43, 57, 62.)  As

explained below, with the exception of Franklin's 2006 Form 10-K,[16] Plaintiffs have not pled

any facts to support their allegations that Mr. Ranieri made a materially misleading statement.

      **B.**      **The Registration Statement Contains No Material Misstatement.**

      The Preferred Stock Plaintiffs contend that Franklin failed to disclose various

facts about its loan portfolio, loan losses and underwriting standards in the May 2006

Registration Statement.  (PSC ¶¶ 32-33.)  Yet, the sole support for that allegation is Franklin's

August 2008 restatement and the subsequent failure of the Bank.  (*Id.* ¶¶ 35-38.)

      The Registration Statement included financial statements for Franklin's fiscal

years 2001 to 2005 and the first quarter of its fiscal year 2006.  (Registration Statement at 1-2,

21-23.)  None of those financial statements was restated by Franklin.  The August 2008

restatement restated only Franklin's financial statements for the first three quarters of its fiscal

year 2007 and for its entire 2006 fiscal year.  (CSC ¶ 90; PSC ¶¶ 76-77.)  Simply because

Franklin restated its 2006 fiscal *year* financial statements does not plead with particularity that

the unaudited financial statements for the first *quarter* of that year contained any inaccuracies,

much less material inaccuracies.  *See Garber* v. *Legg Mason, Inc.*, 2009 U.S. App. LEXIS

21404, at *9-*10 (2d Cir. Sept. 30, 2009) (dismissing Section 11 claim because plaintiff failed to

allege the magnitude of the alleged financial misstatement).  In fact, Franklin's restatement of its

aggregated financial statements for its 2006 fiscal year merely means that an accounting error

was made *at some time during that year, not necessarily in the first quarter*.  It is noteworthy that

---

[16] Mr. Ranieri does not here challenge the sufficiency of Plaintiffs' pleading that the 2006 Form 10-K was inaccurate.  As explained above, however, Plaintiffs plainly have not pled that Mr. Ranieri knew of any inaccuracies in the Form 10-K at the time it was issued in March 2007.

Franklin restated its financial statements for specified quarters of its 2007 fiscal year, but did not restate any of its 2006 fiscal quarter financials.

To plead some actionable misstatement, a plaintiff must allege the particulars of *each* alleged misstatement, specifying not only its content but also "which portion" of the statement was false "and why."  *Williams* v. *WMX Techs.*, 112 F.3d 175, 179 (5th Cir. 1997); *see also Alamosa Holdings, Inc. Secs. Litig.*, 382 F. Supp. 2d 832, 848, 853 (N.D. Tex. 2003) (Cummings, J.) ("Plaintiffs cannot simply allege the projection to have been false or misleading without alleging supporting particulars and why the statement was false or misleading.").

The Preferred Stock Plaintiffs simply have not identified any financial statement in the May 2006 Registration Statement that was inaccurate, why that statement was inaccurate and "how" that inaccuracy materially affected their decision to purchase preferred stock.  The PSC thus fails to allege "what" statement was false, or "why" and "how" that is so.  *ABC Arbitrage*, 291 F.3d at 350; *Williams*, 112 F.3d at 179.

The PSC also alleges that the Registration Statement misrepresented certain risks and Franklin's ability to effectively control those risks:  namely, that Franklin (a) characterized its "lending practices as conservative"; (b) stated that "[w]e have established certain lending practices to reduce our risks"; and (c) stated that "[o]ur single family mortgage portfolio provides high quality liquid assets for us."  (PSC ¶ 33.)  Nowhere in the Registration Statement did Franklin use the word "conservative" to describe its lending practices.  Rather, Franklin simply identified the particular lending practices it employed to reduce risk.  (Registration Statement at 26.)  The PSC does not allege that those lending practices were not employed by Franklin.

Further, these vague expressions of corporate optimism are immaterial as a matter of law.  Statements are "immaterial as a matter of law, and therefore not actionable, where they

26

are vague or general statements of optimism or about a company's progress." *Kurtzman*, 2002 U.S. Dist. LEXIS 26569, at *78 (citing cases).  "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery' . . . .  [I]nvestors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001) (Harmon, J.).

Courts have routinely held statements similar to those alleged here to be inactionable "puffery."  *See ECA & Local 134 IBEW Joint Pension Trust* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009) (statement that company had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process"); *Rosenzweig*, 332 F.3d at 854 (statement that "our fundamentals are strong"); *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 932, at *28 (E.D. Pa. Jan. 9, 2007) (statements that company had "a strong credit culture" and "quality performance loans"); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005) (statement that company had "sound risk-management procedures").

### C. Mr. Ranieri's Statements About Franklin's Reserves Were Accurate.

Plaintiffs allege that Mr. Ranieri misled investors regarding Franklin's reserves when he stated during the November 26, 2007 conference call that "we believe we are adequately reserved, we have looked at this very hard."  (PSC ¶ 66; CSC ¶¶ 69, 72.)  Mr. Ranieri's alleged statement was a "statement of belief," which is actionable only "where the evidence shows that the speaker did not in fact hold that belief and the statement made asserted something false or misleading."  *Greenberg*, 364 F.3d at 670.  No facts are alleged in either

27

complaint to infer that Mr. Ranieri believed on November 26, 2007 that Franklin—after having

increased its reserves by $20 million that day—was not adequately reserved.[17]

       Moreover, there plainly was nothing false about Mr. Ranieri's alleged statement.

He stated that "we believe" Franklin was adequately reserved, not that Franklin was, in fact,

adequately reserved.  "[S]econd-guessing a decision as to the amount of a reserve required is a

matter of judgment and not a basis for securities fraud."  *In re Browning-Ferris Indus. Sec.*

*Litig.*, 876 F. Supp. 870, 901 (S.D. Tex. 1994) (Rosenthal, J.); *see also Hinerfeld*, 1998 U.S.

Dist. LEXIS 10601, at *21-*22 ("The failure to anticipate the extent of necessary reserves, even

if it amounts to mismanagement, is not actionable under federal securities laws.").

### D.    Mr. Ranieri Said Nothing About the Countrywide Loan or Franklin's Alleged Exposure to "Subprime" Mortgages.

       According to the CSC, Mr. Ranieri was required to disclose on the November 26,

2007 conference call that Franklin was exposed to "higher-risk non-traditional mortgage

markets" and "delinquent loans served [sic] by Countrywide Financial, including subprime

loans," and that "Countrywide Financial had defaulted on its" loan.  (CSC ¶ 72(d)-(g).)

       In fact, a defendant "does not commit securities fraud merely by failing to

disclose all nonpublic material information" in his possession.  *Shaw Group*, 537 F.3d at 541.

"Liability under Rule 10b-5 for nondisclosure arises if there is a duty to speak," which arises

"only if what [the defendant] said is misleading."  *Id.*; *Kaplan* v. *Utilicorp United, Inc.*, 9 F.3d

---

[17] *See Krim* v. *Banc Texas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993) (claim that company "'knew or should have known' that the percentage of its assets which were 'nonperforming' would increase and that losses from bad loans would exceed the amount available in [the company's] loan loss reserves" was a claim for "negligence in predicting the future economic climate, which is not actionable under the federal securities laws"); *Hinerfeld* v. *United Auto Group*, 1998 U.S. Dist. LEXIS 10601, at *21 (S.D.N.Y. July 15, 1998) (dismissing securities fraud claim where allegation that defendants knew or should have known that reserves were inadequate was "unsupported by additional factual allegations").

405, 407 (5th Cir. 1993).  In other words, the defendant's statement "must *affirmatively create*

*an impression* of a state of affairs that differs in a material way from the one that actually exists."

*Shaw Group*, 537 F.3d at 541 (emphasis added).

Mr. Ranieri's statements on November 26 did not create any such impression.  On

the conference call, Mr. Ranieri made no statement whatsoever regarding the Bank's loan to

Countrywide, nontraditional mortgages or "subprime" mortgages; the conference call had

nothing to do with those matters at all.  Indeed, throughout the entire complaints, ***Plaintiffs do***

***not point to one instance where Mr. Ranieri said anything at all*** about those matters.

### E.    Mr. Ranieri's Public Comments in 2006 and 2007 Were Accurate.

According to the PSC:

- At a December 2006 industry conference, Mr. Ranieri allegedly stated: "Mandated level of disclosure for capital markets has not kept up with the mortgage-product innovation, making the risk level in residential mortgage-backed securities not readily available or easily transparent."

- In a February 2007 interview with *Bloomberg*, Mr. Ranieri allegedly stated: "This is the leading edge of the storm.  If you think this is bad, imagine what it's going to be like in the middle of this crisis."

(PSC ¶ 88.)  The PSC alleges that "[b]y simultaneously vouching for Franklin while accurately

decrying the financial crisis, Ranieri highlighted his own culpability for the failure of Franklin

and the injury his misstatements and those of his colleagues caused to investors."  (*Id.*)

The allegation that Mr. Ranieri's ***accurate, pessimistic statements*** to the media

somehow establish his "culpability" is, to say the least, puzzling.  Plaintiffs fail to explain how,

by warning of a future downturn in the financial markets and suggesting that risks inherent in

mortgage-backed securities are not easily quantified, Mr. Ranieri could have possibly misled

investors.  If anything, Mr. Ranieri's prescient statements underscore his sound judgment on

matters related to the mortgage industry and suggest that *had he been aware of* any deficiencies at Franklin, he would have acted promptly to address them.

III. **AS A MATTER OF LAW, PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION AS TO ANY OF MR. RANIERI'S ALLEGED MISSTATEMENTS.**

Under the PSLRA, a Section 10(b) plaintiff must plead loss causation—"*i.e.*, a causal connection between the [alleged] material representation and the loss." *Dura*, 544 U.S. at 342. Plaintiffs cannot meet their burden "by simply offering evidence of any decrease in price following the release of negative information." *Greenberg*, 364 F.3d at 665. Instead, they "must show that the false statement causing the increase was related to the statement causing the decrease." *Id*. Plaintiff must plead facts showing "(1) that the negative 'truthful' information causing the decrease in [stock] price [was] related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Alaska Elec. Pension Fund* v. *Flowserve*, 572 F.3d 221, 228 (5th Cir. 2009).

Plaintiffs here offer no theory whatsoever as to any loss caused by any statement by Mr. Ranieri. The Common Stock Plaintiff alleges that the "relevant truth" began to be revealed on November 26, 2007, when Franklin announced that it was increasing its reserves by $20 million, and that the full truth was revealed on May 19, 2008 (*i.e.*, the end of the putative class period), when Franklin announced the conclusion of the Audit Committee's investigation. (CSC ¶¶ 198-99, 204.) The Preferred Stock Plaintiffs appear to allege that the negative truthful information was revealed on March 14, 2008, when Franklin announced that the Audit Committee was beginning its investigation, and on August 6, 2008 (*i.e.*, the end of the putative class period), when Franklin announced the restatement. (PSC ¶¶ 109-10.)

Plaintiffs fail to plead loss causation, for three reasons:

*First*, Plaintiffs nowhere plead any price inflation caused by anything Mr. Ranieri said or did.  To plead loss causation in a "fraud-on-the-market" case such as this, "plaintiffs must show both that *the defendants*' alleged misrepresentations artificially inflated the price of the [security] and that the value of the [security] declined once the market learned of the deception." *Ray* v. *Citigroup Global Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007) (emphasis added). Plaintiffs here identify no Franklin stock price increase connected with anything Mr. Ranieri said or did.  As a result, Plaintiffs do not even contend that they can establish a necessary element of loss causation:  *i.e.*, that "the price on the date of purchase" by each member of the class "was inflated because of [defendant's] misrepresentation."  *Dura*, 544 U.S. at 342.

*Second*, none of the alleged "corrective disclosures" even plausibly "relate[] to an allegedly false, non-confirmatory positive statement made earlier" by Mr. Ranieri.  *Flowserve*, 572 F.3d at 228.  For a corrective disclosure and accompanying price decline to show a causal connection between Mr. Ranieri's prior statements and Plaintiffs' losses, the disclosure must reveal the falsity of *Mr. Ranieri's* statements.  *E.g.*, *Teachers' Ret. Sys. of La.* v. *Hunter*, 477 F.3d 162, 187 (4th Cir. 2007).  The complaints do not suggest that any of Mr. Ranieri's alleged misstatements were corrected by the alleged corrective disclosures during the class periods.  *See Lattanzio* v. *Deloitte & Touche*, 476 F.3d 147, 157 (2d Cir. 2007) ("Plaintiffs have not alleged facts to show that Deloitte's misstatements, among others (made by Warnaco) that were much more consequential and numerous, were the proximate cause of plaintiffs' loss."); *Barrie* v. *InterVoice-Brite, Inc.*, 2009 U.S. Dist. LEXIS 99253, at *40 (N.D. Tex. Oct. 26, 2009) (plaintiffs must show "that the initial false statement causing the stock price to increase and the later corrective disclosure causing the decrease were factually related").  As a result, Plaintiffs have

not pled facts upon which "the [factfinder] could conclude that any of the events revealed the truth about the subject of any of [Mr. Ranieri's] alleged misstatements."  *In re Flag Telecom Holdings Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009); *see also Greenberg*, 364 F.3d at 667-69.[18]

*Finally*, Plaintiffs fail to distinguish their loss allegedly caused by Mr. Ranieri's alleged misstatements from their loss caused by "the 'tangle of [other] factors affecting'" Franklin's stock prices.  *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d at 907 (quoting *Dura*, 544 U.S. at 343); *see Dura*, 544 U.S. at 342-43 (plaintiffs' loss must be caused because the truth "ma[de] its way into the marketplace," not as a result of "changed conditions, or other events" independent of the alleged fraud).  Plaintiffs have failed to allege, as they must, "a facially 'plausible' causal relationship between [Mr. Ranieri's] fraudulent statements or omissions . . . followed by the leaking out of relevant or *related* truth about the fraud that caused *a significant part of the depreciation of the stock*."  *Lormand*, 565 F.3d at 258 (emphasis added).

Plaintiffs completely ignore the fact that their alleged losses coincided with the unprecedented and very largely unanticipated collapse of the mortgage industry, as well as supposed misstatements by other Defendants for which Mr. Ranieri is not responsible.  Because the entire financial industry suffered from this marketwide collapse—and Plaintiffs offer no theory upon which to distinguish any supposed losses caused by Mr. Ranieri from those caused by others or the financial crisis—Plaintiffs cannot plead loss causation under *Dura*.  *See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174-75 (2d Cir. 2005) (where "the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails

---

[18] Mr. Ranieri incorporates by reference herein the "negative causation" argument made by Mr. Nocella in his brief (at Section II.C) in support of his motion to dismiss the Securities Act claims.

when it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events").[19]

In short, Plaintiffs seek to convert price declines resulting from a chaotic and unprecedented market environment into a "fraud" orchestrated by Mr. Ranieri.  They do not allege any correlation—let alone the required causal link—between Mr. Ranieri's alleged misstatements and their alleged losses.  Accordingly, Plaintiffs have not pled loss causation.

## IV.     THE SECURITIES ACT CLAIMS AGAINST ARE TIME-BARRED.

Under Section 13 of the Securities Act, Section 11 and 15 claims must be brought within "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The "controlling date for purposes of the running of" the limitations period is "when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing."  *Topalian* v. *Ehrman*, 954 F.2d 1125, 1133 (5th Cir. 1992).

"The courts uniformly hold that a plaintiff must affirmatively plead compliance with Section 13, as it forms a substantive element of a Securities Act claim."  *In re Longhorn Sec. Litig.*, 573 F. Supp. 255, 266 (W.D. Okla. 1983) (citing cases).  Thus, unlike most statutes of limitations, facts demonstrating compliance with Section 13 "must be pleaded as a substantive element of the plaintiff's Securities Act claims."  *Currie* v. *Cayman Res. Corp.*, 595 F. Supp.

---

[19] *See also*, *e.g.*, *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (dismissing complaint for lack of loss causation in the face of a real estate market downturn); *Bastian* v. *Petren Res. Corp.*, 892 F.2d 680, 684-86 (7th Cir. 1990) (Posner, J.) (same, in the face of an oil market downturn); *In re Rhodia SA Sec. Litig.*, 531 F. Supp. 2d 527, 548 (S.D.N.Y. 2007) (allegation "strongly suggests that market forces other than the alleged misconduct at least contributed to, if not entirely caused, the fall in [the company's] stock prices"); *Tripp* v. *IndyMac Bancorp, Inc.*, 2007 U.S. Dist. LEXIS 95445, at *10-*11 (C.D. Cal. Nov. 29, 2007) (dismissing securities fraud claim in declining housing and mortgage markets, where "an even stronger inference is that Defendants were simply unable to shield themselves . . . from the drastic change in the housing and mortgage markets").

1364, 1377 (N.D. Ga. 1984).  Rote allegations claiming compliance with Section 13 fail as a matter of law, and a plaintiff contending that it lacked notice of alleged wrongdoing occurring more than one year before filing the Securities Act claims must affirmatively plead facts showing the exercise of due diligence.  *See Allred* v. *Whatley*, 1985 U.S. Dist. LEXIS 19174, at \*5-\*6 (N.D. Ga. June 5, 1985) ("If the plaintiffs assert the securities violations were concealed so that the plaintiffs' discovery was delayed and the one-year period was, in effect, tolled, the plaintiffs must affirmatively plead . . . their diligent efforts seeking to discover the violations.").

On March 14, 2008—***almost 14 months before Roucher first asserted any Securities Act claims in this action***—Franklin issued a press release (and filed it with the SEC on March 17) in which it disclosed:

- that "Franklin's Board of Directors learned of possible ***accounting, disclosure and other issues related to single-family residential mortgages and residential [REO]***"; and

- that the Audit Committee had "commenced an independent internal investigation" but was "***unable to estimate the potential accounting effects that might result***."

(PSC ¶ 72 (emphasis added).)  This public disclosure made it abundantly clear that significant accounting issues had been discovered at Franklin.  Indeed, *Plaintiffs here plead affirmatively that Franklin publicly disclosed its wrongdoing in that press release.*  (CSC ¶ 201; PSC ¶ 109.)

Clearly, a reasonable investor would have then been on notice that "there was something amiss" concerning Franklin's financial statements.  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 426 (S.D.N.Y. 2005); *see Jensen* v. *Snellings*, 841 F.2d 600, 607 (5th Cir. 1988) (plaintiff has a duty to engage in a "diligent inquiry" and is "not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility" of fraud); *In re Commonwealth Oil/Tesoro Petroleum Sec. Litig.*, 484 F. Supp. 253, 258 (W.D. Tex. 1979) (disclosure signaled to a reasonably prudent investor "the possibility that the registration statement" was inaccurate).

Further, Franklin's public disclosure related directly to the misstatements or omissions alleged in the PSC about the May 2006 Registration Statement.  (*Compare* PSC ¶ 32 (alleging that the Registration Statement "did not accurately and fully advise investors that . . . the Bank's accounting practices and internal controls were materially deficient" and that "the Bank's delinquent loan accounting, [REO] accounting, loan modification accounting, investment securities accounting and bank-owned life insurance accounting were all deficient").)  Faced with Franklin's disclosure—and, in particular, Franklin's statement that it was "unable to estimate the potential accounting effects that might result"—a reasonable investor would have questioned the accuracy of the financial statements contained in the Registration Statement.[20]

Indeed, Plaintiffs have *admitted* that the alleged wrongdoing underlying their claims was revealed in the March 14 press release.  The Preferred Stock Plaintiffs premise their theory of loss causation on the notion that that press release revealed Franklin's supposed wrongdoing—and caused a drop in the preferred stock price of over 30%.  (PSC ¶ 109.)  Plaintiffs thus admit that Franklin's alleged misstatements were disclosed that day.  Yet, the Securities Act claims were not filed in this action until May 4, 2009—*i.e.*, almost **14 months after the "truth" was revealed**.  (*Id.* ¶ 125.)[21]  Courts in this District have concluded that significant drops in price are alone sufficient to put investors on inquiry notice.  *E.g.*, *In re*

---

[20] The press release need not have set forth every detail of the accounting and control issues.  *See In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 285 (S.D.N.Y. 2009) (press release containing limited information provided inquiry notice, because "storm warnings need not detail every aspect" of the alleged fraud); *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 818 (D. Md. 2002) (a "storm warning" is "any indication" in a "communication issued subsequent to the prospectus that could reasonably be considered contrary to" information in the prospectus).

[21] Pribyl did not assert any Securities Act claims in this action until December 22, 2009, and, thus, his Securities Act claims are also plainly time-barred.

*Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d at 846; *Reed* v. *Prudential Secs.*, 875 F. Supp. 1285, 1289 (S.D. Tex. 1995) (Crone, M.J.) (citing cases), *aff'd*, 87 F.3d 1311 (5th Cir. 1996).

Moreover, even if the March 14 press release were somehow insufficient to provide inquiry notice (notwithstanding the Preferred Stock Plaintiffs' admission to the contrary), Roucher has also admitted in this action that it was on inquiry notice no later than May 1, 2008. In Roucher's original complaint, it admitted that "*[t]he truth was fully revealed after the close of business on May 1, 2008*." (Docket No. 1, ¶ 51 (emphasis added).) On that day, Franklin issued a press release disclosing additional details about the accounting and control issues, including that "the Bank determined that *the accounting for certain delinquent single family loans being serviced by third parties, other [REO], and the Bank's newly created single family loan modification programs to mitigate foreclosure losses . . . should be revised*." (PSC ¶ 73; Franklin Press Release, dated May 1, 2008, Joint App. Tab 10 (emphasis added).) Franklin made this public disclosure also more than one year before Roucher asserted any Securities Act claims in this action. Thus, by any measure, the Securities Act claims are time-barred.

## V. THE COMPLAINTS DO NOT PLEAD CONTROL PERSON CLAIMS AGAINST MR. RANIERI.

Plaintiffs allege that Mr. Ranieri is liable as a "controlling person" of Franklin under Section 15 of the Securities Act and Section 20(a) of the Exchange Act. (CSC ¶¶ 217-20; PSC ¶¶ 127-30, 136-38.) To state a control person claim, a plaintiff must allege (a) a "predicate" violation of the Securities Act (Section 15 claim) or the Exchange Act (Section 20(a) claim) by the controlled person, (b) that the controlling person "had actual power or influence over the controlled person," and (c) that the controlling person "induced or participated in the alleged violation." *Dennis* v. *Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990); *Newby*, 258 F. Supp. 2d at 598. "Control person liability is secondary only and cannot exist in the absence of a

36

primary violation." *Southland*, 365 F.3d at 383; *see Bachow* v. *Swank Energy Income Advisers*, 2010 U.S. Dist. LEXIS 1504, at *21 (N.D. Tex. Jan. 6, 2010) (Kinkeade, J.) ("[A] person cannot be liable as a control person over an entity that has not committed an underlying violation.").

   Even if the Court were to find that the complaints adequately plead Section 10(b) or Section 11 claims against Franklin (or any of the other individual Defendants for that matter), the control person claims against Mr. Ranieri must still be dismissed.  As explained above (*see supra* at pages 24 to 30), Plaintiffs have not alleged that Mr. Ranieri "induced or participated in" any violation of the securities laws.  In *Kaltman*, for example, Judge Junell denied motions to dismiss made by the corporation and several of the individual defendants, but granted motions to dismiss made by other director-defendants because the complaint did not state a primary violation of the Exchange Act *by those defendants*.  447 F. Supp. 2d at 666; *see also In re Sourcecorp Sec. Litig.*, 2006 U.S. Dist. LEXIS 41381, at *14 (N.D. Tex. June 6, 2006) (Godbey, J.) (granting motion to dismiss where viable Section 10(b) claim against one defendant (Deaton) could not serve as the predicate violation against other defendants, because the complaint did not allege that those defendants "induced or participated in Deaton's alleged violations").

   Moreover, Plaintiffs have failed to allege sufficiently that Mr. Ranieri "had actual power or influence over" Franklin.  The PSC alleges that "Defendants" are control persons "by virtue of their positions as senior officers and directors of Franklin."  (PSC ¶ 129; *accord id*. ¶ 137.)  The CSC makes similar allegations.  (CSC ¶ 218.)  Courts in this District have rejected such allegations.  In *Dynegy*, for example, plaintiff alleged that the company's former Chairman and others, "because of their status as high-ranking officers/directors," had the "power to directly or indirectly influence [the company's] corporate policy and actions (including the Company's accounting policies and decisions, public statements and finance decisions)."  339 F. Supp. 2d at

912-13.  Judge Lake granted the former Chairman's motion to dismiss the Section 20(a) claim, ruling that plaintiff did not allege "facts beyond defendant's position or title that show that the defendant had actual power or control" over the company.  *Id.*

The complaints here suffer from the same defect.  As in *Dynegy*, Mr. Ranieri was not a member of the company's Audit Committee and did not have the "ability to control the specific transaction or activity upon which the primary violation is based."  *Zagami* v. *Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 716 (N.D. Tex. 2008) (Fitzwater, J.).  In fact, nothing is alleged in the complaints to show that Mr. Ranieri, an outside director, participated in the day-to-day management of Franklin.

## CONCLUSION

The claims asserted against Mr. Ranieri in the CSC and the PSC should be dismissed with prejudice under Rules 9(b) and 12(b)(6), Fed. R. Civ. P.

Dated:   Austin, Texas
         March 5, 2010

                                   Respectfully submitted,


                                   _____/s/ Steve McConnico_____
                                   Steve McConnico
                                   State Bar No. 13450300 / So. Dist. Bar No. 2879
                                   Cynthia Saiter Connolly
                                   State Bar No. 00797367 / So. Dist. Bar No. 21973
OF COUNSEL:                        SCOTT, DOUGLASS & McCONNICO, LLP
                                   One American Center
Robert J. Giuffra, Jr.             600 Congress Avenue, 15th Floor
Brian T. Frawley                   Austin, Texas 78701-2589
William B. Monahan                 (512) 495-6300
Andrew J. DeFilippis
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

                                   *Attorneys for Defendant*
                                   *Lewis S. Ranieri*

## CERTIFICATE OF CONFERENCE

I certify that I have conferred in good faith with Ralph M. Stone of Shalov Stone Bonner & Rocco LLP, lead counsel for the putative preferred stock class, and Randall K. Pulliam of Cauley Williams Bates Bozeman & Pulliam, PLLC, lead counsel for the putative common stock class, concerning the matters presented in Lewis S. Ranieri's motion to dismiss.  We were unable to reach an agreement resolving these matters.

William B. Monahan

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2010 I electronically filed a true and correct copy of the above and foregoing Motion with the Clerk of the Court using the CM/ECF system, which sends notification of such filing to the following:

Andrea D. Levin (Kim)
Diamond McCarthy et al
909 Fannin  Ste. 1500
Houston, Texas   77010
akim@diamondmccarthy.com

Barrett H. Reasoner
Gibbs Bruns LLP
1100 Louisiana  Ste. 5300
Houston, Texas   77002
breasoner@gibbs-bruns.com

J. Allen Carney
Darrin Williams
Randall K. Pulliam
Cauley Bowman et al.
11311 Areade Drive, Ste. 200
Little Rock, Arkansas   72211
acarney@cauleybowman.com
dwilliams@cauleybowman.com
rpulliam@cauleybowman.com

William Fred Hagans
Hagans Burdine PC
3200 Travis, 4th Floor
Houston, Texas   77006
fhagans@hagans-law.com

Farbod-Moridani
James J. Farrell
Terri L. Lilley
Latham & Watkins LLP
355 South Grand Ave.
Los Angeles, California 90071
farbod.moridani@lw.com
james.farrell@lw.com
Terri.lilley@lw.com

George W. "Billy" Shepherd, III
Cruse Scott, et al.
2777 Allen Parkway, 7th Floor
Houston, Texas   77019
bshepherd@crusescott.com

Gregory S. Meece
Thompson Knight, LLP
333 Clay St., Suite 3300
Houston, TX 77002
gregory.meece@tklaw.com

James A. Harrod
Wolf Popper LLP
845 Third Avenue
New York, NY   10022
jharrod@wolfpopper.com

Thomas C. Fitzhugh, IV
Ware Jackson et al
2929 Allen Pkwy, 42nd Floor
Houston, Texas   77019
champefitzhugh@warejackson.com

Jonathan C. Dickey
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY   10166
JDickey@gibsondunn.com

M. Byron Wilder
Samantha A. Lunn
Gibson Dunn Crutcher LLP
2100 McKinney Ave.  Ste. 1100
Dallas, Texas  75201-6911
bwilder@gibsondunn.com
slunn@gibsondunn.com

Peter Wald
Latham & Watkins
505 Montgomery St, Ste. 1900
San Francisco, California  94111-2566
Peter.wald@lw.com

Ralph M. Stone
Shalov Stone et al
485 7th Avenue, Suite 1000
New York, NY  10018
rstone@lawssb.com

Roger B. Greenberg
Schwartz Junell et al
909 Fannin Ste. 2700
Houston, Texas  77010
rgreenberg@schwartz-junell.com

Ronen Sarraf
Sarraf Gentile LLP
116 John St.
New York, NY   10038
ronen@sarrafgentile.com

William B. Monahan
Sullivan & Cromwell LLP
125 Broad Street
New York, NY   10004
monahanw@sullcrom.com


        Notice has been mailed by U. S. Mail to the following:

Andrew J. De Fillippis
Brian T. Frawley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

David Avi Rosenfeld
Mario Alba, Jr.
Coughlin Stocia Geller Rudman & Rubbins LLP
58 S Service Road, Ste. 200
Melville, NY  11747

David C. Walton
Coughlin Stola Geller Rudman & Robbins LLP
655 W. Broadway Ste. 1900
San Diego, California  92101

James G. Munisteri
Gardere Wynne et al
1000 Louisiana  Ste. 3400
Houston, Texas   77002-5007


                          /s/ Steve McConnico
                         Stephen E. McConnico