IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities Litigation | § § § § | Civil Action No. 4:08-CV-1810<br><br>CLASS ACTION |

## ANTHONY NOCELLA'S MOTION TO DISMISS
## COMMON STOCKHOLDERS' COMPLAINT

James G. Munisteri
State Bar No. 14667380
Orin H. Lewis
State Bar No. 00791110

Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

Issues Presented ..................................................................................................... viii

Summary of Argument ..............................................................................................1

Legal Argument and Authorities ...............................................................................3

      A.      Section 10(b) and Rule 10b-5 Elements ................................................3
      B.      False or Misleading Statements .............................................................3
      C.      Safe Harbor ............................................................................................5
      D.      Scienter ..................................................................................................6

              i.      Strong Inference of Scienter .....................................................6
              ii.      Standard of Review ...................................................................8

      E.      Materiality .............................................................................................9

Application of Law to Facts .......................................................................................9

      A.      Defects Applicable to All Allegations ..................................................9

              i.      The Commons' Complaint Constitutes Confusing "Puzzle
                        Pleading".....................................................................................9
              ii.      The Commons Employ Improper Group Pleading ...................10
              iii.      No Plausible Motive Has Been Alleged ..................................10

      B.      The August 6, 2008 Adjustments..........................................................12

              i.      Factual Background ..................................................................12
               ii.      No Strong Inference of Scienter ..............................................13

      C.      The Subprime Red Herring....................................................................19

              i.      No False or Misleading Statements ..........................................19
               ii.      No Materiality or Strong of Scienter ......................................27

      D.      The Non-Existent Countrywide Default ...............................................27

              i.      Actionable Omissions Not Sufficiently Alleged.....................27
              ii.      No Strong Inference of Scienter ..............................................29

      E.      4Q 2007 Allowances..............................................................................29

              i.      Factual Background ..................................................................29
               ii.      Nocella Made No False or Misleading Statements...................30
              iii.      No Strong Inference of Scienter ..............................................31

        iv.     The PSLRA Safe Harbor Applies ................................................................33

F.     Loan Concentrations ....................................................................................34

        i.      No Actionable Omissions ................................................................34
        ii.     No Materiality or Strong Inference of Scienter .............................35

G.    The Commons Do Not Plead Loss Causation As to Most Allegations ................35
H.    The Commons Fail to State Section 20(a) Claims................................................36

REQUEST FOR RELIEF ......................................................................................................36

Request for Relief ...............................................................................................................36

Certificate of Service ..........................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ...................................................................................3, 4, 16

*Abrams v. Baker Hughes Inc.,*
   292 F.3d 424 (5th Cir. 2002) ..........................................................3, 4, 5, 7, 8, 11, 14, 15, 16

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
   572 F.3d 221 (5th Cir. 2009) ...........................................................................................35

*Allison v. Brooktree Corp.,*
   999 F. Supp. 1342 (S.D. Cal. 1998) ..................................................................................11

*Central Laborers' Pension Fund v. Integrated Electrical Services,*
   497 F.3d 546 (5th Cir. 2007) ...............................................3, 4, 6, 7, 14, 15, 16, 17, 33

*Collmer v. U.S. Liquids, Inc.,*
   268 F. Supp. 2d 718 (S.D. Tex 2003) ..............................................................................35

*Dura Pharmaceuticals, Inc. v. Broudo,*
   544 U.S. 336 (2005) ...........................................................................................................35

*Fener v. Belo Corp.,*
   425 F. Supp. 2d 788 (N.D. Tex. 2006) ............................................................................11

*Financial Acquisition Partners LP v. Blackwell,*
   440 F.3d 278 (5th Cir. 2006) ....................................................................3, 7, 28, 32

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
   565 F.3d 200 (5th Cir. 2009) .............................................................................................7, 8

*Garfield v. NDC Health Corp.,*
   466 F.3d 1255 (11th Cir. 2006) .......................................................................................15

*Goldstein v. MCI WorldCom,*
   340 F.3d 238 (5th Cir. 2003) ...............................................................................7, 8, 14, 16

*Higginbotham v. Baxter Int'l Inc.,*
   495 F.3d 753 (7th Cir.2007) .............................................................................................17

*In re Alamosa Holdings, Inc.,*
   382 F.Supp.2d 832 (N.D. Tex. 2005) ..............................................................................9, 10

*In re Capstead Mortgage Corp. Sec. Litig.,*
   258 F.Supp.2d 533 (N.D. Tex. 2003) ...............................................................................9

*In re Compuware Sec. Litig.,*
   301 F.Supp.2d 672 (E.D. Mich. 2004) ................................................................6

*In re Dynegy, Inc. Sec. Litig.,*
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ...............................................................36

*In re Guess?, Inc. Sec. Litig.,*
   174 F.Supp.2d 1067 (C.D. Cal. 2001) ..............................................................5

*In re Harmonic Inc. Sec. Litig.,*
   163 F.Supp.2d 1079 (N.D. Cal. 2001) ..............................................................6

*In re Ibis Technology Sec. Litig.,*
   422 F.Supp.2d 294 (D. Mass. 2006) .................................................................6

*In re Stone & Webster, Inc., Sec. Litig.,*
   414 F.3d 187 (1st Cir. 2005) ...........................................................................32

*In re Sun Healthcare Group, Inc. Sec. Litig.,*
   181 F.Supp.2d 1283 (D. N.M. 2002) ...............................................................6

*Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,*
   537 F.3d 527 (5th Cir. 2008) ................................3, 7, 8, 9, 14, 15, 16, 17, 23, 24, 28, 32, 36

*Kapps v. Torch Offshore, Inc.,*
   379 F.3d 207 (5th Cir. 204) ...........................................................................9

*Krim v. BancTexas Group, Inc.,*
   989 F.2d 1435 (5th Cir. 1993) .......................................................................9

*Kurtzman v. Compaq Computer Corp.,*
   2000 WL 34292632 (S.D. Tex. Dec 12, 2000) ...............................................6

*McDonald v. Kinder-Morgan, Inc.,*
   287 F.3d 992 (10th Cir. 2002) ...........................................................28, 29, 30

*Melder v. Morris,*
   27 F.3d 1097 (5th Cir. 1994) ........................................................................11

*Miller v. Champion Enterprises Inc.,*
   346 F.3d 660 (6th Cir. 2003) ........................................................................6

*Nathenson v. Zonagen Inc.,*
   267 F.3d 400 (5th Cir. 2001) ........................................................................7

*Nolte v. Capital One Fin. Corp.,*
   390 F.3d 311 (4th Cir. 2004) ........................................................................19

v

*Novak v. Kasaks*,
    216 F.3d 300 (2nd Cir. 2000) ................................................................14

*R2 Investments LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ........................................................7, 8, 28

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ................................................5, 6, 8, 9, 11

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..............................4, 5, 6, 8, 9, 10, 18

*Stavros v. Exelon Corp.*,
    266 F.Supp.2d 833 (N.D. Ill. 2003) ......................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)....................................................................3, 7, 8, 17

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ................................................................10

*Williams v. WMX Technologies, Inc.*,
    112 F.3d 175 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997)..........4, 9

*Yanek v. Staar Surgical Co.*,
    388 F.Supp.2d 1110 (C.D. Cal. 2005) ..................................................6

## STATUTES

15 U.S.C. § 77z-2(i)(1) ..................................................................................5

15 U.S.C. §§ 77z-2(c)(1)(A-B) & 78u-5(c)(A-B)..........................................6

15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2) ..........................................................5

15 U.S.C. §§ 77z-2(c)(3), 78u-5(c)(3) ..........................................................5

15 U.S.C. § 78u-4(b)(1) ..........................................................................3, 4, 7

15 U.S.C. § 78u-4(b)(2) ..................................................................................6

15 U.S.C. § 78u-5(c)(1)(B)..............................................................................6

**OTHER AUTHORITIES**

71 Fed. Reg. at 58,613 ..................................................................................21

71 Fed. Reg. at 58,609 ..................................................................................20

71 Fed. Reg. 58,609 (2006) ...........................................................................20

72 Fed. Reg. 37,569, 37,570 (2007) ..............................................................24

FED. R. CIV. P. 8(a)(2) ....................................................................................9

FED. R. CIV. P. 12(b)(6) ..............................................................................1, 8

Rule 6.B ........................................................................................................11

Rule 8 ............................................................................................................9

Rule 9(b) ..............................................................................................3, 4, 7, 34

Rule 10b-5......................................................................... viii, 2, 3, 6, 7, 36

## ISSUES PRESENTED

1.     Should a Securities fraud claim against an executive who purchased Franklin stock during the class period and lost approximately $4 million be dismissed with prejudice when:  (i) plaintiffs fail to allege particularized facts or corroborating information sufficient to show any false or misleading statement by Nocella; (ii) plaintiffs fail to allege particularized facts sufficient to show that Nocella omitted to disclose information he was under a duty to disclose; and (iii) plaintiffs fail to allege facts sufficient to show statements or omissions were material?

2.     Should Section 10(b) and Rule 10b-5 claims be dismissed with prejudice for lack of scienter when:  (i) plaintiffs employ improper group pleading; (ii) the defendant's alleged, albeit implausible, motive rests on the commonplace desire to inflate stock price; (iii) the defendant only purchased stock during the class period and lost approximately $4 million; (iv) the plaintiffs rely on ambiguous statements susceptible to many interpretations, including innocent ones; (v) plaintiffs plead no specific facts showing that defendant knew of or recklessly disregarded undisclosed facts; (vi) plaintiffs fail to plead sufficient facts to show confidential witness statements are credible or their allegations plausible; and (vii) conclusory allegations regarding the issuer's GAAP violations and the defendant's Sarbanes-Oxley certifications, general awareness of internal controls and confidential witness statements do not suffice, individually, or collectively, do not link between Nocella's knowledge or reckless disregard to any undisclosed information?

3.     Should Section 10(b) and Rule 10b-5 claims be dismissed for lack of causation when plaintiffs have failed to plead a proper causal connection between their losses and Nocella's alleged misstatements and non-disclosures?

4.     Should Section 20(a) claims be dismissed when: plaintiffs have failed to plead a Section 10(b) or Rule 10b-5 claim by any control person and when the plaintiffs failed to plead facts sufficient to demonstrate actual power or influence?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities Litigation | § § § § | Civil Action No. 4:08-CV-1810 CLASS ACTION |

**ANTHONY NOCELLA'S MOTION TO DISMISS
COMMON STOCKHOLDERS' COMPLAINT**

Anthony J. Nocella ("Nocella") moves to dismiss Franklin Investor Group's Second Consolidated Amended Complaint ("SCAC") pursuant to FED. R. CIV. P. 12(b)(6).

**SUMMARY OF ARGUMENT**

1.    Despite a year and several amended consolidated pleadings later, the Common Stockholders ("Commons") still articulate no plausible theory for how the officers of Franklin Bank Corporation ("Franklin"), including Anthony Nocella, Franklin's former Chief Executive Officer, defrauded them. The Commons' 101 page Complaint consists largely of disconnected, conclusory allegations and group pleading that make it impossible to recognize how Nocella or any other person made material misstatements or omissions with scienter.[1] The claims should be dismissed because:

(a) **<u>Improper Pleading & Lack of Motive</u>**. The Commons' Complaint should be dismissed for improper group pleading and confusing "puzzle pleading." The Commons articulate no motive sufficient to infer scienter, much less the strong inference required by the PSLRA. Nocella's alleged motive lacks plausibility and constitutes the kind of common-place executive motives the Fifth Circuit has held cannot raise an inference of scienter.

---

[1]       Focusing on the alleged misstatements or omissions, the Commons' Complaint falls into five broad categories: (i) financial figures that Franklin admitted needed to be adjusted in Franklin's August 6, 2008 Adjustments; (ii) alleged misstatements and omissions regarding subprime loans and non-traditional mortgages ("Subprime Allegations"); (iii) statements concerning loan loss reserves in the fourth quarter of 2007 ("4Q 2007 Allowances"); (iv) alleged non-disclosures related to Countrywide Financial ("Countrywide Allegations"); and (v) and alleged non-disclosure of significant loan concentrations ("Loan Concentration Allegations").

(b) **August 6, 2008 Adjustments**.  The Commons do not allege particularized facts that raise any inference, much less a strong inference, that Nocella knew or recklessly disregarded red flags regarding five discrete accounting issues that led to the August 6, 2008 Adjustments.  The Commons' conclusory allegations regarding Nocella's executive position, Franklin's GAAP violations, Nocella's Sarbanes-Oxley certifications, general awareness of internal controls and confidential witness statements do not suffice.  None of these allegations link Nocella's knowledge and the accounting issues in dispute.

(c) **Subprime Allegations**.  The Commons allege no particularized facts showing that Nocella's statements were false or misleading and made with scienter.  In addition, no basis exists for this Court to infer materiality.

(d) **Countrywide Allegations**.  The Commons do not plausibly allege that Countrywide had a line of credit or that a default occurred.  Neither the confidential witness statements nor the documents offered by the Commons will suffice.

(e) **4Q 2007 Allowances**.  The Commons allege no particularized facts showing that loan loss reserves announced in the fourth quarter of 2007 were false or misleading.  Such loss reserves also fall within the safe harbor for forward-looking statements.  Even if false, in hindsight, no particularized facts have been alleged to establish a strong inference that Nocella made such statements with scienter.  No basis exists for this Court to assume the materiality.

(f) **Loan Concentration Allegations**.  Franklin disclosed its asset strategy, amount of loans by product lines, geographic concentrations, and related risks.  The Commons fail to identify with specificity what information was omitted or how any associated statements misled anyone.

(g) **Loss Causation**.  No loss causation can be shown as to the Countrywide, Subprime, 4Q 2007 Allowances and Loan Concentration allegations.  The Commons allege no contrary disclosures made at any time prior to the point the Commons' stock became worthless.

(h) **Section 20(a) Claims**.  Control person liability cannot exist in the absence of a primary violation."  Since the Commons have failed to allege Section 10(b) or Rule 10b-5 claims, the Section 20(a) claims lack merit.  In addition, the Commons do not plead facts demonstrating that Nocella was a "control person" within the meaning of Section 20(a).[2]

---

[2] Nocella also incorporates by reference the legal arguments and authorities and, to the extent applicable to Nocella, the factual arguments set forth in the motions of Defendant Lewis Ranieri [DE 188] ("Ranieri Motion"), Russell McCann with respect to the Commons' complaint [DE 186] (McCann Motion"), Defendant Directors Chimerine, Golush, Howard, Master, Perro, Rhodes, and Selman [DE 189] (Directors' Motion"), including without limitation Defendant Ranieri's argument concerning loss causation (Ranieri Motion at III), the Defendant Directors' argument regarding reliance (Directors' Motion at IV), and the Defendant Directors' argument that the plaintiffs' allegations should not be permitted to rest on the partial disclosure of information prohibited from disclosure by law

## LEGAL ARGUMENT AND AUTHORITIES

### A.   SECTION 10(B) AND RULE 10B-5 ELEMENTS

2.     To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately injured him. *Central Laborers' Pension Fund v. Integrated Electrical Services*, 497 F.3d 546, 550 (5th Cir. 2007); *Financial Acquisition Partners LP v. Blackwell,* 440 F.3d 278, 286 (5th Cir. 2006).[3]

### B.   FALSE OR MISLEADING STATEMENTS

3.     The PSLRA § 21D(b)(1) requires for any false or misleading statement that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[4] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citing 15 U.S.C. § 78u-4(b)(1)).  This requirement reinforces the Fifth Circuit's strict interpretation of Rule 9(b), which requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *Central Laborers' Pension Fund ,* 497 F.3d at 550; *Abrams v. Baker*

---

(even indirectly through the partial disclosure of FDIC examinations in the FDIC Report) (Directors' Motion at III.C.3.b).

[3]       An actionable omission occurs only if a duty  to disclose exists. *Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 541 (5th Cir. 2008).  A defendant "does not commit securities fraud merely by failing to disclose all nonpublic material information" in his possession. *Id.*  If nondisclosure rests on a misleading statement, the statement "must affirmatively create an impression of a state of affirs that differs in a material way from the one that actually exists." *Shaw Group,*  537 F.3d at 541 (emphasis added).

[4]       Prior to the PSLRA, Rule 9(b) governed the sufficiency of securities fraud complaints. *Telltabs, Inc.*, 551 U.S. at 319.  Congress enacted the PSLRA to set a uniform pleading standard missing from circuit interpretations of Rule 9(b), and thereby curb the abuse of private class actions. *Id*. at 320.  For the Fifth Circuit, the PSLRA heightened some requirements for pleading a federal securities law claim. *See Central Laborers' Pension Fund ,* 497 F.3d at 550.  Other requirements remained consistent with the Fifth Circuit's relatively strict interpretation of Rule 9(b). *Id.*  Regardless, both Rule 9(b) and the PSLRA apply to Section 10(b) and Rule 10b-5 claims, and a district court must dismiss a federal securities fraud complaint if the plaintiff fails to satisfy either pleading requirement. *Blackwell*, 440 F.3d at 287; *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

*Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004).

      4.     Rule 9(b) requires plaintiffs in securities fraud causes to plead with particularity the circumstances constituting fraud. *Southland Securities Corp.*, 365 F.3d at 362; *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997). A complaint can be long-winded, even prolix, without pleading the requisite particularity. *Southland Sec. Corp.*, 365 F.3d at 362; *WMX Technologies, Inc.*, 112 F.3d at 178. Such a garrulous style is a common mask for an absence of facts. *Southland Sec. Corp.*, 365 F.3d at 362; *WMX Technologies, Inc.*, 112 F.3d at 178.

      5.     The Fifth Circuit has also rejected the group pleading doctrine. *Southland Sec. Corp.*, 365 F.3d at 365. The Fifth Circuit does not construe allegations in a complaint against the "defendants" as a group as properly imputable to any particular individual defendant unless the plaintiff specifically pleads the connection. *Id.*

      6.     Additionally, Section 21D(b)(1) specifically provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Central Laborers' Pension Fund* , 497 F.3d at 550 (citing 15 U.S.C. § 78u-4(b)(1)). This rule applies to all allegations not based on a plaintiff's personal knowledge. *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 351. A complaint can meet this requirement only by providing documentary evidence or a sufficient general description of the personal sources of the plaintiff's beliefs. *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 352. Failure to do so results in dismissal. *Central Laborers' Pension Fund* , 497 F.3d at 550.

7.     To be adequate, documentary support must provide sufficient corroborating details regarding its contents, authors and recipients. *Southland Sec. Corp.*, 365 F.3d at 370; *Abrams*, 292 F.3d at 432.   A hindsight assessment that does nothing more than describe a company's problems lacks sufficient particularity to satisfy the PSLRA. *Rosenzweig*, 332 F.3d at 868; *In re Guess?, Inc. Sec. Litig.*, 174 F.Supp.2d 1067, 1076 (C.D. Cal. 2001).   Likewise, a hindsight assessment is meaningless when the report fails to identify its sources or when the defendant knew the information. *Rosenzweig*, 332 F.3d at 868.

C.     **SAFE HARBOR**

8.     The PSLRA provides a "safe harbor" for both verbal and written forward-looking statements.   The PSLRA defines a "forward-looking statement" as "a statement containing a projection of revenues . . . or other financial items" or "a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations . . . ."  15 U.S.C. § 77z-2(i)(1).

9.     Safe harbor protection may exist for forward-looking statements under any one of three different scenarios. *Southland Sec. Corp.*, 365 F.3d at 371-72.   A forward-looking statement will not be actionable: (1) if "identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,"[5] or (2) if

---

[5]     Oral statements can qualify for the "safe harbor" if (i) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially (essentially a formality as to the form of the statement); (ii) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document; (iii) the statement identifies the document or portion thereof containing the additional information; and (iv) the identified document itself contains appropriate cautionary language. *Southland Sec. Corp.*, 365 F.3d at 372 (citing  15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2)).   Readily available written documents for this purpose include documents filed with the SEC or generally disseminated. *Southland Sec. Corp.*, 365 F.3d at 372 (citing 15 U.S.C. §§ 77z-2(c)(3), 78u-5(c)(3)).

"immaterial"; or (3) if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading. *See id.* (citing 15 U.S.C. §§ 77z-2(c)(1)(A-B) & 78u-5(c)(A-B)).

10.     To avoid the safe harbor, plaintiffs must, at a minimum, plead facts demonstrating that the statement was made with "actual knowledge" of its falsity.[6] *Southland Sec. Corp.*, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B)).   However, allegations based on a forward-looking statement should be dismissed if immaterial or accompanied by meaningful cautionary statements. *Southland Sec. Corp.*, 365 F.3d at 372 (dismissing allegations as immaterial); *Rosenzweig*, 332 F.3d at 869 (affirming district court's dismissal based on cautionary statements).   In such cases, the defendant's state of mind is irrelevant. *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 670 (6th Cir. 2003).

D.   **SCIENTER**

     i.   ***Strong Inference of Scienter***

11.     Section 21D(b)(1) requires "with respect each act or omission alleged" that the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" *Id.*; 15 U.S.C. § 78u-4(b)(2).   Apart from forward-looking statements, the PSLRA did not generally alter the *substance* of the scienter requirement for Section 10(b) and Rule 10b-5 claims. *Central Laborers' Pension*, 497 F.3d at 551 (emphasis in

---

"Meaningful" means "substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors. *Southland Securities Corp.*, 365 F.3d at 372.

[6]     "Actual knowledge" requires a higher level of scienter than would otherwise be required by Section 10(b), Rule 10b-5 or even Section 11. *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1124 (C.D. Cal. 2005); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F.Supp.2d 1283, 1289 (D. N.M. 2002); *Kurtzman v. Compaq Computer Corp.*, 2000 WL 34292632, *6 (S.D. Tex. Dec 12, 2000).   Recklessness, even severe or deliberate recklessness, will not suffice. *Miller*, 346 F.3d at 670; *In re Ibis Technology Sec. Litig.*, 422 F.Supp.2d 294, 310-11 (D. Mass. 2006); *In re Compuware Sec. Litig.*, 301 F.Supp.2d 672, 683-84 (E.D. Mich. 2004); *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 847 (N.D. Ill. 2003); *In re Harmonic Inc. Sec. Litig.*, 163 F.Supp.2d 1079, 1087, 1098 (N.D. Cal. 2001).

6

original); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003). However, the PSLRA

did enhance the particularity previously needed to plead fraud under Rule 9(b). *Indiana Electric*

*Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)

(citing 15 U.S.C. § 78u-4(b)(1)) (emphasis added). To survive a motion to dismiss a Section

10(b) or Rule10b-5 claim, a plaintiff must now plead with particularity the specific facts giving

rise to a "strong inference" of scienter.[7]  *Goldstein*, 340 F.3d at 245, 249; *Abrams*, 292 F.3d at

430.

13.   12.    Scienter for purposes of Section 10(b) and Rule 10b-5 means "either intent or

severe recklessness." *Shaw Group, Inc.*, 537 F.3d at 533; *Central Laborers' Pension*, 497 F.3d

at 551; *Blackwell*, 440 F.3d at 287. Severe recklessness is:

> limited to those highly unreasonable omissions or misrepresentations that involve not
> merely simple or even inexcusable negligence, but an extreme departure from the
> standards of ordinary care, and that present a danger of misleading buyers or sellers
> which is either known to the defendant or is so obvious that the defendant must have been
> aware of it.

*Shaw Group, Inc.*, 537 F.3d at 545; *Goldstein*, 340 F.3d at 245-46. Severe recklessness actually

"resembles a slightly lesser species of intentional misconduct." *Nathenson v. Zonagen Inc.*, 267

F.3d 400, 408 (5th Cir. 2001).

13.    To properly plead scienter, the plaintiff must plead facts that either (1) show a

defendant's motive to commit securities fraud, or (2) identify circumstances that indicate

conscious behavior on the part of the defendant. *R2 Investments LDC v. Phillips*, 401 F.3d 638,

---

[7]     "Strong" for purposes of the PSLRA means persuasive, effective and cogent, powerful to demonstrate or convince. *Tellabs, Inc.*, 551 U.S. at 323. Any omissions and ambiguities, therefore, will count against inferring scienter. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (quoting *Tellabs, Inc.*, 551 U.S. at 326.). "Strong" also means strong in light of other explanations. *Tellabs, Inc.*, 551 U.S. at 324. To determine whether a strong inference of scienter has been pled, the court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. Id. at 323-24. A merely "reasonable" or "permissible" inference will not suffice. *Id.* at 324. A complaint will only survive if a reasonable person would deem the inference of scienter not only "cogent" but also "at least as compelling as any opposing inference one could draw from the facts." *Id.* at 324.

644 (5th Cir. 2005).   When scienter rests on conscious behavior alone, the strength of its circumstantial evidence must be greater.  *R2 Investments LDC*, 401 F.3d at 644-45.  Even motive and opportunity, without more, will not satisfy the PSLRA pleading requirements.  *Goldstein*, 340 F.3d at 246; *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003); *Abrams*, 292 F.3d at 430.

     ii.    ***Standard of Review***

     14.    In *Tellabs* the United States Supreme Court described the standard of review for a motion to dismiss under the PSLRA.  *Tellabs,* 551 U.S. at 322-23.  First, as in federal pleadings generally, all factual allegations must be taken as true.  *Tellabs,* 551 U.S. at 322.  However, conclusory statements do not infer scienter.  *Shaw Group, Inc.*, 537 F.3d at 538-39.

     15.    Second, the court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions.  *Tellabs,* 551 U.S. at 322; *Shaw Group, Inc.*, 537 F.3d at 533.  The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled.  *Tellabs,* 551 U.S. at 323 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002)).

     16.    Third, the court must consider plausible opposing inferences.  *Tellabs,* 551 U.S. at 323; *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208, 212 (5th Cir. 2009).

     17.    The Fifth Circuit's rejection of group pleading also applies to scienter.  *Shaw Group, Inc.*, 537 F.3d at 533; *Southland Sec. Corp.*, 365 F.3d at 366-67.  For corporate scienter, the Fifth Circuit does not consider the collective knowledge of all officers and employees but only the state of mind of the individual specifically identified as having acted with scienter. *Shaw Group, Inc.*, 537 F.3d at 533; *Southland Sec. Corp.*, 365 F.3d at 366.  Allegations that do not "give rise to a strong inference of scienter on the part of any one individual" will not suffice.

8

*Id.* at 375.   By the same token, group pleading will not satisfy the particularity needed to establish scienter.  *Id.* at 376-78.

E.     **MATERIALITY**

18.     A misstatement or omission is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Rosenzweig*, 332 F.3d at 865; *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993) (Section 11). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rosenzweig*, 332 F.3d at 854; *Krim*, 989 F.2d at 1448.  Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information."  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).  A fact is material only if a substantial likelihood exists that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.  *Southland Sec. Corp.*, 365 F.3d at 362; *Krim*, 989 F.2d at 1448.  "The 'total mix' of information normally includes information that is and has been in the readily available and facts known or reasonably available to the shareholders."  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 204).

## APPLICATION OF LAW TO FACTS

A.     **DEFECTS APPLICABLE TO ALL ALLEGATIONS**

   i.     ***The Commons' Complaint Constitutes Confusing "Puzzle Pleading"***

19.     This Court should dismiss the Commons' Complaint for improper pleading.  *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d 832, 857 (N.D. Tex. 2005) (citing *Williams*, 112 F.3d at 180); *In re Capstead Mortgage Corp. Sec. Litig.*, 258 F.Supp.2d 533, 556-61 (N.D. Tex. 2003). Rule 8 puts the burden on the Commons to plead "a short and plain statement of the claim." FED. R. CIV. P. 8(a)(2).  For the most part, the Commons' Complaint dumps lots of material into

this Court's lap without really explaining how the allegations relate to each claim's elements or to Nocella in particular.  The burden rests with the Commons, not this Court, to present proper pleadings.  *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 857.

      ii.     **The Commons Employ Improper Group Pleading**

     20.     The Fifth Circuit has rejected "group pleading" as to both publication of statements and scienter.  *Southland Sec. Corp.*, 365 F.3d at 363-65.  Despite this clear prohibition, the Commons' Complaint overflows with vague references to "Defendants," "Franklin Bank Management," "Franklin Bank," "Franklin," the "bank," the "Company," "Company executives," "top executives," "senior executives," and even statements in the passive voice that do not identify any actor.  *See, e.g.*, SCAC ¶¶ 97, 102, 104-05, 109-10, 113, 115-116, 127, 132, 136, 147, 151-52, 158, 170-71, 174-75, & 179.  Even worse, the Complaint heavily relies on third party documents (such as the FDIC Report and the February 2008 Letter) and confidential witness statements that suffer from the same flaw.  *See, e.g.*, SCAC ¶¶ 95-96, 98-99, 100, 103-08, 119, & 132.  In addition, the Commons complain routinely of statements without alleging that Nocella or any other person made them.  *See, e.g.,* SCAC ¶¶ 43, 44, 51, 54, 59, 68, 73, 75, & 78.  Such allegations may not be imputed to Nocella.

      iii.     **No Plausible Motive Has Been Alleged**

     21.     The Fifth Circuit has held squarely that a motive to commit securities fraud cannot properly be inferred from common-place motives, such as a desire to increase market share, gain a competitive advantage, maintain an artificially inflated stock price, or secure, maintain or increase compensation.  *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994).  Otherwise, the state-of-mind requirement for all corporate officers and defendants would be effectively eliminated.   *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).

22.     The Commons' Complaint rests on the dubious premise that Franklin secretly engaged in a high risk business strategy to quickly grow and sell Franklin.  SCAC ¶¶ 3, 6.  As the story goes, rather than "admit" this strategy, Franklin concealed its worsening financial condition in the face of deteriorating market conditions in the hopes that a delay would allow Franklin to foist its stock upon an unwitting investor.  SCAC ¶¶ 3, 6.  The Commons identify no motive other than the common place desire to inflate stock price.  Such motive allegations fail when, as here, no allegations exist that any defendant sold or profited from artificially inflated stock price. *Rosenzweig*, 332 F.3d at 867; *Abrams*, 292 F.3d at 434.[8]

23.     Nocella did not sell any shares and actually purchased shares during the class period.  *See* Summary of Nocella Stock Transaction History (JA24) (reflecting purchase of 32,923 common shares during the class period at a cost of $428,965.70, no sales of shares during class period, for a total loss to Nocella during the class period of approximately $4 million).[9] This fact negates any inference of improper motive.  *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1352-53 (S.D. Cal. 1998) (allegation that defendant was motivated to engage in securities fraud in order to sell stock at inflated prices negated where defendant did not sell but only purchased shares during the class period).  *See also Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 812-13 (N.D. Tex. 2006).   .

---

[8]     Insurmountable inferential gaps riddle the Commons' case theory, including: (i) the absence of the identity of any potential investor who would have been in position to purchase Franklin during the so-called period of delay; (ii) the absence of any explanation as to how Franklin could have expected to outwit such an investor during the due diligence period that would precede any contemplated acquisition; (iii) the absence of any explanation as to how Franklin hoped to conceal its true financial condition from state and federal banking regulators who routinely had access to and evaluated Franklin's financial records and operations; (iv) the absence of any factual allegations to support Defendants' alleged deliberate concealment; and (v) how August 6, 2008 Adjustments, the only errors to which Franklin has admitted, could conceivably relate to the Commons' theory.

[9]     For the convenience of the Court, the individual defendants have filed Defendants' Joint Appendix ("JA"), which includes documents relied on in the individual defendants' various motions to dismiss.  Nocella incorporates by reference Defendants' Joint Appendix and the documents contained therein.  Pursuant to Rule 6.B of this Court, the individual defendants are providing the Court with a Joint Compendium ("JC") of unreported authorities cited within their motions.

B.   **THE AUGUST 6, 2008 ADJUSTMENTS**

24.   If any coherent thread can be found in the Commons' Complaint, it revolves around adjustments to Franklin's 2006 10K, and Franklin's 1st, 2nd and 3rd Quarter 10Qs that were described in Franklin's August 6, 2008 8K ("August 6, 2008 Adjustments").[10]   In addition to material misstatements, the Commons also appear, based on these adjustments, to claim that Franklin falsely represented or failed to disclose that its financial statements were not prepared in accordance with GAAP, failed to disclose that Franklin's controls were inadequate, and issued false Sarbanes-Oxley Certifications.

i.   ***Factual Background***

25.   On February 19, 2008, Craig Wolfe, a Vice President of Loss Mitigation, sent Debbie Hale, the Senior Vice President of Internal Audit, a letter, of which Nocella received a copy. The letter disclosed, among other things, certain "accounting irregularities" at Franklin ("February 2008 Letter").   SCAC ¶¶ 102, 107.   The Commons do not explain how this letter relates to the August 6, 2008 Adjustments.[11]   Nevertheless, the February 2008 Letter represents the first time that Nocella knew about those issues.

26.   On March 14, 2008, Franklin reported that Franklin's Board of Directors had learned in February 2008 of possible accounting issues related to single family residential mortgages and residential real-estate owned and that Franklin's Audit Committee had commenced an investigation.   SCAC ¶ 78.   During the ten-week investigation that followed, Franklin determined (based on information learned subsequent to 2007) that the accounting for certain delinquent single family loans being serviced by third parties ("Delinquent Loan

---

[10]      SCAC ¶¶ 43-44, 47-48, 50(a)-(d), 51-52, 53(a)-(d), 54, 57, 58(a)-(d), 59, 64, 66, 67(a)-(d), 72(a)-(c), 74(a)-(c), 77(a)-(c), 78, 79(a)-(c), 84, 90, 94, 99, 107-08, 158-66, 192-93, 201, and 204.

[11]      The February 2008 Letter does vaguely described certain loan modification accounting and real estate owned ("REO") accounting issues.   SCAC ¶ 107.

Accounting"), other real estate owned ("REO Accounting"), and the Bank's newly created single family loan modification programs to mitigate foreclosure losses ("Loan Modification Accounting") should be revised.  SCAC ¶ 83; May 1, 2008 Press Release (JA10).

27.     On August 6, 2008, following completion of the investigation, Franklin released an 8-K reflecting adjustments for the first three quarters of its fiscal year 2007 and for its 2006 fiscal year.  August 6, 2008 8K (JA11).  These adjustments related not only to Delinquent Loan Accounting, REO Accounting, and Loan Modification Accounting but also to the accounting for certain investment securities ("Investment Securities Accounting") and monthly increases in the cash surrender value of certain bank-owned life insurance ("BOLI Accounting").   August 6, 2008 8K at 3-5.  No other adjustments were identified.

ii.     ***No Strong Inference of Scienter***

28.     The Commons' Complaint does not contain a single allegation that Nocella knew of or recklessly ignored red flags regarding these five accounting issues.   None of the information offered in the Commons' Complaint (executive positions in the company, GAAP errors, Sarbanes-Oxley Certifications, vague confidential witness statements, the February 2008 Letter,[12] or the FDIC Report) infers scienter.

a.     **Executive Position**

29.     Notwithstanding clear Fifth Circuit precedent to the contrary, the Commons ask this Court to presume that Nocella and others acted with scienter just because they were high-level executives.  SCAC ¶¶ 23-25, 101.  The Fifth Circuit has repeatedly held that scienter may not rest on an executive's position with the company.  *Shaw Group, Inc.*, 537 F.3d at 535; *Abrams*, 292 F.3d at 432.  Similarly, general allegations regarding a defendant's management

---

[12]     The February 2008 Letter and FDIC Report contains no allegations that specifically link Nocella to any of the five accounting issues.  *See supra* subsection A.ii.  A.ii

style or knowledge of company controls will not support an inference of scienter either. *Shaw Group, Inc.*, 537 F.3d at 535; *Goldstein*, 340 F.3d at 251. Such statements lack the requisite specificity about what the defendant knew or was reckless not to know about the details at issue. *Shaw Group, Inc.*, 537 F.3d at 535; *Goldstein*, 340 F.3d at 251.

30.     The Commons insinuate that Nocella must have known of problems based on receiving records or serving on certain committees. SCAC ¶¶ 114-15, 123-27, 131, 136-38, 142-44. Allegations that an executive received reports, however, does not infer that the executive knew of any inaccuracy. *Shaw Group, Inc.*, 537 F.3d at 540. Nor does an executive's likely attendance at committee or board meetings. *TXU Corp.*, 565 F.3d at 211-12.

31.     Finally, the Commons do not allege any facts that would link Nocella's knowledge of those reports or meetings to any of the specific accounting errors that led to the August 6, 2008 Adjustment.

       b.     **Failure to Follow GAAP**

32.     Even when a restatement has occurred, mere publication of inaccurate accounting figures or a failure to follow GAAP does not establish scienter. *Central Laborers' Pension Fund*, 497 F.3d at 552; *Abrams*, 292 F.3d at 432. The party must know that it has published materially false information or was severely reckless in doing so. *Id.* at 432-33 (observing that accounting problems leading to restatement could "easily arise from negligence, oversight, or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"). A complaint must state particularized facts showing that the defendant knowingly or with deliberate recklessness violated accounting principles. *Id.* (contrasting *Novak v. Kasaks*, 216 F.3d 300, 311-12 (2nd Cir. 2000)).

33.     Here, the Commons allege no facts showing that Nocella knew or ignored red flags showing that Franklin's Delinquent Loan Accounting, REO Accounting, Loan

Modification Accounting, Investment Securities Accounting, or BOLI Accounting were improper at anytime during which the alleged misstatements were being made. SCAC ¶¶ 158-66. The Commons can only make conclusory statements about Nocella's knowledge of GAAP based on his alleged status as a CPA. SCAC ¶ 168.

34.    The Commons also allege that Nocella must have been aware of Franklin's accounting policies based on the Summary of Significant Accounting Policies set forth in its SEC filings. SCAC ¶ 167-68. But, the Commons do not link these allegations to any of the accounting issues in dispute. More importantly, such allegations do not show with the requisite particularity that Nocella knew or recklessly disregarded red flags that any such policy had been violated.

**c.    Sarbanes-Oxley Certifications**

35.    Sarbanes-Oxley certifications, standing alone, do not infer scienter. *Shaw Group, Inc.*, 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006)); *Central Laborers' Pension Fund*, 497 F.3d at 555 (citing *Garfield*, 466 F.3d at 1266) ("if we were to accept [this] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA") Instead, a Sarbanes-Oxley certification only suggests scienter if the person signing the certification acted with severe recklessness in certifying the accuracy of the financial statements. *Shaw Group, Inc.*, 537 F.3d at 545.

36.    A plaintiff must plead particularized facts establishing that the officer who signed the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions. *Shaw Group, Inc.*, 537 F.3d at 545 (quoting *Garfield*, 466 F.3d at

15

1266); *Central Laborers' Pension Fund*, 497 F.3d at 555 (same). Moreover, such knowledge must be linked to the actual accounting and reporting problems that arose. *Central Laborers' Pension Fund*, 497 F.3d at 555. Here, the Commons allege no facts linking Nocella's knowledge with the five accounting issues. SCAC ¶¶ 181-183.

### a.   Weak Internal Controls

37.   Generalized allegations about corporate controls that do not establish any link between the defendant's knowledge, the internal control problems, and the actual accounting problems will not establish scienter. *Central Laborers' Pension Fund*, 497 F.3d at 552; *Shaw Group, Inc.*, 537 F.3d at 535 (general allegations regarding a defendants' management style or knowledge of company controls will not support an inference of scienter as they lack specificity about what a defendant may have known or was reckless in not knowing); *Abrams*, 292 F.3d at 432 (knowledge of control problems may not be inferred from an executive's position); *Goldstein*, 340 F.3d at 251 (allegation that defendant was a "hands-on" CEO and must have been aware of the accounting problem lacked the requisite specificity). *See also Shaw Group, Inc.*, 537 F.3d at 537 (noting that weak controls do not demonstrate an intent to defraud as weak control could just as easily bias financial figures up as well as down). Here, the Commons identify nothing specific to Nocella and only allege that Franklin could have had better internal controls. SCAC ¶¶ 172-184.

### b.   Confidential Witness Statements

38.   To be given any weight, confidential sources must be described with sufficient particularity to support the probability that a person in the position occupied by the source would have possessed *and understood* the information pled. *Shaw Group, Inc.*, 537 F.3d at 535, 538; *Central Laborers' Pension Fund*, 497 F.3d at 552 (concluding confidential source statements lacked sufficient supporting detail to give them any weight) *ABC Arbitrage Plaintiffs Group,*

16

291 F.3d at 352.  Such allegations must relate to the specific statements at issue.  *Shaw Group,*

*Inc.*, 537 F.3d at 537.  Even then, confidential sources afford no basis for drawing the plausible

competing inferences required by *Tellabs*.    *Shaw Group, Inc.*, 537 F.3d at 535 (citing

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir.2007) ("*Tellabs* requires judges

to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences;

anonymity frustrates that process").  The Commons offer no confidential witness testimony

sufficient to link any Franklin officer to any of any accounting errors at issue.

39.    The statements of CW2,[13] CW3 and CW4 relate to warehouse lines of credit and

bear no relevance to the August 6, 2008 Adjustments whatsoever.  The Commons proffer CW1

to show that internal controls in the single family residential portfolio were "awful."  SCAC ¶

114.  CW1 does not identify any specific controls that were weak, much less link the control to

any accounting error or Nocella.  The Commons do not allege any fact that would show that

CW1 would have been in a position to understand fully what internal controls in the single

family residential portfolio existed.[14]  The Commons never identify any executive, including

Nocella, who knew of control problems, much less how CW1 could verify what Nocella knew.

40.    The Commons do not state any facts regarding the source of CW1's

"understanding" that would permit this Court to give it weight.  SCAC ¶ 116.  The Commons

argue that this led to Franklin's "need to restate financial results."  Yet the Commons never plead

any facts that would link Chreitzberg's concerns with the August 6, 2008 Adjustment.

---

[13]     CW2's unsubstantiated, conclusory accusations in paragraph 129 bear no weight.  Even if credited, CW2's statements do not link Nocella with any accounting issue in dispute.

[14]     The Commons offer no information regarding CW1's position at Franklin other than senior manager.  His former employment by Access Lending, a mortgage warehouse lender, suggests that he would not be involved in controls related to the single family residential portfolio.  SCAC ¶ 114 n.5.  The Commons claim CW1 participated in certain committee meetings, but do not specify when he participated or how his claimed knowledge relates to those meetings.  The Commons claim CW1 learned about control problems in "various executive level meetings," offering not a single factual detail regarding those meetings that would corroborate his claimed knowledge.

Specifically, the Commons do not establish how the improper aggregation method CW1 cites as an example relates to any of the five accounting issues. More importantly, the Commons plead no facts showing that Nocella knew of this problem. To begin, CW1 does not indicate when Chrietzberg blew the whistle or, if so, whether or when he notified Nocella. While CW1 claims that Nocella had signed off on the loan loss reserve policy, CW1 does not state that Nocella knew of Chreitzberg's concerns at the time or at any relevant time thereafter. *Southland Sec. Corp.*, 365 F.3d at 383 (subsequent disclosures insufficient to support an inference of scienter as "they do not show what any particular individual knew, or was severely reckless in not knowing at the time [in question]").

41.     The Commons identify CW5 a person who worked for Franklin "in a variety of positions with a variety of responsibilities from February 2004 until July 2007." SCAC ¶ 141. Absent from the Complaint are any facts linking Nocella to knowledge of any improper accounting treatment or any facts showing how CW5 had access to the claimed information or when CW5 held the position of "Funder." SCAC ¶ 141. Likewise, while the Commons then describe certain forms prepared by CW5, the Commons do not allege that CW5 had such information during any time relevant to the August 6, 2008 Adjustments.

42.     The Commons allege that Sharon Koehl, Senior Vice President of Asset Acquisition, prepared reports for various senior executives, including Nocella, but do not describe the contents of such reports or how the information therein might relate to the five accounting issues. The Commons describe reports and forms related to REO. These allegations include no evidence that Nocella received the described forms related to loans serviced by others, which is the loan category at issue. August 6, 2008 8K at 4. Moreover, the Commons do not allege that either the list or the forms had anything to do with REO accounting, much less the

accounting for loans serviced by others.  Finally, the Commons do not allege how the list or reports would have led to knowledge by Nocella of improper REO Accounting.

43.    The Commons describe CW5's alleged knowledge of monthly and quarterly reports regarding Franklin's "Held for Sale" portfolio and its "Held for Investment" portfolio and Nocella's alleged approval of transfers between the two, but do not describe how CW5 obtained such knowledge that would entitle this Court to give it any weight.  CW5 does not link these reports to either Nocella or any accounting issue.[15]  The assertions suggest that CW5's alleged knowledge (2004-2005) predates the accounting issues made the subject of the August 6, 2008 Adjustment.

44.    These confidential witness statements carry no weight and do not link Nocella to knowledge of any improper accounting treatment related to the August 2008 Adjustment.

C.    **THE SUBPRIME RED HERRING**

    i.    ***No False or Misleading Statements***

45.    The Commons accuse Franklin of failing to disclose Franklin's "exposure to higher-risk non-traditional mortgage markets."' SCAC ¶¶ 50, 53, 58, 67, 72, 74.  The Complaint patches together out of context a series of short, vague statements in conference calls connected only by the Commons' imagination and deliberate blurring of the distinction between the terms used and products referenced.[16]  The Common's misuse of terminology begins with their treatment of the phrases non-traditional and subprime as synonymous, which they are not.

---

[15]    The Investment Securities Accounting involved the transfer of securities.  August 6, 2008 8K at 5.  The transfer at issue also occurred during the third quarter of 2007 and was reported after CW5 was admittedly no longer employed by Franklin.

[16]    The Commons' non-disclosure claims stand or fall on whether or not false statements were misleading.  Franklin did not have any legal obligation to disclose the specific details standing alone or its mortgage portfolio.  *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316-17 (4th Cir. 2004) (in affirming dismissal, holding that as long as the bank met its regulatory obligations of disclosing its capital and loan loss reserves, no more specificity regarding the size of its "subprime" portfolio was required).

SCAC ¶ 2.  The regulatory context in which these conference calls occurred shows how plainly

the Commons misunderstand Franklin's mortgage business.

      46.     On October 4, 2006, the FDIC issued an *Interagency Guidance on Nontraditional*

*Mortgage Products*, 71 Fed. Reg. 58,609 (2006), which defined "non-traditional", "alternative",

or "exotic" mortgage loans as "mortgage products that allow borrowers to defer payment of

principal and, sometimes, interest." 71 Fed. Reg. at 58,609.  Examples included "interest-only"

mortgages and "payment-option" adjustable rate mortgages.  *Id.*  Reduced documentation,

simultaneous second lien mortgages, and an applicant's creditworthiness (prime versus Alt-A

versus subprime) were features that might be combined with non-traditional mortgages but did

not differentiate them from traditional mortgages.  *See id.*; *see also* SCAC ¶ 96 (quoting FDIC

Report) (differentiating nontraditional and subprime mortgages).

      47.     In response Franklin revised its ALLL methodology to incorporate this

Interagency Guidance:

> Additionally, for single family mortgages we review our portfolio to determine those
> loans that have multiple risk factors based on Interagency guidance on non-traditional
> mortgages and apply an additional credit allowance factor based on the additional
> risks.

2006 10K (JA7) at 36.  Franklin also increased its provision for credit losses on single family
loans:

> The increase in the single family loan provision is due to the results of our analysis on
> our single family loans that showed that the loss exposure had increased based on
> Interagency guidance on non-traditional mortgages issued during the fourth quarter of
> 2006.

2006 10K at 43.  These statements belie any suggestion that Franklin concealed exposure to non-

traditional mortgages.

      48.     Shortly after the Interagency Guidance, Nocella began Franklin's January 31,

2007 Conference Call ("2006 YE") as follows:

> Good morning. First, let me start by stating that earnings were lower than our expectations for the year primarily as a result of the inverted yield curve (and our) continued unwillingness to compromise our credit standards (or) participating in the higher-risk non-traditional mortgage market. And these products were the dominant product in the market during the year.

Transcript of Conference Call on January 31, 2007 ("2006 YE Transcript") (JA25) at 3. Undeniably, this statement has nothing to do with subprime lending. Nor does it characterize all of Franklin's mortgage operations either. The statement merely indicates that Franklin did not participate in the "higher-risk non-traditional mortgage market" in a year when those products dominated the market. Even the FDIC Report states that sometime prior to 2007 Franklin had "halted the bank's nontraditional mortgage and subprime operations." SCAC ¶ 96 (quoting FDIC Report).

49. Moreover, the statement does not even relate to non-traditional mortgages generally. The statement only applied to the "higher-risk non-traditional mortgage market."[17] Even among non-traditional mortgage products, different risk elements exist that may make certain non-traditional mortgage products riskier than others. Interagency Guidance, 71 Fed. Reg. at 58,613 ("the focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type, itself").

50. The Commons also mislead this Court by taking out of context Nocella's response to Jon Arfstrom's question in that same conference.[18] Nocella replied to Arfstrom's inquiry

---

[17]    The Commons conveniently add a comma to this statement to make it appear as though the phrase higher risk was intended to describe the entire non-traditional mortgage market.

[18]    In the January 31, 2007 Conference Call, the following colloquy occurred, (only the last two paragraphs of which were quoted by the Commons):

> Jon Arfstrom: OK, great. And then, Tony, just one of the other comments in the release was some of your cautiousness on trends in the single-family residential mortgage market in terms of what's being underwritten. Can you talk a little bit about what you're seeing there and why you're a bit more cautious?

> Tony Nocella: Well, I think the – a lot of it's happened since the (inter-agency) guidelines came out in the fourth quarter, and such things as pay option arms and negative amortization (are) simultaneously – simultaneous second mortgages with the first have been reduced substantially. I mean there's 40 to 60

about industry trends.  Arfstrom's follow-up question concerned what Franklin would be doing in the future, not the past.  The question also distinguished between mortgages originated for investment and mortgages originated for sale.  Specifically, Arfstrom wanted assurance that Franklin would not originate "the more exotic products" (that is, higher risk non-traditional mortgage products) for investment but only for sale.

51.    Even the FDIC's self-serving assessment states that, by 2007 Franklin had not only "halted [its] nontraditional mortgage operations" but had "[begun] to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans." Nocella's response was remarkably reserved.  Nocella stated that, notwithstanding Franklin's then standards, if Franklin did originate any non-traditional loans they would be held for sale and "probably" simply "brokered through," which means originated on behalf of a third party lender or to whom the mortgage would be sold.  The loan would not "touch [Franklin's] balance sheet." The Commons aver no facts indicating that Franklin originated non-traditional loans during the first quarter of 2007, let alone that Nocella knew such loans were contemplated and deliberately misled investors as to Franklin's intentions.  *Shaw Group, Inc.*, 537 F.3d at 535 (rejecting strong inference of scienter when a nonculpable inference was more likely).

---

percent reduction in the fourth quarter and so far in January. So the – it looks like everybody's looking for a new – a new mousetrap in the single-family business, but obviously there's significant decline in originations, as you've heard in the press.

Jon Arfstrom: OK, and just to be clear, these–some of the more exotic products are not going on your balance sheet. You just take them (out of) your warehouse and sell them.

Tony Nocella: Yes, (and if) we ever had anything like that, but that's – we'd sell – we'd sell them (if ever) do anything except for sale. We'd probably broker it through, in fact.  It wouldn't even – it wouldn't even touch our balance sheet.

2006 YE Transcript at 3.

52.     The Commons also construe statements out of context with their interpretation of a colloquy between Nocella and Paul Miller during the second quarter conference call.[19] Miller's question related to whether Franklin was seeing "*some subprime issues*" in its prime loans, which would necessarily be limited to loans held for investment (not for sale).   Miller expressed this concern because Countrywide had reported problems in its portfolio of Home Equity Lines of Credit ("HELOCs") on the "prime side."   After clarifying that Franklin did not do HELOCs and sharing his interpretation of Countrywide's report, Nocella observed that Franklin had not seen the same level of delinquencies reported by Countrywide on the "prime side."

53.     Despite the limited context of the question, the Commons ask this Court to implausibly infer that Nocella chose at this moment to make a non-responsive, blanket statement that Franklin had no subprime mortgages in any of its portfolios.  SCAC ¶ 56.  To make this

---

[19]       The colloquy between Nocella and Miller was as follows:

Paul Miller: Hey, listen. Can you, you know, just to get – a more general question. I missed the first five minutes of the call so, you might address this. But, you know, you saw Countrywide's numbers come out yesterday. They're starting to show some trouble in their [HELOC] portfolio on the prime side. And this is the first time anybody talked about prime loans having trouble. You know, you, like I said, you've been through a lot of cycles and I think this cycle has, you know, been defined as very sloppy underwriting, very easy credit. Are we starting to see some sub-prime issues? I mean what – how do you think this cycle's going to play out and how long do you think it's going to play out?

Tony Nocella: Yes. Let me do two things. For the Countrywide side, you know, this is not a Countrywide call. But, I would say [HELOCs] are not a business. First of all, we –well, I don't think we even know how do a home equity loan at line of credit. That's not our business. And, you probably know in Texas there's an 80 percent loan to value law for home equity loans.

So, the so called 100 percent home equities and, let alone, securitized home equities, we don't have any of that. But, as far as it playing out, I think what you're seeing for the first time, at least in his write up, (Angelo)'s write up, was an increase in the prime side of the business. And I would say that you are seeing some delinquency increase which, I would say, it really doesn't make any sense because you're talking about solid 80 percent loan to value, even under 70, 70 percent loan to value with 700 FICO scores from time to time being delinquent. And, I would think that is completely new. I mean, it's like a cultural difference. And, I don't know if that's what (Angelo) was talking about with the prime side.

But on a sort of [steady] state basis, you know, we running about, you know, delinquencies which are substantially lower than the his level. Then the level he talked about in the prime side. **We don't have any sub-prime so, [I don't know]**.

Transcript of Conference Call on July 25, 2007 ("2Q 2007 Transcript") (JA13) at 9-10 (bracketed language and emphasis from SCAC ¶ 55).

argument, the Commons conveniently omit the portion of Miller's question that refers to Countrywide's HELOC portfolio on the prime side. *Compare* SCAC ¶ 55 *with* 2Q 2007 Transcript at 9 ("they're starting to show some trouble *in their [HELOC] portfolio on the prime side. And this is the first time anybody talked about prime loans having trouble*") (emphasis on omitted portions). In so doing, the Commons improperly disregard that Nocella's comment phrase responded to what Miller asked. "We don't have any sub-prime . . ." meant that Franklin did not have any subprime *issues* in its prime side loans. Even if this was not what Nocella meant, the context alone refutes any plausible inference that Nocella intended the statement as broadly as the Commons' claim.[20]  *Shaw Group, Inc.*, 537 F.3d at 538 (an ambiguous statement susceptible to many interpretations, including innocent ones, will not contribute to a strong inference of scienter).

54.     The Commons next take issue with Nocella's response to Miller's follow-up question in that same conference call, emphasizing the portion of Nocella's response that compared Franklin's loan characteristics with Countrywide.[21]  The Commons, of course, offer no

---

[20]     Notably, the terms "subprime", itself, is not consistently defined in the marketplace or among financial institutions. *Statement on Subprime Mortgage Lending*, 72 Fed. Reg. 37,569, 37,570 (2007). This ambiguity, itself, cuts against any inference that that Nocella's statements were false or, if false, that Nocella made such statements with scienter. Indeed, it also further undermines any statistics purporting to quantify subprime loans. *See infra* subsection C.ii. *See* FDIC Report at 5 n.13 (admitting that "Franklin did not have a subprime lending program as defined by interagency guidance" but arguing nonetheless that Franklin had loans with "subprime characteristics").

[21]     Miller's follow-up question and Nocella's response were as follows:

**Paul Miller: No, I know you've been very – I think you guys are one of the – have been one of the more conservative underwriters out there. I remember having many discussions with you where you didn't touch this [Alt-A] stuff and what not. But, we're concerned more about if this is starting to leaking into the prime. Are we–could we be going into a credit cycle?**

Tony Nocella: I don't know. I mean, I listened to what he has. He has such a better data base, you know. Although our database is across the United States in terms of the $2 billion we put on at, you know, back in '04 and '05. I mean, that–those loans, ((inaudible)) you're looking at that is just a little bit every place. So, we're not seeing as significant as he sees it. But remember, he did – **Countrywide [did pay option ARMs, which Neg-AM], and they secondly did a lot of simultaneous seconds. That's 100 percent CLTVs. They're two characteristics that we stayed away from.**

2Q 2007 Transcript at 10-11 (bracketed language and emphasis from SCAC ¶ 55).

explanation as to why these statements were misleading.  Again, the question concerns loans held for investment.  In that context, Nocella referred to two characteristics that Franklin "stayed away from": "pay option ARMs" with "Neg-AM" and "simultaneous seconds with 100 percent CLTVs."  The first term refers to payment option adjustable rate mortgages that permitted negative amortization.[22]  The second term refers to simultaneous first and second mortgages with a combined loan to value ratio of 100%.  Notably, nowhere do the Commons allege facts showing that Franklin originated loans with either characteristic, much less loans held for investment during the time period referenced (2004 to 2005).  Not even the FDIC's self-serving assessment makes that claim.[23]

55.    The final "subprime" statement quoted by the Commons comes from Franklin's October 30, 2007 Conference Call.[24]  Once again, the Commons offer no explanation as to why

---

[22]    Negative amortization occurs when a loan permits payments less than accruing interest.

[23]    The FDIC Report does not identify negative amortization or 100% CLTV ratio as a characteristic of any of Franklin's single family mortgage loans.  SCAC ¶ 96 (quoting FDIC Report).  Although the FDIC does claim that Franklin held loans with simultaneous second-lien loans, it admits that these second mortgages were not held by the bank.

[24]    Franklin's pre-litigation transcript records the exchange as follows:

Brian Klock: OK. And now the question that have been asked a few times is about the reserve level and I guess when you think about–I think Russell you said 20 basis points is what–is your factor for the one or four family's portfolio. I mean, I guess when you look at your portfolio and have as long as history say like a Washington Mutual does because of your history as a public company but you know, their third quarter– their prime mortgage loan portfolio one or four family has [charge-offs] of 21 basis points.

Russell McCann: A bummer for them but, you know, I don't think you can compare our portfolio to Washington Mutual.  **If you really look at why Washington Mutual's portfolio they did pay options ARMs and they got a large amount of subprime–we Brian, don't have [any of those] in portfolio.**

**[Nocella]: Just to put it aside, there's almost hardly any loans in their portfolio in the [that met our screen].**

Brian Klock: And ((inaudible)) to their prime portfolio though.

[Nocella]: I said their prime portfolio.

Brian Klock: OK. Russell said subprime I want to make sure it's prime.

Russell McCann: No, I meant prime. I meant prime.

Brian Klock: OK.

Russell:  McCann: They did as a matter of course a loan called a pay option ARM and that basically is the big reason for a lot of their problems. As well as their subprime portfolios.

this statement was misleading.  Worse yet, the Commons suggest an implausible version of the exchange that alters key words and eliminates an important clarification.  Klock asked McCann to comment on Franklin's charge-offs in light of Washington Mutual's charge-offs in its "prime mortgage loan portfolio."  Despite this context, the Commons ask this Court to make the implausible inference that McCann chose at this moment to make a non-responsive, blanket statement about subprime mortgages.  The Commons conveniently omit the exchange that follows immediately and that shows that McCann mistakenly used the word subprime, instead of prime.

56.     The only reasonable inference would be that  McCann responded that Franklin's and Washington Mutual's portfolio differed because Washington Mutual prime portfolio contained a large amount of payment option adjustable rate mortgages and that Franklin's did not.  No facts alleged by the Commons refute the accuracy of such a statement.

57.     Likewise, the Commons' interpretation of Nocella's first sentence, "I refuse to put it inside", makes no sense.  Any inference that Nocella intended to describe subprime loans would be implausible given that Nocella subsequently clarified that he was referring only to prime loans.  The 3Q 2007 Transcript supports the more reasonable inference that Nocella interrupted McCann as "an aside" to point out that Washington Mutual portfolio contained hardly any loans that met Franklin's screen.  No facts alleged by the Commons refute the accuracy of such a statement.

---

Transcript of Conference Call on October 30, 2007 ("3Q 2007 Transcript") (JA14) at 34-35 (bracketed language, in lieu of inaudible, from SCAC¶ 63).

ii.     *No Materiality or Strong of Scienter*

58.     The Commons do not allege facts that link Nocella to awareness of any false statements.   Neither the FDIC nor the February 2008 Letter impute any such knowledge to Nocella.

59.     Likewise, the Commons allege no facts that would permit this Court to assess the materiality with which of any statements regarding subprime mortgages were made.  The FDIC Report does not quantify the amount of loans that Franklin originated as subprime mortgages. Contrary to Mr. Wolfe's assertions, the FDIC Report concedes that "Franklin did not have a subprime lending program as defined by interagency guidance." FDIC Report at 5 n.3.  Instead, the FDIC estimated retroactively the loans the FDIC then considered to have subprime characteristics.   Strictly speaking, subprime refers only to borrowers displaying specific characteristics at the time of origination or purchase.  Expanded Guidance for Subprime Lending Programs, FDIC Press Release, PR-9-2001, at 2 (January 31, 2001).

60.     While Mr. Wolfe's letter states that Franklin funded an average of $10-$15 million in subprime loans, the letter does not state how many months this program remained in place, how many months Mr. Wolfe had have access to this information, what percentage of the loans in question were sold to third parties, what standards he used to identify what he considered subprime, or any other information upon which this Court could reliably quantify the amount of subprime loans at issue.

D.     THE NON-EXISTENT COUNTRYWIDE DEFAULT

i.     *Actionable Omissions Not Sufficiently Alleged*

61.     The Commons allege no facts sufficient to infer that Nocella omitted material facts regarding an alleged default by Countrywide on a warehouse line of credit.   The Countrywide theory rests on the factually false premise that Franklin concealed and never

revealed the default on an alleged $150 million warehouse line of credit purportedly extended to Countrywide.  The only support the Commons offers for this fiction consists of minutes from a single Board of Directors meeting and the statements of a confidential witnesses responsible for providing mortgage lending to construction companies (not other lenders, such as Countrywide). SCAC ¶ 112, 117-122.  Neither provides support necessary to satisfy the PSLRA .[25]

62.     Despite  repeatedly  alleging  non-disclosures  related  to  Countrywide,  the Commons  offer  no  explanation  as  to  how  investors  were  mislead.   No  actionable  omission occurs  when  the  omitted  information  adds  nothing  to  the  accuracy  of  the  facts  stated.   *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (*McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002)).   Nor do the Commons explain why Nocella would otherwise have a duty to disclose such information under the circumstances.

---

[25]     The Minutes of a January 3, 2007 Board of Directors Meeting ("January 3, 2007 Minutes") do refer to a "loan sale summary report by Countrywide Securities." SCAC Exh. D.  However, nothing in those words supports the inference that the summary referred to a warehouse line of credit.  On the contrary, the remainder of the sentence suggests that the summary involved the sale of a $590 million pool of loans.  That would be the far more plausible inference given that Franklin had disclosed Countrywide as both a principal entity to whom Franklin sold and purchased mortgage loans, but not as an entity to whom Franklin had extended a line of credit.  2006 10K at 4, 20, 58 (47% of total purchases); 2005 10K at 5, 22, 52 (67% of total purchases).  Notably, Franklin also reported the sale of $580 million in single family loans at the end of January 2007.  April 26, 2007 Press Release (JA26) at 1, 3.

As for the confidential witness, his statement simply lacks reliability.  Nothing in the Commons' description suggests CW2 would have been in a position to personally know the facts.  Also, no single corroborative fact exists to support his statements.  By the Commons' own admission, Franklin never suggested such an event occurred either directly or indirectly: despite an amendment to Franklin's 3rd Quarter 2007 10Q on December 20, 2007, despite a 2007 year end earning release that reported a $45 million net loss for 2007, despite an independent investigation of Franklin by its Audit Committee and related adjustment, and despite ongoing oversight by the FDIC and TDSML resulting in Franklin's closure on November 7, 2008.  The FDIC Report does not, as one might expect, mention or allude to an event of that significance.  FDIC Report at 4-5.  There was no such default on any warehouse line of credit.  Finally, the Commons do not point to any disclosures by Countrywide that one might expect would result from any such default.

Moreover, even if a loan existed and a default occurred, nothing suggests that CW2 would have understood the context of the loans purportedly held as collateral.  *Shaw Group, Inc.*, 537 F.3d at 540 (contractor not in a position to know practices of every superintendent on every project).  Absent such detail, any allegation that Franklin's fraudulently failed to disclose the default of this loan would be conclusory.  *Blackwell*, 440 F.3d at 283, 288 (pleadings regarding defendants' failure to disclose $50 million loan and its default were insufficient to allege fraudulent non-disclosure under PSLRA absent specific details regarding the loan).

ii.   ***No Strong Inference of Scienter***

63.   Neither the January 3, 2007 Minutes nor CW2's alleged statements provide the requisite proof to raise a strong inference of scienter. Neither establishes that Nocella knew of Franklin's exposure to subprime loans under a warehouse line of credit.[26] As noted above, the January 3, 2007 Minutes do not even refer to a line of credit. As noted above, CW2's statements lack credibility and do not attribute any knowledge regarding the alleged Countrywide default or collateral contents to Nocella. At most, CW2 makes the conclusory statement that in early 2007 Nocella "should have been aware" of Countrywide's ***financial problems*** based on national media reports.

E.   **4Q 2007 ALLOWANCES**

i.   ***Factual Background***

64.   As repeatedly disclosed by Franklin, "[c]ertain of [Franklin's] accounting policies, by their nature, involve a significant amount of subjective and complex judgment by [its] management. Prospectus filed December 18, 2003 ("Initial Prospectus") (JA1) at 38, F-10; 2006 10K at 36, 81. Among these was its allowance for credit losses, which was "the amount estimated by management to be sufficient to absorb probable losses based on available information." Initial Prospectus at 38; 2006 10K at 36. Reflecting its significance, Franklin repeatedly described the methodology used to calculate this figure in its SEC filings. Initial Prospectus at 38-39; 2006 10K at 36. Franklin also disclosed the risks inherent in such analysis.[27]

---

[26]   Certain of CW2's allegations in fact weigh against finding a strong inference of scienter. For example, in regards to Countrywide's alleged default, CW2 asserts that "'[b]y the time we got notice of the default, we realized the portfolio was full of sub-prime dog [expletive].'" *Id.* A straightforward interpretation of CW2's allegations confirms that CW2 and others were unaware of the quality of the collateral behind Franklin Bank's alleged loan to Countrywide until around the time that Countrywide purportedly defaulted, towards the end of 2007.

[27]   From its Initial Prospectus through its 2006 10K, Franklin's annual reports contained the following disclosures: (i) "our allowance for credit losses may be insufficient to cover actual losses, which could materially

65.     As Franklin grew, the bank's allowance for credit losses grew both numerically and as a percentage of total loans:

|  | Initial Prospectus | 2003 10K | 2004 10K | 2005 10K | 2006 10K | 3Q 2007 10Q |
|---|---|---|---|---|---|---|
| Total Allowance | $2.6 million | $4.9 million | $7.4 million | $13.4 million | $11.7 million. | $16.8 million |
| As % Total Loans | 0.21% | 0.27% | 0.24% | 0.35% | 0.25% | .40% |

IP at 68; 2003 10K at 49; 2004 10K (JA2) at 51; 2005 10K (JA3) at 60; 2006 10K at 66; 3Q 2007 10Q (JA19) at 26.

66.     On November 26, 2007, as market conditions deteriorated, Franklin announced that it had elected to increase its allowance for credit losses by approximately $20 million. SCAC ¶ 68.   In so doing, Franklin more than doubled its historical percentage rates for allowance for credit losses to 0.91% of total loans.  *Id*.  By year end, Franklin specified that this forewarned increase would be $23.5 million, for a total allowance for credit losses for 2007 of $40.3 million, or 1.03% of total loans.  January 31, 2008 Press Release (JA22) at 1, 6.

ii.     *Nocella Made No False or Misleading Statements*

67.     Although the Commons quote the November 26, 2007 press release, the November 26, 2007 conference call, and the January 31, 2008 press release at length, nowhere do the Commons allege specific facts inferring that these statements were false and misleading. In particular, the Commons do not explain why the 4Q 2007 Allowances or the statements that accompanied them were false. [28]   The Commons do not claim or plead that Franklin's actual

---

and adversely affect our financial performance"; (ii) "significant increases to the allowance for credit losses may be necessary if material adverse changes in general economic conditions occur and the performance of our loan portfolio deteriorates"; and (iii) "as a part of their examinations, the FDIC and [TSLD/TDSML] periodically review [Franklin's] estimated losses on loans and the carrying value of our assets and increases in the provision for credit losses and other real estate owned could materially and adversely affect our financial condition, results of operations and cash flows. . . ."  Initial Prospectus at 6; 2006 10 K at 23.  *See also* Initial Prospectus at F-10 (noting the possibility that "in the near term the bank may sustain losses that are substantial relative to the allowance for credit losses"); 2006 10 K at 81 (same).

[28]     Among the statements the Commons challenge is Franklin's allowance for credit losses.  SCAC ¶¶ 68-72, 75-77, 99, 165-66, 193, 199, & 201.  These statements can be divided into two groups: (i) the allowances recorded in the fourth quarter of 2007 that Franklin announced on November 26, 2007 and January 31, 2008 ("4Q 2007

allowances for the fourth quarter of 2007 were greater than actually disclosed. The Commons do not claim or explain how any accompanying highlighted statements were false. Nor do they claim a specific amount by which the 4Q 2007 Allowances were understated that would allow this Court to assess the materiality of any alleged misstatement. While the Commons do follow each quoted statement with a laundry list of alleged non-disclosures, the Commons do not explain or plead any facts that would show how the 4Q 2007 Allowances relate to such non-disclosures.

68.    The increase in the allowance for credit losses from November 26, 2007 to January 31, 2008 does not show that the November 26, 2007 allowance was false when made. The Commons do not allege any facts showing that Franklin had actually recorded an allowance as of November 26, 2007 greater than $20 million. The January 31, 2008 press release concerned Franklin's increase for the entire fourth quarter of 2007, not simply through November 26, 2007. As a result, the January 31, 2008 release itself cannot support the inference that the November 26, 2007 allowance was false when made.

iii.    ***No Strong Inference of Scienter***

69.    Nowhere do the Commons allege facts showing that Nocella or any other individual employed by Franklin deliberately or recklessly underestimated Franklin's 4Q 2007 Allowances.[29] No allegations link Nocella to knowledge that Franklin's allowances were being

---

Allowances"); and (ii) the adjustments to Franklin's 2007 10Qs that were announced in Franklin's August 6, 2008 8K ("Adjusted Allowances"). SCAC ¶ 166. To the extent that the Commons complain of the Adjusted Allowances, those adjustments have been previously addressed along with the five discrete accounting issues to which they relate.

[29]    The Commons, relying upon the FDIC's OIG Report, ask this Court to infer that Franklin failed to implement FDIC recommendations regarding Franklin's ALLL policies. SCAC ¶ 100. However, the FDIC merely states that it "repeatedly reported concerns" regarding Franklin's ALLL policies. SCAC ¶ 99. Nothing the FDIC says supports the inference that these concerns did not change over time or that Franklin did not implement changes the FDIC recommended. Changes to Franklin's description of its ALLL methodology prove the contrary. Compare 2003 10K at 26-27 with 2004 10K at 27 (expanding factors and instituting classification system for commercial loans); *compare* 2005 10K at 34, 60 with 2006 10K at 36-37, 65-66 (changing methodology for single family

misstated.   For the 4Q 2007 Allowances, the Commons do not even identify specific GAAP violations.[30]   Nor, as noted above, do the Commons attempt to quantify the extent to which the 4Q 2007 Allowances were understated.   Certainly, no restatement of these figures has ever occurred.   As a result, the Commons have failed to plead a strong inference of scienter for these statements.[31]

70.   The Commons' confidential witness statements do not support a strong inference of scienter either.   The Commons proffer CW3 for the proposition that "senior executives knew the bank was facing rising delinquencies in its mortgage portfolio."   SCAC ¶ 132.   As to CW3's credibility, the Commons allege no facts showing how CW3, "the Vice President in the Warehouse Lending Division," would know about delinquencies in other areas of the bank (outside his Warehouse Lending Division).   Moreover, the Commons do not allege that CW3 knew about any Credit Committee presentations, including whether, when or how often his reports were presented at such meetings.

71.   More importantly, the Commons do not specify when this occurred or how such knowledge would conflict with Franklin's 4Q 2007 Allowances.   CW3's conclusory statement that Franklin "didn't disclose its delinquent loans" has no specificity.   Finally, the Commons

---

mortgages and instituting monthly risk management review of allowance for credit losses).   Nothing in the FDIC Report identifies a specific recommendation that Franklin failed to implement that resulted in a GAAP violation.  *Blackwell*, 440 F.3d at 290 (allegations regarding GAAP errors conclusory where plaintiff failed to allege facts demonstrating failure to follow applicable standard).   Moreover, nothing in the FDIC Report shows that Nocella, himself, deliberately failed to implement recommended changes.

[30]   The Commons merely reference GAAP violations related to the August 6, 2008 Adjustment concerning financial statements prior to the fourth quarter 2007.   SCAC ¶¶ 165-66.

[31]   *Shaw Group, Inc.*, 537 F.3d at 537 (citing *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 199 (1st Cir. 2005)) (concluding that where no restatement has occurred, allegations regarding accounting errors do not contribute any inference to scienter where the plaintiff offers no standard for comparison as to what the correct numbers would have been).  *See also Shaw Group, Inc.*, 537 F.3d at 537 (identifying as especially suspect alleged accounting errors based on standards that leave broad scope for judgment and informed estimation as such determinations can differ reasonably and sizably).

allege no facts that would suggest CW3 had any knowledge of what Nocella knew about either of these issues.

72.     The Commons allege no facts showing CW4 had any knowledge beyond his position as a "senior member of the Warehouse Lending Division." SCAC ¶ 133. At the same time, CW5 identifies a person other than Nocella "as responsible for setting reserves for the warehouse lines." SCAC ¶ 135. CW5 vaguely describes "portfolio management" as coming down from Nocella. However, the Commons plead no facts showing that this had anything to do with allowances or that would attribute any specific knowledge to Nocella about specific allowances.

73.     Finally, without attribution to CW4, the Commons allege that in March 2008 Franklin had a meeting in which Nocella "brought to our attention that the bank needed to meet federal guidelines." This unattributed statement occurs after the relevant time frame, does not identify any specific guidelines, and does not even support the inference that Franklin had been violating any specific guidelines. Again, no facts alleged, individually or collectively, infer that Franklin understated the 4Q 2007 allowances, much less support a strong inference that Nocella knew or recklessly disregarded red flags indicating that the 4Q 2007 Allowances were understated. *See Central Laborers' Pension*, 497 F.3d at 555 (even a variety of allegations will not collectively establish scienter where, as here, the plaintiff fails to link the misstatements or omission at issue with the bases for inferring scienter).

iv.     ***The PSLRA Safe Harbor Applies***

74.     To the extent that the November 26, 2007 allowance could be viewed as an estimate of Franklin's allowances for the fourth quarter of 2007 (or any allowance could be viewed as an actual estimate of Franklin's future losses), those forward-looking statements fall within the PSLRA's safe harbor. The announcements were identified as forward-looking

statements and contained meaningful cautionary language.  November 26, 2007 Press Release (JA20) at 2, Transcript of Conference Call on November 26, 2007 (JA21) at 1; January 31, 2008 Press Release at 7-8.  The Commons also failed to plead actual knowledge for the same reasons set forth above with respect to scienter.

F.     **LOAN CONCENTRATIONS**

    i.     ***No Actionable Omissions***

75.     The Commons allege that several statements were misleading because they failed to disclose that Franklin allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring and controls.  SCAC ¶¶ 58(f), 67(f), 72(f).  As with the Countrywide omissions, the Commons do not explain which portions were misleading or why. *Williams,* 112 F.3d at 179 (dismissing allegations pursuant to Rule 9(b) where plaintiffs fails to specify which portions of excerpted prospectus were false or misleading and why).  Nor do the Commons explain why Nocella or any other person would otherwise have a duty to disclose such information under the circumstances.

76.     From the outset, Franklin disclosed that its business strategy focused on three specific loan products: (i) mortgage banking; (ii) residential construction lending; and (iii) mortgage banker finance.  Initial Prospectus at 1, 3-4, 5; 2006.  Franklin routinely disclosed the amount of loans in each of these three categories, the extent to which these loans were concentrated by geography, the risks associated with its strategy, and the steps Franklin undertook to mitigate those risks.  Initial Prospectus at 3-4, 7-10, 12, 43, 60-62, 77-80, 81-82, F-17; 2006 10K at 3, 6, 18-21, 23-24, 27, 57-60, 92-94.  Given the foregoing and the lack of specificity for their allegations, the Commons wholly fail to identify with any specificity what was not disclosed, why any statement to which they cite may have been misleading, or why Nocella would have a duty to disclose under the circumstances.

34

ii.     *No Materiality or Strong Inference of Scienter*

77.     The Commons plead no facts suggesting that any omission was material. Likewise, the Commons plead no specific facts linking Nocella to any knowledge of any of the unidentified controls alleged to be lacking.

G.     **THE COMMONS DO NOT PLEAD LOSS CAUSATION AS TO MOST ALLEGATIONS**

78.     No loss causation can be shown as to the Countrywide, Subprime, 4Q 2007 Allowances and Loan Concentration allegations.  The Commons allege no contrary disclosures made at any time prior to when the Commons' stock became worthless.  Under the PSLRA, a plaintiff alleging a Section 10(b) claim must plead loss causation, that is, a causal connection between the alleged material representation and the loss allegedly suffered by the plaintiff.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  A plaintiff must plead: (1) that negative "truthful" information causing a decrease in price related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009).

79.     The Commons allege that their stock became in worthless in 2008.  SCAC ¶ 2008.  However, the Commons do not allege any specific contrary disclosures related to the Countrywide, Subprime, 4Q 2007 Allowances and Loan Concentration allegations prior to that time.  As a result, the Commons have failed to show loss causation for those allegations.  To the extent the Commons' merely intend to rely on the conclusory allegations regarding Nocella's executive position, Franklin's GAAP violations, Nocella's Sarbanes-Oxley certifications, general awareness of internal controls, or any confidential witness statements, the Commons' allegations do not suffice for the reasons set forth above.

H.     **THE COMMONS FAIL TO STATE SECTION 20(A) CLAIMS**

80.     To state a claim for control person liability, a plaintiff must allege: "(1) a primary violation of the federal securities laws and (2) that the alleged control person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation." *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 757 (S.D. Tex 2003).   Control person liability is secondary only and cannot exist in the absence of a primary violation." *Shaw Group, Inc,* 537 F.3d at 545.   Since the Commons fail to allege Section10(b) or Rule 10b-5 claims, their Section 20(a) claims lack merit as well.

81.     In addition, the Commons have failed to plead facts demonstrating that Nocella was a "control person" within the meaning of Section 20(a).   A plaintiff must allege "some facts *beyond a defendant's position or title* that show the defendant had actual power or control over the controlled person." *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004) (emphasis added).   Accordingly, the Commons' Section 20(a) should be dismissed on that basis as well.

**REQUEST FOR RELIEF**

Anthony Nocella requests that the Court grant this motion to dismiss, that the Court enter an order dismissing with prejudice all claims against Nocella, and for such other and further relief, at law or in equity, to which Nocella may be justly entitled.

Respectfully submitted,

By:_____
　　　James G. Munisteri
　　　State Bar No. 14667380

GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

OF COUNSEL:

Thomas Hagemann
State Bar No. 08686800
Orin H. Lewis
State Bar No. 00791110
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
Telephone:　　(713) 276-5500
Facsimile:　　(713) 276-5555

## CERTIFICATE OF SERVICE

I, James G. Munisteri, do certify that on the 5th day of March, 2010, a copy of the Anthony Nocella's motion to dismiss was served on the following parties via the Court's ECF system as indicated below:

| | |
|---|---|
| Roger G. Greenberg | rgreenberg@schwartz-junell.com |
| Ralph M. Stone | rstone@lawssb.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| J. Allen Carney | dwilliams@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| William B. Monahan | monahanw@sullcrom.com |
| M. Byron Wilder | bwilder@gibsondunn.com |
| Jonathan C. Dickey | jdickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Stephen E. McConnico | smcconnico@scottdoug.com |
| Cynthia Saiter Connolly | cconnolly@scottdoug.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | James.farrell@lw.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |

David A. Rosenfeld
Mario Alba, Jr.
Couglin Stoia Geller Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY 11747

David C. Walton
Couglin Stoia Geller Rudman & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

Andrew J. DeFilippis
Brian T. Frawley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004


_____

James G. Munisteri