IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities Litigation | § § § § | Civil Action No. 4:08-CV-1810<br><br>CLASS ACTION |

## ANTHONY NOCELLA'S MOTION TO DISMISS PREFERRED STOCKHOLDERS' COMPLAINT

James G. Munisteri
State Bar No. 14667380
Orin H. Lewis
State Bar No. 00791110

Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

# TABLE OF CONTENTS

Table of Contents .................................................................................................ii-iii

Table of Authorities .............................................................................................iv-ix

Issues Presented ....................................................................................................x

Summary of Argument .........................................................................................1

Section 11 Claims .................................................................................................3

    A.    No Material Misstatements or Omissions.................................................3

        i.    Applicable Law .............................................................3

            a.   Standard of Review for Section 11 Claims Sounding in Negligence ..........3
            b.   Misstatements and Actionable Omissions .................................................4
            c.   Materiality.................................................................6

        ii.    Application of Law to Facts...........................................7

            a.   Five Accounting Issues .................................................8
            b.   Accounting Practices, Internal Controls and Financial Figures...................9
            c.   Loan Loss Reserves .................................................10
            d.   FDIC Concerns and Recommendations...................................10
            e.   Risky Lending.................................................12
            f.   Financial Figures.................................................12
            g.   Lending Practices .................................................12
            h.   Single Family Mortgage Portfolio .........................................13

    B.    PSLRA Safe Harbor.................................................13
    C.    Negative Causation .................................................15
    D.    Statute of Limitations.................................................17
    E.    Section 11 Claims Sounding in Fraud .......................................18

Section 10(b) and Rule 10b-5 Claims.................................................19

    A.    Section 10(b) and Rule 10b-5 Elements ....................................19
    B.    False or Misleading Statements .........................................19
    C.    Materiality and Safe Harbor.................................................21
    D.    Scienter .................................................21

        i.    Strong Inference of Scienter .............................................21
        ii.    Standard of Review.................................................22

    E.    Application of Law to Facts.................................................23

        i.    Defects Applicable to All Allegations .......................................23

      a.   The Preferreds Employ Improper Group Pleading and "Puzzle Pleading" .................................................................23

      b.   No Plausible Motive Has Been Alleged ...................................24

  ii.     The August 6, 2008 Adjustments................................................24

      a.   Factual Background ..................................................................25

      b.   No Strong Inference of Scienter ..............................................26

  iii.    The Subprime Red Herring ..........................................................28

      a.   No False or Misleading Statements ..........................................28

      b.   No Materiality or Strong Inference of Scienter .........................34

  iv.    4Q 2007 Allowances....................................................................35

      a.   Factual Background ..................................................................35

      b.   No Material Misstatements or Actionable Omissions ...............36

      c.   No Strong Inference of Scienter ..............................................38

      d.   PSLRA Safe Harbor Applies ...................................................39

  v.     No Loss Causation .......................................................................40

Control Person Claims ...................................................................................41

Request for Relief .........................................................................................42

Certificate of Service ....................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
    291 F.3d 336 (5th Cir. 2002) ...........................................................................19, 20

*Abrams v. Baker Hughes Inc.,*
    292 F.3d 424 (5th Cir. 2002) ...................................7, 19, 20, 21, 22, 24, 25, 26, 28

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
    572 F.3d 221 (5th Cir. 2009) ...................................................................................40

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (U.S. 2009).........................................................................................3

*Bank of Heflin v. Miles,*
    621 F.2d 108 (5th Cir. 1980) ...................................................................................10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).........................................................................3, 5, 6, 8, 9, 31

*Castlerock Management Ltd. v. Ultralife Batteries, Inc.,*
    114 F.Supp.2d 316 (D.N.J. 2000) ..........................................................................4, 5

*Central Laborers' Pension Fund v. Integrated Electrical Services,*
    497 F.3d 546 (5th Cir. 2007) ...................................................19, 20, 21, 26, 27

*Collins v. Morgan Stanley Dean Witter,*
    224 F.3d 496 (5th Cir. 2000) .....................................................................................3

*Collmer v. U.S. Liquids, Inc.,*
    268 F. Supp. 2d 718 (S.D. Tex. 2003) .....................................................................41

*Davidco Investors, LLC v. Anchor Glass Container Corp.,*
    2006 WL 2092280 (M.D. Fla. Jul 26, 2006) ...........................................................16

*Dodds v. Cigna Sec., Inc.,*
    12 F.3d 346 (2nd Cir. 1993) .....................................................................................17

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005).................................................................................................40

*Eberhardt v. Merck & Co.,*
    106 Fed. App. 277 (5th Cir. 2004)............................................................................17

*Ehlert v. Singer,*
    245 F.3d 1313 (11th Cir. 2001) ...............................................................................13

iv

*Eizenga v. Stewart Enterprises, Inc.*,
   124 F.Supp.2d 967 (E.D. La. 2000) ................................................................6

*Financial Acquisition Partners LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) ................................................19, 21, 38

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ................................................22, 26

*Garber v. Legg Mason, Inc.*,
   2009 WL 3109914 (2nd Cir. 2009) ................................................................9

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) ................................................................27

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) ................................21, 22, 24, 26, 28

*In re Acceptance Ins. Companies Sec. Litig.*,
   423 F.3d 899 (8th Cir. 2005) ................................................................5, 6

*In re Alamosa Holdings, Inc.*,
   382 F.Supp.2d 832 (N.D. Tex. 2005) ................................4, 16, 23

*In re American Business Fin. Serv., Inc. Sec. Litig.*,
   2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ................................................13

*In re Azurix Corp.* Sec. Litig.,
   198 F.Supp.2d 862 (S.D. Tex. 2002) ................................................28

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
   — F.Supp.2d —, 2009 WL 3353045 (S.D.N.Y. Oct 19, 2009) ................15, 16

*In re CIT Group, Inc. Sec. Litig.*,
   349 F.Supp.2d 685 (S.D.N.Y. 2004) ................................................................6

*In re Compuware Sec. Litig*,
   301 F.Supp.2d 672 (E.D. Mich. 2004) ................................................14

*In re Dynegy, Inc.*,
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ................................17, 41

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
   352 F.Supp.2d 429 (S.D.N.Y. 2005) ................................................4

*In re Harmonic Inc. Sec. Litig.*,
   163 F.Supp.2d 1079 (N.D. Cal. 2001) ................................................14

*In re Ibis Technology Sec. Litig.*,
422 F.Supp.2d 294 (D. Mass. 2006) ...............................................................14

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F.Supp.2d 1248 (N.D. Cal. 2000) .............................................................16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
272 F.Supp.2d 243 (S.D.N.Y. 2003)...........................................................15, 16

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
289 F.Supp.2d 429 (S.D.N.Y. 2003)................................................................16

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) (Harmon, J.)........................................39

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
181 F.Supp.2d 1283 (D.N.M. 2002) ...............................................................14

*Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008) ...................................21, 22, 26, 27, 28, 31, 33, 39

*J & R Marketing, SEP v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) ......................................................................4, 5

*Jensen v. Snellings*,
841 F.2d 600 (5th Cir. 1988) ..........................................................................17

*Jones v. Bock*,
549 U.S. 199 (2007)........................................................................................17

*Kaplan v. Rose*,
49 F.3d 1363 (9th Cir. 1994), *cert. denied*, 516 U.S. 810 (1995)........................4

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) ..............................................................3, 6, 7, 41

*Krim v. BancTexas Group, Inc.*,
989 F.2d 1435 (5th Cir. 1993) .......................................................4, 5, 6, 7, 39

*Kurtzman v. Compaq Computer Corp.*,
2000 WL 34292632 (S.D. Tex. 2000) ........................................................13, 14

*Little v. KPMG LLP*,
575 F.3d 533 (5th Cir. 2009) ............................................................................3

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) ..........................................................................7

*Melder v. Morris,*
    27 F.3d 1097 (5th Cir. 1994) ............................................................................24

*Miller v. Champion Enterprises Inc.,*
    346 F.3d 660 (6th Cir. 2003) .....................................................................14, 15

*Nathenson v. Zonagen Inc.,*
    267 F.3d 400 (5th Cir. 2001) ...........................................................................22

*Novak v. Kasaks,*
    216 F.3d 300 (2nd Cir. 2000)............................................................................26

*Panther Partners Inc. v. Ikanos Communications, Inc.,*
    2009 WL 2959883 .................................................................................................5

*Panther Partners Inc. v. Ikanos Communications, Inc.,*
    538 F.Supp.2d 662 (S.D.N.Y. 2008).....................................................................5

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
    658 F.Supp.2d 299 (D. Mass. 2009) .....................................................................6

*R2 Investments LDC v. Phillips,*
    401 F.3d 638 (5th Cir. 2005) .......................................................................7, 24

*Reed v. Prudential Secs.,*
    875 F. Supp. 1285 (S.D. Tex. 1985) ..................................................................18

*Rombach v. Chang,*
    355 F.3d 164 (2nd Cir. 2004) ...........................................................................13

*Rosenzweig v. Azurix,*
    332 F.3d 854 (5th Cir. 2003) ..............................................4, 6, 7, 12, 15, 21, 24, 28

*Rubin v. MF Global, Ltd.,*
    634 F.Supp.2d 459 (S.D.N.Y. 2009).....................................................................5

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,*
    75 F.3d 801 (2nd Cir. 1996).............................................................................39

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ..................................6, 7, 14, 15, 19, 20, 22, 23

*Stavros v. Exelon Corp.,*
    266 F.Supp.2d 833 (N.D. Ill. 2003) ..................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..........................................................................19, 22, 32

*Tuchman v. DSR Communications Corp.*,
14 F.3d 1061 (5th Cir. 1994) ..........................................................................3, 24

*Waterhouse v. Maggart and Welch, P.C.*,
571 F.2d 1089 .................................................................................................10

*Williams v. WMX Technologies, Inc.*,
112 F.3d 175 (5th Cir. 1997), cert. denied, 522 U.S. 966 (1997) ....................20, 23

*Yanek v. Staar Surgical Co.*,
388 F.Supp.2d 1110 (C.D. Cal. 2005) ...............................................................14

*Zirkin v. Quanta Capital Holdings Ltd.*,
2009 WL 185940 (S.D.N.Y. Jan 23, 2009) ....................................................4, 5, 6

## STATUTES

15 U.S.C. § 77k(a) ...................................................................................................4

15 U.S.C. § 77k(e) .................................................................................................15

15 U.S.C. § 77m (codifying § 13 of the 1933 Act)...............................................17

15 U.S.C. § 77z-2(i)(1) ..........................................................................................14

15 U.S.C. §§ 77z-2(c)(1)(A-B) & 78u-5(c)(A-B).................................................14

15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2) ..................................................................14

15 U.S.C. §§ 77z-2(c)(3), 78u-5(c)(3) ..................................................................14

15 U.S.C. § 78u-4(b)(1) ...............................................................................19, 20, 21

15 U.S.C. § 78u-4(b)(2) ..........................................................................................21

15 U.S.C. § 78u-5(c)(1)(B) .....................................................................................14

Section 10(b) of the Securities Exchange Act of 1934 ..................x, 1, 13, 14, 19, 21, 40

## OTHER AUTHORITIES

12 C.F.R. § 309.2(e)................................................................................................10

12 C.F.R. § 309.6(a)................................................................................................10

71 Fed. Reg. at 58613 ..................................................................................................30

71 Fed. Reg. at 58,609 .................................................................................28, 29, 34

71 Fed. Reg. 58,609 (2006) ..........................................................................................28

FED. R. CIV. P. 8 ............................................................................................................3

FED. R. CIV. P. 12(b)(6) ...........................................................................1, 3, 16, 17, 22

Rule 9 .............................................................................................................................3

Rule 9(b) ....................................................................................................5, 19, 20, 21

Rule 10b-5........................................................................................x, 1, 2, 13, 14, 19, 21

Rule 10b-5 and Section 11 .............................................................................................x

## ISSUES PRESENTED

1.      Does the Preferred Stockholders' (the "Preferreds") Complaint properly allege a claim under Section 11 of the Securities Act of 1933?

2.      Does the safe harbor protection of the Private Securities Litigation Reform Act ("PSLRA") protect forward-looking statements in a registration statement when meaningful cautionary language accompanies the statements?

3.      For purposes of Section 11, does the Preferreds' pleading negate causation when the Preferreds have plead no corrective disclosures prior to the date their stock became worthless?

4.      Does the one-year statute of limitations bar the Preferreds' Section 11 and 15(a) claims?

5.      Does the Preferreds' Complaint properly allege a claim under Section 10(b) of the Securities Exchange Act of 1934 or Securities and Exchange Commission Rule 10b-5?

6.      For purposes of Section 10(b), Rule 10b-5 and Section 11 claims sounding in fraud, does the Preferreds' Complaint properly plead scienter?

7.      For purposes of Section 10(b) or Rule 10b-5, does the Preferreds' Complaint properly plead loss causation when the Preferreds have failed to plead a proper causal connection between their losses and defendant's alleged misstatements and non-disclosures?

8.      Does the Preferreds' Complaint properly plead Section 20(a) claims when the Preferreds have failed to plead a Section 10(b) or Rule 10b-5 claim by any controlled person, and when the Preferreds have failed to plead facts sufficient to demonstrate actual power or influence?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities | § | |
| Litigation | § | Civil Action No. 4:08-CV-1810 |
| | § | |
| | § | CLASS ACTION |

### ANTHONY NOCELLA'S MOTION TO DISMISS
### PREFERRED STOCKHOLDERS' COMPLAINT

Anthony J. Nocella moves to dismiss the Amended Consolidated Preferred Stock Purchaser Complaint ("APC") pursuant to FED. R. CIV. P. 12(b)(6).

### SUMMARY OF ARGUMENT

1.      The Preferreds' Section 11 claims against Nocella, Franklin Bank Corporation's ("Franklin") former Chief Executive Officer, should be dismissed because:

(a) **No Material Misstatements or Omissions.**   The Preferreds do not allege particularized facts sufficient to infer that any statements were false or that any omitted information was known or should have been known.

(b) **Safe Harbor**.  The PSLRA's safe harbor protects any forward-looking statements in Franklin's Registration Statement, such as Franklin's statements related to allowances or the liquidity of the single family mortgage portfolio.

(c) **Causation**.  The Preferreds' own complaint negates causation.  Their stock became worthless prior to any corrective disclosures linked to the Registration Statement.

(d) **Statute of Limitations**.  The one-year statute of limitations bars the Preferreds' Sections 11 and 15(a) claims as the Preferreds have been on inquiry notice since the Audit Committee investigation and delay in filing Franklin's 2007 10K announced on March 14, 2008.

2.      The Preferreds' Section 10(b) and Rule 10b-5 claims against Nocella should be dismissed because:

(a) **Improper Pleading and Lack of Motive**.  The Preferreds' Complaint improperly employs group pleading and confusing "puzzle pleading." Also, the Preferreds fail to articulate a motive and therefore must meet the more stringent conscious behavior standard.

1

(b) **August 6, 2008 Adjustments**.  The Preferreds do not allege particularized facts that raise any inference, much less a strong inference, that Nocella knew or recklessly disregarded red flags regarding the five discrete accounting issues that led to the August 6, 2008 Adjustments.  The Preferreds' conclusory allegations regarding Nocella's executive position, Franklin's GAAP violations, Nocella's Sarbanes-Oxley certifications, general awareness of internal controls, and Nocella's resignation do not suffice.  None of these allegations link Nocella's knowledge and the accounting issues in dispute.

(c) **Subprime Allegations**.  The Preferreds allege no particularized facts showing that Nocella's statements were false or misleading and made with scienter.  In addition, no basis exists for this Court to infer materiality.

(d) **4Q 2007 Allowances**.  The Preferreds allege no particularized facts showing that loan loss reserves announced in the fourth quarter of 2007 were false or misleading. Reserves fall within the safe harbor for forward-looking statements.  Even if false, in hindsight, no particularized facts have been alleged to establish a strong inference that Nocella made such statements with scienter.  No basis exists for this Court to infer materiality.

(e) **Loss Causation**.   No loss causation can be shown as to any misstatements or omissions not related to the August 6, 2008 Adjustments as the Preferreds allege no contrary disclosures made at any time prior to the point the Preferreds' stock became worthless.

3.      The Preferreds' control person claim must be dismissed because:

(a) **Primary Violation Required**.  Control person liability cannot exist in the absence of a primary violation.  Since the Preferreds fail to allege Section 11, Section 10(b) or Rule 10b-5 claims, their Section 15 and Section 20(a) claims also lack merit.  In addition, the Preferreds do not plead facts demonstrating that Nocella was a control person.[1]

---

[1]      Nocella also incorporates by reference the legal arguments and authorities and, to the extent applicable to Nocella, the factual arguments set forth in the motions of Defendant Lewis Ranieri [DE 188] ("Ranieri Motion"), Russell McCann [DE 187] ("McCann Motion"), and Defendant Directors Chimerine, Golush, Howard, Master, Perro, Rhodes, and Selman [DE 189] ("Directors' Motion"), including without limitation Defendant Ranieri's argument concerning loss causation (Ranieri Motion at III), the Defendant Directors' argument regarding reliance (Directors' Motion at IV), and the Defendant Directors' argument that the plaintiffs' allegations should not be permitted to rest on the partial disclosure of information prohibited from disclosure by law (whether partially disclosed directly through the 2008 FDIC Exam or indirectly through the partial disclosure of FDIC examinations in the FDIC Report) (Directors' Motion at III.C.3.b.).

SECTION 11 CLAIMS

A.    NO MATERIAL MISSTATEMENTS OR OMISSIONS

     i.    *Applicable Law*

        a.    **Standard of Review for Section 11 Claims Sounding in Negligence**

    4.    FED. R. CIV. P. 8 applies to Section 11 claims. *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 215 (5th Cir. 2004). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Little v. KPMG LLP*, 575 F.3d 533, 541 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the factual content allows the court to draw the reasonable inference that the defendant is liable. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (U.S. 2009). Determining whether a complaint states a plausible claim will, therefore, be a context-specific task requiring the court to draw on its judicial experience and common sense. *Id.* at 950.

    5.    A pleading that offers nothing more than conclusions or a formulaic recitation of the elements of a cause of action will not do. *Ashcroft*, 129 S.Ct. at 1949. Nor does a complaint suffice if it tenders naked assertions devoid of factual enhancement. *Id.* To avoid dismissal under Rule 12(b)(6), a plaintiff "must plead specific facts, not mere conclusory allegations." *Tuchman v. DSR Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). A court should "not accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

    6.    This rule applies equally to allegations regarding a defendant's state of mind. While Rule 9 allows malice, intent, knowledge and other conditions of the mind to be alleged generally, the rule does not require courts to credit a complaint's conclusory statements without reference to its factual content. *Ashcroft*, 129 S.Ct. at 1954 (concluding that plaintiff had not plead sufficient facts to reasonably infer discriminatory intent).

3

b.   **Misstatements and Actionable Omissions**

7.      Under Section 11, a purchaser may recover damages if, at the time the registration statement became effective, the registration statement "contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." *Rosenzweig v. Azurix*, 332 F.3d 854, 861 (5th Cir. 2003) (quoting 15 U.S.C. § 77k(a)).  To prevail on a Section 11 claim, a plaintiff must show (1) that the registration statement contained an omission or misrepresentation and (2) that the omission or misrepresentation was material.    *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994), *cert. denied*, 516 U.S. 810 (1995); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993).

8.      An actionable omission exists only if a duty to disclose exists.  *J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008).  Under Section 11, a duty to disclose exists only if required by statute or regulation or required to make another statement not misleading.  *J & R Marketing, SEP*, at 390.  Absent a duty to disclose mandated by regulation or statute, to properly allege that the registration statement contained an omission, the plaintiff must allege how the claimed omitted fact negates the truth of or renders misleading statements actually made.  *Castlerock Management Ltd. v. Ultralife Batteries, Inc.*, 114 F.Supp.2d 316, 324 (D.N.J. 2000).

9.      Truth for purposes of a Section 11 claim must be adjudged based on the facts as they existed when the registration statement became effective.  *Zirkin v. Quanta Capital Holdings Ltd.*, 2009 WL 185940, *10 (S.D.N.Y. Jan 23, 2009); *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 352 F.Supp.2d 429, 447 (S.D.N.Y. 2005).  A statement in a prospectus will be grounds for liability under Section 11 only if it was false or misleading when the registration statement became effective. *Kaplan*, 49 F.3d at 1373; *In re Alamosa Holdings, Inc.*,

4

382 F.Supp.2d 832, 865 (N.D. Tex. 2005) (dismissing Section 11 claims on grounds that the defendant had failed to allege an actionable misrepresentation or omission in the Registration Statement – plaintiffs' factual allegations did not show that the misrepresented or undisclosed conduct occurred until after the date of the Registration Statement).

10.    To state a claim based on estimated reserves, the plaintiff must plead facts showing that the defendant knew or should have known, at the time the registration statement was effective, that the statement was untrue. *Zirkin*, 2009 WL 185940, at \*10 (applying *Twombly* standard).  To state a claim based on an omission, the plaintiff must plead facts to demonstrate both that the allegedly omitted facts existed and were known or knowable at the time of the registration statement.[2] *Krim*, 989 F.2d at 1445; *J & R Marketing, SEP*, 549 F.3d at 391; *Panther Partners Inc. v. Ikanos Communications, Inc.*, 2009 WL 2959883, \*\*2-3 (2nd Cir. Sept. 17, 2009) (dismissing Section 11 claims based on *Twombly* standard when plaintiff failed to allege sufficient facts that defendant knew of abnormally high defect rate before registration statement was published), *aff'g, Panther Partners Inc. v. Ikanos Communications, Inc.*, 538 F.Supp.2d 662, 670, 671 (S.D.N.Y. 2008) (dismissing multiple Section 11 non-disclosure claims based on *Twombly* standard); *Ultralife Batteries, Inc.*, 114 F.Supp.2d at 323 & n.5 (D.N.J. 2000) (noting dismissal was appropriate even though Rule 9(b) standard did not apply).

11.    Hindsight analysis is not enough. *In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d 899, 903-04 (8th Cir. 2005); *Zirkin*, 2009 WL 185940, at \*11.  The existence of control problems, at a later date, will not support the inference that the same control problem existed at an earlier date. *Rubin v. MF Global, Ltd.*, 634 F.Supp.2d 459, 473-74 (S.D.N.Y. 2009) (applying *Twombly* standard to conclude that disclosures regarding problems with risk management

---

[2]    If an omission rests on a regulatory duty to disclose "known" information, alleging facts that show that the information was "knowable" will not suffice. *J & R Marketing, SEP*, 549 F.3d at 391-92.

systems in February 2008 did not support inference that problems existed when prospectus was issued in July 2007).  Likewise, actual knowledge at a later date will not support the inference that contrary information was known or should have been known earlier.  *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F.Supp.2d 299, 309-10 (D. Mass. 2009) (dismissing Section 11 claims under *Twombly* standard).[3]

        c.    **Materiality**

    12.    For Section 11 liability, an undisclosed fact must be material at the time the registration statement became effective.  *Eizenga v. Stewart Enterprises, Inc.*, 124 F.Supp.2d 967, 975 (E.D. La. 2000). The Fifth Circuit treats materiality for purposes of Section 11 and Section 10(b) as functionally equivalent.  *Kapps*, 379 F.3d at 215; *Rosenzweig*, 332 F.3d at 873-74.  A misstatement or omission is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Rosenzweig*, 332 F.3d at 865; *Krim*, 989 F.2d at 1448 (Section 11).  Materiality is not judged in the abstract, but in light of the surrounding circumstances.  *Rosenzweig*, 332 F.3d at 854; *Krim*, 989 F.2d at 1448.  Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information."  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).  A fact is material only if a substantial likelihood exists that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of

---

[3]    Revised reserves do not infer that the earlier estimates were false.  *Zirkin*, 2009 WL 185940, at *10 (plaintiffs failed to state a claim under *Twombly* standard when the only fact plead to support falsity of estimate at time of registration statement was upward revision two months later); *In re Acceptance Ins. Companies Sec. Litig.*, 423 F.3d at 902-04 (affirming dismissal "even under liberal pleading requirements" because allegations regarding increase in reserves at a later date did not support inference of prior knowledge that reserves were inadequate at the time the registration statement became effective); *In re CIT Group, Inc. Sec. Litig.*, 349 F.Supp.2d 685, 690-91 (S.D.N.Y. 2004) (dismissing claims on grounds that increase in reserves three weeks after registration statement "provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time the registration statement and prospectus became effective").

the reasonable shareholder. *Southland Sec. Corp.*, 365 F.3d at 362; *Krim*, 989 F.2d at 1448. The "total mix" of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders. *Kapps*, 379 F.3d at 216.

13.    No actionable omission occurs when the omitted information adds nothing to the accuracy of the facts stated. *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (*McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002)).

14.    Generalized statements about a company's strengths, experienced management and future prospects lack materiality. *Southland Sec. Corp.*, 365 F.3d at 372; *Rosenzweig*, 332 F.3d at 869. An issuer has no duty to cast its business in a pejorative rather than a positive light. *Rosenzweig*, 332 F.3d at 868 (citing *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002)) ("[A]s long as public statements are reasonably consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of the company's current performance"). Analysts rely on facts in determining the value of a security, not mere expressions of optimism from a company spokesman. *Rosenzweig*, 332 F.3d at 868. Positive characterizations may be dismissed as mere puffery. *Southland Sec. Corp.*, 365 F.3d at 372; *Rosenzweig*, 332 F.3d at 868.

ii.    ***Application of Law to Facts***

15.    Paragraphs 32 and 33 set forth all the alleged omissions and misstatements that form the basis of the Preferreds' claims.[4] Regardless of how characterized, all the Preferreds' allegations suffer from the same weakness. Resting on a presumed, relaxed pleading standard, the Preferreds make no effort to plead facts inferring that any of the statements made were false,

---

[4]    Section 11 claims must rest, if at all, on misstatements and omission contained in the Registration Statement. Section 11 would not apply to any subsequent statements.

that any of the omitted information was known or should have been known, or that some information was material at the time the Registration Statement became effective.   The Preferreds' conclusory allegations do not satisfy the *Twombly* standard.  Further, as to each of the alleged non-disclosures, the Preferreds do not identify facts that would plausibly show that Nocella had a duty to disclose.

<blockquote>a.   **Five Accounting Issues**</blockquote>

16.   The Preferreds allege that Defendants failed to disclose that its Delinquent Loan Accounting, REO Accounting, Loan Modification Accounting, Investment Securities Accounting, or BOLI Accounting were all "deficient" or "impaired."  APC ¶ 32(d).  These correspond to the same five accounting issues that were the subject of the August 6, 2008 Adjustment.  Those adjustments, however, only pertained to Franklin's financial statements for the year ending December 31, 2006.  August 6, 2008 8K (JA11).[5]  Nothing in the August 6, 2008 8K suggests that these issues existed or were material prior to the fourth quarter of 2006.[6]

17.   On the contrary, Franklin made no adjustments specific to the first three quarters of 2006.  Further, any adjustments that post-dated the Registration Statement would not, themselves, infer that these accounting issues existed or were material in May of 2006.[7]  No

---

[5]   For the convenience of the Court, the individual defendants have filed Defendants' Joint Appendix ("JA"), which includes documents relied on in the individual defendants' various motions to dismiss. Nocella incorporates by reference Defendants' Joint Appendix and the documents contained therein. Pursuant to Rule 6.B of this Court, the individual defendants are providing the Court with a Joint Compendium of unreported authorities cited within their motions.

[6]   The Preferreds quote, out of context, a sentence from the August 6, 2008 8K stating that Franklin "has undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005 and 2004." APC ¶ 35. However, that sentence, in proper context, shows that Franklin limited its adjustments to no earlier than its financial statements for the year ending December 31, 2006 despite having undertaken a review of financial statements from as early as 2004. August 6, 2008 8K at 2-5. If anything, this allegation supports the inference that these accounting issues either did not exist or were not material to any of the financial statements that preceded Franklin's 2006 10K, including its quarterly statements for 2006.

[7]   The Preferreds do not even accurately state the adjustments that were made to the fiscal year ending December 31, 2006. APC ¶ 36. The impact on Total Assets for the entire year was only $678,000. August 6, 2008 8K at 7. The impact on earnings for the entire year was closer to 7%. *Id.* at 8.

other allegations suggest that these five accounting issues existed, were known, knowable, or were material at the time the Registration became effective. And, the Preferreds made no effort to quantify any alleged impact at that time. *Garber v. Legg Mason, Inc.*, 2009 WL 3109914, *3 (2nd Cir. 2009) (dismissing Section 11 claims under *Twombly* standard as conclusory on the element of materiality when plaintiff failed to allege magnitude of financial misstatement).[8]

### b.   Accounting Practices, Internal Controls and Financial Figures

18.   The Preferreds' allegations related to accounting practices and internal controls lack merit. As to alleged non-disclosure in subparagraph 32(a), the Preferreds plead no facts inferring that "accounting practices and internal controls were materially deficient" or that such deficiencies were known or knowable at the time the Registration Statement became effective. As to subparagraph 33(g), the Preferreds likewise plead no particularized facts that would infer falsity, that is, that Franklin's results were not "prepared in conformity with generally accepted accounting principles" or that Franklin's accounting function did not possess "working and adequate controls.[9]"

19.   Nor do the Preferreds plead any facts that would infer materiality. Beyond the five accounting issues identified in subparagraph 32(d), the Preferreds do not identify any specific accounting practices and internal controls that violated GAAP, that were inadequate, or that were materially deficient. The Preferreds plead no information regarding the magnitude of any related error that would allow this Court to assess its materiality.[10]

---

[8]   To the extent that any of the Preferreds' misstatements regarding financial figures (subparagraphs (d)-(f)) relate to these five accounting issues, the Preferreds have also failed to allege particularized facts sufficient to support the inference that any such statements were false or material at the time the Registration Statement became effective.

[9]   On the contrary, the FDIC Report confirms that through the October 2006 examination Franklin had "appropriate internal controls in place." FDIC Report at 7.

[10]   The FDIC Report does not do so either. FDIC Report at 8.

c.     **Loan Loss Reserves**

20.     The Preferreds plead no facts that would support the inference that Franklin inadequately accounted for loan loss reserves or that such inadequacies were known, knowable, or material in May 2006. APC ¶ 32(b)&(c). As with the five accounting issues, any adjustments to Franklin's allowances for loan losses, as a result of the August 6, 2008 Adjustment, were limited to financial statements for the year ending December 31, 2006 or later. August 6, 2008 8K. Likewise, the mere increase of Franklin's allowance for loan losses on November 26, 2007 (APC ¶ 64) would not show that prior reserves were inadequate, much less that Nocella knew or should have known they were inadequate. Nor do the Preferreds offer any allegations regarding the magnitude of any understated allowance that would support materiality.

d.     **FDIC Concerns and Recommendations**

21.     As to sub-paragraph 32(e), no duty to disclose the FDIC's unspecified concerns regarding Franklin ALLL methodology should exist. At a minimum, 12 C.F.R. § 309.6(a) mandates that the FDIC examinations be kept confidential.[11] The FDIC's statement does not even support the inference that any specific concern raised by the FDIC existed or was material

---

[11]     Section 309.6 provides, in relevant part: states:

*[N]o person shall disclose or permit the disclosure of any exempt records, or information contained therein, to any persons* other than those officers, directors, employees, or agents of the Corporation who have a need for such records in the performance of their official duties. In any instance in which any person has possession, custody, or control of FDIC exempt records or information contained therein, all copies of such records shall remain the property of the Corporation and *under no circumstances shall any person, entity or agency disclose or make public in any manner the exempt records or information* without written authorization from the Director of the Corporation's Division having primary authority over the records or information as provided in this section.

12 C.F.R. § 309.6(a) (emphasis added); *see also* 12 C.F.R. § 309.2(e) ("record" includes "records, files, documents, reports, correspondence, books, and accounts, or any portion thereof"). The Fifth Circuit and other courts have held that these regulations prevent disclosure of information contained in FDIC examination reports absent written authorization from the agency. *Bank of Heflin v. Miles*, 621 F.2d 108, 113 (5th Cir. 1980) (affirming permanent injunction prohibiting bank from disclosing FDIC reports and related portion of board minutes to shareholders); *Waterhouse v. Maggart and Welch, P.C.*, 871 F.2d 1089 (in Exchange Act case, noting "anyone who has custody of exempt records of the F.D.I.C. is prohibited from disclosing such records, even in response to legal process" without authorization from the FDIC).

at the time the Registration Statement became effective.  The paragraph of the FDIC Report cited

by the Preferreds states:

> Beginning with the September 2004, examination, the FDIC repeatedly reported
> concerns with the bank's ALLL policies and/or methodology for calculating the
> ALL, including the need for management to consider and document adjusting
> qualitative factors (such as industry, geographic, and economic factors) to the
> industry's loss rates, and to implement and document a methodology for loans for
> impairment.  In the October 2007 ROE, . . .

FDIC Report at 9.  Nothing the FDIC says supports the inference that the FDIC's concerns

remained static over time or that Franklin did not implement recommended changes before the

effective date of the Registration Statement.  Changes to Franklin's description of its ALLL

methodology suggest the contrary.  *Compare* 2003 10K (JA2) at 26-27 with 2004 10K (JA3) at

27 (expanding factors and instituting impairment classification system).  The FDIC Report does

not identify any specific recommendation that Franklin failed to implement and that resulted in a

material misstatement.   Indeed, the FDIC Report confirms no substantial deficiencies in

Franklin's allowance were found during the relevant period.  FDIC Report at 23.

    22.    Similarly, the Preferreds' claimed non-disclosure that Franklin "repeatedly failed

to implement FDIC examiner recommendations (including those made in November 2005 report

regarding improving the Bank's liquidity policies . . . ." disproves itself.  No such examiner

recommendation was made, at the earliest, until after the November 2005 examination.[12]  FDIC

Report at 16.  That next examination post-dated the Registration Statement.  Further, the

Complaint alleges no facts that showing that Nocella or any defendant knew or had reason to

believe that any such recommendations had not been implemented.  Just the opposite.  The FDIC

Report concedes that Franklin believed it had implemented examiner recommendations.

---

[12]    The Preferreds state that November 2005 was the report date.  The FDIC Report does not indicate the date
the FDIC's report regarding the November 2005 Examination was provided to Franklin.  Franklin did not receive
the report until many months later.

      e.     **Risky Lending**

23.     The Preferreds plead no facts inferring that Franklin engaged in "risky, poorly documented, and/or exotic low quality and subprime lending" at the time the Registration Statement was effective" and that Nocella knew or should have known such facts, or that such facts if known would have been material.[13]

      f.     **Financial Figures**

24.     The Preferreds allege that several financial figures were misstated and that, as a result, its ability to pay its regular dividend was impaired. APC ¶¶ 32((h), 33(d)-(f). Once again, the Preferreds plead no facts that would support the inference.[14] No allegations support the inference that any overstatement or impairment was known, knowable or material.

      g.     **Lending Practices**

25.     The Preferreds criticize statements regarding lending practices that Franklin had "established" or "utilized" for certain loans. The Preferreds mislead this Court, suggesting that these words were intended to characterize Franklin's lending practice as "conservative."[15] Nothing could be further from the truth.[16] The words simply meant Franklin was using the particular practices described.[17] No facts have been alleged that would support the inference that

---

[13]     Even if such loans existed, the Preferreds make no effort to allege the portion of Franklin's portfolio involved.

[14]     The Preferreds allegation that, on August 8, 2008, Franklin announced that it would not declare a dividend on preferred stock due on September 15, 2008 (APC ¶ 79), of course, does not raise the inference that Franklin's ability to pay dividends was severely impaired in May of 2006.

[15]     The Prospectus does not contain the word "conservative."

[16]     Even if the Preferreds' characterization was appropriate, which it is not, such characterization of its lending practices would be immaterial puffery. *See Rosenzweig*, 332 F.3d at 854 (statement that "our fundamentals are strong" was "obvious immaterial puffery [because] [a]nalysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from a company spokesman").

[17]     The relevant portions from the Prospectus are as follows:

        We utilize certain lending practices to reduce these risks, including pricing all builder lines based on a risk adjusted return on capital and underwriting them based on debt/net worth, cash flow coverage, loan-to-value and loan-to-cost ratios, interest reserve

the described lending practices were not, in fact, being used at the time the Registration Statement became effective. Nor do the Preferreds allege the magnitude of any variance that would infer materiality.

h.    **Single Family Mortgage Portfolio**

26.    The Preferreds criticize Franklin's statement that it "maintains a portfolio of single family mortgages that provides high quality liquid assets for us while we develop our community banking and commercial product lines." Prospectus dated May 5, 2006 ("Prospectus") (JA6) at 3; APC ¶ 33(b) & (c). Once again, the Preferreds plead no facts that would support the inference that this statement was false.[18] Nor do the Preferreds plead any facts that would support the inference that such a statement was material. *In re American Business Fin. Serv., Inc. Sec. Litig.*, 2007 WL 81937, at *8 (E.D. Pa. Jan. 9, 2007) (statements that issuer had "a strong credit culture" and "quality performance loans" not actionable).

**B.    PSLRA SAFE HARBOR**

27.    The PSLRA provides a "safe harbor" for both verbal and written forward-looking statements that applies to Section 11 as well as Section 10(b) and Rule 10b-5. *Rombach v. Chang*, 355 F.3d 164, 173, 175-76, 178 (2nd Cir. 2004); *Ehlert v. Singer*, 245 F.3d 1313, 1316-20 (11th Cir. 2001); *Kurtzman v. Compaq Computer Corp.*, 2000 WL 34292632, *62 (S.D. Tex. 2000). The PSLRA defines a "forward-looking statement" as: "a statement containing a projection of revenues . . . *or other financial items*;" or "a statement of future economic

---

coverage, experience of management, inventory turnover by subdivision and guarantees. . . .

We have established certain lending practices to reduce our risks relating to these types of loans. These include, but are not limited to, maximum loan-to-value, minimum debt service coverage, physical inspections and the operating experience of the borrower. . . .

Prospectus at 26.

[18]    Franklin had every reason to believe it was true; Franklin sold $580 million in single family loans at the end of January 2007. April 26, 2007 Press Release (JA26) at 1, 3.

13

performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations . . . ."  15 U.S.C. § 77z-2(i)(1) (emphasis added).

28.     Safe harbor protection may exist for forward-looking statements under any one of three different scenarios.  *Southland Sec. Corp.*, 365 F.3d at 371-72.  A forward-looking statement will not be actionable: (1) if "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,"[19] or (2) if "immaterial"; or (3) if the plaintiff fails to prove that the statement was made with actual knowledge that the statement was false or misleading.  *See id.* (citing 15 U.S.C. §§ 77z-2(c)(1)(A-B) & 78u-5(c)(A-B)).

29.     To avoid the safe harbor, the plaintiffs must plead facts demonstrating that the statement was made with "actual knowledge" of its falsity.[20]  *Southland Sec. Corp.*, 365 F.3d at 371 (citing 15 U.S.C. § 78u-5(c)(1)(B)).  However, allegations based on a forward-looking

---

[19]     Oral statements can qualify for the "safe harbor" if (i) the statement is accompanied by a cautionary statement that the "particular" oral statement is forward-looking and that actual results could differ materially (essentially a formality as to the form of the statement); (ii) the statement is accompanied by an oral statement that additional information that could cause actual results to differ materially is contained in a readily-available written document; (iii) the statement identifies the document or portion thereof containing the additional information; and (iv) the identified document itself contains appropriate cautionary language.  *Southland Sec. Corp.*, 365 F.3d at 372 (citing  15 U.S.C. §§ 77z-2(c)(2), 78u-5(c)(2)).  Readily available written documents for this purpose include documents filed with the SEC or generally disseminated.  *Southland Sec. Corp.*, 365 F.3d at 372 (citing 15 U.S.C. §§ 77z-2(c)(3), 78u-5(c)(3)).

"Meaningful" cautions means "substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.  *Southland Sec. Corp.*, 365 F.3d at 372.

[20]     "Actual knowledge" requires a higher level of scienter than would otherwise be required by Section 10(b), Rule 10b-5 or even Section 11.  *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1124 (C.D. Cal. 2005); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F.Supp.2d 1283, 1289 (D.N.M. 2002); *Kurtzman.*, 2000 WL 34292632, at *6.  Recklessness, even severe or deliberate recklessness, will not suffice.  *Miller*, 346 F.3d at 670; *In re Ibis Technology Sec. Litig.*, 422 F.Supp.2d 294, 310-11 (D. Mass. 2006); *In re Compuware Sec. Litig*, 301 F.Supp.2d 672, 683-84 (E.D. Mich. 2004) *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 847 (N.D. Ill. 2003); *In re Harmonic Inc. Sec. Litig.*, 163 F.Supp.2d 1079, 1087, 1098 (N.D. Cal. 2001).

statement may also be dismissed if immaterial or accompanied by meaningful cautionary statements. *Southland Sec. Corp.*, 365 F.3d at 372 (dismissing allegations as immaterial); *Rosenzweig*, 332 F.3d at 869 (affirming district court's dismissal based on cautionary statements). In such cases, defendant's state of mind is irrelevant. *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 670 (6th Cir. 2003).

30.     To extent that any of the Preferreds' alleged misstatements could be construed as forward-looking, such as Franklin's statements related to allowances or the liquidity of the single family mortgage portfolio the bank maintained, the PSLRA's safe harbor protects those statements. Each of those statements fell within a category specifically designated as forward-looking statements.[21]  Moreover, the statements were each accompanied by meaningful cautionary language.[22]  Finally, the Preferreds failed to allege that Nocella actually knew that any such statements were false.

C.    **NEGATIVE CAUSATION**

31.     Section 11 permits a defendant to prove "that any portion or all of [the plaintiff's] damages " represents other than the depreciation in value of [the] security resulting from" the material misstatement or omission in the registration statement or prospectus.  15 U.S.C. § 77k(e); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, — F.Supp.2d —, 2009 WL 3353045, *13 (S.D.N.Y. Oct 19, 2009); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272

---

[21]     Prospectus (JA6) at 44 (identifying as forward-looking statements "credit performance on loans made or acquired by us," "margins on sales or securitizations of loans," and "other business operations and strategies").

[22]     Prospectus at 44-45 (including "prevailing economic conditions," "changes in . . . loan demand, real estate values, and competition, which can materially affect . . . gains on sale results in our mortgage business, as well as other aspects of our financial performance," "the level of defaults, losses and prepayments on loans made or acquired by us, whether held in portfolio, sold in the whole loan secondary markets or securitized, which can materially affect charge-off levels, credit loss reserve levels and our periodic valuation of our retained interests from securitizations," and "adverse changes or conditions in capital or financial markets, which can adversely affect our ability to sell or securitize loan originations on a timely basis or at prices which are acceptable to us, as well as other aspects of our financial performance").

F.Supp.2d 243, 253 (S.D.N.Y. 2003).  This defense, sometimes called "negative causation,"

constitutes an affirmative defense to Section 11 liability.  *In re Alamosa Holdings, Inc.*, 382

F.Supp.2d 832, 865 (N.D. Tex. 2005); *In re Merrill Lynch & Co., Inc. Research Reports Sec.*

*Litig.*, 289 F.Supp.2d 429, 437 (S.D.N.Y. 2003).  If a negative causation defense is apparent on

the face of a complaint, a court may properly dismiss a Section 11 claim pursuant to Rule

12(b)(6).  *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 865 (citing *In re Merrill Lynch & Co.,*

*Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d at 253-54).  *See also In re Britannia Bulk*

*Holdings Inc. Sec. Litig.*, 2009 WL 3353045, at *13; *Davidco Investors, LLC v. Anchor Glass*

*Container Corp.*, 2006 WL 2092280, *25 (M.D. Fla. Jul 26, 2006); *In re Merrill Lynch & Co.,*

*Inc. Research Reports Sec. Litig.*, 289 F.Supp.2d at 437; *In re McKesson HBOC, Inc. Sec. Litig.*,

126 F.Supp.2d 1248, 1262 (N.D. Cal. 2000).

32.     Under Section 11, a price decline before disclosure may not be charged to

defendants.  *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 865; *In re Merrill Lynch & Co., Inc.*

*Research Reports Sec. Litig.*, 289 F.Supp.2d at 437; *In re Merrill Lynch & Co., Inc. Research*

*Reports Sec. Litig.*, 272 F.Supp.2d at 253-54.  When a security has lost its value before an

alleged corrective disclosure has been made, negative causation compels dismissal pursuant to

Rule 12(b)(6).  *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 2009 WL 3353045, at *13

(dismissal based on negative causation warranted when security lost 90% of its value prior to

alleged corrective disclosure and when even alleged corrective disclosure did not apply to any

statements made at the time of the IPO); *In re Merrill Lynch & Co., Inc. Research Reports Sec.*

*Litig.*, 289 F.Supp.2d at 437 (S.D.N.Y. 2003) (dismissal based on negative causation warranted

when security lost 74% of its value prior to alleged corrective disclosure); *In re Merrill Lynch &*

*Co., Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d at 253-54 (dismissal based on negative

causation warranted when security lost 76.5% of its value prior to alleged corrective disclosure and plaintiff sold shares prior to corrective disclosure).

33.     Here, the Preferreds have alleged that their stock lost its value by the end of November 2008. APC ¶¶ 37, 111. While the Preferreds do identify a series of alleged corrective disclosures that they claim lead to this precipitous decline in the stock value, any such disclosures concern SEC filings subsequent to May 2006 or concern events unrelated to any filing whatsoever.[23]  APC ¶¶ 35-37, 72-74, 76-81, 109-110.  No corrective disclosures concern any misstatements or omissions that form the basis of the Preferreds' Section 11 claims. As a result, the Preferreds' own complaint negates causation and must be dismissed on that basis.

D.     **STATUTE OF LIMITATIONS**

34.     The law in this circuit has long been that limitations may support dismissal under Rule 12(b)(6).  *In re Dynegy, Inc.*, 339 F. Supp. 2d 804, 839 (S.D. Tex. 2004); *see also Jones v. Bock*, 549 U.S. 199, 215 (2007); *Eberhardt v. Merck & Co.*, 106 Fed. App. 277, 278 (5th Cir. 2004) (not selected for publication).  The statute of limitations for Sections 11 and 15 requires that a plaintiff file within one year of discovering the facts giving rise to his claim.  15 U.S.C. § 77m (codifying § 13 of the 1933 Act); *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 249 n. 1 (2nd Cir. 1993) (holding that § 15 is subject to the same limitation as § 11).  Limitations commences when the plaintiff "knew -- or in the exercise of reasonable diligence, should have known -- of the alleged wrongdoing." *In re Dynegy, Inc.*, 339 F. Supp. 2d at 826 (citing *Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir. 1988)).  If circumstances or "storm warnings" exist that would trigger an investigation by a reasonable investor, then the plaintiff is charged with knowledge of all facts that a reasonable investigation would have disclosed. *Id.* at 845 (citing *Jensen*, 841 F.2d at 607).

---

[23]     Beyond these alleged corrective disclosures, all of the information that the Preferreds offer to support their allegations, including the FDIC Report, the February 2008 Letter and the 2008 FDIC Exam, were all, by the Preferreds' own admission, not made public until 2009. APC ¶¶ 38, 82, 84.

35.     The Preferreds face an inescapable paradox that demands dismissal of their Section 11 and Section 15 claims.  The Preferreds concede that their Section 11 claim (and thus their Section 15 claim as well) was "first filed" on May 4, 2009.  APC ¶ 125.  If the disclosures that they claim caused their loss did not concern their Section 11 claim, negative causation requires dismissal of their complaint.  If those disclosures do concern the Preferreds' Section 11 claim, they were on inquiry as early as November 26, 2007, when Franklin dramatically increased its allowance for loan losses and no later than March 14, 2008, when Franklin announced that its Audit Committee had launched an investigation into possible accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned . . ."  APC ¶¶ 66, 72,  *See also* APC ¶ 73 (quoting Franklin's May 1, 2008 Press Release that announced that information contained in Franklin's September 2007 Form 10-Q, as well as the information in Franklin's January 31, 2008 Press Release, "should no longer be relied upon").

36.     This paradox does not cut both ways.  Even if the corrective disclosures in the Preferreds' Complaint were not corrective, those disclosures together with the dramatic drop in price of the Preferreds' shares that accompanied them were still storm warnings sufficient to excite an inquiry as to whether the Registration Statement contained actionable omissions or misstatements.[24]

E.     **SECTION 11 CLAIMS SOUNDING IN FRAUD**

37.     Notwithstanding the Preferreds' disclaimer, the Preferreds' claims sound in fraud for the reasons set forth in Ranieri's Motion and should be dismissed for the reasons stated

---

[24]     Indeed, a sharp drop in stock price alone (such as the Preferreds have alleged) will suffice to trigger an investor's duty to make a diligent inquiry to discover the existence of possible fraud. *See, e.g., In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d at 846; *Reed* v. *Prudential Secs.*, 875 F. Supp. 1285, 1289 (S.D. Tex. 1995) (collecting cases), *aff'd.* 87 F.3d 1311 (5th Cir. 1996). *See* APC ¶ 109.

therein. Ranieri's Motion at 10-11. In addition, no effort has been made to allege scienter as to any of the Preferreds' Section 11 claims. The Section 11 claims should be dismissed on that basis as well.

## SECTION 10(B) AND RULE 10B-5 CLAIMS

### A.   SECTION 10(B) AND RULE 10B-5 ELEMENTS

38.   To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately injured him. *Central Laborers' Pension Fund v. Integrated Electrical Services*, 497 F.3d 546, 550 (5th Cir. 2007); *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006).

### B.   FALSE OR MISLEADING STATEMENTS

39.   The PSLRA § 21D(b)(1) requires for any false or misleading statement that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."[25]  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citing 15 U.S.C. § 78u-4(b)(1)). This requirement reinforces the Fifth Circuit's strict interpretation of Rule 9(b), which requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent. *Central Laborers' Pension Fund*, 497 F.3d at 550; *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002); *Southland Sec. Corp.*, 365 F.3d at 353.

---

[25]   Prior to the PSLRA, Rule 9(b) governed the sufficiency of securities fraud complaints. *Tellabs, Inc.*, 551 U.S. at 319. Congress enacted the PSLRA to set a uniform pleading standard, missing from circuit interpretations of Rule 9(b), and thereby curb the abuse of private class actions. *Id.* at 320. For the Fifth Circuit, the PSLRA heightened some requirements for pleading a federal securities law claim. *See Central Laborers' Pension Fund*, 497 F.3d at 550. Other requirements remained consistent with the Fifth Circuit's relatively strict interpretation of Rule 9(b). *Id.* Regardless, both Rule 9(b) and the PSLRA apply to Section 10(b) and Rule 10b-5 claims, and a district court must dismiss a federal securities fraud complaint if the plaintiff fails to satisfy either pleading requirement. *Blackwell*, 440 F.3d at 287; *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

40.     Rule 9(b) requires plaintiffs in securities fraud causes to plead with particularity the circumstances constituting fraud. *Southland Sec. Corp.*, 365 F.3d at 362; *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177-78 (5th Cir. 1997), cert. denied, 522 U.S. 966 (1997). A complaint can be long-winded, even prolix, without pleading the requisite particularity. *Southland Sec. Corp.*, 365 F.3d at 362; *WMX Technologies, Inc.*, 112 F.3d at 178. Such a garrulous style is a common mask for an absence of facts. *Southland Sec. Corp.*, 365 F.3d at 362; *WMX Technologies, Inc.*, 112 F.3d at 178.

41.     The Fifth Circuit has also rejected the group pleading doctrine. *Southland Sec. Corp.*, 365 F.3d at 365. The Fifth Circuit does not construe allegations in a complaint against the "defendants" as a group as properly imputable to any particular individual defendant unless the plaintiff specifically pleads the connection. *Id.*

42.     Additionally, Section 21D(b)(1) specifically provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Central Laborers' Pension Fund*, 497 F.3d at 550 (citing 15 U.S.C. § 78u-4(b)(1)). This rule applies to all allegations not based on a plaintiff's personal knowledge. *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 351. A complaint can meet this requirement only by providing documentary evidence or a sufficient general description of the personal sources of the plaintiff's beliefs. *ABC Arbitrage Plaintiffs Group*, 291 F.3d at 352. Failure to do so results in dismissal. *Central Laborers' Pension Fund* , 497 F.3d at 550.

43.     To be adequate, documentary support must provide sufficient corroborating details regarding its contents, authors and recipients. *Southland Sec. Corp.*, 365 F.3d at 370; *Abrams*, 292 F.3d at 432. A hindsight assessment that does nothing more than describe a

company's problems lacks sufficient particularity to satisfy the PSLRA. *Rosenzweig*, 332 F.3d at 868.  Likewise, a hindsight assessment is meaningless when the report fails to identify its sources or when a defendant knew the information. *Rosenzweig*, 332 F.3d at 868.

C.   **MATERIALITY AND SAFE HARBOR**

44.   The materiality and safe harbor standards for Section 10(b) and Rule 10b-5 claims mirror those standards for Section 11 claims as set forth above.

D.   **SCIENTER**

i.   ***Strong Inference of Scienter***

45.   Section 21D(b)(1) requires "with respect each act or omission alleged" that the complaint state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.*; 15 U.S.C. § 78u-4(b)(2).  Apart from forward-looking statements, the PSLRA did not generally alter the substance of the scienter requirement for Section 10(b) and Rule 10b-5 claims. *Central Laborers' Pension*, 497 F.3d at 551 (emphasis in original); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 245 (5th Cir. 2003).  However, the PSLRA did enhance the particularity previously needed to plead fraud under Rule 9(b). *Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citing 15 U.S.C. § 78u-4(b)(1)) (emphasis added).  To survive a motion to dismiss a Section 10(b) or Rule 10b-5 claim, a plaintiff must now plead with particularity the specific facts giving rise to a "strong inference" of scienter. *Goldstein*, 340 F.3d at 245, 249; *Abrams*, 292 F.3d at 430.

46.   Scienter for purposes of Section 10(b) and Rule 10b-5 means "either intent or severe recklessness." *Shaw Group, Inc.*, 537 F.3d at 533; *Central Laborers' Pension*, 497 F.3d at 551; *Blackwell*, 440 F.3d at 287.  Severe recklessness is:

limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Shaw Group, Inc.*, 537 F.3d at 545; *Goldstein*, 340 F.3d at 245-46.   Properly defined, severe recklessness actually "resembles a slightly lesser species of intentional misconduct." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

ii.     ***Standard of Review***

47.    In *Tellabs* the United States Supreme Court described the standard of review for a motion to dismiss under the PSLRA. *Tellabs*, 551 U.S. at 322-23.  First, as in federal pleadings generally, all factual allegations must be taken as true. *Tellabs*, 551 U.S. at 322.  However, conclusory statements do not contribute infer scienter. *Shaw Group, Inc.*, 537 F.3d at 538-39.

48.    Second, the court must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. *Tellabs*, 551 U.S. at 322; *Shaw Group, Inc.*, 537 F.3d at 533.  The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pled. *Tellabs*, 551 U.S. at 323 (citing *Abrams*, 292 F.3d at 431).

49.    Third, the court must consider plausible opposing inferences. *Tellabs*, 551 U.S. at 323; *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208, 212 (5th Cir. 2009).

50.    The Fifth Circuit's rejection of group pleading also applies to scienter.  *Shaw Group, Inc.*, 537 F.3d at 533; *Southland Sec. Corp.*, 365 F.3d at 366-67.  For corporate scienter, the Fifth Circuit does not consider the collective knowledge of all officers and employees but only the state of mind of the individual specifically identified as having acted with scienter. *Shaw Group, Inc.*, 537 F.3d at 533; *Southland Sec. Corp.*, 365 F.3d at 366.  Allegations that do

not "give rise to a strong inference of scienter on the part of any one individual" will not suffice. *Id.* at 375. By the same token, group pleading will not satisfy the particularity needed to establish scienter. *Id.* at 376-78.

E.   **APPLICATION OF LAW TO FACTS**

    i.   ***Defects Applicable to All Allegations***

        a.   **The Preferreds Employ Improper Group Pleading and "Puzzle Pleading"**

51.   The Preferreds' Complaint employs improper puzzle pleading. *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 857 (citing *Williams*, 112 F.3d at 180). In addition, the Fifth Circuit has rejected "group pleading" as to both publications of statements and scienter. *Southland Sec. Corp.*, 365 F.3d at 363-65. Despite this clear prohibition, the Preferreds' Complaint overflows with vague references to "defendants," "certain defendants," "Franklin Bank," "Franklin," the "Bank," "bank management," "management," "bank officers," "senior officers," "others at the bank" and even statements in the passive voice that do not identify any actor. *See, e.g.*, APC ¶¶ 38, 40, 43, 50-53, 56 43, 64, 66, 68, 70-74, 76, 82-83, 85, 87-92, 94-95, & 111. Even worse, the Complaint heavily relies on third party documents (such as the FDIC Report and the February 2008 Letter) that suffer from the same flaw. *See, e.g.*, APC ¶¶ 38, 39, 75, 82, 84, 87 & 93. In addition, the Preferreds complain routinely of statements without alleging that Nocella or any other person made them. *See, e.g.*, APC ¶¶ 41, 43, 50-51,[26] 52-53, 56, 60-61, 64, 68 & 70-74. Such allegations may not be imputed to Nocella.

---

[26]   Paragraph 51 improperly alleges in conclusory fashion that Nocella approved certain narratives in a March 2007 brochure. These conclusory allegations do not constitute the kind of "particular factual allegations" necessary to show Nocella's "involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Southland Sec. Corp.*, 365 F.3d at 365. Indeed, the quoted document actually attributes the statement to Michael Davitt, not Nocella. APC ¶ 51.

### b.   No Plausible Motive Has Been Alleged

52.     To properly plead scienter, a plaintiff must plead facts that either (1) show a defendant's motive to commit securities fraud, or (2) identify circumstances that indicate conscious behavior on the part of the defendant.  *R2 Investment LDCs*, 401 F.3d at 644.  When scienter rests on conscious behavior alone, the strength of its circumstantial evidence of scienter must be correspondingly greater.  *R2 Investments LDC*, 401 F.3d at 644-45.  However, even motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA. *Goldstein*, 340 F.3d at 246; *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003); *Abrams*, 292 F.3d at 430.

53.     Here, the Preferreds conjure no motive, much less any facts that would support a motive, for any of Nocella's alleged misstatements or omissions.[27]  As a result, the conscious behavior standard applies and the corresponding evidence must be greater.

### ii.   *The August 6, 2008 Adjustments*

54.     The Preferreds claim that that Franklin overstated financial figures in several SEC filings, conference calls, and miscellaneous documents (many of which, as set forth above, are not factually linked to Nocella) based on adjustments that Franklin disclosed in it August 6, 2008 8K.  APC ¶¶ 35-36, 41-42, 44, 48, 50, 52-54, 56-57, 59-63.  However, the Preferreds failed to plead any facts inferring that Nocella acted with scienter.

---

[27]     The Fifth Circuit has squarely held that a motive to commit securities fraud cannot properly be inferred from common-place motives, that is, a desire to increase market share, gain a competitive advantage, maintain an artificially inflated stock price, or secure, maintain or increase compensation.  *Tuchman*, 14 F.3d at 1068-69. Otherwise, the state of mind requirement as to all corporate officers and defendants would be effectively eliminated. *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994).  To the extent that certain allegations, such as Nocella's compensation, were intended to imply such a motive, such allegations fail.  *See* APC ¶ 12.

a.   **Factual Background**

55.   On February 19, 2008, Craig Wolfe, a Vice President of Loss Mitigation, sent Debbie Hale, the Senior Vice President of Internal Audit, a letter, of which Nocella received a copy. The letter disclosed, among other things, certain "accounting irregularities" at Franklin ("February 2008 Letter"). APC ¶ 82. The Preferreds assert that this led to the Franklin Audit Committee investigation which, in turn, led to the August 6, 2008 Adjustments. *Id.*  The February 2008 Letter represents the first time, according to the Preferreds' own allegations, that Nocella knew about those issues.

56.   On March 14, 2008, Franklin reported that Franklin's Board of Directors had learned in February 2008 of possible accounting issues related to single family residential mortgages and residential real estate and that Franklin's Audit Committee had commenced an investigation. APC ¶ 72. During the ten-week investigation that followed, Franklin determined (based on information learned subsequent to 2007) that the accounting for certain delinquent single family loans being serviced by third parties ("Delinquent Loan Accounting"), other real estate owned ("REO Accounting"), and the Bank's newly created single family loan modification programs to mitigate foreclosure losses ("Loan Modification Accounting") should be revised. APC ¶ 73; May 1, 2008 Press Release (JA10).

57.   On August 6, 2008, following completion of the investigation, Franklin released an 8-K reflecting adjustments for the first three quarters of its fiscal year 2007 and for its 2006 fiscal year. August 6, 2008 8K. These adjustments related not only to Delinquent Loan Accounting, REO Accounting, and Loan Modification Accounting but also to the accounting for certain investment securities ("Investment Securities Accounting") and monthly increases in the cash surrender value of certain bank-owned life insurance ("BOLI Accounting"). August 6, 2008 8K at 3-5. No other adjustments were identified.

25

b.      **No Strong Inference of Scienter**

58.      The Preferreds' Complaint does not contain a single allegation that Nocella knew of or recklessly ignored red flags regarding these five accounting issues.   None of the information in the Preferreds' Complaint (executive positions in the company, GAAP errors, Sarbanes-Oxley Certifications, the February 2008 Letter, the FDIC Report, or the 2008 FDIC Exam) infers scienter.[28]

59.      The Fifth Circuit has repeatedly held that scienter may not rest on an inference based on an executive's position with the company. *Shaw Group, Inc.*, 537 F.3d at 535; *Abrams*, 292 F.3d at 432.   Similarly, general allegations regarding a defendant's management style or knowledge of company controls will not infer scienter either.   *Shaw Group, Inc.*, 537 F.3d at 535; *Goldstein*, 340 F.3d at 251.   Such statements lack the requisite specificity about what the defendant knew or was reckless not to know about the details at issue.   *Shaw Group, Inc.*, 537 F.3d at 535; *Goldstein*, 340 F.3d at 251.[29]

60.      Even when a restatement has occurred, mere publication of inaccurate accounting figures or a failure to follow GAAP does not establish scienter.   *Central Laborers' Pension Fund*, 497 F.3d at 552; *Abrams*, 292 F.3d at 432.   The party must know that it has published materially false information or was severely reckless in doing so.   *Id.* at 432-33 (observing that accounting problems leading to restatement could "easily arise from negligence, oversight, or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action").   A complaint must state particularized facts showing that the defendant

---

[28]      The February 2008 Letter, the FDIC Report and the 2008 FDIC Exam contains no allegations that specifically link Nocella to any of the five accounting issues.

[29]      Allegations that an executive received reports or other information do not substantiate any inference that the executive knew of any inaccuracy. *Shaw Group, Inc.*, 537 F.3d at 540.   Nor does an executive's likely attendance at certain committee or board meetings support any inference that the executive was present when a specific topic was discussed. *TXU Corp.*, 565 F.3d at 211-12.

knowingly or with deliberate recklessness violated accounting principles. *Id.* (contrasting *Novak v. Kasaks*, 216 F.3d 300, 311-12 (2nd Cir. 2000)).   The Preferreds plead no facts sufficient to make such a showing.

61.   The Preferreds do mention Nocella's signed Sarbanes-Oxley certifications as proof of scienter. APC ¶ 96.  However, Sarbanes-Oxley certifications, standing alone, do not infer scienter. *Shaw Group, Inc.*, 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006)); *Central Laborers' Pension Fund*, 497 F.3d at 555 (citing *Garfield*, 466 F.3d at 1266) ("if we were to accept [this] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA").  Instead, a Sarbanes-Oxley certification only suggests scienter if the person signing the certification acted with severe recklessness in certifying the financial statements. *Shaw Group, Inc.*, 537 F.3d at 545.

62.   A plaintiff must plead particularized facts establishing that the officer who signed the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions. *Shaw Group, Inc.*, 537 F.3d at 545 (quoting *Garfield*, 466 F.3d at 1266); *Central Laborers' Pension Fund*, 497 F.3d at 555 (same).  Moreover, such knowledge must be linked to the actual accounting and reporting problems that arose. *Central Laborers' Pension Fund*, 497 F.3d at 555.  Here, the Preferreds allege no facts linking Nocella's knowledge with the five accounting issues.

63.   Generalized allegations that do not establish any link between the defendant's knowledge, the internal control problems, and the actual accounting problems will not establish

27

scienter either. *Central Laborers' Pension Fund*, 497 F.3d at 552; *Shaw Group*, Inc., 537 F.3d at 535 (general allegations regarding a defendants' management style or knowledge of company controls will not support an inference of scienter as they lack specificity about what a defendant may have known or was reckless in not knowing); *Abrams*, 292 F.3d at 432 (knowledge of control problems may not be inferred from an executive's position); *Goldstein*, 340 F.3d at 251 (allegation that defendant was a "hands-on" CEO and must have been aware of the accounting problem lacked the requisite specificity). *See also, Shaw Group, Inc.*, 537 F.3d at 537 (noting that weak controls do not demonstrate an intent to defraud as weak control could just as easily bias financial figures up as well as down).

64. Finally, the Preferreds allude in several places to Nocella's resignation. APC ¶¶ 12, 74-75. However, resignations do not support a strong inference of scienter as such resignations merely reflect a loss of faith in the ability of the executive to successfully manage the company. *In re Azurix Corp. Sec. Litig.*, 198 F.Supp.2d 862, 891 (S.D. Tex. 2002) *aff'd*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003). *See also* APC ¶¶ 74-75.

     iii. ***The Subprime Red Herring***

        a. **No False or Misleading Statements**

65. The Preferreds accuse Nocella of making false and misleading statements during conference calls in 2007 as to quality of Franklin's loans. APC ¶¶ 43, 57, 66. The Preferreds, however, wholly fail to allege facts with sufficient particularity to establish that any of these statements were false.

66. To understand the problems with the Preferreds' allegations, one must understand the regulatory context in which these conference calls occurred. On October 4, 2006, the FDIC issued an *Interagency Guidance on Nontraditional Mortgage Products*, 71 Fed. Reg. 58,609 (2006), which defined "non-traditional," "alternative," or "exotic" mortgage loans as "mortgage

products that allow borrowers to defer payment of principal and, sometimes, interest." 71 Fed.

Reg. at 58,609.  Examples included "interest-only" mortgages and "payment-option" adjustable

rate mortgages.  *Id.*  Reduced documentation, simultaneous second lien mortgages, and an

applicant's creditworthiness (prime versus Alt-A versus subprime) were features that might be

combined with non-traditional mortgages but did not differentiate them from traditional

mortgages.  *See id.*; *see also* FDIC Report at 5 (differentiating nontraditional and subprime

mortgages).

      67.  In response Franklin revised its ALLL methodology to incorporate this

Interagency Guidance:

> Additionally, for single family mortgages we review our portfolio to determine
> those loans that have multiple risk factors based on Interagency guidance on non-
> traditional mortgages and apply an additional credit allowance factor based on the
> additional risks.

2006 10K at 36.  Franklin also increased its provision for credit losses on single family loans:

> The increase in the single family loan provision is due to the results of our
> analysis on our single family loans that showed that the loss exposure had
> increased based on Interagency guidance on non-traditional mortgages issued
> during the fourth quarter of 2006.

2006 10K (JA7) at 43.  These statements belie any suggestion that Franklin concealed exposure

to non-traditional mortgages.

      68.  Shortly after the Interagency Guidance, Nocella began Franklin's January 31,

2007 Conference Call ("2006 YE Conf. Call") as follows:

> Good morning. First, let me start by stating that earnings were lower than our
> expectations for the year primarily as a result of the inverted yield curve (and our)
> ***continued unwillingness to compromise our credit standards (or) participating
> in the higher-risk non-traditional mortgage market.***  And these products were
> the dominant product in the market during the year.

Transcript of January 31, 2007 Conference Call ("2006 YE Transcript") (JA26) at 3 (emphasis

on quotation for APC ¶ 43).  Undeniably, this statement has nothing to do with subprime

lending. Nor does it characterize all of Franklin's loan operations either. The statement merely indicates that Franklin did not participate in the "higher-risk non-traditional mortgage market" in a year when those products dominated the market. Even the FDIC Report states that sometime prior to 2007 Franklin had "halted the bank's nontraditional mortgage and subprime operations." FDIC Report at 5.

69.     Moreover, the statement does not even relate to non-traditional mortgages generally. The statement only applied to the "higher-risk non-traditional mortgage market."[30] Even among non-traditional mortgage products, different risk elements exist that may make certain non-traditional mortgage products riskier than others. *Interagency Guidance*, 71 Fed. Reg. at 58613 ("the focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type, itself").

70.     The Preferreds also mislead this Court by misquoting and taking out of context Nocella's response to Jon Arfstrom's question in that same conference.[31] Nocella made the comments in the context of Arfstrom's inquiry about industry trends. Arfstrom's follow-up

---

[30]     The Preferreds conveniently add a comma to this statement to make it appear as though the phrase higher risk was intended to describe the entire non-traditional mortgage market.

[31]     In the January 31, 2007 Conference Call, the following colloquy occurred, (only the emphasized words, of which, were quoted by the Preferreds):

Jon Arfstrom: OK, great. And then, Tony, just one of the other comments in the release was some of your cautiousness on trends in the single-family residential mortgage market in terms of what's being underwritten. Can you talk a little bit about what you're seeing there and why you're a bit more cautious?

Tony Nocella: Well, I think the – a lot of it's happened since the (inter-agency) guidelines came out in the fourth quarter, and such things as pay option arms and negative amortization (are) simultaneously – simultaneous second mortgages with the first have been reduced substantially. I mean there's 40 to 60 percent reduction in the fourth quarter and so far in January. So the – it looks like everybody's looking for a new – a new mousetrap in the single-family business, but obviously there's significant decline in originations, as you've heard in the press.

Jon Arfstrom: OK, and just to be clear, these–some of the more *exotic products* are not going on your balance sheet. You just take them (out of) your warehouse and sell them.

Tony Nocella: Yes, (and if) *we ever had anything like that*, but that's – we'd sell – we'd sell them (if ever) do anything except for sale. We'd probably broker it through, in fact. It wouldn't even – *it wouldn't even touch our balance sheet.*

2006 YE Transcript at 3.

question concerned what Franklin would be doing in the future, not the past. The question also distinguished between mortgages originated for investment and mortgages originated for sale. Specifically, Arfstrom wanted assurance that Franklin would not originate "the more exotic products" (that is, higher risk non-traditional mortgage products) for investment but only for sale.

71.     At that time Franklin had not only "halted [its] nontraditional mortgage operations" but had "[begun] to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans." Nocella's response was remarkably reserved. Nocella stated that, notwithstanding Franklin's then standards, if Franklin did originate any non-traditional loans they would be held for sale and "probably" simply "brokered through," which means originated on behalf of a third party lender or to whom the mortgage would be sold immediately.[32] The loan would not "touch [Franklin's] balance sheet." The Preferreds aver no facts indicating that Franklin originated non-traditional loans during the first quarter of 2007, let alone that Nocella knew such loans were contemplated and deliberately misled investors as to Franklin's intentions. *Shaw Group, Inc.*, 537 F.3d at 535 (rejecting strong inference of scienter when a nonculpable inference was more likely).

72.     The Preferreds take their manipulation of Nocella's statements one step further by deliberately mischaracterizing a colloquy between Nocella and Paul Miller during the second quarter conference call.[33]   APC ¶ 57. The Preferreds falsely imply that Miller asked about

---

[32]     The Preferreds claim that Nocella said "we *never* had anything like that" makes no sense once viewed in the context of Nocella's response as a whole. Why would Nocella claim that Franklin would sell or broker through what it never had? Why would Nocella even be concerned about loans it never had touching Franklin's balance sheet. Even under the *Twombly* standard, this Court need not credit such an implausible version of the facts.

[33]     The colloquy between Nocella and Miller was as follows:

Paul Miller: Hey, listen. Can you, you know, just to get – a more general question. I missed the first five minutes of the call so, you might address this. But, you know, you saw Countrywide's numbers come out yesterday. They're starting to show some trouble in their [HELOC] portfolio on the prime side. And this is

31

subprime lending.  In fact, Miller's question related to whether Franklin was seeing "*some subprime issues*" in its prime loans, which would necessarily be limited to loans held for investment (not for sale).  Miller expressed this concern because Countrywide had reported problems in its portfolio of Home Equity Lines of Credit ("HELOCs") on the "prime side." After clarifying that Franklin did not do HELOCs and sharing his interpretation of Countrywide's report, Nocella observed that Franklin had not seen the same level of delinquencies reported by Countrywide on the "prime side."

73.    Despite the limited context of the question, the Preferreds ask this Court to implausibly infer that Nocella chose at this moment to make a non-responsive, blanket statement that Franklin had no subprime mortgages in any of its portfolios.  To make this argument, the Preferreds deliberately mischaracterize Miller's question that unmistakably refers to Countrywide's HELOC portfolio on the prime side.  2Q 2007 Transcript at 9 ("they're starting to show some trouble *in their [HELOC] portfolio on the prime side. And this is the first time anybody talked about prime loans having trouble*") (emphasis on omitted portions).  In so

---

the first time anybody talked about prime loans having trouble. You know, you, like I said, you've been through a lot of cycles and I think this cycle has, you know, been defined as very sloppy underwriting, very easy credit. Are we starting to see some sub-prime issues? I mean what – how do you think this cycle's going to play out and how long do you think it's going to play out?

Tony Nocella: Yes. Let me do two things. For the Countrywide side, you know, this is not a Countrywide call. But, I would say [HELOCs] are not a business. First of all, we –well, I don't think we even know how do a home equity loan at line of credit. That's not our business. And, you probably know in Texas there's an 80 percent loan to value law for home equity loans.

So, the so called 100 percent home equities and, let alone, securitized home equities, we don't have any of that. But, as far as it playing out, I think what you're seeing for the first time, at least in his write up, (Angelo)'s write up, was an increase in the prime side of the business. And I would say that you are seeing some delinquency increase which, I would say, it really doesn't make any sense because you're talking about solid 80 percent loan to value, even under 70, 70 percent loan to value with 700 FICO scores from time to time being delinquent. And, I would think that is completely new. I mean, it's like a cultural difference. And, I don't know if that's what (Angelo) was talking about with the prime side.

But on a sort of [steady] state basis, you know, we running about, you know, delinquencies which are substantially lower than the his level. Then the level he talked about in the prime side. **We don't have any sub-prime so, (inaudible)**.

Transcript of July 25, 2007 Conference Call ("2Q 2007 Transcript") (JA13) at 9-10.

doing, the Preferreds improperly disregard that Nocella's comment responded to what Miller asked. "We don't have any sub-prime . . ." meant that Franklin did not have any subprime *issues* in its prime side loans. Even if this was not what Nocella meant, the context alone refutes any plausible inference that Nocella intended the statement as broadly as the Preferreds' claim.[34] *Shaw Group, Inc.*, 537 F.3d at 538 (an ambiguous statement susceptible to many interpretations, including innocent ones, will not contribute to a strong inference of scienter).

74. The Preferreds also seemingly seek to attribute to Nocella certain statements made by Andy Black in Franklin's November 26, 2007 conference call. APC ¶ 66. However, no dispute exists that Black, not Nocella, made them. Further, Black's statements concerned a very narrow segment of Franklin's business, community bank loans offered by Franklin through its various branches in Texas. 2006 10K at 3. The Preferreds have plead no facts suggesting that Black's statement was false.[35]

75. The alleged non-disclosure of FDIC's findings (APC ¶ 40) lacks merit as well. The Preferreds do not plead facts with particularity that link these non-disclosures with Nocella or any statement they claim to be misleading. Moreover, no duty exists to disclose FDIC findings.

---

[34] Notably, the terms "subprime", itself, is not consistently defined in the marketplace or among financial institutions. *Statement on Subprime Mortgage Lending*, 72 Fed. Reg. 37,569, 37,570 (2007). This ambiguity, itself, cuts against any inference that that Nocella's statements were false or, if false, that Nocella made such statements with scienter. Indeed, it also undermines any statistics purporting to quantify subprime loans. *See* FDIC Report at 5 n.13 (admitting that "Franklin did not have a subprime lending program as defined by interagency guidance" but arguing nonetheless that Franklin had loans with "subprime characteristics").

[35] The statistics and statements regarding single family mortgages in the 2008 FDIC Exam, the February 2008 Letter on which the Preferreds rely, relate to Franklin's retail and wholesale mortgage banking operations. APC ¶¶ 39, 82. *See also* FDIC Report at 4. Franklin's community banking business was a part of its banking operating segment, which was a separate operating segment from Franklin's mortgage banking segment. 2006 10K (JA7) at 3-4.

b.    **No Materiality or Strong Inference of Scienter**

76.    The Preferreds do not allege facts that link Nocella to awareness of any false statements.  Neither the FDIC Report, nor the 2008 FDIC Exam, nor the February 2008 Letter impute any such knowledge to Nocella.  Similarly, the Preferreds also plead no facts that would support an inference, much less a strong inference, that Nocella knew or recklessly disregard red flags that Black's statement was false.

77.    Likewise, the Preferreds allege no facts that would permit this Court to assess the materiality of any alleged statements regarding exotic, non-traditional, or subprime loans.  The FDIC Report on which the Preferreds rely (APC ¶ 43) does not quantify the amount of loans that Franklin *originated* as subprime mortgages.  Contrary to Mr. Wolfe's assertions, the FDIC Report contains the concession (conveniently omitted by the Preferreds) that "Franklin did not have a subprime lending program as defined by interagency guidance." FDIC Report at 5 n.3. Instead, the FDIC estimated retroactively the loans the FDIC then considered to have "subprime characteristics."    Strictly speaking, subprime refers only to borrowers displaying specific characteristics at the time of origination or purchase.  Expanded Guidance for Subprime Lending Programs, FDIC Press Release, PR-9-2001, at 2 (January 31, 2001).

78.    While Mr. Wolfe's letter states that Franklin funded an average of $10-$15 million in subprime loans (APC ¶ 82), the letter does not state how many months this program remained in place, how many months Mr. Wolfe had access to this information, what standards he used to identify what he considered subprime, and, most importantly, what percentage of the loans in question were sold to third parties, or any other information upon which this Court could reliably quantify the amount of subprime loans at issue.

79.    The FDIC Report describes what it refers to as Franklin's non-traditional lending program, but the FDIC's definition does not correspond to agency guidance either, that is,

"mortgage products that allow borrowers to defer payment of principal and, sometimes, interest." 71 Fed. Reg. at 58,609. Even assuming that the FDIC used the term appropriately, the FDIC Report does not quantify the percentage of non-traditional loans that Franklin held at the time of either of Nocella's statements. Similarly, the quoted statistics from the 2008 FDIC Exam (APC ¶ 39) do not provide the necessary information because reduced documentation does not differentiate a traditional loan from a non-traditional or exotic loan.

80.     Finally, the Preferreds plead no allegations regarding the extent of any variance in the credit quality of community bank loans that would support the inference that Black's statement was material. Further, even if such information had been plead, Black's statements regarding "a solid credit quality" would be immaterial as puffery. Black's statement would also be protected by the PSLRA's safe harbor.[36]

iv.     *4Q 2007 Allowances*

a.     **Factual Background**

81.     As repeatedly disclosed by Franklin, "[c]ertain of [Franklin's] accounting policies, by their nature, involve a significant amount of subjective and complex judgment by [its] management." Prospectus dated December 18, 2003 ("Initial Prospectus") (JA1) at 38, F-10; 2006 10K at 36, 81. Among these was its allowance for credit losses, which was "the amount estimated by management to be sufficient to absorb probable losses based on available information." Initial Prospectus at 38; 2006 10K at 36. Reflecting its significance, Franklin repeatedly described the methodology used to calculate this figure in its SEC filings. Initial

---

[36]     Contrary to the Preferreds' assertion, the November 26, 2007 conference call incorporated by reference the cautionary language in the November 26, 2007 press release. November 26, 2007 Transcript (JA21) at 1.

Prospectus at 38-39; 2006 10K at 36.   Franklin also disclosed the risks inherent in such analysis.[37]

82.     As Franklin grew, the bank allowance for credit losses grew both numerically and as a percentage of total loans:

|  | Prospectus | 2003 10K | 2004 10K | 2005 10K | 2006 10K | 3Q 2007 10Q |
|---|---|---|---|---|---|---|
| Total Allowance | $2.6 million | $4.9 million | $7.4 million | $13.4 million | $11.7 million. | $16.8 million |
| As % Total Loans | 0.21% | 0.27% | 0.24% | 0.35% | 0.25% | .40% |

Initial Prospectus at 68; 2003 10K at 49; 2004 10K at 51; 2005 10K (JA4) at 60; 2006 10K at 66; 3Q 2007 10Q (JA19) at 26.

83.     On November 26, 2007, as market conditions deteriorated, Franklin announced that it had elected to increase its allowance for credit losses by approximately $20 million.  APC ¶ 66.  In so doing, Franklin more than doubled its historical percentage rates for allowance for credit losses to 0.91% of total loans.  *Id.*  By year end, Franklin specified that this forewarned increase would be $23.5 million, for a total allowance for credit losses for 2007 of $40.3 million, or 1.03% of total loans.  January 31, 2008 Press Release (JA22) at 1, 6.

<h4 align="center">b.     No Material Misstatements or Actionable Omissions</h4>

84.     Another common theme running through the Preferreds' Complaint concerns the adequacy of Franklin's statements regarding loss reserves.  APC ¶¶ 38, 64-66, 68-69, 84, 87, 90-95.  To begin, the Preferreds do not allege any particular facts showing that Nocella made any of the specific statements of which they complain from the November 26, 2007 press release or the

---

[37]     From its initial Prospectus through its 2006 10K, Franklin's annual reports contained the following disclosures: (i) "our allowance for credit losses may be insufficient to cover actual losses, which could materially and adversely affect our financial performance"; (ii) "significant increases to the allowance for credit losses may be necessary if material adverse changes in general economic conditions occur and the performance of our loan portfolio deteriorates"; and (iii) "as a part of their examinations, the FDIC and [TSLD/TDSML] periodically review [Franklin's] estimated losses on loans and the carrying value of our assets and increases in the provision for credit losses and other real estate owned could materially and adversely affect our financial condition, results of operations and cash flows. . . ."  Initial Prospectus at 6; 2006 10 K at 23. *See also* Initial Prospectus at F-10 (noting the possibility that "in the near term the bank may sustain losses that are substantial relative to the allowance for credit losses"); 2006 10 K at 81 (same).

November 26, 2007 conference call.  Beyond that, although the Preferreds quote the November 26, 2007 press release, the November 26, 2007 conference call, and the January 31, 2008 press release at length ("4Q 2007 Allowances"), [38] nowhere do the Preferreds allege any specific facts showing that these statements were false and misleading when made.

85.    The increase in the allowance for credit losses from November 26, 2007, to January 31, 2008, does not show that the November 26, 2007, allowance was false when made. The Preferreds do not allege any facts showing that Franklin had actually recorded an allowance as of November 26, 2007, greater than $20 million.  The January 31, 2008, press release concerned Franklin's increase for the entire fourth quarter of 2007, not simply through November 26, 2007.  As a result, the January 31, 2008, release cannot, itself, support the inference that the November 26, 2007 allowance was false when made.

86.    The FDIC Report which is, itself, conclusory, does not reflect that the 4Q 2007 Allowances were false either.   The October 2007 Examinations pre-dated the 4Q 2007 Allowances and the July 2008 Examination concerned the adequacy of allowances as of March 31, 2008.  APC ¶ 84.

87.    While normally a subsequent revision to financial figures would support an inference of falsity, even the Preferreds' allegation in paragraph 68 that the Franklin restated its 4Q 2007 Allowance does not support that inference.  Franklin disclosed in its May 1, 2008 8K that Franklin's inability to close its financial statements for the fourth quarter 2007 meant that the call report submitted for the fourth quarter 2007 could be revised based on events that

---

[38]        Statements regarding allowances can be divided into two basic groups: (i) the allowances recorded in the fourth quarter of 2007 that Franklin announced on November 26, 2007 and January 31, 2008 ("4Q 2007 Allowances"); and (ii) the adjustments to Franklin's 2007 10Qs that were announced in Franklin's August 6, 2008 8K ("Adjusted Allowances").   To the extent that the Preferreds complain of the Adjusted Allowances, those adjustments have been previously addressed along with the five discrete accounting issues to which they relate.

occurred *after* those call reports had been submitted.  APC ¶ 73.  The subsequent revision of the call report for the fourth quarter 2007 does not infer that that 4Q 2007 Allowances were false.

88.     The Preferreds also plead no facts that would support the inference that any statements made by in the January 31, 2008 press release were false.  The Preferreds claim in conclusory fashion that that Nocella "falsely stated that, 'Franklin continues to be well capitalized under all regulatory capital requirements.'"  Without proper corroboration, the Preferreds assert that Franklin was undercapitalized as of the October 2007 examination.  APC ¶ 64.  However, the FDIC Report on which the Preferreds rely actually shows that Franklin remained well-capitalized until the July 2008 Examination, which reflected Franklin's financial state as of March 31, 2008.  FDIC Report at 17.  *See also* APC ¶ 84.

89.     The Preferreds also pick and choose out specific words and phrase from Nocella's statement in the January 31, 2008 press release to suggest that Nocella falsely characterized the allowance:

> During the fourth quarter of 2007 we significantly increased our allowance for credit losses by approximately $23.5 million. While this increase obviously had a negative impact on our quarterly and yearly earnings, it was necessary and **prudent** given the turmoil in the housing markets nationwide, which has negatively impacted our home builder customers and many single family borrowers. We believe that **this action better positions us to weather the current challenging economic environment**," remarked Anthony J. Nocella, President and CEO of Franklin Bank Corp.

January 31, 2008, Press Release (JA22) at 1.  In proper context, Nocella focused solely on the prudence of taking the allowance even though it negatively impacted earnings.  Nocella only claimed that Franklin was in a better position than it would have been if it had done nothing.

### c.     No Strong Inference of Scienter

90.     Nowhere do the Preferreds allege facts tending to show that Nocella or any other individual employed by Franklin deliberately or recklessly underestimated Franklin's 4Q 2007

Allowances.[39]  No allegations link Nocella to knowledge that Franklin's allowances were being misstated.  For the 4Q 2007 Allowances, the Preferreds do not even identify specific GAAP violations.[40]  For this reason, the Preferreds have failed to plead a strong inference of scienter for these statements.[41]  To the extent applicable, the Preferreds' conclusory allegations regarding Nocella's executive position, Franklin's GAAP violations, Nocella's Sarbanes-Oxley certifications, general awareness of internal controls, do not suffice for the same reasons set forth above.

91.     Likewise, the Preferreds plead no facts that showing that Nocella knew or ignored any red flags that Franklin was not, in fact, well capitalized as of the fiscal year ending December 31, 2008.  Nor do they plead facts that would support the inference that Nocella did not believe or had no reasonable basis for believing that the 4Q 2007 Allowance was prudent or would "better position" Franklin.

d.     **PSLRA Safe Harbor Applies**

92.     Both the 4Q 2007 Allowance and the statements attributed to Nocella in the January 31, 2008 press release, as well as the earnings guidance referenced in the October 20,

---

[39]     The Preferreds, relying upon the FDIC Report, ask this Court to infer that Franklin failed to implement FDIC recommendations regarding Franklin's ALLL policies.  APC ¶¶ 38, 93.  However, the FDIC merely states that it "repeatedly reported concerns" regarding Franklin's ALLL policies.  *Id*.  Nothing in the FDIC Report supports the inference that these concerns did not change over time or that Franklin did not implement changes the FDIC recommended.  Changes to Franklin's description of its ALLL methodology prove the contrary.  *Compare* 2003 10K at 26-27 with 2004 10K at 27 (expanding factors and instituting classification system for commercial loans); *compare* 2005 10K at 34, 60 with 2006 10K at 36-37, 65-66 (changing methodology for single family mortgages and instituting monthly risk management review of allowance for credit losses).  Nothing in the FDIC Report identifies a specific recommendation that Franklin failed to implement that resulted in a GAAP violation.  *Blackwell*, 440 F.3d at 290 (allegations regarding GAAP errors conclusory where plaintiff failed to allege facts demonstrating failure to follow applicable standard).  Moreover, nothing in the FDIC Report shows that Nocella, himself, deliberately failed to implement recommended changes.

[40]     The Preferreds merely reference GAAP violations related to the August 6, 2008 Adjustment concerning financial statements prior to the fourth quarter 2007.  APC ¶ 90.

[41]     *Shaw Group, Inc.*, 537 F.3d at 537 (identifying as especially suspect alleged accounting errors based on standards that leave broad scope for judgment and informed estimation as such determinations can differ reasonably and sizably).

2007 conference call as forward-looking statements would be protected by the PSLRA's safe harbor.[42]   The announcements were identified as forward-looking statements and contained or referenced meaningful cautionary language.   November 26, 2007, Press Release (JA21) at 2; November 26, 2007, Transcript (JA21) at 1; January 31, 2008, Press Release at 7-8; October 30, 2007, Transcript (JA14) at 1-2.   The Preferreds also failed to plead actual knowledge for the same reasons set forth above with respect to scienter.

     v.    ***No Loss Causation***

93.     No loss causation can be shown as to the Subprime Allegations, the 4Q 2007 Allowances or any other miscellaneous misstatements or.   Under the PSLRA a plaintiff alleging a Section 10(b) claim must plead loss causation, that is, a causal connection between the alleged material representation and the loss allegedly suffered by the plaintiff.   *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).   Specifically, plaintiff must plead: (1) that negative "truthful" information causing a decrease in price related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable that not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline."   *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009).

94.     The Preferreds admit that their stock had lost all value by the end of November 2008.   APC ¶¶ 37, 110.   While the Preferreds do identify a series of alleged corrective

---

[42]     To the extent that the projections regarding earnings in the March 2007 brochure-style report could be attributed to Nocella, those projections would not be actionable as the Preferreds have plead no facts sufficient to support the inference that they were knowingly false or severely reckless when made.  In addition, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim*, 989 F.2d at 1447; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 811 (2nd Cir. 1996) (statements that company was "'optimistic' about [its earnings]" and "should deliver income growth consistent with its historically superior performance" were inactionable "puffery," because they "lack the sort of definitive positive projections that might require later correction"); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001) (Harmon, J.) ("Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery' . . . . [I]nvestors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts.")

disclosures that they claim lead to this precipitous decline in the stock value, those disclosures relate specifically to the August 6, 2008, Adjustments. [43]   APC ¶¶ 35-37, 72-74, 76-81, 109-110. No corrective disclosures concerning any other misstatements or omissions have been plead.

## CONTROL PERSON CLAIMS

95.    To state a claim for control person liability under Section 15 or 20(a), a plaintiff must allege: (1) a primary violation of the securities laws and (2) that the alleged control person possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of the individual allegedly liable for the primary violation. *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 757 (S.D. Tex. 2003).

96.    Moreover, to the extent that the Preferreds' Section 20(a) and Section 15 claims were otherwise viable, they would still lack merit as they have failed to plead facts demonstrating that Nocella was a "control person" of any of the other defendants. *Kapps*, 379 F.3d at 221 ("[D]ismissal is appropriate where the plaintiff fails to plead any facts from which it can reasonably be inferred that the particular defendant was a control person."); *Collmer*, 268 F. Supp. 2d 727 n.11 (in the Fifth Circuit, a plaintiff needs to show that "the alleged control persons possess the power to control [the primary violator]").   Importantly, a plaintiff must allege "some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person." *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d at 828 (emphasis added).  The Preferreds have not met this burden.

---

[43]    Beyond these alleged corrective disclosures, all of the information that Preferreds offer to support their allegations including the FDIC Report, the February 2008 Letter and the March 31, 2008 FDIC Exam were all, by the Preferreds' own admission, not made public until 2009. APC ¶¶ 38, 82, 84.

**REQUEST FOR RELIEF**

Anthony Nocella requests that the Court grant this motion to dismiss, that the Court enter an order dismissing with prejudice all claims against Nocella, and for such other and further relief, at law or in equity, to which Nocella may be justly entitled.

Respectfully submitted,

By: _____
James G. Munisteri
State Bar No. 14667380

GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

OF COUNSEL:

Thomas Hagemann
State Bar No. 08686800
Orin H. Lewis
State Bar No. 00791110
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
Telephone:     (713) 276-5500
Facsimile:     (713) 276-5555

42

## CERTIFICATE OF SERVICE

I, James G. Munisteri, do certify that on the 5th day of March, 2010, a copy of the Anthony Nocella's Motion to Dismiss Preferred Stockholders' Complaint was served on the following parties via the Court's ECF system as indicated below or by U.S. Mail:

| | |
|---|---|
| Roger G. Greenberg | rgreenberg@schwartz-junell.com |
| Ralph M. Stone | rstone@lawssb.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| J. Allen Carney | dwilliams@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| William B. Monahan | monahanw@sullcrom.com |
| M. Byron Wilder | bwilder@gibsondunn.com |
| Jonathan C. Dickey | jdickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Stephen E. McConnico | smcconnico@scottdoug.com |
| Cynthia Saiter Connolly | cconnolly@scottdoug.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | James.farrell@lw.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |

David A. Rosenfeld
Mario Alba, Jr.
Couglin Stoia Geller Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY  11747

Andrew J. DeFilippis
Brian T. Frawley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

David C. Walton
Couglin Stoia Geller Rudman & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

_____
James G. Munisteri