# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### HOUSTON DIVISION

| | |
|---|---|
| In re FRANKLIN BANK CORP., SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) |

**CIVIL FILE NO. 4:08-CV-01810**

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

---

**FRANKLIN INVESTOR GROUP'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS LEWIS S. RANIERI'S, ANTHONY NOCELLA'S, AND RUSSELL McCANN'S MOTIONS TO DISMISS FRANKLIN INVESTOR'S GROUP'S SECOND CONSOLIDATED AMENDED COMPLAINT**

---

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

NATURE AND STATE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      The Acquisition of Franklin Bank In the Shadow Of Bank United . . . . . . . . . . . . . . . 2

II.     Defendants' Repeated Denials During The Class Period That Franklin
        Possessed Subprime Or Nontraditional Mortgages . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Former Officers and Employees At Franklin Bank Establish, Among Other
        Things, That Defendants' Public Descriptions Of The Bank's Loan Portfolio
        Were "Demonstrably False" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     The FDIC Concludes That Franklin Failed Because The Bank's Board of
        Directors, Chaired By Defendant Ranieri, "[A]llowed [B]ank [M]anagement
        [T]o [P]ursue [A] [H]igh-[R]isk [B]usiness [S]trategy . . . ." . . . . . . . . . . . . . . . . . . . 9

V.      Procedural Posture of Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.      APPLICABLE LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.      Rule 12(b)(6) Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.      Rule 9(b) and PSLRA Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

II.     RELEVANT LEGAL AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      The SCAC Satisfies the Pleading Standards of Rules 8 and 9
                and the PSLRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      The SCAC Does Not Improperly rely On the Group Pleading Doctrine . . . . . . 24

        C.      The SCAC Adequately Pleads That Defendants Published Materially
                Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

1.      Defendants' False and Misleading Statements . . . . . . . . . . . . . . . . . . . . 27

2.      Materiality of Defendants' Statements Regarding Subprime
        Lending and Loan Concentrations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D.      The SCAC Raises a Strong Inference That the Defendants Acted
        With the Requisite Degree of Scienter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        1.      Defendant Ranieri's Status as an "Outside Director" Does Not
                Insulate Him From Liability for False Statements He Made
                With Scienter  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        2.      The SCAC Provides Sufficiently Particularized Allegations
                Regarding Defendants' Motive to Commit the Alleged Fraud . . . . . . . . 33

        3.      Defendants Were Aware Of, Or Recklessly Disregarded, Internal
                Corporate Information That Contradicted Their Statements  . . . . . . . . . 36

        4.      Magnitude and Duration of the Fraud . . . . . . . . . . . . . . . . . . . . . . . . 39

        5.      Violations of GAAP and the Restatement of Earnings . . . . . . . . . . . . . 40

        6.      Failure of Heed Red Flags  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        7.      Lack of Internal Controls  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

        8.      Violations of Internal Policies and False Sarbanes-Oxley
                Certifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

E.      The SCAC Adequately Pleads Loss Causation . . . . . . . . . . . . . . . . . . . . . . 44

F.      Safe Harbor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

G.      Plaintiff Has Adequately Pleaded Control-Person Claims . . . . . . . . . . . . . . 49

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

ii

# TABLE OF CITATIONS

Cases                                                                                    Page Number

*ABC Arbitrage v. Tchuruk,*
        291 F.3d 336 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23 n. 6, 29

*Abbott v. Equity Group, Inc.,*
        2 F.3d 613 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Alaska Elec. Pension Fund v. Flowserve,*
        572 F.3d 221 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Ashcroft v. Iqbal,*
        129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Barrie v. Intervoice-Brite, Inc.,*
        409 F.3d 653 (5th Cir.  2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26 n. 7, 34

*Basic Inc. v. Levinson,*
        485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Bell Atl. Corp. v. Twombly,*
        550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) . . . . . . . . . . . . . . . . . . . . 20

*Bruhl v. Conroy,*
        Case No. 03-23044-Civ-MARRA/JOHNSON, 2007 U.S. Dist. LEXIS 21886
        (S.D. Fla. Mar. 27, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Capital Parks, Inc., v. Southeastern Adver. & Sales Sys., Inc.,*
        30 F.3d 627 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,*
        497 F.3d 546 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Dura Pharmaceuticals, Inc. v. Broudo,*
        544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) . . . . . . . . . . . . . . . . 45, 46, 47

*Fener v. Belo Corp.,*
        513 F. Supp. 2d 733 (N.D. Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fin. Acquisition Ptnrs. v. Blackwell*
        440 F.3d 278 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

-iii-

*G.A. Thompson & Co. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Goldstein v. MCI Worldcom*,
    340 F.3d 238 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Haack v. Max Internet Communs., Inc.*,
    No. 3:00-CV-1662-G, 2002 U.S. Dist. LEXIS 5652
    (N.D. Tex. Apr. 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Capstead Mortg. Corp. Secs. Litig.*,
    258 F. Supp. 2d 533 (N.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Compaq Sec. Litig.*,
    848 F. Supp. 1307 (S.D. Tex. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Dell Inc. Secs. Litig.*,
    591 F. Supp. 877 (W.D. Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n. 11

*In re Enron Corp. Secs., Der. & "ERISA" Litig.*,
    465 F. Supp. 2d 687 (S.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*In re First Energy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Global Crossing Ltd. Sec. Litig.*,
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Landry's Seafood Rests., Inc. Sec. Litig.*,
    Civ. No. H-99-1948 (S.D. Tex. Feb. 19, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Leslie Fay Cos. Sec. Litig.*,
    835 F. Supp. 167 (S.D.N.Y. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re McKesson HBOC Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Microstrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*In re Netsolve, Inc.*,
185 F. Supp. 2d 684 (W.D. Tex 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re OCA Sec. & Derivative Litig.*,
No. 05-2165 Section R(3), 2006 U.S. Dist. LEXIS 90854
(E.D. La. Dec. 14, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Pall Corp.*,
No. 07-CV-3359 (JS) (ARL), 2009 U.S. Dist. LEXIS 88240
(E.D.N.Y. Sept. 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*In re Qwest Communx. Int'l Inc. Sec. Litig.*,
387 F. Supp. 2d 1130 (D. Colo. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*In re Rent-Way Secs. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re Sec. Litig. BMC Software, Inc.*,
183 F. Supp. 2d 860 (S.D. Tex. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Tetra Techs., Inc. Sec. Litig.*,
Civil Action No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687
(S.D. Tex. July 9, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 38, 38 n. 12, 44

*In re Thornburg Mortgage, Inc. Sec. Litig.*,
No. CIV 07-0815 JB/WDS, 2010 U.S. Dist. LEXIS 13375
(D.N.M. Jan. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Triton Energy Ltd. Secs. Litig.*,
No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920
(E.D. Tex. Mar. 30, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*,
537 F.3d 527 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
    677 F.2d 1045 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kunzweiler v. Zeronet, Inc.*,
    No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080
    (N.D. Tex. July 3, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 29, 30, 45, 47

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 48

*McNamara v. Bre-X Minerals, Ltd.*,
    46 F. Supp. 2d 628 (E.D. Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Midwest Commerce Banking v. Elkhart City Centre*,
    4 F.3d 521 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32, 33, 34

*Newby v. Enron Corp.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Dynegy, Inc.*,
    339 F. Supp. 2d 804 (S.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Rosky v. Farha*,
    Case No. 8:07-cv-1952-T-26MAP (Consolidated),
    2009 U.S. Dist. LEXIS 107531, at *21-*22 (S.D. Fla. Mar. 30, 2009) . . . . . . . . . 32, 44

*SEC v. First Jersey Secs., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 27, 34

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*STI Classic Fund v. Bollinger Indus., Inc.,*
    No. 3-96-CV-823-R, 1996 U.S. Dist. LEXIS 21553,
    at *5 (N.D. Tex. Oct. 25,  1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 127 S. Ct. 2499, 169 L. Ed. 2d 179 (2007) . . . . . . . . . . . . . . . . . . *passim*

*United  States v. Peterson,*
    101 F.3d 375 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Wight v. Bankamerica Corp.,*
    219 F.3d 79 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51 n. 14

## **Other Authority**                                                   **Page Number**

15 U.S.C. § 77z-2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

15 U.S.C. § 77z-2(c)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

15 U.S.C. § 78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

15 U.S.C. §78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## <u>INTRODUCTION</u>

After regulators forcibly closed Franklin Bank Corporation ("Franklin" or the "Company") on November 7, 2008, the Federal Deposit Insurance Corporation (the "FDIC") released a Material Loss Review concluding that "Franklin failed due to management's high-risk business strategy." This assessment is completely at odds with statements Defendants Lewis Ranieri, Anthony Nocella, and Russell McCann made from January 31, 2007 through May 19, 2008 (the "Class Period"), when they were able to trick the investing public into believing that Franklin was one of the more "conservative underwriters out there." In particular, these Defendants represented to the markets that Franklin did not hold any subprime or nontraditional mortgages, when if fact the bank possessed a significant amount of these high risk investments. Because the operative complaint raises a strong inference that Defendants acted with scienter when they made false and misleading statements during the Class Period, this Court should deny the pending Motions to Dismiss.

## NATURE AND STAGE OF THE PROCEEDING

I. **The Acquisition Of Franklin Bank In The Shadow Of Bank United**

Fresh on the heels of the lucrative financial bonanza made possible by their association with Bank United Corp. ("Bank United"), Defendants Ranieri and Nocella purchased Franklin Bank Corporation for $11.2 million in April 2002. (Franklin Investor Group's Second Consolidated Am. Compl. ("SCAC") ¶ 4.) Recreating the business growth strategy that led to a quick and highly profitable sale of Bank United, Defendants Ranieri and Nocella assembled former Bank United executives and employees for the intention of duplicating their earlier success. (*Id.*) Over the next five years, Franklin's balance sheet experienced a staggering transformation: total assets increased 1,461% from $365 million to $5.7 billion, total deposits increased 1,493% from $182 million to $2.9 billion, and total loans increased 1,236% from $306 million to $4.09 billion. (*Id.* ¶ 5.) Unbeknownst to investors seeking to capitalize on this dizzying growth, but what was later revealed by the Federal Deposit Insurance Corporation's ("FDIC") audit of Franklin, was that "Franklin's management allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring, and controls." (*Id.* ¶¶ 96, 99.)[1] In other words, Franklin invested heavily in subprime and nontraditional mortgages, while Defendants told investors the bank did not do so.

To provide context, Defendants Ranieri and Nocella purchased Bank United in 1995 with the goal of growth through acquisitions of other banks and expansion of lending operations, thereby

---

[1] By way of background, Franklin added mortgages to its loan portfolio in three ways. First, the Company originated loans directly to home buyers and took mortgages as collateral. Second, Franklin established "warehouse lines of credit" through which the Company would loan money to mortgage brokers who would, in turn, make loans to the ultimate borrower. Franklin would then take the mortgages as collateral. Third, Franklin purchased pools of mortgages originated by other lenders. (SCAC ¶ 3.)

maximizing the conditions for a profitable sale. (SCAC ¶ 37.) This objective became a reality in 2001 when Washington Mutual acquired Bank United. (*Id.*) As part of the Bank United deal, Defendants Ranieri and Nocella were required to enter into covenants not to compete for approximately one year. (*Id.* ¶ 38.)

With the expiration of their covenants not to compete in 2002, these Defendants reemerged on the banking scene with the mindset to re-engineer the plan that worked so well at Bank United. (SCAC ¶ 38.) In furtherance of this undertaking, Defendants Ranieri and Nocella assembled numerous former Bank United executives and employees. (*Id.*) None, however, bore the esteemed reputation of Defendant Ranieri, who was heralded by the Company as being the "father" of the securitized market and an "expert and innovator in both the mortgage and capital markets." (*Id.* ¶ 40.) It was under this brand that Defendant Ranieri, along with Defendants Nocella and McCann, caused the total assets, deposits, and loans at Franklin to balloon at an astounding rate from 2002 to 2007. (*Id.* ¶ 41.)

## II.    Defendants' Repeated Denials During The Class Period That Franklin Possessed Subprime Or Nontraditional Mortgages

At the beginning of 2007, the Company reported its financial results for fiscal year 2006, and it shortly thereafter repeated those achievements in its 2006 Form 10-K, which was signed by Defendants Ranieri, Nocella, and McCann and filed with the U.S. Securities and Exchange Commission (the "SEC") on March 14, 2007. (SCAC ¶¶ 44, 47-49.) At a conference call with analysts assembled to discuss the numbers, Defendant Nocella explained that Franklin's yearly earnings were actually lower than expected due to "our ***continued*** unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market." (*Id.* ¶¶ 45-46 (emphasis added).)

Some months later, as he fielded questions regarding the Company's second quarter numbers for 2007, Defendant Nocella returned to this recurring theme by stating that Franklin didn't "have any subprime," "pay option ARMs," or "simultaneous seconds," supposedly providing him no basis for knowing whether Countrywide Financial ("Countrywide") was feeling the effects of "subprime" mortgages. (SCAC ¶ 55.)  With no reason to disbelieve Defendants' persistent characterization of the bank's apparently stringent lending policies, analysts were left with the impression that Franklin was one of the more "conservative underwriters out there." (*Id.* ¶¶ 55-56.)  Never once while discussing the second quarter financials, or at any time during the Class Period, did Defendants Nocella or Ranieri reveal that Franklin had, among other things, loaned hundreds of millions of dollars to Countrywide under a line of credit arrangement securitized by Countrywide mortgages. (*Id.* ¶ 111.)  Indeed, even when Countrywide defaulted on $150 million owed to Franklin and the Company took possession of the loans collateralizing the line of credit, which included subprime loans, Defendants said nothing to its investors. (*Id.* ¶¶ 111, 118-22.)

Throughout 2007, Defendants continued to dupe the markets by falsely heralding Franklin's invulnerability to the subprime crisis.  When addressing Franklin's third quarter results, for instance, Defendant Nocella reassured analysts that the deterioration in the marketplace was of little relevance because Franklin was adequately reserved against expected loan failures, a fact that was confirmed by Defendant McCann. (SCAC ¶¶ 60-61.)  Defendant McCann proceeded to declare that Franklin "only originated prime level lending" and did not have "any of those [pay option ARMs] in a portfolio." (*Id.* ¶¶ 62-63, 65.)

Moreover, in the face of a declining market, Defendants Ranieri, Nocella, and McCann did their best to convince investors that their knowledge and experience put them in a uniquely strong

position to adequately assess and address the issues faced by the Company.  (SCAC ¶¶ 68-69.)  In this regard, Defendant Ranieri, in a November 26, 2007 conference call, explained that while the Company "remain[ed] well collateralized," Franklin was increasing its allowance for credit losses by approximately $20 million ($13.5 million after-tax) to carry it beyond the present period and "into the future."  (*Id.* ¶¶ 69-70.)  While allowing that the "mortgage market [was] struggling," with "[l]iquidity in the big banks . . . considerably strained," Defendant Ranieri scoffed that he had "gone through these cycles before" and was "very experienced in this."  (*Id.* ¶ 69.)  Directing attention to his "background," the self-proclaimed "'father' of the securitized mortgage market" sought to allay investors' fears by emphasizing that he and his team were eminently qualified to "shepherd" Franklin through the distress. (*Id.* ¶¶ 40, 69.)  Mincing no words about who would be heading that effort, Defendant Ranieri assured that his "job" was to "guard the place."  (*Id.* ¶ 71.)

When he announced during the November 26 call that Franklin had increased its reserves so as to "carry" the bank "into the future," Defendant Ranieri was joined by Defendant Nocella, who added that "[w]e estimate commercial loan credit cost in 2008 to be between [$]5 million and $7.5 million.  This means that we should have three to four years of reserves."  (SCAC ¶ 69.)  To underscore the Company's ability to respond to troubled loans, Defendant Ranieri pointed out that the "credit committee of the Board," on which both he and Defendant Nocella served, was meeting "a number of times every month" in order to "review . . . credits that we put on [a] list because we want to watch them."  (*Id.* ¶¶ 70, 124.)  Less than one month after these upbeat remarks, Franklin announced that it was reclassifying $13.5 million in loans as nonperforming.  (*Id.* ¶ 73.)  Unfortunately, this would be a harbinger of things to come.

III.    **Former Officers And Employees At Franklin Bank Establish, Among Other Things, That Defendants' Public Descriptions Of The Bank's Loan Portfolio Were "Demonstrably False."**

Concerned about the nature of the Company's loan portfolio and rising delinquencies, Mr. Craig Wolfe, Franklin's Vice President of Loss Mitigation, sent a letter, dated February 19, 2008,[2] to Debbie Hale, Franklin's Senior Vice President of Internal Audit, itemizing specific instances in which the Company had violated SEC rules, GAAP, and Sarbanes-Oxley. (SCAC ¶ 102.) Specifically, Mr. Wolfe recounted for Ms. Hale how he refused to execute a Sarbanes-Oxley Attestation because "[he] knew that the Bank's accounting of REOs [real estate owned] was misleading, inaccurate, and did not comport with Generally Accepted Accounting Principles (GAAP). In addition, [he] decided not to sign the Attestation based on [his] knowledge that Franklin Bank had incorrectly and perhaps deliberately overstated the value of certain Non-Performing Assets (NPAs) and failed to disclose the existence of others to obfuscate the extent of certain in-substance REOs that were not properly classified, and that the Bank's stated book value of REO inventory as of December 31, 2007 substantially exceeded the [net] realizable value." (*Id.* ¶ 103.)

Mr. Wolfe went into some detail about how Franklin's public statements that the Company did not own or originate any subprime loans were "demonstrably false." (SCAC ¶ 106.) Mr. Wolfe further enlightened Ms. Hale about instances during which Franklin had reclassified seriously delinquent loans as current, failed to recognize losses on valid repurchase requests, and failed to

---

[2] It is perplexing, to say the least, that Defendants seek to derive benefit from the fact that Mr. Wolfe's letter is dated after they made many of their material misstatements. While Defendants may wish to pretend that the Wolfe letter put them on notice of the fraud at Franklin, the SCAC demonstrates that they were, at a minimum, severely reckless as to the truth of declarations they made well before the Wolfe correspondence. Indeed, Mr. Wolfe makes clear that he is addressing issues that were known to Defendants at the time of their false statements, and the actual date of the letter is completely beside the point.

indemnify Countrywide under the entities' agreement.  (*Id.* ¶ 107.)  Because of the Company's misconduct, Mr. Wolfe proposed that "the 2007 earnings report that Franklin Bank filed should be restated because it is not accurate and therefore constitutes fraud against shareholders." (*Id.* ¶¶ 105, 108.)  For his candidness and honesty, Mr. Wolfe was demoted.  (*Id.* ¶ 104.)

It is not particularly surprising, given Defendants' commitment to replicate the financial windfall at Bank United, that Mr. Wolfe's unwillingness to countenance malfeasance cost him his "loss mitigation" responsibilities.  What is astonishing, however, is the person to whom Franklin reassigned those duties: None other than the Director of Loan Acquisitions, Sharon Koehl, who was the very person responsible for creating the loans in the first place.  (SCAC ¶ 104.)  This combined role allowed Ms. Koehl, according to Mr. Wolfe, to "focus[] her efforts on delaying the reporting and recognition of such losses rather than taking meaningful action to mitigate those losses."  (*Id.*)  Disheartened by Franklin's failure to address his internal entreaties to Ms. Hale, Mr. Wolfe eventually contacted the FDIC.  (*Id.* ¶ 109.)

Corroborating the details in Mr. Wolfe's letter, Confidential Witness No. 1 ("CW1") confirmed that the internal controls and monitoring of Franklin's single family residential portfolio were inadequate (SCAC ¶ 114), further confiding that Defendant Ranieri applied pressure upon employees to "get the internal controls in line," (*id.* ¶ 115).  CW1 also recalled that the Company's accounting for loan loss reserves, which had been directly approved by Defendants Nocella and McCann, was inaccurate because the Company had used an aggregation method[3] that was

---

[3]For instance, suppose Franklin had two $100,000 mortgages outstanding, but one was secured by a home appraised at $150,000 while the collateral for the other was property valued at only $50,000. Using aggregation, the Company would decline to take any reserve for the latter loan, on the theory that the "cushion" attributable to the former would make up the difference.  (SCAC ¶ 116.)

impermissible under GAAP. (*Id.* ¶ 116.) Confidential Witness No. 2 ("CW2") verified that as a result of Countrywide defaulting on its line of credit in approximately September or October 2007, Franklin took possession of the primarily substandard loans collateralizing the line of credit. (*Id.* ¶¶ 118-22.) CW2 further recalled that as voting members of the Board Credit Committee, Defendants Nocella and Ranieri received regular packets regarding agenda items and were involved in reviewing and approving any line of credit over $10 million (*id.* ¶¶ 123-25), a threshold the $150 million Countrywide line of credit easily surpassed.[4] Along these same lines, CW2 stated that Defendants Nocella and McCann were members of the Management Loan Committee, which reviewed loan extensions, modifications and covenant waivers for loans $10 million and under. (*Id.* ¶ 126.) In these roles, CW2 identified Defendants Nocella, Ranieri, and McCann as the parties responsible for "write downs and reserves to specific loans," further noting that "Nocella is a mathematical genius" and "if there's a mathematical way to push an expense to another period, Nocella would do it." (*Id.* ¶¶ 127, 129.)

Confidential Witness No. 3 ("CW3") attested to the fact that senior executives were present at meetings and/or had access to regular reports discussing the rising rate of nonperforming loans, yet Franklin "didn't disclose its delinquent loans." (SCAC ¶¶ 130-32.) Confidential Witness No. 4 ("CW4") verified that Defendant McCann was "responsible for setting reserves for the warehouse lines" and that information regarding aged and delinquent loans were accessible to senior management via regular reports and the Company's internal databases. (*Id.* ¶¶ 135-38.) Confidential Witness No. 5 ("CW5") bore witness to the facts that senior executives, including Defendants Nocella and McCann,

---

[4]It is of no small significance that Defendant Ranieri acknowledges his awareness of the Countrywide line of credit. (Ranieri Br. 18-19.) As a member of the Credit Committee, Mr. Ranieri was, at a minimum, severely reckless if he did not also understand the collateral securing such a large loan to such a troubled borrower during the Class Period.

were supplied with monthly reports regarding (1) due diligence of loans to be acquired, (2) production of mortgage officers, (3) delinquent loans, (4) fraudulent loans, and (5) the Company's entire portfolio, as well as the Company's individual "Held for Sale" and "Held for Investment" portfolios.  (*Id.* ¶¶ 142, 145.)

**IV.     The FDIC Concludes That Franklin Failed Because The Bank's Board Of Directors, Chaired By Defendant Ranieri, "[A]llowed [B]ank [M]anagement [T]o [P]ursue [A] [H]igh-[R]isk [B]usuness [S]trategy . . . ."**

Shortly after Mr. Wolfe's letter to Ms. Hale and following contact with the FDIC, the Company on March 14, 2008 disclosed that it was delaying the filing of its Annual Report on Form 10-K for the year ended December 31, 2007 because "[i]n February 2008, the Company's Board of Directors learned of possible accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned that could effect the Company's 2007 financial statements."  (SCAC ¶ 78.)  As a result, Franklin was also required to notify shareholders that it was not in compliance with rules of the American Stock Exchange ("AMEX") and in jeopardy of being delisted.  (*Id.* ¶ 80.)  However, approximately two weeks later, the Company was touting progress by issuing a press release indicating that AMEX had accepted the Company's proposed plan to bring Franklin back into compliance.  (*Id.* ¶ 82.)

The next month, however, Franklin revealed that its Audit Committee had completed its investigation and found "a number of accounting errors in the areas described below:

(1)     Franklin did not properly account for certain single family mortgage loan modification programs developed and implemented as part of an effort to reduce delinquencies and mitigate foreclosure losses.

(2)     Franklin did not charge off certain uncollectible single family second lien loans.

(3)    Franklin did not record, and in some instances did not write-down, certain Real Estate Owned (REO) and in-substance foreclosures in connection with foreclosures in its single family mortgage portfolio.

(4)    Franklin did not properly record certain mark-to-market writedowns on loans transferred from 'Held for Sale' to 'Held for Investment.'"

(SCAC ¶ 84.) The Company additionally disclosed that based on the Audit Committee's findings, the SEC had commenced an informal inquiry into Franklin's affairs. (*Id.* ¶ 86.) In the face of these revelations, the Company announced that it was diligently working to amend and restate its Form 10-Q for the third quarter of 2007. (*Id.* ¶ 87.) Finally, on August 6, 2008, the Company issued a Form 8-K that contained restated unaudited financial statements for the year ended December 31, 2006 and the quarters ended March 31, 2007; June 30, 2007; and September 30, 2007. (*Id.* ¶ 90.)

Subsequently, in July 2009, the Office of Inspector General of the FDIC issued a Material Loss Review of Franklin Bank. (SCAC ¶ 94.) In a section entitled "Reason for Failure and Material Loss," the FDIC left nothing to the imagination when it determined that, "Overall, **Franklin failed due to bank management's high-risk business strategy**." (*Id.* ¶ 95.) Continuing on, the FDIC explained:

> The strategy focused on asset growth concentrated in 1-4 family residential and ADC loans funded with wholesale funding, including potentially high-cost and volatile deposits and borrowings. Coupled with weak risk management practices and controls, this business strategy left the bank unprepared and unable to effectively manage operations in a declining economic environment. Franklin's asset quality deteriorated significantly as the real estate market and economy slowed. For example, adverse loan classifications increased from $178.5 million reported in the October 2007 Report of Examination (ROE) to $783.7 million reported in the July 2008 ROE. Franklin's adverse classifications, including loan losses, resulted primarily from its portfolio of 1-4 family residential loans and ADC loans. As adverse loan classifications increased, earnings eroded, liquidity became strained, and Franklin's capital became increasingly deficient. Ultimately, Franklin was closed by the DSML due to the bank's

inability to meet liquidity needs.  The resulting loss to the DIF at closing was estimated at $1.5 billion.

(*Id.* ¶ 95 (emphasis added).)  The Material Loss Review further revealed that

> Franklin's asset quality problems were exacerbated by its emphasis in high-growth markets and concentrations in 1-4 family residential loans **(that contained a significant volume of nontraditional and subprime mortgages)** and ADC loans, which, as of September 2008 totaled 937 percent and 736 percent of total capital, respectively. In particular, **Franklin's management allowed significant loan concentrations to exist without adequate risk identification, measurement, monitoring, and controls.**

(*Id.* ¶ 96 (emphasis added).)  It is evident, then, that Defendants misled investors when they insisted that Franklin was a stranger to subprime or nontraditional mortgages.  The FDIC made this point time and again in its Material Loss Review.  For instance:

> [W]ithin its 1-4 family residential loan portfolio, **Franklin originated, purchased, and sold an array of mortgage products that included nontraditional and subprime mortgages.** The bank's nontraditional mortgage lending program included the following underwriting characteristics:
>
> •     interest-only loans;
> •     no documentation, limited documentation, and stated income loans;
>
> •     payment option adjustable rate mortgages;
> •     simultaneous second-lien loans (not held by the bank);
> •     high combined loan-to-value ratios, high combined debt-to-income ratios, and loans to borrowers with low credit scores;
> •     purchased loan pools serviced by others; and
> •     multiple risk layers.

(SCAC ¶ 96 (emphasis added).)

Keeping in mind that Defendants had repeatedly assured that the Company "didn't have any subprime . . . pay option ARMs . . . or simultaneous seconds" (SCAC ¶ 55 (statements of Defendant Nocella)) and "only originated prime level lending" (*Id.* ¶ 62) (statement of Defendant McCann)) –

with Defendant Ranieri "guard[ing] the place" to ensure that the bank had the financial wherewithal to emerge from economic distress (*Id.* ¶ 71) – the amount of exotic loans actually held by Franklin boggles the mind.  As the FDIC discovered:

> **As of July 2008, 82 percent of the 1-4 family residential loans held on the bank's books had been originated under reduced documentation or stated income loan programs.** In addition, 16 percent of the residential loans were considered subprime loans, and 72 percent of the bank's residential loans were purchased from and serviced by others. The purchased loans were typically collateralized with first-lien positions; however, many of the homes that collateralized the bank's loans also had second liens in place. As a result, the borrowers had limited equity positions in the homes they purchased or refinanced. Further, these loans were concentrated in markets that had experienced a significant level of appreciation and then deterioration.

(*Id.* ¶ 96 (emphasis added).)

Although Franklin tried at the eleventh hour to right the ship by implementing the policies Defendants had been trumpeting for years – something on which Defendants now place stock[5] – the damage had already been done.  The FDIC put it bluntly:

> Due to the collapse of the subprime mortgage market and the tightening of the mortgage credit market, bank management halted the bank's nontraditional mortgage and subprime operations and, in the first quarter of 2007, began to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans. However, **Franklin's curtailment of its nontraditional mortgage and subprime operations was not sufficient to improve the overall performance of its loan portfolio.**

---

[5]Of course, it is of virtually no import that Defendants late in the day attempted to impose the sort of conservatism they had falsely claimed to employ at Franklin for years.  During the Class Period, Defendants represented that Franklin's loan "portfolio" – or all the loans on its books – was free of subprime or nontraditional products, something that Craig Wolfe, the FDIC, the SCAC, and others have shown to be "demonstrably false."

(*Id.* ¶ 96 (emphasis added).)

To make matters even worse, the Material Loss Review further disclosed that Franklin manipulated its delinquent loans so that it did not have to report them:

> Based on our review of the 2007 and 2008 ROEs and related guidance, we identified instances where Franklin may have inappropriately used interest reserve loans to (1) bring delinquent loans current; (2) modify loans on projects that were experiencing construction delays, funding shortfalls, and deteriorating collateral values/positions; and (3) fund raw land loans.

(*Id.* ¶ 97.)  Leaving no stone unturned, the FDIC's audit of Franklin also exposed that the institution's access to capital was configured so that the bank had a "greater risk exposure and a reliance on funding sources that may not be available in times of financial stress or adverse changes in market conditions." (*Id.* ¶ 98.)  Indeed, in 2007, Franklin was in the 97th percentile of banks in the ranking of the use of what are known as "non-core" funding sources.  (*Id.*)  Far from being "conservative," the Company was actually among the 5 percent of banks with the riskiest availability of capital.

Upon consideration of the various factors which contributed to Franklin's demise, the FDIC used the following language to place responsibility squarely at the feet of the Board of Directors chaired by Defendant Ranieri:

> **Franklin's BOD [Board of Directors] allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls.** In addition, management failed to effectively implement audit and examination recommendations or to ensure that, as the bank grew, the sophistication of the bank's risk identification and monitoring systems also expanded to effectively identify, measure, monitor, and control bank operations and risks. Franklin's management did not ensure the accuracy of financial reporting and soundness of related accounting controls, which, to a certain degree, masked the bank's financial deterioration. Franklin's weak risk management practices were exhibited in several areas.

(SCAC ¶ 99 (emphasis added).)   The FDIC then took some pains to highlight the precise areas in

which the Board of Directors, chaired by Defendant Ranieri, failed to institute satisfactory "risk

management practices" at Franklin:

> **Internal Audit.** In the ROEs from September 2003 through July
> 2008, the FDIC identified weaknesses in the structure and
> independence of Franklin's internal audit program. The FDIC also
> noted that the scope and frequency of internal audit coverage was
> not fully adequate. In the October 2006 ROE, the FDIC cited
> Franklin's contravention of the Interagency Policy Statement on the
> Internal Audit Function and Its Outsourcing, dated December 22,
> 1997. The policy statement identifies key characteristics and sound
> practices for the internal audit function and management of internal
> audit outsourcing arrangements. In the July 2008 ROE, the FDIC
> noted that one Franklin vice president, who was not independent of
> management, was involved in developing risk assessments, testing
> programs, and selecting audit samples. The lack of independence
> was a contravention of the policy statement.
>
> **Due Diligence.** Franklin's BOD did not implement an adequate due
> diligence process for purchased pools of 1-4 family residential loans.
> Specifically, it became apparent upon our review of the ROEs and
> discussions with FDIC examiners that Franklin purchased such loan
> pools without a complete understanding of what is was purchasing.
> Most notable, Franklin was not aware that loans it purchased contained
> second-lien positions that, in hindsight, made the loans far less
> attractive and valuable. In our opinion, the lack of adequate due
> diligence on these loan pools indicates that Franklin's BOD did not
> ensure that as the bank grew, the sophistication of the bank's risk
> identification and monitoring systems expanded to effectively identify,
> measure, monitor, and control bank operations and risk.
>
> **Internal Control and Financial Reporting.** Franklin's
> management did not ensure the accuracy of financial reporting and
> soundness of related accounting controls. As a result, management
> was unable to ensure the timely and accurate reporting of the bank's
> financial condition, and the bank's financial deterioration was
> masked to a certain degree. As the result of a "whistleblower"
> complaint, Franklin's BOD arranged for an independent
> investigation of the bank to be conducted by Baker Botts, Limited
> Liability Partners, during the first and second quarters of 2008. The
> investigation revealed significant accounting errors, inappropriate

accounting entries, a lack of internal controls, and significant questions regarding the competency of management.

In the July 2008 ROE, the FDIC noted that management and the BOD did not provide for internal controls and information systems that would ensure timely and accurate financial reporting. According to the FDIC, Franklin's management disclosed that financial reporting since December 2006 could not be relied on. The FDIC also noted that management made multiple amendments to the September 2007 through March 2008 Reports of Condition and Income (Call Report). These amendments were the result of major accounting and internal control weaknesses related to 1-4 family residential loans, residential loans serviced by others, other real estate owned, loan modifications, and bank-owned life insurance.

**Allowance for Loan and Lease Losses (ALLL) Methodology.** Franklin's management did not establish a sufficient ALLL or an adequate ALLL methodology. Specifically, management did not develop an ALLL methodology that fully complied with the Interagency Policy Statement on the Allowance for Loan and Lease Losses (FIL-105- 2006), dated December 13, 2006. According to FIL-105-2006, each institution must analyze the collectibility of its loans and maintain an ALLL at a level that is appropriate and determined to be in accordance with Generally Accepted Accounting Principles (GAAP).  An appropriate ALLL covers estimated loan losses on individually evaluated loans that are determined to be impaired as well as estimated loan losses inherent in the remainder of the loan and lease portfolio. As previously discussed, Franklin's adverse loan classifications increased significantly between 2007 and 2008. An effective loan review system and controls (including loan classification and credit grading system) helps ensure asset quality problems are identified and an appropriate ALLL is established.

Beginning with the September 2004 examination, the FDIC repeatedly reported concerns with the bank's ALLL policies and/or methodology for calculating the ALLL, including the need for management to consider and document adjusting qualitative factors (such as industry, geographic, and economic factors) to the industry's loss rates, and to implement and document a methodology for measuring loans for impairment. In the October 2007 ROE, the FDIC reported that Franklin did not provide documented support that showed how the ADC loan portfolio's historical loss rates had been determined. Further, the FDIC stated

-15-

> that Franklin did not consider the impact of current environmental
> factors in its analysis despite the rapidly deteriorating economic
> conditions in the bank's primary markets. As Franklin's assets
> deteriorated, it became apparent that its ALLL was insufficient to
> absorb loan losses.

> Historically, . . . from 2002 through 2006, Franklin maintained the
> bank's ratio of ALLL to total loans and leases at levels that were
> consistently well below its peer group average – ranging from the
> 3rd to 10th percentile. From 2004 until the bank closed, Franklin
> also maintained its capital levels below peer.

(SCAC ¶ 99 (emphasis added).)  Consequently, Franklin was delisted and forced into bankruptcy.

## V.    Procedural Posture Of Litigation

This lawsuit is brought by aggrieved investors who bought Franklin stock on the strength of

the false and misleading statements – some of them admittedly untruthful – made by the Defendants

during the Class Period.  This Memorandum responds to the motions filed by the Defendants

requesting dismissal of the claims brought against them pursuant to Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934, and rule 10b-5 promulgated by the SEC.  For the reasons stated in

the succeeding paragraphs, this Court should deny the pending Motions to Dismiss.

**STATEMENT OF THE ISSUES**

1.     Should the Court Deny Defendant Ranieri's Motion to Dismiss the claim against him for violation of § 10(b) of the Exchange Act?

     A.     By signing the admittedly untrue Form 10-K Franklin filed with the SEC during the Class Period, and by making other public remarks shown by the SCAC to have been materially misleading, did Defendant Ranieri make false and misleading statements for purposes of the Exchange Act?

     B.     Did Defendant Ranieri mislead the markets with scienter during the Class Period, when he vowed that he would "guard the place" and "shepherd" a "well-collateralized" Franklin through financial upheaval, even though he knew that Franklin had made many unconventional loans and was anything but "well-collateralized"?

2.     Should the Court deny Defendant Nocella's Motion to Dismiss the claim against him for violation of § 10(b) of the Exchange Act?

     A.     By signing the admittedly false financial reports Franklin filed with the SEC during the Class Period, and by making other public remarks shown by the SCAC to have been materially misleading, did Defendant Nocella make false and misleading statements for purposes of the Exchange Act?

     B.     Did Defendant Nocella mislead the markets with scienter during the Class Period when he represented that Franklin didn't "have any subprime," "pay option ARMs," or "simultaneous seconds," even though he knew that Franklin's mortgage portfolio was filled with unconventional loans fitting those descriptions?

3.     Should the Court deny Defendant McCann's Motion to Dismiss the claim against him for violation of § 10(b) of the Exchange Act?

     A.     By signing the admittedly false financial reports Franklin filed with the SEC during the Class Period, and by making other public remarks shown the the SCAC to have been materially misleading, did Defendant McCann make false and misleading statements for purposes of the Exchange Act?

     B.     Did Defendant McCann mislead the markets with scienter during the Class Period when he represented that Franklin "only originated prime level lending" and did not have pay option ARMs "in a portfolio," even though he knew that Franklin's mortgage portfolio was filled with unconventional loans that were less than prime?

4.     Has the Complaint successfully alleged loss causation, where it provides Defendants with a clear indication of the causal connection that resulted in damages to the Class?

5.      Are Defendant Nocella's November 26, 2007 statements about Franklin's reserves entitled to safe harbor protection, where they are not forward-looking and are unaccompanied by meaningful cautionary language?

6.      Has the SCAC stated viable "control person" claims against Defendants, where there has been an underlying violation of the Exchange Act by an entity they had the ability to control?

## SUMMARY OF THE ARGUMENT

The United States Supreme Court has instructed that courts evaluating motions to dismiss under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, must "accept all allegations in the complaint as true" and "consider the complaint in its entirety," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 169 L. Ed. 2d 179, 192-93 (2007).  With the teachings from *Tellabs* as a guide, it is easy to see that the complaint in this litigation raises a strong inference that Defendants made false statements with scienter during the Class Period.  Because the pleading also satisfactorily alleges loss causation and states viable "control person" claims against Defendants, this Court should deny the pending Motions to Dismiss.

**ARGUMENT**

## I.      APPLICABLE LEGAL STANDARDS

### A.      Rule 12(b)(6) Standards

Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The burden upon those who seek refuge in this rule is indeed high, for a motion to dismiss must be denied unless a complaint is so deficient that it fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 884 (2009) (repeating that viable causes of action must only possess "facial plausibility"); *cf. Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) ("The motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."); *In re Landry's Seafood Rests., Inc. Sec. Litig.*, Civ. No. H-99-1948, slip op. at 4 n.8 (S.D. Tex. Feb. 19, 2001) (Harmon, J.) (elaborating upon a district court's "limited" role when passing upon a Rule 12(b)(6) motion to dismiss a securities fraud complaint). "In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with fact-specific inquiries." *Haack v. Max Internet Communs., Inc.*, No. 3:00-CV-1662-G, 2002 U.S. Dist. LEXIS 5652, at *11 (N.D. Tex. Apr. 2, 2002) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).

Moreover, when "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Malcor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179, 192 (2007). Additionally, it is necessary to "construe those allegations in the light most favorable to the plaintiff." *Capital Parks,*

*Inc., v. Southeastern Adver. & Sales Sys., Inc.,* 30 F.3d 627, 629 (5th Cir. 1994); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001) ("We will accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiff.").

Finally, the court should consider the allegations set forth in Plaintiff's Second Consolidated Amended Complaint ("SCAC") in their entirety, "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009); *STI Classic Fund v. Bollinger Indus., Inc.*, No. 3-96-CV-823-R, 1996 U.S. Dist. LEXIS 21553, at *5 (N.D. Tex. Oct. 25,  1996) (deeming it improper to isolate "the circumstances alleged in Plaintiffs' amended complaint rather than to consider them in their totality"); *cf. Tellabs*, 551 U.S. at 322-3 ("The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." (emphasis in original)).  Application of these venerable pleading standards –  including the high burden on the Defendants, the requirement to construe allegations in the light most favorable to Plaintiffs, and consideration of Plaintiffs' claims in the aggregate – establishes that Defendants Ranieri's, Nocella's, and McCann's motions to dismiss should be denied.

## B.    Rule 9(b) and PSLRA Standards

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  Building upon these principles, the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (the "PSLRA"), provides that the complaint shall specify "each statement or omission alleged to have been misleading, [and]

the reason or reasons why the statement is misleading . . .," *Id.* § 78u-4(b)(1).  Still, as the United

States Court of Appeals for the Fifth Circuit (the "Fifth Circuit") observed in *ABC Arbitrage v.*

*Tchuruk*, 291 F.3d 336 (5th Cir. 2002), "even when the requirements of Rule 9(b) are combined with

the requirements of 15 U.S.C. §78u-4(b)(1) under the PSLRA, the plaintiff need not plead '*all* his

evidence' related to a securities fraud claim."  *Id.* at 351 n.70 (emphasis in original). Stated another

way, Rule 9(b) does *not* require the pleading of evidence – let alone conclusive proof – of defendants'

fraudulent conduct.  *In re Netsolve, Inc.*, 185 F. Supp. 2d 684, 696 n.10 (W.D. Tex 2001) ("At the

motion to dismiss stage, the plaintiffs need only allege facts sufficient to describe the purported fraud

with the requisite particularity.").

     As a practical matter, then, a plaintiff is required only to "put the defendants on notice of the

claims and to allow them to frame responsive pleadings" by "addressing the 'who, what, when, where,

and how' of defendants' alleged securities fraud."  *ABC Arbitrage,* 291 F.3d at 350.  This obligation

is satisfied by pleading "(1) the statement alleged to be misleading/fraudulent; (2) the speaker of the

alleged fraudulent statement; (3) when and where the alleged fraudulent statement was made; (4) with

particularity the contents of the false representations; (5) with particularity what the person making the

misrepresentation obtained thereby; and (6) the reason(s) why the statement is misleading/fraudulent."

*Kunzweiler v. Zeronet, Inc.*, No. 3:00-CV-2553-P, 2002 U.S. Dist. LEXIS 12080, at *9 (N.D. Tex. July

3, 2002).

     The policy reasons for such rule are manifest, as it would be fundamentally unfair to require

plaintiffs to include information in the SCAC that is within the exclusive possession of the

Defendants.[6]  As demonstrated herein, the SCAC plainly satisfies the particularity requirements of

Rule 9(b) as articulated in *ABC Arbitrage*.

## II.      RELEVANT LEGAL AUTHORITIES

### A.      The SCAC Satisfies the Pleading Standards of Rules 8 and 9 and the PSLRA

Disregarding the fact that Rule 8 of the FRCP must be harmonized with both Rule 9 and the

PSLRA in the securities fraud context, Defendant Nocella argues, on the one hand, that Plaintiff's

SCAC should be dismissed for failing to plead with particular detail, while, on the other hand, arguing

that Plaintiff's SCAC should be dismissed for failing to allege a short and plain statement of the claim.

(Nocella's Br. 3-4, 9.)  Contrary to Defendant Nocella's competing characterizations of Plaintiff's

SCAC, the complaint satisfies all applicable pleading standards.

Elaborating on these same concerns in *In re Compaq Sec. Litig.*, 848 F. Supp. 1307 (S.D.

Tex. 1993), this Court concluded,

> Since Rule 9(b) is to be read in conjunction with Rule 8's general notice
> pleading requirement that pleadings contain a 'short and plain statement
> of the claim,' it can be satisfied as long as the complaint contains
> information concerning the 'time, place and nature of fraudulent
> behavior and defendant's relationship thereto.'  In a similar vein Judge
> Posner recently explained that 'rule 9(b) does not require that the
> complaint explain the plaintiff's theory of the case, but only that it state
> the misrepresentation, omission, or other action or inaction that plaintiff
> claims was fraudulent.'

*Id.* at 1310 (quoting *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir.

1993)); *see also In re Capstead Mortg. Corp. Secs. Litig.*, 258 F. Supp. 2d 533, 560 (N.D. Tex. 2003)

---

[6]The Fifth Circuit has explained that, "the plaintiffs need not allege 'all' facts that may be 'related'
to their claims, since such a requirement is impossible at the pleading stage because, in nearly every
securities fraud case, only the defendants know 'all' the facts." *ABC Arbitrage,* 291 F.3d at 354
(quotations omitted).

(stating to adequately plead fraud, plaintiffs "should identify the particular statement they contend is false [or] misleading and the reason why that statement is false or misleading").

Here, the SCAC clearly identifies the statements alleged to be false and/or misleading by documenting where, when, and by whom each disputed pronouncement was made. (SCAC ¶¶ 44-49, 51-52, 54-57, 59-66, 68-70, 73, 75-76, 78.)  Moreover, as discussed in the SCAC, the false and misleading nature of many of these statements was readily admitted by Franklin by virtue of the Company's restatement for fiscal year 2006 and the first three quarters of 2007, which was for the sole purpose of correcting material errors.  (*Id.* ¶¶ 152-55.)  Nevertheless, the SCAC clearly enumerates why each statement was false and misleading by setting forth exactly what adverse facts were omitted and/or misrepresented.  (*Id.* ¶¶ 50, 53, 58, 67, 72, 74, 77, 79.)  As such, Plaintiff has adequately identified the statements alleged to have contained false and misleading information and given the reasons why they are false and misleading.  Thus, any confusion that may exist with regard to the misstatements set forth in the SCAC was infused by the underhanded tactics employed by Defendants to artificially inflate Franklin's stock price, rather than Plaintiff's memorialization of such machinations.

### B.   The SCAC Does Not Improperly Rely On the Group Pleading Doctrine

In their briefs, Defendants Nocella and Ranieri suggest that Plaintiff has improperly relied on the group pleading doctrine.  (Nocella's Br. 10; Ranieri's Br. 24-25.)  To put it mildly, this is simply not at all so.  The group pleading doctrine is a principle that allows "unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364 (5th Cir. 2004).  The Fifth Circuit has rejected the group pleading doctrine. *Id.* at 365. *But see Tellabs*, 551 U.S. at 326 n.6, 127

-24-

S. Ct. at 2511 n.6, 168 L. Ed. 2d at 195 n.6 (declining to consider the validity of the group pleading doctrine).  Significantly, though, the Fifth Circuit's ban on group pleading does not prevent a plaintiff from attributing a statement to more than one individual, nor does it prohibit a plaintiff from using collective terms such as "Defendants" for purposes of identifying the parties.  *See Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir.  2005) ("Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant."); *cf. In re Thornburg Mortgage, Inc. Sec. Litig.*, No. CIV 07-0815 JB/WDS, 2010 U.S. Dist. LEXIS 13375, at *90 (D.N.M. Jan. 27, 2010) ("The reality is that individuals in a corporation often act collectively, and there is no reason to ban good, succinct prose when reviewing the allegations of conduct and omissions that defendants did collectively.").  Indeed, specifically addressing the issue of whether or not a plaintiff may attribute false statements to more than one defendant, the Fifth Circuit stated that "unattributed statements within documents may be charged to different individuals, and specific facts may tie more than one individual to the same statement." *Southland*, 365 F.3d at 365.  What is more, "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.  If nothing else, the former official is at fault for a material omission in failing to correct such statements in that context." *Barrie*, 409 F.3d at 656 (citation omitted).

Here, for the sake of grammatical simplicity, Plaintiff sometimes use the collective term "Defendants" in its SCAC to identify Defendants Ranieri, Nocella, and McCann; however, Plaintiff does not enlist this term in reliance on any presumption. *See generally In re Thornburg Mortgage*, 2010 U.S. Dist. LEXIS 13375, at *90 ("[T]here is no reason to ban good, succinct prose . . . .").

Rather, the SCAC specifically identifies Defendants Ranieri, Nocella, and McCann as participants in the alleged fraud by identifying each Defendant as a signatory to SEC filings, an author of a statement released in a press release, or a participant in a conference call.  More to the point, the SCAC, as conceded by Defendant Ranieri in his brief, identifies Defendant Ranieri as a signatory to the Company's 2006 Form 10-K.  (SCAC ¶ 49; Ranieri's Br. 24.) Identifying a defendant as a signatory to SEC filings that are alleged to contain false and misleading information sufficiently "ties [the defendant] to the statements that form the basis of [its] securities fraud claims by alleging their involvement in providing inflated [] figures." *Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 739-40 (N.D. Tex. 2007) (finding that although plaintiffs had engaged in group pleading, they had otherwise satisfied Rule 9(b) and the PSLRA to the extent necessary to avoid dismissal by alleging that the defendant had prepared and signed the company's SEC filings, issued statements in press releases, and led conference calls with analysts and investors.).  The SCAC also identifies Defendant Ranieri as a commentator on a November 26, 2007 conference call, wherein he committed to "shepherd" the bank through hard times and assured investors that Franklin was well collateralized even though the market was showing signs of deterioration.  (SCAC ¶¶ 69, 70.)[7] Similarly, the SCAC specifically links Defendants Nocella and McCann to the challenged statements as signatories, authors, or participants. (*Id.* ¶¶ 45-48, 52, 55-57, 60-66, 69.) Accordingly, Plaintiff has sufficiently linked each Defendant with the public statements containing the misrepresentations and/or omissions, including but not limited to SEC filings, press releases, and comments during analyst conference calls.

---

[7]Additionally, Defendant Ranieri's argument that he "said nothing on January 31, July 25 and October 30 calls" (Ranieri Br. p. 25) does not absolve him from liability in this case because, as previously noted, he "cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *Barrie*, 409 F.3d at 656 (citation omitted).

**C.**   **The SCAC Adequately Pleads That Defendants Published Materially Misleading Statements**

1.   Defendants' False and Misleading Statements

In their memoranda supporting the Motion to Dismiss, Defendants go to great lengths to distance themselves from the false and misleading statements detailed in the SCAC.  In doing so, however, Defendants conveniently eschew the fact that the Company's financial summaries filed with the SEC during the Class Period – and signed by Defendants – have now been restated.  To reiterate, the restatement of the reports constitutes an admission that those public disclosures were false when made, *In re: First Energy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("By definition . . ., a restatement says that the prior financial statement was false."), and Defendants' signatures suffice to make them accountable for the misstatements, *e.g., Southland*, 365 F.3d at 365 ("[S]pecific facts tying a corporate officer to a statement would include a signature on the document . . . ."); *In re OCA Sec. & Derivative Litig.*, No. 05-2165 Section R(3), 2006 U.S. Dist. LEXIS 90854, at *39 (E.D. La. Dec. 14, 2006) (deeming execution of SEC reports "adequate[ to] attribute[] . . . false or misleading statements identified in the complaint . . . to . . . defendants").

By signing admittedly inaccurate SEC filings during the Class Period, each Defendant is subject to liability under § 10(b) of the Exchange Act.  Furthermore, the SCAC establishes in no uncertain terms that Defendants compounded this deception through verbal remarks touting the undaring nature of Franklin's lending practices.  Defendant Ranieri boasted during the Class Period about the adequacy of the reserves Franklin had set aside for bad loans (CAC ¶ 66), and Defendants Nocella and McCann strove to persuade the markets that the bank did not "have any subprime," "pay option ARMs," or "simultaneous seconds" (*id.* ¶ 55 (statements of Defendant Nocella) because it "only originated prime level lending" (*id.* ¶ 62 (statement of Defendant McCann)).  All the while, as

-27-

recounted in the SCAC, Franklin possessed woefully insufficient reserves and presided over a portfolio filled with unconventional loan products.

Naturally, the investing community took to heart Defendants' glowing representations about the Company, with the bank receiving accolades as "one of [the] more conservative underwriters out there." (SCAC ¶ 55.)  It is only now – following Franklin's collapse at the hands of what was actually a "high-risk business strategy" (*id.* ¶ 3) – that Defendants seek to escape responsibility by engaging in revisionist exercises designed to fool this Court into believing things like Defendant Nocella **really** meant that Franklin didn't have any "subprime *issues*" when he pledged that the bank didn't "have any sub-prime" (Nocella's Br. 24) or that he **really** was interjecting something as an "aside" rather than making the point – reflected by independently created, pre-litigation transcripts[8] – that Franklin refused to place subprime loans "inside" its portfolio (Nocella's Br. 25-26; McCann's Br. 12).  Not only does this transparent gamesmanship run afoul of the time-honored principle that at this juncture the Court must "accept all factual allegations in the complaint as true," *Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509, 168 L. Ed. 2d at 192, but Defendants' contorted, after-the-fact recharacterizations also do violence to a natural understanding of the words they spoke.  Plaintiff submits that any objective interpretation of the **actual** transcripts cited in the SCAC reveals that Defendants falsely declared during the Class Period that Franklin maintained a pristine portfolio filled with loans of the highest

---

[8]When reproducing Defendants' remarks at phone conferences during the Class Period, the SCAC borrows from the "final" transcripts prepared by the esteemed Bloomberg L.P.  To substantiate that the SCAC has accurately quoted from these prelitigation, third-party records – and to counter Defendants' baseless and unwarranted accusations on this subject – Plaintiff has included within its Appendix of Unreported Authorities full copies of the underlying Bloomberg transcripts.  (*See* Franklin Investor Group's App. Unreported Authorities Tabs 12-15.)  These Bloomberg materials clearly show, among other things, that Defendant Nocella said that he "refuse[d] to put [subprime loans] inside [Franklin's portfolio]" – and did not use tortured language to indicate that he was stating something as an "aside" – on the October 30, 2007 earnings call.  (*Id.* Tab 14, at 15.)

quality.  Because nothing could have been further from the truth, Defendants' oral comments listed in the SCAC are – in addition to the admittedly untrue SEC filings – false and misleading statements for purposes of § 10(b).

> 2.   Materiality of Defendants' Statements Regarding Subprime Lending and Loan Concentrations

Defendant Nocella argues that Plaintiff's SCAC should be dismissed because it does not allege facts that allow this Court to assess the materiality of statements and omissions regarding the Company's subprime lending and loan concentrations.  (Nocella Br. 27, 35).  Taking into account the actual allegations contained in the SCAC, as well as the prevailing circumstances at Franklin during the Class Period, Defendant Nocella's assertion is, at best, difficult to comprehend.  To begin with, materiality is generally not appropriately resolved on a motion to dismiss as it involves issues for the trier of fact. *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996).  Beyond that consideration, "materiality is determined by evaluating whether there is [a] substantial likelihood that the false and misleading statement would have been viewed by the reasonable investor as having altered the total mix of information available." *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. Tex. 2002). In this regard, "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material. . . ." *Lormand*, 565 F.3d at 248.  As such, the Fifth Circuit made clear in *Lormand* that "[o]nce the defendants engaged in public discussions concerning the benefits of [certain products and] programs, they had a duty to disclose a '"mix of information' that is not misleading." *Id.* at 248-49 (emphasizing "a duty to speak the full truth arises when a defendant undertakes a duty to say anything.  Although such a defendant is under no duty to disclose every fact

or assumption, he must disclose material, firm-specific adverse facts that affect the validity of plausibility of that prediction").

Here, it is without question that the Defendants' misstatements and omissions regarding the Company's loan portfolio, including its subprime lending and loan concentrations, are exactly what an investor would very likely rely on and view in "the total mix of information." Indeed, effectively demonstrating investors' interests in Franklin's nontraditional and subprime lending, analysts following Franklin specifically asked Defendants about their use of such products. (SCAC ¶¶ 46, 55-56, 60-65, 69-70.) The curiosity about this topic was completely understandable, given that the country was at that time in the grips of an unrivaled crisis in the mortgage markets in which Franklin operated. In response to these inquiries, Defendants affirmatively denied carrying such financial tools in Franklin's loan portfolio. (*Id.*) In truth, however, the Company's loan pool was overrun with subprime and nontraditional loans that were performing poorly. (*Id.* ¶¶ 3, 96.) Likewise, the Defendants misstated the Company's loan concentrations to allay investors' fears over the Company's ability to withstand deteriorating market conditions. (*Id.* ¶¶ 60-65, 69-70.) Thus, as set forth in the SCAC, Defendants omitted known risks that eventually proved disastrous for the Company. Indeed, Franklin has itself admitted the materiality of these subjects by restating financial figures relevant to the same points. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("[T]he mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.") Mindful of all this, to dismiss as immaterial at this stage would be inappropriate. *See Lormand*, 565 F.3d at 249 (finding "the total mix of information was misleading" because "defendants continually skewed the mix of information by omitting the

known severe risks associated with [their] business actions even as they recognized signs that those

risks had already materialized").

    **D.**    **The SCAC Raises a Strong Inference That the Defendants Acted With the Requisite Degree of Scienter**

In general terms, scienter, for purposes of claims arising under the Securities Exchange Act

of 1934 (the "Exchange Act"), encompasses intentional misbehavior and severe recklessness. *Fin.*

*Acquisition Ptnrs. v. Blackwell,* 440 F.3d 278, 287 (5th Cir. 2006); *see Tellabs*, 551 U.S. at 319 n.3

("Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter

requirement by showing that the defendant acted intentionally or recklessly. . . ."). Since the Supreme

Court's decision in *Tellabs*, courts within the Fifth Circuit have adopted a three step approach to

evaluating allegations of scienter:

> First, the plaintiff's allegations must, as in federal pleadings generally, be
> taken as true. Second, courts may consider documents incorporated in the
> complaint by reference and matters subject to judicial notice. Third, a
> plaintiff must plead scienter such that it raises a 'strong inference' (i.e., a
> powerful or cogent inference) of 'fraudulent intent' and is sufficiently pled
> 'only if a reasonable person would deem the inference of scienter cogent and
> at least as compelling as any opposing inference one could draw from the
> facts alleged.'

*In re Tetra Techs., Inc. Sec. Litig.*, Civil Action No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687,

at *16-*17 (S.D. Tex. July 9, 2009) (quoting *Tellabs*, 511 U.S. at 324, 127 S. Ct. at 2510, 168 L. Ed.

2d at 193-94). Notably, however, it is beyond cavil that the strong inference of scienter "need not be

of the smoking-gun genre or even the most plausible of competing inferences." *Id.* (internal quotations

omitted); *see also id.* at 330, 127 S. Ct. at 2513, 168 L. Ed. 2d at 197 (Scalia, J., dissenting)

(characterizing as "doubtless true" the proposition that scienter allegations need not equate to a

smoking gun). With this much understood, it is evident that the circumstances advanced in Plaintiff's

-31-

SCAC – *i.e.*, the awareness of adverse facts, statements of confidential witnesses, the magnitude and duration of the fraud, Defendants' manifest violations of GAAP, the Company's restatement of earnings, violations of internal policies, and false SOX certifications – combine to create "an inference of scienter *at least as likely* as any plausible opposing interest." *Tellabs*, 551 U.S. at 328, 127 S. Ct. at 2513, 168 L. Ed. 2d at 196.

> 1.    Defendant Ranieri's Status as an "Outside Director" Does Not Insulate Him From Liability for False Statements He Made With Scienter

In his brief, Defendant Ranieri portrays himself as a mere "outside" director who cannot be held responsible for the misdeeds of Franklin's management.  In making this argument, he directs the Court to cases like *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001), which approved the dismissal of outside directors who were not "alleged to have made any statements" and against whom there existed no "other allegation . . . tending to support an inference of scienter."  In the final analysis, as relevant to this issue, the opinions cited by Defendant Ranieri stand for little more than the unremarkable principle that outside directors face no liability for securities fraud if they did not make a false statement with scienter.  *See id.*; *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Dynegy, Inc.*, 339 F. Supp. 2d 804, 895-909 (S.D. Tex. 2004) (Lake, J.) (dismissing claims against outside directors simply because complaint failed to raise inference of scienter against them, not **because** they were outside directors); *Newby v. Enron Corp.*, 258 F. Supp. 2d 576, 624-38 (S.D. Tex. 2003) (Harmon, J.) (same).  Like all other persons, though, an outside director of a corporation will be liable should that person otherwise violate § 10(b).  *See, e.g., Rosky v. Farha*, Case No. 8:07-cv-1952-T-26MAP (Consolidated), 2009 U.S. Dist. LEXIS 107531, at *21-*22 (S.D. Fla. Mar. 30, 2009)

-32-

(denying motion to dismiss against outside directors who were alleged to have made false statements with scienter).

Here, the SCAC does not seek to hold Defendant Ranieri accountable for the sins of "management," but rather demonstrates that he, personally, mischaracterized Franklin's affairs by doing things like signing the Company's admittedly false 2006 10-K and making other misleading oral statements during the Class Period. Moreover, and as the SCAC and this Memorandum make apparent, Defendant Ranieri did so with the requisite scienter.

One of the founders of Franklin Bank, Defendant Ranieri was closely involved with the Company's day-to-day operations. That this was so is evident from his own remarks during the Class Period, through which he implored investors to count on his "background" as sufficient to "shepherd" the bank through financial turmoil. (*See* SCAC ¶ 69.) As Defendant Ranieri put it then, his "job" was to "guard the place" (*id.* ¶ 71), and this Court should reject his post-litigation efforts to disclaim that representation by hiding behind his nominal status as an outside director.

<u>                    </u>2.    <u>The SCAC Provides Sufficiently Particularized Allegations Regarding Defendants' Motive to Commit the Alleged Fraud</u>

Defendants argue that Plaintiff's scienter allegations are deficient because they do not include allegations of insider sales and, thus, suggest nothing more than "common-place motives." (Nocella's Br. 10-11; Ranieri's Br. 13-14; McCann's Br. 16-17.) Not only does Defendants' argument mischaracterize the allegations of the SCAC, but it misconstrues the law regarding scienter, and in particular motive and opportunity. To begin with, as the Fifth Circuit recognized in *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 411 (5th Cir. 2001), "[t]he PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter." Thus, allegations of insider sales are

anything but a sina qua non for a securities fraud complaint. *See Southland*, 365 F.3d at 368 (recognizing that allegations of insider trading are but one form of motive and opportunity allegations). For that matter, the United States Supreme Court has made it clear that the "absence of a motive allegation is not fatal" to a § 10(b) cause of action. *Tellabs*, 551 U.S. at 325, 127 S. Ct. at 2511, 168 L. Ed. 2d at 194; *see also Novak v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000) (concluding "Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard [for scienter]").  Even so, it is true that motive allegations – which include a wide range of considerations beyond just insider trading – may serve to bolster an inference of scienter. *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 250 (5th Cir. 2003) (rejecting defendants' characterization of plaintiffs' motive allegations as "routine corporate events" and finding plaintiffs' allegations regarding a lucrative merger and the CEO's unique compensation package sufficiently particularized); *Barrie*, 397 F.3d at 264 (acknowledging that allegations of the defendants' bonuses added to the total mix of information).  In this vein, the most hurried examination of the SCAC establishes it to be built upon particularized facts showing motive and opportunity that "meaningfully enhance the strength of the inference of scienter." *Nathenson,* 267 F.3d at 412.

More plainly, as a "high-ranking corporate officer[]," *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*, 537 F.3d 527, 543 (5th Cir. 2008), it is undeniable that each Defendant had the opportunity to commit the alleged fraud.  Further, the specifically pleaded facts in this case demonstrate that each Defendant also possessed the motive to engage in the alleged wrongdoing.  Generally speaking, Defendants were motivated to conceal from the public the true condition of Franklin so that they could accomplish a sale of the bank on favorable terms and in so doing duplicate the financial windfall they reaped at Bank United.  Confronted with similar circumstances, the Fifth

Circuit confirmed that affirmatively acting to suppress from investors and prospective buyers the true financial well-being of an enterprise is sometimes sufficient to demonstrate motive. *See MCI Worldcom*, 340 F.3d at 249-50. In *MCI Worldcom*, the plaintiffs alleged that "defendants initially sought to avoid taking a charge for uncollectible accounts receivable until the Sprint merger was approved by Sprint and Worldcom shareholders; then, once Sprint and Worldcom shareholders approved the merger, the defendants thereafter continued to issue artificially inflated results to ensure the deal was completed on terms favorable to Worldcom." *Id.* at 249-50. In its analysis, the Fifth Circuit stated that such allegations "sufficiently demonstrate[d] the importance of the Sprint merger to Worldcom" and the court recognized plaintiff's allegations as alleging more than a routine corporate motive. *Id.* Similarly, the SCAC demonstrates that each Defendant in this case was incentivized to hide the capital structure of Franklin to secure and finalize a sale consistent with the deal they previously struck in the Bank United/Washington Mutual merger.[9] Indeed, the Defendants' concerted re-creation of the circumstances surrounding the Bank United/Washington Mutual merger, such as employing the same staff to implement the same high-risk strategy without sufficient internal controls,

---

[9]Feigning incredulity, Defendant Nocella now questions such things as how the scheme might have avoided the attention of those performing due diligence for any transaction involving Franklin. (Nocella Br. 11 n.8.) Of course, such trifling concerns would have taken a back seat as Defendants did their best to make the Company as appealing as possible to suitors. On analogous facts, the United States Court Appeals for the Seventh Circuit observed:

> The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

shows that Defendants did not possess a  routine motive for the good of the company, but had a specific motive to inflate Franklin's stock to secure a sale.  These facts, when viewed in conjunction with the multitude of other scienter allegations, serve to bolster the inference that Defendants acted with the requisite state of mind.[10]

3.    Defendants Were Aware of, or Recklessly Disregarded, Internal Corporate
      Information that Contradicted Their Statements

Defendants knew that they were publishing materially false and misleading information, or were severely reckless in publishing such false and misleading information, because they had access to internal corporate information that contradicted their statements.  Indeed, the SCAC explains that an internal audit performed by the FDIC evidences that while Franklin was publicly denying originating or owning any payment option adjustable rate mortgages or subprime mortgages, Franklin was, in fact, originating, purchasing, and selling "an array of mortgage products that included nontraditional and subprime mortgages.'" (SCAC ¶¶ 3, 96.)  The FDIC report also makes clear that while the Company was touting its stability as a well collateralized entity, the truth was that Franklin's liquidity was "strained" and its capital "deficient."  (*Id.* ¶ 95.)

That Defendants knew of their misconduct, and intended to lie to the investment community, is corroborated by the statements of five confidential witnesses, all of whom were employees of Franklin during the Class Period.[11]  More pointedly, CW1 declared that his attendance at various

---

[10]Of course, in the unlikely event this Court rejects Plaintiff's motive allegations, the remaining assertions within the SCAC are independently sufficient to raise a strong inference of Defendants' scienter.  *Cf. Tellabs*, 551 U.S. at 325, 127 S. Ct. at 2511, 168 L. Ed. 2d at 194 ("[T]he absence of a motive allegation is not fatal.").

[11]Contrary to Defendant McCann's assertions, the fact that two of Plaintiff's confidential witnesses were not employed for the entirety of the Class Period does not negate a finding of Defendant McCann's scienter.  (McCann Br. 21-25.)  Rather, by identifying each witness's job title and related

-36-

executive level meetings in the first month he was with Franklin made it glaringly evident, as it plainly was to all those such as Defendants Nocella, Ranieri, and McCann, that the Company's internal controls and monitoring of the single family residential portfolio were "awful."  (SCAC ¶¶ 114-15.) CW2, as Executive Vice President reporting directly to Defendant Nocella, recounted that Defendants Nocella and Ranieri were both members of the Company's Board Credit Meetings, which met monthly for the purpose of reviewing and/or approving line of credits over $10 million.  (*Id.* ¶¶ 123-25.) Accordingly, they knew, or were certainly on notice, of the Countrywide line of credit, which was secured by hundreds of millions of dollars in subprime loans.  Likewise, CW2 explained that by way of their memberships in Franklin's Management Loan Committee, Defendants Nocella and McCann most assuredly had first hand knowledge of all matters involving loan modifications and covenant waivers.  (*Id.* ¶ 126.)  In the face of these actual facts, Defendants repeatedly – and falsely – advised investors that the Company "only originated prime level lending," dismissing questions about nontraditional and subprime as inapplicable to Franklin.  (*Id.* ¶¶ 45, 46, 55, 62, 63, 65.)

With regard to the Company's aged and delinquent accounts, CW3 confirmed that each Defendant had access to a weekly Aging Report and a weekly Delinquent Report that were circulated every Friday and effectively laid out issues with regard to specific accounts and the overall portfolio.

---

duties and the relevant time frame that the witness was employed, Plaintiff provided sufficient detail with regard to these two witnesses, identified in the SCAC as CW1 and CW4.  Indeed, as noted in *In re Dell Inc. Secs. Litig.*, 591 F. Supp. 877, 895 (W.D. Tex. 2008), a complaint may provide sufficient detail of a confidential witnesses' credibility by "giv[ing] details such as the person's job description, individual responsibilities, and specific employment dates."  Furthermore, the statements of CW1 and CW4 sufficiently detail Defendant McCann's knowledge of areas alleged to have been deficient in their accounting and internal controls by documenting that Defendant McCann was "responsible for setting reserves for the warehouse lines," approved the Company's accounting for loan losses, and participated in the discussion and/or review of aging loans as a member of the Credit Committee, which met biweekly.  (SCAC ¶¶ 116, 133-38.)  Accordingly, CW1's and CW4's statements provide meaningful insight into the proximity each had with Defendant McCann and the wrongdoing alleged during the Class Period.

(SCAC ¶ 130.)  Moreover, CW3 and CW4 stated that members of the Company's Credit Committee participated in biweekly meetings where the topic of rising delinquencies was undoubtedly a constant agenda item.  (*Id.* ¶¶ 130-32, 136-38.)

In like fashion, CW5 reported that each Defendant had access to the Company's list of Real Estate Owned ("REO"), which itemized the Company's REO transactions (SCAC ¶¶ 143-44) and received monthly and quarterly reports specifically reporting the Company's "Held for Sale" and "Held for Investment" portfolios, (*Id.* ¶ 145).

It cannot seriously be questioned that these internal corporate reports supplied Defendants with internal information regarding the true nature of the Company's financial condition.  *See In re Tetra Techs., Inc. Sec. Litig.*, Civil Action No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687, at *12 (S.D. Tex. July 9, 2009) (noting that allegations regarding "named reports delivered on particular dates are specific enough to support securities act claims.").[12]  Thus, Plaintiff has adequately alleged that each Defendant had access to internal information that contradicted the pertinent statements concerning Franklin's loan portfolio and financial performance.

Furthermore, Plaintiff's allegations that Defendants acted intentionally or recklessly is highlighted by Mr. Wolfe's letter dated March 14, 2008.  Specifically, Mr. Wolfe wrote how he refused to execute a Sarbanes-Oxley Attestation because he "knew that the Bank's accounting of REOs

---

[12] Moreover, the district court in *In re Tetra Techs.* made clear that statements of confidential witnesses my be credited if "[t]he confidential sources listed . . . consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify." *In re Tetra Techs.*, 2009 U.S. Dist. LEXIS 126687, at *23 (citation omitted).  Here, the credibility of the confidential witnesses is virtually unassailable in that the informants in the SCAC consist of Company employees who (i) actually prepared internal reports that contradicted the Defendants' public statements, (ii) attended meetings and or presented information at meetings wherein the Company's undisclosed problems were agenda topics, and (iii) reported directly to Defendant Nocella.  (SCAC ¶¶ 114-46.)  Thus, Defendants' dismissal of these statements as lacking foundation ignores reality.  (*See* Nocella's Br. 16-19; McCann's Br. 21-25; Ranieri's Br. 16-18.)

[real estate owned] was misleading, inaccurate, and did not comport with Generally Accepted Accounting Principles (GAAP).  In addition, [he] decided not to sign the Attestation based on [his] knowledge that Franklin Bank had incorrectly and perhaps deliberately overstated the value of certain Non-Performing Assets (NPAs) and failed to disclose the existence of others to obfuscate the extent of certain in-substance REOs that were not properly classified, and that the Bank's stated book value of REO inventory as of December 31, 2007 substantially exceeded the [net] realizable value." (SCAC ¶ 103.)  Mr. Wolfe also went into detail about how Franklin's public statements that the Company did not own or originate any subprime loans – remarks attributed in the SCAC to Defendants Nocella, Ranieri, and McCann – were "demonstrably false."  (*Id.* ¶ 106.)  Mr. Wolfe further revealed specific instances where Franklin had reclassified serious delinquent loans as current, failed to recognize losses on valid repurchase requests, and failed to indemnify Countrywide under the entities' agreement.  (*Id.* ¶ 107.)  Based on his knowledge and experiences at Franklin, Mr. Wolfe opined that "the 2007 earnings report that Franklin Bank filed should be restated because it is not accurate and therefore constitutes fraud against shareholders."  (*Id.* ¶¶ 105, 108.)

### 4.   Magnitude and Duration of the Fraud

The magnitude and duration of accounting irregularities, while not determinative of scienter, is probative of it.  *In re Qwest Communx. Int'l Inc. Sec. Litig.,* 387 F. Supp. 2d 1130, 1147 (D. Colo. 2005) ("Allegations of pervasive and long-standing accounting machinations, and resulting misstatements, may support a strong inference of scienter under the PSLRA."); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000); *see also In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) ("We are satisfied that the magnitude of the fraud and the duration of the irregularities (spanning two fiscal years) are such that it is reasonable to find them

probative of scienter."); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("Alleged fraud of this magnitude, coupled with plaintiffs' other allegations, creates an implication of recklessness, on the face of the pleading, which compels us to deny defendant's motion."). Stated another way, there is a fundamental difference between accidental oversight and deliberately turning a "blind eye" to the facts month after month. *In re Global Crossing Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 346 (S.D.N.Y. 2004).

Here, Plaintiff has alleged an ongoing scheme to defraud investors spanning a period of nearly two fiscal years. Indeed, the pervasive nature of the accounting deficiencies was memorialized in the FDIC's Material Loss Review (SCAC ¶¶ 94-99), and the very things about which Defendants lied to the public were things that led to the bank's failure. These allegations, when viewed in conjunction with Plaintiff's other scienter allegations, create a strong inference that Defendants acted with scienter.

5.     Violations of GAAP and the Restatement of Earnings

There can be no legitimate dispute that violations of GAAP, combined with other circumstances indicative of fraudulent intent, can raise a strong inference of scienter. *See MicroStrategy*, 115 F. Supp. 2d at 635, 638-39 (acknowledging that "'scienter requires more than a misapplication of accounting principles,'" but agreeing that it "take[s] on further inferential weight" through such evidence); *In re Triton Energy Ltd. Secs. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *33 (E.D. Tex. Mar. 30, 2001) (reiterating that while GAAP violations, standing alone, may be insufficient to give rise to a strong inference of scienter "this does not mean that a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus."). Moreover, this case presents unusually strong allegations

concerning the extent and nature of the accounting improprieties that, in and of themselves, further support a strong inference of scienter.  *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) ("[P]laintiff has not alleged a mere technical violation of one of GAAP's proscriptions. Instead, the Complaint details numerous instances of accounting legerdemain that all serve to overstate the ledger of [the company].").

Here, the nature of the Company's alleged GAAP violations is the overstatement of revenue via the improper recognition of interest income on delinquent loans, failing to properly account for loan modifications, and failing to adequately allow for credit losses.  (SCAC ¶¶ 158-66.)  Notably, the applicable GAAP policies involved simple and basic accounting principles that Defendants, two of whom are CPA's and the other being the "father of securitized mortgages," were well aware of.  (*Id.* ¶¶ 168-71.)  It should therefore come as no surprise that internal information showing the true financial condition of the Company, which was reviewed by the FDIC, provides evidence that Defendants were knowingly violating these GAAP policies.  (*Id.* ¶¶ 94-99, 170.)  As a result of the Defendants' calculated manipulation of these accounting standards, the Company was required to restate its earnings for fiscal year 2006 and the first three quarters of 2007.  These allegations, when viewed in the total mix of Plaintiff's scienter allegations, support a strong inference that Defendants acted wtih the requisite intent; "[a]fter all, books do not cook themselves."  *In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

### 6.   Failure to Heed Red Flags

As amply demonstrated in the SCAC, the red flags in this case, at the very least, warranted further investigation into the Company's financial position.  "Red flags are those facts which come to the attention of a [defendant] which would place a reasonable [defendant] on notice that the . . .

-41-

company was engaged in wrongdoing to the detriment of its investors." *Bruhl v. Conroy*, Case No. 03-23044-Civ-MARRA/JOHNSON, 2007 U.S. Dist. LEXIS 21886, at *17 n.6 (S.D. Fla. Mar. 27, 2007). "Together with GAAP violations, red flags may be sufficient to establish scienter." *In re Eagle*, 319 F. Supp. 2d at 1328.

Setting to one side Defendants' vigorous denials, there were numerous circumstances in this case that forewarned Defendants that Franklin's reported financials were false and misleading. First, the fact that Franklin took possession of $150 million in loans pledged as collateral certainly indicated to Defendants the need to investigate, especially since these loans included a high level of subprime and nontraditional mortgages and the market for such loans was rapidly deteriorating. Second, receipt of and access to reports and databases showing the rising delinquencies of loans without question alerted Defendants of the need for further investigation, especially in the face of the Company's repeated public assertions that it was well collateralized despite a down-turn in the market. Third, Mr. Wolfe's refusal to sign the Company's 2007 SOX Attestation on three different occasions and his recital of a litany of reporting irregularities was undoubtedly a red flag of severe accounting woes. Indeed, as outlined in the FDIC's Material Loss Review, there were glaring accounting deficiencies present at Franklin. (SCAC ¶¶ 95-99.) The FDIC report further makes clear that these problems were ignored by Franklin's management, as well as its Board of Directors. (*Id.*)[13]

7.      Lack of Internal Controls

Defendants' failure to heed the red flags enumerated above highlights the deficiencies in the Company's oversight and monitoring programs. "[A] failure to maintain sufficient internal controls

---

[13]In this regard, Defendant Ranieri's attempt to distance himself from the alleged fraud by asserting that the FDIC report undermines any inference of Defendant Ranieri's scienter because it concludes that Franklin's problems arose solely at the hands of the Company's "management" is to no avail. (*See* Ranieri's Br. 20-23.)

to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006). Here, Defendants admitted, by virtue of Frankin's restatement, that they failed to maintain adequate internal controls. Moreover, as witnessed by CW1, the Company's internal control problems were obvious and known to Franklin's executives. (SCAC ¶¶ 114-15.) Accordingly, the Company's lack of internal controls throughout the Class Period – which the FDIC laid at the feet of the Board of Directors chaired by Defendant Ranieri – further supports an inference of scienter. This is particularly true in this case because of the Defendants' business backgrounds and expertise, which qualified them to recognize the multiple red flags and control issues.[14]

8. Violations of Internal Policies and False Sarbanes-Oxley Certifications

Violations of Franklin's own internal policies is further indicia of the Defendants' scienter. *See In re Veeco*, 235 F.R.D. at 231 (stating "alleged actions, which are contrary to expressed policy and prior practice, form the basis for proof of recklessness" (internal quotations omitted)). As set forth in the SCAC, Franklin's financial statements for fiscal year 2006 and for the first three quarters of 2007 violated, not only GAAP policies, but the Company's own accounting policies as stated in Franklin's Statement of Significant Accounting Policies in the Company's Form 10-K for 2007 and Form 10-Qs for the first, second, and third quarters of 2007. (SCAC ¶¶ 167-71.)

Along these same lines, Defendants' false Sarbanes-Oxley certifications further support a strong inference of scienter. "Sarbanes-Oxley certifications are 'probative of scienter' where, as here, 'the persons signing the certification were severely reckless in certifying the accuracy of the financial

---

[14]Defendant Ranieri's argument that the SCAC's confidential witness statements regarding internal controls weigh against a finding of Defendant Ranieri's scienter mischaracterizes the allegations in the SCAC. (Ranieri's Br. 17-18.) When read in the proper context, the SCAC avers that Defendant Ranieri knew that the Company was experiencing internal control problems; despite this knowledge, he omitted to disclose this deficiency to the investing public in a timely manner.

statements.'" *Rosky v. Farha*, Case No: 8:07-cv-1952-T-26MAP (Consolidated), 2009 U.S. Dist. LEXIS 107531, at *22 (S.D. Fla. Mar. 30, 2009) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)); *In re Tetra Techs*, 2009 U.S. Dist. LEXIS 126687, at *29 (noting "The Fifth Circuit accepted as a 'plausible' interpretation of the PSLRA that a defendants' SOX certification may raise an inference of scienter 'if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" (quoting *Cent. Laborers Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007))).

Here, as certifiers of Franklin's financial statements, Defendants Nocella and McCann have virtually no room to contend they were unaware of the disclosure requirements of Sarbanes-Oxley. *See In re Pall Corp.*, No. 07-CV-3359 (JS) (ARL), 2009 U.S. Dist. LEXIS 88240, at *22 (E.D.N.Y. Sept. 21, 2009) (finding that because plaintiffs had alleged that each defendant certified the financial statements alleged to be false, "Plaintiffs have sufficiently established, for purposes of surviving this 12(b)(6) motion, that Defendants should have familiarized themselves with the facts relevant . . . to ensure that the SEC filings they signed were both truthful and accurate."). Despite knowledge of their disclosure obligations, however, the Defendants chose to turn a blind eye or not to disclose that the Company's reported numbers did not adequately reflect the true state of operations at Franklin.

In sum, contrary to Defendants' assertions, Plaintiff's scienter allegations, when viewed collectively, sufficiently establish scienter at this stage of the litigation.

### E.    The SCAC Adequately Pleads Loss Causation

In discussing the pleading standards for loss causation, the Fifth Circuit recently stated:

> [W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in
> respect to loss causation, a facially 'plausible' causal relationship
> between the fraudulent statements or omissions and plaintiff's
> economic loss, including allegations of a material misrepresentation or
> omission, followed by the leaking out of relevant or related truth about
> the fraud that caused a significant part of the depreciation of the stock
> and plaintiff's economic loss, *see Dura*, 544 U.S. at 342; or, as
> *Twombly* indicates, the complaint must allege enough facts to give rise
> to a reasonable hope or expectation that discovery will reveal evidence
> of the foregoing elements of loss causation.

*Lormand*, 565 F.3d at 258; *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125

S. Ct. 1627, 1634, 161 L. Ed. 2d 577, 588 (2005) (stating that a plaintiff need only "provide a

defendant with some indication of the loss and the causal connection that the plaintiff has in mind");

*In re Enron Corp. Secs., Der. & "ERISA" Litig.*, 465 F. Supp. 2d 687, 724 n.47 (S.D. Tex. 2006)

("[O]ne acceptable, but not the only, way to plead proximate cause and economic loss . . . in fraud on

the market cases is to allege that the price a plaintiff paid for a security fell significantly after the truth

[of the material misrepresentation of omission] becomes known and that the disclosure of the

misrepresentation or omission had a significant effect on the market price.").  Plaintiff has easily

crossed this threshold.

Here, Plaintiff alleges that Franklin's stock prices were inflated throughout the Class Period

as a result of Defendants' misstatements and omissions, which concealed the truth about the

Company's internal controls, loan portfolio, accounting for delinquent loans, REOs, loan modification,

and monthly increases in the cash surrender value of certain bank owned life insurance. (SCAC ¶¶ 2,

29, 147, 189, 190-205.)  Plaintiff further alleges that the Company's stock price fell from $19.00 on

January 30, 2007 until it was rendered worthless during 2008 as the truth of the Company's

misstatements "leaked" out, particularly averring that the value of shares in the Company decreased

with the disclosures of (i) the increase in allowance for credit losses in November 2007, (ii) the reclassification of $13.5 million loans to non-performing in December 2007, (iii) the increase in loan loss allowance in February 2008, (iv) the Company's investigation into reported "accounting, disclosure and other issues related to single-family residential mortgages and residential real estate owned that could affect the Company's 2007 financial statements" in mid-March 2008, (v) the Company's compliance and delisting issues, which specifically arose from the Company's loan loss problems, in April 2008, and (vi) the Company's restatement and analysts reports of erosion in asset quality, and the lowering of EPs targets in May 2008. (*Id.* ¶¶ 195, 197, 199-204.) To be sure, in the press release discussing the Company's restatement alone, Franklin referenced that its reported financials were incorrect as a result of the Company's improper accounting for "certain single family mortgage loan modification programs developed and implemented as part of an effort to reduce delinquencies and mitigate foreclosure losses," "uncollectable single family second lien loans," "Real Estate Owned (REO) and insubstance foreclosures in connection with foreclosures in its single family mortgage portfolio," and "writedowns on loans transferred from 'Held for Sale' to 'Held for Investment.'" (¶ 84.) Thus, Plaintiff has sufficiently provided Defendants "with some indication of the loss and the causal connection that [she] has in mind," *Dura Pharmaceuticals*, 544 U.S. at 347, 125 S. Ct. at 1634, 161 L. Ed. 2d at 588, comprising exactly the sort of information necessary to defeat Defendants' motions to dismiss.

Notwithstanding, the Defendants argue that Plaintiff has failed to plead loss causation with regard to allegations concerning Countrywide, subprime lending practices, 4Q 2007 allowances and loan concentrations. (Nocella Br. 35; Ranieri Br. 30-33; McCann Br. 28.) In so arguing, the Defendants cite to the Fifth Circuit's opinion in *Alaska Elec. Pension Fund v. Flowserve*, 572 F.3d 221

(5th Cir. 2009), which states that to **prove** loss causation a plaintiff must establish "(1) that the negative 'truthful' information causing the decrease in price [was] related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount to decline." *Id.* at 228. However, Defendants' reliance on *Alaska* is misplaced as that case dealt with the loss causation standard at the class certification stage for purposes of establishing predominance under Rule 23 employing the summary judgment standard. *Id.* at 228-9. Quite differently, the present inquiry is limited to the issue of loss causation for purposes of surviving a motion to dismiss, which entails a much lower threshold. *See Tellabs*, 551 U.S. at 324 n.5, 127 S. Ct. at 2510 n.5, 168 L. Ed. 2d at 194 n.5 ("[T]he test [for dismissal] at each stage [of a lawsuit] is measured against a different backdrop."); *cf. Dura*, 544 U.S. at 347, 125 S. Ct. at 1634, 161 L. Ed. 2d at 588 (reflecting that pleading loss causation "should not prove burdensome for a plaintiff"); *In re Enron*, 465 F. Supp. 2d at 724 (recognizing the distinction between plaintiff's burden at the motion to dismiss stage and the summary judgment or trial phase). With this crucial distinction in mind, the applicable standard in the present case, as set forth above, is that "the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." *Lormand*, 565 F.3d at 258. Plaintiff has more than sufficiently met this standard by demonstrating devaluations in Franklin's stock price that are traceable to the public revelations of the Defendants' misrepresentations and omissions.

Furthermore, Defendant Ranieri's assertion that Plaintiff has failed to allege loss causation because it ignored pervasive market conditions is simply incorrect. (Ranieri's Br. 32.) In truth, the

SCAC specifically rules out the notion that the decline in Franklin's stock price was solely attributable to a decline in the market by alleging as follows:

> By comparison, as shown in the attached Exhibit E, the stock price for Franklin Bank's peers, as represented by the ACBQ Index[13], declined on average only 26.5% during the same span.  In percentage terms, Franklin Bank's shares lost 46.6% more than the share prices of its two primary peers.  These investor losses, therefore, were not attributable to economic or industry forces, but, rather, were primarily caused by the revelations of Franklin Bank's previous overstatement of its financial results.

(SCAC ¶ 196.)

### F.    Safe Harbor

_____Defendant Nocella contends that his November 26, 2007 statements about the sufficiency of Franklin's reserves are protected by the PSLRA's "safe harbor."  *Cf.* 15 U.S.C. § 77z-2(c) (establishing applicability of safe harbor).  Defendant Nocella is mistaken.  To be sure, the safe harbor does offer shelter to some "forward-looking statement[s]," *id.* § 2(i)(1), but on that basis alone the provision is inapplicable here.  Plainly put, during the November 26 conference call Defendant Nocella declared that Franklin's reserves were adequate *as of that day,* and there is nothing at all "forward-looking" about that vote of confidence.  *Cf. Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").  As such, the safe harbor does not apply to Defendant Nocella's November 26 statements.

Even if the safe-harbor were potentially available to Defendant Nocella, the surrounding circumstances prevent its operation on the instant record.  As a preliminary matter, this Memorandum

_____
[13]The NASDAQ Americas Community Bankers Index is a market value weighted index made up of over 500 NASDAQ listed financial institutions.

has established that on November 26, 2007 Defendant Nocella had actual knowledge that his statement about the adequacy of Franklin's reserves was false. *Cf.* 15 U.S.C. § 77z-2(c)(1)(B)(i) (specifying that safe harbor may not apply if a "natural person" makes a statement with actual knowledge of its falsity). Furthermore, because the cautionary language accompanying the comments is completely general in nature, and does not advise that Franklin was acutely vulnerable to a collapse in the subprime market, the safe harbor does not extend to Defendant Nocella's November 26, 2007 statements. *Id.* § (c)(1)(A)(i) (confirming that forward-looking statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"). This Court should reject Defendant Nocella's claims to the contrary.

### G.    Plaintiff Has Adequately Pleaded Control-Person Claims

Pursuant to § 20(a) of the Exchange Act, liability attaches to one who "controls" a person who violates any provision of the securities laws. To state a valid control-person claim, Plaintiff needs only allege a violation of the securities laws and that Defendants were controlling persons with respect to the violation within the meaning of §§ 15 and 20. As set forth herein, Plaintiff has adequately alleged violations of §10(b) and, accordingly, only "control" remains at issue. In the Fifth Circuit, "[t]he term 'control' . . . means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 957 (5th Cir. 1981); *see also SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996).

Plaintiff has satisfied this pleading requirement, as "The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed '***the power to control***'[the primary

violator], not the exercise of the power to control." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp.

2d 860, 869 n. 17 (S.D. Tex. 2001), *quoting Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir.

1992). Control-person liability exists if a plaintiff makes a *prima facie* showing that the defendants

"had the power (whether exercised or not) to control the transactions in question and to control the

operations . . . in general.  In other words, it is ***enough*** if the defendant simply had the *abstract power*

to control.  *Actual exercise* of that power is *not* required." *McNamara v. Bre-X Minerals, Ltd.*, 46 F.

Supp. 2d 628, 638 (E.D. Tex. 1999).

Here, the SCAC makes clear that each Defendant was able to and did control the content of

the various SEC filings, press releases and other public statements pertaining to the Company during

the Class Period.  Accordingly, Plaintiff has adequately plead control-person claims against each

Defendant.

## V.    **CONCLUSION**

The United States Supreme Court has directed that a complaint alleging securities fraud

should be assessed in its entirety, *Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509, 169 L. Ed. 2d at 192,

and consideration of that standard has caused some to reflect that federal courts should no longer

"close their eyes to circumstances that are probative of scienter viewed with a practical and common

sense perspective," *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  Employing

these principles, this Court should determine that it is both cogent and compelling to suggest that

Defendants made materially false statements during the Class Period with nothing less than severe

recklessness as to their falsity.   Consequently, and based on the arguments contained in this

Memorandum, this Court should deny Defendants Ranieri's, McCann's, and Nocella's Motions to

Dismiss.[14]

Respectfully Submitted,

**CARNEY WILLIAMS BATES**
   **BOZEMAN & PULLIAM, PLLC**

_J. Allen Carney_            _by Pamela Twaddon_

J. Allen Carney
Arkansas Bar No. 94122
Admitted Pro Hac Vice
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500 - telephone
(501) 312-8505 - facsimile

_**Attorney in Charge for Lead Plaintiff**_
_**Franklin Investor Group**_

Of Counsel:

**CARNEY WILLIAMS BATES**
   **BOZEMAN & PULLIAM, PLLC**

Marcus Bozeman
Arkansas Bar No. 95287
Randall K. Pulliam
Arkansas Bar No. 98105
Texas Bar No. 24048058
Admitted Pro Hac Vice
Tiffany Wyatt Oldham
Arkansas Bar No. 2001287
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500 - telephone
(501) 312-8505 - facsimile

---

[14]In the unlikely event the Court perceives any deficiencies in the SCAC, Plaintiff respectfully requests leave to replead. To justify a denial of such leave to amend, it must appear to the Court that the amendment is futile, offered in bad faith, prejudicial or otherwise contrary to the interests of justice. _Foman v. Davis_, 371 U.S. 178, 182 (1962); _Wight v. Bankamerica Corp._, 219 F.3d 79, 91 (2d Cir. 2000).

and

Liaison Counsel:

**HAGANS BURDINE MONTGOMERY
    & RUSTAY, PC**

William Fred Hagans
State Bar No. 08685500
Federal Bar No. 2457
Jennifer Rustay
State Bar No. 24002124
Federal Bar No. 23980
3200 Travis, Fourth Floor
Houston, Texas 77006
(713) 222-2700 - telephone
(713) 547-4950 - facsimile

### CERTIFICATE OF SERVICE

I hereby certify that I have e-filed this pleading and accordingly forwarded a true and correct copy of the foregoing upon all known counsel pursuant to all applicable rules of procedure and/or The Southern District's Administrative Procedures for Electronic Filing in Civil and Criminal Cases.

J. Allen Carney   by permission Rustay

-52-