# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

```
------------------------------------------------------------ x
                                                             :
                                                             :    C. A. NO.: 4:08-cv-01810
In re FRANKLIN BANK CORP.                                    :
SECURITIES LITIGATION                                        :
                                                             :    CLASS ACTION
                                                             :
------------------------------------------------------------ :
                                                             :
The HAROLD ROUCHER TRUST U/A DTD                             :
09/21/72, Individually And On Behalf Of All Others          :
Similarly Situated,                                          :
                                                             :
            Lead Plaintiff,                                  :
                                                             :
                                                             :
         v.                                                  :
                                                             :
RBC CAPITAL MARKETS CORP.; ANTHONY J.                        :    April 26, 2010
NOCELLA; RUSSELL MCCANN; LEWIS S.                            :
RANIERI; LAWRENCE CHIMERINE; DAVID M.                        :
GOLUSH; JAMES A. HOWARD; ALAN E.                             :
MASTER; ROBERT A PERRO; WILLIAM .                           :
RHODES; JOHN B. SELMAN; and DELOITTE &                      :
TOUCHE LLP,                                                  :
                                                             :
            Defendants.                                      :
------------------------------------------------------------ x
```

**PREFERRED STOCK PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CONSOLIDATED
PREFERRED STOCK PURCHASER COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ v

TABLE OF ABBREVIATIONS ........................................................................................ xiv

NATURE AND STAGE OF PROCEEDINGS ...................................................................... xvi

ISSUES TO BE RULED UPON ........................................................................................ xvii

I.   SUMMARY OF ARGUMENT ....................................................................................1

II.  FACTS RELATING TO PARTIES AND THE COMPLAINT .............................................2

    A.  Plaintiffs .........................................................................................................2

    B.  Nonparty Franklin Bank ................................................................................2

    C.  Defendants .....................................................................................................3

    D.  The Complaint ...............................................................................................4

III. ARGUMENT ..........................................................................................................5

    A.  Standards Applicable To This Motion ...........................................................5

        1.  Standard – Materiality .........................................................................6

        2.  Standard – Scienter .............................................................................6

        3.  Standard – Causation ..........................................................................8

    B.  Defendants' Class Period Statements Are Actionable ..................................10

        1.  Nocella's Misrepresentations Regarding The Bank's Asset Quality and Credit Risk .............................................................................................10

            (a)   Nocella's Misstatements Nos. 1-2 Were False and Misleading. ...................10

            (b)   Nocella's Misstatement No. 3 Was Materially False and Misleading ..........16

            (c)   Nocella's Misstatements Nos. 1-3 Were Material .........................................18

            (d)   Nocella Knew or Recklessly Disregarded That Misstatements Nos. 1-3 Were False. ........................................................................................................19

            (e)   Nocella's Misstatements Nos. 1-3 Caused Plaintiffs' Losses. ......................21

2. Misrepresentations Related To The Bank's Balance Sheet And Operating Results For 2006 And First Three Quarters Of 2007 .................................................21

   (a) Misrepresentations Nos. 4-9 Were Materially False and Misleading ..........23

   (b) The Magnitude and Significance of the Proposed Restatements Contribute to the Strong Inference of Scienter Against All Individual Defendants With Respect to Misstatements Nos. 4-8. ........................23

   (c) The Consistency of the "Errors" Indicates that Misstatements Nos. 4-8 Were More Likely the Result of Deliberate Manipulation Than Random Incompetence.................................................................................................26

   (d) The Simplicity and Obviousness of the GAAP Violations Contribute to the Strong Inference of Scienter Against All Individual Defendants With Respect to Misstatements Nos. 4-8.......................................................27

   (e) Individual Defendants Were Aware, or Should Have Been Aware, of Numerous Other "Red Flags" that the 2006 and 2007 Financial Statements Contained Misstatements ..................................................30

   (f) Additional Indicia Contribute to the Strong Inference of Scienter Against Nocella and McCann with Respect to Misstatements Nos. 4-8.......32

   (g) Misstatements Nos. 4-8 Caused Plaintiffs' Losses. ............................33

3. Misrepresentations Regarding Sufficiency Of Bank's Allowance For Credit Losses, And Reasons For 2007Q4 Increase In The Provision.................................33

   (a) Misstatements Nos. 9, 10, and 12 Were False and Misleading ....................35

   (b) Misstatements Nos. 9, 10 and 12 Were Material.......................................36

   (c) The Individual Defendants Were Severely Reckless Concerning the Falsity of Misstatements Nos. 9, 10 and 12 ..........................................38

   (d) Misstatements Nos. 11, 12, 13 and 14 by Ranieri, Nocella and McCann Were False and Misleading.......................................................................41

   (e) Misstatements Nos. 11, 12, 13 and 14 by Ranieri, Nocella and McCann Were Material. ...........................................................................................43

   (f) Ranieri, Nocella and McCann Were Severely Reckless Concerning the Falsity of Misstatements Nos. 11, 12, 13 and 14 .................................45

   (g) Misstatements Nos. 9-14 Caused Plaintiffs' Losses. ...........................45

4. D&T Misstatements Regarding 2006 Audit and Financial Statements.................46

(a) D&T's Misstatements Nos. A-C Were Materially False and Misleading .......47

(b) D&T's Misstatements Nos. A-C Were Material ................................51

(c) D&T Knew of, or Were Severely Reckless as to, the Falsity of Misstatements Nos. A-C ..........................................................................52

(d) D&T's Misstatements Nos. A-C Caused Plaintiffs' Losses .............................55

C. The Complaint Adequately Pleads Securities Act Claims ..........................................55

1. Background On The Misleading Offering ................................................................55

2. The Securities Act Claims Are Not Time Barred ..................................................60

3. Rule 9(b) Is Not Applicable To The Securities Act Claims. ................................65

4. The Prospectus Contained Material Misstatements ..............................................67

5. The Prospectus Did Not "Bespeak Caution" .........................................................69

6. The "Negative Causation" Defense Is Not Appropriate And Lacks Merit .........73

D. The Individual Defendants Are Liable As Controlling Persons ..................................75

IV. CONCLUSION ..................................................................................................................75

## TABLE OF AUTHORITIES

### CASES

*Abrams v. Baker Hughes Inc.*
(5th Cir. 2002) 292 F. 3d 424 ..................................................................53

*In re Alamosa Holdings, Inc.*
(N.D. Tex. 2005) 382 F. Supp. 2d 832 ....................................................74

*Alaska Elec. Pension Fund v. Flowserve Corp.*
(5th Cir. 2009) 572 F. 3d 221 ................................................................10

*In re American Business Fin. Serv. Inc. Sec. Litig.*
(E.D. Pen. January 9, 2007) 2007 WL 81937 ........................................68

*American Pipe & Constr. Co. v. State of Utah*
(1974) 414 U.S. 538 ................................................................................65

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*
(S.D.N.Y. 2004) 381 F. Supp. 2d 192 ....................................................52

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*
(5th Cir. 2010) 597 F. 3d 330 ..................................................................9

*Ashcroft v. Iqbal*
(2009) 129 S. Ct. 1937 ..............................................................................5

*In re Atlas Air Worldwide Holdings Inc. Sec. Litig.*
(S.D.N.Y. 2004) 324 F. Supp. 2d 474 ............................................ *passim*

*Backe v. Novatel Wireless, Inc.*
(S.D. Cal. 2009) 642 F. Supp. 2d 1169 ..................................................27

*Basic Inc. v. Levinson*
(1988) 485 U.S. 224 ..................................................................................6

*In re Beef Industry Antitrust Litig.*
(5th Cir. 1979) 600 F. 2d 1148 ..............................................................61

*Bell Atl. Corp. v Twombly*
(2007) 550 U.S. 544 ..................................................................................5

*In re Britannia Bulk Holdings Inc. Sec. Litig.*
(S.D.N.Y. Oct. 19, 2009) 2009 WL 3353045 ........................................74

*Bryant v. Uland*
    (S.D. Tex. 1971) 327 F. Supp. 439 ................................................................................64

*In re Catalina Marketing Corp. Sec. Litig.*
    (M.D. Fla. 2005) 390 F. Supp. 2d 1110 ..................................................................24, 26

*Central Laborers' Pension Fund v. Integrated Electrical Services*
    (5th Cir. 2007) 497 F. 3d 546 ................................................................................31

*City of Sterling Heights Police and Fire Retirement System v. Abbey National, PLC*
    (S.D.N.Y. 2006) 423 F. Supp. 2d 348.............................................19, 39, 44, 45

*Collmer v. U.S. Liquids, Inc.*
    (S.D. Tex. 2003) 268 F. Supp. 2d 718 ................................................................72

*In re Convergent Tech. Sec. Litig.*
    (9th Cir. 1991) 948 F. 2d 507 ................................................................................70

*In re Countrywide Financial Corp. Sec. Litig.*
    (C.D. Cal. 2008) 588 F. Supp. 2d 1132 ................................................................52

*Davidco Investors, LLC v. Anchor Glass Container Corp.*
    (M.D. Fla. March 6, 2006) 2006 WL 547989................................................74

*Davidco Investors, LLC v. Anchor Glass Container Corp.*
    (M.D. Fla. Jul. 26, 2006) 2006 WL 2092280 ................................................74

*In re Dell Inc. Sec. Litig.*
    (W.D. Tex. 2008) 591 F. Supp. 2d 877.......................................25, 52, 53

*Dodds v. Cigna Securities, Inc.*
    (2d Cir. 1993) 12 F. 3d 346................................................................................64

*In re Donald J. Trump Casino Sec. Litig.*
    (3d Cir. 1993) 7 F. 3d 357.......................................................................37, 70

*Dura Pharmaceuticals, Inc. v. Broudo*
    (2005) 544 U.S. 336................................................................................9

*In re Dynergy, Inc. Sec. Litig.*
    (S.D. Tex. 2004) 339 F. Supp. 2d 804 ................................................60, 61, 64, 75

*In re Electronic Data Sys. Corp. Sec. and "ERISA" Litig.*
    (E.D. Tex. 2004) 298 F. Supp. 2d 544................................................................19

*In re Enron Corp. Sec. Derivative & ERISA Litig.*
  (S.D. Tex. 2002) 235 F. Supp. 2d 549 ................................................................15

*In re Enron Corp. Sec. Derivative & ERISA Litig.*
  (S.D. Tex 2007) 540 F. Supp. 2d 831 ................................................................61

*In re Enron Corp. Secs.*
  (S.D. Tex 2003) 258 F. Supp. 2d 576 ................................................................24

*FDIC as Receiver for Franklin Bank, S.S.B. v. Baker Botts, LLP*
  (S.D. Tex) C.A. No. 4:09-cv-02492 ................................................................29

*Feiner v. SS&C Technologies*
  (D. Conn. 1998) 11 F. Supp. 2d 204 ................................................................65

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*
  (E.D. Tex. Jun. 16, 2004) 2004 WL 5278716 at ................................................*passim*

*Fujisawa Pharmaceutical Co., Ltd. V. Kapoor*
  (7th Cir. 1997) 115 F. 3d 1332 ................................................................60-61

*Garber v. Legg Mason, Inc.*
  (2009) 347 F. Appx. 665 ................................................................69

*Goldman v. Belden*
  (2d Cir. 1985) 754 F. 2d 1059 ................................................................66

*Goldstein v. MCI Worldcom*
  (5th Cir. 2003) 340 F. 3d 238 ................................................................24

*Halperin v. eBanker USA.Com, Inc.*
  (2d Cir. 2002) 295 F. 3d 352 ................................................................72

*Harden v. Raffensperger, Hughes & Co.*
  (7th Cir. 1995) 65 F. 3d 1392 ................................................................70

*Herman & MacLean v. Huddleston*
  (1983) 459 U.S. 375 ................................................................65, 66

*Hinerfeld v. United Auto Group*
  (S.D.N.Y. Jul. 15, 1998) 1998 WL 396852 ................................................................41

*Huddleston v. Herman & MacLean*
  (5th Cir. 1981) 640 F. 2d 524 ................................................................70-71

*Huddleston v. Herman & MacLean*
    (1982) 456 U.S. 914 ............................................................................. 70-71

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group Inc.*
    (5th Cir. 2008) 537 F. 3d 527 .................................................................27

*Isquith v. Middle South Utils., Inc.*
    (5th Cir. 1988) 847 F. 2d 186 .................................................................66

*Jensen v. Snellings*
    (5th Cir. 1988) 841 F. 2d 600 ..........................................................60, 64

*Kaltman v. Key Energy Servs. Inc.*
    (W.D. Tex. 2006) 447 F. Supp. 2d 648...........................................23, 32, 47

*Klein v. PDG Remediation, Inc.*
    (S.D.N.Y. 1996) 937 F. Supp. 323............................................................66

*Kline v. First Western Gov't Sec., Inc.*
    (3d Cir. 1994) 24 F. 3d 480.....................................................................70

*Krim v. Banc Texas Group, Inc.*
    (5th Cir. 1993) 989 F. 2d 1435 ...............................................................41

*In re Lattice Semiconductor Corp. Sec. Litig.*
    (D. Or. Jan. 3, 2006) 2006 WL 538756 ....................................................24

*Lewis v. Straka*
    (E.D. Wisc. 2008) 535 F. Supp. 2d 926....................................................20

*Lone Star Ladies Investment Club v. Schlotzsky's Inc.*
    (5th Cir. 2001) 238 F. 3d 363 ....................................................65, 66, 67

*Lormand v. US Unwired Inc.*
    (5th Cir. 2009) 565 F. 3d 228 ....................................................... *passim*

*Margolies v. Deason*
    (5th Cir. 2006) 464 F. 3d 547 .................................................................60

*Marks v. CDW Computer Conters, Inc.*
    (7th Cir. 1997) 122 F. 3d 363 .................................................................61

*In re MBIA, Inc. Sec. Litig.*
    (S.D.N.Y. Mar. 31, 2010) 2010 WL 1253925 ............................................18

*In re McKesson HBOC Inc. Sec. Litig.*
   (N.D. Cal. 2000) 126 F. Supp. 2d 1248 .................................................................74

*Merck & Co., Inc. v. Reynolds*
   S. Ct. Docket No. 08-905 ..................................................................... 61-62

*Mercury Air Group, Inc. v. Mansour*
   (5th Cir. 2001) 237 F. 3d 542 ..........................................................................7

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
   (S.D.N.Y. 2003) 272 F. Supp. 2d 243.................................................................73

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*
   (S.D.N.Y. 2003) 289 F. Supp. 2d 429.................................................................73

*In re Microstrategy, Inc. Sec. Litig.*
   (E.D. Va. 2000) 115 F. Supp. 2d 620 ....................................................23, 27, 52

*In re MoneyGram Int'l Inc. Sec. Litig.*
   (D. Minn. 2009) 626 F. Supp. 2d 947 ...............................................................19

*Nathenson v. Zonagen Inc.*
   (5th Cir. 2001) 267 F. 3d 400 ...............................................................6, 9, 21

*In re NationsMart Corp. Sec. Litig.*
   (8th Cir. 1997) 130 F. 3d 309 ...........................................................................70

*In re Netsolve, Inc. Sec. Litig.*
   (W.D. Tex. 2001) 185 F. Supp. 2d 684................................................................20

*In re New Century*
   (C.D. Cal. 2008) 588 F. Supp. 2d 1206 .................................................................5

*Newman v. Warnaco Group, Inc.*
   (2d Cir. 2003) 335 F. 3d 187..............................................................................61

*Norfolk County Retirement Sys. v. Ustian*
   (N.D. Ill. Jul. 28, 2009) 2009 WL 2386156..................................................8, 29

*Plotkin v. IP Axess Inc.*
   (5th Cir. 2005) 407 F. 3d 690 .............................................................................6

*PR Diamonds, Inc. v. Chandler*
   (6th Cir. 2004) 364 F. 3d 671 ...........................................................................53

*Randall v. Loftsgaarden*
    (1986) 478 U.S. 647 ................................................................................66

*In re Raytheon Sec. Litig.*
    (D. Mass. 2001) 157 F. Supp. 2d 131 ..........................................................26

*Rehm v. Eagle Finance Corp.*
    (N.D. Ill. 1997) 954 F. Supp. 1246 ...................................................... *passim*

*In re Reliance Sec. Litig.*
    (D. Del. 2000) 91 F. Supp. 2d 706 ...................................................38, 39, 41

*Ritchey v. Horner*
    (8th Cir. 2001) 244 F. 3d 635 .................................................................60-61

*Rosenzweig v. Azuirx Corp.*
    (5th Cir. 2003) 332 F. 3d 854 .................................................................32-33

*Rubinstein v. Collins*
    (5th Cir. 1994) 20 F. 3d 160 .................................................................69, 70

*Sanders v. John Nuveen & Co.*
    (7th Cir. 1980) 619 F. 2d 1222 .................................................................66

*In re Scalzo*
    (SEC Release No. 1839, Aug. 13, 2003) 2003 WL 21938985 ..........................52

*Schlesinger v. Herzog*
    (5th Cir. 1993) 2 F. 3d 135 .......................................................................66

*In re Sec. Litig. BMC Software, Inc.*
    (S.D. Tex. 2001) 183 F. Supp. 2d 860 ........................................................16

*In re Seitel, Inc. Sec. Litig.*
    (S.D. Tex. 2006) 447 F. Supp. 2d 693 ....................................................24, 53

*Shapiro v. UJB Financial Corp.*
    (3d Cir. 1992) 964 F. 2d 272 ...............................................................37, 41

*Simons v. Dynacq Healthcare, Inc.*
    (S.D. Tex. Jul. 28, 2005) 2005 WL 1801946 .........................................5, 48, 49

*In re Stone & Webster, Inc., Sec. Litig.*
    (1st Cir. 2005) 414 F. 3d 187 .....................................................................52

x

*In re Suprema Specialties, Inc. Sec. Litig.*
    (3d Cir. 2006) 438 F. 3d 256...................................................................................54

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    (2007) 551 U.S. 308.............................................................................7, 8, 52, 53

*In re Telxon Corp. Sec. Litig.*
    (N.D. Ohio 2000) 133 F. Supp. 2d 1010....................................................28, 40

*In re Tetra Technologies, Inc. Sec. Litig.*
    (S.D. Tex. Jul. 9, 2009) 2009 WL 6325540.................................................. *passim*

*TSC Indus., Inc. v. Northway, Inc.*
    (1976) 426 U.S. 438..............................................................................................66

*U.S. v. Causey*
    (S.D. Tex. October 17, 2005) 2005 WL 2647976 ..........................36-37, 38, 44

*United States v. Arthur Young & Co.*
    (1984) 465 U.S. 805..............................................................................................52

*Virginia Bankshares, Inc. v. Sandberg*
    (1991) 501 U.S. 1083............................................................................................70

*Virginia Bankshares, Inc. v. Sandberg*
    (1991) 111 S. Ct. 2749.........................................................................................37

*In re Washington Mutual, Inc. Sec. Litig.*
    (W.D. Wash. 2009) 259 F.R.D. 490 .....................................................................5

*Wieland v. Stone Energy Corp.*
    (W.D. La. Aug. 17, 2007) 2007 WL 2903178..............................................15, 16

*In re WorldCom, Inc. Sec. Litig.*
    (S.D.N.Y. 2003) 294 F. Supp. 2d 431..................................................................64

*Zuckerman v. Foxmeyer Health Corp.*
    (N.D. Tex. 1998) 4 F. Supp. 2d 618 ....................................................................69

### STATUTES, RULES & REGULATIONS

17 C.F.R. §230.405..........................................................................................................75

12 U.S.C. §1821m(h)(1) .................................................................................................50

15 U.S.C. §77k.....................................................................................................65, 67

15 U.S.C. §77m.........................................................................................................60

Fed. R. Civ. P. Rule 8 ................................................................................................65

Fed. R. Civ. P. Rule 9(b)................................................................................... *passim*

Fed. R. Civ. P. Rule 12(b)(6) ............................................................................ *passim*

*Private Securities Litigation Reform Act of 1995,* Pub. L. No. 104-67, 109 Stat.737
    (1995)......................................................................................................... *passim*

*Sarbanes-Oxley Act of 2002,* Pub. L. No. 107-204, 116 Stat. 745 (2002)............................ *passim*

*Securities Act of 1933,* 48 Stat. 74 (1933) (codified at 15 U.S.C. §77a *et seq.*). ................... *passim*

*Securities Exchange Act of 1934,* ch. 404, 48 Stat. 881 (1934) (codified at 15 U.S.C. §78a *et
    seq.*)........................................................................................................... *passim*

## TREATISE

*Restatement (Second) of Torts §548A* (1977) .............................................................9

## ACCOUNTING

AICPA Audit & Accounting Guide, *Deposit and Lending Institutions: Banks and Savings
    Institutions, Credit Unions, Finance Companies, and Mortgage Companies* (June 1,
    2009) ................................................................................................................49

AICPA Continuing Professional Education, *Audits of Banks, Saving Institutions, Credit
    Unions and Other Financial Institutions* (2009) ........................................... 49-50

Statement on Auditing Standards ("AU"), Section 150, *Generally Accepted Auditing
    Standards* .....................................................................................................49, 50

Statement on Auditing Standards ("AU"), Section 311, *Planning and Supervision*....................50

Statement on Auditing Standards ("AU"), Section 326, *Audit Evidence* ......................................50

Statement on Auditing Standards, Section 342 ("AU"), *Auditing Accounting Estimates*.............51

Committee of Sponsoring Organizations of the Treadway Commission, *Internal Control-Integrated Framework* (Treadway Commission 1992) ....................................................46

Financial Accounting Standards ("FAS") No. 5, *Accounting for Contingencies* (FASB March 1975) .............................................................................................................. *passim*

Financial Accounting Standards ("FAS") No. 15, *Accounting by Debtors and Creditors for Troubled Debt Restructurings* (FASB June 1977) ..........................................................28

Financial Accounting Standards ("FAS") 114, *Accounting by Creditors for Impairment of a Loan,* (FASB May 1993) .................................................................................... *passim*

Financial Accounting Standards ("FAS") 115, *Accounting for Certain Investments in Debt and Equity Securities,* (FASB May 1993) .........................................................................29

FDIC, *2008 Annual Report, Appendix c (2009),* www.fdic.gov/about/strategic/report/2008annualreport/appendix_c.html ........................10

FDIC, *Interagency Guidance on Nontraditional Mortgage Product Risks,* 71 Fed. Reg. 58609 (October 4, 2006) .................................................................................... *passim*

FDIC, *Interagency Policy Statement on Allowances for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2001)........35

FDIC, *Interagency Policy Statement on the Allowance for Loan and Lease Losses,* Financial Institution Letter 105-2006 (December 13, 2006) .................................................35, 37, 39

Investopedia, *What Does Alt-A Mean?,* www.investopedia.com/terms/a/alt-a.asp.....................17

Division of Supervision and Risk Management of the Federal Reserve Bank of Kansas City, *Basics for Bank Directors* (5th Ed. 2010).............................................................33, 39, 43

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief:

### BANKING, ACCOUNTING AND REGULATORY REFERENCES

"ALLL" for references to the practice of Allowance for Loan and Lease Losses.

"Alt-A" for references to the Alternative A-Paper mortgage type.

"ARM" for references to Adjustable-Rate Mortgages.

"BOLI" for references to Bank-Owned Life Insurance.

"CLP" for references to the Contingency Liquidity Plan.

"CLTV" for references to the Combined Loan to Value Ratio indicator.

"EDGAR" for references to the Security and Exchange Commission's Electronic Data Gathering, Analysis and Retrieval system.

"FAS" for references to the Financial Accounting Standards instituted by the Financial Accounting Standards Board.

"FDIC" for references to the Federal Deposit Insurance Corporation.

"GAAP" for references to the standard framework of Generally Accepted Accounting Practices.

"GAAS" for references to the standard framework of Generally Accepted Auditing Standards.

"IPO" for references to an Initial Public Offering.

"Neg-AM" for references to the loan method of Negative Amortization.

"NPA" for references to Nonperforming Assets.

"NPL" for references to Nonperforming Loans.

"OIG" for references to the United States Office of the Inspector General.

"PCAOB" for references to the Public Company Accounting Oversight Board.

"PSLRA" for references to Private Securities Litigation Reform Act of 1995.

"REO" for references to the Real Estate Owned property class.

"SEC" for references to the United States Securities and Exchange Commission.

"SFAS" for references to Statements of Financial Accounting Standards as published by the Financial Accounting Standards Board.

"SOX" for references to Sarbanes-Oxley Act of 2002.

### REFERENCES TO PARTIES OR FILINGS IN THIS LITIGATION

"ACPC" for references to the Amended Consolidated Preferred Stock Purchaser Complaint, dated December 22, 2009.

"D&T" for references to Defendant Deloitte & Touche LLP.

"D&T Mem." for references to the Defendant Deloitte & Touche LLP's Motion to Dismiss Memorandum, dated March 5, 2010.

"ID Mem." for references to the Defendants Chimerine, Golush, Howard et al. Motion to Dismiss Memorandum, dated March 5, 2010.

"IDJA" for references to the Defendants Joint Appendix to the Individual Defendants Motion to Dismiss Memorandum, dated March 5, 2010.

"RBC" for references to Defendant RBC Capital Markets Corp.

"RBC Mem." for references to RBC Capital Markets Corp. Motion to Dismiss Memorandum, dated March 5, 2010.

## NATURE AND STAGE OF PROCEEDINGS

The Amended Consolidated Preferred Stock Purchaser Complaint ("ACPC") was filed on December 22, 2009. The ACPC asserts the following claims against the following defendants:

| Defendant | Claims |
|---|---|
| RBC Capital Markets Corp. | Securities Act of 1933 ("Securities Act") § 11 |
| Anthony J. Nocella ("Nocella") | Securities Act §§ 11, 15; Securities Exchange Act of 1934 ("Exchange Act") §§ 10(b), 20(a) |
| Russell McCann | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| Lewis S. Ranieri ("Ranieri") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| Lawrence Chimerine ("Chimerine") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| David M. Golush ("Golush") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| James A. Howard ("Howard") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| Alan E. Master ("Master") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| Robert A. Perro ("Perro") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| William Rhodes ("Rhodes") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| John B. Selman ("Selman") | Securities Act §§ 11, 15; Exchange Act §§ 10(b), 20(a) |
| Deloitte & Touche LLP ("D&T") | Exchange Act §§ 10(b) |

All defendants have filed motions to dismiss the Complaint. There has been no discovery to date, and discovery is stayed pursuant to 15 U.S.C. §78u-4.

## ISSUES TO BE RULED UPON

1.      Does the ACPC state a claim against defendants (except D&T) for violations of Section 11 of the Securities Act, when the Prospectus for the initial public offering of Franklin Bank preferred shares failed to disclose that the Bank had repeatedly been the subject of regulatory criticisms of its internal controls, failed to disclose that the Bank a significant subprime lending program and exposure to subprime loans; and where its most recent financial data was restated?

2.      Does the ACPC state control person claims under Securities Act § 15 against those persons in positions of authority at the Bank and who signed the Registration Statement for the preferred IPO?

3.      Does the ACPC state a claim against all defendants (except RBC) for violations of Section 10(b) of the Exchange Act, for making materially false and misleading statements about the Bank and its financial condition with scienter and causing plaintiffs to suffer losses?

4.      Does the ACPC state control person claims under Exchange Act § 20(a) against those persons in positions of authority at the Bank?

## I.   Summary of Argument

This is a class action on behalf of investors who purchased shares of preferred stock of Franklin Bank Corp. ("Franklin" or the "Bank") either in or traceable to the Bank's initial public offering of such shares in May 2006 (the "Preferred IPO") or in the "Class Period" from January 31, 2007 through August 6, 2008. Plaintiffs allege that the Registration Statement and Prospectus (collectively herein, the "Prospectus") for the Preferred IPO contained materially false and misleading statements and omitted to state material facts that rendered such documents materially misleading. Persons who purchased shares in or traceable to the Preferred IPO enjoy claims under the Securities Act of 1933 (the "Securities Act"), while open market purchasers during the Class Period allege claims arising under the Securities Exchange Act of 1934 (the "Exchange Act").

The claims arise from defendants' failures to disclose the Bank's significant exposure to subprime loans and its deficient controls over lending and accounting such that this exposure brought the Bank to ruin. The Bank did not collapse because of the economic downturn that has afflicted much of the economy. It succumbed to inordinate subprime exposure that was not disclosed to investors. Indeed, defendants worked hard to portray the Bank as having no subprime exposure and excellent controls over its lending and accounting. This portrayal was false.

All defendants have filed extensive motions to dismiss. The bulk of the briefing is addressed to whether plaintiffs have adequately pleaded scienter. The complaint (the "ACPC") makes clear that defendants knew or were reckless in not knowing about the Bank's subprime exposure and ineffective controls over lending and accounting.

Defendants also argue that the statements complained of were not material, claiming that various documents sufficiently apprised investors of the breadth of the Bank's subprime exposure and that the Bank's controls over lending and accounting were deficient. But that is just not the case, as we show below.

1

Certain defendants challenge the Securities Act claims as time-barred by a one year statute of limitations. But the claims were timely filed on May 4, 2009, less than one year after plaintiffs knew or reasonably could have discovered that the Bank's defective controls and subprime exposure actually embraced 2006, and not merely the third quarter of 2007, as defendants actively suggested up until August 2008. No defendant even attempts to suggest what plaintiffs could have alleged about the Preferred IPO in good faith on May 4, 2008. It was not until August 2008 that defendants revealed for the first time that the Bank's deficiencies were so enormous that they stretched back years rather than months.

Finally, all defendants seek to challenge causation, either as loss causation on the Exchange Act claims or as "negative causation" on the Securities Act claims. The ACPC more than adequately alleges a series of share price declines associated with revelatory disclosures.

As we show below, defendants' arguments must be rejected on this motion.

## II. Facts Relating to Parties and The Complaint

### A.      Plaintiffs

Plaintiffs Harold Roucher Trust U/A DTD 09/21/72 and Joseph Pribyl each purchased shares of Franklin preferred stock pursuant to the Registration Statement (of which the Prospectus was a part) filed in connection with and in or traceable to the preferred IPO that commenced on or about May 6, 2006. ACPC ¶¶ 8-9.

### B.      Nonparty Franklin Bank

Nonparty Franklin Bank was a Houston-based bank holding corporation and the issuer of the preferred stock. Its principal asset was a multi-branch savings bank institution, Franklin Bank, S.S.B. Together, these entities are referred to herein as the "Bank." The Bank is being liquidated under Chapter 7 of the United States Bankruptcy Code. ACPC ¶ 10.

2

### C.   Defendants

Defendant Ranieri served as a director since the Bank was founded in 2001, and as Chairman of the Board during all relevant times.  He is a renowned banker with vast experience in the fields of mortgage finance, complex mortgage-backed securities and banking.  ACPC ¶ 11.

Defendant Nocella, a CPA, served as a director of the Bank and as President and CEO since 2002, and as the Chairman, CEO and President of Franklin Bank, S.S.B. since April 2002. In May 2008, Nocella was effectively terminated from the Bank.  He served on the Bank's Credit Committee at all relevant times, which provided oversight to the Bank's credit review and risk management process.  ACPC ¶ 12.

Defendant McCann, a CPA, was the Bank's CFO and Treasurer, responsible for, inter alia, asset and liability management, and financial and managerial accounting.  He served on the Bank's risk management committee at all relevant times, which provided oversight to the Bank's credit review and risk management process.  ACPC ¶ 13.

Defendants Howard, Chimerine, Golush and Master, Perro, Rhodes and Selman were each directors of Franklin during the relevant time and during the preferred IPO and each was a signer of the Registration Statement for the preferred IPO.  ACPC ¶ 14.  Defendants Ranieri, Nocella, McCann, Chimerine, Golush, Howard, Master, Perro, Rhodes and Selman are referred to herein collectively as the "Individual Defendants."   Each of the Individual Defendants signed the Registration Statement for the preferred IPO.  ACPC ¶ 15.

Defendants Howard, Chimerine, Golush and Master served on the Audit Committee of the Bank's Board of Directors, which monitored the integrity of Franklin's financial statements, the performance of the Bank's audit function and independent auditors, and its compliance with legal and regulatory requirements.  ACPC ¶ 16.  Defendants Ranieri, Master, Selman, Golush and Nocella served on the Credit Committee of the Bank's Board of Directors.   According to

statements made by defendant Ranieri in November 2007, the Board's Credit Committee met a number of times every month at least since December 2006, and followed a process of reviewing credits on a "very big" "watch list" of risky credits. ACPC ¶ 17.

Defendant RBC Capital Markets Corp. ("RBC") is one of the world's largest financial services companies. RBC is an underwriter of securities and strategic advisor to corporations. RBC served as the manager and lead underwriter of the preferred IPO. RBC conducted "due diligence," before the preferred Offering, during which it had access to and reviewed confidential information about Franklin's business, financial condition, accounting procedures, audit reports, audit reviews and summary documents from auditors concerning the quality and condition of Franklin's financial reporting and internal controls, along with regulatory examination reports, among other things. ACPC ¶ 18.

Defendant D&T was the Bank's outside auditor at all relevant times. Throughout the Class Period, D&T auditors identified by name were present on-site at Franklin's facilities. ACPC ¶ 22.

**D.     The Complaint**

The ACPC is divided into multiple sections with the allegations pertinent to the Securities Act claims in two sections. Paragraphs 31 through 40 set forth the facts forming the basis of the Securities Act claims against RBC and the Individual Defendants. The Securities Act counts are then set forth in paragraphs 112 through 130.

The bulk of the complaint sets forth the facts essential to the Exchange Act claims. Paragraphs 41 through 81 recite the chronology of key events giving rise to the Exchange Act claims, including identifying a series of materially false and misleading statements, along with paragraphs that set forth why those various statements are false and misleading. Paragraphs 82-106 bring together additional information that forms the basis for alleging that defendants knew or were reckless in not knowing that their statements were false and misleading.

The specific statements at issue in this case are recited and addressed in the argument section of the brief below.

## III. Argument

### A. Standards Applicable To This Motion

It remains good law that on a Rule 12(b)(6) motion, "the Court must accept the factual allegations of the Complaint as true, view them in the light most favorable to Plaintiffs, and draw all reasonable inferences in Plaintiffs' favor." *Simons v. Dynacq Healthcare, Inc.*, 2005 WL 1801946 at *1 (S.D. Tex. Jul. 28, 2005) (hereinafter, "*Dynacq*"); *In re Tetra Technologies, Inc. Securities Litigation*, 2009 WL 6325540 at *2 (S.D. Tex. Jul. 9, 2009) (hereinafter, "*Tetra*"). Dismissal is only proper "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Dynacq* at *1 (citations omitted). The complaint must, however, "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[1]

To state a claim under §10(b) of the Exchange Act, plaintiff must allege, in connection with the purchase of securities (1) a material misstatement or omission, (2) made with scienter, (3) on which plaintiff relied, (4) economic loss, and (5) "loss causation" (causal connection between the material misrepresentation and the loss). *Tetra* at *3, *citing, among others, Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009) (hereinafter, "*US Unwired*").

The Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995

---

[1] As for documents outside the pleadings, much has already been said in connection with the Motion to Strike. *See* Plaintiffs' Opp. To Defs. Motion to Strike, March 12, 2010, Docket entry 193 and Response to joinder of Defendants, dated March 29, 2010, Docket entry 201, which we incorporate by reference herein in response to certain arguments concerning an FDIC Examination Report referenced in the ACPC. This Court may take judicial notice of certain materials for what they say, but not for their truth. *In re Tetra Techs. Inc. Sec. Litig.*, at *2. The Court may also take judicial notice of accounting standards, several of which we submit concurrently herewith attached to the Greenberg Decl. *In re Washington Mutual, Inc. Sec. Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009); *In re New Century*, 588 F. Supp.2d 1206, 1219 (C.D. Cal. 2008).

(PSLRA), along with Rule 9(b), Fed. R. Civ. P., requires complaints to specify the statements alleged to be misleading, the reasons why they are misleading, the speaker(s), when and where the statements were made, and the factual basis for allegations about statements or omissions that are alleged on information and belief. *Tetra* at *3.[2]

### 1. Standard – Materiality

Materiality is the "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The disclosure is not measured by the "literal truth" but by the ability of the statements to accurately inform rather than mislead prospective buyers. *US Unwired*, at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* Materiality is a question of fact, unless the omission is "so obviously unimportant to an investor that reasonable minds cannot differ on the question, in which case the Court can rule as a matter of law. *Tetra* at *4.

### 2. Standard – Scienter

In this Circuit, scienter can be established with intent or "severe recklessness." *See US Unwired*, at 251 and n.15. Severe recklessness is defined as "highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001). *Accord Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("'[Scienter] encompasses reckless indifference such that the omission or misrepresentation was "so obvious that the defendant must have been aware

---

[2] As scienter is premised on knowledge or recklessness, not motive, motive need not be alleged as to the statements.

6

of it.""") (quoting *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 546 n.3 (5th Cir. 2001)); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at * 10 (E.D. Tex. 2004) (hereinafter, "*Fleming*") ("Securities fraud complaints typically have sufficed to state a claim based on recklessness when plaintiffs 'have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements' or have 'alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud.'") (citations omitted).

At the pleading stage, plaintiffs "must only 'plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference.'" *US Unwired*, at 250 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007) (hereinafter, "*Tellabs*")). Although the court "must engage in a comparative evaluation," and "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," it need only consider those competing explanations that are "rationally drawn from the facts alleged." *Id.* at 324. *Accord US Unwired*, at 253-54 (rejecting competing, nonculpable explanation of defendants' conduct as "not accurately reflect[ing] the plaintiff's allegations"). The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the 'most plausible of competing inferences.'" *Tellabs*, at 324. D&T's contrary assertion – that *Tellabs* requires courts to determine which competing inference is "more plausible" (D&T Mem. at 3) – is simply wrong. Thus, where the inference of intentional or severely reckless conduct is "equally as compelling as any alternative inference … a tie favors the plaintiff." *US Unwired*, at 254.

Under *Tellabs*, the court must "accept all factual allegations in the complaint as true" and "consider the complaint in its entirety." *Tellabs*, at 322. "The inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323-24. *See also id.* at

7

325 ("We reiterate...that the court's job is not to scrutinize each allegation in isolation but to assess the allegations holistically."); *Norfolk County Retirement Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) ("[D]efendants cannot defeat a complaint by 'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) of the PSLRA... [A] securities fraud complaint should not be judged by dismembering it and viewing its separate parts.") (internal citations omitted).

Here, each of the defendants has taken the opposite approach: dissecting the ACPC into separate indicia of scienter – including the restatement, multiple GAAP violations, multiple amendments to call reports, lack of internal accounting controls, lack of formal accounting policies, and multiple red flags repeatedly raised by FDIC examiners – and then arguing that none of these, *viewed in isolation*, raises a strong inference of scienter. As plaintiffs will demonstrate, however, these and the myriad other indicia applicable to the respective defendants, *collectively*, do give rise to a strong inference of severe recklessness with respect to each of the defendants' misstatements. And that strong inference is not dependent upon the existence of allegations of personal financial motive. As *Tellabs* made clear, "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, ... the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.[3]

### 3. Standard – Causation

To withstand a motion to dismiss based on loss causation at the pleading stage, plaintiffs must only allege that "the defendant's misrepresentation (or other fraudulent conduct) proximately

---

[3] We note that several defendants seek to use documents cited in the Complaint to suggest defenses and thus ask the Court to assume the truth of what is in them and only to read them in their favor. For example, several defendants have proffered the "collapse" of the real estate market as an example of an innocent explanation for the Bank's collapse, citing to the OIG Report. D&T, for example, contends that the Bank's subprime exposure "became evident only after the real estate market deteriorated" (D&T Mem. at 9 *citing* OIG Report at 12). D&T fails to provide the context of that remark, such as the prior sentence which informs that skilled auditors would have identified these risks much earlier. We submit that it would be improper to engage in this analysis on this motion and to give meaning to explanations that might be proffered based on various documents without a more complete record and discovery.

caused the plaintiff's economic loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344 (2005). As the Supreme Court explained, loss causation occurs "'when the facts . . . become generally known' and 'as a result' share value 'depreciate[s].'" *Id. (quoting Restatement (Second) of Torts* § 548A, Comment b, at 107 (1977)); *see also US Unwired*, at 255-56 & 258-59 (must allege facially plausible relationship between revelation or leaking of truth and alleged misstatement)); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 413 (5th Cir. 2001) ("'loss causation' refers to a direct causal link between the misstatement and the claimant's economic loss")(citations omitted). Here, the Complaint alleges that the shares were inflated throughout the Class Period and it identifies the corrective statements which all related to previous misstatements and which, when revealed, caused the stock to decline significantly.

At the pleading stage (unlike the class certification or summary judgment stages), all plaintiffs must do is plead enough to give defendants notice of the relevant losses and to plausibly allege the relatedness between a stock price decline associated with a revelation and the alleged misrepresentation or omission. *US Unwired,* at 262-63 (pleading of knowing omission and concealment, disclosure, and consequent decline in stock price was enough); *Tetra,* at *9 (facially plausible causal relationship is enough)

Contrary to defendant Ranieri's argument, plaintiffs need not necessarily plead that the stock price rose when the misstatement was made, but rather that the price was inflated at the time of purchase and that there was a decline upon revelation. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 335 (5th Cir. 2010) (causal connection can be shown by "either by an increase in stock price" upon the positive information "or by showing negative movement in the stock price after release of the alleged 'truth'").

Nor at this stage must plaintiffs separate the drops in the shares from the "largely unanticipated collapse of the mortgage industry" as Ranieri suggests. First, only the subprime

9

mortgage industry collapsed and only a tiny fraction of banks actually collapsed as a result of the subprime debacle, making Franklin a stand-out among its peers for the spectacle of its implosion.[4] Second, plaintiffs are not obliged at this stage to separate out the loss attributable to the specific matters that have been plausibly alleged from the general market trends that Ranieri very generally and with no citation or evidence has decided to assert. It is enough that plaintiffs offer a plausible explanation of loss causation on this motion, and it is left to discovery and often experts to sort through and conduct the kind of separation that Ranieri suggests on page 32 of his brief.[5]

## B. Defendants' Class Period Statements Are Actionable

### 1. Nocella's Misrepresentations Regarding The Bank's Asset Quality and Credit Risk

Nocella made the following false statements regarding the quality of loans and the level of credit risk in the Bank's portfolio:

1. During a conference call for investors on January 31, 2007, Nocella stated that the Bank had "continued unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market." ACPC ¶ 43 (quoting Bloomberg Transcript of Franklin Bank 2006Q4 Earnings Call) (*see* Greenberg Ex. M at 2)).

2. During the same conference call on January 31, 2007, Nocella stated that the Bank "never had" any "exotic products" on its balance sheet. ACPC ¶ 43 (quoting Greenberg Ex. M at 5)).

3. During a conference call with the investment community on July 25, 2007, Nocella stated "we don't have any subprime…". ACPC ¶ 57 (quoting Greenber Ex. N at 5).

#### (a) Nocella's Misstatements Nos. 1-2 Were False and Misleading

Nocella concedes that interest-only mortgage loans are among the mortgage products classified as "non-traditional" and "exotic". *See* Nocella Mem. at ¶ 66 (citing *Interagency Guidance on Nontraditional Mortgage Product Risks*, 71 Fed. Reg. 58,609 (October 4, 2006) (hereafter

---

[4] In 2008, a total of 25 FDIC insured institutions (out of 8,305) failed. See http://www.fdic.gov/about/ strategic/report/2008annualreport/appendix_c.html (under heading "Resolving Failed Institutions"). While virtually all banks have suffered in the economic downturn, only a miniscule amount have collapsed. Of those that have failed, few have been as spectacular in size as Franklin's. Defendants cannot hide in the bushes on this one.

[5] Defendants rely primarily on *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009). In *Flowserve*, though, the causation issue was addressed on the merits in a review of a class certification order and a summary judgment decision, not a Rule 12(b)(6) motion. In each of these contexts, the burden on plaintiffs to demonstrate loss causation was greater than it is at the pleading stage.

"*Interagency Guidance*")).  Contrary to Misstatements Nos. 1 and 2, in every examination of the Bank between September 2003 and July 2008, FDIC examiners noted that the Bank's single family mortgage portfolio comprised "non-traditional" and "exotic" loans in the form of hybrid adjustable rate/interest-only mortgages.  ACPC ¶102; Lunn Ex. G (FDIC OIG Report) at 23.  Indeed, the FDIC's July 2008 Examination Report identified almost 41.5% (or $686 million) of the Bank's single family mortgage portfolio as "non-traditional" mortgage loans, consisting almost entirely of interest-only mortgages.  ACPC ¶ 84.  Given that the Bank ceased originating new non-traditional single family mortgage loans during 2007Q1, it is reasonable to infer that most – if not all – of the $686 million non-traditional single family mortgages identified by the FDIC in the July 2008 examination were already in the Bank's portfolio when Nocella made Misstatements Nos. 1 and 2 on January 31, 2007.  *See* OIG Report at 5.  Thus, Nocella's Misstatements Nos. 1 and 2 were materially false and misleading when made.

Nocella tacitly concedes that the Bank was a participant in the market for non-traditional and exotic mortgage products, but nevertheless contends that Misstatement No. 1 was not misleading because: (1) it did not refer to the entire non-traditional loan market, but only to the "'higher risk[] non-traditional loan market'",[6] and (2) it referred only to the fact that the bank had not participated in the "higher risk[] non-traditional loan market" during 2006.  *See* Nocella Mem. at ¶¶ 68-69.  These arguments must be rejected.  The contention that the Bank only engaged in non-traditional lending that was not "higher risk" is belied by the substantial proportion of its single family mortgage loans that were originated under limited-documentation or stated income programs – comprising an astonishing 82% of the portfolio as of July 2008 – and were combined with second

---

[6] Nocella accuses plaintiffs of "conveniently add[ing] a comma" to his statement "to make it appear as though the phrase higher risk was intended to describe the entire non-traditional mortgage market." Nocella Mem. at n.30.  In fact, the comma in question appears in the original Bloomberg Transcript upon which plaintiffs relied in drafting the ACPC, and was not added by plaintiffs. *See* Greenberg Ex. M at 2.  In any event, Nocella cannot contradict plaintiffs' well-pled allegation by proffering evidence in the form of an unauthenticated document that purports to be a transcription of the January 31, 2007 teleconference. *See US Unwired*, at 232 ("When faced with a Rule 12(b)(6)

lien loans – 32% of the portfolio as of July 2008.  ACPC ¶¶ 39, 84; OIG Report at 5.  The *Interagency Guidance* specifically identifies these two characteristics – reduced documentation and simultaneous second liens – as exacerbating the risks presented by non-traditional loans.  *See* Greenberg Ex. E (*Interagency Guidance*) at 2, 10.  In short, the Bank's non-traditional loans were not low risk, but overwhelmingly among the riskiest types of loans identified by regulators.  In addition, the Bank's non-traditional single family mortgage loans were high risk because, as noted in every FDIC examination report from September 2003 through July 2008, they were "concentrated in higher-risk geographic locations" including California, Arizona and Florida.  ACPC ¶¶ 84, 102; OIG Report at 5, 23.  Thus, even assuming that Nocella's Misstatement No. 1 was limited to the "higher risk" segment of the non-traditional mortgage market – rather than referring to all non-traditional lending as "higher risk" – it would have been materially false and misleading.

Nocella's contention that Misstatement No. 1 only referred to the Bank's non-participation in the "higher risk[] non-traditional mortgage market" *during 2006* is contradicted by the statement itself.  What Nocella told the investment community on January 31, 2007 was that the Bank's "earnings were lower than our expectations for the year [*i.e.*, calendar 2006] primarily as a result of the inverted yield curve and our *continued* unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market…".  *See* Greenberg Ex. M at 2 (emphasis added).  The word "continued" indicated that the Bank had not participated in the relevant market in, or prior to, 2006.  This was false and misleading.  FDIC examiners noted that the Bank had hybrid adjustable rate/interest-only mortgages in its single family mortgage portfolio continuously from 2003 through 2008.  ACPC ¶102; OIG Report at 23.  In addition, the OIG Report indicates that the Bank continued to originate non-traditional and subprime single family mortgages throughout 2006, and only halted this practice sometime in 2007Q1.  *See* OIG Report at 5 ("Due to

---

motion to dismiss a §10(b) action, courts must … accept all factual allegations in the complaint as true.").

the collapse of the subprime mortgage market and the tightening of the mortgage credit market, bank management halted the bank's nontraditional mortgage and subprime operations and, in the first quarter of 2007, began to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans."). *Contra* Nocella Mem. at ¶ 69. Thus, even if it had only referred to the Bank's activities and portfolio during 2006, Misstatement No. 1 would have been materially false and misleading.

Nocella's attempt to dispute the truth of plaintiffs' allegation concerning Misstatement No. 2 is likewise unavailing. The Bloomberg Transcript, upon which plaintiffs relied in drafting the complaint, reflects the following colloquy between Nocella and John Arfstrom of RBC Capital Markets:

> **Q – Jon Arfstrom:** Okay and just to be clear these – some of the more *exotic products are not going on your balance sheet*, you take them in your warehouse and sell them?
>
> **A – Anthony Nocella:** *Yeah and we know that we never had anything like that* but that's – we sell them if we ever do anything except for sale, we'd probably broker it through in fact, it wouldn't even touch our balance sheet.

Greenberg Ex. M at 5 (emphasis added). The Court must accept plaintiffs' allegation as true. *See US Unwired*, at 232 ("When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must … accept all factual allegations in the complaint as true."). Thus, Nocella could not defeat plaintiffs' well-pled ACPC by proffering his own version of the facts, even if presented in admissible form – which the unauthenticated document upon which Nocella relies is not.

In any event, Nocella's version of Misstatement No. 2 is not materially different from the Bloomberg Transcript used in drafting the complaint. According to Nocella's competing version of the facts, he answered "Yes" in response to Mr. Arfstrom's statement: "some of the more exotic products are not going on your balance sheet." Nocella Mem. at p.30 n.31. Nocella's affirmative response was false and misleading because, in reality, the Bank's assets included a substantial amount of exotic single family mortgages. ACPC ¶¶ 39, 84, 102; OIG Report 23. For the same

13

reason, it was also false and misleading for Nocella to state – as he concedes he did – that "It [*i.e.,* any exotic product] wouldn't even – it wouldn't even touch our balance sheet." Nocella Mem. at p. 30 n.31.

Nocella contends that it would have made no sense for him to say "we never had anything [*i.e.,* exotic product] like that" (as reflected in the Bloomberg transcription) given that he went on to state the Bank would "broker through" any exotic product that it originated. *See* Nocella Mem. at p. 31 n.32. However, the Bloomberg transcription makes perfect sense in the context of the colloquy. Mr. Arfstrom sought confirmation that the Bank did not have any exotic products *on its balance sheet*. Nocella provided that confirmation: "Yeah and we know that we never had anything like that [on our balance sheet]…." Greenberg Ex. M at 5. Any exotic products that the Bank "brokered through" – *i.e.,* originated on behalf of third party lenders – were not Bank assets (and did not represent credit risk for the Bank, which is what Mr. Arfstrom and the rest of the investment community were interested in evaluating). Nocella's rather more garbled version of his response, which includes unexplained parentheses, means exactly the same thing: "Yes [ *i.e.,* exotic products are not going on our balance sheet], (and if) we ever had anything like that…we'd sell them… We'd probably broker it through, in fact. It wouldn't even – it wouldn't even touch our balance sheet." *See* Nocella Mem. at p. 30 n.31.

Nocella's contention that his Misstatement No. 2 was not misleading because it was describing what the Bank would be doing in the future, not what it had done in the past, is unsupported by either of the two transcriptions of the teleconference. *See* Nocella Mem. at ¶¶ 70-71. Mr. Arfstrom asked about the Bank's balance sheet as reflected in the January 30, 2007 press release that was the reason for the teleconference. *See* ACPC ¶¶ 41-42; Greenberg Ex. M at 5. The Bank's current and future financial condition was dependent upon the quality of the billions of dollars of loan assets already on its balance sheet, not merely on the quality of the additional loan

assets it intended to acquire in the future. It would have been illogical for Mr. Arfstrom to have limited his inquiry to the latter. Even assuming that Nocella's Misstatement No. 2 had been limited to the loans that the Bank intended to add to its balance sheet going forward, it would have been misleading for Nocella to omit the previously undisclosed fact that the Bank had already acquired enough exotic mortgages to ensure its ultimate financial collapse. *See* OIG Report at 5 ("Franklin's curtailment of its nontraditional mortgage and subprime operations [in 2007Q1] was not sufficient to improve the overall performance of its loan portfolio.").

The Court must reject Nocella's attempt to raise a "truth-on-the-market" defense with respect to Misstatements Nos. 1 and 2. *See* Nocella Mem. at ¶ 67. "'[T]he truth-on-the-market doctrine views a misrepresentation as immaterial if the information is already known to the market because that misrepresentation therefore cannot defraud the market.'" *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 574 (S.D. Tex. 2002)). Nocella points to two ambiguous statements buried in the 125-page 2006 Form 10-K as having informed the market that – contrary to Nocella's misrepresentations – the Bank did, in fact, own non-traditional, exotic single family mortgages. *See* Nocella Mem. at ¶ 67. However, these statements were not published until six weeks after Nocella made Misstatements Nos. 1 and 2, and did not clearly state that the Bank's single family mortgage portfolio included a substantial portion of non-traditional mortgages. At most, by describing the Bank's purported compliance with the *Interagency Guidance*, these statements imply that the Bank identified an undisclosed amount of non-traditional loans as a result of "review" and "analysis" of its single family portfolio, and adjusted its allowance for credit losses appropriately. *See* Nocella Mem. at ¶ 67. Furthermore, given their location deep within the 2006 Form 10-K (at pages 36 and 43), these purportedly "true" statements were not conveyed to the public "with a degree of intensity and credibility sufficient to counterbalance effectively [the]

misleading information created by" Nocella's Misstatements Nos. 1 and 2, and by the Bank's numerous false statements to the same effect.[7]  *See Stone Energy*, 2007 WL 2903178, at *11 (quoting *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 905-06 n.46 (S.D. Tex. 2001)). In any event, resolution of Nocella's truth-on-the-market defense will require "a fact-specific inquiry, which is not appropriately disposed of on a motion to dismiss." *Id.*

### (b)  Nocella's Misstatement No. 3 Was Materially False and Misleading

Nocella's Misstatement No. 3 – that the Bank did not have any subprime loans – was also materially false and misleading when made.  Every FDIC examination report from November 2005 through July 2008 noted that the Bank's single family mortgage portfolio was comprised of subprime mortgages.  ACPC ¶102; OIG Report at 23.  According to Wolfe, writing in February 2008, the Bank had "until recently" funded an average of $10-$15 million in subprime loans per month.  ACPC ¶ 82.  According to the FDIC, by the time of the October 2007 examination, subprime loans represented approximately 67 percent of the Bank's Tier 1 Capital, and by July 2008 examination, that ratio had risen to 171 percent.  ACPC ¶ 43.  In light of these facts, Nocella's attempt to contest the materiality of the Bank's exposure to subprime loans as of July 2007 is unavailing.  Significantly, although Nocella repeatedly cites to the conclusion of the FDIC's OIG that the Bank "did not have a subprime lending *program*" (*see* Nocella Mem. at p.33 n.34 and ¶ 77 (citing OIG Report at 5 n.3) (emphasis added)), he conveniently omits the OIG's conclusion that "*a significant volume*" of the Bank's loans had subprime characteristics. *See* OIG Report at 5 n.3 (emphasis added).  The OIG Report simply confirms that even though the Bank did not publicly disclose that it was a subprime lender, with a formal subprime lending program, it originated or purchased, and owned, "a significant volume" of subprime loans.

---

[7] *E.g.*, ACPC ¶ 60, listing August 20, 2007, September 10, 2007 and October 30, 2007 filings of investor presentations with slides stating that the Bank had a "low risk balance sheet with minimal sub prime exposure."

Again, Nocella attempts to create an improper factual dispute concerning what he actually said during the July 25, 2007 teleconference, and accuses plaintiffs of "manipulation" and "deliberate mischaracterizing" of his statement. *See* Nocella Mem. at ¶¶ 72-73. Nocella contends – counterfactually – that he did not make a "blanket statement that Franklin had no subprime mortgages in any of its portfolios" but only stated "that Franklin did not have any subprime *issues* in its prime side loans." *See id.* at ¶ 73. In fact, any deliberate mischaracterization here is Nocella's, not plaintiffs'. Both the Bloomberg Transcript and Nocella's unauthenticated purported transcription reflect that Nocella simply stated, without qualification, that the Bank did not have any subprime loans. *See* Greenberg Ex. N at 5 ("We don't have any subprime so I don't know."); Nocella Mem. at p.32 n.33 ("We don't have any sub-prime so, (inaudible).").

Nocella's contention that this statement was not responsive to the question posed by Paul Miller of FBR Capital Markets is correct, however. Mr. Miller had asked Nocella whether the Bank was seeing "some sub-prime issues" – *i.e.*, increasing borrower delinquencies – in its prime loans. *See* Greenberg Ex. N at 5. Immediately after Nocella's rambling response, which concluded with the unqualified statement "We don't have any subprime so I don't know" Mr. Miller followed up:

> **Paul Miller:** No, I know you've been very – I think you guys have been one of the more conservative underwriters out there. I remember having many discussions with you where you didn't touch this Alt-A stuff and what not but we're concerned more about if this started leaking into the prime could we be going into a credit cycle?

*Id.* at 5. Mr. Miller's remarks that "you guys have been one of the more conservative underwriters out there" and "you didn't touch this Alt-A stuff" -- meaning loans rated below prime because of risk factors other than the borrower's credit history[8] – confirm that Mr. Miller heard Nocella

---

[8] *See* www.investopedia.com/terms/a/alt-a.asp: **"What Does *Alt-A* Mean?** A classification of mortgages where the risk profile falls between prime and subprime. The borrowers behind these mortgages will typically have clean credit histories, but the mortgage itself will generally have some issues that increase its risk profile. These issues include higher loan-to-value and debt-to-income ratios or inadequate documentation of the borrower's income."

"make a non-responsive, blanket statement that Franklin had no subprime mortgages in any of its portfolios" exactly as plaintiffs allege.

> Further confirmation is provided by Nocella's next response to Mr. Miller:

> **Anthony Nocella:** I don't know. I mean, I listened to what he has -- He has a much better data base, you know, although our database if you cross the United States in terms of this, the $2 billion we put on it back in '04 and '05, I mean that, those loans that you are looking at they're just a little bit every place. So I, we are not seeing it as significant as he seeks it. But remember he did, Countrywide did pay option ARMs which, you know, Neg-AM and they secondly did a lot of simultaneous seconds. That's 100% CLTVs. *They are two characteristics that we stayed away from.*

*Id.* at 5 (emphasis added). Nocella's statement that the Bank "stayed away" from payment option ARMs and loans with simultaneous second liens was materially false and misleading. In fact, the Bank's single family mortgages included payment option ARMS, and many of them – as many as 32% as of July 2008 – had simultaneous second liens which increased the Bank's exposure to credit risk. ACPC ¶¶ 39, 43, 44, 84; *Interagency Guidance* at 2, 10. In light of these follow up remarks, it is disingenuous for Nocella to claim that "we don't have any subprime" "meant that Franklin did not have any subprime *issues* in its prime side loans."

### (c) Nocella's Misstatements Nos. 1-3 Were Material

Misstatements Nos. 1-3 occurred during a conference call held for the specific purpose of providing information to investors, and two of three of the misstatements were in response to specific questions asked by investment analysts, who serve as the information conduit between issuers and other market participants. These facts alone demonstrate that the information was material since it was either selected by defendants for presentation to investors or specifically responded to the requests for information from the investment community. It cannot credibly be disputed that subprime exposure and the magnitude of such exposure was of critical importance to investors. *See In re MBIA, Inc. Sec. Litig.*, __ F. Supp.2d __, 2010 WL 1253925 at *14 (S.D.N.Y. March 31, 2010) (alleged risky nature of investments would alter total mix of information for

investors); *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F. Supp.2d 947, 975 (D. Minn. 2009) (finding allegations sufficient to show that exposure to subprime collateral was material considering, *inter alia*, "the external market indicators" and "the importance of the [p]ortfolio to [defendant's] solvency and ability to meet its payment service obligations"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey National, PLC*, 423 F. Supp.2d 348, 360-61 (S.D.N.Y. 2006) (hereinafter, "*Abbey National*") (finding positive statements regarding company's risk exposure misleading because they omitted exposure to losses from investments in companies under investigation).

Nocella conflates materiality with the Rule 9(b) particularity requirements, arguing that plaintiffs have not quantified the extent of Franklin's subprime exposure. Nocella Mem. at 34, ¶ 77. Nocella provides no authority for this argument, and in any event, the ACPC is replete with financial data showing the magnitude of the Bank's exposure to subprime. What matters on the question of materiality is whether the misstatements would matter to investors. On this issue, Nocella is silent.

### (d) Nocella Knew or Recklessly Disregarded That Misstatements Nos. 1-3 Were False

Single family mortgage loans comprised 60% of the Bank's loans and 51% of its total assets, as at December 31, 2006. *See* 2006 Form 10-K at 40; August 6 Form 8-K at 7. It is simply inconceivable that, as the Bank's CEO and President since 2002, Nocella could have been unaware of the significant volume of non-traditional, exotic and subprime loans in that portfolio. ACPC ¶¶ 43, 82, 84, 102. It is also inconceivable that he was unaware that the vast majority of the Bank's single family loans were higher risk because of limited documentation, simultaneous secondary liens and/or their concentration in geographic locations where housing prices were deteriorating. ACPC ¶¶ 39, 84, 102. The sheer magnitude and importance of these issues to the Bank support no other inference but knowledge on Nocella's part. *See, e.g., In re Electronic Data Sys. Corp. Sec. and ERISA Litig.*, 298 F. Supp. 2d 544, 557 (E.D. Tex. 2004) (inferring that CEO and CFO must have

19

known about problems with issuer's contract with U.S. Navy based on that contract's "sheer magnitude and importance"); *In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (alleged problems relating to issuer's primary customer and significant losses of other customers were "of such a nature that, if true, would have been obvious to the individual defendants" including issuer's CEO and CFO); *In re Atlas Air Worldwide Holdings Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (hereinafter, "*Atlas Air*") ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant [a high-level corporate officer] knew or should have known the statements were false when made.").

Nocella was, moreover, a member of the Bank's Management Credit Committee, responsible for setting the Bank's underwriting guidelines and credit policies, and of its Risk Management Committee, responsible for overseeing the credit review and risk management process including reviewing individual portfolio risks. *See* IDJA Tab 7 (2006 Form 10-K) at 5-6; *see also Lewis v. Straka*, 535 F. Supp.2d 926, 930 (E.D. Wisc. 2008) (service on loan and audit committees supports scienter). It would have been impossible for Nocella to function in these capacities had he been ignorant of the composition of the Bank's single family mortgage portfolio and the factors affecting its credit risk. In addition, Nocella received copies of the numerous FDIC examination reports that noted the presence of non-traditional and subprime loans in the Bank's single family mortgage portfolio. *See* Greenberg Ex. F (*Overview of the Compliance Examination*, attachment to FDIC Financial Institution Letter 52-2003 (June 20, 2003) at 4 ("The results of the examination will also be communicated to the board of directors and management of the institution in a Report of Examination."). The inference the Nocella knew that his Statements Nos. 1-3 were false is, therefore, inescapable. *See Atlas Air*, at 491 ("The individual defendants were not entitled to make

statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading.").

### (e) Nocella's Misstatements Nos. 1-3 Caused Plaintiffs' Losses.

The first revelation that the Bank was significantly exposed to subprime loans was after the market closed on August 6, 2008, when the Bank disclosed for the first time that its restatements were far more severe and affected much earlier periods than previously represented.  These restatements also reflected that they resulted from nonperforming loans and nonperforming assets which should have been recognized in much earlier periods, requiring extraordinary revisions to loan loss reserves and reflecting that the Bank had significant subprime exposure, going back to at least 2006 full year results, if not much earlier.  ACPC ¶¶ 76-77.  The next day, August 7, 2008, the preferred shares declined by 35% from $4.735 per share to $3.05 per share.  ACPC ¶110.[9]

### 2. Misrepresentations related to the Bank's Balance Sheet and Operating Results for 2006 and First Three Quarters of 2007

On May 1, 2008, the Bank announced that it had amended its Reports of Condition and Income filed with the FDIC ("Call Reports") for the nine months ended September 30, 2007 and the twelve months ended December 31, 2007.  ACPC ¶ 73.  In a Form 8-K filed on August 6, 2008 (and signed by Ranieri), the Bank reported that its audited financial statements for 2006 and interim statements for each of the first three quarters of 2007 filed with the SEC could no longer be relied upon and were required to be restated.  *Id.* at ¶ 77.  The Form 8-K disclosed that the financial statements were materially false and misleading in the following respects:

---

[9] In addition, ACPC ¶108, among several others, plainly alleges that the share prices were artificially inflated at all relevant times and that plaintiffs and the Class purchased at artificially inflated prices, contrary to certain defendants' argument that plaintiffs have not pleaded this.  In addition, certain defendants argue that the fraud on the mark presumption of reliance has somehow been rebutted, because, according to them, the price of the preferred shares did not rise when certain positive statements were made.  This misreads the requirements for the fraud on the market presumption of reliance.  In this regard, too, defendants' reliance on *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001), is misplaced.  Contrary to defendants' reading of it (*e.g.*, ID Mem. at 22), the Circuit does not require (and in that case did not require) a corresponding price increase when allegedly false statements were made, but only required stock price decline when alleged revelations were made.  *Id.* at 417.

4. The Bank's Nonperforming Loans were understated in 2006 and in each of the first three quarters of 2007, by the following approximate percentages and amounts:

| 2006 | | 2007Q1 | | 2007Q2 | | 2007Q3 | |
|------|------|------|------|------|------|------|------|
| 155% | $20,501,000 | 158% | $28,612,000 | 222% | $36,316,000 | 202% | $60,987,000 |

ACPC ¶¶ 41-42, 44, 54, 59, 63.

5. The Bank's Nonperforming Assets were understated in 2006 and in each of the first three quarters of 2007, by the following approximate percentages and amounts:

| 2006 | | 2007Q1 | | 2007Q2 | | 2007Q3 | |
|------|------|------|------|------|------|------|------|
| 66% | $22,642,000 | 87% | $36,281,000 | 98% | $45,987,000 | 97% | $66,806,000 |

ACPC ¶¶ 41-42, 44, 54, 59, 63.

6. The Bank's Real Estate Owned was understated in 2006 and in each of the first three quarters of 2007, by the following approximate percentages and amounts:

| 2006 | | 2007Q1 | | 2007Q2 | | 2007Q3 | |
|------|------|------|------|------|------|------|------|
| 10.7% | $2,141,000 | 32.1% | $7,669,000 | 31% | $9,671,000 | 15% | $5,819,000 |

ACPC ¶¶ 41-42, 44, 54, 59, 63.

7. The Bank's net income was overstated in 2006 and in each of the first three quarters of 2007, by the following approximate percentages and amounts:

| 2006 | | 2007Q1 | | 2007Q2 | | 2007Q3 | |
|------|------|------|------|------|------|------|------|
| 5.8% | $1,122,000 | 5.1% | $410,000 | 18.43% | $1,607,000 | 97.6% | $8,946,000 |

ACPC ¶¶ 41-42, 44, 52-53, 56, 63.

8. The Bank's Earnings Per Share were overstated in 2006 and in each of the first three quarters of 2007, by the following approximate percentages and amounts:

| 2006 | | 2007Q1 | | 2007Q2 | | 2007Q3 | |
|------|------|------|------|------|------|------|------|
| 7.69% | $0.05 | 7.69% | $0.02 | 23.33% | $0.07 | 120% | $0.36 |

ACPC ¶¶ 41-42, 44, 52-53, 56, 61, 63.

Misstatements Nos. 4-8 are attributable to Nocella, McCann, Ranieri, and the other Individual Defendants. The Bank's 2006 Form 10-K, which recited the false 2006 financial results, was signed by all of the Individual Defendants and accompanied by the Sarbanes-Oxley certifications of Nocella and McCann. ACPC ¶¶ 44; IDJA Tab 7 (2006 Form 10-K, filed with the SEC on March 14, 2007) at 122 and Exs. 31.1-2, 32.1-2. The Forms 10-Q for each of the first three quarters of 2007, which recited the false quarterly financial results, were each signed by

22

McCann and accompanied by Sarbanes-Oxley certifications of Nocella and McCann.   ACPC

¶¶ 54, 59, 63; IDJA Tab 19 (2007Q3 Form 10-Q, filed with the SEC on November 9, 2007);

Greenberg Ex. B (2007Q1 Form 10-Q, filed with the SEC on May 10, 2007) and Greenberg Ex. C

(2007Q2 Form 10-Q, filed with the SEC on August 9, 2007).[10]

### (a)   Misrepresentations Nos. 4-9 Were Materially False and Misleading

The Bank was closed by the FDIC and state regulators before it could file amendments

correcting its false SEC filings.  *Id.* ¶¶80-81.  However, the material falsity of the Bank's financial

statements for 2006 and the first three quarters of 2007 is sufficiently alleged based on the

amended Call Reports and the admissions in the August 6, 2008 Form 8-K.  *See Kaltman v. Key*

*Energy Servs., Inc.,* 447 F. Supp.2d 648, 658 (W.D. Tex. 2006) (sufficiently pled falsity based on

company's announcement of need to restate financial statements); *Fleming,* at *25  (same).

### (b)   The Magnitude and Significance of the Proposed Restatements Contribute to the Strong Inference of Scienter Against All Individual Defendants With Respect to Misstatements Nos. 4-8

Defendants' efforts to trivialize the significance of the required financial restatements are

unavailing.  While it is true that "[t]he mere fact that there was a restatement or a violation of

GAAP, by itself, cannot give rise to a strong inference of scienter; the *nature* of such a

restatement or violation... may ultimately do so....  Indeed, common sense and logic dictate that

the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a

restatement or violation was made consciously or recklessly."  *In re Microstrategy, Inc. Sec.*

*Litig.,* 115 F. Supp. 2d 620, 635, 636 (E.D. Va. 2000) (hereinafter, "*Microstrategy*") (emphasis in

---

[10] The admitted falsity of the Bank's REO data also calls into question the veracity of McCann's statement of November 26, 2007 that "Franklin anticipates Real Estate Owned to decrease by year end."  ACPC ¶ 64.  Even if the statement was literally true, it is inconceivable that REO declined unless it was because the assets had been substantially marked down and the Bank deliberately forestalled further foreclosures.  Disclosing a decline in REO without disclosing the reasons for it would be misleading.  In addition, misstatements 4-8 necessarily implicate the unguarded statement by Raneiri and Nocella in March 2007 that "We anticipate 2007 will be a year of record earnings for Franklin."  ACPC ¶ 51.

original). *Accord In re Seitel, Inc. Sec. Litig.,* 447 F. Supp. 2d 693, 704 (S.D. Tex. 2006) ("While a financial restatement by itself is not sufficient to raise a strong inference of scienter, together with other allegations that take into account and measure the relative seriousness of the restatement, 'significant overstatements of revenue tend to support the conclusion that the defendants acted with scienter.'") (quoting *In re Enron Corp. Secs.,* 258 F. Supp. 2d 576, 626 n.55 (S.D. Tex. 2003)); *Fleming,* at *11 ("When the number, size, timing, nature, frequency, and context of the misapplication [of GAAP] or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.").[11]

Here, the overall magnitude of the proposed restatement contributes to the strong inference of scienter against each of the Individual Defendants. The GAAP violations admitted in the August 6, 2008 Form 8-K had inflated the Bank's net income and its earnings per share by 7.7% and $0.05 per share for 2006 and by 120% and $0.36 per share for the nine months ending September 30, 2007. ACPC ¶¶ 41, 52-53, 59, 61. Had its financial statements complied with GAAP, the Bank would not have met its earnings targets for the first two quarters of 2007,[12] and would have reported a loss of $0.06 per share -- instead of earnings of $0.26 per share -- in the third quarter of 2007. *See* ACPC ¶ 61. Earnings restatements of lesser magnitude have been found to contribute to a strong inference of scienter. *See, e.g., In re Catalina Marketing Corp. Sec. Litig.,* 390 F. Supp. 2d 1110, 1115 (M.D. Fla. 2005) ("sheer size" of restatement supported inference of scienter where income from operations had been overstated by 43% and earnings per share by 56%); *In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 WL 538756, at *12-13 (D. Or.

---

[11] Contrary to Ranieri's contention, the decision in *Goldstein v. MCI Worldcom,* 340 F.3d 238 (5th Cir. 2003) is not to the contrary. *See* Ranieri Mem. 14. The court in that case did not hold that the magnitude of an accounting irregularity can never give rise to an inference of scienter, but merely concluded that the irregularity at issue -- a $500 million write-off of uncollectible accounts receivable -- was not of sufficient magnitude *given the size of WorldCom and the fact that the company "frequently took large write-offs."* 340 F.3d at 251 (emphasis added).

[12] The Bank's earnings targets were: $0.25 to $0.27 per share for 2007Q1, and $0.30 to $0.32 per share for 2007Q2. The Bank reported $0.26 per share for 2007Q1 and $0.30 per share for 2007Q2. According to the August 6, 2008 Form 8-K, it should only have reported $0.24 per share for 2007Q1 and $0.23 per share for 2007Q2. *See* ACPC ¶¶ 52-53, 56; IDJA Tab 11 at 8.

Jan. 3, 2006) (GAAP violations that, *inter alia*, inflated revenues by 6.8% and overstated earnings by $0.08 cents per share during nine month period supported inference). *Compare In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 894 (W.D. Tex. 2008) (weight given to inference of scienter arising from restatement was tempered by the fact that the "magnitude of the errors was quite small," totaling less than 1% of the total net income for the period).

Even more importantly, the Bank's admitted GAAP violations massively distorted the primary metrics that investors and regulators use to evaluate the financial condition of lending institutions: namely, the asset categories Nonperforming Loans and Real Estate Owned. *See* ACPC ¶ 42.[13]   The Bank's financial statements underreported its Nonperforming Assets (comprised of Nonperforming Loans and Real Estate Owned) by 66% in 2006, and by 87%, 98% and 97% in each of the first three quarters of 2007. *See* ¶¶ 42, 53, 59, 63. This massive underreporting of troubled assets concealed the fact that the Bank's critical ratio of Nonperforming Assets to Total Assets was rapidly deteriorating. Whereas this asset quality ratio had ranged between 0.24% and 0.69% during the prior four years,[14] in 2006 it shot up to 1.03% (but was reported as 0.62%) and continued to climb in 2007: from 1.61% (reported as 0.86%) in 2007Q1, to 1.68% (reported as 0.85%) in 2007Q2, and then 2.37% (reported as 1.20%) in 2007Q3. *See* Lunn Ex. H (August 6, 2008 Form 8-K) at p.9. In short, the drastic underreporting of Nonperforming Loans and Real Estate Owned concealed significant deterioration in the Bank's asset quality and credit risk during the Class Period. "Accordingly, the size and nature of the restatement suggests that this was no mere error caused by the improper application of hyper-technical accounting rules -- it indicates that there were systemic accounting abuses within [the

---

[13] It is not disputed that NPL's and REO are asset classes of great significance to investors, who place great weight on the quality of an institution's assets, and particularly in this case, where the misstatements involved (year end NPA's understated by $22.6 million) were so great, particularly in relation to the bank's earnings of $15.5 million. *See Tetra*, at *20 (finding plausible materiality where misstated number exceeded previous year's earnings).

[14] *See* IDJA Tab 7 (2006 Form 10-K) at p. 33 (reporting ratio of nonperforming assets to total assets of 0.69% for 2005, 0.24% for 2004, 0.29% for 2003, and 0.68% for 2002).

Bank] that resulted in a serious public misrepresentation of [its] financial condition." *Atlas Air*, at 489.

### (c) The Consistency of the "Errors" Indicates that Misstatements Nos. 4-8 Were More Likely the Result of Deliberate Manipulation Than Random Incompetence

The fact that all but one of the accounting irregularities reported in the August 6, 2008 Form 8-K resulted in making the Bank's financial condition appear better than it actually was – by understating troubled assets and/or overstating income – also supports the inference of scienter. *See In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) (GAAP violations raised strong inference of scienter where complaint alleged, *inter alia*, "numerous instances of accounting legerdemain that all serve[d] to overstate the ledger..."); *Catalina Marketing*, 390 F. Supp. 2d at 1115 ("That the accounting irregularities identified in the restatements worked to support Defendants' misleading claims about [the company's] growth and profitability gives rise to a strong inference of scienter.").[15]   Here, the different accounting "issues" identified in the August 6, 2008 Form 8-K worked to overstate the Bank's financial condition, and to support the defendants' numerous false and misleading positive statements.  In particular, by concealing the extent to which loans were delinquent or in foreclosure, or their collection was otherwise doubtful, the accounting manipulations supported defendants' false optimistic statements that the Bank would have record earnings in 2007 (see Misstatement No. 23), and was adequately reserved for credit losses and adequately capitalized (Misstatements Nos. 9-14).

---

[15] Of the five separate accounting "issues" described in the August 6, 2008 Form 8-K, only one – the BOLI Accounting issue – did not result in the under-reporting of troubled assets and/or over-reporting of income. *See* ACPC ¶ 77; IDJA Tab 11 at p.5.  The BOLI Accounting issue resulted in the Bank's failure to recognize immaterial amounts of income during 2007. It did not necessitate the filing of a restatement. *See* Lunn Dec. Ex. I (SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999)); Greenberg Ex. L (FAS 154, *Accounting Changes and Error Corrections*).  The amendments to the Bank's FDIC Call Reports for September 2007 and December 2007 did not include any changes resulting from the BOLI Accounting issue. *See* ACPC ¶ 73.  In short, the BOLI Accounting issue was a red herring that was only included in the August 6, 2008 Form 8-K in order to mask the suspicious consistency of the accounting irregularities that necessitated restatement of the reported financials.

For this reason, among others, the instant complaint is distinguishable from that in *Indiana Elec. Workers' Pension Trust Fund v. Shaw Group*, 537 F.3d 527 (5th Cir. 2008). *See* McCann Mem. 16; Ranieri Mem. 14; Individual Mem. 14. In *Shaw Group*, the court found that allegations concerning inadequacies in the company's internal accounting controls did not support an inference of scienter because the inadequate controls did not necessarily result in revenues being consistently overstated. 537 F.3d at 537 ("Because errors could bias the figures down as well as up, the inference that such errors demonstrate an intent to defraud is weak."). Here, by contrast, the GAAP violations consistently and increasingly "bias[ed]" the figures for earnings and asset quality in an upward direction, while the Bank's financial condition was actually going down. This adds further weight to the inference of scienter.

### (d) The Simplicity and Obviousness of the GAAP Violations Contribute to the Strong Inference of Scienter Against All Individual Defendants With Respect to Misstatements Nos. 4-8

In addition, the fact that the GAAP violations admitted in the August 6, 2008 Form 8-K involved simple, unequivocal accounting principles that are central to the business of banking adds particular strength to the inference of scienter. "This is so because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious." *Microstrategy*, at 638. *Accord Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1186 (S.D. Cal. 2009) ("the simplicity of the accounting principles violated" was a factor in court's determination that complaint as a whole established strong inference of scienter against, *inter alia*, CEO, president and several senior VPs).

The August 6, 2008 Form 8-K signed by Ranieri admits that, in violation of GAAP, the Bank improperly recorded tens of millions of dollars in loans that were probably not collectible as if they were income-producing assets. ACPC ¶ 77; Lunn Ex. H (August 6, 2008 Form 8-K) at pp.3-5. This was accomplished by means of three separate, but straightforward, accounting

27

manipulations: (1) not properly accounting for single family mortgages that had been modified in troubled debt restructurings (the "Loan Modification Accounting" issue); (2) not properly accounting for single family mortgages that were severely delinquent (the "Delinquent Loan Accounting" issue); and (3) not properly accounting for single family mortgages that were in foreclosure (the "REO [*i.e.*, real estate owned] Accounting" issue). ACPC ¶ 77; Lunn Ex. H (August 6, 2008 Form 8-K) at pp.3-5. The GAAP standards that should have been applied to these three categories of nonperforming assets are not complex or obscure, but are well-established and central to the business of banking. They include FAS No. 5, *Accounting for Contingencies*, in effect since March 1975; FAS 15 *Accounting by Debtors and Creditors for Troubled Debt Restructurings*, in effect since June 1977, and FAS 114, *Accounting by Creditors for Impairment of a Loan*, in effect since May 1993. ACPC ¶¶ 84, 90. *See Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246, 1255-56 (N.D. Ill. 1997) (hereinafter, "*Eagle Finance*") (violation of FAS No. 5, combined with defendant's statements mitigating the seriousness of the credit loss problem, raised strong inference of scienter in light of "crucial significance" of accurate credit loss accounting in determining financial viability of company engaged in acquisition and servicing of automobile and retail installment sales contracts).

Nor were the Bank's violations of these standards merely technical, or excusable as a matter of accounting judgment. To the contrary, the Bank's admitted failures to comply with FAS Nos. 5 and 114 were serious accounting irregularities that raise a strong inference of scienter. *See In re Telxon Corp. Sec Litig.*, 133 F. Supp. 2d 1010, 1030 (N.D. Ohio 2000) ("The more serious the error, the less believable are defendants['] protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy."). That was certainly the opinion of the FDIC, which concluded that the Bank's "[m]anagement has been reluctant in properly recognizing losses in the residential

mortgage portfolio." ACPC at ¶ 84; *see also* OIG Report at 18 (noting "significant errors and possible intentional falsification of Franklin's call reports").[16]

The August 6, 2008 Form 8-K also admits to another serious GAAP violation: during 2007Q3, the Bank manipulated its accounting treatment of tens of millions of dollars in equity securities (the "Investment Securities Accounting" issue). *See* ACPC ¶ 77; August 6, 2008 Form 8-K at 5. Specifically, $91.7 million of available-for-sale securities were transferred to the trading portfolio, and $75.9 million were transferred from trading to held-to maturity. *See* August 6, 2008 Form 8-K at 5. The explanation that "[m]anagement believed these transfers were appropriate under GAAP at that time but subsequently learned that these transfers were inconsistent with GAAP" is patently implausible. *Id.* The relevant GAAP pronouncement, which has been in force since May 1993, expressly provides that "transfers into or from the trading category should be rare." *See* FAS 115 *Accounting for Certain Investments in Debt and Equity Securities* (May 1993) at ¶ 15. Significantly, the transfer of $91.7 into the trading category enabled the Bank to boost its earnings by immediately recognizing a $1.7 million gain. *See* August 6, 2008 Form 8-K at p. 5; FAS 115 at ¶ 15b. The transfer of $75.9 million out of the trading category would have enabled the Bank to cease writing-down those assets if – as was likely the case – their market value was expected to decline. *See* FAS 115 at ¶ 7. Thus, the Bank's admitted violations of FAS 115 are at least as likely to have been a deliberate attempt to manipulate the Bank's balance sheet and operating results as they are to have been the result of negligence or incompetence. *See Norfolk County Retirement Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) ("Negligence can always be offered as an explanation for fraudulent behavior, but here it does not create an inference that is more compelling than plaintiffs'.")

---

[16] Indeed, the FDIC has been continuing its investigation of Franklin Bank, as evidenced by the ongoing litigation over the Baker Botts report and other investigative materials surrounding the frauds revealed at the bank in 2008. See docket of *FDIC as Receiver for Franklin Bank, S.S.B. v. Baker Botts, LLP*, C.A. No. 4:09-cv-02492 (S.D. Tex.)

### (e) Individual Defendants Were Aware, or Should Have Been Aware, of Numerous Other "Red Flags" that the 2006 and 2007 Financial Statements Contained Misstatements

All of the Individual Defendants were aware that, prior to and during 2006 and 2007, the FDIC had repeatedly expressed concerns regarding ineffectiveness of the Bank's internal accounting controls. The reports of the FDIC's examinations were provided contemporaneously to all of the Individual Defendants. *See* Greenberg Ex. F    (*Overview of Compliance Examinations*) at 4. Those reports repeatedly informed the Individual Defendants of weaknesses and inadequacies in the Bank's internal audit program. ACPC ¶¶ 38, 85, 87; OIG Report (internal audit weaknesses flagged by FDIC in September 2003, September 2004, November 2005, October 2006, and October 2007 reports). The FDIC also repeatedly informed the Individual Defendants that the Bank's accounting and financial reporting were matters of concern to the regulators and required improvement. *Id.* ¶¶ 38; OIG Report at 22 (accounting and financial reporting flagged in September 2003, November 2005, October 2007 and July 2008 reports).

Given their positions, experience and professional training as CPAs, it is simply not plausible that Nocella and McCann were not aware in 2006 and 2007 that the Bank lacked adequate internal controls, as documented in the Baker Botts report and the FDIC's OIG Report. ACPC ¶¶ 12, 13, 75, 87. *See Fleming,* at *11 ("The individual defendants' positions and experience are among the factors that constitute competent evidence of scienter. But a pleading of scienter may not rest solely on the inference that defendants must have been aware of the misstatement based on their positions within the company. At the same time, some information is so obvious that the court can infer that the defendants must have been aware of it.")(internal citations omitted). Under the totality of the circumstances, Nocella's and McCann's Sarbanes-Oxley certifications attesting to the adequacy of the Bank's internal controls further contribute to the strong inference of scienter against them. *See Tetra,* at *8 ("[A] defendants' SOX certification

may raise an inference of scienter 'if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.'") (quoting *Central Laborers' Pension Fund v. Integrated Electrical Services*, 497 F. 3d 546, 555 (5th Cir. 2007)).

As well as the red flags reported to them by the FDIC, the Individual Defendants also must have known that in critical areas of its operations, the Bank either had no formal accounting policies and procedures at all, or had procedures that were recklessly inadequate. First, although a majority of the Bank's activities involved loans originated and serviced by third parties, the Bank had *no policies or procedures whatsoever* for the oversight of loans serviced by third parties. ACPC ¶¶ 39, 84. Significantly, two of the four categories of accounting irregularities that necessitated the financial restatement involved loans serviced by third parties. ACPC ¶ 73, 77; August 6, 2008 Form 8-K at 3-4. Second, the Bank's policies and procedures for loan acquisition did not include adequate due diligence. ACPC ¶¶ 39, 84; OIG Report at 8. The FDIC's OIG concluded that, as a result, the Bank had purchased pools of high-risk single family loans "without a complete understanding of what it was purchasing. Most notable, Franklin was not aware that loans it purchased contained second-lien positions that, in hindsight, made the loans far less attractive and valuable." OIG Report at 8. In addition, the Bank's loan acquisition procedures did not include any compliance due diligence whatsoever – management simply relied upon the sellers' representations and warranties concerning the loans' regulatory compliance. ACPC ¶¶ 39, 84. Third, the Bank had no formal accounting policies and procedures for loan modification/loss mitigation, and its informal policies were not consistent with GAAP. ACPC ¶¶ 82, 84 and Ex. 2 at pp. 5-6. The FDIC concluded that this contributed to the underreporting of impaired loans that necessitated restatement of the Bank's financial statements. ACPC ¶ 84.

The FDIC faulted the Bank's board of directors and "senior management" – *i.e.*, all of the

Individual Defendants – for the Bank's lack of appropriate written policies as described above. *See* ACPC ¶¶ 39, 84; OIG Report at 8.   The FDIC also faulted the Audit Committee – *i.e.*, Howard Chimerine, Golush and Master – for the fact that there was no system in place for Board or Audit Committee review of the Bank's internal audit systems.  ACPC ¶ 84.  The Individual Defendants must have been aware of these glaring deficiencies in the Bank's policies and procedures, and the probability that these deficiencies would result in the Bank's financial statements being inaccurate.

### (f) Additional Indicia of the Strong Inference of Scienter Against Nocella and McCann with Respect to Misstatements Nos. 4-8

The following additional factors contribute to the strong inference that Nocella and McCann both knew, or recklessly disregarded, the fact that the Bank's audited 2006 and interim 2007 financial statements were materially false and misleading:   (1) Nocella was the Bank's Chairman, CEO and President since 2002 (ACPC ¶ 12); (2) McCann was the Bank's CFO and Treasurer (*id.* ¶ 13); (3) Nocella and McCann are qualified CPAs (ACPC ¶¶ 12-13); (4) Nocella and McCann have extensive experience in the banking industry (*id.*); (5) Nocella and McCann certified all of the false financial statements pursuant to the Sarbanes-Oxley Act (*id.* at ¶ 96); (6) the Bank's Board concluded that Nocella and McCann were responsible for the false financial statements, due to their lack of oversight and their creation of a "tone at the top" that was contrary to compliance (*id.* at ¶ 74); (7) the Bank's board of directors forced Nocella to accept an accelerated retirement because of the false financial statements (*id.* at ¶¶ 12, 84);[17] and (8) Nocella retaliated against a Bank officer who refused to sign a Sarbanes-Oxley attestation with respect to the Bank's accounting for real estate owned (which the Bank later admitted was false), and

---

[17] *See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 653 (W.D. Tex. 2006) (termination of CEO because company needed to restate one or more prior years financial statements supported strong inference of scienter).   By contrast, in the inapposite *Rosenzweig v. Azuirx Corp.*, 332 F. 3d 854 (5th Cir. 2003) (cited in Nocella Mem. at ¶ 64), the Fifth Circuit found that successive voluntary resignations by key executives did not give rise to a strong inference of scienter because it was "more likely probative only of the fact that the company was failing" than "that those

replaced that officer with an officer who was both unqualified and conflicted. *Id.* at ¶ 82 and Ex. 2 at pp. 1, 4-5.

### (g)  Misstatements Nos. 4-8 Caused Plaintiffs' Losses

The first disclosure that accounting information between September 2007 and January 2008 was no longer reliable was on May 1, 2008, after the market closed. ACPC ¶ 73. The next day, the preferred shares declined by 35%, from $7.55 per share to $4.85 per share. ACPC ¶ 110.

The first disclosure that restatements were far more severe and affected much earlier periods, and that many restatements resulted from nonperforming loans and nonperforming assets which should have been recognized in much earlier periods, requiring extraordinary restatements and revisions to loan loss reserves (and thus that the Bank's significant subprime exposure predated 2006), going back to at least 2006 full year results, if not much earlier, was on August 6, 2008, after the market closed. ACPC ¶¶ 76-77. The next day, August 7, 2008, the preferred shares declined by 35% from $4.735 per share to $3.05 per share. ACPC ¶110.

### 3.  Misrepresentations Regarding Sufficiency Of Bank's Allowance For Credit Losses, And Reasons For 2007Q4 Increase In The Provision

All of the Individual Defendants made specific misrepresentations that the Bank's allowance for credit losses was adequate.[18] In addition, Ranieri, Nocella and McCann misrepresented the reason that the Bank increased its provision for credit losses by $23.5 million in November 2007. These defendants made the following materially false and misleading statements regarding the allowance and the increase in provision:

9.  The Bank's 2006 Form 10-K, signed by all of the Individual Defendants, stated in the notes to financial statements: "We maintain our allowance for credit losses at the amount estimated by

---

executives were fleeing from their improprieties." 332 F. 3d at 867

[18] Allowance for credit losses, also known as Allowance for Loan and Lease Losses ("ALLL") or the reserve, is a bank's estimate of the amount it will not be able to collect on its loans, based on current information and events. To fund the ALLL, the bank takes a periodic charge against earnings called a provision. A bank should have a defined methodology for determining an adequate level for the ALLL. If the ALLL is inadequate, either because the bank's methodology is flawed or the data to which it is applied is inaccurate, the bank's earnings and capital will be overstated and, if loan losses occur, the bank's capital will not be adequately protected. *See* Div. of Super. and Risk Mgmt of the Federal Reserve Bank, *Basics for Bank Directors* (5th ed. 2010) (hereafter "*Basics*") at 37-39.

management to be **sufficient** to absorb probable losses based on available information.  Our estimates of credit losses meet the criteria for accrual of loss contingencies **in accordance with SFAS No. 5**, 'Accounting for Contingencies,' as amended by SFAS No. 114, 'Accounting by Creditors for Impairment of a Loan.'" ACPC ¶ 44 (emphasis added).

10. Each of the 2007 Forms 10-Q signed by McCann stated: "Management believes that the allowance for credit losses is **adequate** to cover known and inherent risks in the loan portfolio as of [last date of quarter]."  ACPC ¶¶ 54, 59, 63; IDJA Tab 19 (2007Q3 Form 10-Q) at 26; Greenberg Ex. B (2007Q1 Form 10-Q) at 14 and Greenberg Ex. C (2007Q2 Form 10-Q) at 14 (emphasis added).

11. A November 26, 2007 Form 8-K signed by McCann included a press release that stated: "[I]n response to unprecedented market condition changes in the past few weeks, **management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors.… As a result of such evaluation and review**, Franklin elected to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax)….Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91%.  The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while the overall commercial loan reserve will increase from 0.61% to 1.33%.…  **Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.**" ACPC ¶ 66; IDJA Tab 20 (emphasis added).

12. During the conference call for investors on November 26, 2007, Ranieri stated: "**We have evaluated** these changes [in market conditions] relative to the potential risk inherent in our portfolio and as a result of these changing market conditions **[we] have concluded** that we are going to increase reserves by approximately $20 million.  We believe this action that we are taking **will ensure the level of future earnings**, as the annual credit cost should be limited to the expected levels without our guidance.  What we are trying to do here, we believe we are **adequately reserved, we have looked at this very hard.**  But given the circumstances and I will be happy to elaborate on this later that we are seeing, **we are trying within the confines of what the accounting literature will allow us to do.  Take this whole issue of the institution's mortgage portfolio, and its lending to builders off the table with the reserve that will carry us not for a period, but into the future because frankly management and the Board does not want to have to do this again.**  These are obviously difficult times, and **I and the management are very experienced in this.**" ACPC ¶ 66 (emphasis added).

13. During the same conference call on November 26, 2007, James Ellman of Seacliff Capital asked: "**Has there been any conversation that you have had regarding this change in your provisioning with the regulators** and any additional need to raise capital?"  Ranieri responded: "**No.** I – the first part, this is Lewis.  As you know we can't comment on conversations with the regulators.  But neither are we stupid, and I would leave it at that.  And we remain well capitalized by all standards.  And we have access to capital, but we would not choose at this stock price.…  But we have no desire, given that we remain well capitalized by all ratios, to think about diluting shareholders." ACPC ¶ 66 (emphasis added).

14. The Bank's press release announcing 2007 results on January 31, 2008 quoted Nocella as follows: "During the fourth quarter of 2007 we significantly increased our allowance for credit losses by approximately $23.5 million.  While this increase obviously had a negative impact on our quarterly and yearly earnings, it was necessary and **prudent** given the turmoil in the housing markets nationwide, which has negatively impacted our home builder customers, and many

single family borrowers.  We believe that this action *better positions us to weather the current challenging economic environment*." ACPC ¶ 69; IDJA Tab 22 at Ex. 99.1 (emphasis added).

### (a) Misstatements Nos. 9, 10, and 12 Were False and Misleading

The statements that the Bank's allowance for credit losses was "sufficient," and "adequate," and would "ensure the level of future earnings" were false and misleading.  *See* Misstatements Nos. 9, 10, and 12.  In fact, the Bank's allowance for credit losses was grossly inadequate throughout 2006 and 2007 because the Bank used a flawed ALLL methodology for determining the allowance. Beginning with the September 2004 examination, the FDIC repeatedly reported concerns that the Bank's ALLL methodology was inadequate, and failed to comply with both GAAP and regulatory guidelines.  ACPC ¶¶ 32(e), 38, 64, 87, 102.  Specifically, the FDIC found the Bank's ALLL methodology to be in contravention of:  (1) FAS No. 114, *Accounting by Creditors for Impairment of a Loan* (May 1993); (2) FAS No. 5, *Accounting for Contingencies* (May 1975);  (3) *Interagency Policy Statement on Allowances for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2001); (4) *Interagency Policy Statement on the Allowance for Loan and Lease Losses*, Financial Institution Letter 105-2006 (December 13, 2006); and (5) *Interagency Guidance on Nontraditional Mortgage Product Risks*, 71 Fed. Reg. 58,609 (October 4, 2006).  ACPC ¶ 84; FDIC OIG Report at 9, 10, 15.  These defects in the ALLL methodology persisted throughout 2006 and 2007, and ultimately led to the allowance for credit losses being insufficient to absorb loan losses as the Bank's assets deteriorated.  *See* FDIC OIG Report at 9.

Nocella's claim that Bank addressed all of the concerns expressed by the FDIC by revising its ALLL methodology in 2004 and 2006 is belied by the FDIC OIG Report.  *Compare* Nocella Mem. at p. 39 n.39 *with* OIG Report at 9.  The OIG Report identifies numerous, persistent defects in the ALLL methodology that are unrelated to the changes in ALLL methodology that Nocella highlights; in particular, (1) the lack of a methodology for measuring loans for impairment, (2) the lack of consideration given to the impact of current economic conditions, and (3) the lack of

35

consideration given to the higher risk of loss posed by nontraditional single family loans involving layered risks. *See* OIG Report at 9, 10, 15. The glaring deficiencies in the Bank's ALLL methodology, including non-compliance with GAAP and regulatory guidance, and the OIG's unequivocal conclusion that "Franklin's management did not establish a sufficient ALLL or an adequate ALLL methodology" (*id.*), adequately allege that statements regarding the adequacy and sufficiency of the Bank's allowance for credit losses were false when made.

In addition, Statements Nos. 9 and 10 – which attest to the adequacy and sufficiency of the allowances for credit losses set forth in the Bank's false and misleading financial statements – were false and misleading when made because of the accounting irregularities discussed in section II.B.1. and 2., above. "The process of evaluating the adequacy of credit losses has two basic elements: *first, the identification of problem loans based on current operating financial information* and fair value of the underlying collateral property; and second, a methodology for estimating general credit losses." 2006 Form 10-K at 36 (emphasis added). The August 6, 2008 Form 8-K signed by Ranieri admitted that the Bank's operating financial information for 2006 and the first three quarters of 2007 properly identified only about one-third of the Bank's "problem loans." ACPC ¶¶ 42, 54, 59, 63. Thus, quite apart from the deficiencies in its ALLL methodology, the Bank's allowance for credit losses in 2006 and the first three quarters of 2007 was insufficient because the Bank omitted two-thirds of its "problem loans" from the evaluation process. *See* August 6, 2008 Form 8-K (reporting that Allowance for Credit Losses had been understated in 2007Q1 by 326,000 or 2.7%, in 2007Q2 by 533,000 or 3.4%, and in 2007Q3 by $7,667,000 or 46%).

### (b)  Misstatements Nos. 9, 10 and 12 Were Material

Having made public statements regarding the adequacy of the Bank's allowance for credit losses, the Individual Defendants cannot now claim that this particular indicator of the Bank's financial condition was immaterial. *See U.S. v. Causey*, 2005 WL 2647976, at *7 (S.D. Tex. Oct.

17, 2005) ("'By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to a reasonable shareholder, and thus is bound to speak truthfully.'")(quoting *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 282 (3d Cir. 1992) (hereinafter "*UJB Financial*")). In fact, the allowance for credit losses "represents one of the most significant estimates in an institution's financial statements and regulatory reports." *Interagency Policy Statement on the Allowance for Loan and Lease Losses*, Financial Institution Letter 105-2006 (December 13, 2006) at 2. *Accord Eagle Finance*, at 1257 (describing the allowance for credit losses as a "critical financial indicator").

Nor can the Individual Defendants successfully claim that their misrepresentations regarding the adequacy of the reserve were too general or conclusory to be material, or that they were merely expressions of belief. *See* Ranieri Mem. at 28-29. These arguments were all raised and rejected in *UJB Financial*, where the Third Circuit held representations that a bank holding company's loan loss reserves were "adequate," "strong," and "solid" to be material for § 10(b) purposes. *UJB Financial*, 282 ("[I]f a defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud."). The court reasoned that such statements of belief by directors and management are material because of the speakers' superior knowledge and expertise. *UJB Financial* at 282 (citing *Virginia Bankshares, Inc. v. Sandberg*, 111 S. Ct. 2749, 2757 (1991)). Indeed, the investment community particularly valued Ranieri's opinions because of his status as a banking industry leader and expert. *See* ACPC ¶¶11, 88. And Ranieri affirmatively encouraged that reliance. *See* Ranieri's Statement No. 12 ("I and the management are very experienced in this.").

Nor do purportedly cautionary statements in the 2006 Form 10-K render Misstatement No. 9 immaterial. *See* McCann Mem. at 13-14. In the first place, the "bespeaks caution" doctrine does not apply to misrepresentations of present facts. *See U.S. v. Causey*, 2005 WL 2647976, at *14. It is

therefore inapplicable to Misstatement No. 9 which misrepresents present facts; namely, that (1) the Bank's allowance for credit losses was sufficient to absorb the losses that were probable at the time the statement was made; and (2) was estimated in accordance with GAAP (specifically FAS Nos. 5 and 114). *See In re Reliance Sec. Litig.*, 91 F. Supp.2d 706, 721 (D. Del. 2000) (CEO's misrepresentations regarding strength and adequacy of finance company's allowance for credit losses were not projections protected by the PSLRA safe harbor, "[r]ather they [were] directed to the then-present state of the company's financial condition.")  In fact, the reserve was not sufficient to absorb the losses that were probable at that time because it was based on the defective methodology and false data described above.  In addition, as previously noted, the estimate was not made in accordance with FAS Nos. 5 and 114.

In any event, the boilerplate warnings that the allowance for credit losses "may be insufficient to cover actual losses" and that the Bank's internal controls "may not prevent all possible errors" are not "such that for a reasonable investor [they would] offset the misleading effect of the misrepresentation." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 372 (3d Cir. 1993).  *Accord U.S. v. Causey*, 2005 WL 2647976, at *9 (warnings must "exhaust the misleading statement's capacity to influence the reasonable investor").  The 2006 Form 10-K did not disclose that the Bank lacked adequate internal controls and internal audit; had underreported nonperforming loans by $20.5 million; had not complied with GAAP or regulatory guidance in estimating the allowance for credit losses, and had been repeatedly criticized by the FDIC for the improper methodology it used to estimate the allowance for credit losses.

### (c) The Restatements Defendants Were Severely Reckless Concerning the Falsity of Misstatements Nos. 9, 1) and 12

The following factors raise a strong inference that the Individual Defendants were at least severely reckless as to misrepresentations concerning the adequacy of allowance for credit losses.

38

First, the sheer magnitude of the insufficiency of the Bank's allowance for credit losses is strong circumstantial evidence of scienter. *See Abbey National*, at 361 (bank's announcement more than doubling the provision for credit losses contributed to strong inference of conscious misbehavior or recklessness); *Eagle Finance*, at 1251, 1256 (300% increase in finance company's provision for credit losses contributed to strong inference of scienter). Within a matter of months after McCann's misrepresentation in the 2007Q3 Form 10-Q (Misstatement No. 10) and Ranieri's misrepresentation during the November 26, 2007 conference call (Misstatement No. 12), the FDIC concluded that the Bank's allowance for credit losses was "substantially underfunded" and that an additional provision of $164,850,000 – representing a massive 980% increase in the reported allowance for credit losses – would be necessary. ACPC ¶ 84; IDJA Tab 19 at p. 23.

Second, the "crucial significance of accurate credit loss accounting in determining the financial viability of [the Bank]" also contributes to the strong inference of scienter. *See Eagle Finance*, at 1256; *accord In re Reliance Sec. Litig.*, 91 F. Supp.2d at 725 (critical importance of adequate loan loss reserve to company's financial integrity contributed to strong inference of recklessness against CEO, CFO and directors of finance company).

Third, the reasons for the inadequacy of the Bank's allowance for loan losses – deficient ALLL methodology and inaccurate financial reporting – were matters for which the Individual Defendants were responsible. As members of the Bank's board of directors, Nocella, Ranieri and the Individual Defendants were responsible, among other things, for reviewing and approving the Bank's written ALLL policy (including the ALLL methodology) at least annually, and overseeing management's maintenance of an adequate allowance for credit losses. *See Interagency Policy Statement on the Allowance for Loan and Lease Losses* at pp. 5-7; *Basics* at pp. 35-40. Both Nocella and McCann were members of the Bank's risk management committee, charged among other things with responsibility for the ALLL methodology and the level of the allowance for

credit losses. *See* 2006 Form 10-K at 6. The glaring defects in the Bank's ALLL methodology support a strong inference that all of the Individual Defendants were at least severely reckless as to the falsity of their assertions concerning the adequacy of the allowance. *See In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000) (failure to adequately reserve for sales returns "would seem to put reasonable men, particularly those with the training, background and access to information available to [defendant CEO and CFO], on notice that [it was] improper and would lead to a serious misstatement of revenue").

Nocella, Ranieri and McCann, in particular, had extensive banking industry experience. In fact, Ranieri publicly claimed that he and the Bank's management were "very experienced" with respect to determining allowances for credit losses. *See* Misstatement No. 12. It is implausible that these defendants were not aware of the applicable regulatory requirements, or of the fact that the Bank's ALLL methodology did not comply with them. As CPAs, Nocella and McCann would have known that the Bank's ALLL methodology did not comply with GAAP.

Fourth, the Individual Defendants knew about the FDIC's persistent concerns regarding deficiencies in the ALLL methodology, which were contemporaneously communicated to all of the Individual Defendants beginning in September 2004. ACPC ¶¶ 32(e), 38, 64, 87, 102; Greenberg Ex. F (*Overview of the Compliance Examination*) at 4 ("The results of the examination will also be communicated to the board of directors and management of the institution in a Report of Examination.").

Fifth, for the reasons set forth above in section III.B.2(c)-(f), all of the Individual Defendants were either aware, or recklessly ignorant, of the fact that, during 2006 and the first three quarters of 2007, the financial data used to determine the allowance for credit losses only included a fraction of the Bank's nonperforming loans.

Sixth, the false statements by Ranieri, Nocella and McCann downplaying the significance

40

of the $20 million increase in the Bank's provision for loan losses made during 2007Q4 – *see* discussion of Misstatements 11-14, below – further strengthen the inference that these three defendants acted with knowledge or were willfully blind to the truth. *See Eagle Finance*, at 1257 ("[M]agnitude of accounting error alleged combined with defendants' public statements minimizing the credit loss problem [gave] rise to a strong inference of scienter."); *In re Reliance Sec. Litig.*, 91 F.Supp.2d at 724 (defendants' statements to the press and in SEC filings "reassuring investors that company's loan loss reserves were sufficient" after announcing significant additional provisions for credit losses were circumstantial evidence of recklessness).[19]

### (d) Misstatements Nos. 11, 12, 13 and 14 by Raniere, Nocella and McCann Were False and Misleading

On November 26, 2007, the Bank announced that it would more than double its existing provision for credit losses. ACPC ¶ 66; August 6, 2008 Form 8-K at 6. Ranieri, Nocella and McCann deliberately downplayed the significance of this extraordinary adjustment by falsely and misleadingly portraying it as the result of a decision made by the Bank out of an abundance of caution, after a thorough review of the loan portfolio in light of current "unprecedented market conditions." ACPC ¶¶64, 66, 69. *See* Ranieri's Misstatement No. 12 ("we have looked at this very hard... we are trying ...[to t]ake this whole issue of the institution's mortgage portfolio, and its lending to builders[,] off the table with the reserve that will carry us not for a period, but into the future because frankly management and the Board does not want to have to do this again");

---

[19] These six indicia of scienter distinguish the instant case from the cases cited by Ranieri. *See* Ranieri Mem. at 28 n.17. In *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993), plaintiff's failure to present any evidence that the company knew that its losses from bad loans would exceed its reserves resulted in summary judgment for the defendant. In *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998), plaintiffs merely alleged – in conclusory fashion, and without support –that the defendants knew or should have known that the company's reserves against future losses were inadequate. In dismissing the complaint, the court in *Hinerfeld* also noted that the plaintiffs had failed to allege that the defendants had made any affirmative misrepresentations concerning the adequacy of the company's reserves. 1998 WL 397852, at *7 n.9. Absent affirmative misrepresentations, "'it is not a violation of securities laws to simply fail to provide adequate loan loss reserves.'" *Id.* at * 6 (quoting *UJB Financial*, at 283). Here, by contrast, plaintiffs have alleged multiple misstatements concerning the adequacy of the Bank's reserves, and specific facts that give rise to a strong inference that the defendants knew of, or were severely reckless as to, the falsity of those statements.

Nocella's Misstatement No. 14 (increase in provision was "prudent given the turmoil in the housing markets nationwide" and "better positions us to weather the current challenging economic environment"); McCann's Misstatement No. 11 ("management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors" in an "effort to anticipate issues, rather than wait for them").[20]

These statements were false and misleading because no such review of the Bank's loan portfolios had been undertaken as of November 26, 2007, as evidenced by the fact that the Chief Credit Officer responsible for conducting that review – at the insistence of the FDIC – was not even appointed by the Bank's board until December 19, 2007. ACPC ¶ 64; OIG Report at 11 and n.1. Moreover, any review of the Bank's loan portfolios during or prior to November 2007 could not have been "thorough" or involved "look[ing] … very hard" given that at that time: (1) tens of millions of dollars of doubtful and foreclosed loans were, and for many months thereafter continued to be, misclassified as performing assets (ACPC ¶¶ 41-42, 44, 54, 59, 63), and (2) the Bank was not even aware of the existence of simultaneous second liens (which increased the probability of default) on many single family mortgages that had been acquired without adequate due diligence. OIG Report at pp. 8, 13. In fact, the FDIC's OIG has preliminarily concluded that the Bank collapsed at least in part because its management never performed a thorough review of loan portfolios in light of current economic conditions. *See* ACPC ¶ 93 ("'Franklin did not consider the impact of current environmental factors in its [ALLL] analysis despite rapidly deteriorating economic conditions in the bank's primary markets'") (quoting OIG Report at 9); OIG Report at 10 (Bank never implemented a portfolio-level stress test to quantify the impact of changing economic conditions on asset quality, earnings, and capital as recommended in the FDIC's October 2007 examination report).

---

[20] Similarly misleading is McCann's February 1, 2008 statement that "[w]e believe that we have the capital levels

It is also reasonable to infer that Ranieri's unequivocal statement that, prior to more than doubling its provision for credit losses in November 2007, the Bank had not had any discussions with regulators was false. *See* Misstatement No. 13; ACPC ¶ 66.  As of November 26, 2007, the Bank was in the middle of an FDIC examination that ultimately resulted in the FDIC downgrading the Bank's composite rating[21] and directing the Bank to take Prompt Corrective Action to maintain its capital adequacy.  ACPC ¶ 64.  As part of the examination process, the Bank's senior managers would have been engaged in extensive discussions with the FDIC examiners at that time.  *See Basics* at pp. 18-19.  Significantly, just three weeks after announcing the provision increase, the Bank's board – of which Ranieri was chairman – appointed a Chief Credit Officer in response to concerns raised by the FDIC examiners (that ultimately resulted in a Prompt Corrective Action directive).  *Id.*; OIG Report at 11 and n.1.  It is, therefore, reasonable to infer that the sudden doubling of the Bank's provision of credit losses – which occurred less than three weeks after McCann had attested to the adequacy of the allowance for credit losses in the 2007Q3 Form 10-Q (Misstatement No. 10) — was also in response to concerns raised by the FDIC examiners, and was most likely an effort to stave off adverse regulatory findings.  In any event, it is clear that the provision for credit losses was not increased for the reasons that Ranieri, Nocella and McCann claimed:  that is, as a result of the Bank's thorough review of its loan portfolios in light of current economic conditions.

### (e)  Misstatements Nos. 11, 12, 13 and 14 by Ranieri, Nocella and McCann Were Material

The comforting misrepresentations by Ranieri, Nocella and McCann that the Bank had

---

required to support our business now and into the future."  ACPC ¶ 71.

[21] The Bank's FDIC composite rating was downgraded to "3" in the October 2007 FDIC examination report.  *See* OIG Report at 11.  A composite rating of 3 designates an institution that is "in a less than satisfactory compliance position. It is a cause for supervisory concern and requires more than normal supervision to remedy deficiencies.  Violations may be numerous.  In addition, previously identified practices resulting in violations may remain uncorrected.  ... Although management may have the ability to effectuate compliance, increased efforts are necessary...."  *See* Greenberg Ex. G (FDIC, Composite Ratings Definition List).

thoroughly reviewed the riskiness of its loan portfolio in light of the prevailing economic conditions, and had made conservative provision for probable additional credit losses were unquestionably material. The decision in *Abbey National*, is instructive. In that case, the court held that statements that Abbey National bank's risk profile had been adequately reduced by a £95 million increase in its provision for credit losses were actionable as securities fraud. *Abbey National* at 359-63. The court focused on the following statement by the bank's CEO, which is eerily reminiscent of Ranieri's Misstatement No. 12:

> '[W]e've done a very thorough review... of our entire ... portfolio. We've made appropriate, in fact, very conservative ... provisions. And, of course, we've been entirely transparent throughout the process and ... put our hands up for the exposure that we do have. So we're happy with the present situation.'

*Id.* at 360 (ellipses in original). Four months later, Abbey National announced the need for additional provisioning of $256 million. *Id.* at 353. In holding that the bank and its CEO had made material misrepresentations concerning Abbey National's then-existing financial condition, the court noted that "investors had no other source of information other than Abbey's disclosures to analyze the risk exposure." *Id.* at 361. The same was true here. A reasonable investor could have viewed the total mix of information as significantly altered by Ranieri's, Nocella's and McCann's false assurances that (1) the Bank's loan portfolios had been thoroughly reviewed in light of the current economic conditions, (2) based on that review, the Bank's highly experienced Chairman and management considered a $20 million increase in the provision for credit losses was all that was necessary, and (3) the increase in provision had not been required by bank regulators. *Accord U.S. v. Causey*, 2005 WL 2647976, at *11 (S.D. Tex. Oct. 17, 2005) (noting a substantial likelihood that a reasonable investor would have considered Ken Lay's misrepresentations that Enron and its auditors had "scrubbed" the company's books and that no additional write-downs would be forthcoming to be important).

44

**(f)  Raniere, Nocella and McCann Were Severely Reckless Concerning the Falsity of Misstatements Nos. 11, 12, 13 and 14**

The totality of the circumstances gives rise to a strong inference that Ranieri, Nocella and McCann knew, or were severely reckless in not knowing, that the Bank had not conducted a thorough review of its portfolio and that the $20 million increase in provision would not be sufficient.  (1) Within a few months after Misstatements Nos. 11-14 were made, the FDIC concluded that the Bank's allowance for credit losses was so "substantially underfunded" that an additional provision of $164.8 million – eight times the size of the provision that Nocella touted as "prudent" – was necessary. ACPC ¶ 84; IDJA Tab 19 at p. 23; *Abbey National*, at 361; *Eagle Finance*, at 1251. (2) Ranieri, Nocella and McCann knew that the Bank had substantial exposure to high risk, nontraditional and subprime loans and was likely to experience a high level of defaults in the near future. (3) Ranieri, Nocella and McCann knew, or were recklessly ignorant of the fact, that the Bank did not have the ability to accurately evaluate the riskiness of its loan portfolios because of: (a) improper accounting for troubled, delinquent and foreclosed loans, (b) inadequate acquisition due diligence of loans originated by others, (c) inadequate internal controls, and (d) inadequate internal audit systems.  (4) Ranieri, Nocella and McCann knew, or were recklessly ignorant of the fact, that the Bank's ALLL methodology was inadequate and in violation of GAAP and regulatory guidelines. (5) "[T]he crucial significance of accurate credit loss accounting in determining the financial viability of [the Bank], combined with defendants' careful statements mitigating the seriousness of the credit loss problem, raises a strong inference that defendants acted with knowledge of their public misstatements or were willfully blind to the truth." *Eagle Finance*, at 1256.

**(g)  Misstatements Nos. 9-14 Caused Plaintiffs' Losses**

The first disclosure that accounting information between September 2007 and January 2008 was no longer reliable was on May 1, 2008, after the market closed.  ACPC ¶ 73.  The next

day, May 2, 2008, the preferred shares declined by 35%, from $7.55 per share to $4.85 per share. ACPC ¶ 110.

The first disclosure that restatements were far more severe and affected much earlier periods, and that many restatements resulted from nonperforming loans and nonperforming assets which should have been recognized in much earlier periods, requiring extraordinary restatements and revisions to loan loss reserves (and thus that the Bank's significant subprime exposure predated 2006), going back to at least 2006 full year results, if not much earlier, was on August 6, 2008, after the market closed.  ACPC ¶¶ 76-77.  The next day, August 7, 2008, the preferred shares declined by 35% from $4.735 per share to $3.05 per share.  ACPC ¶110.

### 4. D&T Misstatements Regarding 2006 Financial Statements, Internal Controls and Audit

D&T made the following materially false and misleading statements regarding the Bank's 2006 financial statements, the effectiveness of the Bank's internal controls, and D&T's own compliance with generally accepted auditing standards ("GAAS") in auditing same:

15. "In our opinion, [the Bank's balance sheets as of December 31, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ending December 31, 2006] present fairly, in all material respects, the financial position of Franklin Bank Corp. and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America." ACPC ¶ 45.

16. "In our opinion, management's assessment that the company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Also, in our opinion, the company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission." *Id.* at ¶ 47.

17. "We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States) [*i.e.*, GAAS[22]]." *Id.* at 45.

---

[22] The standards of the PCAOB include GAAS in existence as of April 16, 2003.  ACPC ¶ 97 n.1.

### (a)   D&T's Misstatements Nos. 15-17 Were Materially False and Misleading

The falsity of D&T's Misstatement No. 15 is sufficiently alleged based on the Bank's admissions in the August 6, 2008 Form 8-K. *See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d at 658 (plaintiffs sufficiently pled falsity based on company's announcement of need to restate financial statements); *Fleming*, at *25 (same). The Bank has admitted that the 2006 financial statements audited by D&T did not fairly present the Bank's financial condition and were not stated in conformity with GAAP. ACPC ¶¶ 41-42, 89-95, 97, 98; August 6, 2008 Form 8-K at pp.3-4. In fact, the audited 2006 financial statements massively underreported the troubled assets on the Bank's balance sheet:   (1) Nonperforming Loans were understated by $20.5 million (or 155%), (2) Nonperforming Assets were understated by $22.6 million (or 66%), and (3) Real Estate Owned due to foreclosures on defaulted loans was understated by $2.1 million (or 10.7%). ACPC ¶¶ 41-42; Misstatements Nos. 4-6. As a result, (4) the Bank's 2006 net income was overstated by $1,122,000 (or 5.8%) and (5) earnings per share were overstated by $0.05 (or 7.69%). ACPC ¶¶ 41-42; Misstatements Nos. 7-8. These financial manipulations were accomplished in blatant disregard of GAAP, through a combination of improper accounting for severely delinquent single family mortgages, and improper accounting for single family mortgages in foreclosure. ACPC ¶ 77, August 6, 2008 Form 8-K at pp. 3-4.

The material falsity of D&T's Misstatement No. 16 – attesting to the effectiveness of the Bank's internal controls over financial reporting – would have been sufficiently pled merely by the fact that the Bank needed to restate its 2006 financial reports. *See* August 6, 2008 Form 8-K at 2 (stating that the Bank's 2006 financial statements, and D&T's report thereon, "should no longer be relied upon"); ACPC ¶¶ 76-77. However, plaintiffs have also alleged the existence of numerous adverse findings in the FDIC's October 2006 and October 2007 examination reports concerning the ineffectiveness of the Bank's internal controls over financial reporting ***during the twelve month***

*period ended December 31, 2006.*[23]   Specifically, during all or part of the twelve month period

ended December 31, 2006, the FDIC noted:  (1) the weakness and inadequacy of the Bank's internal

audit function (ACPC ¶¶ 38, 85, 87; OIG Report at 22); (2) unsatisfactory accounting and financial

reporting (ACPC ¶¶ 38, 84; OIG Report at 22); (3) weak loan administration (ACPC ¶ 84; OIG

Report at 22); (4) inadequate measurement, monitoring and reporting of loan concentrations (ACPC

¶ 86; OIG Report at 23); and (5) inadequate internal review and grading of loans.  OIG Report at 22,

23.

Although D&T seeks to portray all of the Bank's internal control problems as having arisen

suddenly, after December 31, 2006 (*see, e.g.,* D&T Mem. at 4, 7, 22-23), the ACPC and the OIG

Report make clear that all of the above deficiencies and violations *were observed by FDIC*

*examiners during fiscal 2006*.  The instant case is, therefore, distinguishable from this Court's

decision in *Dynacq,* upon which D&T erroneously places heavy reliance.  *See* D&T Mem. at 3, 15,

16 n.30, 17, 20.  First, the audited financial statements at issue in *Dynacq* were not required to be

restated.  *See* 2005 *Dynacq,* at *4 ("[T]he SEC has not required a writedown of Dynacq fiscal 2002

revenues or accounts receivable.").  Second, the complaint in *Dynacq* failed to demonstrate that the

alleged accounting improprieties had materially affected the financial statements.  *See id.* ("[T]he

Complaint also fails to make clear how the allegations as to the inappropriate treatment of revenue

materially affected the 2002 financial statements. ...  The reclassification by the successor auditor of

certain accounts receivable from short-term to long-term status had no effect on net revenues, net

income, retained earnings, or earnings per share.").

---

[23] The assertion that problems with the Bank's internal controls reported in the October 2007 FDIC examination have
no bearing on D&T's audit of the twelve month period ending December 31, 2006 is simply incorrect.  *See* D&T
Mem. at 22 (misinterpreting the summary of examiner comments and recommendations set forth at Appendix 3 to the
OIG Report).  Regular FDIC compliance examinations are conducted approximately annually, and are referred to by
the "as of" date of the financial information examined.  During the October 2006 examination, the FDIC reviewed the
Bank's operations for the approximately twelve months ended October 15, 2006.  The October 2007 examination
covered the period from October 16, 2006 to October 15, 2007, *i.e.* it included the fourth quarter of fiscal 2006.
Therefore, both the October 2006 and October 2007 examination reports describe the Bank's internal accounting
controls during the twelve month period ended December 31, 2006 that was the subject of D&T's reckless audit.

Third, this Court was unpersuaded by the argument in *Dynacq* that E&Y's resignation *in December 2003* could reasonably support an inference that the audited company's internal controls had been ineffective *during fiscal 2002*. *Id.* at \*3. The reason given by E&Y for its noisy withdrawal in December 2003 was the fact that *in November 2003* the CEO had negotiated (but not consummated) a significant sale of accounts receivable without the knowledge of the CFO, the board or E&Y. *Id.* This Court observed that "the Complaint contain[ed] no allegation that there was any similar transaction during fiscal 2002." *Id.* Here, by contrast: (1) the Bank's fiscal 2006 financial statements were required to be restated; (2) the material impact of the accounting irregularities is quantified in the complaint; and (3) the ineffectiveness of the Bank's internal controls in fiscal 2006 need not be inferred by hindsight because it was documented contemporaneously by FDIC examiners. In short, *Dynacq* is completely inapposite.

Contrary to Misstatement No. 17, D&T did not conduct its audit of the Bank's 2006 financial statements in accordance with GAAS. ACPC ¶¶ 98-105. Had it done so, it could not have failed to detect the Bank's admitted, obvious GAAP violations and the ineffectiveness of the Bank's internal controls. Standard of Field Work No. 2 required D&T to "obtain a sufficient understanding of the entity and its environment, including its internal control, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures." AU § 150.02 (Greenberg Ex. O); ACPC ¶ 103. In order to satisfy this standard, *D&T was required to obtain and consider the results of the FDIC's annual examinations of the Bank*. *See* AICPA Audit & Accounting Guide, *Deposit and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies* (June 1, 2009) at ¶¶ 5.159, 5.207, 5.219, 5.221. Either D&T failed to obtain and consider the FDIC's examination reports – in which case, it did not conduct a GAAS audit (*see* AICPA Continuing Professional Education, *Audits of Banks, Savings Institutions, Credit*

49

*Unions and Other Financial Institutions* (2009) (failure to obtain audit evidence produced by Bank examiners "may constitute less than a GAAS audit")) – or it failed to adequately plan the audit in light of numerous red flags that the examination reports revealed. AU § 150.02, Standard of Field Work No. 1 ("The auditor must adequately plan the work and must properly supervise any assistants."); AU Section 311.03 ("The auditor must plan the audit so that it is responsive to the assessment of the risk of material misstatement based on the auditor's understanding of the entity and its environment, including its internal control."); ACPC ¶¶ 100-102.

The GAAP violations that caused the Bank's 2006 financial statements to be materially misstated all related to improper accounting for loans serviced by third parties. *See* ACPC ¶ 77; August 6, 2008 Form 8-K at pp. 3-4. The FDIC examination reports that were available to D&T when it was planning and performing the fiscal 2006 audit[24] included red flags that should have put D&T on notice of the significant involvement of third parties in servicing the Bank's loan assets. *See* OIG Report at 23 (flagging single family loans "acquired through correspondents and serviced by others," and construction loans "comprised of large purchased participations"). Had D&T planned and performed the audit in response to this information, as required by Standards of Field Work Nos. 1 and 2, it would have sought confirmation from the third parties concerning the valuation and allocation of the Bank's loan assets. *See* AU Section 150.02, Standard of Field Work No. 3 ("Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."); AU Section 326 (Greenberg Ex. P); ACPC ¶ 103. Had it done so, D&T would have detected that $20.5 million in severely delinquent loans serviced by the third parties, and $2.1 million in real estate owned by the bank as a result of foreclosures on loans serviced by the third parties, were not properly recorded in the Bank's books as of December 31,

---

[24] The Bank was required to provide these reports to D&T. *See* ACPC ¶ 102 (citing 12 U.S. C. § 1821m(h)(1)).

2006. *See* Misstatement No. 4; ACPC ¶¶ 41-42, 44.  D&T also would have detected the fact that the Bank's actual nonperforming loans far exceeded – by 155% – its reported nonperforming loans if it had adequately audited the Bank's allowance for credit losses in accordance with GAAS.  *See* AU Section 342.10 (Greenberg Ex. Q) (requiring auditor to review and test the process used by management to develop the estimate, develop an independent expectation of the estimate, or review subsequent events or transactions).

The FDIC examination reports indisputably put D&T on notice that the Bank's internal controls were ineffective.  Specifically, (1) the FDIC's September 2003, September 2004 and November 2005 examination reports flagged weaknesses and inadequacies in the Bank's internal audit function (ACPC ¶¶ 38, 85, 87; OIG Report at 22); (2) the FDIC's September 2003 and November 2005 examination reports flagged the Bank's accounting and financial reporting as in need of improvement, and the November 2005 examination report also flagged accounting and financial reporting as a matter of concern (ACPC ¶¶ 38, 84; OIG Report at 22); (3) the FDIC's September 2003, September 2004 and November 2005 examination reports flagged the need for improved measuring, monitoring and reporting of loan concentrations (ACPC ¶ 86; OIG Report at 23); and (4) the FDIC's September 2003, September 2004 and November 2005 examination reports flagged the existence of weaknesses in the Bank's ALLL methodology and/or policy. ACPC ¶¶ 38, 84, 87, 93, 102; OIG Report at 9, 23.  Had D&T complied with Standards of Fieldwork Nos. 1 and 2 it could not have attested to the effectiveness of the Bank's internal controls over financial reporting.

### (b) D&T's Misstatements Nos. 15-17 Were Material

Significantly, in moving to dismiss the complaint, D&T does not contend that Misstatements Nos. 15-17 were not material.  Indeed, the materiality of these statements is beyond dispute.  "Few matters could be more important to investors than that of whether an issuer's

financial statements, contained in its filings with the [SEC], had, in fact, been subjected to annual audit conducted in accordance with GAAS in all material respects." *In re Scalzo*, 2003 WL 21938985 (SEC Release No. 1839, Aug. 13, 2003) at *14.

### (c) D&T Was Severely Reckless as to the Falsity of Misstatements Nos. 15-17.

At the outset, this Court must reject D&T's baseless contention that "[t]he PSLRA and Rule 9(b) impose an exceptionally rigorous pleading burden on Plaintiffs seeking to state a Section 10(b) claim against an outside auditor." *See* D&T Mem. at 13. *See also id.* at 3, 15-16. Under the PSLRA, Rule 9(b) and *Tellabs*, the standard that applies to evaluating the sufficiency of scienter allegations against outside auditors is the same as the standard that applies to securities fraud allegations against all other defendants. *See, e.g., In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 239 (S.D.N.Y. 2004) ("Ernst & Young's protestations notwithstanding, Rule 9(b) does not contemplate a higher standard for pleading fraud by an independent auditor than for pleading fraud by any other 10(b) defendant."); *Microstrategy*, at 650 ("The PSLRA's pleading requirements do not distinguish between corporate defendants and accountants...").[25]

The decision of the District Court for the Western District of Texas in *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877 (W.D. Tex. 2008) (cited in D&T Mem. at 3, 6, 15-16, 23) is not to the contrary. The court in *Dell* simply noted, in dicta, that the Second, Sixth and Ninth Circuits "have

---

[25] Likewise, this Court should reject D&T's unsubstantiated argument concerning outside auditors' purported lack of financial incentive to participate in their clients' frauds. See D&T Mem. at 3, 15. Despite Congress having enacted standards for auditor independence and created the Public Company Accounting Oversight Board in the Sarbanes-Oxley Act of 2002, courts continue to recognize that there are strong financial incentives for outside auditors to put the interests of their audit clients ahead of their duties to the investing public. *See, e.g., In re Countrywide Financial Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 n.79 (C.D. Cal. 2008)("Auditors are hired and retained by insiders. A few top auditing firms compete for high-profile clients.... Therefore, they have strong structural incentives to yield to management on close questions."); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 215 (1st Cir. 2005) (rejecting argument that auditors are without economic incentive, "[w]e do not doubt that such a profit motive [i.e., to continue a profitable business relationship] could contribute to an auditor's decision to 'turn[] a blind eye,' to a corporation's misleading accounting."). *See also generally United States v. Arthur Young & Co.*, 465 U.S. 805, 817 (1984) (auditors have a special "public responsibility transcending any employment relationship with the client"). In any event, inasmuch as plaintiffs have not alleged that auditing fees provided a motive for D&T to commit securities

concluded that meaning of recklessness in securities fraud cases is 'especially stringent' when the claim is made... against an outside auditor." 591 F. Supp. 2d at 899. After discussing the "especially stringent" standard supposedly applied in those circuits (in language that D&T quotes out of context), the court then went on to evaluate the scienter allegations against Dell's outside auditor according to the same standards it had applied to Dell's chairman, CEO and CFO. *See id.* at 900-905 (concluding that the allegations did not give rise to the requisite strong inference of scienter against PwC because: (1) PwC's independence was not compromised; (2) there were no allegations that PwC was aware of, or recklessly disregarded, deficiencies in Dell's internal controls; (3) the restatement affected less than 1% of Dell's net income; (4) the accounting errors were not egregious or obvious; and (5) the "red flags" alleged would not have placed a reasonable auditor on notice of potential wrong doing). *See also id.* at 899.[26]

In this Circuit, a strong inference of severe recklessness will suffice to plead scienter against an outside auditor. *See, e.g., In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 704 (S.D. Tex. 2006) ("The 'severe recklessness' threshold is not met by simple negligence 'or even inexcusable negligence.' Rather, it is satisfied only by 'those highly unreasonable omissions or misrepresentations that involve ... an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.') (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)); *Fleming*, at * 37 ("courts have held that in assessing the totality of the circumstances the following may each contribute in supplying an inference that an

---

fraud in this case, D&T's argument to the contrary is not a "competing inference[] rationally drawn from the facts alleged" that this Court must consider under *Tellabs. See Tellabs* at 314.

[26] Even under "especially stringent" pleading standards applied in by other courts, an auditor's recklessness may be shown in a variety of ways, including by showing that the audit was "so deficient that the audit amounted to no audit at all" or that there was "an egregious refusal to see the obvious or to investigate the doubtful" or "that accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693-94 (6th Cir. 2004). In this case, D&T failed to investigate the doubtful by ignoring the numerous red flags reported in the FDIC examination reports.

auditor performed a reckless or fraudulent audit:  1) red flags regarding accounting matters, 2) restated financial statements, 3) an auditor's failure to obtain sufficient support for accounting balances, and 4) an auditor's failure to follow-up on known accounting errors.").

Here, the totality of the following circumstances contributes to a strong inference that D&T was severely reckless in auditing the Bank's 2006 financial statements:  (1) the magnitude of the required restatement (*see Fleming*, at * 38 ("When the defendant is an auditor…courts appear willing to allow a complaint alleging GAAP violations and/or a financial restatement to survive at the pleading stage where the magnitude of the GAAP violation is exceptionally large in proportion to the previously reported numbers…")); (2) the simplicity and obviousness of the GAAP violations (*see id.* at *37 (simplicity of accounting principles that were violated "adds significant weight to the scienter calculus")); (3) the fact that D&T had served as the Bank's outside auditor since at least 2003, "giving D&T thorough knowledge of all aspects of [the Bank's] financial history, accounting practices, internal controls, and business operations" (*id.* at *40); (4) the FDIC's conclusion that the outside auditing of the Bank had been unsatisfactory[27];  and (5) the numerous "red flags" concerning Bank's ineffective internal controls that were reported in the FDIC examination reports available to D&T.  *See Fleming*, at *37 ("The fact that an auditor ignored red flags constitutes strong evidence of intentional or reckless conduct."); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) ("At the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand [an auditor's] motion to dismiss.").

In addition, D&T was aware of the following risk factors which should have caused it to be more skeptical of the level of nonperforming loans reported by the Bank as of December 31, 2006:

---

[27] D&T's contention that the FDIC found no fault "with [the Bank's] independent auditors *in 2006*" is disingenuous. See D&T Mem. at 22.  The finding in the FDIC's July 2008 examination report that "[e]xternal audit is unsatisfactory" must have related to D&T's audit of the Bank's 2006 financial statements, which was the last audit of the Bank ever completed by D&T. *See* OIG Report at 22.

(1) significant loan growth; (2) single family loans concentrated in California and other high-risk geographic locations; (4) single family loans comprised of subprime mortgages; (5) single family loans comprised of nontraditional mortgages; (6) single family loans comprised of hybrid adjustable rate mortgages/interest only mortgages; (7) construction loans concentrated in higher-risk geographic locations; and (8) construction loans comprised of unsecured builder lines of credit. *See* OIG Report at 22, 23.

### (d)  D&T's Misstatements Nos. 15-17 Caused Plaintiffs' Losses

D&T does not dispute the sufficiency of plaintiffs' loss causation allegations on this motion.  In particular, the ACPC alleges that the first disclosure of internal controls problems that could affect 2007 financial statements was on March 14, 2008, after the market closed.  The next day, the preferred shares declined over 30% in value from $10.95 per preferred share to $7.50 per share.  ACPC ¶ 109.  The first disclosure that restatements were far more severe and affected audited financial results, and disclosing that extraordinary restatements and revisions to loan loss reserves (and thus that the Bank's significant subprime exposure predated 2006) were required, going back to at least 2006 full year results, if not much earlier, was on August 6, 2008, after the market closed.  ACPC ¶¶ 76-77.  The next day, August 7, 2008, the preferred shares declined by 35% from $4.735 per share to $3.05 per share.  ACPC ¶110.

### C.  The Complaint Adequately Pleads Securities Act Claims

### 1.  Background On The Misleading Offering

In connection with the preferred IPO, the Bank filed a Registration Statement and the Prospectus, which forms a part of the Registration Statement, on May 5, 2006.  ACPC ¶ 31.

In many places throughout the Registration Statement, defendants made the following false and misleading statements and set forth the facts that follow.  For example:

a)      In its recitation of its business operations, the Bank repeatedly characterized

its lending practices as conservative, repeatedly asserting that the Bank had "established" and "utilized" "lending practices to reduce risks" (Prospectus at 26);[28]

        b)      In its description of its Builder Finance business, the Prospectus stated at pages 26 and 27:

> *In order to be approved for a builder line, we require that customers satisfy specific qualification requirements,* including reputation in the community, unsold inventory levels, geographic area concentration and other factors. ...
>
> *We utilize certain lending practices to reduce these risks,* including pricing all builder lines based on a risk adjusted return on capital and underwriting them based on debt/net worth, cash flow coverage, loan-to-value and loan-to-cost ratios, interest rate coverage, experience of management, inventory turnover by subdivision and guarantees. We monitor the ongoing financial condition of the builder and the status of construction by regular review of periodic builder reports and financials and site inspection of the actual construction. We approve draws only after third party on-site inspections and review of subdivision performance and borrowers' inventory. We believe these requirements reduce the potential for misdirected advances to other areas of the builder's business.
>
> Commercial Real Estate. ... We have established certain lending practices *to reduce our risks* relating to these types of loans. These include, but are not limited to, maximum loan-to-value, minimum debt service coverage, physical inspections and the operating experience of the borrower.
>
> Mortgage Banker Finance. ... To reduce [] risks we have assembled a team of experienced mortgage banker finance professionals to manage this business. *We have established the necessary procedures, controls, and systems to operate this business, including taking control of the mortgage collateral, monitoring the age of the collateral supporting the line and requiring paydowns on the line when the collateral on the line exceeds a specified age.* ...
>
> Single Family Mortgage Portfolio
>
> Our single family mortgage portfolio provides *high quality liquid assets* for us while we develop our community banking and commercial product lines.

        c)      Under a section entitled "Recent Developments," the Bank's Prospectus stated that

---

[28] Defendants argue that the word "conservative" is never used, but it is surely a plausible interpretation given to the "high quality" of its purported loans and the "established" procedures and "specific qualification requirements" applied to borrowers, among other things. On the other hand, defendants do not contend that the Prospectus disclosed that the Bank's loan portfolio was subprime and of low quality.

"[f]or the three months ended March 31, 2006, our net income was $6.6 million or $0.28 per diluted share, compared to $6.9 million or $0.31 per diluted share for the quarter ended March 31, 2005." (Prospectus at 2); and statements to the effect that the Bank's financial results had been prepared in conformity with GAAP and that the Bank's financial accounting function possessed working and adequate internal controls. ACPC ¶ 33.

These statements were false and misleading when made because they did not accurately and fully advise investors that, among other things: The Bank's accounting practices and internal controls were materially deficient; the Bank did not adequately reserve for loan losses; the Bank's delinquent loan accounting, REO accounting, loan modification accounting, investment securities accounting and BOLI accounting were all deficient and/or impaired such that the Bank's financial reporting could not be relied upon; the Bank's ALLL methodology repeatedly had been the subject of concern in nonpublic FDIC examination reports sent to the Bank starting no later than September 2004 [FDIC OIG Report (July 2009) (defined infra) at 9]; the Bank had repeatedly failed to implement FDIC examiner recommendations (including those made in a November 2005 report) regarding improving the Bank's liquidity policies and establishing a CLP [Contingency Liquidity Plan] and volatile liability risk limits [FDIC OIG Report at 16], thereby exposing the Bank to a heightened risk of failure; and the Bank directly and indirectly engaged in risky, poorly documented, and/or exotic low quality and subprime lending. ACPC ¶ 32.

In the Spring of 2008, Franklin disclosed that its third quarter 2007 financial reporting could not be relied upon and that it was conducting an investigation into certain accounting practices at the Bank. At that time, Franklin attempted to characterize the issues as isolated as to time, and these initial disclosures about accounting issues suggested nothing about any time period earlier than September 2007. ACPC ¶ 35. On August 6, 2008, Franklin filed a Report on Form 8-K disclosing for the first time that as a result of the investigations into accounting deficiencies and

problems associated with fiscal year 2007 and interim reporting periods in that year, the Bank "has undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005 and 2004" and that Franklin had engaged an accounting firm to serve as Special Accounting Master to review its accounting practices and financial disclosures. Since the time of that disclosure, Franklin has made no further financial disclosures via the SEC's EDGAR filing system. ACPC ¶ 35.

Among numerous other disclosures, the August 6, 2008 Report on Form 8-K disclosed for the first time that the Bank's previously disclosed assets in 2006 were overstated by at least $22 million and that its diluted earnings per share were overstated by at least $0.05, or almost 10%. As a result of these and other deficiencies outlined in the filing, the Bank reported that it would take a loss of $102 million in the second quarter of 2008, including a $70 million goodwill impairment charge. None of these figures were finalized, however, and the Bank never filed another quarterly or annual report on Form 10-Q or 10-K, and it never took the opportunity to amend prior reports for 2006 through 2008, as to which the Bank then disclaimed reliability. ACPC ¶ 36.

On July 2, 2009, the FDIC's Office of Inspector General issued the OIG Report, which highlighted that in each of four FDIC examinations (three of which predate the Preferred IPO), in September 2003, September 2004, November 2005 and October 2006, FDIC examination reports – which were contemporaneously furnished to Franklin and its management – concluded, *inter alia*: Franklin had internal audit weaknesses and/or inadequacies; Franklin's ALLL methodology had weaknesses and/or inadequacies; and that Franklin needed to improve its internal audit function. By November 2005, the FDIC's examination report noted that: accounting and financial reporting concerns at Franklin; concentrations of loans in several high risk categories, including high risk geographies and subprime loans; and that Franklin did not have adequate risk

management to identify, measure, monitor and control risk.  ACPC ¶ 38.

According to a Fall 2008 Examination Report prepared by the FDIC, "[o]nly 18 percent of the portfolio is considered a 'fully-documented' product, with the balance originated under various 'limited documentation' or stated income programs."  It also stated that "[t]he primary risk factors leading to performance problems are the existence of piggy-back second liens, limited documentation/no documentation of income, and geographic location."  The report noted "continued" deficiencies, highlighting a history of such problems, stating that the Bank's Commercial Real Estate "program continues to have significant deficiencies and overall risk management practices remain unsatisfactory ...."  The examination report also stated, *inter alia*, the following concerning the Bank's multi-billion dollar mortgage transactions business:

> Examiners determined that Franklin Bank's asset acquisition policies and procedures do not include compliance due diligence prior to acquiring loan packages.  Interviews with management confirmed they relied solely on compliance regulation warranties and representations included in the purchase agreements.
>
> ***In addition, the bank does not have policies and procedures regarding oversight of serviced loans.  Interviews with management revealed the bank never performed any compliance-related reviews of any of their loan servicers.*** Management had no knowledge of whether any consumer complaints existed or how the servicers handled oversight responsibilities regarding third-party services even though the bank's service agreements provided access rights to information and documentation, including the right to examine and audit servicer compliance with applicable regulations regarding mortgage loans. ...

ACPC ¶ 39. (Emphasis added.)

These inadequacies and their description necessarily imply that the bank's internal controls weaknesses were longstanding, and not transient or new at the time of the examination report.  The Examination Report and the OIG Report highlight that regulators repeatedly noted serious deficiencies in Franklin's internal controls directly affecting loan quality.  The Prospectus's repeated emphasis on asset quality and high lending standards was materially misleading.

## 2. The Securities Act Claims Are Not Time Barred

Defendants contend that the Securities Act claims against them are time-barred.  There is no dispute that the Securities Act claims were first asserted on May 4, 2009.  Thus, the inquiry for limitations purposes is what did plaintiffs know (or what should they have known) by May 4, 2008.  The insurmountable problem for the defendants is that by that date, the only information available to plaintiffs suggested merely that problems existed at the Bank in the latter half of 2007.  Nothing suggested that there were internal controls issues, subprime exposure issues or other problems that stretched back to May 2006, the time of the preferred IPO, and any complaint alleging it would have been meritless conjecture, as prior to August 2008 absolutely nothing suggested that Franklin's problems predated the September quarter of 2007.

Section 13 of the Securities Act provides that suit must be brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.  15 U.S.C. § 77m; *see In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 845 (S.D. Tex. 2004) (hereinafter "*Dynegy*"), citing *inter alia Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir. 1988).  "Storm warnings" denotes circumstances which trigger a plaintiff's duty to inquire because the circumstances suggest to an investor of ordinary intelligence that he has been injured or defrauded by defendants' conduct. *Dynegy* at 846.  If the plaintiff should have learned of certain facts placing him on notice of his potential claim by the "exercise of reasonable diligence," then the plaintiff is said to have been on inquiry notice. *Margolies v. Deason*, 464 F.3d 547,553-54 (5th Cir. 2006) *citing Jensen v. Snellings*, 841 F.2d 600,607 (5th Cir. 1988).  Although federal courts disagree as to what constitutes a "storm warning," "the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must instead be 'sufficiently confirmed or substantiated' to a point at which the victims are incited to investigate." *Id., quoting Ritchey v. Horner*, 244 F.3d 635, 640-41 (8th Cir.

60

2001), *quoting Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1335 (7th Cir. 1997). Additionally, the facts relied upon to support inquiry notice must "be such that [they] relate[] directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants." *Id., citing Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003); *In re Enron Corp. Sec. Litig.*, 540 F.Supp. 2d 800, 831 (S.D. Tex. 2007).[29]

Hints are not sufficient to trigger inquiry notice. *See Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997) ("[N]ot only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence."); *In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir.1979), *cert. denied*, 449 U.S. 905 (1980). To trigger inquiry notice, there must be enough information available to the investor to file a complaint. *Marks v. CDW Computer Centers Inc.*, 122 F.3d 363, 368 (7th Cir. 1997). Since the determination of what circumstances constituted a "storm warning" is fact-intensive, the decision of when a plaintiff was placed on inquiry notice is typically left to the jury. *Dynegy*, at 846, *citing Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997).

By May 4, 2008, the date one year before the operative filing that turned off the clock, investors knew <u>only</u> that Franklin's Report on Form 10-Q for the period ended September 30, 2007 was the subject of restatement and that the year end 2007 10-K would be delayed. Nothing in the news up to that date even remotely hinted that the Bank's May 2006 prospectus more than a year earlier was also tainted by the accounting irregularities that defendants worked so hard to characterize as limited in time to the latter half of 2007.

Defendants primarily rely on press releases between March 14, 2008 and May 1, 2008 as the storm warnings that should have prompted an earlier lawsuit against them for their 2006

---

[29] We note that issues surrounding "storm warnings" in securities cases are presently *sub judice* before the Supreme

misconduct. On March 14, 2008, Franklin issued a press release that said it had accounting issues that "could affect Franklin's 2007 financial statements." ACPC ¶ 72. Nothing in that disclosure suggested that any of Franklin's problems predated 2007.[30] On May 1, 2008, Franklin announced that its filing of a "Report on Form 10-K for the year ended December 31, 2007 has been delayed." ACPC ¶ 73. It stated further that "Based on Franklin's ongoing review and evaluation of its 2007 financial statements, certain changes to the Bank's previously submitted call reports are necessary." ACPC ¶ 73. Again, there is no mention of anything prior to 2007. That same press release disclosed that the information in the Company's then-most recent SEC filing, its Form 10-Q for September 2007 "should no longer be relied upon." ACPC ¶ 73. No other period financial statements were mentioned. Nothing implicated financial statements predating the September 2007 10-Q. Even as late as May 19, 2008, Franklin issued another press release stating in pertinent part that "Franklin is working diligently to complete and file its Form 10-K for the fiscal year ended December 31, 2007 and to amend and restate its form 10-Q for the quarterly period ended September 30, 2007." ACPC ¶ 74. Nothing in these disclosures even remotely suggests that Franklin's problems impacted financial statements that predated September.[31]

It was not until August 6, 2008 that Franklin first disclosed that periods earlier than September 2007 were impacted. Indeed, this pivotal disclosure was the first to suggest that restatements would impact *audited* financial statements. ACPC ¶ 77. It was the first time Franklin disclosed to the market that, subsequent to its restatement of the September 2007 quarter "Franklin has undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005 and 2004 in order to determine whether the impact of the foregoing accounting issues was limited to the third quarter of 2007."

---

Court in *Merck & Co., Inc v. Reynolds*, Sup. Ct. Docket No. 08-905. A decision is expected imminently.

[30] Likewise a series of disclosures about an Amex delisting process which was necessarily triggered by the Bank's inability to timely file its 2007 Form 10-K because of the September 2007 issues, could not possibly be construed to trigger a warning of problems in a much earlier time period.

Because the March 14, 2008 through May 1, 2008 disclosures are clearly limited to the period from September 2007 onward, there is nothing in those disclosures that placed investors on notice that the Preferred IPO was tainted by the same irregularities. Indeed, the disclosure then-to-date misleadingly suggested otherwise. Defendants offer no insight into what plaintiffs could have alleged on May 5, 2008, or what inquiry they should have then undertaken, for surely no inquiry by plaintiffs would have exposed what was later revealed in August 2008.

Defendants place significant emphasis on a June 2008 complaint filed by plaintiff Roucher that stated that on May 1, 2008, the truth had been "fully revealed" about Franklin Bank. But that complaint – which does not mention subprime exposure or use the word subprime and which says nothing about the Bank's lending practices – was filed on June 6, 2008, predating by several weeks the new August 2008 series of revelations about Franklin Bank. As of the date of that original complaint, June 6, 2008, the record disclosed absolutely nothing to indicate that Franklin Bank's problems predated the Preferred IPO. That is why the class period in that complaint stretches only far enough back to embrace the September 2007 results.

How plaintiffs were supposed to know that the Bank's issues in fact stretched back years rather than months, defendants do not say, and defendants do not cite a single case in which a company's announcement of errors or restatements in one period were sufficient to excite inquiry notice for a period more than a year earlier. Nor do defendants suggest what diligence plaintiffs could or should have performed in May 2008 to ascertain that the Prospectus was misleading.

Reliance on market reactions similarly is unhelpful to defendants. While the market did in fact react to the increasingly bad revelations made by defendants, none of the supposed storm warnings disclosed that the Bank's May 2006 prospectus was also false and misleading. Thus, the stock price declines pre-dating August 2008 were unrelated to the Offering.

---

[31] RBC's review of pertinent facts on page 15 of its brief is entirely consistent with this chronology.

Defendants rely heavily on *Dynegy*. *Dynegy* is instructive. There, the Court evaluated each of defendants' purported "storm warnings" to assess whether they directly related to and disclosed triggering information about two transactions that were the subject of that case. Although most of the purported storm warnings were rejected by the Court, one disclosure had been acknowledged by plaintiffs and irrefutably was specifically tied to one of the two transactions at issue and thus served as a storm warning of the irregularity or impropriety of that transaction. *Id.* at 853-54 (ultimately finding triggering disclosure of the "Project Alpha" issue in a detailed disclosure about it). Contrary to the spin defendants seek to place on it, *Dynegy* highlights that the warning must directly relate to the matter complained of to be a storm warning. Thus, pointing to a series of disclosures about 2007 simply cannot be presumed to serve as storm warnings of problems in 2005 and 2006. *Accord In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp.2d 431, 447 (S.D.N.Y. 2003) (press reports insufficient to put plaintiffs on notice where they failed to implicate particular statements).[32]

Finally, defendants argue that strict compliance with Section 13 of the Securities Act requires that plaintiff "plead and prove" compliance with the statute of limitations. The language "plead and prove" comes from a case decided after trial, *Bryant v. Uland*, 327 F. Supp. 439, 446 (S.D. Tex. 1971). In any event, the ACPC contains the requisite allegation, ¶ 125, and provides the factual basis for timeliness, by making clear that the defining revelation of August 6, 2008 was the first event that implicated the years that included the Preferred Offering and thus placing plaintiffs on inquiry notice. ACPC ¶¶ 76-78. These allegations are more than sufficient.[33]

---

[32] *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346 (2d Cir. 1993) is also inapposite. There, notice of an unsuitability claim against a broker by his client was triggered by offering prospectus, signed by plaintiff, expressly warning of the unsuitable nature of the investment. Equally unhelpful is *Jensen v. Snellings*, 841 F.2d 600 (5th Cir. 1988). In *Jensen*, which was decided on summary judgment, the plaintiff was given advice from counsel – a 35 page memo that expressly "could build a case" – disclosing the allegations of fraud and secret profits associated with the plaintiffs' loss more than two years before the suit had been brought and outside the applicable limitations period on certain of the claims in that case. *Id.* at 608. No one has given plaintiffs any similar memo here.

[33] The Individual Defendants also argue, without citation, that the claims of plaintiff Pribyl are "plainly time-barred" because Pribyl was not added to the complaint until the latest amendment, December 22, 2010. This argument is

### 3. Rule 9(b) Is Not Applicable To The Securities Act Claims.

RBC argues that Rule 9(b), Fed. R. Civ. P., is applicable to the Securities Act claims. Nocella, on the other hand, recognizes that the Securities Act claims do not sound in fraud and that Rule 9(b) is not applicable to them, and that Rule 8 instead applies. Nocella at 3.

Section 11 of the Securities Act allows purchasers of a registered security to sue an issuer, its officers, *underwriters* and others in a registered offering when false or materially misleading information is included in a registration statement. As the Fifth Circuit recently made clear, these claims are distinct from fraud-based Exchange Act claims, do not sound in fraud, and involve a far lower threshold of liability. *Lone Star Ladies Investment Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001)("The lower threshold of liability under section 11 and 12 of the 1933 Act as compared to the 1934 Act here matters a great deal.") "The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). There is no dispute that underwriters of a public offering are proper defendants in suits relating to materially false or misleading prospectuses issued under their firm's imprimaturs and as to which the underwriters enjoy substantial fees. 15 U.S.C. § 77k.

To establish a *prima facie* case, plaintiffs "need only show a material misstatement or omission" in the registration statement, *Huddleston* at 382, and, as the Supreme Court has made clear, and the Fifth Circuit has reiterated, the burden on plaintiffs for such claims is "relatively minimal." *Id.* ("[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements"); *Lone Star Ladies*, 238 F.3d 363, 369 (5th Cir. 2001) (reiterating that liability is "virtually absolute"); *Feiner v. SS&C Technologies*, 11 F. Supp.2d 204, 207 (D. Conn. 1998);

---

properly relegated to a footnote (ID Mem. at 25 n.43). In fact, Pribyl's claims were tolled since the May 4, 2009 filing asserted a class that included him and thus tolled the statute of limitations. *See generally American Pipe & Constr. Co. v. State of Utah*, 414 U.S. 538, 662-53 (1974) (explaining tolling of limitations for class members).

*Klein v. PDG Remediation, Inc.*, 937 F. Supp. 323, 326-27 (S.D.N.Y. 1996).[34]

These claims do not sound in fraud, and plaintiffs need not plead or prove privity, reliance, causation or scienter to establish liability. *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) (causation not an element); *Lone Star Ladies Investment Club*, 238 F.3d 363, 369 (5th Cir. 2001); *Schlesinger v. Herzog*, 2 F.3d 135, 141 (5th Cir. 1993) (scienter and reliance not elements of the claim); *see also Herman & McLean v. Huddleston*, 459 U.S. 375, 382.

Liability attaches for any materially false or misleading statement or omission. A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc., v. Northway, Inc.*, 426 U.S. 438, 449 (1976).[35] The issue of materiality is a "mixed question of law and facts, involving as it does the application of a legal standard to a particular set of facts." *Id.* at 450. Determinations of materiality in the context of a Rule 12(b)(6) motion are therefore inappropriate "unless [the omissions complained of] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985); *see also Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 208 (5th Cir. 1988).

Under these authorities, the Complaint alleges cognizable claims against RBC and the defendants who signed the Registration Statement under Section 11 of the Securities Act of 1933.

RBC argues that the claims asserted against it are fraud claims, although the ACPC expressly indicates otherwise and is organized in a manner intended to set forth the pertinent

---

[34] RBC attempts to disavow responsibility for portions of the Prospectus that were expertised. RBC Brief at 15 n.13. After discovery, RBC may assert an affirmative defense of due diligence. But, underwriters cannot blindly follow expertised reports without conducting any inquiry. *See Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1227-28 (7th Cir. 1980). Due diligence requires inquiry, even as to expertised portions of a Prospectus, although the standards of diligence vary. Notwithstanding attempting to assert a due diligence argument, these defendants have not proffered any information (and there has been no discovery) concerning their purported diligence.

[35] The standards of materiality under the Securities Act of 1933 and the Securities Exchange Act of 1934 are the same, and courts routinely cite cases asserting claims under either act interchangeably on the materiality issue.

allegations concerning the Prospectus before turning to the class period allegations relating to the fraud claims against the other defendants.  RBC points to phrases such as that RBC "knew or should have known" (a decidedly negligence-oriented phrase) and that certain statements were "misleading when made," which is an element of the Section 11 (nonfraud) claim (*see* 15 U.S.C. § 77k, which uses words "untrue statements" and "misleading").  RBC then cites to ACPC ¶ 48, a paragraph that appears in the class period fraud section of the complaint, after the section concerning the misleading prospectus and thus not applicable to defendant RBC.  In any event, the Fifth Circuit has counseled that to the extent there are fraud allegations somehow intermixed among the nonfraud allegations -- which we believe not to be the case here -- the Court may simply ignore the fraud allegations.  *Lone Star Ladies,* 238 F.3d at 368.  Equally inapplicable are Ranieri's arguments concerning the degree of specificity required (Ranieri Mem. at 26).  These arguments rely on Rule 9(b) principles applied in the Exchange Act context, and, after *Lone Star Ladies,* simply do not control the Securities Act claims.[36]

### 4. The Prospectus Contained Material Misstatements

The Complaint highlights several material misstatements in the Prospectus, listed at ACPC ¶ 33.  Chief among these is the repeated references to the Bank's lending standards as "high quality" and designed to "reduce risks" and the existence of "necessary procedures, controls, and systems" to operate the Bank's businesses. *E.g.* ACPC ¶ 33 b.

All of these statements are alleged to be false or misleading.  The complaint alleges that the Bank's controls were materially deficient, the Bank repeatedly failed to implement FDIC recommendations concerning improving the Bank's liquidity, and the Bank engaged in risky, poorly documented and exotic, low-quality and subprime lending.  ACPC ¶ 32.  These allegations alone are sufficient.  But the complaint goes further anyway, citing to the FDIC's OIG Report,

---

[36] Even if Rule 9(b) applied, the ACPC more than adequately specifies the statements and the place of the Prospectus,

which flagged repeatedly in the examinations prior to the Preferred Offering that Franklin had internal controls weaknesses, that noted financial reporting concerns at the Bank, and that flagged concentrations of loans in high risk categories and subprime loans.  ACPC ¶ 38.

Likewise, certain financial statements included in the Prospectus were also misleading, although the amounts of the misstatements cannot yet be quantified because the forensic accounting at the Bank either ceased upon the Bank's collapse or has not been made public.

The Prospectus included pro forma earnings data for the first quarter of fiscal 2006.  The Bank later disclosed that year's financial statements were overstated by more than 8%.  Thus, even under RBC's asserted 5% threshold (RBC Mem. at 16), one can safely assume that this financial data was materially misrepresented.

Nocella argues that the restatements do not support a valid claim, relying entirely on cases in which there were no restatements.  To be sure, augmentation of reserves in later periods is not the same thing as a restatement.  But a restatement is an admission that the earlier figures were not correct.  Greenberg Ex. L at 6 (FAS 154, *Accounting Changes and Error Corrections*).

Nocella also argues that some of these statements are immaterial puffery.  But repeated statements concerning lending standards are in fact material and were intended to assure investors about the strength of the Bank's assets.  Statements about the quality of the Bank's lending standards are not comparable to statements about a "strong credit culture" (whatever that means) that "consistently originates quality loans" as was found immaterial in *In re American Business Fin. Serv. Inc. Sec. Litig.*, 2007 WL 81937 (E.D. Pa. Jan. 9, 2007).  In fact, in that case, the defendant originated "quality" loans, as that statement did not preclude the possibility of both good and bad loans being originated.  In contrast, here, blanket statements about the quality of the bank's lending standards are decidedly more specific and were false when made.

---

and clearly intends to hold RBC as the speaker of these statements given its imprimatur on the document.

68

Similarly, Ranieri seeks to compare this case to cases that dismissed as immaterial generalized statements about a "highly disciplined" risk management process and "our fundamentals are strong." As to the latter, it is not even clear what that phrase standing alone means. As to both, the statements are generalized and do not purport to be specific to any business unit, and there appeared to be no specific credible allegations undermining those statements. In contrast, here, the allegations concern specific standards and procedures in specific credit categories and allegations that those procedures were not in fact being followed (*i.e.*, defendants "never" performed various due diligence procedures relating to loans.)

Ranieri argues that the financial misstatements in the Prospectus must include allegations identifying the precise magnitude of the misstatement. This argument relies on the inapposite case of *Garber v. Legg Mason Inc.*, 347 Fed. Appx. 665 (2d Cir. 2009). But in *Garber*, which did not involve a restatement, the plaintiff alleged that the prospectus failed to disclose that certain expenses were then experiencing a "dramatic increase" and that this somehow rendered prior statements about expenses misleading. Such conclusory allegations necessarily and speculatively implicated forward-looking statements rather than specifically alleging that certain prior financial results were in fact misstated as occurred here.

### 5. The Prospectus Did Not "Bespeak Caution"

The Individual Defendants contend that the Prospectus "shouted" caution "from the rooftops." ID Mem. at 31-32. But the "risk disclosures" to which they point are about what "may" happen, not what was happening or what had happened.

The bespeaks caution doctrine "merely reflects the unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994); *see also Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp.2d 618, 624-25 (N.D. Tex. 1998).

To assert the bespeaks caution defense, the language relied on by defendants must "relate

directly to that by which plaintiffs claim to have been misled." *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994). The disclaimers forming the basis for the "bespeaks caution" defense must be "highly specific, very factual, and directly address[]" the claimed omitted facts or circumstances. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993) ("[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored"); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("not every mixture with the true statements will neutralize the deceptive and if it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow"). Not only the existence of a risk, but the magnitude of that risk must be explicitly disclosed in order for statements truly to bespeak caution.

Disclosing as a "risk" a situation that is in fact already occurring is inadequate (and itself misleading), and vague, general or conditional boilerplate "risk" disclosures – cast in terms of what "may" or "might" happen – are insufficient as a matter of law to apprise investors of facts, events and circumstances that are currently being experienced. *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 317 (8th Cir. 1997) ("cautionary statements, however, cannot be general risk warnings or mere boilerplate"); *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir. 1994) ("Moreover, the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts."); *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (bespeaks caution doctrine is limited to "forward-looking statements"); *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) ("'To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'")

70

(quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*, 456 U.S. 914 (1982)).

Turning to the specific disclosures to which the Individual Defendants point, none of them warns that the first quarter 2006 financial results were misstated and none speaks of what was then happening. Instead, each is a disclosure of what "may" or "could" happen. Hence, stating that "[o]ur allowance for credit losses *may* be insufficient" is unhelpful to investors – indeed it is itself inherently misleading – if the allowance is in fact insufficient at the time. Stating that newly originated loans "*may* cause our loan portfolio to experience increased losses" is not cautionary if the proper accounting would mean that the Bank at the time was experiencing increased losses.

Defendants also point to a disclosure that the Bank tends to close more loans with lower than market interest rates. ID Mem. at 31 (second bullet). Rather than cautioning about the risky lending that plaintiffs allege, this language misleadingly suggests that the Bank's lending was of a higher than usual quality and was not subprime, since that is what lower interest rates signal. Likewise, defendants can find no solace in a disclosure of the risk of being subject to fraudulent acts of loan applicants, since plaintiffs do not allege anything about loans procured by fraud. This disclosure is inapplicable and unresponsive to allegations of inadequate internal controls.

Also misplaced is defendants' elliptical reliance on risk disclosures relating geographic concentrations of certain loans. ID Mem. at 28. These are disclosures of concentrations of loans in certain Texas counties, but they say nothing about the concentrations of loans in Arizona, Nevada, California and central Florida that were the locations that exposed the Bank to its greatest risks. Similarly, the ID Mem. points to disclosures about "future indebtedness" impairing the ability to pay dividends, but the ACPC does not allege that the Bank was overwhelmed by future debts.

Defendant McCann on the other hand suggests that he should be immune since the Bank's

2006 Report on Form 10-K (dated March 14, 2007) disclosed that internal controls, no matter how well designed, "may not prevent all possible errors" and that certain accounts are by their nature subjective. The first disclosure is precisely the type of boilerplate that means nothing in the face of allegations of ineffective internal controls. This case is not about an idiosyncratic error that a well-designed control failed to catch. It is about systemic failures of controls – after repeated warnings – that led to inordinate exposure to defaulted and subprime loans. The second disclosure about estimates and subjective judgments is similarly meaningless, particularly because the Bank restated these figures not because subjective judgments were debated but because under GAAP (which the Bank claimed to but did not properly apply) the accounts were misstated.

This case is not comparable to the on-point warnings in *Halperin v. eBanker USA.Com, Inc.*, 295 F.3d 352 (2d Cir. 2002). In *Halperin*, the plaintiff complained that a prospectus misleadingly suggested that the company intended to go public in the near future, but the prospectus expressly disclosed otherwise and couched the intention in very soft language (that it "intended to endeavor" to go public). Cautionary language such as that the investor should be prepared to hold the illiquid investment indefinitely, and that there was no assurance the company would go public obviously eliminated the plaintiff's claims.[37]

Finally, the Individual Defendants (ID Mem. at 33), Ranieri and Nocella argue without citation to any authority that although the year end 2006 figures were restated, there is nothing to suggest that there was anything wrong with financial data prior to the fourth quarter of 2006. Leaving to one side the interpretational differences concerning fiscal years 2004 and 2005, there can be no dispute, at least at this stage, that the intended restatement of full year 2006 financial results necessarily implicated the first quarter of 2006, which financial results were included in the

---

[37] McCann's reliance on *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp.2d 718, 744 (S.D. Tex. 2003), is misplaced. As that decision points out, the bespeaks caution doctrine only applies to forward looking statements and does not apply to such factual statements as financial statements, among other things. The Securities Act claims there survived, and the Court rejected the application of bespeaks caution in the face of seemingly better cautions than those here.

Prospectus.  *See Atlas Air*, at 487 ("If the company believed that its earnings were reported correctly during the first and second quarter of 2000, [it] could and presumably would have announced that the restatement applied only to the third and fourth quarters of 2000.") Ranieri also argues that by implication because the first quarter 10-Q was not restated there was nothing wrong with the first quarter data.  This is not a reasonable inference, as *Atlas Air* explains, and Ranieri offers no information concerning why the quarterly statements were not restated.

### 6. The "Negative Causation" Defense In Not Appropriate And Lacks Merit

Plaintiffs asserting Section 11 claims do not need to allege or prove causation.  Instead, as defendants recognize, "negative causation" is an affirmative defense.  Nocella attempts to shift his burden by arguing that plaintiffs cannot show causation since a significant amount of the value of the preferred shares had been lost before the end of the class period.  The argument ignores that significant value was lost during and after the Class Period.  In any event, plaintiffs have alleged facts showing price declines in the preferred shares associated with disclosures.  For example, ¶ 110 highlights stock drops associated with revelatory disclosures -- the August 7, 2008 drop of 35% of the value of the preferred shares, which immediately followed the first revelations concerning long-term accounting irregularities at the Bank stretching back for years rather than months.  These post-disclosure declines fully support causation.  Moreover, defendants offer no evidence -- such as expert evidence which might be necessary to establish causation -- nor could they on this motion.

The cases relied upon by Nocella on this point are distinguishable.  The *Merrill Lynch Research Reports*[38] cases were brought by mutual fund shareholders alleging that the funds purchased shares of technology companies because of a conflict of interest (resulting from the mutual fund company's parent serving as banker for the underlying investee companies) rather

---

[38] 272 F. Supp.2d 243 (S.D.N.Y. 2003) and 289 F. Supp.2d 429 (S.D.N.Y. 2003).

than as a result of genuine interest or fundamentals of the technology companies. These flawed cases disregarded how mutual fund shares are valued – solely based on the net asset values of the investments held by the funds. The plaintiffs neglected to examine or allege anything about the values of the investee companies on the date of the alleged revelation, the day on which a state attorney general filed a claim against Merrill Lynch. The complaints in these cases largely admitted that the net asset values of the funds did not respond to the purported revelations, and thus it could be determined on a Rule 12(b)(6) motion that causation was an impossibility. Similarly, other cases cited by Nocella involve situations in which the complaints admitted that the registration statements at issue had been filed with the SEC *before* any of the alleged improper conduct had even begun. Thus, the registration statements could not have disclosed improper conduct that had not yet occurred. *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp.2d 404, 419 (S.D.N.Y. 2009); *In re Alamosa Holdings, Inc.* 382 F.Supp.2d 832, 865 (N.D. Tex. 2005).[39]

Contrary to Nocella's assertions, the August 6, 2008 disclosures revealed previously undisclosed facts, including highlighting for the first time that the Bank's internal controls irregularities were long-term issues rather than issues that only impacted September 2007, and advising for the first time that the Bank's financial results for 2006 could no longer be relied upon, the first quarter of which data was included in the Prospectus. ACPC ¶¶ 33, 77. The revelations necessarily implicated the poor quality of its lending and assets, and, without more, the disclosure that the fiscal 2006 results could not be relied upon necessarily implicated the entire year. *See Atlas Air*, at 487 ("If the company believed that its earnings were reported correctly during the

---

[39] Nocella relies on *Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 WL 2092280 (M.D. Fla. July 26, 2006), which actually sustained a complaint and did not address the causation issue. Nocella may have intended to cite the earlier *Davidco Investors, LLC v. Anchor Glass Container Corp.*, 2006 WL 547989 at *25 (M.D. Fla. Mar. 6, 2006), which dismissed claims of specific plaintiffs who sold their shares before the revelations that caused the stock drops, and thus who necessarily also could not show causation. Also fitting this pattern of claims precluded by share sale prior to revelation is In re *McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp.2d 1248, 1262 (N.D. Cal. 2000).

first and second quarter of 2000, [it] could and presumably would have announced that the restatement applied only to the third and fourth quarters of 2000." )

### D. The Individual Defendants Are Liable As Controlling Persons

The Individual Defendants dispute that they may be held liable as controlling persons under Sections 15 of the Securities Act and 20(a) of the Exchange Act.  Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person..."  *Dynegy*, at 828, *quoting* 17 C.F.R. § 230.405.  Courts have never hesitated to hold directors and officers responsible under this test.  Each named individual defendant was a controlling person of Franklin and of one another.  ACPC ¶¶ 11-17, 129, 137.

### IV. Conclusion

For all of the foregoing reasons, the motions to dismiss should be denied in their entirety.

Dated this 26ᵗʰ day of April, 2010   Respectfully submitted,

          SCHWARTZ JUNELL GREENBERG
           & OATHOUT, LLP

        By:  */s/ Roger B. Greenberg*
           Roger B. Greenberg
           Texas State Bar No. 08390000
           Federal I.D. No. 3932
           Thane Tyler Sponsel III
           Texas State Bar No. 24056361
           Federal I.D. No. 690068
           909 Fannin Street, Suite 2700
           Houston, TX 77010
           Telephone (713) 752-0017
           Facsimile (713) 752-0327

          *Liaison Counsel*

           *- and -*

SHALOV STONE BONNER & ROCCO LLP
Ralph M. Stone (pro hac vice)
Susan M. Davies
Amanda C. Scuder
485 Seventh Avenue, Suite 1000
New York, NY 10018
Telephone (212) 239-4340
Facsimile (212) 239-4310

*Lead Counsel*
*For Preferred Stock Purchaser Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 26, 2010, a copy of the foregoing document was served on the following counsel via the Court's ECF system as indicated below:

| | |
|---|---|
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| Cynthia S. Connolly | cconnolly@scoutdoug.com |
| J. Allen Carney | acarney@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | james.farrell@lw.com |
| M. Bryon Wilder | BWilder@gibsondunn.com |
| Jonathan C. Dicket | JDickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |
| Stephen E. McConnico | smcconnico@scottdoug.com |

and on the following parties by U.S. mail:

James G. Munisteri
Orin H. Lewis
Gardere Wynne Sewell & Riggs
1000 Louisiana, Suite 3400
Houston, Texas 77002

Robert J. Giuffra, Jr.
Brian T. Frawley
William B. Monahan
Andrew J. DeFilippis
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Robbins Rudman Geller & Dowd, LLP
58 South Service Road, Suite 200
Melville, NY 11747

David C. Walton
Anne L. Box
Robbins Geller Rudman Dowd, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

_____/s/ Thane Tyler Sponsel III_____
THANE TYLER SPONSEL III