# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re FRANKLIN BANK CORP. | § | CIVIL ACTION NO. 4:08-CV-1810 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | CLASS ACTION |
| | § | |
| | § | |
| | § | JURY TRIAL DEMANDED |

---

**DEFENDANT RUSSELL McCANN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE FRANKLIN INVESTOR GROUP'S SECOND CONSOLIDATED AMENDED COMPLAINT**

---

Barrett H. Reasoner
Sam W. Cruse III
Ashley McKeand
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas   77002
Telephone: (713) 650-8805

*Attorneys for Defendant Russell McCann*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.  ARGUMENT ........................................................................................................................ 1

    A.    Plaintiffs Fail to Sufficiently Allege That McCann Materially Misled Investors Regarding the Bank's Exposure to Subprime ........................................ 1

    B.    Plaintiffs Fail to Plead Scienter ........................................................................... 4

        i.    Plaintiffs' Motive Theory Is Not Tied to McCann; Even If It Were, Desire to Sell Franklin Bank Stock On Favorable Terms Is a Routine Corporate Motive That Is Not Probative of Scienter ................ 4

        ii.    Plaintiffs Have Not Alleged That McCann Was Aware of, or Recklessly Disregarded, Internal Corporate Information .......................... 6

            a.    The Confidential Witnesses ........................................................... 6

            b.    Craig Wolfe's February 19, 2008 Letter ......................................... 9

            c.    The OIG Report ........................................................................... 10

        iii.    Plaintiffs' Remaining Scienter Arguments Are Likewise Inadequate ........................................................................................... 11

            a.    Nature of the Alleged GAAP Violations ...................................... 11

            b.    Red Flags .................................................................................... 14

        iv.    McCann's Competing Inference is More Compelling ............................... 15

    D.    Plaintiffs Have Not Adequately Pleaded Control Person Claims ........................ 16

    E.    The SCAC Should Be Dismissed With Prejudice ............................................... 17

II.  CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Baker Hughes Inc.*
  292 F.3d 424 (5th Cir. 2002) ............................................................. 8, 15

*Bay v. Palmisano*
  2002 WL 31415713 (E.D. La. Oct. 24, 2002) ................................. 12, 14

*Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*
  2010 WL 601364 (E.D. Wis. Feb. 18, 2010) ........................................ 3

*Goldstein v. MCI Worldcom*
  340 F.3d 238 (5th Cir. 2003) ............................................................. 4, 5

*Higginbotham v. Baxter Int'l, Inc.*
  495 F.3d 753 (7th Cir. 2007) ............................................................. 11

*In re Dynegy, Inc. Sec. Litig.*
  339 F. Supp. 2d 804 (S.D. Tex. 2004) ............................................. 4, 16

*In re Enron Corp. Sec., Derivative, and ERISA Litig.*
  258 F. Supp. 2d 576 (S.D. Tex. 2003) ................................................. 4

*In re InfoSonics Corp. Sec. Litig.*
  2007 WL 2301757 (S.D. Cal. 2007) .................................................... 4

*In re Tetra Techs., Inc. Sec. Litig.*
  2009 WL 6325540 (S.D. Tex. July 9, 2009) ................................. 1, 6, 15

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*
  537 F.3d 527 (5th Cir. 2008) ..................................................... 3, 5, 6, 12

*Kalnit v. Eicher*
  264 F.3d 131 (2d Cir. 2001) .............................................................. 4

*MaGruder v. Halliburton Co.*
  2009 WL 854656 (N.D. Tex. March 31, 2009) ..................................... 8

*MCI WorldCom* ............................................................................... 17

*Mortensen v. Americredit Corp.*
  123 F.Supp.2d 1018 (N.D. Tex. 2000) ............................................... 13

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*
  2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ............................... 4, 11, 12

*Shields v. Citytrust Bancorp, Inc.*
    25 F.3d 1124 (2d Cir. 1994) ........................................................................ 14

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*
    365 F.3d 353 (5th Cir. 2004) .................................................................. passim

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007).......................................................................... 4, 15

*Tuchman v. DSC Commc'ns Corp.*
    14 F.3d 1061 (5th Cir. 1994) .................................................................. 14

Plaintiffs, in the SCAC and again in their response, rely almost exclusively on improper position and group pleading in an attempt to state claims against McCann. When these improper allegations are stripped away, two things become clear. First, Plaintiffs have failed to link McCann to any actionable misrepresentations concerning Franklin Bank's alleged subprime exposure. Second, Plaintiffs have failed to direct the Court to any facts giving rise to a strong inference of scienter on the part of McCann. To the contrary, the far more plausible inference from Plaintiffs' complaint is that the Bank tried—transparently and in good faith—to react to the dramatic collapse of the real estate market during the class period. Accordingly, Plaintiffs' claims against McCann should be dismissed.[1]

## I.   ARGUMENT

### A.   Plaintiffs Fail to Sufficiently Allege That McCann Materially Misled Investors Regarding the Bank's Exposure to Subprime.

The gravamen of Plaintiffs' case is that, they allege, Defendants "repeatedly" misrepresented the risk associated with the Bank's lending practices. *See* Resp. (Doc. No. 210) at 1, 11. More specifically, Plaintiffs claim that "***Defendants*** represented to the markets that Franklin did not hold any subprime or nontraditional mortgages, when in fact the bank possessed a significant amount of these high risk investments." *Id.* at 1 (emphasis added). However, Plaintiffs only identify two such purported statements, both from the October 30, 2007 conference call, that were actually made by McCann.[2] Neither is actionable.

---

[1] Plaintiffs have also failed to allege loss causation. In an effort to avoid unnecessary duplication, McCann hereby adopts and incorporates by reference the loss causation arguments presented by Messrs. Nocella and Ranieri in their respective motions and replies.

[2] Plaintiffs recognize that the Fifth Circuit has rejected the group pleading doctrine. Resp. at 25. "This rejection requires plaintiffs, in pleading both material misstatements and scienter, to distinguish among defendants and allege the role of each with respect to 'each act or omission' in the alleged fraud." *In re Tetra Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *3 (S.D. Tex. July 9, 2009) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2005)).

Plaintiffs fail, in the SCAC and again in their response, to show how or why McCann's alleged statement that Franklin "only originated prime level lending" was false.  SCAC ¶ 62. Indeed, the facts alleged in the SCAC are actually consistent with McCann's statement.  The OIG report establishes that the Bank "began to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans" *many months before the October 30, 2007 conference call.*  SCAC ¶ 96 (quoting OIG report).  The OIG Report also noted that "Franklin did not have a subprime lending program as defined by interagency guidance."  OIG Report at 5 n.3.  Similarly, Confidential Witness No. 2 confirmed that the "Bank didn't get directly into sub-prime."  SCAC ¶ 119.[3]  McCann clearly set forth this argument in his motion, but Plaintiffs opted not to address it in their response.

Plaintiffs also have no answer—indeed, they completely ignore—McCann's arguments concerning his alleged statement that the Bank did not have "any of those in portfolio."  SCAC ¶¶ 3, 65.  By reading the sentence in isolation, disregarding the context, and omitting the end of the exchange (which Plaintiffs still have not acknowledged), Plaintiffs offer the strained interpretation that McCann was making a blanket statement that the Bank never owned or originated any subprime or pay option ARM mortgages.  *See* Resp. at 4, 17, 39.  But the full exchange reveals that McCann did no such thing.  *See id.*, Tab 14 at 15 (Oct. 30, 2007 conference call transcript) (Analyst:  "Well Russell said suprime and I want to make sure it was prime that we are talking about."  McCann:  "No, I meant prime.  I meant prime.").  Regardless, this exchange is at most ambiguous, and thus not actionable under the securities laws.  *See Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp.*, 2010 WL 601364, at *6 (E.D. Wis.

---

[3]    Craig Wolfe's February 19, 2008 letter does not contradict McCann's statement.  While Wolfe says, "As of December 31, 2007, there were at least $13 million of Bank-originated subprime loans in portfolio," the letter provides no information regarding when those loans were allegedly originated or when they were placed in portfolio.

Feb. 18, 2010) (where statement "was so vague that it [was] hard to know what [the speaker] was talking about," the statement was not material and was not actionable); *see also Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 538 (5th Cir. 2008) ("[A] statement cannot contribute to a strong inference of scienter [if] it is 'susceptible to many interpretations, including innocent ones.'" (citation omitted)).[4]

Two further points regarding the conference calls merit attention. First, to be perfectly clear, Plaintiffs never specifically allege that McCann said that the Bank was "conservative." Resp. at 1, 4, 27. The statement, "I think you guys have been one of the more conservative underwriters out there," was made by Paul Miller, an analyst, and thus may not be attributed to McCann. *See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004) ("Generally, securities issuers are not liable for statement or forecasts disseminated by securities analysts or third parties unless they have sufficiently entangled themselves with the analysts' predictions so as to render those predictions attributable to the issuers."); *Fulton County Employees' Ret. Sys.*, 2010 WL 601364, at *6 (holding that statement of analyst was not actionable against company executive because, "Most of this statement consists of conclusions that the analysts drew after meeting with Culver [a company executive], rather than direct quotes from Culver.").

Second, in an effort to prop up their allegations, Plaintiffs argue for the first time that McCann should be liable for failing to correct the allegedly false statements that Nocella and Ranieri made during analyst conference calls. Resp. at 25-26. But this new claim fails because Plaintiffs did not plead it. *See In re InfoSonics Corp. Sec. Litig.*, 2007 WL 2301757, at *11 (S.D.

---

[4]   It is not surprising that Plaintiffs' relegate to one line their allegation that McCann misled investors during the October 30, 2007 conference call when he said that he was "pretty comfortable" with the Bank's reserve level. Resp. at 4.  That statement was immaterial puffery, and Plaintiffs have not shown it to be false. McCann Mtn. at 10-11.

Cal. 2007) ("Some courts have held that a high-ranking official cannot knowingly fail to correct a false statement made by another official at a conference call with analysts or similar setting. . . . However, Plaintiffs need to *plead* that the official failed to correct the statements of another. . . . Plaintiffs have not specifically made such allegations."). Moreover, as discussed below, Plaintiffs have not shown that McCann *knew* that any statements by others were false when made (or that statements by others were actually false).

### B. Plaintiffs Fail to Plead Scienter.

As the Fifth Circuit has stated, allegations of scienter must be "sufficiently connected to [each of the defendants] such that [a] strong inference of scienter on [his or her] part is appropriate." *Goldstein v. MCI Worldcom*, 340 F.3d 238, 249 (5th Cir. 2003); *see also In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 895 (S.D. Tex. 2004). *Tellabs* provides further clarity, explaining that for an inference of scienter to be "strong," it "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs' complaint fails to meet this standard.

### i. Plaintiffs' Motive Theory Is Not Tied to McCann; Even If It Were, Desire to Sell Franklin Bank Stock On Favorable Terms Is a Routine Corporate Motive That Is Not Probative of Scienter.

Plaintiffs do not allege that McCann had any individual motive to commit fraud.[5] Instead, Plaintiffs assert that "[g]*enerally speaking*, Defendants were motivated to conceal from the public the true condition of Franklin so that they could accomplish a sale of the bank on

---

[5] Nor could Plaintiffs credibly claim that McCann benefitted personally from the purported fraud. McCann did not sell any company stock at allegedly artificially inflated prices. In fact, McCann increased his holdings of Franklin Bank stock during the proposed class period. *See* Supplement to Individual Defendants' Joint Appendix, Tab 4 (Cruse Declaration). "It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings and executive compensation." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 2010 WL 961597, at *9 (S.D.N.Y. Mar. 17, 2010) (citing *Kalnit v. Eicher*, 264 F.3d 131, 140-41 (2d Cir. 2001)); *see also In re Enron Corp. Sec., Derivative, and ERISA Litig.*, 258 F. Supp. 2d 576, 638 (S.D. Tex. 2003) (purchase of additional shares inconsistent with scienter).

favorable terms and in so doing duplicate the financial windfall they reaped at Bank United." Resp. at 34 (emphasis added).   However, the factual allegations in the SCAC regarding an alleged plan to replicate the sale of Bank United are vague, speculative, and tied, if at all, to Defendants Nocella and Ranieri only. *See* SCAC ¶ 5, 37-41; *see also* Resp. at 2-3.  Plaintiffs do not allege that McCann was also an architect of the Bank United sale or of the alleged plan to orchestrate a similar sale of Franklin Bank. *See id.*

Even if Plaintiffs had tied these allegations to McCann, the alleged motive to "accomplish a sale of the bank on favorable terms" is a routine corporate motive that is insufficient to support an inference of scienter.  "Scienter in a particular case may not be footed solely on motives universal to corporate executives." *Shaw Group, Inc.*, 537 F.3d at 544.

In arguing that the Defendants' alleged desire to sell the Bank on favorable terms is not a universal corporate motive, Plaintiffs rely heavily on *MCI Worldcom*, 340 F.3d 238, 250 (5th Cir. 2003). However, the allegations in *MCI Worldcom* are markedly different than those in the SCAC.[6]  In *MCI Worldcom*, the plaintiffs alleged that the defendant sought to complete a "crucial" $129 billion dollar merger that was already negotiated and was merely awaiting shareholder and regulatory approval.  *Id.* at 249-250.   The plaintiffs also alleged that "if Worldcom's stock price dropped 'significantly,' [the defendant] stood to lose millions in compensation" and that, as a result, "certain personal loans—which were insured by [the defendant's] share of Worldcom stock—would immediately come due." *Id.*   In contrast, Plaintiffs do not allege that Franklin Bank was in the midst of a transaction or that it had even identified a potential buyer.   Nor do Plaintiffs furnish factual allegations concerning any

---

[6]  Indeed, the Fifth Circuit has subsequently described the extraordinary situation presented in *MCI Worldcom* as "the outlier to the acquisition proposition" and reaffirmed that a general desire for a future sale or acquisition on favorable terms is not a sufficient motive to support an inference of scienter. *See Shaw Group*, 537 F.3d at 544.

potential compensation that McCann might receive should a hypothetical buyer materialize, or any potential liabilities that McCann might incur absent a sale.

In sum, Plaintiffs have pleaded only that McCann, as an officer of the company, would like to see the company's stock sold to some unspecified buyer at some unspecified future time at a favorable price. Because this alleged motive is universal to corporate executives, it is not probative of scienter. *See Shaw Group,* 537 F.3d at 544.

ii.　**Plaintiffs Have Not Alleged That McCann Was Aware of, or Recklessly Disregarded, Internal Corporate Information.**

Plaintiffs argue that their confidential witness allegations, the February 19, 2008 letter by Craig Wolfe, and the FDIC's OIG Report create an inference of scienter. Resp. at 36-39. However, Plaintiffs fail to plead particularized facts regarding these sources that show McCann was aware of information contrary to his statements during the October 30, 2007 conference call or disclosures in the securities filings that he signed.

a.　**The Confidential Witnesses.**

In this circuit, "allegations of confidential witnesses must be discounted, and, at the very least, must . . . [be] identified with sufficient particularity to support the probability that the person would possess the information pleaded." *In re Tetra Techs., Inc. Sec. Litig.*, 2009 WL 6325540, at *6 (S.D. Tex. July 9, 2009) (citing *Shaw Group*, 537 F.3d at 535). And, like any other facts pled regarding scienter, confidential witness allegations must be particularly linked to McCann. *Cf. Southland Sec. Corp.*, 365 F.3d at 364-65 (rejecting the group pleading doctrine). McCann argued in its opening motion that none of Plaintiffs' five confidential witnesses meet these standards. McCann Mtn. (Doc. No. 186) at 21-25. Plaintiffs' response fails to resuscitate these allegations. Resp. at 36-38.

Plaintiffs do not dispute that CW1 lacked personal knowledge regarding his claim that Clark Creitzburg "blew the whistle" regarding the manner in which the Bank calculated its loan loss reserves. SCAC ¶ 116 (stating that CW1 "understood" that [Chrietzberg] blew the whistle). Instead, Plaintiffs assert that "CW1 declared that his attendance at various executive level meetings in the first month he was with Franklin made it glaringly evident, as it plainly was to all those such as Defendants Nocella, Ranieri, and McCann" that the Company's internal controls were inadequate. Resp. at 36-37. Plaintiffs, however, provide no support for the statement that McCann was aware of problems with the company's controls.[7] Indeed, the only foundation provided in support of this allegation is that "CW1 participated in the Company Board Credit Committee Meetings and Credit Committee." SCAC ¶ 114. McCann, of course, was not on the Board or on the Board Credit Committee. *See id.* ¶ 124 (listing members of the Board Credit Committee).

CW2's allegations actually cut against an inference that McCann's alleged October 30, 2007 statements regarding the Bank's subprime exposure were made with scienter. CW2 does not claim—and Plaintiffs have never asserted—that McCann was aware of the alleged consequences of the purported Countrywide default. Further, in a moment of candor that is entirely consistent with McCann's alleged statements, CW2 conceded that the Bank "didn't get directly into subprime." SCAC ¶ 119. Recognizing the need for a new plan, in their response, Plaintiffs cite CW2 as establishing that McCann, as a member of the Management Loan Committee, "most assuredly had first hand knowledge of all matters involving loan modifications and covenant waivers." Resp. at 37. This is pure speculation. CW2 does not say

---

[7]   To be clear, CW1 did not say that McCann was aware of problems with the company's internal controls. *See* SCAC ¶ 115 (alleging that "CW1 stated with certainty that "all of the Company executives" were aware of problems).

that he was on the Management Loan Committee and, aside from the unremarkable observation that members would receive an "agenda," he does not describe the contents of any reports reviewed by the committee.[8] Further, CW2 does not specifically identify any information that McCann would have reviewed in the real time as a member of the Management Loan Committee that would have put McCann on notice that the accounting treatment for any specific loan modification or covenant waiver was improperly recorded in the Bank's financial statements.

Plaintiffs next assert that "CW3 and CW4 stated that members of the Company's Credit Committee participated in biweekly meetings where the topic of rising delinquencies was *undoubtedly* a constant agenda item." Resp. at 38 (emphasis added). But CW3 provides no information specific to McCann—indeed, CW3 does not identify McCann as a member of the Credit Committee. SCAC ¶ 130-33. As such, CW3's statements that "of course" senior executives knew the Bank was facing rising delinquencies, and that the Bank "didn't disclose its delinquent loans," lack foundation, constitute improper position pleading, and are wholly conclusory. The allegations of CW4 are equally deficient because he does not connect any reports or activities of the Credit Committee to McCann or any specific allegations of fraud in this case.[9]

---

[8]  *See MaGruder v. Halliburton Co.*, 2009 WL 854656, at *14 (N.D. Tex. March 31, 2009) ("Plaintiffs are required to specifically plead corroborating information, such as *the specific contents of the allegedly contrary reports*, who authored the reports, who received the reports, and when they were received." (emphasis added)); *see Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("An unsupported general claim about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss. Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors and recipients.")

[9]  Further, CW4 fails to link his statement that McCann was "responsible for setting reserves for warehouse lines" to any alleged misleading statements in this case. SCAC ¶ 135. Nor does CW4 claim that McCann knew at the time the reserves were being set that they were in any way improper.

CW5 mentions McCann only once, and it is in a paragraph containing allegations regarding reports and meetings that CW5 does not claim to have prepared or attended. *Id.* ¶ 142. The rest CW5's allegations stand for the unremarkable (and legally deficient) proposition that "top executives" received certain reports regarding the Bank's REO and also the Bank's Held-for-Sale and Held-for-Investment portfolios. *Id.* ¶ 144-45. In any event, CW5 (who stopped working at the Bank in June 2007) fails to tie McCann to these reports or to identify any actual information contained in these reports that was inconsistent with the Bank's financial disclosures.

### b.     Craig Wolfe's February 19, 2008 Letter.

Plaintiffs continue to plead Wolfe's letter with broad strokes of generality, all the while ignoring that the letter was not addressed to McCann, was not carbon copied to McCann, and does not even mention McCann. Wolfe does not identify a single "concern" that was ever directed to McCann, and he does not say that McCann had any knowledge of Wolfe's refusal to sign Sarbanes-Oxley ("SOX") attestations or the purported retaliation that followed.[10]

Plaintiffs' assertion that the Wolfe letter proves the falsity of McCann's statement that the Bank "only originated prime level lending" does not survive scrutiny. Resp. at 39. The Wolfe letter references a quote—from an unidentified speaker at an unidentified time—that the Bank "***never*** originated subprime for portfolio." SCAC ¶ 106 (emphasis added). Plaintiffs, of course, do not allege that McCann made that statement or used the word "never" when discussing subprime. As discussed above, McCann's statement on October 30, 2007—that the

---

[10]     It warrants mention that the 2007 earnings release (the January 31, 2008 Form 8-K) is the only financial statement that Wolfe specifically contends "Bank management" was aware contained false information at the time it was released. Wolfe Letter at 8 ("It *appears* that *Bank management* was in fact aware of the extent of its losses when 2007 earnings were releases, if not much earlier." (emphasis added)) This concession cuts against scienter with respect to the earlier financial statements implicated by Plaintiffs' case. In any event, as explained in McCann's motion and this reply, the Wolfe Letter does not give rise to a cogent inference of scienter as to any alleged misleading statements by McCann.

Bank "only originated prime level lending"—was entirely consistent with the OIG Report and the statements of CW2. Put another way, Plaintiffs plead no particularized allegations that contradict McCann's statement.

### c.     The OIG Report.

Although they again quote extensively from it, Plaintiffs do not really say anything new about the OIG Report. Plaintiffs, for instance, do not dispute that the report—which was issued in July 2009, from the vantage point of the other side of the financial crisis—notes that the FDIC office that examined the Bank from September 2003 through July 2008 believed that "rapid and pronounced declines in residential real estate and secondary mortgage funding markets were important contributing factors to Franklin's failure." OIG Report, Material Loss Review summary page.

Nor do Plaintiffs address the point that, in every examination prior to the one issued on February 14, 2008, the FDIC examiners gave the Bank and its management positive ratings. McCann Mtn. at 26-27. The Bank maintained a composite rating of 2, or "strong," until the October 2007 examination (*the report for which was not issued until February 14, 2008*), when it changed to 3, indicating increasing risk. OIG Report at 11. Importantly, the fact that the Bank's risk level was increasing in late 2007 and early 2008—as the mortgage markets were in a freefall—was disclosed to investors. In November, the Bank announced that it was increasing its allowance for credit losses by approximately $20 million "in response to unprecedented market changes in the past few weeks." SCAC ¶ 68. Then, in December 2007, the Bank amended its third quarter 10-Q in order to reclassify four commercial loans to one borrower totaling $13.5 million as non-performing. *Id.* ¶ 73. In light of these prompt disclosures, Plaintiffs cannot be heard to complain that the Bank's management ignored warning signs or did not react quickly

enough. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) (stating that "[m]anagers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal."); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,* 2010 WL 961596, at *11 (S.D.N.Y. Mar. 17, 2010).

Plaintiffs assert that the OIG Report shows that "Defendants misled investors when they insisted Franklin was a stranger to subprime." Resp. at 11. As previously discussed, Plaintiffs mischaracterize McCann's statements regarding the Bank's lending practices. Regardless, all parties agree that those purported statements were made on October 30, 2007. By contrast, the analysis in the OIG Report is *as of July 2008*. SCAC ¶ 96. The OIG report, moreover, notes that the Bank "did not have a subprime lending program," (OIG Report at 5, n.3), and that in the first quarter of 2007 the Bank "began to limit the types of 1-4 family residential loan products that it originated to only high-quality loans." *Id.* at 5.

### iii.    Plaintiffs' Remaining Scienter Arguments Are Likewise Inadequate.

Plaintiffs acknowledge—as they must—that they cannot demonstrate scienter simply by alleging that the Bank's financial statements were inconsistent with GAAP in certain respects or that McCann signed SOX certifications. Resp. at 40. Plaintiffs therefore try to bolster their allegations by arguing that the purported simplicity of the GAAP rules at issue and the purported existence of "red flags" contribute to an inference of scienter. Resp. at 39-44. Plaintiffs' arguments do not hold water.

### a.    Nature of the Alleged GAAP Violations.

Plaintiffs assert that "the nature of the Company's alleged GAAP violations is the overstatement of revenue via the improper recognition of income on delinquent loans, failing to properly account for loan modifications, and failing to adequately allow for credit losses." Resp.

at 41.  They further claim, in conclusory fashion, that "the applicable GAAP policies involved simple and basic accounting principles that Defendants . . . were well aware of." *Id.*  However, "[g]iven the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of corresponding fraudulent intent." *Plumbers & Steamfitters Local 773*, 2010 WL 961596, at *13 (citation and quotation omitted).[11]

Such deference is warranted here.  The Bank disclosed in its financial statements that it recognized income on certain delinquent loans. *See, e.g.*, Appx. (Doc. No. 190), Tab 7 at 94 (2006 10-K); Appx., Tab 19 at 25 (Q32007 10-Q) ("Additionally, at September 30, 2007, the company had $57.4 million of loans that were four payments or more delinquent and still accruing interest, which were primarily composed of single family loans served by others under an agreement with the servicer whereby we receive scheduled payments until foreclosure.").  That this **disclosed** accounting treatment was subsequently revised is far more indicative of an after-the-fact, good faith disagreement about interpreting and applying accounting principles than it is fraud.[12]

The Bank likewise disclosed, in several paragraphs of detail, its treatment and handling of the investment securities transfer. *See* Appx., Tab 19 (Q32007 10-Q) at 7, 22 (stating that the

---

[11] *See also Shaw Group, Inc.*, 537 F.3d at 536 ("Valuations of assets . . . as well as the application of sophisticated accounting standards like 'fair value,' leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably."); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) (finding the fact that the defendants changed auditors because of a difference in judgment about GAAP was insufficient to allege conscious behavior on the part of the defendants and explaining that "[t]he term 'generally accepted accounting principles' . . . is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement'").

[12] *Cf. Collmer v. U.S. Liquids*, 268 F. Supp. 2d 718, 744 (S.D. Tex. 2007) (a reasonable fact finder "could not conclude that the alleged misrepresentation 'would influence a reasonable investor's investment decision'" where specific risk disclosures addressed the substance of the challenged statement); *Bay v. Palmisano*, 2002 WL 31415713, at *9 (E.D. La. Oct. 24, 2002) (where defendant disclosed to investors its method of recognizing revenue, including the aspects that plaintiffs claimed violated GAAP, plaintiffs failed to allege that the statements were false or misleading).

Bank had "transferred available for sale securities with a carrying value of $91.7 million to trading securities and recognized a gain of $1.7 million."). Moreover, the August 6, 2008 8-K noted that, "Management believed these [securities] transfers were appropriate under GAAP at the time but subsequently learned that these transfers were inconsistent with GAAP." Appx., Tab 11 (Aug. 6, 2008 8-K) at 5. Again, these disclosures cut against scienter. They also refute Plaintiffs' claim that these were simple, black and white, accounting rules.[13]

Plaintiffs allege, based on the statements of CW1, that the Bank violated GAAP by "aggregating" single family loans when setting its allowance. SCAC ¶ 116. Even if CW1 had personal knowledge regarding this issue (he does not), this allegation does not contribute to a finding of scienter. The manner in which the Bank calculated its loan loss reserves for its single family residential portfolio—including that it considered these loans "as a group" when setting the reserve—was described in detail in the SEC disclosures. *See* Appx., Tab 7 at 36 (2006 10-K) ("Single family mortgages and consumer loans are evaluated as a group."), *see also id.* at 65-67 ("For homogeneous loans, such as single family mortgages . . . we utilize the frequency and severity of losses for the asset class in determining the credit allowance factor.").[14] Equally compelling is that the FDIC did not even mention, much less criticize, the so-called "aggregation method" (Resp. at 7) in its after-the-fact investigation and report. *See generally* OIG Report at 9.

---

[13]   The Bank also informed the investing public about its efforts to curb delinquencies by modifying loans. During the October 30, 2007 conference call, Daniel E. Cooper, the Managing Director of Mortgage Banking at the time, said: "The current environment for the single-family mortgage business remains challenging. Our prime mortgage portfolio has been influenced by the nationwide housing environment. In light of this, we are aggressively pursuing various loan modification programs." Resp., Tab 14 at 3 (Transcript of Oct. 30, 2007 conference call).

[14]   It is significant that the 2006 10-K was contemporaneously audited by Deloitte & Touche LLP. *See Mortensen v. Americredit Corp.*, 123 F.Supp.2d 1018, 1026-27 (N.D. Tex. 2000) (no strong inference of scienter where company's independent auditor did not object to the accounting practices at issue.").

Setting the loan loss reserve was a quintessential exercise of business judgment.[15] Despite the length of the SCAC, Plaintiffs do not allege a single fact suggesting McCann knew that the loan loss allowance estimate was incorrect or understated.[16] On the contrary, Plaintiffs' allegations—which candidly admit that the Bank actually increased its allowance by $20 million in November 2007—support the inference that the Bank's management tried through the good faith exercise of their business judgment to evaluate and adjust the loan loss allowance in light of the unprecedented and ever-worsening market meltdown. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (holding that pleadings that suggested that defendants should have been more alert or more skeptical regarding loan loss reserves, but did not indicate that management was promoting fraud, were inadequate to satisfy scienter requirement).[17]

  **b.**  **Red Flags.**

Plaintiffs allege that purported "red flags" existed, but they fail to tie any of them to McCann. *See* Resp. at 41. For example, Plaintiffs argue that when Franklin Bank purportedly took possession of $150 million in loans pledged as collateral by Countrywide, Defendants were put on notice of a need to investigate. *See id.* at 42. However, the SCAC fails to link McCann with any knowledge of this purported transaction, the collateral, or an alleged need to

---

[15] Indeed, the Bank's SEC filings plainly warned that the allowance was an estimate and involved a "significant amount of subjective and complex judgment." Appx., Tab 7 at 36 (2006 10-K); *see also Bay*, 2002 WL 31415713, at *9 (where defendant disclosed to investors its method of recognizing revenue, including the aspects that plaintiffs claimed violated GAAP, plaintiffs failed to allege that the statements were false or misleading).

[16] Nor have Plaintiffs established that any statements regarding reserves in the Bank's financial statements were false when made.

[17] The allegation that the loan loss allowance was understated establishes at most that "the defendants were wrong; but misguided optimism is not a cause of action and does not support an inference of fraud." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . . ."); *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("[F]raud cannot be proved by hindsight . . . .").

investigate. *See* SCAC at ¶¶ 111-112 (making no mention of McCann in connection with Countrywide allegations).

Second, Plaintiffs assert that Defendants received or had access to reports and databases showing the rising delinquency of loans. *See* Resp. at 42. In support of this claim, Plaintiffs presumably rely on the statements of the confidential witnesses, which were discussed above. Moreover, pleading that McCann had access to generic reports containing unspecified information falls far short of what is needed to support a strong inference of scienter. *See Abrams*, 292 F.3d at 432 (finding that "plaintiffs' allegations regarding non-specific internal reports [were] inadequate").

Third, Plaintiffs cite Wolfe's alleged refusal to sign the Bank's 2007 SOX attestation on three different occasions as a "red flag." *See* Resp. at 42. However, Plaintiffs have not pleaded any facts to support an inference that McCann was aware of this supposed issue at the time any of the alleged misrepresentations were made.[18]

### iv.    McCann's Competing Inference is More Compelling.

A plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent;" scienter is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Tetra Techs. Sec. Litig.*, 2009 WL 6325540, at *5 (quoting *Tellabs, Inc.*, 551 U.S. at 323-24). Here, the most compelling inference is that the Bank tried—transparently and in good faith—to react to the dramatic collapse of the real estate market during the class period. Plaintiffs' allegations, and the documents on which they rely, establish

---

[18]    The OIG Report does not, as Plaintiffs' contend (Resp. at 42), identify any specific concerns or recommendations that the Bank *ignored*. McCann addresses this point in detail in his Reply in Support of His Motion to Dismiss the preferred stockholders' complaint. McCann adopts that argument and incorporates it herein by reference.

the following facts: (a) McCann had no personal motive to mislead investors—he actually increased his Bank holdings during the Class Period; (b) after investigating the accounting issues that came to light, Franklin Bank's board of directors chose to retain McCann as CFO; (c) the Bank increased its loan loss allowance as the economy worsened; and (d) issues that Plaintiffs now allege show fraud (e.g., the treatment of interest income on delinquent loans serviced by others, securities transfers, and the allowance for loan losses) were disclosed in the Bank's financial statements. These facts, and the nonfraudulent inference they create, substantially outweigh any inference to be gained from Plaintiffs' conclusory and illogical fraud allegations.

### D.   Plaintiffs Have Not Adequately Pleaded Control Person Claims.

Because the Plaintiffs have failed to allege a "primary violation" under Section 10(b), their Section 20(a) claim for control person liability must also fail. *See Southland Sec. Corp.*, 365 F.3d at 383.   In addition, as explained in McCann's motion, Plaintiffs have failed to plead any facts from which it can be reasonably inferred that McCann had actual power or control over the actions of any primary violator. *See* McCann Mtn. at 29-30.  In response, Plaintiffs offer— without any citation to the SCAC—only the conclusory assertion that "each Defendant controlled the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period." Resp. at 50.  Plaintiffs' conclusory assertion on this point should be rejected as nothing more than improper group and position pleading. *See In re Dynegy, Inc.*, 339 F. Supp. 2d at 912 (stating that "an officer's status alone will not subject him to liability under § 20 . . . plaintiffs must allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person").

### E.     The SCAC Should Be Dismissed With Prejudice.

In a footnote of their response, Plaintiffs request leave to replead in the event that the Defendants' motions to dismiss are granted.  Resp. at 51 n.14.  Plaintiffs have not, however, tendered a proposed amended petition or suggested any additional facts not initially pleaded that could cure the pleading defects the Defendants have raised.  Accordingly, if the Court grants the motion to dismiss, it should do so with prejudice.  *See Southland Sec. Corp.*, 365 F.3d at 384 (affirming dismissal with prejudice where plaintiffs never at any time either tendered a further amended Complaint or advised the district court of how or in what manner they would amend the Complaint or what allegations would be added or deleted if allowed to do so); *see also MCI WorldCom*, 340 F.3d at 255.

## II.     CONCLUSION

As set forth in his motion and this reply, Russell McCann respectfully requests that Plaintiffs' claims against him be dismissed, with prejudice, in their entirety.

Dated: June 4, 2010

Respectfully submitted,

By:     /s/ Barrett H. Reasoner
           Barrett H. Reasoner
           T.B.A. No. 16641980
           So. Dist. Bar No. 14922
           GIBBS & BRUNS LLP
           1100 Louisiana, Suite 5300
           Houston, Texas   77002
           Telephone: (713) 650-8805
           Facsimile: (713) 750-0903

**ATTORNEY-IN-CHARGE FOR DEFENDANT RUSSELL MCCANN**

**Of Counsel:**
Sam W. Cruse III
T.B.A. No. 24036423
So. Dist. Bar No. 617834
Ashley McKeand
T.B.A. No. 24060263
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas   77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

## CERTIFICATE OF SERVICE

I certify that on June 4, 2010, a copy of this unopposed motion was served via the Court's ECF system as indicated below:

Roger B. Greenberg, rgreenberg@schwartz-junell.com
Thane Tyler Sponsel, III, tsponsel@schwartz-junell.com
Thomas C. Fitzhugh, IV, champefitzhugh@warejackson.com
Andrea D. Levin, akim@diamondmccarthy.com
Ronen Sarraf, ronen@sarrafgentile.com
Randall K. Pulliam, rpulliam@cauleybowman.com
Darrin Williams, dwilliams@cauleybowman.com
J. Allen Carney, acarney@cauleybowman.com
James A. Harrod, jharrod@wolfpopper.com
Cynthia Saiter Connolly, cconnolly@scottdoug.com
William B. Monahan, monahanw@sullcrom.com
James G. Munisteri, jmunisteri@gardere.com
Orin H. Lewis, olewis@gardere.com
M. Byron Wilder, bwilder@gibsondunn.com
Samantha A. Lunn, slunn@gibsondunn.com
Farbod Moridani, farbod.moridani@lw.com
James J. Farrell, james.farrell@lw.com
George W. "Billy" Shepherd, bshepherd@crusescott.com
Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
David C. Walton
Anne L. Box


    /s/ Barrett H. Reasoner
    Barrett H. Reasoner

18