# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re FRANKLIN BANK CORP. SECURITIES LITIGATION | § § § § § § § | CIVIL ACTION NO. 4:08-CV-1810<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## DEFENDANT RUSSELL McCANN'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS THE REDACTED AMENDED CONSOLIDATED PREFERRED STOCK PURCHASER COMPLAINT

Barrett H. Reasoner
Sam W. Cruse III
Ashley McKeand
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805

*Attorneys for Defendant Russell McCann*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.  ARGUMENT ............................................................................................................... 1

    A.  Plaintiffs Fail to Sufficiently Plead a Section 10(b) Claim Against McCann. ............................................................................................................. 1

        i.  Plaintiffs Have Not Sufficiently Alleged That McCann Ignored Any Red Flags. ............................................................................................ 2

        ii.  Plaintiffs' GAAP Allegations Do Not Support a Strong Inference of Scienter. ............................................................................................. 5

            a.  The alleged GAAP violations at issue do not contribute to an inference of scienter. ........................................................................ 6

            b.  Even if the alleged GAAP violations provide some support for an inference of scienter (and they do not), case law demonstrates that the RPSC still does not give rise to a strong inference of scienter. ........................................................ 9

        iii.  Plaintiffs' Remaining Allegations Concerning the Loan Loss Allowance Do Not Support a Strong Inference of Scienter. ...................... 10

        iv.  McCann's Competing Inference Is More Compelling. ............................. 12

    B.  Plaintiffs Have Not Adequately Pleaded Control Person Claims. ..................... 13

II.  CONCLUSION .......................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Backe v. Novatel Wireless, Inc.*
642 F. Supp. 2d 1169 (S.D. Cal. 2009) ......................................................................... 9

*Bay v. Palmisano*
2002 WL 31415713 (E.D. La. Oct. 24, 2002) ............................................................... 8

*Collmer v. U.S. Liquids*
268 F. Supp. 2d 718 (S.D. Tex. 2007) ........................................................................... 8

*Higginbotham v. Baxter Int'l, Inc.*
495 F.3d 753 (7th Cir. 2007) ......................................................................................... 5

*In re Catalina Marketing Corp. Sec. Litig.*
390 F. Supp. 2d 1110 (M.D. Fla. 2005) ....................................................................... 10

*In re Dynegy, Inc. Sec. Litig.*
339 F. Supp. 2d 804 (S.D. Tex. 2004) ...................................................................... 9, 13

*In re Enron Corp. Sec., Derivative, and ERISA Litig.*
258 F. Supp. 2d 576 (S.D. Tex. 2003) ......................................................................... 10

*In re Fleming Sec. Litig.*
2004 WL 5278716 (E.D. Tex. 2004) ............................................................................. 9

*In re Microstrategy, Inc. Sec. Litig.*
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................................ 9

*In re Tetra Techs. Sec. Litig.*
2009 WL 6325540 ....................................................................................................... 12

*Indiana Elec. Workers' Pension IBEW v. Shaw Group, Inc.*
537 F.3d 527 (5th Cir. 2008) ............................................................................. 7, 8, 11

*Kalnit v. Eicher*
264 F.3d 131 (2d Cir. 2001) ........................................................................................ 10

*Konkol v. Diebold, Inc.*
590 F.3d 390 (6th Cir. 2009) ......................................................................................... 6

*Lovelace v. Software Spectrum Inc.*
78 F.3d 1015 (5th Cir. 1996) ......................................................................................... 7

*Mortensen v. Americredit Corp.*
123 F .Supp. 2d 1018 (N.D. Tex. 2000) ........................................................................ 7

*Nathenson v. Zonagen, Inc.*
    267 F.3d 400 (5th Cir. 2001) ............................................................................................. 4

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*
    2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) ............................................................ 5, 6, 10

*Rehm v. Eagle Finance Corp.*
    954 F. Supp. 1246 (N.D. Ill. 1997) .................................................................................. 12

*Shields v. Citytrust Bancorp, Inc.*
    25 F.3d 1124 (2d Cir. 1994) ............................................................................................ 12

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*
    365 F.3d 353 (5th Cir. 2004) ............................................................................... 4, 11, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007) ........................................................................................................ 12

*Tuchman v. DSC Commc'ns Corp.*
    14 F.3d 1061 (5th Cir. 1994) ............................................................................................ 4

Plaintiffs, in the RPSC and their response, rely heavily on improper position and group pleading in an attempt to state a 1934 Act claim against McCann.[1] When these improper allegations are stripped away, however, it is clear that Plaintiffs have failed to direct the Court to facts giving rise to a strong inference of scienter on the part of McCann. To the contrary, Plaintiffs' allegations give rise to the far more compelling (and nonfraudulent) inference that the Bank tried—transparently and in good faith—to react to the dramatic collapse of the real estate market during the class period. Accordingly, and as discussed in more detail below, Plaintiffs' claims should be dismissed.[2]

I. ARGUMENT

A. Plaintiffs Fail to Sufficiently Plead a Section 10(b) Claim Against McCann.

Plaintiffs do not challenge McCann's argument that his statements during conference calls are not actionable. McCann Mtn. (Doc. No. 187) at 10-12. Instead, Plaintiffs focus on so-called "Misstatement Nos. 4-8" and "Misstatement Nos. 9-11," which relate to alleged GAAP violations and alleged deficiencies in the Bank's allowance for loan and lease losses (ALLL). Plaintiffs, however, fail to allege facts giving rise to a strong inference of scienter with respect to either category of misstatement.

Despite the extensive length of the RPSC and response, Plaintiffs' scienter allegations are conspicuously narrow. Plaintiffs do not allege that McCann had any motive to commit fraud. Resp. (Doc. No. 211) at 6, n. 2. Nor do Plaintiffs' allegations specifically connect McCann to any real time meetings, conversations, or documents (i.e., inside information) showing the

---

[1] The "RPSC" is the Redacted Amended Consolidated Preferred Stock Purchaser Complaint (Doc. No. 217).

[2] Plaintiffs' pleading suffers other dispositive defects. To avoid unnecessary duplication, McCann hereby adopts and incorporates by reference: (a) Nocella, Ranieri, and the Directors' loss causation arguments with respect to the 1934 Act claims and Nocella's "negative causation" argument with respect to the 1933 Act claims; (b) Nocella, Ranieri, and the Directors' arguments with respect to Plaintiffs' failure to plead a Section 11 claim; and (c) the Directors' argument that the 1933 Act claims are time barred.

Bank's financial condition to be different than reported to investors. *See generally* McCann Mtn. at 16-23.

In an attempt to fill in these significant holes in the RPSC, Plaintiffs offer two primary arguments. First, they claim that the OIG Report establishes that Defendants ignored "red flags."[3] Second, they assert that the nature of the alleged GAAP violations—i.e., the purported simplicity of the issues involved and the alleged magnitude and consistency of the errors— contribute to an inference of scienter. Plaintiffs also provide a list of purported factors which, they claim, create a strong inference of scienter regarding the alleged allowance misstatements. As discussed below, Plaintiffs' arguments do not hold water.

### i. Plaintiffs Have Not Sufficiently Alleged That McCann Ignored Any Red Flags.

The purported "red flags" cited by Plaintiffs all source from one document, the OIG Report. The OIG Report, of course, was not prepared or issued until July 2009. By contrast, Plaintiffs' proposed class period ends in August 2008 and, more significantly, the last allegedly misleading statement by McCann was made on November 26, 2007. *See* Resp. at 34. Plaintiffs try to work around this temporal discrepancy by alleging that the OIG Report establishes that the FDIC made various recommendations and expressed certain concerns during its examinations of the Bank from 2003 through 2007. Resp. at 30 (alleged concerns regarding "internal accounting controls"); *id.* at 40 (alleged concerns regarding "deficiencies in the ALLL methodology"). However, Plaintiffs' "red flag" allegations do not create a strong inference of scienter for the following reasons.

---

[3] Parts of Plaintiffs' original "red flags" argument was based on the FDIC's July 2008 Report of Examination, but those allegations were stricken from the PSC. *See* Memorandum and Order Granting Joint Motion to Strike (Doc. No. 214).

2

First, Plaintiffs' allegations lack the requisite particularity because they do not identify the scope of the FDIC's alleged recommendations, when those recommendations were reported to the Bank, to whom at the Bank they were reported (the document never mentions McCann), and how the Bank responded.[4] The vagueness of Plaintiffs' allegations is highlighted by the following comparison. One the one hand, Plaintiffs assert that the FDIC examination reports "repeatedly informed the Individual Defendants of weaknesses and inadequacies in the Bank's internal audit program." Resp. at 30. The OIG Report, on the other, paints a different picture. It states that: "Although the FDIC noted concerns regarding the bank's internal audit function [in the 2003 through 2007 examinations], *the FDIC did not highlight inadequacies as a repeated area of concern. Further, only the July 2008 ROE identified the apparent contraventions of [Interagency Guidelines]*." OIG Report at 16 (emphasis added). One cannot plausibly infer from these passages that McCann was on notice of, and disregarded, specific deficiencies in the Bank's internal audit operation.

Second, and perhaps more to the point, the OIG Report does not identify any specific recommendations or concerns—regarding any subject—that the Bank *ignored*. In fact, the report establishes that the Bank acted on the examiners' recommendations and concerns, but that—the FDIC concluded, looking back with the benefit of perfect hindsight—the measures the Bank took were not altogether sufficient. *See* OIG Report at 7 ("management failed to *effectively* implement audit and examination recommendations." (emphasis added)). Failing to "effectively" implement recommendations or concerns regarding subjective and complex issues

---

[4] Aware of this deficiency, Plaintiffs argue that the FDIC examination reports "were provided contemporaneously to all of the Individual Defendants." Resp. at 30. To make this argument, Plaintiffs (1) include an affidavit from their counsel that cites an "Overview of Compliance Examination" and (2) refer to paragraphs redacted from the PSC. *See id.* at 30-31 (citing PSC ¶¶ 39, 84-85). However, Plaintiffs provide no indication that the examination overview was followed in this case, and neither the RPSC nor the response contain any non-conclusory allegations that specific reports were provided to McCann at specific times prior to when the financial statements at issue were released.

such as internal controls and allowances for loan losses is a far cry from ignoring them, particularly where, as here, Plaintiffs must show severe recklessness.[5] Indeed, even the FDIC, which had access to real-time internal information, concedes that its examiners "could have better ensured that it made recommendations and took corrective actions that were effective and timely in addressing Franklin's risks." OIG Report at 15; *see also id.* (noting that the FDIC did not "ensure that management considered the higher risk of loss posed by layered risks when establishing the ALLL"). Thus, contrary to Plaintiffs' assertion that the Bank ignored obvious fixes to simple issues, the far more compelling inference is that the Bank (and the FDIC) was trying in good faith to react to the calamitous market conditions in which it was operating. That the Bank did not do so perfectly does not make a fraud claim.[6]

Third, Plaintiffs' "red flag" allegations are belied by the actual ratings that the Bank received *at the time*. As McCann pointed out in his motion, the FDIC examiners gave the Bank and its management positive ratings in every examination report prior to the one issued on February 14, 2008. McCann Mtn. at 21. The Bank maintained a composite rating of 2, or "strong," until the October 2007 examination, when it changed to 3, indicating increasing risk. OIG Report at 11.[7] Importantly, the fact that the Bank's risk level was increasing in late 2007

---

[5] "Severe recklessness" is limited to "highly unreasonable omissions and misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that a present danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

[6] *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . . ."); *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("[F]raud cannot be proved by hindsight . . . .").

[7] The OIG Report demonstrates that in every FDIC examination prior to the one issued on February 14, 2008, the examiners' conclusion regarding the board and management's performance was that "[the board] and management are satisfactory/effective." OIG Report at 22. Also during each of those examinations, the examiners gave the bank high ratings in: (a) "asset quality," rated as "strong," with "loan underwriting" described as "conservative," *id.* at 23; (b) "liquidity," with the comment that there was "[s]atisfactory/sufficient liquidity and funds management," *id.* at 24; and (c) "[r]isk management practices," with the comment that "[a]ppropriate internal controls [were] in place." *Id.* at 22. It was not until February 14, 2008—i.e., after McCann made all of the alleged misstatements identified in

and early 2008—as the mortgage markets were in a freefall—was not ignored, but rather was disclosed to investors and addressed. In November 2007, the Bank announced that it was increasing its allowance for credit losses by approximately $20 million "in response to unprecedented market changes in the past few weeks." RPSC ¶ 64. In light of this prompt disclosure, Plaintiffs cannot be heard to complain that the Bank ignored warning signs or did not react quickly enough. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) (stating that "Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal"); *see also Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 2010 WL 961596, at *11 (S.D.N.Y. Mar. 17, 2010).

Finally, it bears mention—but is consistent with Plaintiffs' continued failure to articulate any plausible theory for why McCann would commit the alleged fraud—that Plaintiffs wholly ignore the competing, non-fraudulent inference to which the OIG Report gives rise. Specifically, the OIG Report notes that the FDIC office that examined the Bank from September 2003 through July 2008 believed that "rapid and pronounced declines in residential real estate and secondary mortgage funding markets were important contributing factors to Franklin's failure." OIG Report, Material Loss Review summary page.

  ii. **Plaintiffs' GAAP Allegations Do Not Support a Strong Inference of Scienter.**

Plaintiffs acknowledge—as they must—that they cannot demonstrate scienter simply by alleging that the Bank's financial statements were inconsistent with GAAP in certain respects. Resp. at 23. Plaintiffs therefore try to bolster their allegations by arguing that the nature of the alleged accounting errors contributes to an inference of scienter. *Id.* at 23-29. While it is true

---

the response—that the FDIC examiners first concluded that the board and management "need[ed] improvement." *Id.* at 22.

that GAAP violations may, in certain circumstances, *contribute* to an inference of scienter, such is not the case here.

### a. The alleged GAAP violations at issue do not contribute to an inference of scienter.

The August 6, 2008 press release identified five accounting issues: (i) "Delinquent Loan Accounting" (the recognition of income on delinquent loans serviced by others); (ii) "Loan Modification Accounting" (the accounting for loan modifications); (iii) "REO Accounting" (the identification of foreclosures within the Bank's portfolio of loans serviced by others); (iv) "Investment Securities Accounting" (the transfer of securities from the sale portfolio to the investment portfolio; and (v) "BOLI Accounting" (accounting for Bank-owned life insurance policies). *See* Appx. (Doc. No. 190), Tab 11 at 2-5. Plaintiffs assert that these issues (other than BOLI Accounting, which they baldy assert is a "red herring," (Resp. at 26, n.15)) "involved simple, unequivocal accounting principles that are central to the business of banking." Resp. at 27. Plaintiffs further assert that "[t]he GAAP standards that should have been applied to [the Delinquent Loan Accounting, Loan Modification Accounting, and REO Accounting] are not complex or obscure." This claim is pure *ipse dixit*. Resp. at 28.[8] It is also inconsistent with relevant case law.

"Given the flexibility in interpreting GAAP and financial reporting requirements, deference is afforded executives absent evidence of corresponding fraudulent intent." *Plumbers & Steamfitters Local 773*, 2010 WL 961596, at *13 (citation and quotation omitted); *see also*

---

[8] In an effort to bolster this argument, Plaintiffs rely on allegations that were stricken from the PSC. *See* Resp. at 28-29 (quoting the 2008 examination report and citing stricken paragraph 84). Plaintiffs also state—without any support—that the ongoing FDIC investigation supports an inference of fraud. *Id.* at 29, n.16. Aside from being entirely speculative, this assertion is also legally deficient. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009) ("Although a government investigation is not altogether irrelevant to the scienter analysis, a decision by the government to investigate a company is not sufficient to meet the heightened *Tellabs* standard on its own . . . Government investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants.").

6

*Indiana Elec. Workers' Pension IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 536 (5th Cir. 2008) ("Valuations of assets . . . as well as the application of sophisticated accounting standards like 'fair value,' leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably."); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) (finding the fact that the defendants changed auditors because of a difference in judgment about GAAP was insufficient to allege conscious behavior on the part of the defendants and explaining that "[t]he term 'generally accepted accounting principles' . . . is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement'").

Such deference is warranted here. The Bank disclosed in its financial statements its Delinquent Loan Accounting treatment and the dollar amounts of the loans affected. *See, e.g.*, Appx., Tab 7 (2006 10-K) at 94; Appx., Tab 19 (Q32007 10-Q) at 25 ("Additionally, at September 30, 2007, the company had $57.4 million of loans that were four payments or more delinquent and still accruing interest, which were primarily composed of single family loans serviced by others under an agreement with the servicer whereby we receive scheduled payments until foreclosure."). That this *disclosed* accounting treatment was subsequently revised is far more indicative of an after-the-fact, good faith disagreement about interpreting and applying accounting rules than it is fraud.[9]

---

[9] It is significant that the 2006 10-K in which the Delinquent Loan Treatment was disclosed was contemporaneously audited by Deloitte & Touche LLP. *See Mortensen v. Americredit Corp.*, 123 F. Supp. 2d 1018, 1026-27 (N.D. Tex. 2000) (no strong inference of scienter where company's independent auditor did not object to the accounting practices at issue").

The Bank likewise disclosed, in several paragraphs of detail, its treatment of the Investment Securities Accounting issue. *See* Appx., Tab 19 (Q32007 10-Q) at 7, 22 (stating that the Bank had "transferred available for sale securities with a carrying value of $91.7 million to trading securities and recognized a gain of $1.7 million"). Moreover, the August 6, 2008 8-K noted that, "Management believed these [securities] transfers were appropriate under GAAP at the time but subsequently learned that these transfers were inconsistent with GAAP." Appx., Tab 11 (Aug. 6, 2008 8-K) at 5. Again, these disclosures cut against scienter.[10] They also refute Plaintiffs' claim that these were simple, black and white, accounting rules.[11]

In a last-ditch effort to prop up their allegations, Plaintiffs identify purported "additional indicia" of scienter. Resp. at 32-33. However, as set forth in his motion, neither McCann's executive position, his license as a CPA, nor his industry experience support an inference of scienter. *See* McCann Mtn. at 16-23; *see also Shaw Group, Inc.*, 537 F.3d at 540 ("The 'defendants must have known' allegation was rejected by this court . . . as too vague to support a strong inference of scienter."). Furthermore, while Plaintiffs assert that the Board considered

---

[10] *Cf. Collmer v. U.S. Liquids*, 268 F. Supp. 2d 718, 744 (S.D. Tex. 2007) (a reasonable fact finder "could not conclude that the alleged misrepresentation 'would influence a reasonable investor's investment decision'" where specific risk disclosures addressed the substance of the challenged statement); *Bay v. Palmisano*, 2002 WL 31415713, at *9 (E.D. La. Oct. 24, 2002) (where defendant disclosed to investors its method of recognizing revenue, including the aspects that plaintiffs claimed violated GAAP, plaintiffs failed to allege that the statements were false or misleading).

[11] The Bank also informed the investing public about its efforts to curb delinquencies by modifying loans. During the October 30, 2007 conference call, Daniel E. Cooper, the Managing Director of Mortgage Banking at the time, said: "The current environment for the single-family mortgage business remains challenging. Our prime mortgage portfolio has been influenced by the nationwide housing environment. In light of this, we are aggressively pursuing various loan modification programs." Resp., Tab 14 at 3 (Transcript of Oct. 30, 2007 conference call).

For its part, the REO Accounting issue involved, among other things, difficulty the Bank had in reconciling information that it received from its servicers on a monthly basis. *See* Appx., Tab 11 (Aug. 6, 2008 8-K) at 3-4. Plaintiffs have not alleged any facts indicating that McCann had any role in reconciling the Bank's REO data. Plaintiffs have likewise failed to allege facts to suggest that these data intake issues were caused by anything other than innocent human error.

McCann responsible for certain "tone at the top" concerns, the far more specific and compelling fact is that, after its investigation, the Board chose to retain McCann as the Bank's CFO.

      **b.**      **Even if the alleged GAAP violations provide *some* support for an inference of scienter (and they do not), case law demonstrates that the RPSC still does not give rise to a *strong* inference of scienter.**

In his opening motion, McCann described in detail the inadequacy of Plaintiffs' GAAP and Sarbanes-Oxley certification allegations. McCann Mtn. at 16-19 (comparing Plaintiffs' allegations to the facts of *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804 (S.D. Tex. 2004)). Quite tellingly, Plaintiffs made no effort to address McCann's discussion of *In re Dynegy* and instead they cited different cases. Plaintiffs' cases, however, underscore the insufficiency of their allegations.

For example, *Backe* and *Microstrategy* included allegations of substantial insider trading in addition to GAAP violations. *See Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1184 (S.D. Cal. 2009) ("During nine months of the Class Period, Plaintiff alleges that Defendants . . . all sold over 90% of their Novatel holdings (excluding vested options) for a combined total of $29 million . . . ."); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000) ("Plaintiffs allege that the Individual Defendants 'reaped over $90 million from sales of substantial portions of their holdings during the Class Period.'").

Other cases cited by Plaintiffs confirm that, absent insider trading, allegations of GAAP violations need to be coupled with specific allegations that defendants were aware of, or recklessly disregarded, the alleged fraud. *See In re Fleming Sec. Litig.*, 2004 WL 5278716, at *31 (E.D. Tex. 2004) ("The allegations in the TAC include not only circumstantial evidence [regarding GAAP violations], but also direct evidence [from, among other sources, former employees] of [defendant's] knowledge of and involvement in the scheme."); *In re Catalina*

*Marketing Corp. Sec. Litig.*, 390 F. Supp. 2d 1110, 1114-15 (M.D. Fla. 2005) (In addition to GAAP violations, plaintiff (i) alleged that defendant "failed to disclose the loss of its largest European customer for more than a year . . . all the while publicly expressing confidence in the European operations," (ii) alleged that defendant had access to specific internal reports "that indicated [the company] could not meet the projected revenue," and (iii) provided detailed statements from former employees "indicating that the intent of [the alleged fraudulent scheme] was to 'fudge' the numbers to meet quarterly estimates.").

In this case, by contrast, Plaintiffs concede that McCann had no motive to participate in the alleged fraud. Resp. at 6, n. 2.[12] Further, the RPSC is devoid of any particularized allegations detailing what McCann allegedly knew at the time. For instance, Plaintiffs do not specifically allege that McCann had access to information (from reports, meetings, or the like) indicating that the company's financial statements were incorrect in any way. Simply put, Plaintiffs have not alleged facts—let alone particularized facts—creating a strong inference that McCann knew of or recklessly disregarded any inaccuracies in the financial statements that he signed. Plaintiffs have failed to meet their pleading burden.

### iii. Plaintiffs' Remaining Allegations Concerning the Loan Loss Allowance Do Not Support a Strong Inference of Scienter.

Plaintiffs' allegations fail to link McCann to actual awareness that his three purported misstatements regarding the allowance for loan losses were false when made. Specifically, Plaintiffs plead no particularized facts to support the inference that McCann did not believe the

---

[12] Nor could Plaintiffs plausibly claim that McCann benefitted from the purported fraud. McCann did not sell any company stock at allegedly artificially inflated prices. In fact, McCann increased his holdings of Franklin Bank stock during the proposed class period. *See* Supplement to Individual Defendants' Joint Appendix, Tab 4 (Cruse Declaration). "It is nonsensical to impute dishonest motives to the Individual Defendants when each of them suffered significant losses in their stock holdings and executive compensation." *Plumbers & Steamfitters Local 773*, 2010 WL 961596, at *9 (citing *Kalnit v. Eicher*, 264 F.3d 131, 140-41 (2d Cir. 2001)); *see also In re Enron Corp. Sec., Derivative, and ERISA Litig.*, 258 F. Supp. 2d 576, 638 (S.D. Tex. 2003) (purchase of additional shares inconsistent with scienter).

allowance was "sufficient" as of the 2006 10-K or "adequate" as of the Q32007 10-Q. The allegation that the loan loss allowance was understated establishes at most that "the defendants were wrong; but misguided optimism is not a cause of action and does not support an inference of fraud." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994); *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) ("[C]orporate mismanagement does not, standing alone, give rise to a 10b-5 claim . . . ."); *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("[F]raud cannot be proved by hindsight . . . ."). Plaintiffs likewise fail to allege any non-conclusory allegations to support an inference that McCann was aware that his statements in the November 26, 2007 press release regarding the Bank's decision to increase the allowance by over $20 million were false.[13]

Instead, Plaintiffs offer a laundry list of purported factors that they claim give rise to an inference of scienter. Resp. at 38-41, 45. For most of these factors (e.g., the significance of accurate allowances, matters of responsibility, industry experience, and professional accreditation as a CPA), the inference that Plaintiffs encourage is a patently improper one; namely, that McCann "must have known" based on his position with the company. *See Shaw Group*, 537 F.3d at 540. Other alleged factors, including that defendants knew that the financial data used to calculate the allowance was incomplete and that the Bank had substantial exposure to subprime loans, are conclusory and devoid of factual support. Plaintiffs also cite the "sheer

---

[13] Plaintiffs have also failed to plead that purported "Mistatement Nos. 9-11" were false. *See also* McCann Mtn. at 13-14. To allege falsity, Plaintiffs rely on allegations that have either been stricken by the Court (PSC ¶¶ 64, 84) or that, in turn, rely on the OIG Report. RPSC ¶¶ 32(e), 38, 87, 102. As discussed in more detail above, the OIG Report does not contain information suggesting that these statements were false. While the report did reflect concerns over methodology, the report confirms that the FDIC did not consider the Bank's allowance to be deficient until the October 2007 examination—the report for which was not issued until February 14, 2008. OIG Report at 23. Moreover, with respect to "Misstatement No. 11," that a Chief Credit Officer was not elected by Franklin's Board until December 19, 2007 does not infer that a review was not undertaken prior to such officer's election nor does it infer that the review was not a "complete evaluation."

magnitude of the insufficiency" as a factor, but virtually all of their allegations in that respect are sourced from the stricken 2008 Report of Examination. *See* Resp. at 39.[14]

### iv. McCann's Competing Inference Is More Compelling.

A plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent;" scienter is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Tetra Techs. Sec. Litig.*, 2009 WL 6325540, at *5 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). Here, the most compelling inference is that the Bank tried—transparently and in good faith—to react to the dramatic collapse of the real estate market during the class period. Plaintiffs' allegations, and the documents on which they rely, establish the following facts: (a) McCann had no personal motive to mislead investors—he actually increased his Bank holdings during the Class Period; (b) after investigating the accounting issues that came to light, Franklin Bank's board of directors chose to retain McCann as CFO; (c) the Bank increased its loan loss allowance as the economy worsened; and (d) issues that Plaintiffs now allege show fraud (e.g., Delinquent Loan Accounting and Investment Securities Accounting) were disclosed in the Bank's real time financial statements. These facts, and the nonfraudulent inference they create, substantially outweigh any inference to be gained from Plaintiffs' conclusory and illogical fraud allegations.

---

[14] Plaintiffs cite extensively to *Rehm v. Eagle Finance Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997) in their loan loss allowance scienter argument. This reliance is misplaced. Factually, the instant case is more like *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994), where the Second Circuit held that it could not find that a bank alleged to have understated its loan reserves acted with scienter because the plaintiff failed to allege "that the company's disclosures were inconsistent with current data." *Shields*, 25 F.3d at 1129. Moreover, unlike here, the alleged fraud in *Eagle Finance* did not occur when the market for one of the company's primary businesses was collapsing. Thus, the court was not confronted with the same compelling nonfraudulent explanation for the reserve understatement that is present in the instant case.

### B. Plaintiffs Have Not Adequately Pleaded Control Person Claims.

Because, as explained above, the Plaintiffs have failed to allege a "primary violation" under Section 10(b), their Section 20(a) claim for control person liability must also fail. *See Southland Sec. Corp.*, 365 F.3d at 383. In addition, as explained in McCann's motion, Plaintiffs have failed to plead any facts from which it can be reasonably inferred that McCann had actual power or control over the actions of any primary violator. *See* McCann Mtn. at 29-30. In response, Plaintiffs offer only the conclusory assertion that "each named defendant was a controlling person of Franklin and of one another." Resp. at 75. Plaintiffs' conclusory assertion on this point should be rejected as improper group and position pleading. *See In re Dynegy, Inc.*, 339 F. Supp. 2d at 912 (stating that "an officer's status alone will not subject him to liability under § 20 . . . plaintiffs must allege some facts beyond a defendant's position or title that show that the defendant had actual power or control over the controlled person").

## II. CONCLUSION

Accordingly, Russell McCann respectfully requests that the Court GRANT his motion and dismiss the Preferred Plaintiffs' claims against him with prejudice.

Respectfully submitted,

By: /s/ Barrett H. Reasoner
Barrett H. Reasoner
T.B.A. No. 16641980
So. Dist. Bar No. 14922
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

ATTORNEY-IN-CHARGE FOR DEFENDANT
RUSSELL MCCANN

**Of Counsel:**
Sam W. Cruse III
T.B.A. No. 24036423
So. Dist. Bar No. 617834
Ashley McKeand
T.B.A. No. 24060263
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

## CERTIFICATE OF SERVICE

I certify that on June 4, 2010, a copy of this unopposed motion was served via the Court's ECF system as indicated below:

Roger B. Greenberg, rgreenberg@schwartz-junell.com
Thane Tyler Sponsel, III, tsponsel@schwartz-junell.com
Thomas C. Fitzhugh, IV, champefitzhugh@warejackson.com
Andrea D. Levin, akim@diamondmccarthy.com
Ronen Sarraf, ronen@sarrafgentile.com
Randall K. Pulliam, rpulliam@cauleybowman.com
Darrin Williams, dwilliams@cauleybowman.com
J. Allen Carney, acarney@cauleybowman.com
James A. Harrod, jharrod@wolfpopper.com
Cynthia Saiter Connolly, cconnolly@scottdoug.com
William B. Monahan, monahanw@sullcrom.com
James G. Munisteri, jmunisteri@gardere.com
Orin H. Lewis, olewis@gardere.com
M. Byron Wilder, bwilder@gibsondunn.com
Samantha A. Lunn, slunn@gibsondunn.com
Farbod Moridani, farbod.moridani@lw.com
James J. Farrell, james.farrell@lw.com
George W. "Billy" Shepherd, bshepherd@crusescott.com
Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
David C. Walton
Anne L. Box

                                            /s/ Barrett H. Reasoner
                                            Barrett H. Reasoner