IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities | § | |
| Litigation | § | Civil Action No. 4:08-CV-1810 |
| | § | |
| | § | CLASS ACTION |

**ANTHONY NOCELLA'S REPLY IN SUPPORT OF MOTION TO DISMISS PREFERRED STOCKHOLDERS' COMPLAINT**

James G. Munisteri
State Bar No. 14667380
Orin H. Lewis
State Bar No. 00791110

Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

# TABLE OF CONTENTS

Table of Contents ................................................................................................................ ii

Table of Authorities ........................................................................................................... iii

Section 10(b) or Rule 10b-5 Claims ................................................................................... 1

    A.    The Preferreds Fail to Show That Nocella Made Any Misleading
          Statements With Scienter ........................................................................................ 1

         i.    Subprime (Asset Quality) Allegations ......................................................... 1
             a.  No Material Misrepresentations ..................................................... 1
             b.  No Strong Inference of Scienter .................................................... 8

         ii.   August 6, 2008 Adjustment ............................................................. 9
         iii.  Allowance for Credit Losses ............................................................. 13
             a.  No Material Misstatements ............................................................ 13
             b.  No Strong Inference of Scienter .................................................... 16

    B.    No Loss Causation .................................................................................................. 17

Section 11 Claims ............................................................................................................. 19

    A.    Section 11 Claims Sounding in Negligence Warrant Dismissal ............................ 19
    B.    Section 11 Claims Sounding in Fraud Warrant Dismissal .................................... 19
    C.    Statute of Limitations ............................................................................................ 19
    D.    Negative Causation Paradox .................................................................................. 19

Request For Relief ............................................................................................................. 21

Certificate of Service ........................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
291 F.3d 336 (5th Cir. 2002) ..................................................................................2

*Abrams v. Baker Hughes, Inc.,*
292 F.3d 424 (5th Cir. 2002) ...............................................................8, 9, 10, 17

*Alaska Elec. Pension Fund v. Adecco S.A.,*
434 F.Supp.2d 815 (S.D. Cal. 2006), *aff'd sub nom.,* 256 Fed. Appx. 74 (9th Cir.
2007) ..............................................................................................................16

*Ashcroft v. Iqbal,*
129 S.Ct. 1937 (U.S. 2009)..............................................................................1, 2

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................1, 2, 7

*Central Laborers' Pension Fund v. Integrated Electrical Services,*
497 F.3d 546 (5th Cir. 2007) ...................................................................9, 10, 17

*Coates v. Heartland Wireless Communications, Inc.,*
26 F.Supp.2d 910 (N.D. Tex. 1998) .................................................................8

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
553 F.3d 187 (2nd Cir. 2009)...........................................................................7

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.,*
565 F.3d 200 (5th Cir. 2009) ...........................................................................8

*Garber v. Legg Mason, Inc.,*
2009 WL 3109914 (2nd Cir. 2009).................................................................7

*Goldstein v. MCI WorldCom,*
340 F.3d 238 (5th Cir. 2003) .......................................................................8, 10

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,*
313 F.3d 305 (5th Cir. 2002) ...........................................................................2

*In re Affiliated Computer Services Derivative Litig.,*
540 F.Supp.2d 695 (N.D. Tex. 2007) ..............................................................8

*In re Azurix Corp. Sec. Litig.,* 198 F.Supp.2d 862, 891 (S.D. Tex. 2002) *In re CIT Group,
Inc. Sec. Litig.,* 349 F.Supp.2d 685 (S.D. N.Y. 2004) ............................................13

**Page(s)**

CASES

*In re Electronic Data Systems Corp. Sec. and "ERISA" Litig.*,
298 F.Supp.2d 544 (E.D. Tex. 2004) ........................................................................9

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F.Supp.2d 951 (S.D. Ohio 2009) ......................................................................16

*In re MBIA, Inc., Sec. Litig*,
--- F.Supp.2d ----, 2010 WL 1253925 (S.D. N.Y. Mar 31, 2010) ...........................8

*In re Netsolve, Inc. Sec. Litig.*,
185 F.Supp.2d 684 (W.D. Tex. 2001) .......................................................................9

*In re Taleo Corp. Sec. Litig.*,
2009 WL 322914 (N.D. Cal. Feb 09, 2009) .............................................................13

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ................................................................................16

*In re Westinghouse Sec. Litig.*,
90 F.3d 696 (3rd Cir.1996) .......................................................................................8

*Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008) ..................................................................9, 10, 12, 17

*Kaltman v. Key Energy Services, Inc.*,
447 F.Supp.2d 648 (W.D. Tex. 2006) .....................................................................13

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..................................................................................18

*Malin v. XL Capital Ltd.*,
499 F.Supp.2d 117 ...................................................................................................17

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ....................................................................................9

*R2 Investments LDC v. Phillips*,
401 F.3d 638 (5th Cir. 2005) ....................................................................................8

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ...............................................................................8, 13

*Ryan v. Flowserve Corp.*,
245 F.R.D. 560 (N.D. Tex. 2007) ...........................................................................18

iv

**Page(s)**

**CASES**

*Shields v. Citytrust Bancorp, Inc.,*
  25 F.3d 1124 (2nd Cir. 1994) ....................................................................16

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
  365 F.3d 353 (5th Cir. 2004) ...................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007).......................................................................6, 8, 16


**STATUTES AND RULES**

15 U.S.C. § 78u-4(b)(1) ...............................................................................2

FED. R. CIV. P. 9(b) .....................................................................................19

Rule 10b-5......................................................................................................1


**OTHER AUTHORITIES**

71 Fed. Reg. 58,609 (2006) ......................................................................4, 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities | § | |
| Litigation | § | Civil Action No. 4:08-CV-1810 |
| | § | |
| | § | CLASS ACTION |

### ANTHONY NOCELLA'S REPLY IN SUPPORT OF MOTION TO DISMISS PREFERRED STOCKHOLDERS' COMPLAINT

Anthony J. Nocella files this reply in support of his motion to dismiss the Amended Consolidated Preferred Stock Purchaser Complaint ("APC") [DE 192] ("Motion").[1]

### SECTION 10(B) OR RULE 10B-5 CLAIMS

A.   **THE PREFERREDS FAIL TO SHOW THAT NOCELLA MADE ANY MISLEADING STATEMENTS WITH SCIENTER**

   i.   *Subprime (Asset Quality) Allegations*

      a.   **No Material Misrepresentations**

   1.   In their Response, the Preferreds identify three specific alleged misstatements regarding "asset quality" (addressed in Motion ¶¶ 65-73) [DE 192].   Each of these alleged misstatements fails for two reasons.   First, the alleged falsity rests not on what Nocella said but on what the Preferreds believe the statements imply.   The Preferreds also fail to support their belief in this alleged falsity with appropriate documentation or other corroborating information.

   2.   The Preferreds' flawed analysis begins with the faulty premise that notwithstanding the PSLRA, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (U.S. 2009), this Court must accept as true ***what the Preferreds say Nocella meant***.   While the 12(b)(6) standard of review has long required courts to

---

[1]      Nocella also incorporates by reference the legal arguments and authorities and, to the extent applicable to Nocella, the factual arguments set forth in the replies of Defendant Lewis Ranieri ("Ranieri Reply") [DE 228], Defendant Russell McCann [DE 227], and Defendant Directors Chimerine, Golush, Howard, Master, Perro, Rhodes, and Selman ("Directors' Reply") [DE 229] as well as Nocella's own Reply in Support of his Motion to Dismiss the Common Stockholders' Complaint.

1

accept all well-pleaded facts as true, that standard has *never* required courts to accept as true a plaintiff's unwarranted inferences or deductions from those facts. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313, 322-23 (5th Cir. 2002).

3.      *Twombly* and *Ashcroft* have set the bar even higher requiring the plaintiff to plead "enough facts to state a claim to relief that is plausible on its face," that is, in context, enough "factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 547; *Ashcroft*, 129 S.Ct. at 1940 ("determining whether a complaint states a plausible claim is context-specific, requiring the court to draw on its judicial experience and common sense").

4.      On top of this minimum standard, the PSLRA § 21D(b)(1) requires that the Preferreds' complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and . . . to state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)). To meet this standard, in turn, requires "supporting documentary evidence and/or a sufficient general description of the personal sources of the plaintiff's beliefs." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351 (5th Cir. 2002). In sum, this means the Preferreds' complaint must plead enough facts, supported by documentation or other corroborating information, to support the reasonable inference that Nocella's statements imply what the Preferreds say they imply and then to plead enough facts, supported by documentation or other corroborating information, to support the reasonable inference that the actual facts were other than what was implied.

5.      The first statement concerns a remark Nocella made during Franklin's January 31, 2007, conference call ("2006 YE Conf. Call") regarding "the higher risk non-traditional mortgage market":

> Good morning. First, let me start by stating that earnings were lower than our
> expectations for the year primarily as a result of the inverted yield curve and our

> *continued unwillingness to compromise our credit standards by participating in the higher-risk non-traditional mortgage market,* and these products were the dominant product in the market during the year.

2006 YE Conf. Call [DE 210-13] (emphasis on quotation from APC ¶ 43). The Preferreds argue that this statement misleads as it implies that Franklin: (i) never had non-traditional mortgages in its single family loan portfolio, (ii) had never originated any non-traditional mortgages with limited documentation or stated income, and (iii) had no non-traditional mortgages in its portfolio with second liens and had no non-traditional mortgages in California, Arizona and Florida.[2]

      6.    Nothing the Preferreds plead in their complaint (or say in their Response) supports the inferences the Preferreds ask this Court to make. Nor does the Preferreds' complaint (or even their Response) provide documentation or sufficient corroborating information to support their belief. Indeed, the Preferreds do not even offer this Court an explanation as to why Nocella's statement implies what they say it implies. The following facts refute such the Preferreds' skewed reading:

      (a)    The descriptive adjective "higher-risk" proceeds (and thus modifies) the phrase "non-traditional mortgage market." The belief that this statement applies to all non-traditional mortgages would render this modifier meaningless. Franklin's January 30, 2007 press release (the day prior) contained a nearly identical statement attributed to Nocella that did not include the conveniently [mis]placed comma.[3]

---

[2]    The Preferreds have abandoned as untenable their argument that this statement misleadingly implied that Franklin had no subprime loans. *See* APC 43; Motion ¶ 66 [DE 192].

[3]    January 30, 2007 Press Release at 1 [DE 231-6] (noting Franklin's "unwillingness to compromise our credit standards by participating in the higher-risk non-traditional mortgages that were the dominant product in the market"). The Preferreds construe the adjectives "higher-risk" and "non-traditional" disjunctively based on a comma that they placed between the two in their complaint. Nothing requires this Court to accept as true their punctuation of Nocella's *verbal* statement. The Preferreds' punctuation, even if drawn from Bloomberg, constitutes nothing more than an inference that is, itself, implausible as it either renders the phrase "higher-risk" meaningless or the phrase "higher-risk non-traditional mortgage market" nonsensical. Grammatically speaking, if the adjectives were truly coordinate, the statement would be equivalent to saying that Franklin was unwilling to compromise its credit standards "by participating in the non-traditional and higher-risk mortgage market."

(b)     Franklin disclosed that it had non-traditional mortgages in both the *Critical Accounting Policies* and the *Provision for credit loss* sections of its 2006 10K. 2006 10K [DE 190-7] at 36, 43.  *See* Motion ¶ 67 [DE 192].[4]

(c)     Nocella's statement concerned "the higher risk non-traditional mortgage market" which was the "dominant product in the market."  Geographical location and reduced documentation are underwriting characteristics, not a product.[5]

(d)     Franklin disclosed the geographic distribution of its loan portfolio by state. 2006 10K [DE 190-7] at 59-60; 2005 10K [DE 190-4] at 53-54; 2004 10K [DE 190-3] at 45-46.  *See also* note 4.

(e)     Nocella's statement concerned Franklin's earnings for 2006 and concerned the mortgage products that Franklin offered in that year only.[6]

7.     The Preferreds also fail to allege facts, including corroborating documents or other information, sufficient to support their belief that Nocella's statement was false.[7]  Nowhere do the Preferreds supply this Court with any facts that would support the inference that Franklin

---

[4]     The Preferreds self-servingly cast these disclosures as a truth on the market (i.e., materiality) defense. Response at 15.  These disclosures had far great impact than that.  They conclusively refute any notion that Franklin failed to disclose its non-traditional mortgages, they undermine the plausibility of any inference that Nocella's statement was misleading, they undermines loss causation and reliance, and they put the Preferreds on notice for purposes of limitations.  The Preferreds discount these disclosures as not sufficiently intense and credible to counterbalance the strained inference the Preferreds attach to Nocella's statement.  Franklin unambiguously disclosed the existence of these loans in both the *Critical Accounting Policies* and *Provision for credit losses* sections of its 2006 10K concerning the same financial period.  Such disclosures would have effectively corrected any misplaced impression that Franklin had no non-traditional mortgages.

[5]     Non-traditional mortgages products are defined by their terms, not their underwriting characteristics. *Interagency Guidance on Nontraditional Mortgage Products*, 71 Fed. Reg. 58,609, 613 (2006) [DE 212-5] ("These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.").  To avoid confusion, a distinction must also be drawn between a loan product (defined by its terms) and a loan program (that targets borrowers meeting certain underwriting characteristics).  *Id.* at 58, 614 & n.9 (discussing mortgage programs that target subprime borrowers).  *See also* Expanded Guidance for Subprime Lending Programs, FDIC Press Release, PR-9-2001, at 2 (January 31, 2001).  [IDJC 28].

[6]     The Preferreds seize upon the word "continued" to argue that the statement implies that Franklin had not participated in the "higher risk non-traditional mortgage market" for some indefinite period of time prior to 2006 (presumably since Franklin was formed).  While the allegedly implied fact may well be true (certainly the Preferreds provide this Court with no documentation to the contrary), the context refutes the Preferreds' argument that the statement implies what they say it implies.  In context, "continued" refers to Franklin's persistence (during 2006) in refusing to participate in the higher-risk non-traditional mortgage market despite the dominance of those products in the market that year (2006), and not what it had done in the past.

[7]     The Preferreds rely on allegations in paragraphs 39, 43, 84 and 102 related to the 2008 Exam which have been stricken in whole (39 and 84) or in part (43) by this Court.  This Court should similarly disregard the arguments in the Preferreds' Response that arise from these allegations.

4

originated non-traditional mortgage products,[8] much less higher-risk non-traditional mortgage products in 2006 (or even in 2005).  The Preferreds focus solely on underwriting characteristics and not on specific mortgage products.  And, the Preferreds do not even provide this Court with an analytical framework for inferring that higher-risk non-traditional mortgage products were originated by Franklin in 2006 (or prior).[9]

8.    The second statement Nocella made responding to Arfstrom's question regarding "some of the more exotic products" suffers from the same implausibility.  Like the first statement, the Preferreds repeatedly read out of Arfstrom's question the important qualifier "*some of the more exotic* products".  The Preferreds also completely misrepresent the context, claiming the exchange was not about "trends" and what Franklin would be doing but about what was on Franklin's balance sheet as of December 31, 2006.  The exchange that immediately proceeded Arfstrom's question refutes that notion.[10]  Further, even if Nocella's answer was

---

[8]    The Preferreds claim that Franklin "ceased originating new non-traditional single family mortgages loans during 2007Q1".  Response at 11 [DE 211] (citing FDIC Report [DE 167-2] at 5).  The FDIC report actually says that Franklin "in the first quarter of 2007, began to limit the types of 1-4 family residential loan products that it originated to only conforming high-quality loans."  The FDIC Report admits that Franklin had previously "halted the bank's nontraditional mortgage . . . operations" but carefully avoids stating when that occurred.  Nor does the FDIC's chart (FDIC Report at 23) support that inference either.  That Franklin had non-traditional mortgages (interest only mortgages) as of 2006 does not support the inference that Franklin originated non-traditional mortgages in 2006.

[9]    As even a cursory review of the *Interagency Guidance on Nontraditional Mortgage Products* reveals, what made a particular non-traditional mortgage product riskier than another was not the particular product type (whether "interest-only" or "payment-option") but how the specific terms of the products offered by lenders impacted a borrower's ability to repay. *See Interagency Guidance on Nontraditional Mortgage Products*, 71 Fed. Reg. at 58, 613-14 & nn. 6 & 7 (discussing, for example, the risks associated with various terms including whether the mortgage provided for an introductory or "teaser" rate, the spread between the introductory rate and the accrual rate, the extent to which negative amortization was permitted or capped, and a balloon payment combined with a borrower option for an extended amortization period).

[10]   The exchange as set forth in the Bloomberg transcript proffered by the Preferreds was as follows:

Jon Arfstrom: OK, great. And then Tony, just one of the other comments in the release was some of your cautiousness on *trends in the single-family residential mortgage market* in terms of what's been underwritten. Can you talk a little bit about *what you're seeing* there and why you're a bit more cautious?

Tony Nocella: Well, I think the – a lot of tap [sic] and *since the you know agency guidelines came out in the – in the fourth quarter*, and such things has [sic] pay option alarms [sic] and negative amortization run simultaneously – simultaneous second mortgages with the first have been reduced substantially.  I mean *this 40 to 60 percent reduction in the fourth quarter and so far in January*, so the – it looks like

retrospective, it concerned the **products** Franklin had offered (i.e., "some of the more exotic products") and would have been limited to the time period just discussed (i.e., the fourth quarter of 2006). It could not plausibly be construed to refer (as the Preferreds insist) to every mortgage Franklin held as an asset as of December 31, 2006 (even if originated for sale) or had ever originated since Franklin's formation. Nocella's only statement regarding Franklin's **balance sheet** was undeniably forward-looking. 2006 Bloomberg YE Transcript [DE 212-13] at 5 ("[I]f we ever do anything except for sale, we'd probably broker it through, in fact. It wouldn't even – it wouldn't even touch our balance sheet").

9.    Even worse, the Preferreds simply proclaim falsity without providing this Court with any factual basis for assessing what exotic products Franklin had allegedly offered and how those exotic products were more exotic than the other exotic products being offered in the marketplace. To the extent that the Preferreds proclaim falsity based solely on non-traditional mortgages, that fact was fully disclosed and was correct for the same reasons the statement regarding "higher-risk non-traditional mortgages" was correct.

10.   The third statement likewise pulls words out of context to imply a blanket statement about subprime loans. Nocella never used the phrase "subprime **loans**." That suggestion is purely the Preferreds' suggested inference. The Preferreds concede as they must that Miller's question concerned whether Franklin was seeing "subprime **issues**" with its prime loans. Nevertheless, they argue that Nocella's "rambling" answer was non-responsive![11] In fact,

---

*everybody's looking for a new mass track [sic] in the single family business, but obviously there's a significant decline in originations,* as you've heard in the press.

2006 Bloomberg YE Transcript at 5 (emphasis added). Notably, the Preferreds do no rest their argument that Arfstrom was talking about Franklin's assets for the period ending December 31, 2006 on what Arfstrom asked but merely speculation about what it would be logical for him to ask about. Words matter.

[11]    Contrary to the Preferreds' characterization, Nocella's response was not rambling but made perfect sense. Miller's concern arose from the trouble Countrywide was seeing in their "HELOC portfolio in the prime side." Nocella began by pointing out he didn't even think Franklin had a home equity line of credit, that HELOCs were not Franklin's business. He went on to say that prime loan delinquencies were on the rise but that Franklin's

Nocella's answer was directly on point.  It's only the Preferreds' inference (subprime *loans*), not Nocella's answer (subprime issues with prime side loans), that doesn't fit.[12]

11.     Finally, the Preferreds attempt to sneak in the back door an alleged misstatement the Preferreds never plead.  That statement, regarding two characteristics that Franklin "stayed away from": "pay option ARMs" which "Neg-AM" and "simultaneous seconds" with "100% CLTVs" has been addressed in Nocella's motion to dismiss the Common's complaint (which is incorporated herein by reference).  Nocella Motion (Commons) [DE 191] ¶ 54.[13]

12.     As to materiality, the Preferreds completely miss the point.  None of the analysts at issue were seeking the information that the Preferreds infer Nocella implied in response. Further, concerning Nocella's statements regarding higher-risk non-traditional mortgage products, the more exotic products, and the two characteristics Franklin stayed away from, nothing the Preferreds have plead suggests that any loans that would plausibly fall into that category were of sufficient magnitude to be material.[14]

---

delinquencies were substantially lower than Countrywide's.  Nocella's conclusion that Franklin didn't have any subprime issues with prime side loans was both responsive and made perfect sense in that context.

[12]     To bolster their non-responsive inference, the Preferreds seek comfort in Miller's follow-up question. However, Miller's comments would be equally responsive to Nocella's observation that Franklin had seen some delinquency increases even with solid 80-70% loan to value ratios and 700 FICO scores (which is what he thought Countrywide might have been talking about).  Further, this Court should resist any temptation to speculate as to what Miller heard (much less what Nocella meant) based on Miller's reference to "Alt-A stuff".  Contrary to the Preferreds' suggestion, Alt-A has no standard definition in the industry.  *See* http://www.clearonmoney.com/dw/doku.php?id=public:definitions_a ("In fact there is no standard definition, and any report on Alt-A should be read carefully to see what definition is being used.") (collecting definitions).

[13]     For falsity, the Preferreds also rely upon paragraphs that have been stricken and/or do not even mention these characteristics.

[14]     The burden rests with the Preferreds under *Twombly* to plead sufficient facts for this Court to reasonably infer materiality.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2nd Cir. 2009); *Garber v. Legg Mason, Inc.*, 2009 WL 3109914, *3 (2nd Cir. 2009).  Even if information may be qualitatively relevant, it may still be quantitatively immaterial.  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3rd Cir.1996) (upholding 12(b)(6) dismissal).  The Preferreds misplace their reliance on *In re MBIA, Inc., Sec. Litig.*, --- F.Supp.2d ----, 2010 WL 1253925, (S.D. N.Y. Mar 31, 2010), as no facts have been plead facts showing the amount of loans at issue much less why the amounts, though small, would still be material.  *Id.* at *14 (finding materiality where the investments though a small fraction of the defendant's portfolio created an exposure 25% greater than the defendant's capital base).

b.    **No Strong Inference of Scienter**

13.    The Preferreds claim that scienter exists for these "asset quality" statements because single family mortgages comprised 60% of Franklin's loans and 51% of its total assets and because Nocella served on Franklin's Management Credit Committee and Risk Management Committee.  That is it.  Response at 19-20 [DE 211].  The Preferreds' showing comes nowhere near the showing necessary to establish a strong inference of scienter.

14.    First, since Preferreds have failed to show motive, they must meet the more stringent conscious behavior standard.  *R2 Investments LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005).  To satisfy the PSLRA, the strong inference of scienter must be cogent and compelling, "at least as compelling as any opposing inference one could draw from the facts."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  Any omissions or ambiguities will count against inferring scienter.  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (quoting *Tellabs, Inc.*, 551 U.S. at 326.).

15.    Here, nothing the Preferreds have alleged shows that Nocella consciously misled investors.  The Preferreds' showing consists entirely of the kind of speculative/imputed knowledge rejected by the Fifth Circuit as insufficient to establish scienter.[15]  Plaintiffs' authorities, only two of which come from district courts of the Fifth Circuit, do not stand for the

---

[15]    *TXU Corp.*, 565 F.3d at 211-12 (executive position and likely attendance at board meetings); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003) (allegations that executives must have know about the problem because of its magnitude); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 859 (5th Cir. 2003) (rejecting plaintiffs' contention that defendants must have been aware of gloomy prospects and undisclosed problems involving project because it was the company's second largest asset and a part of the company's "core" business).  *See also In re Affiliated Computer Services Derivative Litig.*, 540 F.Supp.2d 695, 701 (N.D. Tex. 2007) (service on compensation committee that approved back-dated stock options insufficient to plead scienter as such allegations merely rested on defendants' position in the company) (citing *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 916 (N.D. Tex. 1998) ("Plaintiffs must properly plead wrongdoing and scienter as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within the Heartland organization.").

broad propositions for which they are cited.[16]  Finally, the Preferreds' skewed interpretation of what Nocella's statements implied at worst creates an ambiguity regarding falsity that cuts against any inference that Nocella consciously misled investors.

    ii.    ***August 6, 2008 Adjustment***

16.    The Preferreds fail to adequately plead a strong inference of scienter regarding the August 6, 2008 Adjustment.[17]  Other than the unsupported accusation that Nocella retaliated against a bank officer who refused to sign a Sarbanes-Oxley attestation, the Preferreds offer this Court nothing more than the GAAP violations, Sarbanes-Oxley certifications, resignations, and executive positions, all of which have been found by the Fifth Circuit to be individually and collectively insufficient to support a strong inference of scienter.[18]  Notably, as here, the common denominator in each of these Fifth Circuit cases was the plaintiffs' failure to provide

---

[16]    *In re Electronic Data Systems Corp. Sec. and "ERISA" Litig.*, 298 F.Supp.2d 544 (E.D. Tex. 2004) and *In re Netsolve, Inc. Sec. Litig.*, 185 F.Supp.2d 684 (W.D. Tex. 2001) each involved a single customer or contract of unusual importance to the success or failure of the company. *In re Electronic Data Systems Corp. Sec. and "ERISA" Litig.*, 298 F.Supp.2d at 557; *In re Netsolve, Inc. Sec. Litig.*, 185 F.Supp.2d at 697 (describing company's primary customer as the lifeblood of the company). *See also Abrams*, 292 F.3d at 438-39 (concurring opinion) ("Given that the company's fortunes would rise or fall based on the success of that single product, we deduced that that misstatements concerning it were more likely to have been made with scienter.") (distinguishing *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001). Here, nothing the Preferreds have plead would suggest that higher-risk non-traditional mortgage products, more exotic products, or pay-option ARMs with negative amortization or simultaneous seconds with 100% CLTV ratios were of any importance, much less of unusual importance, to Franklin. Rather, the Preferreds simply transform the significance of single family mortgages to Franklin's business generally into perfect knowledge of the terms of every loan Franklin ever held. *In re Electronic Data Systems Corp. Sec. and "ERISA" Litig.* may also be distinguished in that the Court specifically refused to rest its holding on the importance of the contract at issue pointing to "specific meetings, reports, and practices whereby [the defendants were made actually aware" of the status of the contract. *Id.* at 557.

[17]    As noted above, since the Preferreds have failed to adequately plead any motive, the Preferreds must meet the more stringent conscious behavior standard.

[18]    *Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532-545 (5th Cir. 2008) (allegations collectively insufficient to raise strong inference of scienter, including failure to follow GAAP, magnitude and extent of alleged GAAP violations, executive positions, weak internal controls, confidential witness statements, various allegations of knowledge unsupported by documentation or personal sources of belief, receipt of reports and attendance at meetings where subject matter was discussed, alleged motives based on stock sales, performance bonuses, and the desire to acquire other companies and to avoid credit downgrades, and Sarbanes-Oxley certifications); *Central Laborers' Pension Fund v. Integrated Electrical Services*, 497 F.3d 546, 551-55 (5th Cir. 2007) (GAAP violations, restatement, confidential witness statements, stock sales, and Sarbanes-Oxley certifications); *Abrams*, 292 F.3d at 431-35 (senior level executives, receipt of unidentified daily, weekly and monthly financial reports, general knowledge of internal control problems, accounting irregularities necessitated restatement of several previously issued reports, GAAP violations, resignation of key accounting officials, motivation to raise capital, enhance incentive compensation and sell stock at inflated prices).

adequate documents or corroborating information sufficient to connect the individual defendants to actual awareness of accounting issues or other problems in dispute. *Central Laborers' Pension Fund*, 497 F.3d at 555; *Shaw Group, Inc.*, 537 F.3d at 537; *Abrams*, 292 F.3d at 432-33. *See also Goldstein*, 340 F.3d at 251-52. Here, the Preferreds fail to offer allegations that would support such a link.

17.     Instead, the Preferreds offer a series of rationales for imputing knowledge or recklessness to an executive based on his position (magnitude of restatement, consistency of the errors, simplicity and obviousness of GAAP violations, and awareness of FDIC concerns), none of which offer the particularized showing necessary to link Nocella to awareness of the five accounting issues in dispute.  Not surprisingly, an examination of each of these rationales demonstrates the danger of relying upon such generalized showings as a substitute for the particularized showing required by the PSLRA and the Fifth Circuit.

18.     By way of example only, with regard to magnitude, the Preferreds' argue that scienter should be inferred from the impact the adjustments had on income and earnings. However, the August 6, 2008 Adjustment, taken as a whole, actually negates any inference of conscious behavior.  The August 6, 2008 Adjustment shows that the two largest issues (Delinquent Loan Accounting and REO Accounting) pre-dated the 2007 quarterly income and earning impacts the Preferreds regard as significant and grew, not as a result of conscious behavior, but as a function of increased delinquencies.  Likewise, while the Loan Modification Accounting issue first arose in the quarter ending June 30, 2007, its impact during that quarter on income ($1,000) and thus earnings was negligible.  August 6, 2008 8K at 4 [DE 190-11].

19.     Similarly, the Preferreds cast the "massive underreporting of troubled assets" as "no mere error caused by the application of hyper-technical accounting rules." However, as to magnitude and simplicity, the difference in non-performing loans was due entirely to the

Delinquent Loan Accounting issue and the difference in non-performing assets entirely to the Delinquent Loan Accounting issue and the REO Accounting issue. *Compare* August 6, 2008 8K at 3-4 *with* August 6, 2008 8K at 9. However, far from concealing the problems with these assets, Franklin specifically disclosed its Delinquent Loan Accounting treatment and the dollar amount of the loans affected in its discussion of non-performing assets in each of the periods affected.[19] As the Delinquent Loan Accounting issue and the REO Accounting issue both involved loans serviced by others, the amounts disclosed in each of these filings included not only the dollar amounts affected by the Delinquent Loan Accounting issue but also the dollar amounts impacted the REO Accounting issue.

20. As to simplicity and consistency, the REO Accounting issue involved, among other things, difficulty Franklin had in reconciling information that it received from its servicers on a monthly basis. August 6, 2008 8K at 4. Due to the nature of the issue, any delays associated with these difficulties only affected one month of each quarter and only resulted in an increase to the extent that the amount of the month omitted as a result of the delay exceeded the amount of the month included from the prior quarter as a result of the delay. As here, in a period of increasing foreclosures, this one-month delay may have caused REO to be understated. In a period of decreasing foreclosures, this one-month delay may have caused REO to be overstated. *See Shaw Group, Inc.*, 537 F.3d at 537 (noting that weak controls do not demonstrate an intent to defraud as weak control could just as easily bias financial figures up as well as down).

---

[19]      2006 10 K [DE 190-7] at 94 ("At December 31, 2006 and 2005, the company had impaired loans totaling approximately $6.7 million and $21.4 million, respectively. *Additionally*, at December 31, 2006 and 2005, the company had *$22.5 million and $9.0 million, respectively, of loans that were four payments or more delinquent and still accruing interest* which are comprised of single family loans serviced by others, which are under an agreement with the servicer whereby we receive scheduled payments until foreclosure."); 1Q 2007 10Q [DE 212-2] at 13 ("At March 31, 2007 and December 31, 2006, the company had impaired loans totaling approximately $6.8 million and $6.7 million, respectively. *Additionally*, at March 31, 2007, the company had *$40.1 million of loans that were four payments or more delinquent and still accruing interest*, which are primarily composed of single family loans serviced by others under an agreement with the servicer whereby we receive scheduled payments until foreclosure."); 2Q 2007 10Q [DE 212-3] at 13 (same); 3Q 2007 10Q [DE 190-19] at 25 (same).

21.     Finally, the Preferreds' self-serving analysis of the Investment Securities Accounting issue rings hollow.  For a more thoughtful analysis, please compare Franklin's extended discussion of this issue in the third quarter 10Q at issue.  3Q 2007 10Q at 7 [DE 190-19] (four paragraph discussion).  The Investment Accounting Issue stands as exactly the kind of judgment call the Fifth Circuit has cautioned as suspect for purposes of inferring scienter.  *Shaw Group, Inc.*, 537 F.3d at 537 (identifying as especially suspect alleged accounting errors based on standards that leave broad scope for judgment).

22.     As to FDIC concerns, the Preferreds entire discussion revolves around paragraphs stricken by the Court (APC ¶¶ 39, 84-85) and/or that relate to the FDIC Report (APC ¶ 38, 75, 85, 87)  and should be disregarded on similar policy grounds.  *See* Motion at ¶¶ 21-22.  Setting that argument aside, none of the Preferreds so-called "red flags" involve the specific accounting issues with which the August 6, 2008 Adjustment was concerned or specifically link Nocella to an awareness of those specific problems.  Response at 31 (identifying as red flags oversight of servicers, loan acquisition due diligence, and the lack of formal, versus informal, loss mitigation policies) [DE 211].

23.     As to the so-called "additional indicia" regarding Nocella, as set forth above, neither Nocella's executive positions nor his Sarbanes Oxley Certifications support an inference of scienter.  *See* Motion ¶¶ 59, 61-62 [DE 192].   In particular, the Preferreds make no particularized showing linking Nocella's alleged knowledge or awareness to any of the five accounting issues in dispute.  Likewise, Nocella's status as a CPA does not support an inference of scienter either where, as here, no particularized showing has been made that suggests that Nocella by virtue of his professional status or experience knew or should have known that Franklin was not correctly handling the five accounting issues in dispute.  *In re Taleo Corp. Sec. Litig.*, 2009 WL 322914, *10 (N.D. Cal. Feb 09, 2009).   That Nocella requested that he be

allowed to accelerate his retirement and step down as CEO on or about May 16, 2008 does not

infer scienter either, especially given that Nocella remained on the Franklin Board, remained as

Chairman of the bank, and was contemporaneously elected to serve on Franklin's interim

Executive Committee.  May 20, 2008 8-K [DE 182-3] at 2.[20]  Finally, Wolfe's own account of

the events refutes the Preferreds' suggestion that he was retaliated against for refusing to sign a

SOX attestation related to one of the accounting issues in dispute.[21]

     iii.    ***Allowance for Credit Losses***

       a.    **No Material Misstatements**

    24.    The only "misstatements" the Preferreds attribute to Nocella regarding the

allowance of credit losses come from Franklin's 2006 10K and the January 31, 2008 press

---

[20]    *In re Azurix Corp. Sec. Litig.*, 198 F.Supp.2d 862, 891 (S.D. Tex. 2002) *aff'd, Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003).  *See also* APC ¶ 74.  Contrary to the Preferreds' assertion, *In re Azurix Corp. Sec. Litig.*, which the Fifth Circuit affirmed in relevant part, is directly on point.  The May 16, 2008 Board of Director Minutes, which is the only supporting documentation referenced by the Preferreds, reflects that the Nocella's request to accelerate his retirement was voluntary.  Certainly, nothing in those Minutes suggest that Nocella was terminated because he had engaged in any conscious misbehavior with respect to the five accounting issues.  Ranieri's statement did not place the blame at Nocella's feet but rather merely reflected his observation that: "A [Board] consensus appeared to exist to take actions to beef up the compliance and internal audit functions, *improve* the 'tone at the top' in the organization, and increase openness and communication within the organization and with the regulatory authorities."  May 16, 2008 Board of Director Minutes at 2 (emphasis added).  [4:09-cv-02492, DE 3-7].  In contrast, the Board in *Kaltman v. Key Energy Services, Inc.*, 447 F.Supp.2d 648 (W.D. Tex. 2006), on which the Preferreds rely, issued a press release stating that its CEO had been terminated "for cause".  Here, neither Nocella nor any accounting official, including Defendant McCann, was asked to resign as a result of the investigation.

[21]    Wolfe's own account reflects that the SOX Attestation permitted him to respond not only "Yes" but "No" to questions of the Bank's compliance and that the VP of Mortgage Accounting suggested he do so.  Wolfe Letter at 3.  However, rather than simply respond "No," Wolfe refused four separate requests, including Haas' suggestion that he respond "No," as he did not feel he was "in a position to explain the accounting irregularities." *Id.*  While Wolfe speculates that he was retaliated against, he admits that Cooper never mentioned the SOX Attestation.  Nothing in Wolfe's description of his conversation suggests that the decision to transfer his duties to a Senior Vice President reflected anything other than a shift in corporate priorities.  Even if the two were related, the more likely inference would be that the action arose from Wolfe's refusal to respond either "Yes" or "No" and not any concerns he voiced.  Further, contrary to the Preferreds' suggestion, none of the concerns Wolfe voiced related to any of the five accounting issues involved in the August 6, 2008 Adjustment, including the REO Accounting issue.  Wolfe's concerns related to the period ending December 31, 2007 and involved: (i) a variance between REO 'net realizable value" versus book value; (ii) certain "in substance" REOs; and (iii) uncollectible second liens.  By his own admission, Franklin's difficulties reconciling and thus identifying REOs for loans serviced by others was an issue Wolfe did not become aware of until sometime after his meeting with Cooper.  Wolfe Letter at 4.  As such, even Wolfe did not know of the REO Accounting Issue until sometime after January 28, 2008.  Nothing in Wolfe's letter suggest that Nocella was aware of the issue before Wolfe was.

release (addressed in Motion ¶¶ 81-91) [DE 192].   With regard to Franklin 2006 10K, the

Preferreds seize upon the statement that:

> We maintain our allowance for credit losses at the amount estimated by
> management to be *sufficient* to absorb probable losses inherent in our loan
> portfolios based on available information.  Our estimates of credit losses meet the
> criteria for accrual of loss contingencies *in accordance with Statement of
> Financial Accounting Standards ("SFAS") No. 5*, "Accounting for
> Contingencies," as amended by SFAS No. 114, "Accounting by Creditors for
> Impairment of a Loan."

2006 10K at 36.  The Preferreds, however, fail to allege facts, supported by documents or other

corroborating information, sufficient to show that this statement was false.

      25.     To allege falsity, the Preferreds wholly rely on allegations that have either been

stricken by this Court (APC ¶ 64, 84) or that, in turn, rely on the FDIC Report (APC ¶¶32(e), 38,

87, 102).   The FDIC Report, however, does not contain information suggesting that this

statement was false.  While the FDIC report did reflect concerns over methodology, the FDIC

Report confirms that the FDIC did not consider the Franklin's Allowance for Loan Losses to be

deficient (or even) in contravention of agency policy until the October 2007 Examination.  FDIC

Report [DE 167-2] at 23.  Further, the FDIC does not mention SFAS Nos. 5 or 114 or suggest

that Franklin's estimates of credit losses did not meet the "criteria for accrual of loss

contingencies."  *See* FDIC Report at 9-10, 15.  *See also* SFAS No. 5 [DE 212-8] ¶ 8 (discussing

criteria for accrual of loss contingencies).   The Preferreds also provide no documentation

showing that Franklin understated its allowance for credit losses in its 2006 10K.  Unlike the

quarterly reports for 2007, the August 6, 2008 8-K made no adjustments to the allowance for

credit losses for the period ending December 31, 2006.  *See also* Response at 36 [DE 211].  This

Court has no factual basis for inferring that Franklin's allowance for credit losses for the year

ending December 31, 2006 was insufficient, did not meet applicable FAS criteria, or, if insufficient, was of sufficient magnitude to be material. *See supra* paragraph i.a.1212 & n. 14.[22]

26.     As to the January 31, 2008 press release, the Preferreds do not address Nocella's contention that this statement was not false for the reasons set forth in his Motion. Motion ¶¶ 81-91 [DE 192].  Without explanation, the Preferreds characterize Nocella as having deliberately downplayed the significance of its 4Q 2007 Allowance.[23]  Nocella's comment did not focus on the prudence of the amount but on the prudence of taking the allowance even though it negatively impacted earnings.  January 31, 2008, Press Release [DE 190-22] at 1 ("While this increase obviously had a negative impact on our quarterly and yearly earnings, it was necessary and prudent given the turmoil in the housing markets nationwide, . . .").  Likewise "this action" that "better positions us to weather the current challenging economic environment" concerned the taking of the allowance despite it negative impact on earnings and not the amount.  As with the subprime (asset quality) allegations, the Preferreds' self-serving belief regarding what Nocella's statement means lacks plausibility and has not properly been supported by facts, supporting documentation or other information (or even a reasoned explanation).  *See supra* paragraphs 2-3.  Also, the Preferreds wholly fail to make the necessary particularized showing that any statements regarding the 4Q 2007 Allowance were false when made.  Motion ¶¶ 84-87 [DE 192].[24]

---

[22]     The Preferreds emphasize that Franklin had underreported non-performing loans in its 2006 10-K by $20.5 million.  However, the Delinquent Loan Accounting issue did not keep Franklin from recognizing the amount of these loans that were four or more payments delinquent and estimating its allowance for credit losses in light thereof. *See supra* paragraph 19 & n 19.

[23]     The Preferreds characterize this 4Q 2007 allowance for credit losses as an adjustment.  However, each of the November 26, 2007 press release, the November 26, 2007 Conference Call and the January 31, 2008 press release were prospective or current (4Q 2007), not retrospective.  Motion ¶ 83 [DE 192].

[24]     The Preferreds allege no facts and provide no corroborating documents or other information showing that the 4Q 2007 allowances were understated. *See also* Motion ¶¶ 85-86 [DE 192].  Instead, the Preferreds claim that any statements concerning the 4Q 2007 Allowance were misleading because no "thorough" review of Franklin's portfolios had been undertaken as of November 26, 2007.  That a Chief Credit Officer was not elected by Franklin's Board until December 19, 2007 does not infer that a review was not undertaken prior to such officer's election nor

b.    **No Strong Inference of Scienter**

27.    The Preferreds also wholly fail to make the particularized showing necessary to establish a strong inference of scienter.[25] The Preferreds' failure begins with their inability to show that any of the statements at issue were false and, in particular, that either the 2006 10K allowances or the 4Q 2007 Allowances were understated.[26] From there, the Preferreds wholly fail to plead facts or provide adequate documents or corroborating information sufficient, as

---

does it infer that any review would not be thorough. That certain assets had been "misclassified as performing assets" does not infer that Franklin did not recognize that the loans were impaired. *See supra* paragraph 19 & n 19. That adequate due diligence had not been performed prior to the acquisition of certain single family mortgages does not infer that Franklin was not aware of these second liens when the review was undertaken. FDIC Report at 13 (noting that "[t]he existence of second liens was unknown to both bank management and the FDIC prior to the October 2007 examination"). Likewise, the FDIC's position that Franklin had not considered environmental factors as of October of 2007 does not infer that those factors were not considered when the review was undertaken. *See* FDIC Report at 9. Indeed, it was precisely deteriorating economic conditions that prompted the historic increase.

[25]    The Preferreds split their discussion of scienter into two parts. Response at 38-41,44 [DE 211]. However, the vague, generalized showing the Preferreds attempt makes separate discussion unnecessary.

[26]    Ironically, the Preferreds argue that the "sheer magnitude of the insufficiency" constitutes "strong circumstantial evidence of scienter" having alleged no facts or corroborating documents or other information to support their belief that the allowances in question were understated when made. The Preferreds do cite the 2008 FDIC Exam (allegations stricken by this Court) to support their claim. Response at 39 [DE 211]. However, the figure cited concerns a provision for credit losses (not an allowance for credit losses) and concerns the period ending June 30, 2008 (2Q 2008), not the fourth quarter of 2007. One of the purposes of the PSLRA, and the strong inference of scienter standard in particular, was to put an end to the practice of pleading fraud by hindsight. *Tellabs, Inc.*, 551 U.S. at 326 (tracing the origins of the "strong inference" formulation to the desire to ward off allegations of "fraud by hindsight.") (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2nd Cir. 1994); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-95 (9th Cir. 2002) *See also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) (agreeing that fraud cannot be proved by hindsight in that subsequent developments are "are unpersuasive of scienter, as they do not show what any particular individual knew, or was severely reckless in not knowing, at the time" in question). Attempting to show that a defendant knew that earlier allowances were insufficient by virtue of later write-offs constitutes exactly the kind of fraud by hindsight the PSLRA was intended to defeat. *Shields*, 25 F.3d at 1129 (pre-PSLRA ) (finding $40 million charge off and subsequent increase in loan loss reserves insufficient to infer scienter as to prior statement regarding adequacy of reserves); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F.Supp.2d 951, 964 (S.D. Ohio 2009) ("That Defendants 'later decided to revise the amount of loan loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time' of its public statements.'") (quoting *In re CIT Group, Inc. Sec. Litig.*, 349 F.Supp.2d 685, 687, 690 (S.D. N.Y. 2004) (fact that company took $200 million loan loss charge three weeks after defendants declared $554.9 million reserve for credit losses "adequate" provided absolutely no reasonable basis for concluding that defendants did not think reserves were adequate); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 832-33 (S.D. Cal. 2006) (subsequent $135 million in write-offs "not corroborative of anything" as "reliance on those write-offs constitutes impermissible 'fraud by hindsight'."), *aff'd sub. nom.*, 256 Fed. Appx. 74 (9th Cir. 2007). As such, the magnitude of subsequent charge-offs or increases in reserves does not support a strong inference of scienter either. *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 125 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400, 402 (2nd Cir. 2009) ("[H]aving concluded that none of plaintiffs' allegations showed even a weak inference of scienter, there is no logical way that the District Court could then have determined that the combined effect of the allegations would form a strong inference of scienter.")

repeatedly demanded by the Fifth Circuit, to link Nocella to actual awareness that the allowance of loan loss reserves were inadequate at the time made.  *See supra* paragraph 16.[27]   That Franklin's Board may have been responsible for reviewing and approving Franklin's ALLL policies and that the FDIC "repeatedly expressed concerns" regarding Franklin's ALLL polices does not infer that Nocella knew or recklessly ignored red flags that Franklin's allowance for credit losses were inadequate at any given time. *See* Motion at 39 n.39 [DE 192].[28]

B.   **NO LOSS CAUSATION**

28.   The Preferreds do not articulate the correct standard.  Response at 9.  The Fifth Circuit was very clear.  To survive a motion to dismiss in regards to loss causation, a plaintiff must show a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by: (1) the leaking out of *relevant or related truth* about the fraud that; (2) caused a *significant part of the depreciation* of the stock and plaintiff's economic loss. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).  Here, the Preferreds have failed to offer enough facts to support these two requirements and raise no reasonable hope that they could offer such facts in the future.

---

[27]   Quite tellingly, the Preferreds make no attempt to show, as they must, that Nocella was aware of the inadequacy of Franklin's loan loss reserves at the time of the 2006 10K, the January 31, 2008, Press Release, or any other specific time period. The alleged critical importance of adequate loan loss reserves, knowledge based on industry experience, and professional designations all serve as nothing more than end runs around the well-settled principle in the Fifth Circuit that scienter may not be inferred from an executive's position with the company or GAAP errors. *Central Laborers' Pension Fund*, 497 F.3d at 552; *Shaw Group, Inc.*, 537 F.3d at 535; *Abrams*, 292 F.3d at 432.

[28]   On the contrary, the FDIC Report confirms that the FDIC had not considered Franklin's allowance for credit losses as inadequate at any time prior to Franklin's 2006 10K. FDIC Report at 23. Further, no facts or corroborating documents or other information have been plead to show that Nocella was aware at any time prior to January 31, 2008 that the FDIC had concluded as a result of its October 2007 Examination that Franklin's allowance for credit losses were deficient as of that examination. In particular, no facts have been plead to show when, if at all, Nocella received that examination or the information contained therein.  Assuming that he had, no facts or corroborating documents or other information have been plead to show that the Nocella believed that Franklin's allowance for credit losses remained inadequate after the November 26, 2007 increase. Thus no red flags regarding inadequacy were ignored.

17

29.     The Preferreds fail to allege the necessary relatedness or relevance between a disclosed truth and material omission or misrepresentation.   Instead of relating the alleged disclosures to the alleged misrepresentations of Nocella, all of the Preferreds' "corrective disclosures" relate to the August 6, 2008 Adjustment. *See* APC ¶¶ 35-37, 72-74, 76-81, 109-110. Even in their response, instead of alleging the necessary relatedness or relevance, the Preferreds have merely identified the steepest drop in Franklin Bank's stock prices (the drop on August 7, 2008) and, then, have generally alleged that all seventeen alleged misrepresentations caused this one drop.   This type of pleading is not permitted.   *See* Response at 21, 33, 46, 55 [DE 211]. Preferreds "cannot merely rely on the acute drop in price as proof that the fraud actually moved the market." *See Ryan v. Flowserve Corp.*, 245 F.R.D. 560, 568 (N.D. Tex. 2007).

30.     With regard to the Subprime (Asset Quality) Allegations, nowhere do the Preferreds point to any disclosures regarding higher-risk non-traditional loans, the more exotic products, etc. that would have occurred at any time before the point at which they contend their stock became worthless.   While the Preferreds assert that the August 6, 2008 Adjustment revealed that Franklin was "significantly exposed to subprime loans", the August 6, 2008 Adjustment does not refer to subprime loans or relate to issues specific to them.

31.     Similarly, with regard to the 2006 10K and 4Q 2007 Allowances, while the Preferreds point to the May 1, 2008 Press Release and the August 6, 2008 10K, neither of those documents contains relevant corrective disclosures regarding the allowance for credit losses in Franklin's 2006 10K or any corrective disclosure regarding Franklin 4Q 2007 allowances.   As such, Franklin alleges no corrective disclosures with respect to those allowances at any time before Franklin's stock became worthless.

## SECTION 11 CLAIMS

A.     **SECTION 11 CLAIMS SOUNDING IN NEGLIGENCE WARRANT DISMISSAL**

32.     The Preferreds simply restate the allegations in paragraphs 31-33, 35-36, 38-39 of their complaint (including the allegations in paragraph 39 stricken by this Court). All of these allegations were addressed by Nocella in his motion. Motion ¶¶ 4-26 [DE 192]. Notably, the Preferreds make no effort to respond to Nocella's arguments and authorities set forth therein. Accordingly, the Preferreds' claims must fail on that basis. Nocella also incorporates by reference the points raised in the Ranieri Reply [DE 228] regarding the Preferreds' Section 11 claims.

B.     **SECTION 11 CLAIMS SOUNDING IN FRAUD WARRANT DISMISSAL**

33.     Contrary to the Preferreds' assertion, Nocella specifically moved for dismissal on the grounds that the Preferreds claims sounded in fraud, generally, and that the Preferreds had failed to sufficiently allege scienter, and therefore were subject to dismissal under both Rule 9(b) and the standards set forth in the PSLRA. Motion ¶ 37 [DE 192]. As the Preferreds claims fails even if sounding in negligence, they certainly fail under the more rigorous standards of Rule 9(b) and the PSLRA.

C.     **STATUTE OF LIMITATIONS**

34.     Nocella incorporates by reference the arguments in the Directors' Reply [DE 229] concerning the statute of limitations.

D.     **NEGATIVE CAUSATION PARADOX**

35.     The Preferreds' own pleadings (and arguments) negate causation. The Preferreds do not dispute that dismissal may be warranted where, as here, a negative causation defense is apparent on the face of a complaint. Motion ¶ 31 [DE 192]. The Preferreds do not dispute (or at least offer no authorities to support their implied contention) that a price decline before

disclosure may not be charged to defendants.[29]  Motion ¶ 32 [DE 192].  The Preferreds do not dispute that they have alleged that their stock lost all of its value by November 2008.  Motion ¶ 33 [DE 192].  Instead, they claim that their stock lost some value after the August 6, 2008 8K.

36.    However, the August 6, 2008 8K did not constitute a corrective disclosure as to the falsity of any statement made as of the date the Registration Statement became effective (May 2006).  No information contained in that document demonstrates that the five accounting issues disclosed therein caused Franklin's financial statements to be *materially* misstated as of the date the Registration Statement became effective (May 5, 2006).  That Franklin disclosed that it had "undertaken a review of its financial information for the first two quarters of 2007 and for the years 2006, 2005, and 2004 . . . ." can hardly constitute a disclosure that Franklin's financial statements were materially misstated as of May 5, 2006 given that Franklin made no adjustments to its financial statements for any period prior to its 2006 10K.  Indeed, the declining material impact of these accounting issues over time makes any such speculation highly implausible.[30]

37.    However, even if this did constitute a corrective disclosure (at least as it pertained to the five specific accounting issues disclosed in the August 6, 2008 Adjustment), dismissal would still be appropriate as to the remaining Section 11 claims as all of the remaining information that the Preferreds offer to support their allegations, including the FDIC Report, the Wolfe Letter and the 2008 FDIC Exam, were all, by the Preferreds' own admission, not made public until 2009.  APC ¶¶ 38, 82, 84.

---

[29]    While characterizing the cases on which Nocella relies as "fundamentally flawed", the Preferreds offer no logic to refute the basic principle that loss causation cannot be based on corrective disclosures that occur after stock becomes worthless.

[30]    Not surprisingly, any claims based on accounting errors related to these five accounting issues would still be subject to dismissal as the Preferreds have not plead facts sufficient to raise a plausible inference of negligence by Nocella, falsity or materiality.  *See* Motion ¶¶ 4-14, 18-19 [DE 192].

## REQUEST FOR RELIEF

Anthony Nocella requests that the Court grant this motion to dismiss, that the Court enter an order dismissing with prejudice all claims against Nocella, and for such other and further relief, at law or in equity, to which Nocella may be justly entitled.

Respectfully submitted,

By:_____
    James G. Munisteri
    State Bar No. 14667380

GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

OF COUNSEL:

Thomas Hagemann
State Bar No. 08686800
Orin H. Lewis
State Bar No. 00791110
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002
Telephone:    (713) 276-5500
Facsimile:    (713) 276-5555

## CERTIFICATE OF SERVICE

I, James G. Munisteri, do certify that on the 4th day of June, 2010, a copy of the Anthony Nocella's Reply in Support of Motion to Dismiss Preferred Stockholders' Complaint was served on the following parties via the Court's ECF system as indicated below or by U.S. Mail:

| | |
|---|---|
| Roger G. Greenberg | rgreenberg@schwartz-junell.com |
| Ralph M. Stone | rstone@lawssb.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| J. Allen Carney | dwilliams@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| William B. Monahan | monahanw@sullcrom.com |
| M. Byron Wilder | bwilder@gibsondunn.com |
| Jonathan C. Dickey | jdickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Stephen E. McConnico | smcconnico@scottdoug.com |
| Cynthia Saiter Connolly | cconnolly@scottdoug.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | James.farrell@lw.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |

David A. Rosenfeld
Mario Alba, Jr.
Couglin Stoia Geller Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY  11747

David C. Walton
Couglin Stoia Geller Rudman & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

Andrew J. DeFilippis
Brian T. Frawley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004


_____
James G. Munisteri

22