IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities Litigation | § §  §  § | Civil Action No. 4:08-CV-1810  CLASS ACTION |

**ANTHONY NOCELLA'S REPLY IN SUPPORT OF MOTION TO DISMISS COMMON STOCKHOLDERS' COMPLAINT**

James G. Munisteri
State Bar No. 14667380
Orin H. Lewis
State Bar No. 00791110

Gardere Wynne Sewell LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

# TABLE OF CONTENTS

Legal Argument and Authorities ........................................................................................1

    A.    General Pleading Deficiencies.....................................................................1

        i.    The Commons' Complaint Continues to Puzzle.........................1

        ii.    The Commons Employ Improper Group Pleading ......................1

        iii.    The Commons' Motive Allegations Fail ....................................3

    B.    Nocella Made No Misleading Statements With Scienter .........................3

        i.    The Subprime ("Pristine Portfolio") Allegations.......................3

        ii.    August 6, 2008 Adjustment .......................................................8

        iii.    The Commons Essentially Concede that the Countrywide, 4Q 2007 Allowance, and Loan Concentration Allegations Lack Merit ...................13

    C.    No Loss Causation ....................................................................................14

    D.    The SCAC Should Be Dismissed With Prejudice. ..................................15

REQUEST FOR RELIEF ................................................................................................16

Certificate of Service ......................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ...................................................................5

*Abrams v. Baker Hughes, Inc.*
   292 F.3d 424 (5th Cir. 2002) .................................................3, 7, 9, 10, 11

*Ashcroft v. Iqbal*,
   129 S.Ct. 1937 (U.S. 2009).......................................................................4

*Barrie v. Intervoice-Brite, Inc.*,
   409 F.3d 653 (5th Cir. 2005) ................................................................2, 3

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................4, 6

*Central Laborers' Pension Fund v. Integrated Electrical Services*,
   497 F.3d 546 (5th Cir. 2007) ..........................................................7, 9, 11

*Coates v. Heartland Wireless Communications, Inc.*,
   26 F.Supp.2d 910 (N.D. Tex. 1998) ........................................................10

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2nd Cir. 2009)....................................................................6

*Fin. Acquisition Partners, LP v. Blackwell*,
   440 F.3d 278 (5th Cir. 2006) ....................................................................2

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ..............................................................7, 10

*Garber v. Legg Mason, Inc.*,
   2009 WL 3109914 (2nd Cir. 2009)............................................................6

*Goldstein v. MCI WorldCom*,
   340 F.3d 238 (5th Cir. 2003) .................................................3, 7, 9, 10, 15

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002) ....................................................................4

*In re Affiliated Computer Services Derivative Litig.*,
   540 F.Supp.2d 695 (N.D. Tex. 2007) ......................................................10

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3rd Cir.1996) .......................................................................6

**Page(s)**

CASES

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,*
   537 F.3d 527 (5th Cir. 2008) ..................................................................3, 7, 9, 10, 11, 12, 13

*Lormand v. US Unwired, Inc.,*
   565 F.3d 228 (5th Cir. 2009) ..................................................................................................15

*R2 Investments LDC v. Phillips,*
   401 F.3d 638 (5th Cir. 2005) ....................................................................................................6

*Rosenzweig v. Azurix Corp.*
   332 F.3d 854 (5th Cir. 2003) ......................................................................................................3

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,*
   365 F.3d 353 (5th Cir. 2004) ..........................................................................................1, 2, 15

*Tellabs, Inc. v. Makor Issues & Rights,* Ltd.,
   551 U.S. 308, 324 (2007)............................................................................................................7

*Tuchman v. DSC Communications Corp.,*
   14 F.3d 1061 (5th Cir. 1994) ....................................................................................................3

*Williams v. WMX Technologies, Inc.,*
   112 F.3d 175 (5th Cir. 1997), *cert. denied,* 522 U.S. 966 (1997)............................................1


STATUTES

15 U.S.C. § 78u-4(b)(1) ...............................................................................................................4


OTHER AUTHORITIES

FED. R. CIV. P. 12(b)(6) ...............................................................................................................1

iv

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities | § | |
| Litigation | § | Civil Action No. 4:08-CV-1810 |
| | § | |
| | § | CLASS ACTION |

**ANTHONY NOCELLA'S REPLY IN SUPPORT OF MOTION TO DISMISS
COMMON STOCKHOLDERS' COMPLAINT**

Anthony J. Nocella ("Nocella") files this reply in support of his motion to dismiss Franklin

Investor Group's Second Consolidated Amended Complaint ("SCAC") [DE 191] ("Motion").[1]

**LEGAL ARGUMENT AND AUTHORITIES**

A.   **GENERAL PLEADING DEFICIENCIES**

   i.    ***The Commons' Complaint Continues to Puzzle***

   1.    As if to admit to improper pleading, the Commons use sixteen pages of their

response just to restate the facts.  Even this de facto repleading fails to cure the absence of detail

their lengthy complaint was designed to conceal.  *Williams v. WMX Technologies, Inc.*, 112 F.3d

175, 178 (5th Cir. 1997), *cert. denied*, 522 U.S. 966 (1997).  Further, the Commons exacerbate their

puzzle pleading by offering an equally confusing response that fails to connect-the-dots with regard

to the falsity, materiality, scienter and loss causation of any alleged misleading statement.

   ii.   ***The Commons Employ Improper Group Pleading***

   2.    The Commons acknowledge that the Fifth Circuit rejected the "group pleading"

doctrine in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 363-365 (5th Cir.

2004).   Nevertheless, the Response dismisses the Commons' failure to attribute statements to

particular defendants, arguing that the complaint uses "Defendants" for the sake of grammatical

---

[1]    Nocella also incorporates by reference the legal arguments and authorities and, to the extent applicable to
Nocella, the factual arguments set forth in the replies of Defendant Lewis Ranieri [DE 228], Russell McCann ("McCann
Reply") [DE 226], and Defendant Directors Chimerine, Golush, Howard, Master, Perro, Rhodes, and Selman [DE 229]
as well as Nocella's own Reply in Support of his Motion to Dismiss the Preferred Shareholders' Complaint ("Reply to
Preferred").

simplicity.[2]   The abolition of the group pleading doctrine would be pointless if plaintiffs could circumvent it merely by claiming grammatical simplicity.

3.     The Commons also argue that both *Southland Sec. Corp.* and *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005) permit plaintiffs to use collective terms to attribute statements to multiple defendants.   The Commons' reliance on both cases is misplaced.   While *Southland Sec. Corp.* does permit plaintiffs to charge **unattributed** statements to one or more corporate officers, "specific factual allegations [must] link the individual to the statement at issue" such as "a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Southland Sec. Corp.*, 365 F.3d at 365.[3]   Nothing in *Southland Sec. Corp.* permits plaintiffs to attribute collectively or to attribute to one defendant the statement patently attributed to another.   To the extent that *Barrie* can be read to permit either, that holding conflicts with *Southland Sec. Corp.* and does not constitute binding precedent. *Fin. Acquisition Partners, LP v. Blackwell*, 440 F.3d 278, 287-88 (5th Cir. 2006) (rejecting collective attribution of statements at meeting to all defendants who attended).

4.     Lastly, *Southland Sec. Corp.* leaves no doubt that the abolition of group pleading means that both statements and scienter must plead with particularity as to each defendant. *Southland Sec. Corp.*, 365 F.3d at 363-65.   The Commons cannot look "to the collective knowledge of all the corporation's officers," but must address the state of mind of each individual corporate official. *Id.* at 366.   The Commons' response does not even begin to address the Complaint's failure to specifically link scienter to individual defendants.

---

[2]     Notably, the Complaint never defines "Defendants," "Franklin Bank Management," "top executives" or the myriad of other generalizations used in the Complaint. *See, e.g.,* SCAC ¶¶ 97, 102, 104-05, 109-10, 113, 115-116, 127, 132, 147, 151, 170-71, 174-75, & 179 [DE 167].   The Commons do not use these terms to avoid garrulousness but rather to avoid having to attribute both statements and scienter to specific defendants, exactly what the Fifth Circuit's decision in *Southland Sec. Corp.* was designed to prohibit.

[3]     Nocella did not object to the attribution of any statement he signed. *See* Motion ¶ 22 [DE 191].

2

iii.   *The Commons' Motive Allegations Fail*

5.       The Commons' alleged motive, "to inflate Franklin's stock to secure a sale", represents exactly the kind of common-place motive that the Fifth Circuit has squarely held can not constitute a motive to commit securities fraud. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068-69 (5th Cir. 1994). Incredibly, the Commons compare Nocella's alleged motive to sell Franklin to some unknown, as of yet to be identified buyer at some unknown, speculative point in the future with Worldcom's motive to close a specific, ongoing and "crucial" $129 billion merger with Sprint. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 241, 249-51 (5th Cir. 2003).[4] By citing to the non-analogous *MCI WorldCom* case, the Commons only reinforce that no specific motive exists in this case.[5] The Commons' allegations amount to nothing more than the common-place desire to profit from stock sales insufficient to establish motive absent proof that the executive actually sold stock. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002).

6.       That Nocella did not sell but actually purchased shares during the class period (a fact the Commons ignore) actually ***negates*** any inference of improper motive. Motion ¶ 23.

B.   **NOCELLA MADE NO MISLEADING STATEMENTS WITH SCIENTER**

i.   *The Subprime ("Pristine Portfolio") Allegations*

a.       **No Material Misrepresentations**

7.       In their Response, the Commons identify two alleged misstatements designed (according to Commons) to persuade investors that Franklin maintained a "pristine portfolio", each

---

[4]       *MCI WorldCom* also may be distinguished as the executive in that case had $61 million in loans secured by stock which would become immediately due and payable if the stock value declined due to the failed merger as such decline would constitute an event of default for purposes of the loans. *MCI WorldCom*, 340 F.3d. at 250.

[5]       The Commons' other authorities confirm, by contrast, that no plausible motive has been alleged. *Barrie*, 397 F.3d at 261, 264 (considering performance-based bonuses in finding scienter); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 543-44 (5th Cir. 2008) (concluding that plaintiff had failed to establish motive where at least one director sold large blocks of stock near the market peak, executives received performance-based bonuses, and defendants were involved in existing acquisitions with named companies).

of which Nocella addressed at length in his Motion (Motion ¶¶ 45-57 [DE 191]).[6]  Each of these

alleged misstatements fails for two reasons.  First, the alleged falsity rests not on what Nocella said

but on what the Commons believe the statements imply.  Second, the Commons also fail to support

their belief in the falsity of these allegations with appropriate documentation or other corroborating

information.

        8.      The Commons' argument begins with the faulty premise that notwithstanding the

*PSLRA, Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct.

1937, 1949 (U.S. 2009), this Court must accept as true **what the Commons say Nocella meant**.

While the 12(b)(6) standard of review has long required courts to accept all well-pleaded facts as

true, that standard has never required courts to accept as true a plaintiff's unwarranted inferences or

deductions from those facts.  *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313

F.3d 305, 313, 322-23 (5th Cir. 2002).

        9.      *Twombly* and *Ashcroft* have set the bar even higher requiring the plaintiff to plead

"enough facts to state a claim to relief that is plausible on its face," that is, in context, enough

"factual content [to] allow[] the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Twombly*, 550 U.S. at 547; *Ashcroft*, 129 S.Ct. at 1940 ("Determining

whether a complaint states a plausible claim is context-specific task requiring the court to draw on

its judicial experience and common sense.").  On top of this minimum standard, the PSLRA §

21D(b)(1) requires that the Commons' complaint "specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and . . . to state with particularity

all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)).  To meet this standard, in turn,

---

[6]    As with the Commons' complaint, the Commons expend considerable effort hiding the ball making it difficult to know exactly what the Commons contend.  For instance, the Commons mention Nocella's statement regarding the "higher-risk non-traditional mortgage market" in their restatement of their complaint but then fail to mention it in their discussion on what material misstatements Defendants purportedly made.  The Commons fail to mention other statements highlighted in their complaint entirely.  Motion ¶ 50.  By failing to address these statements in their Response, the Commons have denied Nocella the opportunity to reply.  Accordingly, the Commons have waived relief with respect to these statements.  Alternatively, Nocella incorporates by reference his discussion of these statements in his Reply to Preferred.  Reply to Preferred ¶¶ 5-9.

requires "supporting documentary evidence and/or a sufficient general description of the personal

sources of the plaintiff's beliefs." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 351

(5th Cir. 2002).

10.     The first statement pulls words out of context to imply a blanket statement about

subprime loans that simply does not bear scrutiny.  Nocella never used the phrase "subprime *loans*".

That is purely the Commons' suggested inference.  The Commons concede as they must that

Miller's question concerned whether Franklin was seeing "subprime *issues*" with its prime loans.

Nevertheless, the Commons argue, without any analysis, supporting facts or corroborating

information whatsoever, that Nocella chose to make a blanket non-responsive answer.  In fact,

Nocella's answer was directly on point.[7]  It is only the Commons' unsupported belief (subprime

*loans*), not Nocella's answer (subprime issues with prime side loans), that does not fit.  *See also*

Reply to Preferreds ¶ 10 n.11.[8]

11.     Incredibly, the Commons also continue to point to McCann and Nocella's colloquy

with Brian Klock in Franklin's October 30, 2007 Conference Call as their other subprime statement

even though Nocella never used the word "subprime" and Nocella clarified that he didn't mean to

refer to subprime.  Motion ¶¶ 55-57 [DE 191].  Even taking the Commons' version of the October

30, 2007 Conference Call transcript as true ("I refuse to put it inside"), no question exists that

Nocella did not to refer to subprime loans.  Even the Commons' favored version confirms that

Nocella clarified that he did not refer to subprime loans.[9]  Once again, the Commons offer no

---

[7]     Nocella's response made perfect sense.  Miller's concern arose from the trouble Countrywide was seeing in their "HELOC portfolio in the prime side."  Nocella began by pointing out he didn't even think Franklin had a home equity line of credit, that HELOCs were not Franklin's business.  He went on to say that prime loan delinquencies were on the rise but that Franklin's delinquencies were substantially lower than Countrywide's.  Nocella's conclusion that Franklin didn't have any subprime issues with prime side loans was both responsive and made perfect sense in that context.

[8]     The Commons also mention Nocella's statement regarding two characteristics that Franklin "stayed away from", "pay option ARMs" which "Neg-AM" and "simultaneous seconds" with "100% CLTVs", but then don't discuss this statement in their analysis.  This statement has been fully addressed in Nocella's motion to dismiss the Commons' complaint.  Motion ¶ 54 [DE 191].

[9]     The Commons favored Bloomberg transcript records the exchange as follows:

analysis, supporting facts or corroborating information to support their implausible belief to the contrary. Likewise, since they fail to grasp that Nocella was not referring to subprime loans, the Commons also fail to provide this Court with any facts, corroborating data, or even an analytical framework, for assessing falsity.

12.   As to materiality, the Commons miss the point. None of the analysts at issue were seeking the information that the Commons infer Nocella implied in response. Further, nothing the Commons have plead suggests that types of loans referenced (even if some had been originated by Franklin) were of sufficient magnitude to be material.[10]

### b.   No Stronger Inference of Scienter

13.   Since the Commons have failed to show motive, and, in fact, Nocella's stock purchases negate motive, the Commons must meet the more stringent conscious behavior standard. *R2 Investments LDC v. Phillips*, 401 F.3d 638, 644 (5th Cir. 2005). To satisfy the PSLRA, the

---

Brian Klock: Okay. Okay. And I know the question has been asked a few times, too, about the reserve level and I guess when you think about, I think Russell, you said 20 basis points is what—is your factor for the one to four family's portfolio. I mean, I guess when you look at your portfolio doesn't have as long a history as say Washington Mutual does because of your short history as a public company. But their third quarter, their prime mortgage loan portfolio one to four family had charge-offs of 21 basis points.

Russell McCann:  Yeah.  That was a bummer for them but I don't think you can compare our portfolio to Washington Mutual's.  If you really look at what Washington Mutual's portfolio did, they did pay options ARMs and a large amount.  They did a large amount of subprime.  You know we don't have any of those in a portfolio.

Anthony Nocella:  I refuse to put it inside.  There's almost hardly any loans in their portfolio that met our screen.

Brian Klock: This is in their prime portfolio though.

Anthony Nocella: I said they are [sic] prime portfolio.

Brian Klock:  Okay.  Well Russell said subprime and I want to make sure it was prime that we are talking about.

Russell McCann:  I meant prime.

Brian Klock: Okay

Russell:  McCann: They did as a matter of course alone [sic] called a pay optioned [sic] ARM and that, basically, is the big reason for a lot of their problems.

3Q 2007 Bloomberg Transcript [DE 190-19] at 15.

[10]     The burden rests with the Commons under *Twombly* to plead sufficient facts for this Court to reasonably infer materiality.  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204-05 (2nd Cir. 2009); *Garber v. Legg Mason, Inc.*, 2009 WL 3109914, *3 (2nd Cir. 2009).  Even if information may be qualitatively relevant, it may still be quantitatively immaterial.  *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3rd Cir.1996) (upholding 12(b)(6) dismissal).

strong inference of scienter must be cogent and compelling, "at least as compelling as any opposing inference one could draw from the facts." *Tellabs, Inc. v. Makor Issues & Rights*, Ltd., 551 U.S. 308, 324 (2007). Any omissions or ambiguities will count against inferring scienter. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (quoting *Tellabs, Inc.*, 551 U.S. at 326.).

14.     Here, nothing the Commons have alleged shows that Nocella consciously misled investors. The Commons' showing consists entirely of the kind of speculative/imputed knowledge rejected by the Fifth Circuit as insufficient to establish scienter.[11] Noticeably absent are any facts, documents or corroborating information sufficient to connect Nocella to actual awareness at the time the statements were made of facts contrary to what Nocella said or even what the Commons believe Nocella meant. *Central Laborers' Pension*, 497 F.3d at 555; *Shaw Group, Inc.*, 537 F.3d at 537; *Abrams*, 292 F.3d at 432-33. *See also MCI WorldCom*, 340 F.3d at 251-52. Indeed, the Commons' contentions are so generalized that it is difficult to even sort out what contentions apply to which statements.

15.     To begin, the Commons' skewed interpretation of what Nocella's statements implied at worst creates an ambiguity regarding falsity that cuts against any inference that Nocella consciously misled investors. *Tellabs, Inc.*, 551 U.S. at 326. Beginning in that hole, the Commons offer no particularized allegations sufficient to dig themselves out.

---

[11]     *Indiana Electric Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532-545 (5th Cir. 2008) (allegations collectively insufficient to raise strong inference of scienter, including failure to follow GAAP, magnitude and extent of alleged GAAP violations, executive positions, weak internal controls, confidential witness statements, various allegations of knowledge unsupported by documentation or personal sources of belief, receipt of reports and attendance at meetings where subject matter was discussed, alleged motives based on stock sales, performance bonuses, and the desire to acquire other companies and to avoid credit downgrades, and Sarbanes-Oxley certifications); *Central Laborers' Pension Fund v. Integrated Electrical Services*, 497 F.3d 546, 551-55 (5th Cir. 2007) (GAAP violations, restatement, confidential witness statements, stock sales, and Sarbanes-Oxley certifications); *Abrams*, 292 F.3d at 431-35 (senior level executives, receipt of unidentified daily, weekly and monthly financial reports, general knowledge of internal control problems, accounting irregularities necessitated restatement of several previously issued reports, GAAP violations, resignation of key accounting officials, motivation to raise capital, enhance incentive compensation and sell stock at inflated prices).

16.     Certainly, the FDIC Report contains no information showing that Nocella was aware of contrary facts.[12]  Even if Nocella's statements did concern subprime loans (which they did not), the FDIC Report contains no information showing that Nocella was aware that Franklin had originated subprime loans.  Further, the FDIC Report admits that its own examiners concluded that Franklin did not have a subprime lending program as defined by interagency guidance.  FDIC Report [DE 167-2] at 5 n.3.  Instead, the FDIC's conclusions regarding "subprime" loans rested on a retrospective analysis of whether any loans had subprime characteristics when examined, not when originated.[13]  No allegations plausibly support the Commons' contention that Franklin had extended Countrywide a line of credit, much less that it was secured by subprime loans, much less that Nocella was aware of such facts.  Likewise, Wolfe's letter contains no allegations concerning Nocella's alleged awareness of subprime loans.  Wolfe Letter at 2 [DE 167-4].

ii.     ***August 6, 2008 Adjustment***

17.     The Commons also fail to adequately plead a strong inference of scienter regarding the August 6, 2008 Adjustment as well.[14]  Other than the alleged magnitude and duration of the fraud, the Commons offer this Court nothing more than GAAP violations, Sarbanes-Oxley certifications, vague confidential witness statements, and executive positions, all of which were addressed at length in Nocella's motion and all which have been found by the Fifth Circuit to be individually and collectively insufficient to support a strong inference of scienter.  Motion ¶¶ 28-44.  *See also supra* note 11.  Notably, as here, the common denominator in each of these Fifth Circuit

---

[12]     With regard to the statements the Commons do not discuss, the FDIC Report does not refer to "more exotic products" and does not link Nocella to knowledge of those products.  The FDIC Reports' references to non-traditional mortgages do not infer that Franklin originated or owned "***higher-risk*** non-traditional mortgages" or "***some of the more exotic*** products," much less that Nocella was aware that Franklin did.  *See also* Motion ¶ 54.

[13]     Strictly speaking, subprime refers only to borrowers displaying specific characteristics at the time of origination or purchase.  Expanded Guidance for Subprime Lending Programs, FDIC Press Release, PR-9-2001, at 2 (January 31, 2001) [IDJC 28].  Changes in the borrower's financial condition, however, could cause even a prime loan to have "subprime characteristics" at the time of examination such as a substantial decline in the value of the mortgaged property, an increase in the borrowers' other debt obligations, or the fact that the borrower had allowed the loan, itself, to become delinquent.

[14]     As noted above, since the Commons have failed to adequately plead any motive, and, in fact, Nocella's stock purchases negate motive, the Commons must meet the more stringent conscious behavior standard.

8

cases was the plaintiffs' failure to provide adequate documents or corroborating information sufficient to connect the individual defendants to actual awareness of accounting issues or other problems in dispute. *Central Laborers' Pension Fund*, 497 F.3d at 555; *Shaw Group, Inc.*, 537 F.3d at 537; *Abrams*, 292 F.3d at 432-33. *See also MCI WorldCom*, 340 F.3d at 251-52. Here, the Commons wholly fail to offer facts that would support such a link.

18.     None of the Commons' analysis with respect to GAAP violations, red flags, lack of internal controls or Sarbanes-Oxley Certifications even attempts to link, as the Commons must, those allegations with the five accounting issues in dispute or any awareness by Nocella of those issues at the time of the financial statements in question.[15]  Motion ¶¶ 32-37 [DE 191].

19.     The confidential witness statements do not either.[16]  Motion ¶¶ 38-44.  As to CW1, the Commons do not address the points raised in Nocella's Motion as to why CW1's allegations lack weight.  Motion ¶¶ 39-40.  For instance, the Commons do not explain why a mortgage warehouse lender would have any personal knowledge of (i) policies regarding single family mortgages, (ii) any concerns about those policies, or (iii) Nocella's awareness, if any, of those concerns.  Nor do the Commons link CW1's generalized, unsupported allegations regarding internal controls to any of the specific accounting issues in dispute, much less facts that would show that Nocella was aware of them during the relevant time period.

20.     As with CW1,[17] the Commons do not address the points raised in Nocella's Motion as to why CW2's allegations lack weight.[18]  (Motion ¶¶ 39, 63 & nn. 13, 25, 26).  The Commons

---

[15]     The closest the Commons come to making the required showing (which is not even specific as to Nocella) relates to Wolfe's refusal to sign a Sarbanes-Oxley attestation.  Response at 42.  However, the Wolfe letter shows that this event concerned Franklin's financial statements for the period ending December 31, 2007 and post-dated the financial statements that were the subject of the August 6, 2008 Adjustment.

[16]     Nocella specifically incorporates by reference the points made regarding the deficiencies in the confidential witness statements in McCann's Reply [DE 226].

[17]     In fact, the Commons do not respond to any of Nocella's points regarding any of the confidential witness statements.

[18]     For instance, in their restatement of facts, the Commons repeat CW2's conclusory accusation that "if there's a mathematical way to push an expense to another period, Nocella would do it."  This rank speculation bears no weight in scienter analysis.  Likewise, CW2's unsubstantiated belief that three people were responsible for "write downs and

state that CW2 reported directly to Nocella but neglect to mention that CW2 did not begin reporting to Nocella until the Spring of 2008, after the relevant time period in question, and then only for an unspecified portion of his tenure.  SCAC ¶ 117 [DE 167].  Further, the Commons point to no facts stated by CW2 specifically related to the five accounting issues in dispute.[19]  Indeed, CW2's statements contain no allegations supporting the inference that Nocella had any awareness of these issues.  CW2 merely alleges that Nocella, among others, was a member of certain committees and received reports without any specific allegation linking Nocella to awareness of the accounting issues in dispute.[20]

21.     The Commons also mention CW3, CW4 and CW5 but again do not link these confidential witness statements to awareness by Nocella of any of the accounting issues in dispute or address any of the points raised by Nocella concerning the deficiencies inherent in these allegations.  Motion ¶¶ 39, 41-43, 70-73 & n.15.

22.     The Commons describe some of the allegations in the Wolfe letter, but do not explain, much less establish, how those allegations related to the five accounting issues or how

---

reserves to specific loans" constitutes nothing more than conjecture and is so vague type of loan, time frame or any other context so as to be useless for purposes of determining scienter with respect to any issue at any given time.

[19]     The Commons refer to Management Loan Committee meetings as the basis for Nocella's knowledge of "all matters involving loan modifications."  Response at 37.  However, the Commons plead no facts and provide no documentation or other information that would support the inference that Nocella was aware of how Franklin accounted for any modified loans, much less the inference that Nocella was aware that Franklin's Loan Modification Accounting was improper.  Response at 37.  The Board Credit Committee meetings allegedly involved the review and approval lines of credit over $10 million and thus would not have related to single family mortgages or any other accounting issue made the subject of the August 6, 2008 Adjustment.

[20]     The Commons' assertion that Nocella had "access to internal information" from regular internal reports does not infer scienter without a showing that these reports contained information that actually conflicted with statements made by Nocella.  *See Shaw Group, Inc.*, 537 F.3d at 537 (holding that reports did not infer scienter when information in the reports was not "at odds" with defendant's public statements); *Abrams*, 292 F.3d at 433 (holding that reports did not infer scienter when plaintiffs had "not pointed to any particular reports . . . contrary to the restatements").  Similarly, the Commons improperly argue that Nocella "must have known" based on his position on committees.  *TXU Corp.*, 565 F.3d at 211-12 (executive position and likely attendance at board meetings); *MCI WorldCom*, 340 F.3d at 251 (allegations that executives must have known about the problem because of its magnitude).  *See also In re Affiliated Computer Services Derivative Litig.*, 540 F.Supp.2d 695, 701 (N.D. Tex. 2007) (service on compensation committee that approved back-dated stock options insufficient to plead scienter as such allegations merely rested on defendants' position in the company) (citing *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, (N.D. Tex. 1998) ("Plaintiffs must properly plead wrongdoing and scienter as to each individual defendant and cannot merely rely on the individuals' positions or committee memberships within the Heartland organization.").

Wolfe's letter establishes Nocella's awareness of contrary facts prior to the date (February 1, 2008) of Wolfe's letter.[21]

23.     Finally, the Commons offer the magnitude, duration and simplicity of the accounting issues as independent bases for scienter.  However, these alleged bases for inferring scienter all serve as nothing more than end runs around the well-settled principle in the Fifth Circuit that scienter may not be inferred from an executive's position with the company or GAAP errors. *Central Laborers' Pension Fund*, 497 F.3d at 552; *Shaw Group, Inc.*, 537 F.3d at 535; *Abrams*, 292 F.3d at 432.  Notably, none of these bases for imputing knowledge offers the particularized showing necessary to link Nocella to awareness of the five accounting issues in dispute.  Indeed, by the Commons' description, one cannot even tell what "accounting irregularities" the Commons had in mind.  Not surprisingly, an examination of each of these rationales in the context of the August 6, 2008 Adjustment demonstrates the danger of relying upon such generalized showings as a substitute for the particularized showing required by the PSLRA and the Fifth Circuit.

24.     Indeed, the August 6, 2008 Adjustment actually negates any inference of conscious behavior based on magnitude and duration.  The August 6, 2008 Adjustment shows that the two largest issues (Delinquent Loan Accounting and REO Accounting) pre-dated any period when their impact was material and grew, not as a result of conscious behavior, but as a function of increased delinquencies.  While the Loan Modification Accounting issue first arose in the quarter ending June 30, 2007, its impact during that quarter on income ($1,000) and thus earnings was negligible. August 6, 2008 8K at 4.  *See also* Reply to Preferreds 18-19.

---

[21]     The Commons state that Wolfe refused to execute a Sarbanes-Oxley attestation because he knew that Franklin's accounting of REOs did not comply with GAAP.  However, none of the concerns Wolfe voiced at that time related to any of the five accounting issues, generally, or the REO Accounting issue, in particular.  Wolfe's concerns related to the period ending December 31, 2007 and involved: (i) a variance between REO 'net realizable value" versus book value; (ii) certain "in substance" REOs; and (iii) uncollectible second liens.  Wolfe Letter at 3-4 [DE 167-4].  By his own admission, Franklin's difficulties reconciling and thus identifying REOs for loans serviced by others was an issue Wolfe did not become aware of until sometime after his meeting with Cooper.  Wolfe Letter at 4.  As such, even Wolfe did not know of the REO Accounting Issue until sometime after January 28, 2008.  Nothing in Wolfe's letter suggest that Nocella was aware of the issue before Wolfe was.

25.     Similarly, the Commons describe the accounting issues in dispute as simple and basic but do not even attempt to explain what the errors were or why they were simple and obvious. Notably, the difference in non-performing loans was due entirely to the Delinquent Loan Accounting issue and the difference in non-performing assets entirely to the Delinquent Loan Accounting issue and the REO Accounting issue. *Compare* August 6, 2008 8K at 3-4 *with* August 6, 2008 8K at 9. However, far from concealing the problems with these assets, Franklin specifically disclosed its Delinquent Loan Accounting treatment and the dollar amount of the loans affected in its discussion of non-performing assets in each of the periods affected.[22] As the Delinquent Loan Accounting issue and the REO Accounting issue both involved loans serviced by others, the amounts disclosed in each of these filings also included the dollar amounts impacting the REO Accounting issue.

26.     In addition, the REO Accounting issue involved, among other things, difficulty Franklin had in reconciling information that it received from its servicers on a monthly basis. August 6, 2008 8K at 4. Due to the nature of the issue, any delays associated with these difficulties only affected one month of each quarter and only resulted in an increase to the extent that the amount of the month omitted as a result of the delay exceeded the amount of the month included from the prior quarter as a result of the delay. As here, in a period of increasing foreclosures, this one-month delay may have caused REO to be understated. In a period of decreasing foreclosures, this one-month delay may have caused REO to be overstated. *See Shaw Group, Inc.*, 537 F.3d at

---

[22]     2006 10 K [DE 190-7] at 94 ("At December 31, 2006 and 2005, the company had impaired loans totaling approximately $6.7 million and $21.4 million, respectively. *Additionally*, at December 31, 2006 and 2005, the company had *$22.5 million and $9.0 million, respectively, of loans that were four payments or more delinquent and still accruing interest* which are comprised of single family loans serviced by others, which are under an agreement with the servicer whereby we receive scheduled payments until foreclosure."); 1Q 2007 10Q [DE 212-2] at 13 ("At March 31, 2007 and December 31, 2006, the company had impaired loans totaling approximately $6.8 million and $6.7 million, respectively. *Additionally*, at March 31, 2007, the company had *$40.1 million of loans that were four payments or more delinquent and still accruing interest*, which are primarily composed of single family loans serviced by others under an agreement with the servicer whereby we receive scheduled payments until foreclosure."); 2Q 2007 10Q [DE 212-3] at 13 (same); 3Q 2007 10Q [DE 190-19] at 25 (same).

537 (noting that weak controls do not demonstrate an intent to defraud as weak control could just as easily bias financial figures up as well as down).

27.     Finally, Franklin thoughtfully analyzed the Investment Accounting Issue at the time of the transfer at issue and disclosed the basis for its decision in its third quarter 2007 10Q.  3Q 2007 10Q [DE 190-19] at 7 (four paragraph discussion).  Franklin's straightforward disclosure of its analysis belies any suggestion of simplicity.  Rather, the Investment Accounting Issue stands as exactly the kind of judgment call the Fifth Circuit has cautioned as suspect for purposes of inferring scienter.  *Shaw Group, Inc.*, 537 F.3d at 537 (identifying as especially suspect alleged accounting errors based on standards that leave broad scope for judgment).

### iii.     *The Commons Essentially Concede that the Countrywide, 4Q 2007 Allowance, and Loan Concentration Allegations Lack Merit*

28.     Several of the allegations discussed in Nocella's motion have essentially been conceded by virtue of the Commons failure to meaningfully address them in their response.  For instance, Nocella sought to dismiss the Countrywide allegations based on the complete lack of any corroborating evidence that such a loan existed or was in default, including the complete absence of any reference to such a loan in Franklin's SEC filings or in the FDIC Report.[23]  By failing to address these points in the Response, the Commons' essentially concedes that the Countrywide allegations lack merit and must be dismissed.  With the exception of scienter and loss causation, the Commons wholly fail to even mention, much less address, the Countrywide allegations or any of Nocella's defense thereto in their legal argument.[24]

---

[23]     Nocella's grounds for dismissing the Countrywide allegations, include: (i) the implausibility of the allegations; (ii) no corroborating information (as required by the PSLRA); (iii) no duty to disclose; (iv) no explanation as to how investors were misled by any statement Nocella made; (v) no strong inference of scienter; and (vi) no loss causation. Motion ¶¶ 2(d), 2(g), 61-63, 78-79 [DE 191].

[24]     Although the Commons do reference the Countrywide allegations in their mini-complaint, none of these references points to allegations that cure the deficiencies highlighted in Nocella's motion.  Response at 4, 6, 8. Paragraph 111 contains nothing but conclusory, unsupported allegations.  Paragraphs 118-129 contain the wholly unreliable confidential witness statement (CW2) addressed by Nocella in his Motion. Motion ¶ 25 n.28. The Commons do seem to suggest that Ranieri's motion concedes the existence of the Countrywide loan and default.  However, Ranieri's arguments regarding scienter make no such concession.  As to scienter, the Commons only refer to

29.     Similarly, by omission, the Commons concede that Nocella made no material misstatements regarding Franklin's 4Q 2007 Allowances.  The Commons do not identify any such alleged misstatements in either their restatement of their complaint[25] or their specific discussion of Defendants' alleged misstatements.  Response at 27-29 [DE 210].[26]  The Commons do not even discuss materiality.[27]  Similarly, the Commons' general discussion of scienter does not specifically connect any of the Commons' allegations to the 4Q 2007 Allowances, much less establish a strong inference that Nocella knew that those allowances were understated at the time.[28]  Motion ¶¶ 69-73; Reply to Preferreds ¶¶ 26-27.

30.     Other than materiality and loss causation, the Commons make no effort to rebut Nocella's points regarding the Commons' loan concentration allegations.  Motion ¶¶ 75-76.[29]

## C.   NO LOSS CAUSATION

31.     The Commons recognize the appropriate standard of review but fail to apply it.  To survive a motion to dismiss in regards to loss causation, a plaintiff must show a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiff's economic loss,

---

confidential witness statements and even then do not address the points raised in Nocella's motion.  Motion ¶ 63 & nn. 25-26.

[25]     The Commons do mention an estimate of commercial loan credit costs not even mentioned in their complaint.  Response at 5 [DE 210].  However, the Commons plead no facts and provided no supporting documents or corroborating information to show that this statement was false, material or made with scienter.  Further, as an estimate, this forward-looking statement would be protected by the PSLRA's safe harbor.

[26]     Ironically, the Commons argue that the PSLRA's safe harbor does not protect Nocella's November 26, 2007 statements regarding the adequacy of Franklin's reserves.  Response at 48-49.  However, the Commons render this discussion pointless by failing to address Nocella's argument that no facts support the contention that the 4Q 2007 Allowances were understated when made, much less that Nocella actually knew it.  *See* Motion ¶¶ 67-74 [DE 191].  *See also* Reply to Preferreds ¶ 27.  In addition, contrary to the Commons' contention, the cautionary language in the November 26, 2007 press release [DE 190-20] that was specifically incorporated by reference during the November 26, 2007 conference call [DE 210-16], includes a disclaimer that "allowances for credit losses may be insufficient to cover actual losses."  November 26, 2007 Press Release at 2.

[27]     Significantly, the 4Q 2007 Allowances were never restated.  As such, as pointed out in Nocella's Motion, the Commons had no basis for any plausible inference that any understatement was material.  Motion ¶ 67.

[28]     In a couple of place, the Commons refer obliquely to rising delinquencies.  However, no question exists that Franklin's 4Q 2007 Allowances more than doubled Franklin's historical percentage rates for allowances for credit losses.  Motion ¶ 66.  Thus, even if the Commons' allegations were sufficient to establish Nocella's knowledge of rising delinquencies (which they are not) (*see supra* paragraph 21 and notes 19-20), this knowledge would not support the inference that Nocella actually knew Franklin's 4Q 2007 Allowances were understated.

[29]     Notably, mere materiality does not create a duty to disclose.  *See* Motion at 3 n.3.

including allegations of a material misrepresentation or omission, followed by: (1) the leaking out of *relevant or related truth* about the fraud that; (2) caused a *significant part of the depreciation* of the stock and plaintiff's economic loss. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (emphasis added). Here, the Commons offer no facts to support either of these two requirements.

32.     Instead of alleging the necessary relevance between a disclosed truth and any misleading statement, the Commons simply allege that the specific stock price falls resulted from "the partial disclosure of the previous fraudulent misstatements." *See* SCAC ¶¶ 199-204 [DE 167]. Nowhere do Commons identify the "previous fraudulent misstatements" these disclosure corrected. Notably, not even the Commons' response explains how any of the alleged corrective disclosures relates to the Countrywide, Subprime, 4Q 2007 Allowance or Loan Concentration allegations.

33.     None of the alleged corrective disclosures concern the imagined Countrywide line of credit.  None of the corrective disclosures reveals the existence or amount of subprime loans in Franklin's loan portfolio or the existence of excessive loan concentrations.  The only disclosure related to the 4Q 2007 Allowances is the allowance, itself.  Accordingly, the Commons claims based on the alleged Countrywide, Subprime, 4Q 2007 Allowance or Loan Concentration misrepresentations or omissions must be dismissed on that basis alone.

D.     **THE SCAC SHOULD BE DISMISSED WITH PREJUDICE.**

34.     In a footnote, Plaintiffs request leave to replead in the event that Defendants' motions to dismiss are granted.  Response at 51 n.14.  Plaintiffs have not tendered a proposed amended petition or suggested any additional facts not initially pleaded that could cure the pleading defects Defendants raised.  Accordingly, if the Court grants the motion to dismiss, it should do so with prejudice. *See Southland Sec. Corp.*, 365 F.3d at 384; *MCI WorldCom*, 340 F.3d at 255.

## REQUEST FOR RELIEF

Anthony Nocella requests that the Court grant this motion to dismiss, that the Court enter an

order dismissing with prejudice all claims against Nocella, and for such other and further relief, at

law or in equity, to which Nocella may be justly entitled.

Respectfully submitted,

By:_____
     James G. Munisteri
     State Bar No. 14667380

GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
713-276-5500 – Telephone
713-276-5555 – Facsimile

ATTORNEYS FOR DEFENDANT,
ANTHONY J. NOCELLA

OF COUNSEL:

Thomas Hagemann
State Bar No. 08686800
Orin H. Lewis
State Bar No. 00791110
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas  77002
Telephone:    (713) 276-5500
Facsimile:    (713) 276-5555

## CERTIFICATE OF SERVICE

I, James G. Munisteri, do certify that on the 4th day of June, 2010, a copy of the Anthony Nocella's reply in support of motion to dismiss was served on the following parties via the Court's ECF system as indicated below:

| | |
|---|---|
| Roger G. Greenberg | rgreenberg@schwartz-junell.com |
| Ralph M. Stone | rstone@lawssb.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| J. Allen Carney | dwilliams@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| William B. Monahan | monahanw@sullcrom.com |
| M. Byron Wilder | bwilder@gibsondunn.com |
| Jonathan C. Dickey | jdickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Stephen E. McConnico | smcconnico@scottdoug.com |
| Cynthia Saiter Connolly | cconnolly@scottdoug.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | James.farrell@lw.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |

David A. Rosenfeld
Mario Alba, Jr.
Couglin Stoia Geller Rudman & Robbins, LLP
58 South Service Road, Suite 200
Melville, NY  11747

Andrew J. DeFilippis
Brian T. Frawley
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004

David C. Walton
Couglin Stoia Geller Rudman & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

_____
James G. Munisteri