UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| In re FRANKLIN BANK CORP., SECURITIES LITIGATION | ) ) CIVIL FILE NO. ) 4:08-CV-01810 ) ) ) CLASS ACTION ) ) ) ) DEMAND FOR JURY TRIAL |

**FRANKLIN INVESTOR GROUP'S CONSOLIDATED SUR-REPLY TO DEFENDANTS LEWIS S. RANIERI'S, ANTHONY NOCELLA'S, AND RUSSELL McCANN'S REPLY MEMORANDA IN FURTHER SUPPORT OF THEIR MOTIONS TO DISMISS FRANKLIN INVESTOR'S GROUP'S SECOND CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................. 1

ARGUMENT ...................................................................... 2

I. APPLICABLE LEGAL STANDARDS ........................................ 2

II. THE SCAC ADEQUATELY ALLEGES THAT DEFENDANTS HAD
THE MOTIVE TO COMMIT THE FRAUD DETAILED IN THE SCAC ........... 3

III. THE SCAC RAISES A STRONG INFERENCE THAT DEFENDANTS
ACTED WITH SCIENTER ................................................ 6

    A. The SCAC Provides Strong Circumstantial Evidence That
       Defendants Had the Requisite Intent ............................... 6

    B. Defendant Ranieri's Status as an "Outside Director" Does Not
       Insulate Him From Liability for False Statements He Made With Scienter ..... 9

IV. THE SCAC ADEQUATELY ALLEGES THAT DEFENDANTS
PUBLISHED MATERIALLY MISLEADING STATEMENTS ................... 9

V. PLAINTIFFS HAVE ADEQUATELY PLEADED
CONTROL-PERSON LIABILITY .......................................... 11

VI. THE SCAC ADEQUATELY PLEADED LOSS CAUSATION ................. 12

VII. CONCLUSION ...................................................... 13

## TABLE OF AUTHORITIES

*Abbott v. Equity Group, Inc.*,
 2 F.3d 613 (5th Cir. 1992) .................................................. 11

*Alaska Elec. Pension Fund v. Flowserve*,
 572 F.3d 221 (5th Cir. 2009) ................................................ 12

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .................................. 2 n.1

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544, 127 S. Ct. 1955. 167 L. Ed. 2d 929 (2007) ..................... 2 n.1

*Capital Parks, Inc., v. Southeastern Adver. & Sales Sys., Inc.*,
 30 F.3d 627 (5th Cir. 1994) .................................................. 3

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005) ...................... 12

*Foman v. Davis*,
 371 U.S. 178 (1962) ...................................................... 13 n.11

*Goldstein v. MCI Worldcom*,
 340 F.3d 238 (5th Cir. 2003) ................................................. 5

*In re 2007 Novastar Fin., Inc., Sec. Litig.*, Case No. 07-0139-CV-W-ODS,
 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ....................... 7 n.7

*In re Enron Corp. Secs., Der. & "ERISA" Litig.*,
 465 F. Supp. 2d 687 (S.D. Tex. 2006) ........................................ 12

*In re Microstrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................... 8 n.9

*In re Qwest Communx. Int'l Inc. Sec. Litig.*
 387 F. Supp. 2d 1130 (D. Colo. 2005) ..................................... 8 n.9

*In re Rent-Way Secs. Litig.*,
 209 F. Supp. 2d 493 (W.D. Pa. 2002) ...................................... 8 n.9

*In re Sec. Litig. BMC Software, Inc.*,
 183 F. Supp. 2d 860 (S.D. Tex. 2001) ........................................ 11

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) .................................. 13 n.11

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*,
    537 F.3d 527 (5th Cir. 2008) .................................. 3 n.2

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) .................................. 3, 12

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................. 5

*McNamara v. Bre-X Minerals, Ltd.*,
    46 F. Supp. 2d 628 (E.D. Tex. 1999) .................................. 11

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) .................................. 3, 5 n.4

*Newby v. Lay*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003) .................................. 5 n.4

*STI Classic Fund v. Bollinger Indus., Inc.*, No. 3-96-CV-823-R,
    1996 U.S. Dist. LEXIS 21553 (N.D. Tex. Oct. 25, 1996) .................................. 3

*South Ferry LP, #2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................. 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) .................................. 3, 5 n. 5, 12, 13

*Wight v. Bankamerica Corp.*,
    219 F.3d 79 (2d Cir. 2000) .................................. 13 n.11

## **INTRODUCTION**

In what can only be characterized as self-righteous denials, Defendants dismiss the Federal Deposit Insurance Corporation's (the "FDIC") conclusions that "management's high-risk business strategy" "[c]oupled with weak risk management practices and controls" (Franklin Investor Group's Second Consolidated Amended Complaint ("SCAC") ¶ 95) resulted in Franklin Bank Corporation's ("Franklin" or the "Company") failure, which were based on "six examinations from September 2003 through July 2008" (*See* Office of Inspector General's Material Loss Review of Franklin Bank, S.S.B., Houston, Texas, Report No. AUD-09-014 ("Material Loss Review") p.11.) Instead, Defendants argue that the failure of Franklin was not a result of increased risks taken on by Franklin's management or management's lack of oversight, but occurred because the Company fell victim to the banking crisis that began in 2007. (*See* Ranieri's Reply Brief p. 1; McCann's Reply Brief pp. 1, 15.) In this regard, Defendants ask this Court to simply (1) ignore the bank's high-risk profile and weak risk management practices and (2) dismiss the FDIC's findings that the Company's problems stemmed from "extremely unsafe and unsound practices or conditions, critically deficient performance, and inadequate risk management practices." (Material Loss Review p.11.)

Indeed, as the allegations of the SCAC make clear, Defendants were eager to complete another deal akin to their sale of Bank United Corp. ("Bank United"). This hunger to duplicate their past success resulted in a business strategy that "left the bank unprepared and unable to effectively manage operations in a declining economic environment." (SCAC ¶ 95.) Even in the face of repeated reprimands from the FDIC over a five-year period (*see* Material Loss Review, Appendix 3, p.22), Defendants forged on with their plan to recreate the rapid growth and quick sale achieved with Bank United. Thus, it was the high-risk business strategy created and implemented by

1

Defendants that fueled Franklin's implosion, a fact that is supported by the testimony of numerous former officers and employees. (SCAC ¶¶ 114-146.) Unfortunately, this reality was not revealed to shareholders who were repeatedly assured of the Company's sound financial condition.

In short, the allegations in the SCAC make plain that Defendants acted with scienter when they fraudulently concealed Franklin's aggressive plan to create the public perception that Franklin observed sound, even conservative, financial policies. Try as they might in a mountain of briefing,[1] Defendants cannot refute this fact. Accordingly, Defendants' motions to dismiss should be denied.

## ARGUMENT

### I. APPLICABLE LEGAL STANDARDS

As previously noted in Plaintiff's Consolidated Response in Opposition to Defendants Lewis S. Ranieri's, Anthony Nocella's, and Russell McCann's Motions to Dismiss Franklin Investor's Group's Second Consolidated Amended Complaint ("Plaintiff's Opposition"), when "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must . . . accept all factual allegations in the

---

[1] A word must be said here about Defendants' representations that the Franklin Investor Group has "waived" certain arguments or "conceded" particular points. Lead Plaintiff has done no such thing. It is, as an initial matter, incumbent upon advocates of a motion to dismiss to show that a challenged pleading fails "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007). When drafting responses to the hundreds of pages of briefing, with scores of footnotes, generated by these Defendants, considerations of both space and practicality have caused Lead Plaintiff to address only those well-developed, serious arguments that might – if left unanswered – raise some question about the "plausibility" of the claims in the SCAC. In doing so, Lead Plaintiff has made no attempt to counter every remark Defendants have made in passing. Some things – such as Defendant Nocella's curious insistence that Lead Plaintiff has not "corroborated" (whatever that means, prior to discovery) Franklin's loan to Countrywide (*cf., e.g.,* SCAC ¶¶ 118-22 (setting forth Confidential Witness statements describing the Countrywide loan)) – simply merit no response. In terms more germane to this Court's analysis, none of Defendants' "kitchen sink" asides alters the fact that the SCAC "states a plausible claim for relief [sufficient to] survive[] [Defendants'] motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868, 884 (2009).

complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509, 168 L. Ed. 2d 179, 192 (2007). Not only is a court required to accept the truth of the complaint's allegations, but it must "construe those allegations in the light most favorable to the plaintiff." *Capital Parks, Inc., v. Southeastern Adver. & Sales Sys., Inc.*, 30 F.3d 627, 629 (5th Cir. 1994); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001) ("We will accept the facts alleged in the complaint as true and construe the allegations in the light most favorable to the plaintiff."). Additionally, the court should consider the allegations set forth in the SCAC in their entirety, "as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009); *STI Classic Fund v. Bollinger Indus., Inc.*, No. 3-96-CV-823-R, 1996 U.S. Dist. LEXIS 21553, at *5 (N.D. Tex. Oct. 25, 1996) (deeming it improper to isolate "the circumstances alleged in Plaintiffs' amended complaint rather than to consider them in their totality").

## II. THE SCAC ADEQUATELY ALLEGES THAT DEFENDANTS HAD THE MOTIVE TO COMMIT THE FRAUD DETAILED IN THE SCAC[2]

The SCAC alleges that Defendants were motivated to conceal from the public the true condition of Franklin so that they could accomplish the rapid growth and quick sale achieved with Bank United. In this regard, the SCAC alleges that the Defendants implemented a business strategy that was patterned after the Defendants' previous success. As such, the SCAC avers that Defendants utilized a predetermined formula with complete disregard of known risks in an effort to replicate a

---

[2]There can be no serious dispute that as a "high-ranking corporate officer[]," *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group*, 537 F.3d 527, 543 (5th Cir. 2008), each Defendant had the opportunity to commit the alleged fraud.

3

specific business format that had proven to be successful for Defendants in the past. Indeed, the Material Loss Review reveals that beginning in September 2003, the FDIC notified the Company that it was heavily reliant on potentially volatile funding sources and had weak and/or inadequate internal audit practices. (Material Loss Review, Appendix 3, p. 22.) Likewise, the Material Loss Review shows that beginning in September 2003, the FDIC made multiple recommendations to the Company to improve the measuring, monitoring, and reporting of its loan concentrations, further noting significant subprime mortgages beginning in November 2005. (Material Loss Review, Appendix 3, p. 23.) However, adhering to their formulaic strategy, Defendants either consciously ignored or recklessly disregarded these known risks.

Notwithstanding, Defendants attempt to deflect responsibility by arguing that Plaintiffs' motive allegations amount to nothing more than a routine corporate desire to make a company attractive for sale. (Ranieri Reply Brief p. 4; McCann Reply Brief pp. 4-6; Nocella Reply Brief p. 3.) As demonstrated above, however, the SCAC goes well beyond pleading some vague and generic motive for the good of the company by averring that Defendants systematically re-engineered the circumstances leading to the Bank United/Washington Mutual merger, such as employing the same staff to implement the same high-risk strategy without sufficient internal controls. Accordingly, these facts, when viewed in conjunction with the multitude of other scienter allegations, serve to bolster the inference that Defendants acted with the requisite state of mind.[3]

---

[3] Defendant McCann's assertion that the SCAC's motive allegations are tied to Defendants Nocella and Ranieri only is without merit. (McCann Reply Brief p. 5.) Rather, the SCAC provides significant insight into Defendant McCann's role in the Bank United deal, specifically pleading that prior to joining the Company, he was Senior Vice President and Treasurer of Bank United, where he was responsible for funding, risk management, capital markets and asset and liability management. (SCAC ¶ 22.) As such, Defendant McCann oversaw the asset management plan that was duplicated at Franklin. (SCAC ¶ 39.) Thus, his attempt to diminish his involvement in the

4

Putting a further spin on the facts, Defendants argue that the fact that they lost money weighs against a finding of motive. (Ranieri Reply Brief pp. 3-4; McCann Reply Brief pp. 15-16.) In this regard, the United States Court Appeals for the Seventh Circuit provides valuable insight:

> The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). Thus, the fact that Defendants' wrongdoing did not pay off in the end does not insulate Defendants from liability.[4]

Lastly, Defendants' attempt to explain away the court's findings in *Goldstein v. MCI Worldcom*, 340 F.3d 238 (5th Cir. 2003) is futile. (McCann's Reply Brief pp. 5-6; Ranieri's Reply Brief p. 4; Nocella's Reply Brief p. 3.)[5] As noted in Plaintiff's Opposition, the Court in *MCI*

---

implementation of the replicated high-risk strategy is to no avail.

[4] Furthermore, the fact that Defendant Ranieri purchased stock during the Class Period does not establish, as a matter of law, that he had no motive to defraud. (Ranieri Reply Brief pp. 3-4; *see also* McCann Reply Brief p. 16.) Defendant Ranieri's reliance on *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001) and *Newby v. Lay*, 258 F. Supp. 2d 576 (S.D. Tex. 2003) for this proposition is misplaced. Both of those cases involved whether an inference of scienter had arisen from allegations of suspicious insider sales. *Nathenson*, 267 F. 3d at 420-21; *Newby*, 258 F. Supp. 2d at 612-15. Thus, it was in the context of insider trading that these courts considered the "potential negating of the inference by the lack of sales of others similarly situated." *Newby*, 258 F. Supp. 2d at 614; *see also Nathenson*, 267 F. 3d at 420 (noting the fact that other defendants did not sell during the class period undermines plaintiffs' claim of suspicious insider trading). Here, the SCAC does not predicate its scienter allegations on insider trading. Accordingly, the portions of the *Nathenson* and *Newby* opinions regarding insider trading are inapplicable to the present case. What is more, there is nothing in these two opinions adopting the bright-line test promoted by Defendant Ranieri.

[5] Of course, in the unlikely event this Court rejects Plaintiff's motive allegations, the remaining assertions within the SCAC are independently sufficient to raise a strong inference of Defendants' scienter. *Cf. Tellabs*, 551 U.S. at 325, 127 S. Ct. at 2511, 168 L. Ed. 2d at 194 ("[T]he absence of a motive allegation is not fatal.").

5

*Worldcom* found plaintiff's "allegations of motive and opportunity sufficiently particularized" where the allegations sufficiently demonstrated the import of a merger to the company. *MCI Worldcom*, 340 F.3d at 250. In so finding, the Court stated there was nothing routine about this "crucial event for the future of Worldcom." *Id.* Similarly, here, the SCAC makes clear that Plaintiff's were motivated to re-create a package deal to achieve the same lucrative result gained in the Bank United/Washington Mutual deal.

### III. THE SCAC RAISES A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER

#### A. The SCAC Provides Strong Circumstantial Evidence That Defendants Had the Requisite Intent

In their reply briefs, Defendants incredulously dismiss the problems at Franklin as nothing more than an aftershock of a banking crisis that began in 2007. (Ranieri's Reply Brief p. 1; McCann's Reply Brief pp. 1, 15.) In sharp contrast to Defendants' depiction of what occurred at Franklin, The Material Loss Review makes clear that Franklin was experiencing problems related to the "identification and monitoring of loan concentrations, establishment of liquidity risk limits and contingency liquidity plans, and enhancement of the internal audit function" as early as 2003, years before the 2007 trigger date identified by Defendants. (Material Loss Review pp. 11, 22-24.) On this subject, the Material Loss Review recounts that the FDIC issued annual comments and recommendations from 2003 through 2007 wherein Franklin was notified that it needed to improve its (1) "concentrations in California 1-4 family residential and/or higher-risk ADC lending,"(2) reliance "on potentially volatile funding sources," (3) ALL methodology, (4) "accounting and financial reporting," and (5) "internal audit function." (Material Loss Review, Appendix 3, p.22-24.) The FDIC's Material Loss Review further noted significant subprime mortgages beginning in

6

November 2005. (Material Loss Review, Appendix 3, p. 23.)[6] Thus, Franklin's demise was not the effect of a shaky financial market,[7] but, rather, Defendants' failure to timely and effectively address the problems identified by the FDIC and known to Defendants.

The reality of the situation at Franklin is further supported by the testimony of former officers and employees at Franklin. Specifically, Mr. Craig Wolfe's letter, dated February 19, 2008, recounts how Franklin's public statements that the Company did not own or originate any subprime loans were "demonstrably false" when they were made (SCAC ¶ 106), and how Franklin had reclassified seriously delinquent loans as current, failed to recognize losses on valid repurchase requests, and failed to indemnify Countrywide under the entities' agreement. (Id. ¶ 107.) Likewise, five confidential witnesses provide corroborating testimony that, among other things, (i) the internal controls and monitoring of Franklin's single family residential portfolio were inadequate (SCAC ¶

---

[6]In a related vein, Defendants' assertions that the FDIC's Material Loss Review undermines an inference that Defendants acted with scienter are unpersuasive. (*See* Ranieri Reply Brief p. 8; McCann Reply Brief pp. 10-11) Indeed, the Material Loss Review itself acknowledges that Franklin's weak risk management practices helped to "mask[] the bank's financial deterioration." (Material Loss Review p. 7-8.) Moreover, Defendant Ranieri's argument that the Material Loss Review undermines an inference that he, as Chairman of the Board of Directors, acted with scienter because it concludes that "the Bank failed due to *bank management's* high-risk strategy" is misleading. (Ranieri Reply Brief pp.8-9.) Contrary to Defendant Ranieri's assertions, the FDIC not only found fault with Franklin's management, but the FDIC also found that "Franklin's BOD allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls" and that both "management and the BOD did not provide for internal controls and information systems that would ensure timely and accurate financial reporting." (SCAC ¶ 99; Material Loss Review pp. 7, 8.) Hence, the FDIC not only attributes the Company's failure to management, but to Franklin's BOD as well. As such, the Material Loss Review supports an inference that Defendant Ranieri acted with scienter.

[7]As explained by one district court, "just as the Court could take judicial notice of the fact that the country suffered from the Great Depression in the 1930s, the Court cannot use that fact to infer anything particular about a business operating at the time." *In re 2007 Novastar Fin., Inc., Sec. Litig.*, Case No. 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *5 (W.D. Mo. June 4, 2008).

7

114); (ii) around October 2007, Franklin took possession of the primarily substandard loans collateralizing the Countrywide line of credit (*id.* ¶¶ 118-22); (iii) senior executives were present at meetings and/or had access to regular reports discussing the rising rate of nonperforming loans (*id.* ¶¶ 130-32); (iv) information regarding aged and delinquent loans were accessible to senior management via regular reports and the Company's internal databases (*id.* ¶¶ 135-38); and (v) senior executives, including Defendants Nocella and McCann, were supplied with monthly reports regarding due diligence of loans to be acquired, production of mortgage officers, delinquent loans, fraudulent loans, and the Company's entire portfolio, as well as the Company's individual "Held for Sale" and "Held for Investment" portfolios (*id.* ¶¶ 142, 145).[8] In light of these facts, it is clear that it was the high-risk business strategy created and implemented by Defendants that fueled Franklin's implosion, and that Defendants were aware of, or recklessly disregarded, adverse, internal information.[9]

---

[8]Defendants' contention that the statements of the confidential witnesses do not provide circumstantial evidence of scienter is unpersuasive. (See Ranieri's Reply Brief p. 8; McCann's Reply Brief pp. 6-9; Nocella's Reply Brief pp. 9-10.) The facts supplied by these witnesses demonstrate the proximity of the confidential witnesses to the Defendants' offensive conduct which gave them first hand knowledge of information that was available to the Defendants and enabled them to experience firsthand the Company's aggressive, high-risk strategy. That being so, these company insiders, through their accounts, have provided evidence that supports a strong inference of the requisite intent.

[9]Notably, numerous courts have determined that allegations of the magnitude and duration of the fraud support an inference that the party publishing the challenged statement knew that it was false or was severely reckless in publishing the information. *In re Qwest Communx. Int'l Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1147 (D. Colo. 2005); *In re Rent-Way Secs. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002); *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 652 (E.D. Va. 2000). As evidenced in Plaintiff's Opposition, this is exactly the case here. Thus, Defendant Nocella's attempt to collapse Plaintiff's allegations regarding the magnitude and duration of the accounting irregularities in this case into allegations of an executive's position within the company and GAAP violations are unfounded. (Nocella's Reply Brief p. 11.) Moreover, Defendant Nocella's confused hypothetical regarding timing delays has no application to the present case. (Nocella's Reply Brief

B.  <u>Defendant Ranieri's Status as an "Outside Director" Does Not Insulate Him From Liability for False Statements He Made With Scienter</u>

Yet again, Defendant Ranieri portrays himself as a mere "outside" director who cannot be held responsible for the misdeeds of Franklin's management. (Ranieri's Reply Brief p. 1-2.) However, as noted in Plaintiff's Opposition Brief, the SCAC does not seek to hold Defendant Ranieri accountable for the sins of "management," but rather demonstrates that he, personally, mischaracterized Franklin's affairs by doing things like signing the Company's admittedly false 2006 10-K and making other misleading oral statements during the Class Period. Moreover, as demonstrated by Defendant Ranieri's own words, Defendant Ranieri was anything but the lackadaisical director he now professes himself to be. Rather, he was a "shepherd" ready at the helm to guide the bank through financial turmoil (SCAC ¶ 69) and "guard the place" (*id.* ¶ 71).

## IV. THE SCAC ADEQUATELY ALLEGES THAT DEFENDANTS PUBLISHED MATERIALLY MISLEADING STATEMENTS

Taking liberties with the facts alleged in the SCAC, Defendants argue that this Court cannot rely on the plain meaning of the words Defendants spoke to investors during the Class Period because those words were, according to Defendants, ambiguous. (McCann's Reply Brief p. 2; Ranieri's Reply Brief pp. 5-6; Nocella's Reply Brief pp. 3-6.) In doing so, Defendants inject a revised rendition of what they meant during the January 31st, October 30th and November 26th conference calls. (McCann's Reply Brief p. 2; Ranieri's Reply Brief pp. 5-6; Nocella's Reply Brief pp. 5-6.) However, Defendants' attempt to interject ambiguity where none, in fact, exists should be disregarded. The words spoken by Defendant McCann in the October 30th conference call are clear:

---

p. 12.) Indeed, as evidenced by the Company's announcement that a restatement was necessary to correct material errors, the Company's accounting falsely represented its position, and was not the product of harmless timing errors.

9

- "we only originated prime level lending" (SCAC ¶ 62); and

- "If you really look at what Washington Mutual's portfolio did, they did pay option ARMs and a large amount. They did a large amount of subprime. You know we don't have any of those in a portfolio." (SCAC ¶¶ 62, 63, 65.)

Likewise, the words spoken by Defendant Ranieri in the November 30th conference call are clear:

- "These are obviously difficult times, but I and the management are very experienced in this. We have gone through these cycles before. I think you know our backgrounds and we believe that we can shepherd this institution through this cycle as we have done others and do the best for we, the shareholders." (SCAC ¶ 69);

- "We don't run this as sort of employment center for management and board. The object here is for shareholders, me included." (*Id.* at ¶ 71);

- "my job is to guard the place." (*Id.*)

Lastly, the words spoken by Defendant Nocella are clear:[10]

- "earnings were lower than our expectations for the year primarily as a result of the inverted yield curve and our continued unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market." (SCAC ¶ 45);

- "We don't have any subprime so I don't know." (*Id.* at ¶ 55);

- "Countrywide did pay option ARMs which, you know, Neg-AM and they secondly did a lot of simultaneous seconds, that's 100% CLTVs. They are two characteristics that we stayed away from." (*Id.*)

Moreover, Defendants' attempt to pigeonhole Plaintiffs' claims as arising only from conference calls is a gross mischaracterization of the SCAC. Quite to the contrary, the SCAC pleads that as the Chief Executive Officer and the Chief Financial Officer of Franklin, Defendants Nocella

---

[10]Tellingly, Plaintiffs have not paraphrased Defendants' words, but, rather, Plaintiffs lifted these words directly from the transcripts of the referenced conference call. As a result, Defendant Nocella's argument that Plaintiff relies on "unwarranted inferences or deductions from the facts" is completely without merit. (Nocella's Reply Brief p. 4.)

10

and McCann certified time and again during 2007 and 2008 that Franklin had developed internal controls sufficient "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external purposes;" when, in fact, the Company suffered from material weaknesses and/or significant deficiencies in its internal controls, a fact conceded by the Company in announcing it was obliged to "restate" the financial statements it had previously reported for fiscal year 2006 and the first three quarters of 2007. (SCAC ¶¶ 8, 9, 47, 48, 52, 57.)

Similarly, as Chairman of the Board, Defendant Ranieri signed the Company's 2006 Form 10-K (SCAC ¶¶ 49), which contained false and misleading statements as readily conceded by virtue of the Company's restatement for fiscal year 2006 and the first three quarters of 2007, which was for the sole purpose of correcting material errors. (*Id.* ¶¶ 152-55.) Thus, Plaintiff has adequately alleged that Defendants published materially misleading statements.

## V. PLAINTIFFS HAVE ADEQUATELY PLEADED CONTROL-PERSON LIABILITY

As previously noted in Plaintiff's Opposition Brief, "The Fifth Circuit has stated that a plaintiff need only show that the alleged control persons possessed '*the power to control*'[the primary violator], not the exercise of the power to control." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 869 n. 17 (S.D. Tex. 2001) (quoting *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1992)). Control-person liability exists if a plaintiff makes a *prima facie* showing that the defendants "had the power (whether exercised or not) to control the transactions in question and to control the operations . . . in general. In other words, it is *enough* if the defendant simply had the *abstract power* to control. *Actual exercise* of that power is *not* required." *McNamara v. Bre-X Minerals, Ltd.*, 46 F. Supp. 2d 628, 638 (E.D. Tex. 1999). Here, the SCAC makes clear that each

11

Defendant was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Accordingly, Plaintiff has adequately plead control-person claims against each Defendant.

## VI. THE SCAC ADEQUATELY PLEADS LOSS CAUSATION

Once again touting a higher standard than is required at this juncture, Defendant Nocella argues that Plaintiff's loss causation allegations are deficient. (Nocella' Reply Brief pp. 14-15.) However, as set forth in Plaintiff's Opposition, the present inquiry is limited to the issue of loss causation for purposes of surviving a motion to dismiss, which entails a much lower threshold than the loss causation standard at the class certification stage or the summary judgment stage. *See Alaska Elec. Pension Fund v. Flowserve*, 572 F.3d 221 (5th Cir. 2009), *see also Tellabs*, 551 U.S. at 324 n.5, 127 S. Ct. at 2510 n.5, 168 L. Ed. 2d at 194 n.5 ("[T]he test [for dismissal] at each stage [of a lawsuit] is measured against a different backdrop."); *cf. Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577, 588 (2005) (reflecting that pleading loss causation "should not prove burdensome for a plaintiff"); *In re Enron Corp. Secs., Der. & "ERISA" Litig.*, 465 F. Supp. 2d 687, 724 (S.D. Tex. 2006) (recognizing the distinction between plaintiff's burden at the motion to dismiss stage and the summary judgment or trial phase). Thus, the applicable standard in the present case is that "the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009). Plaintiff has more than sufficiently met this standard by demonstrating devaluations in Franklin's stock price that are traceable to the public revelations of the Defendants' misrepresentations and omissions. (SCAC ¶¶ 195, 197, 199-204.)

## VII. <u>CONCLUSION</u>

The United States Supreme Court has directed that a complaint alleging securities fraud should be assessed in its entirety, *Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509, 169 L. Ed. 2d at 192, and consideration of that standard has caused some to reflect that federal courts should no longer "close their eyes to circumstances that are probative of scienter viewed with a practical and common sense perspective," *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Employing these principles, this Court should determine that it is both cogent and compelling to suggest that Defendants made materially false statements during the Class Period with nothing less than severe recklessness as to their falsity. Consequently, and based on the arguments contained in Plaintiff's Opposition and this brief, this Court should deny Defendants Ranieri's, McCann's, and Nocella's Motions to Dismiss.[11]

---

[11]In the unlikely event the Court perceives any deficiencies in the SCAC, Plaintiff respectfully requests leave to replead. To justify a denial of such leave to amend, it must appear to the Court that the amendment is futile, offered in bad faith, prejudicial or otherwise contrary to the interests of justice. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000). Moreover, Defendant Ranieri's insistence that Plaintiff should not be afforded an opportunity to replead because of prior amendments is unpersuasive. One of the amendments was necessitated by the Company's restatement, and Defendants agreed to it. Moreover, this is the first complaint to be reviewed by the Court. Accordingly, the prior amendments in this case do not weigh against affording Plaintiff the right to cure any deficiencies if any are perceived by this Court. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 312 (S.D.N.Y. 2008) (recognizing "significant doubt as to whether Lead Plaintiff[] should be charged with filing three complaints" when the "action was initially filed by unrelated parties with unrelated counsel.")

13

          Respectfully Submitted,

          **CARNEY WILLIAMS BATES**
            **BOZEMAN & PULLIAM, PLLC**

          */s/ J. Allen Carney* by permission
          J. Allen Carney
          Arkansas Bar No. 94122
          Admitted Pro Hac Vice
          11311 Arcade Drive, Suite 200
          Little Rock, Arkansas 72212
          (501) 312-8500 - telephone
          (501) 312-8505 - facsimile

          *Attorney in Charge for Lead Plaintiff*
          *Franklin Investor Group*

Of Counsel:

**CARNEY WILLIAMS BATES**
  **BOZEMAN & PULLIAM, PLLC**

Marcus Neil Bozeman
Arkansas Bar No. 95287
Randall K. Pulliam
Arkansas Bar No. 98105
Texas Bar No. 24048058
Admitted Pro Hac Vice
Tiffany Wyatt Oldham
Arkansas Bar No. 2001287
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
(501) 312-8500 - telephone
(501) 312-8505 - facsimile

and

Liaison Counsel:

**HAGANS BURDINE MONTGOMERY**
  **& RUSTAY, PC**

William Fred Hagans
State Bar No. 08685500

14

Federal Bar No. 2457
Jennifer Rustay
State Bar No. 24002124
Federal Bar No. 23980
3200 Travis, Fourth Floor
Houston, Texas 77006
(713) 222-2700 - telephone
(713) 547-4950 - facsimile

## CERTIFICATE OF SERVICE

I hereby certify that I have e-filed this pleading and accordingly forwarded a true and correct copy of the foregoing upon all known counsel pursuant to all applicable rules of procedure and/or The Southern District's Administrative Procedures for Electronic Filing in Civil and Criminal Cases.

*/s/ J. Allen Carney* by permission
J. Allen Carney