# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| ------------------------------------------------- x | **C. A. NO.: 4:08-cv-01810** |
| In re FRANKLIN BANK CORP.<br>SECURITIES LITIGATION | **CLASS ACTION** |
| ------------------------------------------------- | |
| The HAROLD ROUCHER TRUST U/A DTD<br>09/21/72, Individually And On Behalf Of All Others<br>Similarly Situated, | |
| Lead Plaintiff, | |
| v. | |
| RBC CAPITAL MARKETS CORP.; ANTHONY J.<br>NOCELLA; RUSSELL MCCANN; LEWIS S.<br>RANIERI; LAWRENCE CHIMERINE; DAVID M.<br>GOLUSH; JAMES A. HOWARD; ALAN E.<br>MASTER; ROBERT A PERRO; WILLIAM .<br>RHODES; JOHN B. SELMAN; and DELOITTE &<br>TOUCHE LLP, | June 25, 2010 |
| Defendants. | |
| ------------------------------------------------- x | |

# PREFERRED PLAINTIFFS' SUR-REPLY IN FURTHER OPPOSITION TO
# DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

I. ARGUMENT ........................................................................................................1

   A. The Redacted Complaint Sufficiently Alleges Section 10(b)(5)Claims ........................1

      1. Lack of Insider Trading Does Not Protect Defendants from Liability ...................1

      2. Nocella is Liable for Misstatements Nos. 1-3 ........................................................3

      3. The Individual Defendants Are Liable for Misstatements Nos. 4-8 ......................5

         a. The Improper Delinquent Loan Accounting Raises A Strong Inference of Scienter .................................................................................................................5

         b. The Improper REO Accounting Raises A Strong Inference of Scienter ........10

         c. The Improper Investment Securities Accounting Raises A Strong Inference of Scienter .....................................................................................12

         d. Defendants Cannot Avoid the Cogent and Compelling Inference that They Were Notified of FDIC Red Flags ...........................................................14

      4. Ranieri, Nocella and McCann, Respectively, Are Responsible for Misstatements Nos. 9-14 ...................................................................................17

      5. D&T is Liable for Misstatements Nos. 15-17 .......................................................18

   B. The ACPC Adequately Pleads Securities Act Claims ...............................................23

      1. The Claims are Timely ..........................................................................................23

      2. Rule 9(b) Does Not Apply .....................................................................................24

      3. The Negative Causation Defense Fails ..................................................................24

   C. Conclusion ...................................................................................................................26

00164797

# TABLE OF AUTHORITIES

## CASES

*Allison v. Brooktree Corp.*
(S.D. Cal. 1998) 999 F. Supp. 1342 ............................................................................18

*City of Dallas, Texas v. Hall*
(N.D. Tex. October 24, 2007) 2007 WL 3125311 ........................................................18

*In re Downey Sec. Litig.*
(C.D. Cal. August 21, 2009) 2009 WL 2767670 ..........................................................20

*In re Dynegy, Inc. Sec. Litig.*
(S.D. Tex. 2004) 339 F. Supp. 2d 804 .........................................................................15

*In re Enron Corp. Securities, Derivative & ERISA Litig.*
(S.D. Tex. 2003) 258 F. Supp. 2d 576 .........................................................................16

*Fait v. Regions Fin. Corp.*
(S.D.N.Y. 2010) 2010 WL 1883487 ...............................................................9, 21, 22

*Fin. Acquisition Partners, L.P. v. Blackwell*
(N.D. Tex. September 29, 2004) 2004 WL 2203253 .....................................................20

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*
(5th Cir. 2009) 565 F. 3d 200 .......................................................................................3

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*
(E.D. Tex. Jun. 16, 2004) 2004 WL 5278716 ..............................................................20

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*
(C.D. Cal. 2008) 554 F. Supp. 2d 1083 .......................................................................20

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group Inc.*
(5th Cir. 2008) 537 F. 3d 527 ...........................................................................9, 13, 21

*Kaltman v. Key Energy Servs. Inc.*
(W.D. Tex. 2006) 447 F. Supp. 2d 648 ........................................................................20

*In re Lattice Semiconductor Corp. Sec. Litig.*
(D. Or. Jan. 3, 2006) 2006 WL 538756 .......................................................................22

00164797

*Ley v. Visteon Corp.*
    (6th Cir. 2008) 543 F. 3d 801 ...................................................................................22

*Lormand v. US Unwired Inc.*
    (5th Cir. 2009) 565 F. 3d 228 ....................................................................................2

*Lovelace v. Software Spectrum Inc.*
    (5th Cir. 1996) 78 F. 3d 1015 ..................................................................................3, 9

*Melder v. Morris*
    (5th Cir. 1994) 27 F. 3d 1097 ....................................................................................3

*Merck & Co., Inc. v. Reynolds*
    (2010) 559 U.S. ___ ................................................................................................24

*Mizzaro v. Home Depot, Inc.*
    (11th Cir. 2008) 544 F. 3d 1230 ................................................................................2

*In re Monster Worldwide, Inc. Sec. Litig.*
    (S.D.N.Y. 2008) 251 F.R.D. 132 ...............................................................................8

*In re Moody's Corp. Sec. Litig.*
    (S.D.N.Y. 2009) 599 F. Supp. 2d 493 ......................................................................17

*Mortensen v. Americredit Corp.*
    (N.D. Tex. 2000) 123 F. Supp. 2d 1018 ..................................................................16

*In re OCA, Inc. Sec. and Derivative Litig.*
    (E.D. La. December 14, 2006) 2006 WL 3747560....................................................5, 20

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*
    (S.D.N.Y. March 17, 2010) 2010 WL 961596 ..........................................................9

*PR Diamonds, Inc. v. Chandler*
    (6th Cir. 2004) 364 F. 3d 671 ..................................................................................21

*Siracusano v. Matrixx Initiatives, Inc.*
    (9th Cir. 2009) 585 F. 3d 228 ....................................................................................2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    (2007) 551 U.S. 308............................................................................................ *passim*

*Tuchman v. DSC Commc'ns Corp.*
    (5th Cir. 1994) 14 F. 3d 1061 ....................................................................................2

iv

*Wieland v. Stone Energy Corp.*
(W.D. La. Aug. 17, 2007) 2007 WL 2903178 ...............................................................6, 8

### STATUTES, RULES & REGULATIONS

12 U.S.C. §1831m(h)(1) ...........................................................................................19

Fed. R. Civ. P. Rule 9(b) .........................................................................................24

Fed. R. Civ. P. Rule 12(b)(6) ...........................................................................3, 16, 24

Fed. R. Civ. P. Rule 15(a)(2) ...................................................................................19

*Sarbanes-Oxley Act of 2002,* Pub. L. No. 107-204, 116 Stat. 745 (2002)................................5, 15

*Securities Act of 1933*, 48 Stat. 74 (1933) (codified at 15 U.S.C. §77a *et seq.*). .....................23, 24

*Securities Exchange Act of 1934,* ch. 404, 48 Stat. 881 (1934) (codified at 15 U.S.C. §78a *et seq.*)...............................................................................................................23

### ACCOUNTING

AICPA Audit & Accounting Guide, *Deposit and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies* (June 1, 2009) ......................................................................................................... 18-19

AICPA Continuing Professional Education, *Audits of Banks, Saving Institutions, Credit Unions and Other Financial Institutions* (2009) ...............................................19

FDIC, *Interagency Policy Statement on Allowances for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions* (July 2001)........17

FDIC, *Interagency Policy Statement on the Allowance for Loan and Lease Losses*, Financial Institution Letter 105-2006 (December 13, 2006) .............................................17

FDIC, *Material Loss Review of Franklin Bank S.S.B., Houston, Texas*, Audit Report (July, 2009) ..................................................................................... *passim*

FDIC, *Overview of the Compliance Examination*, Attachment to Financial Institution Letter 52-2003 (June 20, 2003) ...................................................................................15

00164797

FDIC, *Uniform Retail Credit Classification and Account Management Policy*, 65 Fed. Reg. 36904 (June 12, 2000).................................................................................................7, 22

Financial Accounting Standards ("FAS") No. 5, *Accounting for Contingencies* (FASB March 1975) ................................................................................................................................22

Financial Accounting Standards ("FAS") 114, *Accounting by Creditors for Impairment of a Loan*, (FASB May 1993) ....................................................................................................22

Financial Accounting Standards ("FAS") 115, *Accounting for Certain Investments in Debt and Equity Securities*, (FASB May 1993) ......................................................12, 13, 14, 22

Financial Accounting Standards ("FAS") 154, *Accounting Changes and Error Correction*, (FASB May 2005)............................................................................................................8

Eric Fry, *Sell Bank Stocks: The "Truth" Behind Non-Performing Loans* (March 4, 2010) at http://dailyreckoning.com ........................................................................................... 9-10

OCC Ombudsman, *Appeal of OCC Supervisory Office Decisions Regarding Accounting Treatment of the Investment Portfolio, a Provision to the ALLL, and the Charge Off of Accrued Interest on a Nonaccrual Loan* (Q4/2008) ..........................................................13

Speech by SEC Staff, *Remarks Before 2004 AICPA National Conference on Current SEC and PCAOB Developments* (December 6, 2004) at http:www.sec/gov/news/speech/spch120604jmj.htm ..................................................13, 14

Statement on Auditing Standards ("AU"), Section 150, *Generally Accepted Auditing Standards* ........................................................................................................................18

Statement on Auditing Standards ("AU"), Section 311, *Planning and Supervision* ....................18

Statement on Auditing Standards ("AU"), Section 326, *Audit Evidence* ......................................18

Statement on Auditing Standards ("AU"), Section 342, *Auditing Accounting Estimates* .............18

00164797

Preferred Plaintiffs respectfully submit this sur-reply in further opposition to defendants' motions to dismiss.   References to "Opp. at __" are to pages of Preferred Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss.   Other abbreviations comport with those used in the Opp.   References to the ACPC are to the Redacted Amended Consolidated Preferred Stock Purchaser Complaint, dated May 27, 2010, filed in accordance with the Court's May 13, 2010 order. [1]

## I.   ARGUMENT

### A.  The Redacted Complaint Sufficiently Alleges Section 10(b)(5) Claims

#### 1.  Lack of Insider Trading Does Not Protect Defendants from Liability

The Individual Defendants harp on the fact that the redacted ACPC does not allege that they engaged in unusual or suspicious sales of stock during the Class Period, claiming that this either completely "negate[s]" the inference of scienter against them (*see* Ranieri Reply at 3-4; ID Reply at 5), or forces plaintiffs to meet a "tougher" and "more stringent" pleading standard.  *See* Ranieri Reply at 4-5; Nocella Reply at ¶ 14 and n.17; ID Reply (i.e. reply brief of defendants Chimerine, Golush, Howard, et al.) at 5.  Neither of these propositions is correct.

In *Tellabs*, the Supreme Court expressly rejected the argument advanced by Tellabs's CEO that the absence of allegations that he sold shares during the class period negated any inference of his scienter.  *Tellabs, Inc. v. Makor Issued & Rights, Ltd.*, 551 U.S. 308, 325 (2007).  The Court held that, regardless of whether it included motive allegations, the complaint had to be assessed by the district court in its entirety to determine whether all of the allegations collectively gave rise to a strong inference of scienter.  *Id.*  "While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter

---

[1] Because the redacted ACPC follows the same paragraph numbering as the original ACPC, references to the ACPC in the Opp. may now be assumed to be references to the redacted ACPC.

00164797

1

inference, we agree with the Seventh Circuit that *the absence of a motive allegation is not fatal*. As earlier stated, allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.* (emphasis added, internal citations omitted).

The entirety of the redacted ACPC gives rise to the strong inferences that all of the Individual Defendants were at a minimum severely reckless in making their respective misstatements about the Bank's asset quality, financial results, and allowance for credit losses. Under *Tellabs*, the Individual Defendants cannot trump the cogent, compelling inferences of scienter against them by arguing that the redacted ACPC does not allege a specific motive for their recklessness. *See, e.g., Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 255 n.17 (5th Cir. 2009) (finding plaintiff adequately pled scienter without evaluating the allegations of insider trading); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009) (scienter adequately pled notwithstanding absence of allegations of unusual or suspicious stock sales by defendants, quoting *Tellabs*, 551 U.S. at 324, "absence of a motive allegation is not fatal"); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 n.3 (11th Cir. 2008) ("We emphasize that suspicious stock sales are not necessary to create a strong inference of scienter.") (citing *Tellabs*, at 324).

The Individual Defendants' alternative proposition -- that absent allegations of motive plaintiffs must satisfy a "tougher" pleading standard -- is a distortion of out-of-date dicta concerning what was once accepted in this Circuit as constituting two alternative methods of alleging scienter: namely, by alleging "facts that show a defendant's motive to commit securities fraud... [or] by identifying circumstances that indicate conscious behavior on the part of the defendant." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (cited in

Ranieri Reply at 5).  *See also Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994) (cited in Ranieri Reply at 4-5); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 n.3 (5th Cir. 1996) (cited in ID Reply at 5).  Since the Fifth Circuit no longer recognizes allegations of motive and opportunity standing alone as sufficient to plead a strong inference of scienter (*see, e.g., Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009)), the comparison these earlier cases made between the relative difficulty of pleading intentional or reckless behavior, compared to simply pleading motive to defraud, has no continuing relevance.  Plaintiffs must plead facts that give rise to a strong inference of the defendants' knowing or reckless behavior, irrespective of whether they also plead that the defendants had motive to inflate the value of their own shareholdings.  Thus, contrary to the defendants' assertions, plaintiffs here must satisfy the same pleading standard as every other securities fraud plaintiff in this Circuit.  *Tellabs* instructs that this Court must determine whether Preferred Plaintiffs have met that standard by "assess[ing] all of the allegations holistically," not by ascribing particular "significance … to an allegation of motive, or lack thereof."  551 U.S. at 325.  The totality of the allegations in the ACPC readily gives rise to the requisite strong inferences of scienter against all of the Individual Defendants, as well as against D&T.

### 2.  Nocella Is Liable for Misstatements Nos. 1-3

The plain language of misstatement no. 1 is that Franklin did not participate in subprime lending and adhered to high credit standards.  Nocella asks the Court to make a factual determination accepting his competing interpretation.  This is improper on a Rule 12(b)(6) motion generally and because it asks the Court to decide that Nocella's less plausible

interpretation of the statement is the correct one.  No amount of sophistry can change the clear implication of Nocella's statements.[2]

Nocella asks the Court to assume that the meaning of his words is something different because, according to Nocella, the Bank disclosed its subprime exposure.  Even if this were true, and it is not, prior disclosures cannot immunize current or later misstatements.  In any event, as we show below, the disclosures to which Nocella points did not meaningfully alert investors to Franklin's subprime exposure since those disclosures did not conform to GAAP and concealed information by, among other things, not placing them where GAAP would have required.

Nocella rightly abandons his earlier descriptions of misstatements nos. 2 and 3, tacitly acknowledging that his unauthenticated transcription of the investor conference call was erroneous.  As with misstatement no. 1, Nocella asks the Court to give the words Nocella used meanings other than their plain meanings.  In misstatement no. 2, Nocella affirmatively says that there were no exotic products on Franklin's balance sheet.  Nocella's primary argument is that these statements were forward-looking rather than retrospective.  Although it is unclear how this helps Nocella, it is also a misleading representation of the colloquy at issue.  Indeed, Nocella was clearly being "retrospective" when he falsely stated that "we never had anything like that...."  Nocella also contends that plaintiffs have not shown the presence of material amounts of high risk loans, but even the FDIC examinations cited in the OIG Report show that sufficiently material amounts were repeatedly noted by examiners.  *See* OIG Report at 4-6, 22-23.

As for scienter, Nocella continues to view each scienter fact in isolation.  Thus, from Nocella's perspective: It is not enough that he was the person in charge of the Bank.  It is not

---

[2]  Nocella and McCann argue that because some allegations have been stricken there is no longer any factual support for some of the alleged misstatement claims.  As a review of the redacted ACPC reveals, however, ample factual basis remains for all claims, and in many instances, multiple items are cited as evidencing falsity and scienter.

enough that he signed the financial statements.  It is not enough that he signed the Sarbanes-Oxley certifications.  It is not enough that he spoke the misstatements.  It is not enough that he fired a bank officer who challenged the improprieties.  It is not enough that he sat on the Bank's credit committee.  It is not enough that he was required by law to receive the FDIC's examination reports.  It is not enough that the two years of accounting irregularities converted the Bank from profitable to bankrupt.  And it is not enough that he was fired in the aftermath.

In the aggregate and "holistically," however, these allegations are more than enough to show that Nocella knew or was reckless in not knowing about the Bank's subprime exposure and lax lending standards, thus rendering actionable his statements to the contrary.[3]

### 3.   The Individual Defendants Are Liable for Misstatements Nos. 4-8

#### a.   The Improper Delinquent Loan Accounting Raises A Strong Inference of Scienter

Defendants cannot contest the falsity of misstatements nos. 4-8 in light of the Bank's admissions in the August 6, 2008 Form 8-K that its financial statements for 2006 and the first three quarters of 2007 were required to be restated.  *See In re OCA, Inc. Sec. and Derivative Litig.*, 2006 WL 3747560, at *12 (E.D. La. Dec. 14, 2006) (allegations that the company announced that its financial statements would need to be restated were "plainly sufficient" to establish falsity on a motion to dismiss).  However, Nocella and McCann do attempt to raise a "truth-on-the-market" defense with respect to the Bank's improper accounting for tens of millions of dollars of nonperforming single family loans serviced by third parties (*i.e.*, the Delinquent Loan Accounting issue).  *See* Nocella Reply at ¶ 19 and n.19; McCann Reply at 7.

---

[3]  Nocella argues that there must be corroborating evidence of actual awareness of the key issues.  This is not the standard for strong inference, and it ignores recklessness, which also suffices to show scienter.  From the facts adduced thus far concerning his position, repeated signatures on documents, speaking on the relevant issues and thus making of actual false statements, among other things, it is clear that a strong inference of scienter is more than plausible.

00164797                                                     5

These defendants contend that disclosures buried[4] in the notes to the Bank's financial statements corrected the admitted, massive under-reporting of nonperforming loans[5] and nonperforming assets,[6] over-reporting of interest income[7] and EPS,[8] and under-estimation of the allowance for credit losses[9] – all of which resulted in part from the Delinquent Loan Accounting issue. *See* Lunn Ex. H (August 6, 2008 Form 8-K) at 3.   Specifically, Nocella and McCann point to a single statement in the notes to each of the relevant financial statements disclosing the bare fact that a specified dollar amount of single family loans serviced by third parties "were four payments or more delinquent and still accruing interest." *See* Nocella Reply at n.19; McCann Reply at 7.

Contrary to the defendants' contentions, these purported "disclosures" were not conveyed to investors "with a degree of intensity and credibility sufficient to counterbalance effectively" the admitted misrepresentations in the Bank's financial statements. *See Weiland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) ("The truth-on-the-market doctrine can be used as a defense provided that 'the corrective information [was] conveyed to the public "with a degree of intensity and credibility" sufficient to counterbalance effectively any misleading information created by' the allegedly false and misleading statements."). In the first place, these purported "disclosures" omitted the material fact that GAAP, banking regulations

---

[4] For example, the "disclosure" that is buried in the 2006 Form 10-K appears only once in that 125 page document – at page 94. *See* Nocella Reply at n.19; McCann Reply at 7.  The Bank's nonperforming loans were under-reported (as $13.3 million instead of $33.9 million) *30 pages earlier*, at pages 64-65. *See* IDJA Tab 7 at 64-65.  Contrary to Nocella's contention, the discussion of "Non-Performing Assets and Impaired Loans" at pages 64-65 did not include any reference to the Delinquent Loan Accounting issue. *See* Nocella Reply at ¶ 19.  In fact, even the most diligent investor could have read all of the notes under the heading "Non-Performing Assets and Impaired Loans" in the 2006 Form 10-K without seeing the "disclosure" to which Nocella refers, because that "disclosure" was hidden in the notes discussing the Bank's *performing loan assets*, 30 pages further into the document. *See* IDJA Tab 7 at 92-95.

[5] Misstatement No. 4. *See* Preferred Stock Plaintiffs' Appendix of Alleged Misstatements, annexed hereto.

[6] Misstatement No. 5.

[7] Misstatement No. 7.

[8] Misstatement No. 8.

[9] Misstatement No. 10.

and the Bank's own accounting policies required that the loans in question be given a different –
and far less favorable – accounting treatment. "Under [GAAP], interest should not be accrued
on loans for which payment in full of principal or interest is not expected, or, generally, upon
which payment of principal or interest has been in default for a period of 90 days or more."
Lunn Ex. H (August 6, 2008 Form 8-K) at 3. In other words, loans 90 days or more past due
must be placed on non-accrual status and reported as NPL. *See also* Greenberg Reply
Declaration, Ex. A (FDIC, *Uniform Retail Credit Classification and Account Management
Policy*, 65 Fed. Reg. 36904 (June 12, 2000)) (single family mortgages that have been in default
for 90 days or more should be classified as "Substandard").

In addition, the purported "disclosures" did not explain – let alone quantify – the negative
effects that appropriate, GAAP-compliant treatment of the loans in question would have had on
the Bank's reported interest income – reducing it by $1.1 million in 2006, and by $301,000,
$410,000, and $562,000, respectively, in each of the first three quarters of 2007 – and on the
Bank's provision for credit losses – increasing it by $236,000, $509,000, and $1.9 million,
respectively, in the first three quarters of 2007. *See id.* Even the most savvy investor had no
way of quantifying how much worse the Bank's financial statements should have looked in these
material respects based on the deliberately vague disclosure that some quantity of "loans that
were four payments or more delinquent were still accruing interest."[10] Thus, the overstatement
of the Bank's interest income and EPS, and the under-estimation of its provision for credit

---

[10] In addition, the purported "disclosures" did not quantify the catastrophic effect that GAAP-compliant accounting
would have had on the critical asset-quality ratios of Nonperforming Loans to Total Loans ("NPL Ratio") and
Nonperforming Assets to Total Assets ("NPA Ratio"). In 2006, for example, the Bank artificially improved its NPL
Ratio from 0.80% to 0.31% by a combination of this improper Delinquent Loan Accounting and improper accounting
for troubled debt restructurings (*i.e.* the Loan Modification Accounting issue). *See* Lunn Ex. H (August 6, 2008 Form
8-K) at 9. In 2007, the positive effect on the NPL Ratio was even more dramatic: in 2007Q1, the actual NPL Ratio of
1.16% looked like it was only 0.44%, in 2007Q2 the actual NPL Ratio of 1.24% looked like 0.38%, and in 2007Q3 the
actual NPL Ratio of 2.15% looked like 0.71%. *See id. See also* Opp. at 25.

losses, were not corrected or counterbalanced to any extent by the "disclosures" upon which Nocella and McCann rely. In any event, the Court must reject defendants' truth-on-the-market defense for the separate reason that it requires a fact-specific inquiry that is not appropriately disposed of on a motion to dismiss. *See Stone Energy*, 2007 WL 2903178, at *11 (cited in Opp. at 16).

The Court must also reject McCann's contention that these purported "disclosures" support an inference that the Delinquent Loan Accounting issue was the result of an "after-the-fact, good faith disagreement about interpreting and applying accounting rules." McCann Reply at 7. First, the fact that financial statements needed to be restated is inconsistent with a "disagreement" about competing interpretations of GAAP. A restatement is only necessary when the prior accounting treatment is clearly wrong. *See In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 138 (S.D.N.Y. 2008) ("Under [GAAP], restatements are only required to correct material accounting errors, and [the company] would have little motive to restate if not required to do so under GAAP."); Greenberg Ex. L (FAS No. 154, *Accounting Changes and Error Correction*) at ¶¶ 1, 3h, 3j, 25, B30 (The term "restatement" refers only to the correction of errors in financial statements "resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared.") The inference that McCann seeks is inconsistent with the facts alleged in the ACPC and is, therefore, not an inference that the Court is required to consider under *Tellabs. See* 551 U.S. at 324 (inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged.")[11]

---

[11] Defendants rely on dicta from three cases for the inapposite proposition that a range of accounting judgments may be consistent with GAAP. *See* Rainieri Reply at 7 n.9; Nocella Reply at ¶ 21; McCann Reply at 6-7; D&T Reply at 9 n.18. In this case, the restatement establishes that the accounting treatments that resulted in misstatements nos. 4-8 and

Second, it is highly significant that the Bank's auditor does not support McCann's "good faith disagreement" inference.   To the contrary, rather than attempting to defend a patently indefensible accounting treatment, D&T contends – falsely, to be sure – that the Delinquent Loan Accounting issue resulted not from a disagreement over how to interpret and apply accounting rules, but from the fact that ***"defendants, including the auditors, had no knowledge that those loans were delinquent."*** D&T Reply at 8 (emphasis added). *See also id.* at 7 ("[T]he Bank had no knowledge that a portion of its loans were delinquent because the servicer continued to make payments to the Bank on loans where the borrowers had stopped paying.")  This plainly was not the case. The "disclosures" in the notes to financial statements demonstrate that the Bank and its auditors knew that the loans in question were four payments or more delinquent. *See* Nocella Reply at ¶ 19 and n.19; McCann Reply at 7.  If a good faith basis existed for accounting for these loans as performing loans, then the auditors who signed-off on that treatment should say so, rather than attempting to mislead the Court with patently false excuses.

Third, the incentive for the Bank to reduce the amount of NPL on its balance sheet was extremely strong.  As previously noted, NPL are a critical indicator of a bank's asset quality.  *See* Opp. at 25 and n.13.  For this reason, banks are frequently tempted to engage in "accounting chicanery" in order to make their total NPL appear lower than it really is.[12]

---

10 were not within the GAAP range of tolerance. None of defendants' cases on this involved financial statements that were required to be restated. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535-36 (5th Cir. 2008) (no basis to infer scienter where company never acknowledged GAAP violations by announcing a restatement); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.6 (5th Cir. 1996) (falsity not sufficiently alleged where incoming auditors certified that the company's financial statements complied with GAAP); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 2010 WL 961596 at *13 (S.D.N.Y. Mar. 17, 2010) (finding, in absence of restatement, that timing of write-downs on CIBC's mortgage-backed securities was business judgment); *see also Fait v. Regions Fin. Corp.*, ___ F. Supp. 2d ___, 2010 WL 1883487, at *4 (S.D.N.Y. 2010) (cited in D&T Reply at 9 n.18) (valuation of assets for which there was no objectively determinable value was not misstatement of fact).

[12] *See, e.g.,* Eric Fry, *Sell Bank Stocks: The "Truth" Behind Non-Performing Loans* (March 4, 2010) at http://dailyreckoning.com (commenting on use of "accounting chicanery" and "financial sleight-of-hand" to improve

Here, the Individual Defendants had a particularly strong incentive to under-report NPL because the catastrophic deterioration in the Bank's single family mortgage portfolio threatened to destroy the illusion of asset quality they had created by concealing the Bank's exposure to subprime loans and touting its single family portfolio as comprising "high quality liquid assets." *See, e.g.*, misstatements nos. 1-3; 2006 Form 10-K at 3 ("[W]e maintain a portfolio of single family mortgages that provides high quality liquid assets for us...") and 4 ("Our single family mortgage portfolio provides high quality liquid assets for us...").[13]  Under these circumstances, the Delinquent Loan Accounting issue is at least as likely to have been the result of "accounting chicanery" as it is to have resulted from yet to be identified good faith interpretations of GAAP. *See Tellabs*, 551 U.S. at 328 (inference of scienter need only be "*at least as likely as* any plausible opposing inference.")

### b. The Improper REO Accounting Raises A Strong Inference of Scienter

The Individual Defendants' innocent explanations for other accounting irregularities reported in the August 6, 2008 Form 8-K are even less compelling.  The 8-K simply does not support the defendants' claim that the Bank accounted improperly for millions of dollars of foreclosed single family mortgages (*i.e.,* the REO issue) because of "difficulty [it] had in reconciling information that it received from its [loan] servicers on a monthly basis."  Nocella Reply at ¶ 20 (citing August 6, 2008 Form 8-K at 4); McCann Reply at 8 n.11.  In fact, the 8-K does not identify any "difficulty" experienced by the Bank in this regard.  Rather, it describes a

---

appearance of credit quality by reducing NPL, and noting that "[s]ome banks are utilizing every accounting mechanism in their toolbox to move lousy loans into a loan category – any loan category – other than 'NPL.'")

[13]  Had the Bank accounted properly for all of its nonperforming single family loans in 2006, it would not have been able to report a 49% *decrease* in NPL from the prior year. *See* 2006 Form 10-K at 65 (reporting 2006 NPL of $13.3 million compared to 2005 NPL of $20 million).  Instead, it would have reported an approximately 23% increase in NPL since 2005. *See* August 6, 2008 Form 8-K at 3 (reporting that 2006 NPL was understated by $20.5 million as a result of the Delinquent Loan Accounting issue).  Appropriate accounting treatment of nonperforming single family loans would have had a catastrophic effect on the Bank's NPL and NPA Ratios. *See supra* n. 10 and Opp. at 25.

procedure for identifying foreclosed loans that not only failed to comply with applicable bank regulatory standards, but also was clearly not designed to ensure timely reporting of material information, and was in violation of applicable banking regulations. *See* August 6, 2008 Form 8-K at 3-4 ("Before 2008, Franklin's process for identifying foreclosures or [REO] within its serviced by others portfolio was based on a reconciliation of cash receipts reflected on the servicers' [monthly] reports [which were generally received late in the subsequent month]. Based on this reconciliation, Franklin did not record or write-down foreclosures in its single family mortgage portfolio serviced by others on a timely basis.").

Far from supporting an inference that the REO Accounting issue was the result of "innocent human error" (*see* McCann Reply at 8 n.11), the explanation in the 8-K raises a strong inference of severe recklessness on the parts of Nocella and McCann – who were responsible for designing the Bank's internal financial controls to ensure timely and accurate reporting (*see, e.g.,* 2006 Form 10-K at Ex. 31.1 at ¶¶ 4(a), (b), Ex. 31.2 at ¶¶ 4(a), (b)) – and D&T – which was responsible for certifying the effectiveness of those controls. *See* 2006 Form 10-K at 74.

It is absurd for McCann to contend that the REO issue does not give rise to an inference of scienter absent "facts indicating that McCann had [a] *role in reconciling the Bank's REO data.*" *See* McCann Reply at 8 n.11 (emphasis added). A CFO is not a bookkeeper.[14] A CFO is responsible for ensuring that the bookkeepers' records reflect the company's financial condition on a timely basis. *See, e.g.,* 2006 Form 10-K at Ex. 31.2 at ¶ 4(a). The fact that the Bank's procedures were so inadequate that its bookkeeping was continuously months out-of-date, resulting in materially inaccurate reporting of its assets and income for at least four consecutive reporting periods, was the responsibility of the Bank's management – not its bookkeepers – and

---

[14] It is likewise absurd for McCann to deny that he was a controlling person of the Bank. He clearly had the power to influence the Bank.

00164797                                                    11

raises a strong inference that management, the Board that supervised them, and the accountants that audited them, were severely reckless as to the danger of misleading investors.

It is likewise nonsense for Nocella to contend that the Bank's chronic delays in recording and writing-down loan foreclosures do not support the inference of scienter because they "may have caused REO to be overstated" in a hypothetical period of decreasing foreclosures.  *See* Nocella Reply at ¶ 20.  A downward trend in the foreclosure rate in a particular period does not result in decreasing the amount of REO from what was reported in a prior period.  It simply means that the size of the increase in the REO reported in the prior period will be smaller.  If there were no foreclosures at all in a particular period, REO would remain constant, unless the Bank (1) sold some foreclosed properties (which would result in REO decreasing, but would also result in the Bank having to record expenses of sale and possibly taking a charge against ALLL), or (2) reassessed the value of the foreclosed properties it owned (which could result in the REO increasing or decreasing).  The 8-K makes clear, however, that the REO accounting issue did not involve delays in recording sales or revaluations of REO.  Rather, it resulted only because "Franklin did not record or write-down foreclosures in its single family mortgage portfolio serviced by others on a timely basis." August 8, 2006 Form 8-K at 4.  Regardless of whether the rate of foreclosures was increasing or decreasing, then, delays in recording and writing-down foreclosures would always have tended to bias the Bank's figures upwards.  Thus, the very nature of this accounting issue raises a strong inference of scienter.  *See* Opp. at 26-27.

### c. The Improper Investment Securities Accounting Raises A Strong Inference of Scienter

Contrary to Nocella's contention, FAS 115 (*Accounting for Certain Investments in Debt and Equity Securities*) does not "leave broad scope for judgment" regarding the circumstances under which investment securities may be transferred into and out of the "trading" category, as

the Bank did here.  *See* Nocella Reply at ¶ 21.[15]   Rather, FAS 115 narrowly defines the circumstances in which such transfers are permitted.  *See* Greenberg Ex. K (FAS 115) at 12(a) (defining "trading" securities as those "bought and held principally for the purpose of selling them in the near term") and ¶ 15 ("Given the nature of a trading security, *transfers into or from the trading category also should be rare*.") (emphasis added).  According to the SEC, FAS 115 sets "a very high threshold" such that only "an event that is unusual and highly unlikely to recur in the near term" will justify a transfer into or out of the trading category.  *See, e.g.,* Speech by SEC Staff, *Remarks before 2004 AICPA National Conference on Current SEC and PCAOB Developments* (Dec. 6, 2004) ("SEC Staff Speech") at 2.[16]   Such events may include "a change in statutory or regulatory requirements" or "a significant business combination or other event [that] greatly alters the company's liquidity position."  *Id.*   They specifically do not include "changes in investment strategies, achieving accounting results more closely matching economic hedging activities and repositioning the portfolio due to anticipated changes in the economic outlook."  *Id. See also* OCC Appeal at 1 (volatile market conditions do not qualify as "rare").

Here, the reason offered by the Bank for the transfers at issue – *i.e.,* rebalancing of the Bank's portfolio (*see* 2007Q3 Form 10-Q (cited in Nocella Reply at ¶ 21; McCann Reply at 8)) –

---

[15]  Nocella's reliance upon *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 537 (5th Cir. 2008) in this context is inapposite.  In *Shaw Group,* the plaintiffs alleged that financial statements were not in accordance with GAAP because the company had over-valued its pending contracts and certain assets it had acquired from two bankrupt companies.  *Id.* at 534.  In the absence of a restatement, and without any market by which the fair value of these assets could be readily determined, the court concluded that the valuations at issue were "inherently nuanced conclusions" and not fraudulent misstatements or omissions.  *Id.* at 536.  Here, by contrast, inconsistency with GAAP has already been established by the Bank's announcement that the transfers would have to be reversed. Moreover, determining whether FAS 115 permits a transfer between asset categories under a known set of circumstances is in no way analogous to determining the fair value of assets for which there is no market.

[16]  A copy of this speech is on the SEC's website at www.sec.gov/news/speech/spch120604jmj.htm, and is attached as Exhibit C to the accompanying Greenberg Reply Decl.  *See also* OCC Ombudsman, *Appeal of OCC Supervisory Office Decisions Regarding Accounting Treatment of the Investment Portfolio, a Provision to the ALLL, and the Charge Off of Accrued Interest on a Nonaccrual Loan* (Q4/2008) ("OCC Appeal") at 1 (defining "rare" for purposes of FAS 115 as "isolated, nonrecurring and unusual circumstances"), attached as Exhibit B to Greenberg Reply Decl.

is so clearly inconsistent with FAS 115 that it supports a strong inference of at least severe recklessness against Nocella and McCann. *See* SEC Staff Speech at 2 ("[T]he staff [of the SEC] continues to have a high level of interest related to this issue and will continue to question (and/or challenge) registrants that have transferred securities into or from the trading category. As a result, registrants should consider discussing the issue with us prior to transferring securities into or from the trading category.") It is simply not plausible that Nocella and McCann, both qualified CPAs with extensive banking industry experience, could have had a good faith belief that the transfers at issue were consistent with FAS 115. Thus, the nature of the GAAP standard violated, the exceptional nature of the accounting events involved, and the fact that this misapplication of GAAP enabled the Bank to record an additional $1.7 million of non-interest income, when considered together with Nocella's and McCann's qualifications and banking industry experience, give rise to a strong inference of severe recklessness, which is far more compelling than the Bank's tepid and self-serving statement that "[m]anagement believed these transfers were appropriate under GAAP at that time."

### d. Defendants Cannot Avoid the Cogent and Compelling Inference that They Were Notified of FDIC Red Flags

Beginning with its September 2003 annual examination of the Bank, the FDIC repeatedly flagged the weakness and inadequacy of the Bank's internal audit program, and the need for improvement in the Bank's accounting and financial reporting. *See* Opp. at 30. McCann and directors Chimerine, Golush, et al. seek to avoid the strong inference of scienter that arises from these red flags by arguing, in effect, that Preferred Plaintiffs have not alleged facts demonstrating that they actually received copies of the FDIC examination reports that contained the red flags. *See* McCann Reply at 3 and n.4; ID Reply at 3. In fact, the FDIC's procedures require the reports of annual compliance examinations to be furnished to the financial institution's board of

00164797                                             14

directors and management. *See* Greenberg Ex. F (*Overview of the Compliance Examination*, attachment to FDIC Financial Institution Letter 52-2003 (June 20, 2003) at 4 ("The results of the examination will also be communicated to the board of directors and management of the institution in a Report of Examination."). The inference that the FDIC examiners complied with this examination procedure is far more compelling than defendants' inference that they did not.[17]

McCann relies on the *Dynegy* decision to argue that the ACPC does not allege scienter. *Dynegy*'s dismissal of CEO Watson is distinguishable from the allegations against McCann here. In *Dynegy*, Watson was not identified with any particularity as involved in the two off-balance sheet transactions giving rise to that litigation, notwithstanding the complaint's reliance on trial testimony on the subject (which through its silence seemingly exonerated Watson), among other things, and thus contradicting the plaintiffs' generalized allegations. *In re Dynegy Inc. Sec. Litig.*, 339 F. Supp.2d 804, 898 (S.D. Tex. 2004). More importantly, McCann, as CFO, was the key person at Franklin who took responsibility for financial statements and financial reporting. ACPC at ¶ 13. It was the job of CFO to take on this responsibility, and he signed the false reports and Sarbanes-Oxley certifications falsely attesting to the quality of the financial reporting. ACPC at ¶ 96. These allegations contrast starkly with the unparticularized, conclusory and somewhat contradicted allegations against Watson in *Dynegy*.

Ranieri argues that outside directors cannot be held liable merely based on the magnitude of a restatement. First, this is not a case based solely on magnitude. Second, Ranieri was not truly an outsider. Throughout the Class Period, he played a pivotal role in the affairs of the Bank on precisely the matters giving rise to the claims, including sitting on a relevant committee and

---

[17] Several defendants tacitly or expressly acknowledge that they possess copies of the various Examination Reports. *See* e.g. McCann Brief in Support of Motion to Dismiss [Docket 187], March 5, 2010 at 22, n.17; Ranieri Brief in Support of Motion to Dismiss [Docket 188] at 22 n.14; Nocella Brief in support of Motion to Dismiss [Docket Entry 192] at 11 n.12; ID Brief in Support of Motion to Dismiss [Docket Entry 189] at 20.

00164797                                                    15

as speaker of several of the misstatements at issue (e.g., nos. 12 and 13).  He clearly portrayed himself as one of the Bank's leaders in charge.  Ranieri's claim that he was a rank outsider is thus false and contrary to the impression he and others conveyed to investors.  Third, as the cases cited by Ranieri on reply make clear, directors who play a role in the relevant affairs of the business may be held liable, regardless of their outside status.  *See e.g. In re Enron Corp. Securities, Derivative & ERISA Litig.*, 258 F. Supp. 2d 576 (S.D. Tex. 2003) at 625 n.55.[18]

Defendants argue that they lack scienter because plaintiffs have not pleaded that the auditors objected to or questioned the accounting practices at issue, citing *Mortensen v. Americredit Corp.*, 123 F. Supp. 2d 1018, 1026-27 (N.D. Tex. 2000).  *Mortensen* – which does not say what has been attributed to it – is distinguishable because it relates to a company's misapplication of a subjective rule that was routinely misapplied and as to which clarifying guidance was required from the SEC and FASB because of the universal confusion.  Nothing in *Mortensen* requires auditor disapproval to demonstrate scienter, a proposition that would eliminate scienter in virtually every case involving restatements since discovery is foreclosed pending the motions to dismiss and it would be all but impossible to ascertain the auditor's impressions of a particular accounting treatment at the pleading stage.  And as we have previously shown, the accounting issues here were not subjective ones.

---

[18]  Ranieri also attempts to inject facts outside the record including his place of residence and the fact that he serves on many boards of directors as evidence that he was too busy to run Franklin.  These unsupported statements are improper on a Rule 12(b)(6) motion and do nothing to support Ranieri's conclusion.  Similarly, as we have previously argued, defendants' efforts at getting the Court to conduct its own searching review of documents outside the complaint and not incorporated by reference (such as the OIG Report) in a hunt for plausible alternative explanations is also improper on this motion, as we have explained at length in Plaintiffs' Response to Joinder of Defendants Nocella, McCann, et al. to the Joint Motion of Defendants RBC Capital Markets Corp. and Deloitte & Touche LLP to Strike Certain Factual Allegations [Docket Entry 201] (March 29, 2010) at 2-5.  Although the argument there related to the primarily to the Examination Report, it applies with equal force to the OIG Report.

### 4. Ranieri, Nocella and McCann, Respectively, Are Responsible for Misstatements Nos. 9-14

As we have shown, defendants' statements concerning allowances for credit losses and concerning the Q4 2007 increase in the provision were materially false and misleading.  The primary rebuttal arguments concerning misstatements nos. 9-14 relate to scienter.  Even without the Examination Report, misstatement no. 10 is clearly false since we know from the August 6, 2008 Report on Form 8-K that ALLL needed to be restated, and from the OIG Report that the Bank's ALLL methodology had material weaknesses [OIG Report at 23], and that the ALLL methodology contravened the *Interagency Policy Statement* (*see* Opp. at 35.).

McCann also challenges misstatement no. 11, arguing that he has put forward a more plausible explanation for the misstatements, arguing that the economy was declining and the Bank tried its best.  But a restatement means that the numbers they put out were wrong when first disseminated.  They are not revisions based on subsequent events.  Many of the statements defendants made, including misstatement no. 11, were voluntarily proffered by defendants, and having chosen to speak, they had a duty to speak accurately.  The statement that the Bank had conducted a complete evaluation was simply untrue, as we have shown, Opp. at 42, and the provision that was taken was both inadequate under GAAP and not "anticipatory" as characterized, it was responsive to regulators' demands.  Nor was the provision sufficient to qualify as prudent as characterized.[19]

Ranieri contends that he conveyed that Franklin was in talks with regulators (misstatement no. 13), a contention completely at odds with the fact that he falsely said "no" when directly asked this question.  Nocella, similarly, attempts to mince words in misstatement

---

[19]   Nor can these verifiable statements be characterized as mere puffery.  *See In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 509 (S.D.N.Y. 2009).

no. 14 contending that the reference to prudence was not as to the amount of provison, but just as to the decision to increase the provision. These sorts of arguments highlight the lengths to which these defendants will go to try to distance themselves from the obviously false portrayals they conveyed during the Class Period, and the Court should reject these decidedly less plausible versions.

### 5. D&T Is Liable for Misstatements Nos. 15-17

D&T's argument that the court cannot look beyond the face of the complaint for purposes of resolving this motion runs directly contrary to its earlier argument, in support of its motion to strike, that the court *must* consider "the entire contents and context of" all documents incorporated by reference into the complaint in determining a motion to dismiss. *See* Joint Motion of Defendants RBC Capital Markets Corporation and Deloitte & Touche LLP to Strike Certain Factual Allegations in Plaintiffs' Amended Consolidated Preferred Stock Purchaser Complaint (Docket # 176) at 5 (citing *Tellabs*, 551 U.S. at 322). It is also contrary to law.[20] All of the facts upon which Preferred Plaintiffs base their opposition to D&T's motion to dismiss may properly be considered by the Court because they are alleged in the complaint and/or set forth in documents that are referred to in the complaint or of which the court may otherwise take judicial notice. *See* Opp. at 55 (citing ACPC at ¶¶ 38, 41-42, 44, 45, 47, 76-77, 85-87, 89-95, 97, 98-105, 109-110; August 6, 2008 Form 8-K; FDIC OIG Report; AU § 150 (*Generally Accepted Auditing Standards*); AU § 311 (*Planning and Supervision*); AU § 326 (*Audit Evidence*); AU § 342 (*Auditing Accounting Estimates*); AICPA Audit & Accounting Guide, *Deposit and*

---

[20] *City of Dallas, Texas v. Hall*, 2007 WL 3125311 (N.D. Tex. Oct. 24, 2007) (the only authority cited by D&T for this proposition, *see* D&T Reply at 3) is inapposite. In that case, the court declined to consider *legal arguments* in opposition to a motion to dismiss that were inconsistent with the legal theory alleged in the complaint. *Id.* at *11. The court noted, however, that it could properly consider "documents referred to by complaint, and matters subject to judicial notice." *Id.* (citing *Allison v. Brooktree Corp.*, 999 F. Supp. 1342, 1346 (S.D. Cal. 1998)).

00164797                                        18

*Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies* (June 1, 2009); AICPA Continuing Professional Education, *Audits of Banks, Savings Institutions, Credit Unions and Other Financial Institutions* (2009).[21]

Contrary to D&T's assertion, Preferred Plaintiffs have alleged particularized facts sufficient to show that D&T knew of the red flags about the Bank's financial reporting and controls that were raised by the FDIC. *See* D&T Reply at 5. Specifically, Preferred Plaintiffs have alleged that the Bank was required by law to provide the FDIC's reports of examination to D&T. *See* Redacted ACPC ¶ 102 (citing 12 U.S.C. § 1831m(h)(1), requiring transmission of examination reports to auditors). In addition, under GAAS, D&T was required to consider, and plan its 2006 audit in light of, the FDIC's reports of examination. *See* Opp. at 49-50. The only plausible inference from these facts is that D&T knew of, and ignored, the FDIC's repeated concerns about the Bank's: (1) weak and inadequate internal audit function, (2) unsatisfactory accounting and financial reporting, (3) weak loan administration, (4) inadequate measurement, monitoring and reporting of loan concentrations, and (5) inadequate internal review and grading of loans. *See* Opp. at 48 (citing ACPC ¶¶ 38, 85-87 and OIG Report at 22, 23).

D&T's attempt to characterize these known red flags as mere "indicators of business risk" – rather than auditing risks that demanded investigation – is unavailing. *See* D&T Reply at 4-5. The FDIC's above-listed concerns related directly to the risk that the Bank's financial reporting was unreliable – a risk that a reasonable accountant, facing the same facts, would have

---

[21] In the event that the court finds that the redacted ACPC does not allege sufficient facts to state a claim against D&T, or any of the other defendants, leave should be granted to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.") Preferred Plaintiffs have substantively amended their complaint on only one prior occasion (*see* Docket # 167, Dec. 22, 2009), and their informal factual investigations have been on-going since the date of that amendment. At a minimum, justice requires that Preferred Plaintiffs be given an opportunity to amend in light of the Court's order striking references to the FDIC's July 2008 Report of Examination from the complaint. In consultation with the defendants, Preferred Plaintiffs redacted the complaint to comply with the Court's order, rather than seeking to amend, because of the pendency of defendants' motions to dismiss. Preferred Plaintiffs reserve their rights to seek to amend in the event that any of the defendants' motions are granted.

investigated. *See Fin. Acquisition Partners, L.P. v. Blackwell*, 2004 WL 2203253, at * 21 (N.D.

Tex. Sep. 29, 2004) ("To show scienter . . . Plaintiffs must plead facts which give rise to a strong

inference that no reasonable accountant, facing the same facts, would have made the same

decisions as Deloitte."), *aff'd*, 440 F.3d 278 (5th Cir. 2006) (cited in D&T Reply at 4 n.7).[22]

That risk was ultimately realized, as shown by Bank's public announcement that its 2006

financial statements would have to be restated.[23]

　　　　The Court must also reject D&T's blatantly false assertions regarding the extent and

nature of the accounting violations that necessitated restatement of the Bank's 2006 audited

financial statements.　In the first place, the 8-K identifies *two* separate accounting violations that

resulted in material misstatements in the 2006 audited financial statements, not just one as D&T

claims.　*Compare* D&T Reply at 7 (claiming that "five out of the six items proposed to be

restated had no impact on the 2006 audited financial statements, so they are completely

irrelevant to D&T's scienter") *with* August 6, 2008 Form 8-K at 3-4 (announcing restatement of

the financial statements for the year ended December 31, 2006 as a result of GAAP violations

with respect to Delinquent Loan Accounting and REO Accounting).[24]　Second, D&T proffers a

---

[22]　None of the authorities cited by D&T actually provides support for the contention that knowledge of "business risks" cannot give rise to a strong inference of auditor scienter. *See* D&T Reply at 4 n.7 (citing *Blackwell*, 2004 WL 2203253, at *21 (business risks did not give rise to a strong inference that D&T should have issued a going concern qualification as to the audited financial service company's viability because the risks had been specifically disclosed to investors); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1100 (C.D. Cal. 2008) (fact that real estate mortgage company was acquiring risky Alt-A and Alt-B loans did not raise an inference that CEO knew his statement that the company expected to continue "solid loan acquisitions" was false because the statement referred to the *quantity*, not the *quality*, of future loans); *Fait*, 2010 WL 1883487, at *5 (plaintiff failed to adequately allege that ALLL was misstated); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) (same)).

[23]　*See Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp.2d 648, 658 (W.D. Tex. 2006) (company's announcement of need to restate financial statements sufficiently alleges falsity); *In re OCA, Inc. Sec. and Derivative Litig.*, 2006 WL 3747560, at *12 (E.D. La. December 14, 2006)(same); *In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *25 (E.D. Tex. June 16, 2004).

[24]　D&T selectively quotes from the 8-K the obviously erroneous summary statement that "[t]he impact of REO Accounting is expected to be limited to the financial statements for the periods ended September 30, 2007, June 30, 2007 and March 31, 2007. *See* D&T Reply at 7 n.15.　In the paragraphs that immediately precede this, the 8-K

00164797　　　　　　　　　　　　　　　　　　　20

demonstrably false explanation for the first of these two violations, the improper Delinquent Loan Accounting. According to D&T, NPL were under-reported by $20.5 million in 2006 because "the Bank had no knowledge that a portion of its loans were delinquent..." *See* D&T Reply at 7. *See also id.* at 9 ("the very existence of the delinquencies" was "masked"). In fact, as previously noted, the Bank and D&T were perfectly well aware of the additional $20.5 million in NPL that the Bank chose not to account for in accordance with GAAP, banking regulations, and its own accounting policy. *See supra* at Point I.3(a)(The Improper Delinquent Loan Accounting Raises A Strong Inference of Scienter). The fact the D&T signed off on such a clearly erroneous accounting treatment raises a strong inference that its audit was "so deficient [as to] amount[] to no audit at all" and that it made "accounting judgments . . . that no reasonable accountant would have made ... if confronted with the same facts." *PR Diamonds, Inc. v. Chandler*, 364 F. 3d 671, 693-94 (6th Cir. 2004).

The improper REO accounting also raises a strong inference of D&T's scienter. As previously explained, the 8-K indicates that this GAAP violation resulted from the Bank's ineffective internal controls. *See supra* Point I.3(b)(The Improper REO Accounting Raises A Strong Inference of Scienter). Nevertheless, in Misstatement No. 16, D&T expressed an unqualified opinion as to the effectiveness of those controls. Moreover, like the improper Delinquent Loan Accounting, the improper REO Accounting did not – as D&T claims – involve "highly judgmental and complex" accounting issues. *See* D&T Reply 9 (citing *Shaw Group*, 537 F.3d at 536 and *Fait*, 2010 WL 1883487, at *4 and n.38, both of which involved accounting

---

unambiguously states that as a result of improper REO accounting, restatement of the financial statements for the year ended December 31, 2006 is necessary to increase REO by $2.1 million and reduce pre-tax income by $678,000. *See* August 6, 2008 Form 8-K at 4.

00164797                                                                  21

estimates of the fair value of assets for which there was no market).[25]   To the contrary, GAAP and banking regulations provide bright-line rules regarding when delinquent single family mortgages must be placed on non-accrual status (*i.e.*, reported as NPL) and when they must be reported as REO.  *See* Opp. at 28 (citing FAS 5, FAS 115, FAS 114); FDIC, *Uniform Retail Credit Classification and Account Management Policy*, 65 Fed. Reg. 36904 (June 12, 2000). D&T's unexplained failure to detect these simple and obvious accounting violations raises a cogent and compelling inference of severe recklessness.

Finally, contrary to D&T's contention, restatements of similar magnitude to the proposed restatement of the 2006 audited financial statements have been held to be sufficiently significant to contribute to a strong inference of scienter.   According to the 8-K, for the year ended December 31, 2006, the Bank's NPL were understated by 155% (or $20.5 million), NPA were understated by 66% (or $22.6 million), and REO was understated by 10.7% (or $2.1 million). *See* Misstatements Nos. 4-6.   The resulting overstatements of net income – by 5.8% – and Earnings Per Share – by 7.7% or $0.05 per share – are comparable in magnitude to restatements that have been held to contribute to a strong inference of scienter.  *See, e.g., In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 WL 538756, at *12-13 (D. Or. Jan. 3, 2006) (EPS overstated by $0.08 per share supported inference of scienter).   On this point also, D&T seeks to mislead the court by drawing a bogus analogy to the holding in *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (*see* D&T Reply at n.17), wherein the court found that an overstatement of ***total revenues of 5.68% over a five-year period*** was not of sufficient magnitude to give rise to an inference of scienter.   Contrary to D&T's characterization, a 5.68% overstatement of total revenues over a five-year period is not "of a similar magnitude" to a ***5.8% overstatement of net***

---

[25]  *See supra* notes 11 and 16.

00164797

*income over a one-year period*.   Moreover, in *Ley*, unlike here, the overstatement of total revenues resulted from numerous, unrelated errors, many of which did not involve simple accounting issues.   *See id.* (citing errors involving amendments to retiree health benefit plans, amount and time of certain tax adjustments and changes to deferred taxes, corrections for certain tooling costs and volume related rebates, inventory costing corrections, unrecorded pension expenses related to European operations and postretirement health care expenses in a foreign location, errors related to freight expenses, material surcharges and supplier expenses).

## B. The ACPC Adequately Pleads Securities Act Claims

### 1. The Claims Are Timely

RBC misleadingly asserts that plaintiff has "admitted that it was on actual notice" of its claims more than a year prior to filing its complaint against RBC.   There is no such admission. RBC's argument simply ignores the Opp.   The supposed "judicial admission" is an earlier complaint that asserted a much shorter class period and that was predicated on the then-current understanding of Franklin's problems and thus only stretched as far back as the September 2007 quarter.   Nothing in that filing – which predated significant revelations about the magnitude and duration of problems at the Bank – admits anything about the subsequently revealed fact that RBC's offering of Franklin Bank stock was also affected by the subprime woes and accounting irregularities at the Bank.   Even D&T's reply brief points out that "The Bank's proposed restatement of 2006 financial statements did not arise until August 2008," [D&T Reply at 1-2], which is consistent with the ACPC and with the fact that only in August 2008 was there any

indication that periods earlier than September 2007 were affected by accounting irregularities and by significant and previously undisclosed subprime exposure.[26]

### 2. Rule 9(b) Does Not Apply

Although Rule 9(b) does not apply to the non-fraud claims asserted here, defendants persist with the assertion that the ACPC does not meet a Rule 9(b) standard.  Defendants Chimerine, Golush, Howard, et al. concede that Rule 9(b) does not apply.  *See* Chimerine, et al. Reply at 6 n. 20.  RBC now resorts to declaring that the non-fraud Securities Act claims engage in "wholesale adoption" of the fraud-based claims, but a fair reading of the ACPC shows that it was drafted to avoid any such finding.  RBC's conclusory assertions about lack of specificity are belied by the ACPC, which details the locations and precise words of misstatements in the Prospectus, thus providing ample specificity.  ACPC at ¶¶ 32-33.[27]

### 3. The Negative Causation Defense Fails

Nocella argues that nothing in the August 2008 disclosures disclosed anything false in the Registration Statement.  Nocella offers no factual information beyond this, and no expert opinions in this regard, and rightly so since this is a Rule 12(b)(6) motion.  But these assertions are incorrect.  The ACPC plainly alleges – and the reality is – that in August 2008 the market

---

[26]   Although RBC attempts to distinguish the Supreme Court's recent decision in *Merck & Co. v. Reynolds*, 559 U.S. ___, 130 S.Ct. 1784 (2010), its distinction is unavailing.  RBC points out that the language of the limitations provisions of the Securities Act and the Exchange Act differ.  This points to a historical debate that the *Merck* decision has settled.  There was no dispute that the limitations provision of the Securities Act was objective (discovered or should have discovered), but there was a split of authority over whether the standard for Exchange Act claims was subjective (and thus limited only to actual discovery).  Although RBC states that Justice Scalia's dissent "correctly points out" that these standards are different, in fact the very first paragraph of the *Merck* decision resolves the issue, finding both statutes of limitations are objective.  *Merck*, 130 S.Ct. at 1789-90.  This distinction does nothing to bolster RBC's position in any event, since RBC can point to nothing that shows that plaintiffs should have been on notice as of May 2008 that the Registration Statement and Prospectus contained false or misleading statements, since, prior to August 2008, nothing suggested that periods earlier than September 2007 were affected by the accounting irregularities and previously undisclosed subprime exposure.  Any such allegation prior to August 2008 therefore would have been purely conjecture.

[27]   RBC mistakenly contends that the ACPC does not identify any specific misstatements.  *See* ACPC ¶¶ 32-33 (listing and quoting misstatements) ¶¶ 35-38 (explaining same.)

learned for the first time that the breadth of Franklin's problems stretched back years rather than months.  Only by stretching back years does one discover that the Registration Statement and Prospectus contained false statements.  The stock price declines resulting from these revelations plainly support causation.  Likewise, and contrary to the arguments of Defendants, Chimerine, et al. just as the August 2008 disclosures were the first items to place plaintiffs on notice of the expanded temporal breadth of the claims, the stock price declines in August 2008 plainly would support a finding of causation (and indeed, earlier stock price declines might even be attributable to defendants for damages purposes, even if the earlier declines did not constitute inquiry notice -- which such declines plainly did not since defendants were falsely saying the problems only went back to September 2007).[28]

Nocella also points to revelations in 2009, such as the OIG Report and the Wolfe Letter, to point out that these "revelations" could not have caused the price drop.  This is beside the point.  These documents are revelations only in the sense that they served to bolster or confirm scienter for the fraud-based claims and certainly support claims of falsity, even if they were not themselves causative of plaintiffs' damages.  In the final analysis, the Court should not forget that negative causation is an affirmative defense that Nocella must prove, and he has completely failed to prove that the price of Franklin securities declined for reasons completely unrelated to the misstatements alleged.  The negative causation defense must be rejected on this motion.

---

[28]   So that there is no confusion, earlier stock price declines pre-dating August 2008 are attributable to defendants unless they prove otherwise.  The mere fact that earlier stock price declines did not excite inquiry notice does not mean that plaintiffs cannot recover for these losses, and defendants cite no authority equating the test for inquiry notice with a test for causation.  Although loss causation is not plaintiffs' burden it is conceivable for example that prior stock price declines are related to misrepresentations in the Prospectus even though those declines were insufficient to excite inquiry notice at the time of those declines, and only later, after inquiry notice, did it become evident that those earlier declines were also related to the misrepresentations or omissions in the Prospectus.  In any event, it is up to defendants to prove that these declines are entirely unrelated to their misstatements, and defendants have not done so.

## C. Conclusion

For all the foregoing reasons, the motions to dismiss should be denied.

Dated this 25th day of June, 2010.
Dated this 25th day of June, 2010.                          Respectfully submitted,

SCHWARTZ JUNELL GREENBERG
& OATHOUT, LLP

By:      _/s/ Thane Tyler Sponsel____
Roger B. Greenberg
Texas State Bar No. 08390000
Federal I.D. No. 3932
Thane Tyler Sponsel III
Texas State Bar No. 24056361
Federal I.D. No. 690068
909 Fannin Street, Suite 2700
Houston, TX 77010
Telephone (713) 752-0017
Facsimile (713) 752-0327

- *and* -

SHALOV STONE BONNER & ROCCO LLP
Ralph M. Stone (pro hac vice)
Susan M. Davies
Amanda C. Scuder
485 Seventh Avenue, Suite 1000
New York, NY 10018
Telephone (212) 239-4340
Facsimile (212) 239-4310

*Lead Counsel For Preferred Stock
Purchaser Plaintiffs*

00164797                                    26

## CERTIFICATE OF SERVICE

I certify that on June 25, 2010, a copy of the foregoing *Preferred Plaintiffs' Sur-Reply in Further Opposition to Defendants' Motions to Dismiss* was served on the following counsel via the Court's ECF system as indicated below:

| | |
|---|---|
| Barrett H. Reasoner | breasoner@gibbs-bruns.com |
| Thomas C. Fitzhugh, IV | champefitzhugh@warejackson.com |
| William Fred Hagans | fhagans@hagans-law.com |
| Andrea D. Levin | akim@diamondmccarthy.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Randall K. Pulliam | rpulliam@cauleybowman.com |
| Darrin Williams | dwilliams@cauleybowman.com |
| Cynthia S. Connolly | cconnolly@scoutdoug.com |
| J. Allen Carney | acarney@cauleybowman.com |
| James A. Harrod | jharrod@wolfpopper.com |
| Ronen Sarraf | ronen@sarrafgentile.com |
| Farbod Moridani | farbod.moridani@lw.com |
| James J. Farrell | james.farrell@lw.com |
| M. Bryon Wilder | BWilder@gibsondunn.com |
| Jonathan C. Dicket | JDickey@gibsondunn.com |
| Samantha A. Lunn | slunn@gibsondunn.com |
| George W. "Billy" Shepherd | bshepherd@crusescott.com |
| Stephen E. McConnico | smcconico@scottdoug.com |

and on the following parties by U.S. mail:

James G. Munisteri
Orin H. Lewis
Gardere Wynne Sewell & Riggs
1000 Louisiana, Suite 3400
Houston, Texas 77002

Robert J. Giuffra, Jr.
Brian T. Frawley
Andrew J. DeFilippis
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

Samuel H. Rudman
David A. Rosenfeld
Mario Alba, Jr.
Robbins Geller Rudman & Dowd, LLP
58 South Service Road, Suite 200
Melville, NY 11747

David C. Walton
Robbins Geller Rudman & Dowd, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

_Thane Tyler Sponsel III_
Thane Tyler Sponsel III