IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re Franklin Bank Corp. Securities Litigation | § § § | Civil Action No. 4:08-CV-1810 |
| | | CLASS ACTION |

## MEMORANDUM OPINION AND ORDER

Pending before the Court in this securities fraud class action lawsuit are the following motions and related pleadings:

(1)     Deloitte & Touche LLP's motions to dismiss the (redacted) amended consolidated preferred stock purchaser complaint (Docket Entry No. 181) and for judicial notice (Docket Entry No. 182), to which plaintiffs filed a response (Docket Entry No. 211) and sur-reply (Docket Entry No. 240), and to which defendant filed a reply (Docket Entry No. 230) and an update (Docket Entry No. 242);

(2)     RBC Capital Markets Corporation's motion to dismiss the (redacted) amended consolidated preferred stock purchaser complaint (Docket Entry No. 183) and memorandum in support (Docket Entry No. 184), to which plaintiffs filed a response (Docket Entry No. 211) and a sur-reply (Docket Entry No. 240), and to which defendant filed a reply (Docket Entry No. 224);

(3)     Russell McCann's motion to dismiss the second consolidated amended complaint (Docket Entry No. 186) and joint appendix (Docket Entry No. 190), to which

plaintiffs filed a response (Docket Entry No. 210) and a sur-reply (Docket Entry No. 239), and to which defendant filed a reply (Docket Entry No. 226);

(4)    Russell McCann's motion to dismiss the (redacted) amended consolidated preferred stock purchaser complaint (Docket Entry No. 187) and joint appendix (Docket Entry No. 190) and supplemental appendix (Docket Entry No. 231), to which plaintiffs filed a response (Docket Entry No. 211) and a sur-reply (Docket Entry No. 240), and to which defendant filed a reply (Docket Entry No. 227);

(5)    Lewis S. Ranieri's motion to dismiss the (redacted) amended consolidated preferred stock purchaser complaint and the second consolidated amended complaint (Docket Entry No. 188) and joint appendix (Docket Entry No. 190) and supplemental appendix (Docket Entry No. 231), to which plaintiffs filed a response (Docket Entry No. 211) and a sur-reply (Docket Entries No. 239, 240), and to which defendant filed a reply (Docket Entry No. 228);

(6)    The motion to dismiss the (redacted) amended consolidated preferred stock purchaser complaint filed by Lawrence Chimerine, David M. Golush, James A. Howard, Alan E. Master, Robert A. Perro, William Rhodes, and John B. Selman (Docket Entry No. 189) and joint appendix (Docket Entry No. 190) and supplemental appendix (Docket Entry No. 231), to which plaintiffs filed a response (Docket Entry No. 211) and a sur-reply (Docket Entry No. 240), and to which defendants filed a reply (Docket Entry No. 229);

2

(7)     Anthony Nocella's motion to dismiss the second consolidated amended complaint (Docket Entry No. 191), to which plaintiffs filed a response (Docket Entry No. 210) and defendant filed a reply (Docket Entry No. 233); and

(8)     Anthony Nocella's motion to dismiss the (redacted) amended consolidated preferred stock purchaser complaint (Docket Entry No. 192) and supplemental appendix (Docket Entry No. 231), to which plaintiffs filed a response (Docket Entry No. 211) and a sur-reply (Docket Entry No. 240), and to which defendant filed a reply (Docket Entry No. 232).

The parties also filed various post-submission letters and briefs.  (Docket Entries No. 246, 247, 251-254, 257-262.)  Defendant Nocella's motion for leave of court to file his post-submission brief (Docket Entry No. 254) is **GRANTED**.  Defendant Deloitte & Touche's request for judicial notice (Docket Entry No. 182) is **GRANTED**.

Based on consideration of the motions, the responses, the replies and sur-replies, the exhibits, public government agency documents, the post-submission letters and briefs, and the record, and after hearing argument of counsel, the Court **GRANTS** the motions to dismiss for the reasons that follow.

## I.  BACKGROUND AND CLAIMS

This is a consolidated class action lawsuit brought by two sets of investors:  the purchasers of the common stock of Franklin Bank Corp. (the "Bank" for purposes of these proceedings), who acquired their stock between January 31, 2007, and May 19, 2008, and

are represented by lead plaintiff, the Franklin Investor Group (the "Plaintiffs"), and the purchasers of the preferred stock of the Bank, who acquired their stock between January 31, 2007, and August 6, 2008, and are represented by lead plaintiff, the Harold Roucher Trust U/A DTD 9/21/72 (the "Preferred Stock Purchasers").

Franklin Bank was a state-chartered savings and loan institution purchased by defendants Lewis S. Ranieri and Anthony Nocella in April of 2002.  Ranieri and Nocella initiated a rapid growth strategy for the Bank and, for purposes of this lawsuit, operated without significant financial difficulties until 2007, when real estate, mortgage, and financial markets nationwide were showing sharp downturns.  The Bank, with a strategy focused on asset growth concentrated in 1-4 family residential loans and acquisition, development, and construction loans funded with wholesale funding, began experiencing financial difficulties in 2007, and the price of plaintiffs' common and preferred stock progressively deteriorated until it became essentially worthless when the Bank was shut down by state banking authorities in November of 2008.  The Federal Deposit Insurance Corporation ("FDIC") was appointed as receiver for the Bank for purposes of liquidation.  As part of its investigation of the Bank's failure under the Federal Deposit Insurance Act, the FDIC, through the Office of Inspector General, released a Material Loss Review in July of 2009 (the "OIG Report"),[1] concluding that the Bank's failure was due, at least in part, to bank management's high-risk

---

[1]All of the parties cite and rely on various portions of the OIG Report in their pleadings.

business strategy and weak risk management practices and controls.  Blame was also placed on a declining economic environment and ineffective FDIC supervision.

From 2003 through early 2008, the Bank filed various annual and quarterly financial statements required by federal law, issued press releases regarding the Bank, and participated in public investor conference calls.  It made a public offering of its preferred stock in 2006.  The FDIC regularly examined the Bank, issuing a report of examination ("ROE") for each visit, and conducted quarterly off-site monitoring.  These documents, reports, and other written statements, including statements of confidential witnesses, comprise the sources for the various federal securities law violations alleged by plaintiffs in this lawsuit.[2]

Plaintiffs assert claims against the defendants under Section 10(b), Rule 10b-5, and Section 20(a) of the Securities Exchange Act of 1934,[3] and under Sections 11 and 15 of the Securities Act of 1933, seeking damages for the loss in value of their shares.

A.    The Franklin Investor Group

In their second consolidated amended complaint (the "Complaint") (Docket Entry No. 167), the Plaintiffs bring claims under Section 10(b), Rule 10b-5, and Section 20(a) against

---

[2]The parties no longer rely on non-public governmental agency documents, such as the FDIC examination reports.  However, the OIG Report makes reference to some of these non-public documents, and the parties cite to, and rely on, those references.

[3]The Court will refer to Plaintiffs' claims arising under section 10(b) and Rule 10b-5 as "10(b)" claims for simplicity's sake.

5

defendants Ranieri, Nocella, and Russell McCann, who were directors or officers of the Bank during all times relevant to this lawsuit.

Plaintiffs allege the following securities law violations in the Complaint:

(1)     Count One:  the defendants violated section 10(b) and Rule 10b-5 by carrying out a plan, scheme, and course of conduct which was intended to, and did, deceive Plaintiffs and the investing public; artificially inflating and maintaining the market price of the Bank's common stock; and causing Plaintiffs to purchase the stock at artificially inflated prices that did not reflect the stock's true value.  Defendants concealed adverse information about the Bank's operations, financial condition, and performance, and engaged in fraud and deceit, knowingly or with reckless disregard for the truth, and made material misrepresentations or omissions of fact.

(2)     Count Two: the defendants were controlling persons of the Bank under Section 20(a) by virtue of their high-level positions with the Bank, participation in and awareness of the Bank's operations and intimate knowledge of the Bank's actual performance, their power to influence and control the Bank's decision making, including the content of public and governmental communications, their direct involvement in day-to-day operations of the Bank at the highest levels, and their presumed power to control or influence the acts and transactions giving rise to the 10(b) claims.

Plaintiffs claim that, as a result of defendants' wrongdoings, their stock became worthless.

6

B.      The Preferred Stock Purchasers

In their amended consolidated preferred stock purchaser complaint (the "Roucher Complaint") (Docket Entry No. 168; redacted version, Docket Entry No. 217), the Preferred Stock Purchasers bring claims under Section 10(b), Rule 10b-5, and Section 20(a) against Nocella, McCann, and Ranieri, and against Lawrence Chimerine, David M. Golush, James A. Howard, Alan E. Master, Robert A. Perro, William Rhodes, John B. Selman (collectively the "Directors").[4]  They further bring 10b claims against Deloitte & Touche ("Deloitte"), Section 11 claims under the Securities Act of 1933 against RBC Capital Markets Corporation ("RBC"), and Section 11 and Section 15 claims against Nocella, McCann, Ranieri, and the Directors.

The Preferred Stock Purchasers assert the following claims in the Roucher Complaint:

(1)      Count One:  the defendants (except Deloitte) filed a materially false and misleading registration statement for the Bank's sale of the preferred stock.  RBC, as underwriter for the preferred stock offering, issued the materially false and misleading registration statement, and failed to conduct adequate due diligence.

(2)      Count Two: the defendants Nocella, McCann, Ranieri, and the Directors were controlling persons of the Bank by virtue of their positions as senior officers and directors and their power to control the Bank's corporate actions and transactions giving rise to 10(b)

---

[4]As with the Franklin Investor Group's claims, the Court will refer to the Preferred Stock Purchasers' claims arising under section 10(b) and Rule 10b-5 as "10(b)" claims.

violations.  They did not make a reasonable investigation and had no reasonable grounds to believe that the registration statement was true and without omissions of material fact.

(3)     Count Three:  the defendants (except RBC) knew, or recklessly disregarded, material adverse non-public information about the Bank's financial results and business conditions and failed to disclose such information, and participated in the misleading statements, releases, reports, and other public representations as to the Bank.

(4)     Count Four:  the defendants Nocella, McCann, Ranieri, and the Directors were controlling persons of the Bank by virtue of their senior executive or director positions and had the power and authority to cause the Bank to engage in 10(b) violations.

The Preferred Stock Purchasers claim that, as a result of these wrongdoings, their stock became worthless.

The defendants seek dismissal of the Plaintiffs' claims in the Complaint and the Preferred Stock Purchasers' claims in the Roucher Complaint under Rule 12(b)(6) for failure to satisfy the Private Securities Litigation Reform Act ("PSLRA") heightened pleading requirements for securities fraud cases, and under Rule 9(b) of the Federal Rules of Civil Procedure for failure to plead properly a fraud case.  The defendants also seek dismissal of the claims based on expiration of the applicable one and two year statutes of limitation provided by the Securities Act of 1933 and the Securities Exchange Act of 1934, respectively.

## II.  THE APPLICABLE LEGAL STANDARDS

A.      Section 10(b) and Rule 10b-5

Under Section 10(b) of the Securities Exchange Act of 1934,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Similarly, SEC Rule 10b-5, promulgated pursuant to Section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a private 10(b) claim, a plaintiff must allege the following:

(1)      a material misrepresentation or omission by the defendant;

(2)      scienter;

(3)      a connection between the misrepresentation or omission and the purchase or sale of a security;

9

(4)    reliance upon the misrepresentation or omission;

(5)    economic loss; and

(6)    loss causation.

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 232. Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubenstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994). Under Fifth Circuit construction, the appropriate inquiry is whether, under all the circumstances, the statement or omitted fact is one that a reasonable investor would consider significant in making the decision to invest, "such that it alters the total mix of information available about the proposed investment." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993).

Section 10(b) and Rule 10b-5 do not protect investors against negligence or corporate mismanagement, *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537

F.3d 527, 535 (5th Cir. 2008), and under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant.  Rather, to establish a 10(b) claim, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).[5]  Scienter, in the context of securities fraud, is defined as "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009).

A plaintiff may meet his scienter pleading obligation by pleading facts giving rise to a strong inference of reckless or conscious misconduct.  *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).  Under the PSLRA, the Court considers whether all the facts and circumstances, taken together, give rise to a strong inference of scienter.  *Tellabs, Inc.*, 551 U.S. at 322-23; *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 431 (5th Cir. 2002).  To qualify as "strong" within the meaning of the statute, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent.  *Tellabs, Inc.*, 551 U.S. at 309.

---

[5]Although all of the defendants (except RBC) present arguments against nearly all of the 10(b) factors, they, as will the Court, focus primarily on the issue of scienter.

11

The Fifth Circuit recognizes that a plaintiff may meet the scienter requirement by showing that, with respect to the statement or omission, the defendant acted either intentionally or with severe recklessness.  In *Rosenzweig v. Azurix Corp.*, the Fifth Circuit held that "severe recklessness" is

> limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even excusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

332 F.3d 854, 866 (5th Cir. 2003).  *See also Nathenson*, 267 F.3d at 408.

Pleadings of scienter may not rest on the inference that a defendant must have been aware of the misstatements based on his positions with the company, *Shaw Group*, 537 F.3d at 535, nor does corporate mismanagement, standing alone, give rise to a viable 10(b) claim. *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994).  Conclusory assertions that a defendant "should have known" about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter. *Abrams*, 292 F.3d at 432.  A plaintiff cannot meet his burden of pleading scienter without stating any facts showing that a defendant's alleged statement was belied by his actual knowledge of contradictory facts or by facts so obvious that the defendant had to have been aware of it.  *See Tuchman*, 14 F.3d at 1069.  A plaintiff cannot charge a defendant with intentionally misleading investors about facts the defendant may have become aware of *after*

12

making an allegedly misleading statement.  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005).

Although allegations of motive and opportunity, standing alone, will not suffice to meet the scienter requirement, allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter.  *Shaw Group*, 537 F.3d at 533.  To demonstrate motive, a plaintiff must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.  Merely alleging facts that lead to a strained and tenuous inference of motive is insufficient to satisfy the pleading requirement."  *Id.*, at 543.  Allegations that a defendant was motivated to commit fraud to enhance his position or compensation or to raise capital are also inadequate, because "the executives of virtually every corporation in the United States would be subject to fraud allegations."  *Abrams*, 292 F.3d. at 434.  Allegations of motives that are possessed by almost all corporate executives do nothing to enhance pleadings of scienter.  "Scienter in a particular case may not be footed solely on motives universal to corporate executives," such as the desire to maintain the company's credit ratings or maintain high stock prices to increase its value.  *Shaw Group*, 537 F.3d at 544.  *See also Tuchman*, 14 F.3d at 1068 (holding that motive to inflate stock price and value of defendants' investments was insufficient to establish scienter under Rule 9(b)).

Plaintiffs need not allege motive for a 10(b) claim in order to survive a Rule 12(b)(6) motion to dismiss.  The Supreme Court recognizes that, while motive can be a relevant

consideration, and personal financial gain may weigh heavily in favor of an inference of scienter, the absence of a motive is not fatal.  *Tellabs, Inc.*, 551 U.S. at 325.

Moreover, the Fifth Circuit does not allow a "group pleadings approach" to establishing scienter; the court must look only to the state of mind of the individual who made or issued the statement or furnished information for use in the statement, and not to the collective knowledge of the corporation's officers and employees acquired in the course of their employment.  *See Shaw Group*, 537 F.3d at 534.  The complaint must specifically connect individual defendants to the statements or omissions, otherwise it will fail under the PSLRA's heightened pleading standard.  *Fin. Aquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  Corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document.  *Id*.

The Fifth Circuit has never required a plaintiff to present direct evidence of scienter in order to withstand dismissal of his securities claims.  *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003).  Circumstantial evidence can support a strong inference of scienter under the PSLRA.  *Nathenson*, 267 F.3d at 410.  Conclusory allegations, however, will not suffice to plead scienter, nor may a court conduct a piecemeal analysis of the alleged facts and circumstances.  Rather, the court must view the totality of the alleged facts and circumstances as a whole to determine whether they raise a strong inference of scienter. *Abrams*, 292 F.3d at 430-31.

14

Further, the mere publication of inaccurate accounting figures, or a failure to follow generally accepted accounting principles ("GAAP"), without more, does not establish scienter. *Shaw Group*, 537 F.3d at 534; *Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir. 1994). The nature of accounting problems that lead to restatement of a company's financials, for instance, can "easily arise from negligence, oversight, or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams*, 292 F.3d at 433. In *Shushany v. Allwaste, Inc.*, the Fifth Circuit held that plaintiffs failed to state a fraud claim based on accounting irregularities because

> the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do.

992 F.2d 517, 522 (5th Cir. 1993). Nor does the fact that the defendant executed a statutorily-required Sarbanes-Oxley Act ("SOX") certification establish scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 555 (5th Cir. 2007). To infer scienter from SOX certifications, there must be facts establishing that the officer who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Shaw Group*, 537 F.3d at 545.

15

Allegations regarding scienter that are derived from confidential sources detract from their weight in the scienter analysis, and courts must discount allegations from confidential sources. *Shaw Group*, 537 F.3d at 535. At the very least, the confidential sources must be described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. *Id.*; *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

To determine whether a plaintiff has alleged facts that give rise to the requisite strong inference of scienter, the court must consider plausible, non-culpable explanations for the defendants' conduct, as well as inferences favoring the plaintiff. *Tellabs, Inc.*, 551 U.S. at 324. The inference that a defendant acted with scienter

> need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.' . . . Yet the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations.

*Id.* In short, a complaint will survive only if, when all the allegations in the complaint are taken as true, a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *Id.*, at 326. Further, omissions and ambiguities count against an inference of scienter, as a plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Id.* While the court will view a complaint *in toto* when considering whether a strong inference of scienter has been

pleaded, each allegation of fraud must individually meet the particularity requirements of the PSLRA.

B.   <u>Sections 11 Liability</u>

Under Section 11 of the Securities Act of 1933, entitled "Civil liabilities on account of false registration statement,"

> (a)   In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue –
>
> (1)   every person who signed the registration statement;
>
> *   *   *   *
>
> (5)   every underwriter with respect to such security.

15 U.S.C. § 77k.  Section 11 was enacted to assure compliance with the disclosure requirements of the 1933 Securities Act by imposing a stringent standard of liability on parties who play a direct role in a registered offering. *Herman & McLean v. Huddleston*, 459 U.S. 375, 382 (1983).  Thus, the provision imposes liability if any part of a registration statement or prospectus contains certain untrue statements or omissions.

The elements of a Section 11 claim are:  (1) an omission or misstatement (2) of a material fact required to be stated or necessary to make other statements made not misleading.  *Krim*, 989 F.2d at 1445.  As with 10(b) claims, a fact is material if there is a

17

substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc.*, 485 U.S. at 234. For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* This Court must determine whether the information allegedly omitted or misrepresented in the prospectus was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the prospectus as a whole. *Krim*, 989 F.2d at 1445.

A defendant's actual knowledge of the falsity is not an element of a Section 11 claim and, generally, scienter does not have to be established. *Herman & McLean*, 459 U.S. at 382.[6] If a plaintiff purchased a security issued pursuant to a registration statement, he need only show existence of a material misstatement or omission to establish a *prima facie* case; liability against the issuer or underwriter is virtually absolute, even for innocent misstatements. *Id.*

C.    Sections 15 Liability

Under Section 15 of the Securities Act of 1933 regarding liability of controlling persons,

_____

[6]An exception to this general provision exists for "forward-looking" statements. Under 15 U.S.C. § 77z-2(c)(1)(B)(i), a plaintiff must demonstrate that the defendant had actual knowledge of the false and misleading forward-looking statement made on behalf of the corporation.

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.  The term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  17 C.F.R. § 230.405.

To state a claim for Section 15 control person liability, a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator.  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 221 (5th Cir. 2004).  Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another.  *In re Dynegy, Inc. Securities Litigation*, 339 F. Supp. 2d 804, 828 (S.D. Tex. 2004).  In this circuit, a plaintiff need not allege that the controlling person actually participated in the underlying primary violation to state a claim for control person liability.  *G.A. Thompson & Co. Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981).  However, a plaintiff must allege some facts beyond a defendant's position or title

that show the defendant had actual power or control over the controlled person. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509-510 (5th Cir. 1990).

Although worded differently, the control person liability provisions of Section 15 of the 1933 Act and Section 20(a) of the 1934 Act, below, are interpreted similarly. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 n. 15 (5th Cir. 1993); *In re Dynegy*, 339 F. Supp. 2d at 828.

D.    Section 20(a) Liability

Under Section 20(a) of the Securities Exchange Act of 1934,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Section 20(a), or "control person" liability, is a secondary liability provision, and it is necessary that a primary violation be established before liability under Section 20(a) arises. *ABC Arbitrage*, 291 F.3d at 348 n. 57.  Thus, the failure of a plaintiff to state adequately a 10(b) claim for primary securities fraud violations constitutes a failure to state a claim for control person liability under Section 20(a). *Blackwell*, 440 F.3d at 288.

E.    Safe Harbor Provision for Forward-Looking Statements

With regard to misstatements, the PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability where such a statement is made by a natural person,

20

unless defendants prove that it was made with actual knowledge that the statement was false

and misleading.  15 U.S.C. § 78u-5(c)(1)(A).

A statement is forward looking if it is:

(A)    a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B)    a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C)    a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D)    any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E)    any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

15 U.S.C. § 78u-5(i)(1)(A).

The safe harbor protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial.  15 U.S.C. § 78u-5(c)(1)(A)(i) and (ii).  Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the

21

defendant made the statement with "actual knowledge" that it was "false or misleading."  15

U.S.C. § 78u-5(c)(1)(B).  The safe harbor provision does not apply where the defendants

knew at the time that they were issuing statements that the statements contained false and

misleading information and thus lacked any reasonable basis for making them.

Vague, optimistic statements, however, are not actionable.  Allegations that amount

to little more than corporate "cheerleading" are puffery, projections of future performance

not worded as guarantees, and are not actionable under federal securities law because no

reasonable investor would consider such vague statements material and because investors and

analysts are too sophisticated to rely on vague expressions of optimism rather than specific

facts.  *Krim*, 989 F.2d at 1446.  Additionally, "it is well-established that generalized positive

statements about a company's progress are not a basis for liability."  *Nathenson*, 267 F.3d at

419.  As such, statements that are predictive in nature are actionable only if they were false

when made.  *Shushany*, 992 F.2d at 524.  However, the materiality of predictions is analyzed

on a case-by-case basis.  *ABC Arbitrage*,  291 F.3d at 359.

    F.    <u>Pleadings</u>

Because Plaintiffs and the Preferred Stock Purchasers assert 10(b) violations against

the defendants, they must satisfy the heightened pleading requirements of Rule 9(b), Federal

Rules of Civil Procedure, and the PSLRA.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228

(5th Cir. 2009).  *See also Tellabs, Inc.*, 551 U.S. at 322 (noting that the PSLRA's twin goals

are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover

on meritorious claims).  Rule 9(b) requires a plaintiff to plead fraud with particularity, including specific allegations of the time, place, and content of the misrepresentations, the identity of the persons making the misrepresentations, and what the person who made those misrepresentations gained from making the statements.  *Shushany*, 992 F.2d at 521.  The PSLRA provides, in relevant part, that,

> In any private action arising under this chapter in which the plaintiff alleges that the defendant –
>
> (A)   made an untrue statement of a material fact; or
>
> (B)   omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1); *see also TXU Corp.*, 565 F.3d at 207.

Under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u-4(b)(1)(B).  For each act or omission alleged to be false or misleading, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in making the statement.  15 U.S.C. § 78u-4(b)(2); *Shaw Group*, 537 F.3d at 533.

23

In *ABC Arbitrage*, the Fifth Circuit held that, in order to meet the requirements of the PSLRA and Rule 9(b), a plaintiff pleading a false or misleading statement or omission as the basis of a 10(b) claim must:

(1)  specify each statement alleged to have been misleading;

(2)  identify the speaker;

(3)  state when and where the statement was made;

(4)  plead with particularity the contents of the false representation;

(5)  plead with particularity what the person making the misrepresentation obtained thereby; and

(6)  explain the reason or reasons why the statement is misleading; *i.e.*, why the statement is fraudulent.

291 F.3d at 350.  These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  *Id.*

Rule 9(b) of the Federal Rules of Civil Procedure requires that, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  FED. R. CIV. P. 9(b).  In pleading fraud with particularity, the Fifth Circuit requires that a plaintiff, "at a minimum, include the time, place, and contents of the false representations, as well as identify the speaker who made the misrepresentation and what that person obtained thereby."  *Shushany*, 992 F.2d at 521.  A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.

24

2004).  What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).

Further, general allegations, which lump all defendants together failing to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b).  The Court will reject the "group pleading" approach and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  *Shaw Group*, 537 F.3d at 533.

The pleading of a Section 11 claim, on the other hand, requires only notice pleading under Rule 8 of the Federal Rules of Civil Procedure, rather than the detailed pleading mandated by Rule 9(b) or the PSLRA.  *Kapps*, 379 F.3d at 210.

G.    Limitations

Under 28 U.S.C. § 1658(b)(1), a complaint asserting 10(b) claims is timely if filed no more than two years after a plaintiff discovered the facts constituting the violation.  A cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation, whichever comes first.  *Merck & Co., Inc. v. Reynolds*, 559 U.S. ___, 130 S. Ct. 1784, 1789 (2010).  The facts

constituting the violation include the fact of scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Id.*, at 1790.

In *Merck*, the Supreme Court determined that the fact of scienter constitutes an important and necessary element of a 10(b) violation, so that discovery of the violation includes discovery of facts related to scienter. *Id.*, at 1796. The Court expressly rejected an argument that facts tending to show a materially false or misleading statement (or material omission) are sufficient to establish scienter for purposes of limitations. The Court further rejected an argument that "inquiry notice" can trigger commencement of limitations prior to actual discovery of the facts of scienter. *Id.*, at 1797 ("Because the statute contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have *begun* investigating, we cannot accept [defendant's] argument.") (original emphasis). In short, the Court declined to read an "inquiry notice" exception into the limitations statute:

> We conclude that the limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation' – whichever comes first. In determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating. But the limitations period does not begin to run until the plaintiff thereafter discovers 'the facts constituting the violation,' including scienter – irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.

*Id.*, at 1798.

26

A different statutory scheme governs limitations for claims brought under Section 11of the Securities Act of 1933 for false statements or omissions regarding registration statements and offers to sell securities.  Under Section 13 of the Securities Act of 1933,

> No action shall be maintained to enforce any liability created under section 77k or 77*l* (a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]

15 U.S.C. § 77m.  Violations of sections 77k or 77*l* (a)(2) do not involve the element of scienter, and discovery of scienter is not a factor in a limitations issue.

To determine when the one-year Section 13 limitations period begins to run, courts apply the doctrine of constructive or inquiry notice.  The statute of limitations commences when the plaintiff has actual knowledge of the facts giving rise to his claims or has notice of facts that, in the exercise of reasonable diligence, should have led to such knowledge.  *See In re Dynegy, Inc.*, 339 F. Supp. 2d at 826.  In *Jensen v. Snellings*, the Fifth Circuit held that,

> A plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with knowledge of all facts such an investigation would have disclosed.  Investors are not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transactions.

841 F.2d 600, 607 (5th Cir. 1988) (citations omitted).  The term "storm warnings" is used by courts to describe circumstances that trigger the duty of inquiry because they should suggest to an investor of ordinary intelligence that he has been wronged.  The test for "storm warnings" is an objective one, based on whether a "reasonable investor of ordinary

intelligence would have discovered the information and recognized it as a storm warning." *See Dynegy, Inc.*, 339 F. Supp. 2d at 845-46.

As noted by the district court in *Dynegy, Inc.*, courts do not agree on precisely what constitutes a storm warning, and that among the circumstances found to constitute a storm warning are disclosures in the media, a sudden drop in stock price, filing for bankruptcy, an SEC investigation, and warnings in a prospectus. *Id*. An investor need not have notice of the entire wrong being perpetrated to be on inquiry notice. *Id*. Nevertheless, the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must be "sufficiently confirmed or substantiated" to a point at which the defendants are incited to investigate. *Id*. Moreover, the information constituting storm warnings must be such that it relates directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants. *Id*.

Deciding when a plaintiff is on inquiry notice requires the development of facts. Courts may weigh facts differently, and the determination is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). *Id*., at 847. However, where the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of a wrongdoing can be gleaned from the complaint and agency filings that are integral to the complaint, resolution of the issue on a motion to dismiss is appropriate. *Id*. In the context of dismissal, defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when

28

uncontroverted evidence irrefutably demonstrates when a plaintiff discovered or should have discovered the fraudulent conduct.

H.      Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, ___U.S. ___, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that, where the well pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the plaintiff is entitled to relief. *Id.*, at 1950; *see also* FED. R. CIV. P. 8(a)(2). Although well pleaded factual allegations must be taken as true, the Court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *See Integrated Elec. Servs., Inc.*, 497 F.3d at 550.

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of certain documents attached to the motion to dismiss. The Fifth Circuit restricts such consideration to documents that are referenced in the complaint and are central to the plaintiff's claim. *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). In securities cases, courts may also take judicial notice of the contents of public disclosure

documents that are required by law to be filed with governmental agencies such as the SEC and are actually filed with the agency; however, these documents may be considered only for the purpose of determining what statements they contain, and not for proving the truth of their contents. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 & n. 1 (5th Cir. 1996).

In the usual case under Rule 12(b)(6), the Court must draw all reasonable inferences in favor of the plaintiff. However, for scienter only, and as required by the PSLRA, the Court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs*, 551 U.S. at 314. Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a "strong" inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent. *Id*.

### III.   ANALYSIS OF MOTIONS TO DISMISS THE COMPLAINT

A.   Defendant Lewis S. Ranieri

Defendant Lewis S. Ranieri was one of the two original purchasers of the Bank in April of 2002, and remained a director of the Bank and Chairman of the Board of Directors of Franklin during all times relevant to this lawsuit. In his motion to dismiss (Docket Entry No. 188), Ranieri contends that Plaintiffs fail to allege facts that raise a strong inference that he knew, or was severely reckless in not knowing, of the falsity of certain statements that Plaintiffs allege he made, and that a strong inference of scienter is not stated.

30

Ranieri additionally complains that Plaintiffs failed to allege with the required specificity the material misrepresentations or omissions made by Ranieri and to give reasons why each statement is misleading or fraudulent.

For the reasons shown below, the motion to dismiss (Docket Entry No. 188) is **GRANTED** and Plaintiffs' 10b and Section 20(a) claims against Ranieri are **DISMISSED WITH PREJUDICE**.

> 1.    *Material Misrepresentations*

In their response and sur-reply to the motion to dismiss, and in response to Ranieri's arguments that no specific misleading statements made by him were alleged, Plaintiffs assert that the following assertions in the Complaint constitute material misstatements or omissions by Ranieri during the November 26, 2007, conference call:

(1)    "These are obviously difficult times, but I and the management are very experienced at this.  We have gone through these cycles before.  I think you know our backgrounds and we believe that we can shepherd this institution through this cycle as we have done others and do the best for we, the shareholders."

(2)    "We don't run this as [a] sort of employment center for management and board.  The object here is for shareholders, me included."

(3)    "[M]y job is to guard the place."

(4)    "We have had two of our builders file bankruptcy in the last couple of weeks. Fortunately, we are – and we looked at this hard, we remain well collateralized in those two positions even after the market declined."

(5)    "We remain well capitalized by all standards."

(6)     "We believe we are adequately reserved, we have looked at this very hard."

(7)     Ranieri failed to disclose during the conference call that Countrywide Financial had defaulted on a warehouse line of credit with the Bank and was experiencing delinquencies on its high-risk loans held as collateral by the Bank.

(8)     Ranieri signed the Bank's 2006 Form 10-K, which was materially false and misleading because the Bank announced in 2008 that financials for fiscal year 2006 and the first three quarters of 2007 would need to be restated.

Plaintiffs fail to allege a reason or reasons why each of these particular statements as to Ranieri was false and/or misleading at the time it was made.  To the contrary, Plaintiffs group together all of the defendants' false statements made during the November 26, 2007, conference call, press release, and Form 8-K, and allege collective reasons why the statements were materially false and misleading.  (Docket Entry No. 167, pp. 40-41.) Contrary to Plaintiffs' assertions, this does not satisfy the requirement that, for *each* false or misleading statement, they are to explain the reason or reasons why the statement was misleading, and what the defendant obtained thereby.

Further, the first three of the above quoted statements are too broad and generalized to be actionable and are instead non-actionable puffery as a matter of law.  Statements are non-actionable puffery if they are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Southland Sec. Corp.*, 365 F.3d at 372 (ellipsis in original).  Ranieri's statements of his belief that they could "shepherd" the Bank through the then-current downward market cycle, that

his job was to "guard the place," and that the Bank was not an "employment center for management and board," were positive affirmations or opinions of his belief in the Bank and an acknowledgment of his responsibilities to the shareholders, and were so vague and lacking in specificity that no reasonable investor could find them important in the total mix of information.  *See Basic Inc.*, 485 U.S. at 231-32 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *see also ABC Arbitrage*, 291 F.3d at 359 (dismissing section 10(b) claims finding no materiality for statements in financial reports projecting double digit sales growth).  Projections of future performance generally are not actionable under the securities laws, unless they were false when made.  *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

Plaintiffs do not allege a reason or reasons why Ranieri's statement of his belief  that the Bank was adequately reserved was false and/or misleading at the time it was made.  Nor does it give rise to an inference of scienter that the Bank increased its reserves at some point after Ranieri's statement, or that the FDIC found the Bank undercapitalized just prior to its collapse in late 2008.  (OIG Report, p. 1.)  According to the OIG Report, the Bank's asset quality appeared strong, its capital adequate, and its liquidity sufficient during the times it received composite examination ratings of "2."  *Id.*, p. 18.  Plaintiffs' generalized allegations that Ranieri's statements regarding adequate capitalization and reserves were false *because*

33

the Bank subsequently collapsed do not stand as allegations that the statements were false when made.

Plaintiffs fare no better in their allegations that Ranieri failed to disclose certain adverse information regarding Countrywide Financial during the November 26, 2007, conference call. Plaintiffs allege that Ranieri should have disclosed during the conference call that the Bank had provided a $150 million line of credit to Countrywide Financial, collateralized by Countrywide Financial's mortgage loans which included subprime mortgages. Plaintiffs do not, however, allege facts showing that Ranieri knew as of that date that the Countrywide Financial mortgage loans being held by the Bank as collateral included subprime mortgage loans.

Regardless, as shown below, Plaintiffs fail to allege facts giving rise to a strong inference of scienter that Ranieri acted with an intent to deceive, manipulate, or defraud, or was severely reckless, regarding the alleged misrepresentations or omissions.

      2.   *Scienter*

Plaintiffs assert that the following factual allegations in the Complaint establish a strong inference of scienter as to Ranieri:

(1)      the Bank's announcement of a proposed restatement in August 2008;

(2)       Craig Wolfe's letter of February 19, 2008 (the "Whistleblower Letter");

(3)      statements of confidential witnesses;

(4)      minutes of a January 3, 2007, Board of Directors meeting;

34

(5)     FDIC examination reports (as evinced through the OIG Report); and

(6)     the 2009 OIG Report.

In *Tellabs, Inc.*, the Supreme Court prescribed a three step approach to reviewing scienter allegations in a Rule 12(b)(6) motion to dismiss a federal securities fraud pursuant to the PSLRA.  551 U.S. at 322-323.  First, the allegations pleaded must, as in any federal motion to dismiss, be taken as true.  *Id.*, at 322.  Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id.*  The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded.  Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter.  *Id.*, at 323.  The inference of scienter must ultimately be cogent and compelling, not merely reasonable or permissible.  *Id.* In short, a complaint will survive a 12(b)(6) motion, even with acceptance of all factual allegations as true, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*, at 324.

The critical issue in a motion to dismiss based on insufficient allegations of scienter is whether the allegations of fraud contained in a plaintiff's complaint are sufficiently connected to each of the defendants such that a strong inference of scienter on their part is appropriate.  *Goldstein*, 340 F.3d at 249.  In determining whether a plaintiff's allegations support a strong inference of scienter, the court must consider all facts, circumstances, and

allegations *in toto*. *Id.*, at 246; *Abrams*, 292 F.3d at 431 (holding that the allegations should not be read in isolation, but taken together as a whole to see if they raise the necessary strong inference of scienter). *See also Nathenson*, 267 F.3d at 425.  Under the Supreme Court's decision in *Tellabs*, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter, and the inference of scienter must ultimately be cogent and compelling, and not merely reasonable or permissible.  551 U.S. at 309; *see also Shaw Group*, 537 F.3d at 533.

In the instant case, Plaintiffs fail to set forth allegations sufficient to support an inference of scienter that is at least as compelling as plausible non-culpable inferences, and a strong inference of scienter is not established.  The Court must look only to the state of mind of the individual who made or issued a complained-of statement or furnishes information for use in the statement, and not to the collective knowledge of the corporation's officers and employees acquired in the course of their employment.  *See Shaw Group*, 537 F.3d at 534.

In attempting to establish the required strong inference of scienter as to Ranieri, Plaintiffs expressly rely on the FDIC's statement in the OIG Report that, "Franklin's [Board of Directors] allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls," and that both "management and the [Board of Directors] did not provide for internal controls and information systems that would ensure timely and accurate financial reporting." (Docket Entry No. 239, p. 7.)  Reference to

36

these failings on the part of management and the Board of Directors, however, falls far short of showing scienter as to Ranieri; that is, that he spoke with an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers was either known to the defendant or was so obvious that the he must have been aware of it. *TXU Corp.*, 565 F.3d at 207. Even so, in considering whether the statements or actions can be afforded a non-fraudulent intent under *Tellabs*, it is clear that Ranieri had utilized an aggressive business strategy from the start, with an eye to realizing quick growth for the Bank. His goals for achieving fast growth and profitability are well-recognized corporate goals, and show neither an intent to deceive, manipulate, or defraud, nor severe recklessness in the making of any alleged misstatement attendant to his goals for the Bank.

Nor does the fact that the Bank announced the need for a restatement in August 2008 demonstrate scienter as to Ranieri. The nature of accounting problems that lead to restatement of a company's financials, for instance, can "easily arise from negligence, oversight, or simply mismanagement, none of which rise to the standard necessary to support a securities fraud action." *Abrams*, 292 F.3d at 433. Because Plaintiffs fail to set forth factual allegations sufficient to comply with the pleading requirements of *Shushany*, 992 F.2d at 522, the Court cannot consider the announcement of the proposed restatement as establishing scienter as to Ranieri. Plaintiffs set forth no factual allegations with particularity giving rise to a strong inference that Raneiri acted with an intent to deceive, manipulate, or defraud, or acted with severe recklessness, regarding accounting and related problems

37

leading to the announced need for a restatement in August of 2008.  *See Lormand*, 565 F.3d at 251; *Shaw Group*, 537 F.3d at 533.

Further, the Whistleblower Letter of February 19, 2008, does not evince scienter as to Ranieri.  In his letter, Craig Wolfe, in his capacity as Vice President of Loss Mitigation for the Bank, outlined his observations of purported violations of SEC rules, GAAP, and SOX at the Bank and management's failures to correct the problems.  However, the letter made no reference to Ranieri, and did not specifically accuse him of any violations or wrongdoing.  (Docket Entry No. 167, p. 60.)  Plaintiffs assert that copies of the letter were sent to the Bank's Senior Vice President of Internal Audit and to Nocella, but they do not state that a copy was sent to Ranieri.  Although Plaintiffs claim that the letter "is compelling evidence that the Defendants knew of and participated in the misleading statements to the market, including the intentional manipulations of the Company's financial statements," they make no specific claims of material misrepresentations or omissions made by *Ranieri*.  Their compilations of wrongdoing by "the Company" or "management" cannot be attributed to, or form the basis of, a 10(b) claim against, Ranieri.  *See Shaw Group*, 537 F.3d at 534.  Indeed, Craig Wolfe's threat in his Whistleblower Letter to "disclose my concerns *to the Board* and to Franklin Bank's auditors and the appropriate regulatory agencies," strongly implies that the Board was unaware of the problems outlined in the letter.  (Docket Entry No. 167, Exhibit C, p. 6, emphasis added).

Allegations by Confidential Witness No. 1 that Ranieri "was screaming at them on the phone to get the internal controls in line" (Docket Entry No. 167, p. 67) evinces not scienter, but a desire to correct apparent deficiencies in the Bank's internal controls.  The witness's non-specific statement that Ranieri "was heavily involved" in one or two credit committees gives rise to no inference of scienter, much less an inference of strong scienter.  Confidential Witness No. 2 stated that the Bank "didn't get directly into sub-prime, but Countrywide did and we held those loans as collateral."  (Docket Entry No. 167, paragraph 119.)  The witness's comments that Nocella, McCann, and Ranieri were responsible for "write downs and reserves to specific loans," and that "top executives" would table accounting issues during Bank credit or loan committee meetings, provides nothing giving rise to an inference of scienter regarding any alleged misstatements of Ranieri.  *Id*., paragraph 127.  Nor does the witness state that he was present during those meetings, or otherwise show that Ranieri was in a position to possess the information alleged.  *Shaw Group*, 537 F.3d at 535; *ABC Arbitrage*, 291 F.3d at 353.  Confidential Witnesses No. 3, No. 4, and No. 5, on the other hand, made no express reference to Ranieri, and provide no basis for an inference of his scienter.

Plaintiffs do not adequately allege in the Complaint that Ranieri had a motive to commit the alleged fraud.  As "motive," Plaintiffs aver that Ranieri was motivated to conceal from the public the true conditions of the Bank so he could accomplish the rapid growth and quick sale achieved with a prior bank.  While Ranieri never concealed his goal of rapid

growth for the Bank, the desire to keep stock values high is a universal goal among corporations and their executives and consequently does not contribute significantly to an inference of scienter.  *See Shaw Group*, 537 F.3d at 544.  Moreover, Plaintiffs' allegation that Ranieri intended to inflate the Bank's stock prices then sell the Bank is not a factual allegation that must be taken as true for purposes of Rule 12(b)(6); rather it constitutes unwarranted speculation that need not be afforded any presumption of veracity by this Court. Accordingly, these allegations neither constitute motive for Ranieri to have defrauded Plaintiffs nor do they contribute significantly to an inference of scienter.  Even if the Court were to accept as true Plaintiffs' allegation that Ranieri had wanted to duplicate his success with his prior banking enterprise, it would not help establish a strong inference of scienter as to Ranieri in the instant case.   Although allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter, *Shaw Group*, 537 F.3d at 533, the lack of such allegations is not fatal to a 10(b) claim and provides no basis for the granting of a Rule 12(b)(6) motion.  *Tellabs, Inc.*, 551 U.S. at 325.

Nor do the minutes of the January 3, 2007, Board of Directors meeting evince scienter as to Ranieri.  The minutes reflect that Ranieri participated in the meeting by discussing "the loan sale summary report by Countrywide Securities," and that "Mr. Cooper reviewed a summary of loans in the statistical calculation pool of $590 million stating that the Bank will keep the residual."  The minutes show that Ranieri then "clarified that only $560 million would be put in and $30 million will not be moved."  (Docket Entry No. 167, Exhibit D.)

No other details involving Ranieri are shown.  Plaintiffs do not allege with particularity facts giving rise to a strong inference that Ranieri acted with intent to deceive, manipulate, or defraud, or with severe recklessness, in any misstatements to which the board meeting minutes may be relevant.

Plaintiffs additionally assert that FDIC ROEs show that Ranieri was aware of problems noted by the FDIC.  The OIG Report discusses the FDIC's ROEs, and notes that the FDIC

> performed timely joint safety and soundness examinations of Franklin, conducting six examinations from September 2003 through July 2008. Franklin's composite ratings[7] remained at 2 until the October 25, 2007 examination when the bank's composite rating was downgraded to 3, indicating increased risk.  As a result of the July 14, 2008 examination, the composite rating was downgraded to 5, indicating extremely unsafe and unsound practices or conditions, critically deficient performance, and inadequate risk management practices.

(OIG Report, p. 1.)

The OIG Report further stated that the Bank's management did not effectively implement certain recommendations that were repeatedly made in the FDIC's ROEs.  In particular, the report noted that management did not effectively implement recommendations for the identification and monitoring of loan concentrations, the establishment of liquidity

---

[7] The scale runs from 1 to 5, with each component, and an overall composite score, being assigned a rating of 1 through 5, with 1 having the least regulatory concern and 5 having the greatest concern.  (OIG Report, p. 3.)

risk limits and liquidity contingency plans, and the enhancement of the internal audit function.  *Id*., pp. 10-11.  Indeed, the OIG noted that,

> Specifically, in the November 2005 through October 2007 ROEs, the FDIC repeatedly recommended that management set liquidity risk limits and formulate and/or document a CLP.  However, bank management repeatedly failed to fully implement the FDIC's recommendations,  Further, the FDIC examiners we interviewed stated that *bank management did not fully understand the need for contingency liquidity and crisis plans* and that management considered the bank's CLP to be its ability to market and sell the 1-4 family residential loan portfolio.  Examiners also stated that *the bank's failure to ensure that its loans were marketable was a critical management error* that ultimately contributed to the bank's liquidity crisis and failure.

*Id*., p. 16, emphasis added.  The Bank management's failure to heed adequately, or fully understand the need for, these recommendations or to make critical management errors regarding the liquidity of its 1-4 family residential loan portfolio, does not raise a strong inference of scienter as to Ranieri.  Additionally, the FDIC's examination reports issued prior to February 14, 2008, concluded that "appropriate internal controls are in place" at Franklin. (OIG Report, p. 22.)

Moreover, the OIG Report shows that the FDIC itself was partially blamed for not having properly supervised the Bank to effect a reduction in the eventual losses:

> Specifically, in the 2006 ROE, the FDIC could have better identified and analyzed risk to ensure that Franklin established and appropriately implemented controls and risk limitation and mitigation strategies.  For example, the FDIC did not clearly identify in the 2006 ROE the risk posed by Franklin's 1-4 family loan portfolio.  The FDIC also did not identify ADC loan administration weaknesses on a timely basis.  As a result, the bank's risk profile and asset qualify weaknesses became evident only after the real estate

market deteriorated and significant delinquencies and losses occurred, starting in 2007.

(OIG Report, p. 12.)

The OIG Report found that the FDIC could have better identified and analyzed risk to ensure that Franklin established and appropriately implemented controls and risk limitation and mitigation strategies. As to specific risk identification and management, the OIG Report stated as follows:

> **Franklin's 1-4 Family Residential Loan Portfolio:** In ROEs prior to 2007, the FDIC could have better identified the risk posed by Franklin's 1-4 family residential loan portfolio. Specifically, the FDIC described the overall credit quality of the bank's 1-4 family residential loan portfolio as strong due to the portfolio's weighted-average credit scores, weighted-average loan-to-value percentage, and estimated average total debt service-to-income ratios; however, the FDIC did not identify the bank's failure to stratify or segment its mortgage loan portfolio by risk factors and risk layers. As a result, the FDIC did not identify as a potential concern Franklin's lack of risk identification, measurement, monitoring, and control of its nontraditional and subprime loan portfolios.

> \*   \*   \*   \*

> *In our opinion, had the FDIC encouraged Franklin to adequately identify, measure, monitor, and control its nontraditional and subprime loan portfolio, the level of loss incurred by the bank due to the economic decline could have potentially been reduced.* In addition, both bank management and examiners could have more effectively assessed and managed/supervised the risk associated with the bank's nontraditional and subprime mortgage loan products.

*Id.*, pp. 12-13, emphasis added.

**Due Diligence for Purchased Loan Pools:**  The FDIC did not adequately assess Franklin's due diligence related to its purchased loan portfolio.  The July 2008 ROE states that the primary risk factors leading to performance problems in the bank's mortgage loan portfolio related to the existence of second liens (not held by the bank), limited documentation or no documentation of income, and geographic location.  *The existence of the second liens was unknown to both bank management and the FDIC prior to the October 2007 examination due*, in part, to Franklin's failure to perform an adequate level of due diligence for third-party loan originations and purchased loan pools. . . . *In our opinion, had the FDIC encouraged Franklin to perform a more thorough due diligence review, the increased risk associated with the bank's purchased loans may have been more quickly identified and actions may have been taken to limit or mitigate the level of risk assumed.*

*Id*., p. 13, emphasis added.

**Volatile Liability Dependence:**  Beginning with the September 2003 ROE, the FDIC repeatedly identified the Bank's reliance on non-core funding sources; however, *the FDIC also reported that the bank's strong asset quality and liquid loan portfolio mitigated any significant concern* over the bank's volitile liability dependence. . . . The FDIC did not identify the potential level of risk until the October 2007 ROE, when asset quality began to significantly deteriorate and the marketability of the bank's mortgage portfolio declined. . . . *Had the FDIC not overrelied on the strength of asset quality, more conservative operating parameters and/or mitigating risk factors (such as increased capital levels) could have been established* [and] risk associated with the bank's significant asset growth and loss exposure to adverse economic events could have been reduced.

*Id.*, pp. 14-15, emphasis added.

**Economic Risk Management:**  Examiner comments and analysis concerning the bank's economic risk management practices were lacking.   In the September 2003 and September 2004 ROEs, examiners routinely assessed (and responded favorably) to [risk management assessment questions].   In the September 2004 ROE, examiners also noted that the [Board of Directors] and management closely monitored economic conditions. . . . *The ROEs after the September 2004 examination did not include the risk management assessment pages*.

*Id.*, p. 15, emphasis added.

> **ALLL Analysis:** The October 2006 through July 2008 ROEs and examination workpapers showed that the FDIC did not ensure that the bank had established its ALLL [Allowance for Loan and Lease Losses] for the estimated credit losses inherent in the bank's nontraditional mortgage loan portfolio consistent with regulatory requirements, nor did the FDIC ensure that management considered the higher risk of loss posed by layered risks when establishing the ALLL. . . . *In our opinion, had the FDIC performed or encouraged Franklin to perform this analysis, both the FDIC and Franklin could have had a better understanding of the risk profile of the bank's loan portfolio, and of the amount of ALLL and/or capital needed to reserve for expected and unexpected losses; thereby, mitigating, to a certain degree, the bank's risk profile.*

*Id.*, p. 15, emphasis added.  Thus, to the extent that Plaintiffs allege that *Ranieri* knowingly ignored FDIC recommendations or requirements that would have prevented the Bank's failure or their loss, the overall OIG Report evinces a different story.

Further, Plaintiffs cannot argue that the OIG Report substantiates their allegations that the Bank knowingly misrepresented facts in its financial statements; the OIG Report states nothing more than, "In March 2008, [the Division of Supervision and Consumer Protection] became aware of significant errors and *possible intentional falsification* of Franklin's Call Reports."  (OIG Report, p. 18, emphasis added.)  No further information or specifics are given, and this statement, both standing alone and in context of the OIG Report as a whole, does not raise an inference of scienter as to Ranieri.

When considered *in toto*, the allegations asserted by the Franklin Investor Group against Ranieri in the Complaint fail to raise a strong inference of scienter because they are no more than, at most, conclusory allegations of wrongdoing, mistakes, or errors unsupported

by particularized facts that connect them to fraud or severe recklessness by Ranieri. Nor do Plaintiffs' allegations give rise to a strong inference that Ranieri knew, or was severely reckless in not knowing, that any statement he made was false at the time it was made. In absence of pleading a strong inference of scienter, the Complaint fails to state a 10(b) claim as to Ranieri.

3.     *Control Person Liability Under Section 20(a)*

Plaintiffs allege that Ranieri is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934. Control person liability is secondary only and cannot exist absent a primary violation. *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that Plaintiffs' pleadings of 10(b) liability fail to comply with the PSLRA and *ABC Arbitrage* and are, in any event, insufficient to raise a strong inference of scienter, no primary liability is established and the issue of control person liability as to Ranier is moot.

B.     <u>Defendant Russell McCann</u>

In the Complaint, Plaintiffs allege that defendant Russell McCann was, at all relevant times, the Chief Financial Officer for the Bank. In his motion to dismiss (Docket Entry No. 186), McCann contends that Plaintiffs fail to allege facts that raise a strong inference that he knew, or was severely reckless in not knowing, of the falsity of certain statements that Plaintiffs allege he made, and that a strong inference of scienter is not stated. McCann further complains that Plaintiffs failed to allege with the required specificity the material

46

misrepresentations or omissions made by McCann and give reasons why each statement is misleading or fraudulent, or show what he obtained thereby.  For the reasons that follow, the motion to dismiss (Docket Entry No. 186) is **GRANTED** and Plaintiffs' 10b and Section 20(a) claims against McCann are **DISMISSED WITH PREJUDICE**.

### 1.    *Material Misrepresentations*

In their response and sur-reply to the motion to dismiss, and in response to McCann's arguments that no specific misleading statements made by him were alleged, Plaintiffs assert that the following assertions in the Complaint constitute material misstatements or omissions by McCann:

(1)    "[W]e only originated prime level lending," stated during the October 30, 2007, investor conference call.

(2)    "If you really look at what Washington Mutual's portfolio did, they did pay option ARMs and a large amount.  They did a large amount of subprime.  You know we don't have any of those in a portfolio," stated during the October 30, 2007, investor conference call.

(3)    McCann stated that he was "pretty comfortable" with the Bank's reserve level during the October 30, 2007, investor conference call.

(4)    McCann signed the Bank's 2006 Form 10-K, which was materially false and misleading because it needed to be restated in 2008.

(5)    McCann signed SOX certifications as to the Bank's SEC filings from January 31, 2007, through March 14, 2008, which filings contained material errors because figures for fiscal year 2006 and the first three quarters of 2007 needed to be restated.

(6)    The March 14, 2008, Form 8-K and related press release were fraudulent.

47

(7)     McCann failed to disclose Countrywide Financial's default on a warehouse line of credit with the Bank.

(8)     McCann failed to disclose certain significant loan concentrations.

Plaintiffs fail to allege reasons why these particular statements as to McCann were false and/or misleading at the time they were made.  To the contrary, Plaintiffs group together all of the defendants' false statements made during the October 30, 2007, investor call, March 14, 2008, SEC filings, and press release, and allege only collective reasons why the statements were materially false and misleading.  This does not satisfy the requirement that, for *each* false or misleading statement, Plaintiffs are to explain the reason or reasons why the statement was false and/or misleading and what the speaker obtained thereby.

Regardless, McCann's statement that he was "pretty comfortable" with the Bank's reserve level as of October 30, 2007, is not actionable.  His statement constituted nothing more than the type of corporate "cheerleading" recognized as non-actionable puffery.  *See Krim*, 989 F.2d at 1446; *Nathenson*, 267 F.3d at 419.  Nor do Plaintiffs allege facts showing that McCann was *not* comfortable with the Bank's reserve level as of October 30, 2007, such that his stated comfort was false. *See Shushany*, 992 F.2d at 524.

2.     *Scienter*

Defendant McCann contends that Plaintiffs fail to establish a strong inference of scienter.  Plaintiffs assert that the following factual allegations in the Complaint establish a strong inference of scienter:

(1)     the Bank's announcement of a proposed August 2008 restatement;

(2)     Craig Wolfe's letter of February 19, 2008 (the "Whistleblower Letter");

(3)     statements of confidential witnesses;

(4)     minutes of a January 3, 2007, Board of Directors meeting;

(5)     FDIC examination reports (as evinced through the OIG Report); and

(6)     the 2009 OIG Report.

As with their claims against Ranieri, Plaintiffs fail to set forth allegations sufficient to support a strong inference of scienter, or an inference of scienter that is at least compelling as plausible non-culpable inferences.  *See Tellabs*, 551 U.S. at 309; *see also Shaw Group*, 537 F.3d at 533.  Plaintiffs rely on the FDIC's statement in the OIG Report that "Franklin's [Board of Directors] allowed bank management to pursue a high-risk business strategy without adequate risk management practices and controls" and that both "management and the [Board of Directors] did not provide for internal controls and information systems that would ensure timely and accurate financial reporting."  Reference to these failings on the part of management and the Board of Directors, however, falls far short of showing scienter as to McCann; that is, that he spoke with "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it."  *TXU Corp.*, 565 F.3d at 207.

Nor may Plaintiffs establish a strong inference of scienter by alleging that McCann wanted to keep the Bank's stock prices high in order to attract a favorable buyer for the Bank.  The desire to keep stock values high is a universal goal among corporations and their executives and consequently does not contribute significantly to an inference of scienter.  *See Shaw Group*, 537 F.3d at 544.  Moreover, Plaintiffs' assertion that McCann intended to sell the Bank is an unwarranted factual allegation that cannot be presumed as true by the Court for purposes of Rule 12(b)(6).

Plaintiffs place great emphasis on McCann's statement made during the October 30, 2007, investor conference call that, "[W]e only originated prime level lending."  Plaintiffs allege and rely on statements appearing in the OIG Report showing that the Bank *did* have subprime loans.  However, a close review of the OIG Report shows that the Bank's "subprime" loans did not meet the recognized definition of a "subprime" loan:

> According to DSC, Franklin did not have a subprime lending program as defined by interagency guidance.  Nevertheless, Franklin had a significant volume of loans with subprime *characteristics*.  Based on data provided within the October 2007 and July 2008 ROEs, subprime loans represented approximately 67 percent and 171 percent, respectively, of Tier 1 Capital.

(OIG Report, p. 5, n. 3, emphasis added.)  The OIG Report does not show that the Bank *originated* subprime lending as of October 30, 2007, as the term was defined by interagency guidance.  Plaintiff's allegations as to McCann's statement, as well as the OIG Report itself, do not allow a clear inference of scienter that McCann knew, or was severely reckless in not knowing, that the Bank had originated interagency guidance-defined subprime loans as of

50

October 30, 2007.  Although the OIG Report also notes that, as of July 2008, 16% of the Bank's 1-4 family residential loans held on its books were considered subprime loans, this does not establish that McCann knew, as of October 30, 2007, that the Bank held loans considered subprime by the FDIC.  In like manner, scienter as to McCann is not shown by the FDIC's statement in the OIG Report that, in the first quarter of 2007, bank management halted subprime operations and began limiting its origination of 1-4 family residential loan products to "conforming high-quality loans."  *Id*.  Again, this does not distinguish between interagency-defined subprime loans and loans having only subprime "characteristics" which did not meet the established definition for subprime.  The Court also notes that Plaintiffs' Confidential Witness No. 2 unequivocally stated that the Bank "didn't get directly into sub-prime."  Thus, Plaintiff's allegations do not raise an inference of scienter as to McCann himself.

Plaintiffs raise similar allegations as to McCann's disavowal of payment option ARMs, a particular type of loan, during the October 30, 2007, investor conference call. Although the OIG Report states that payment option adjustable rate mortgages were one of the seven types of nontraditional mortgage loans offered by the Bank, no reference dates are provided and the OIG Report does not allow an inference of scienter as to McCann's October 30, 2007, statement.

Nor do Plaintiffs' allegations as to subprime loans appearing in the Countrywide Financial warehouse loan portfolio provide an inference of scienter as to McCann.  Plaintiffs

51

cannot rely on subprime loans originated by Countrywide Financial, but held as collateral by the Bank, as supporting scienter, because McCann specifically referenced loans *originated* by the Bank.  Moreover, Plaintiffs' Confidential Witness No. 2 asserts that, not until the end of 2007 when Countrywide Financial defaulted on its line of credit, did the Bank realize the Countrywide Financial loans held as collateral contained subprime loans:  "[B]y the time we got notice of the default, we realized the portfolio was full of sub-prime dog [expletive]." This statement directly refutes not only the falsity of McCann's statements as of the date they were made, but that McCann knew, or was severely reckless in not knowing, that the statements were false when made.

Plaintiffs assert that McCann signed SOX certifications during 2007 and 2008.  Under SOX, senior executives of public companies must certify the accuracy of quarterly and annual financial reports under 15 U.S.C. § 7241(a).  The report must identify the officer's basis for making the certification and each officer must certify that he and other officers are "responsible for establishing and maintaining internal controls."  15 U.S.C. § 7241(a)(4)(C), (D).  According to Plaintiffs, these certifications were false because the defendants knew that the Bank's internal accounting controls were inadequate and that there were GAAP violations in the financial statements.  The Fifth Circuit, however, has held that SOX certifications, standing alone, are not indicative of scienter.  *Integrated Elec. Servs., Inc.*, 497 F.3d at 550.  The certifications are probative of scienter only if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.  *Id.*,

citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006).  That is, there must be facts establishing that the person who signed the certification had a "reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Id*. Plaintiffs fall short of this mark.

The Whistleblower Letter fails to discuss McCann and does not give rise to an inference of scienter as to McCann.

The basis for Plaintiffs' reliance on the March 14, 2008, Form 8-K and related press release is unclear.  The Form 8-K and press release announced the Bank's delay in filing an Annual Report for the year ended December 31, 2007, due to the Board of Directors' learning in February 2008 of possible accounting and disclosure issues that could affect the 2007 financial statements, and commencement of an independent internal audit.  Franklin stated that it "was unable to estimate the potential accounting effects that might result from the investigation," but that it did not believe that the expected results of the investigation would affect the status of the Bank as a "well capitalized" institution under regulatory guidelines.  None of these statements was false.  Franklin's belief that the Bank's status as a well-capitalized institution would remain unaffected was not an actionable statement.  *See Krim*, 989 F.2d at 1446; *Nathenson*, 267 F.3d at 419; *Shushany*, 992 F.2d at 524.  Franklin's statement that the Bank was well-capitalized under regulatory guidelines as of March 14, 2008, is supported by the OIG Report: "Franklin's capital designation for PCA purposes

53

remained in the well capitalized range long after its operations had begun to deteriorate." (OIG Report, p. 17.)  Franklin was not declared severely undercapitalized until a few days before it was closed down by state banking regulators, and the deterioration of Franklin's capital ratios was not reflected in the Uniform Bank Performance Report of the Federal Financial Institutions Examination Council until September 30, 2008.  *Id*.  Regardless, these materials do not raise an inference of scienter as to McCann.

When considered *in toto*, the allegations asserted by the Franklin Investor Group against McCann  in the Complaint fail to raise a strong inference of scienter because they are no more than, at most, conclusory allegations of wrongdoing, mistakes, or errors unsupported by particularized facts that connect them to fraud or severe recklessness by McCann.  Nor do Plaintiffs' allegations give rise to a strong inference that McCann knew, or was severely reckless in not knowing, that any statement he made was false at the time it was made.  In absence of pleading a strong inference of scienter, the Complaint fails to state a 10(b) claim as to McCann.

3.    *Control Person Liability Under Section 20(a)*

Plaintiffs allege that McCann is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that Plaintiffs' pleadings of 10(b) liability fail to comply with the PSLRA and *ABC Arbitrage* and are, in any event, insufficient to raise a

strong inference of scienter, no primary liability is established and the issue of control person liability as to McCann is moot.

### C.   Defendant Anthony Nocella

Plaintiffs allege that defendant Anthony Nocella served as Chairman, Chief Executive Officer, and President of the Bank during all times material to this lawsuit.  In his motion to dismiss (Docket Entry No. 191), Nocella contends that Plaintiffs fail to allege facts that raise a strong inference that he knew, or was severely reckless in not knowing, of the falsity of certain statements that Plaintiffs allege he made, and that a strong inference of scienter is not stated.  Nocella further complains that Plaintiffs failed to allege with the required specificity the material misrepresentations or omissions made by Nocella and give reasons why each statement is misleading or fraudulent, or what he obtained thereby.

For the reasons shown below, the motion to dismiss (Docket Entry No. 191) is **GRANTED** and Plaintiffs' 10b and Section 20(a) claims against Nocella are **DISMISSED WITH PREJUDICE**.

### 1.   *Material Misrepresentations*

Plaintiffs allege in the Complaint that the following statements by Nocella constitute material misrepresentations or omissions:

(1)   "Earnings were lower than our expectations for the year primarily as a result of the inverted yield curve and our continued unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market," stated during the January 31, 2007, conference call.

(2)     The Bank "never had" any "exotic products" on its balance sheet, stated during the January 31, 2007, conference call.

(3)     "We don't have any subprime so I don't know," and that, "Countrywide did pay option ARMs which, you know, Neg-AM and they secondly did a lot of simultaneous seconds, that's 100% CLTVs. They are two characteristics that we stayed away from," during an investors' conference call on July 25, 2007.

(4)     Nocella signed SOX certifications for the Bank's financial statements. The certification was a material misrepresentation of the erroneous information contained within the filings because the Bank announced in 2008 that they needed to be restated.

(5)     Nocella failed to disclose Countrywide Financial's default on a warehouse line of credit with the Bank.

(6)     Nocella failed to disclose certain significant loan concentrations.

(7)     Nocella failed to correct an analyst's comment during the July 25, 2007, conference call that, "I think you guys have been one of the more conservative underwriters out there."

Plaintiffs fail to allege a reason or reasons why each of these particular statements as to Nocella was false and/or misleading at the time it was made. Plaintiffs group together all of the defendants' false statements made during the January 31, 2007, conference call, press release, and Form 8-K, and allege collective reasons why the statements were materially false and misleading. (Docket Entry No. 167, pp. 40-41.) Contrary to Plaintiffs' assertions, this does not satisfy the requirement that, for *each* false or misleading statement, they are to explain the reason or reasons why the statement was misleading, and what the speaker obtained thereby.

56

Nor do Plaintiffs allege any specific, omitted, material information regarding the Bank's significant loan concentrations that was within Nocella's actual knowledge and that he was under a duty to disclose. An individual does not commit securities fraud merely by failing to disclose all nonpublic information in his possession. *See Shaw Group*, 537 F.3d at 541. If a claim of failure to disclose rests on an existing misleading statement, the statement must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id*. Plaintiffs do not plead these required allegations of fact.

Plaintiffs further allege as a material omission that Nocella failed to disclose Countrywide Financial's default on a warehouse line of credit with the Bank. For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Basic Inc.*, 485 U.S. at 232. Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubenstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994). Plaintiffs do not allege that Franklin failed to disclose in its SEC filings any financial loss or other consequences caused by a Countrywide Financial default; rather, they allege that Nocella himself failed to disclose specifically that Countrywide Financial had defaulted on a warehouse line of credit with the Bank. Consequently, Plaintiffs must either allege a factual basis for the existence of a duty under which Nocella himself was obligated to disclose the specific default, or that his

57

disclosure of the specific default was necessary in light of a prior statement he made. Plaintiffs fail to make these specific allegations, and they do not plead a material omission claim against Nocella regarding a default by Countrywide Financial on a warehouse line of credit with the Bank.

Plaintiffs assert that Nocella failed to correct an analyst's comment during the July 25, 2007, conference call that, "I think you guys have been one of the more conservative underwriters out there." The analyst's comment was a statement of professional opinion, not a statement of material fact, and Plaintiffs fail to allege facts establishing that Nocella was under any duty to "correct" the analyst's professional opinion. No material omission by Nocella is pleaded in this instance.

2.   *Scienter*

Defendant Nocella argues that Plaintiffs fail to set forth facts and circumstances sufficient to give rise to a strong inference of scienter. Plaintiffs again assert that the following factual allegations in the Complaint establish a strong inference of scienter:

(1)   the Bank's announcement of a proposed August 2008 restatement;

(2)    Craig Wolfe's letter of February 19, 2008 (the "Whistleblower Letter");

(3)   statements of confidential witnesses;

(4)   minutes of a January 3, 2007, Board of Directors meeting;

(5)   FDIC examination reports (as evinced through the OIG Report); and

(6)   the 2009 OIG Report.

These materials suffer from the same deficiencies in raising an inference of scienter as to Nocella as they did as to Ranieri and McCann and, under the same reasoning and analysis, the Court finds that they do not raise a strong inference of scienter as to Nocella.

Nor may Plaintiffs establish a strong inference of scienter by alleging that Nocella wanted to keep the Bank's stock prices high in order to attract a favorable buyer for the Bank. The desire to keep stock values high is a universal goal among corporations and their executives and consequently does not contribute significantly to an inference of scienter. *See Shaw Group*, 537 F.3d at 544. Moreover, Plaintiffs' assertion that Nocella intended to "artificially inflate the stock" then sell the Bank is an unwarranted factual allegation that cannot be presumed as true by the Court for purposes of Rule 12(b)(6).

Plaintiffs again rely on the OIG Report as showing that Nocella knew, or was severely reckless in not knowing, that his January 31, 2007, assertion of the Bank's "unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market" was false when made. Plaintiffs assert that the OIG Report shows that the Bank was participating in higher risk, non-traditional mortgages as of January 31, 2007. The report, however, is not time-specific regarding the Bank's 1-4 family residential loans. More importantly, Plaintiffs' factual allegations do not show that, as of January 31, 2007, the Bank's loans actually constituted higher risk, non-traditional mortgages in light of existing economic conditions *as of that date*. The parties, as well as the OIG Report itself, readily acknowledge that the unprecedented economic downturn and adverse real estate and

mortgage conditions were emergent factors.  As emergent factors, they developed over a period of time and acted to increase loan risks progressively.  As one example, the Bank's adverse loan classifications were reported as $178.5 million in October 2007; by July 2008 they were reported as $783.7 million.  The OIG Report, issued in 2009, resulted from an investigation undertaken in light of fully-developed facts, a hindsight advantage unavailable to Nocella in 2007.[8]  Plaintiffs' allegations regarding the OIG Report do not establish that, as of January 31, 2007, Nocella knew, or was severely reckless in not knowing, that his statement regarding the Bank's refusal to participate in higher risk, non-traditional mortgage markets was false.

This same analysis applies to Nocella's October 31, 2007, statement that the Bank did not have "exotic products" on its balance sheet.[9]  The OIG Report does not establish that, as of January 31, 2007, the Bank had exotic products that were known to be exotic products at that time.  Plaintiffs' allegations regarding the OIG Report do not establish that, as of January 31, 2007, Nocella knew, or was severely reckless in not knowing, that his statement regarding the Bank's lack of "exotic products" on its balance sheet was false.

---

[8]"[T]his business strategy left the bank unprepared and unable to effectively manage operations in *a declining economic environment*.  Franklin's asset quality deteriorated significantly *as the real estate market and economy slowed*."  (OIG Report, p. 3, emphasis added.)  "As adverse loan classifications increased, earnings eroded, liquidity became strained, and Franklin's capital became increasingly deficient."  *Id*.

[9]In an October 4, 2006, guideline for non-traditional mortgages, the FDIC defined "exotic" mortgages as those that "allow borrowers to defer payment of principal and, sometimes, interest," such as "interest only" mortgages and "payment option" adjustable rate mortgages.  71 Fed. Reg. 58,609.

Plaintiffs assert that Nocella knew, or was severely reckless in not knowing, that his July 25, 2007, statement that the Bank did not have negative amortization or 100% combined loan to value ratio mortgages, was false.  They again plead references to the OIG Report as showing scienter as to Nocella.  The report, however, does not state that, as of June 25, 2007, the Bank had negative amortization or 100% combined loan to value ratio mortgages.

Plaintiffs also allege that Nocella knew, or was severely reckless in not knowing, that his July 25, 2007, statement regarding subprime loans was false.  Although Plaintiffs allege that Nocella stated, "We don't have any subprime loans," the text of the actual conference call, as submitted by the parties, refutes this factual allegation:

> Analyst:       [Y]ou saw Countrywide's numbers come out yesterday.  They are starting to show some trouble in their HELOC portfolio in the prime side and this is the first time anybody talked about prime loans having trouble[.] Are we starting to see some *subprime issues*?  I mean, how do you think this cycle is going to play out and, how long do you think it's going to play out?
> Nocella:       [A]s far as it playing out I think what you are seeing for the first time – at least in his write up, Angelo's write up, was an increase in the prime side of the business and I would say that we are, you are seeing some delinquency increase, which I would say it really doesn't make any sense because you are talking about solid 80% loan-to-value even down to 70, 70% loan-to-value with 700 FICO scores from time-to-time being delinquent and I would think that is completely new.  I mean it's like cultural difference.  And I don't know if that's what Angelo was talking about with the prime side, but on a sort of steady state basis you know, we are running about [sic] delinquencies, which are substantially lower than his level, than the level he talked about in the prime side.  *We don't have any subprime so I don't know*.

(Franklin Investor Group's Appendix Tab 12, emphasis added.)

Plaintiffs interpret "We don't have any subprime" as meaning, "We don't have any subprime *loans*," while Nocella construes the statement as meaning, "We don't have any subprime *issues*."  Under Nocella's construction, his statement meant that the Bank was not experiencing with its prime loans the delinquency problems others were reporting with subprime loans.  This construction is entirely consistent with the analyst's question regarding "subprime issues" beginning to appear in prime loans, and with the fact that subprime loans were not the topic of discussion.  Plaintiffs' suggested interpretation is not reasonable in light of the overall discussion.  Regardless, this ambiguity in intent and meaning precludes use of the statement as either a material misstatement or as giving rise to an inference of scienter.  If an ambiguous statement is susceptible to many interpretations, including innocent ones, it will not contribute to an inference of scienter.  *Shaw Group*, 537 F.3d at 538.

3.     *Control Person Liability Under Section 20(a)*

Plaintiffs allege that Nocella is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that Plaintiffs' pleadings of 10(b) liability fail to comply with the PSLRA and *ABC Arbitrage* and are, in any event, insufficient to raise a strong inference of scienter, no primary liability is established and the issue of control person liability as to Nocella is moot.

## IV.  ANALYSIS OF MOTIONS TO DISMISS
## THE ROUCHER COMPLAINT

A.    <u>Defendant Deloitte & Touche</u>

The Preferred Stock Purchasers state that Deloitte & Touche, an accounting firm, acted as the Bank's outside auditor during the times relevant to the lawsuit.  They assert 10(b) claims against Deloitte for material misrepresentations made in Deloitte's "Report of Independent Registered Accounting Firm" appearing in Franklin's 2006 consolidated financial statements and its "Attestation Report of Independent Registered Public Accounting Firm" appearing in Franklin's 2006 "Management's Report in Internal Controls Over Financial Reporting."  These documents were issued on March 14, 2007.

The Preferred Stock Purchasers state that the audits were not performed in compliance with, and were incorrectly certified under, Public Company Accounting Oversight Board ("PCAOB") standards and Generally Accepted Auditing Standards ("GAAS"), and that Deloitte falsely reported that the Bank's disclosure and internal controls were effective. Specifically, the Preferred Stock Purchasers claim that the audits contained materially false and misleading statements because the Bank materially overstated the financial and operations information utilized by Deloitte in the audits and, contrary to Deloitte's certification, the Bank's financial statements were not prepared in compliance with GAAP. The Preferred Stock Purchasers allege that Deloitte knew, or was reckless in failing to know,

that the underlying data was overstated, false, and not in compliance with GAAP, or that the audits were not in performed in compliance with GAAS.

Specifically, the Preferred Stock Purchasers allege that Deloitte knew, or was severely reckless in not knowing, that the following statements it made in the Bank's 2006 10-K Audit Report were false:

(1)     In our opinion, [the Bank's balance sheets as of December 31, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ending December 31, 2006] present fairly, in all material respects, the financial position of Franklin Bank Corp. and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

(2)     In our opinion, management's assessment that the company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also, in our opinion, the company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

(3)     We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States) [*i.e.* GAAS].

(Docket Entry No. 240, pp. 10-11.)

Deloitte's motion to dismiss is premised on two contentions:  that the Preferred Stock Purchasers fail to allege facts sufficient to establish scienter, and that their claims are barred by limitations.  However, because the Supreme Court's intervening decision in *Merck* has

64

altered the way in which the limitations issue in a 10(b) claim is to be presented and reviewed, the parties' 10b limitations arguments currently before the Court are no longer appropriate and will not be addressed.

The issue of scienter, however, is squarely before the Court.  Many circuit courts have found that the meaning of recklessness in securities fraud cases is especially stringent when the claim is made against an outside auditor.  *See In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008), citing *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004) (noting that recklessness on the part of an independent auditor entails a mental state so culpable that it approximates an actual intent to aid in the fraud being perpetrated by the audited company).  It must be established not merely that there was a deviation from accounting principles, but that the accounting practices were so deficient that the audit amounted to no audit at all, or there was an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.  *Id*.

A careful review of the Preferred Stock Purchasers' allegations of scienter reveal little more than their assertions that Deloitte's statements were false when made because the Bank later announced a need to restate certain financial information in 2008.  The Preferred Stock Purchasers assert no allegations showing that Deloitte knew that the statements were false when made, or that it was severely reckless in not knowing that the statements were false

when made.  Any reliance on the OIG Report to establish scienter as to Deloitte would be

misplaced, as the report did not discuss Deloitte or its auditing services.  Accordingly, the

Preferred Stock Purchasers fail to allege facts showing falsity and scienter as to the three

statements, or that the audit was so deficient that it amounted to "no audit at all."  *See In re*

*Dell Inc., Sec. Litig.*, 591 F. Supp. 2d at 900.  In particular, their allegations against Deloitte

fail to encompass "a mental state so culpable that it approximates an actual intent to aid in

the fraud" being perpetrated by the Bank.  *Id*.  That Deloitte failed to discover in 2006 certain

accounting deficiencies that were not found until 2008 might arguably and at most support

an allegation of  negligence, but not of fraud.

Whether analyzed as separate claims or *in toto*, the Preferred Stock Purchasers'

allegations against Deloitte satisfy neither *Tellabs*' nor the Fifth Circuit's standards for

pleading facts that create a strong inference of scienter necessary to pursue further their

securities fraud claims under the PSLRA.  Deloitte's motion to dismiss (Docket Entry No.

181) is **GRANTED** and the Preferred Stock Purchasers' 10b claims against Deloitte are

**DISMISSED WITH PREJUDICE**.

B.    Defendant RBC Capital Markets Corporation

The Preferred Stock Purchasers bring claims against RBC Capital Markets

Corporation ("RBC") for violations of Section 11 of the Securities Act of 1933.  RBC was

the Bank's underwriter for its May 2006 preferred stock offering.  In raising Section 11

claims against RBC, the Preferred Stock Purchasers assert that RBC signed the Bank's 2006

registration statement and that it contained false and misleading statements, as evinced by the Bank's later internal investigation, the announced 2008 restatement, and the 2009 OIG Report.

In its motion to dismiss, supporting memorandum, and reply (Docket Entries No. 183, 184, 224), RBC asserts the following three grounds for dismissal of the Preferred Stock Purchasers' Section 11 claims: failure to allege materiality adequately, failure to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure, and failure to sue RBC within the one-year limitation.

For the reasons shown below, the motion to dismiss (Docket Entry No. 183) is **GRANTED** and the Preferred Stock Purchasers' Section 11 claims against RBC are **DISMISSED WITH PREJUDICE**.

### 1.    *Heightened Pleading Standard of Rule 9(b)*

RBC states that the Preferred Stock Purchasers' pleadings of Section 11 claims fail to comply with Rule 9(b) of the Federal Rules of Civil Procedure, which requires that, in alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. Rule 9(b).  Malice, intent, knowledge, and other conditions of a person's mind, however, may be alleged generally.

The law is clear, and the parties do not dispute, that the heightened pleading requirements of Rule 9(b) apply to 10(b) claims.  RBC and the Preferred Stock Purchasers are at odds, however, as to whether Rule 9(b) governs pleadings for Section 11 claims.  RBC

relies on *In re Dynegy Sec. Litigation*, which holds that, "When § 11 claims sound in fraud instead of negligence, the plaintiff is required to plead the circumstances constituting the alleged fraud with particularity to satisfy Rule 9(b)."  339 F. Supp. 2d at 827.  However, this simple restatement of well settled law only begs the question of whether the Preferred Stock Purchasers' section 11 claims are grounded in fraud.

The very language of Section 10(b) – "manipulative," "deceptive," "contrivance" – establishes that a violation of that section, and the allegations of that violation, will sound in fraud.  This stands in stark contrast to the language of Section 11, which involves "untrue statement" or "omitted statement" and "misleading."  Under Section 11, a defendant is not required to have known that the statement was untrue or misleading when made.  Section 10(b) liability looks to the intent of the defendant in making a false statement; Section 11 makes no inquiry into the defendant's state of mind.  Thus, by the very language, a Section 11 claim does not sound in fraud.

Even so, it is the language actually pleaded by the Preferred Stock Purchasers that will govern this issue.  In *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001), the Fifth Circuit held that, because the complaint did not expressly assert that defendants were liable for fraudulent or intentional conduct and disavowed any allegation of fraud under Section 11, the claims did not sound in fraud and were not subject to dismissal for failure to satisfy Rule 9(b).  A review of the Preferred Stock Purchasers' claims against RBC in the instant case reveals that the Preferred Stock Purchasers  not only alleged RBC

made untrue statements in the registration statement, but that RBC "knew or should have known" the statements were untrue at the time they were made.  Contrary to RBC's argument, the Preferred Stock Purchasers' allegations that RBC knew or should have known that the statements were untrue did not transpose the Section 11 claim into one sounding in fraud.  Fraud encompasses a particular state of mind, an element of intent or deception, which is absent in the Preferred Stock Purchasers' allegations against RBC.  *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009).  Regardless, in paragraph 112 of the Roucher Complaint, the Preferred Stock Purchasers specifically plead that the Section 11 claim "does not sound in fraud."  (Docket Entry No. 217, p. 69.)  This is sufficient under *Schlotzsky's Inc.* to disavow a pleading of fraud for purposes of Rule 9(b).

Even assuming the Preferred Stock Purchasers' use of the phrase "knew or should have known" were to sound in fraud, their failure to comply with Rule 9(b) is not fatal to their Section 11 claim.  If, in disregarding deficient allegations of fraud, a Section 11 claim remains stated, a court may disregard the impermissible generality.  *Schlotzsky's Inc.*, 238 F.3d at 368.  Because disregarding the allegation of "knew or should have known" is not fatal to the Preferred Stock Purchasers' Section 11 claim, the claim is not subject to dismissal under Rule 9(b).

2.    *Section 11 Claims*

The elements of a Section 11 claim are:  (1) an omission or misstatement (2) of a material fact required to be stated or necessary to make other statements made not

69

misleading. *Krim*, 989 F.2d at 1445; 15 U.S.C. § 77k. As with 10(b) claims, a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc.*, 485 U.S. at 234. For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* Thus, this Court must determine whether "the information allegedly omitted or misrepresented in the [registration statement] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the [registration statement] as a whole." *Krim*, 989 F.2d at 1445. Scienter, or actual knowledge of the falsity, is not an element of the Section 11 claim. *Herman & McLean*, 459 U.S. at 382.

Problematic to the Court's consideration of the Preferred Stock Purchasers' allegations against RBC in the Roucher Complaint and in their responses to RBC's motion to dismiss, is the fact that the allegations are pleaded in a consolidated, collective fashion against groups of defendants, and not against RBC as a specific defendant. However, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Roucher Complaint, the Preferred Stock Purchasers state that paragraphs 31 through 40 of the Roucher Complaint set forth their Section 11 factual allegations against "RBC and the Individual Defendants," with the Securities Act counts appearing in paragraphs 112 through 130. As to the latter, the Preferred Stock Purchasers allege that, in acting as underwriter for

the preferred stock offering, RBC "caused to be issued, and participated in the issuance of, the materially false and misleading Registration Statement," and that RBC failed to conduct adequate due diligence.  (Docket Entry No. 217, p. 70.)

In the referenced paragraphs of the Roucher Complaint, the Preferred Stock Purchasers assert the following material omissions in the May 5, 2006, registration statement for the preferred stock offering; accordingly, these assertions of fact constitute their Section 11 allegations of material omissions against RBC:

(1)    that the Bank's accounting practices and internal controls were materially deficient;

(2)    that the Bank did not adequately reserve for loan losses;

(3)    that the Bank did not properly account for or reserve for loan losses;

(4)    that the Bank's delinquent loan accounting, REO accounting, loan modification accounting, investment securities accounting and bank-owned life insurance accounting were deficient such that the Bank's financial reporting could not be relied upon;

(5)    that the Bank's ALLL methodology repeatedly had been the subject of concern in nonpublic FDIC examination reports sent to the Bank no later than September 2004, as stated in the OIG Report;

(6)    that the Bank had repeatedly failed to implement FDIC examiner recommendations regarding improving the Bank's liquidity policies and establishing a contingency liquidity plan and volatile risk limits, thereby exposing the Bank to a heightened risk of failure;

(7)    that the Bank directly and indirectly engaged in risky, poorly documented, and/or exotic low quality and subprime lending; and

(8)     that the Bank's results of operations, reported earnings, earnings per share, retained earning and shareholder equity were materially overstated, such that the Bank's ability to pay regular dividends was severely impaired.

(Docket Entries No. 217, paragraphs 31-38; No. 211, p. 21.)

The Preferred Stock Purchasers further allege that the following false and misleading statements appear in the 2006 registration statement for the preferred stock offering; accordingly, these assertions of fact constitute further Section 11 allegations of untrue statements against RBC:

(1)     that the Bank's lending practices are conservative,[10] and that the Bank had "established" and "utilized" "lending practices to reduce risks";

(2)     that "our single family mortgage portfolio provides high quality liquid assets for us"; and

(3)     that the Bank's financial results had been prepared in conformity with GAAP and that its financial accounting function possessed working and adequate internal controls.

*Id*.  The Preferred Stock Purchasers also set forth various financial figures and quoted a lengthy description of the Bank's builder finance business appearing in the 2006 registration statement, but did not identify the allegedly untrue statements.  They also asserted that RBC

---

[10]The Preferred Stock Purchasers do not provide a source for this allegation; rather, they argue that the untrue statement of "conservative" lending practices is implied by the Bank's assertions of established and utilized lending practices that reduce risk.  (Docket Entry No. 211, p. 56 n. 28.)  Because the Preferred Stock Purchasers acknowledge that this particular statement was not actually made, it will not be considered by the Court.

72

failed to conduct adequate due diligence regarding the preferred stock offering registration statement and related documents.

The Preferred Stock Purchasers allege that subsequent events in 2008 and 2009 revealed that these statements were false and misleading, in that the Bank's accounting practices and internal controls were deficient, that in 2004 and 2005 the FDIC had expressed concern in a nonpublic venue as to the Bank's ALLL methodology, and had recommended improving the Bank's liquidity policies. *Id.*, p. 57. They further state that, in the spring of 2008, the Bank announced it was investigating certain accounting practices utilized in third quarter 2007 financial reports, but later expanded the investigation to encompass all of 2007 and earlier years. In August of 2008, the Bank reported that its 2006 assets and share earnings had been overstated. The Preferred Stock Purchasers further allege that the FDIC's July 2009 OIG Report noted that, in all four of the FDIC's prior examinations – September 2003, September 2004, November 2005, and October 2006 – the FDIC had recommended that the Bank strengthen its internal controls.

In short, the Preferred Stock Purchasers claim that, based on the Bank's subsequent internal audit investigation, the announced need for a restatement in 2008, and the 2009 OIG Report, RBC made untrue statements or material omissions in the registration statement of May 5, 2006, and that the statements were untrue, or the omissions material, as of that date.

The fact that the Bank announced a need to file a restatement in August 2008 is insufficient to plead a Section 11 violation as to RBC's participation in the 2006 preferred

stock offering.  The actual announcement, which is utilized by the parties in their pleadings

and appears in Franklin's July 31, 2008, Form 8-K filed with the SEC, states as follows:

> In its Current Report on Form 8-K filed on May 2, 2008, Franklin disclosed
> that it had determined that the accounting for (i) certain delinquent single
> family loans serviced by third parties ('Delinquent Loan Accounting'), (ii)
> other real estate owned ('REO Accounting') and (iii) the newly created single
> family loan modification programs to mitigate foreclosure losses ('Loan
> Modification Accounting') should be revised.  That report also disclosed
> Franklin's determination that the foregoing accounting issues required the
> restatement of the financial statements contained in Franklin's Quarterly
> Report on Form 10-Q for the period ended September 30, 2007 (the
> 'September 2007 Form 10-Q'), and such financial statements should no longer
> be relied upon.

> Subsequently, Franklin had undertaken a review of its financial information
> for the first two quarters of 2007 and for the years 2006, 2005 and 2004 in
> order to determine whether the impact of the foregoing accounting issues was
> limited to the third quarter of 2007.  In addition to its internal review, Franklin
> has engaged an accounting firm to serve as a Special Accounting Master to
> assist in the review of Franklin's financial information for such periods and
> accounting matters generally.

> As a result of this review, Franklin has discovered that the revisions
> necessitated by Delinquent Loan Accounting, REO Accounting and Loan
> Modification Accounting are not limited to the three months ended September
> 30, 2007.  Additionally, Franklin has discovered that the accounting for certain
> investment securities ('Investment Securities Accounting') and the accounting
> for monthly increases in the cash surrender value of certain bank-owned life
> insurance ('BOLI Accounting') should also be revised.  The Delinquent Loan
> Accounting, REO Accounting, Loan Modification Accounting, Investment
> Securities Accounting and BOLI Accounting issues are referred to in this
> report as the 'Accounting Issues.'

> In light of the revisions necessary to address the Accounting Issues . . . the
> Board of Directors . . . concluded that Franklin's financial statements as of and
> for . . . the year ended December 31, 2006, contained in Franklin's . . . Annual
> Report on Form 10-K for the year ended December 31, 2006 . . . are required

to be restated and such financial statements . . . should no longer be relied upon.

(Docket Entry No. 185, p. 60.)  The Form 8-K further stated that the figures and report "remain subject to revision,"and that the "restatement process may result in additional adjustments."  However, of the accounting issues disclosed in the August 1, 2008, Form 8-K – delinquent loan accounting, REO accounting, loan modification accounting, investment securities accounting, BOLI accounting, and tax impact of the accounting issues – only delinquent loan accounting and its attendant tax impact were disclosed as expected to affect financials for the year ended December 31, 2006.  Franklin disclosed that the revision was due to GAAP, which required that interest should not be accrued on loans for which payment in full of principal or interest is not expected or, generally, upon which payment of principal or interest has been in default for a period of ninety days or more.  Therefore, Franklin determined in August 2008 that its method of accounting for delinquent single family loans serviced by third parties should be revised to place such loans on non-accrual status, which would reduce reported interest income.  (Docket Entry No. 190, Exhibit 11, p. 4.)  Of course, the anticipated restatement for 2006 was never filed and no final financials were released.

These anticipated accounting revisions were disclosed as effective for the entire year 2006.  The registration statement and the alleged untrue statements or material omissions forming these Section 11 claims, on the other hand, were made only as of May 5, 2006.  The Bank's August 2008 disclosure stated that Franklin's financial statements as of and for the

year ended December 31, 2006, contained in Franklin's Annual Report on Form 10-K for the year ended December 31, 2006, would need to be restated and that such financial statements should no longer be relied upon.  The 2006 Form 10-K would not have been included in the May 5, 2006, registration statement, and the Preferred Stock Purchasers do not allege facts showing that the financial information appearing in the registration statement would have been encompassed by the proposed restatement.  Accordingly, the Preferred Stock Purchasers' utilization of this SEC filing and its attendant public announcement is insufficient to plead a Section 11 claim as to RBC's participation in the 2006 preferred stock offering.  It does not show that RBC's alleged statements – that the Bank's lending practices were conservative, and that the Bank had "established" and "utilized" "lending practices to reduce risks"; that the Bank's single family mortgage portfolio provided it high quality liquid assets;  and that the Bank's financial results were prepared in conformity with GAAP and that its financial accounting function possessed working and adequate internal controls – were untrue as of May 5, 2006.  To the extent the Fifth Circuit's additional element of "knowledge" in a Section 11 claim remains relevant, the Preferred Stock Purchasers do not allege that the information allegedly omitted from the registration statement, or the untrue statements made therein, were known to RBC at the time the registration statement was issued and distributed.  *See Krim*, 989 F.2d at 1445.

Nor is the Preferred Stock Purchasers' reliance on the OIG Report sufficient to allege that RBC's statements were untrue as of May 5, 2006.  The report did not find that the Bank

lacked established or utilized lending practices in place to reduce risks as of May 5, 2006, or that the Bank's single family mortgage portfolio did not provide the Bank high quality liquid assets as of that date.  Moreover, it reached no conclusions that the Bank's financial results as of May 5, 2006, were not prepared in conformity with GAAP or that its financial accounting function did not possess working or adequate internal controls.  Although the Preferred Stock Purchasers allege that the FDIC made suggestions for the Bank to improve its internal accounting controls, the FDIC never stated that the existing internal controls were not adequate as of May 5, 2006.

Nor have the Preferred Stock Purchasers sufficiently alleged a Section 11 claim against RBC as to material omissions.  Contrary to their allegations, neither the OIG Report nor the August 2008 announcement of the intended restatement constitute sources for the Preferred Stock Purchasers' allegations regarding the Bank's accounting deficiencies, reserves, loan practices, earnings reports, and failures to implement relevant FDIC examiner recommendations as of May 5, 2006.

The Preferred Stock Purchasers do not allege facts establishing the materiality of any purported untrue statement or omission based on the August 2008, disclosure of the delinquent loan accounting issue.  Even assuming there were an error in the Bank's first quarter 2006 financial statements, or in those disclosed as of May 5, 2006, no materiality is alleged as a matter of law.  For the *entire* fiscal year 2006, the proposed restatement reduced total interest income by only 0.46%, net interest income by 1.4%, and interest income after

provision for credit losses by 1.78%, as shown in Franklin's Form 8K dated as of July 31, 2008.  (Docket Entry No. 190, Exhibit 11, p. 10, revised unaudited consolidated income statement for year ended December 31, 2006.)   In the Roucher Complaint, the Preferred Stock Purchasers allege that the August 2008 Form 8-K disclosed that the 2006 diluted earnings per share were overstated by almost 10%.  The parties agree in principle that a difference of 5% or less between an untrue statement and the true statement would not constitute a material difference as a matter of law.[11]  However, the figures and percentages alleged by the Preferred Stock Purchasers are for the *year* 2006, and are not limited to accountings as of May 5, 2006.  Accordingly, their allegations of materiality utilizing fiscal year 2006 revised accountings do not allege materiality as to the relevant time frame for their Section 11 claims, and materiality is not alleged.

     3.    *Limitations*

RBC argues that the Preferred Stock Purchasers' claims are barred by the one year statute of limitations governing false statements or omissions in registration statements or offers to sell securities under 15 U.S.C. § 77m.  Specifically, RBC alleges that the Preferred Stock Purchasers admitted in their original complaint that "the truth was fully revealed after the close of business on May 1, 2008," more than one year prior to the filing of the amended

---

[11]*See* Transcript of Hearing held October 12, 2010, p. 107, lines 6-11 (Preferred Stock Purchasers), p. 76, lines 4-9 (RBC).

complaint first naming RBC as a defendant.  The Preferred Stock Purchasers did not name RBC as a defendant until May 4, 2009, over one year later.

A complaint filed after expiration of the applicable limitations should be dismissed under Rule 12(b)(6) "where it is evident from the plaintiff's pleadings that the action is barred" and no grounds for tolling provisions are alleged.  *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).  For purposes of a Rule 12(b) motion, the court is required to accept as true all factual allegations set forth in the complaint, but need not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Southland Sec. Corp.*, 365 F.3d at 361.

Under 15 U.S.C. § 77m, the governing limitations provision for claims brought under Section 11 of the Securities Act of 1933,

> No action shall be maintained to enforce any liability created under section 77k or 77*l* (a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]

The one year limitation commences when the plaintiff has actual knowledge of the facts giving rise to his claim or has notice of facts that, in the exercise of reasonable diligence, should have led to such knowledge.  The requisite knowledge that a plaintiff must have to commence the running of limitations is merely that of the facts forming the basis of the cause of action, and not of the existence of the cause of action itself.  *Jensen*,  841 F.2d at 606.

The judicial admission relied on by RBC as appeared in the Preferred Stock Purchasers' original complaint was not carried forward into the current Roucher Complaint, and has been abandoned by the Preferred Stock Purchasers. The Court will not dismiss a plaintiff's lawsuit based on a factual allegation the plaintiff has abandoned through amendment.

As further argument for expiration of limitations, RBC asserts that there were "red flags" sufficient to constitute "storm warnings" prior to May 4, 2008, triggering commencement of limitations. As sufficient storm warnings, RBC directs the Court to the Bank's adverse disclosure of March 14, 2008, which resulted in a 30% drop in the value of the Bank's stock, and the subsequent May 1, 2008, adverse disclosure which resulted in an additional drop in stock value by over 35%. In the disclosure of March 14, 2008, the Bank announced the undertaking of an internal audit investigation regarding its internal accounting practices and internal controls, with the assistance of independent legal and accounting advisors. The Bank further stated on that date that the filing of its annual Form 10-K for 2007 would be delayed due to "possible accounting disclosure and other issues related to single-family residential mortgages and residential real estate owned that could affect Franklin's 2007 financial statements." In its simultaneously-filed notice of late filing with the SEC, the Bank stated that it expected to report a net loss for the year ended December 31, 2007, and subject to completion of the internal audit committee's investigation, an

impairment of goodwill of $65 million and an increase in loss allowances of over $23 million.

On May 1, 2008, Franklin announced the amending of its call reports for the third and fourth quarters of 2007, and disclosed in a press release that its September 2007 Form 10-Q should not be relied upon due to the incorrect call reports and its determination that past accountings for delinquent single family loans needed revision.  In August 2008 the Bank reported a need to file a more extensive restatement, including its 2006 financial restatements.

On May 4, 2009, the instant Section 11 claims were brought against RBC.  RBC argues that the claims are time barred because the Preferred Stock Purchasers had notice of facts that, in the exercise of reasonable diligence, would have led to their knowledge of the alleged untrue statements no later than May 1, 2008.  *See In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d at 845.  The Preferred Stock Purchasers, on the other hand, assert that, not until the August 2008 restatement announcement did the Bank disclose that the financial problems would encompass 2006, the time period covered by RBC's untrue statements and material omissions.

The Preferred Stock Purchasers' Section 11 claims against RBC are based on purportedly untrue statements or material omissions made by RBC in the May 2006 registration statement for the preferred stock offering.  However, by their own terms, the disclosures of March 14, 2008, and May 1, 2008, related to events occurring in *2007*, and did

81

not otherwise indicate potential problems  as to fiscal year 2006.[12]  To the extent the

disclosures of March 14, 2008, and May 1, 2008, and the ensuing drops in stock prices,

constituted "storm warnings" putting the Preferred Stock Purchasers on notice, they would

have been warnings as to events or problems regarding 2007, not 2006.  Not until the

proposed restatement announcement in August 2008 did the Bank indicate that the

accounting problems might go back as far as 2006, and clearly the Preferred Stock

Purchasers then would have been on notice of potential claims against RBC as to the 2006

registration statement.  Accordingly, the Preferred Stock Purchaser's Section 11 claims

against RBC are not barred by limitations.

        C.      <u>Defendants Chimerine, Golush, Howard, Master, Perro, Rhodes, and Selman</u>

The Preferred Stock Purchasers lodge claims against the Directors under Section

10(b), Rule 10b-5, and Section 20(a) of the Securities and Exchange Act of 1934, and under

Section 11 and Section 15 of the Securities Act of 1933.  For the reasons that follow, the

Directors' motion to dismiss (Docket Entry No. 189) is **GRANTED** and the Preferred Stock

---

[12]The May 1, 2008, disclosure discussed a need for accounting revisions as to certain delinquent family loans, REO accounting, and the single family loan modification program to mitigate foreclosure losses.  Although RBC argues that these accounting problems put the Preferred Stock Purchasers on notice of their Section 11 claims, RBC ignores the Bank's attendant disclosure that these "accounting issues required the restatement of the financial statements contained in Franklin's Quarterly Report on Form 10-Q for the period ended September 30, 2007[.]"  Thus, the disclosed accounting irregularities were expressly limited to the 2007 financial statements.

Purchasers' Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against the Directors are **DISMISSED WITH PREJUDICE**.

        1.    *Material Misrepresentations*

The Preferred Stock Purchasers  allege that, by signing the Bank's 2006 Form 10-K issued on March 13, 2007, the Directors intentionally made, or were severely reckless in making, material misrepresentations in the Form 10-K because:

(1)    the Bank's nonperforming loans were understated in 2006 and in each of the first three quarters of 2007;

(2)     the Bank's nonperforming assets were understated in 2006 and in each of the first three quarters of 2007;

(3)    the Bank's real estate owned was understated in 2006 and in the each of the first three quarters of 2007;

(4)    the Bank's net income was overstated in 2006 and in each of the first three quarters of 2007;

(5)    the Bank's earnings per share were overstated in 2006 and in each of the first three quarters of 2007; and

(6)    that the Directors, by signing the 2006 Form 10-K, are liable for the material misstatement in the report that, "We maintain our allowance for credit losses at the amount estimated by management to be sufficient to absorb probable losses based on available information.  Our estimates of credit losses meet the criteria for accrual of loss contingencies in accordance with SFAS No. 5, "Accounting for Contingencies," as amended by SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."

(Docket Entry No. 240, Appendix of Alleged Misrepresentations, pp. 3-7.)

In their motion to dismiss, the Directors contend that the Preferred Stock Purchasers fail to assert any particular facts against any particular named director, which is fatal to their burden of setting forth facts sufficient to raise a strong inference of scienter as to each named individual.   In their responses, the Preferred Stock Purchasers collectively refer to the directors as "the Individual Directors," and argue that the same allegations of material representations and facts establishing scienter apply to each of the named directors because they each signed  the same documents.

        2.   *Scienter*

The Preferred Stock Purchasers allege as establishing a strong inference of scienter the fact that each understatement or overstatement of the Bank's financial conditions in 2006 and the first three quarters of 2007 was announced as requiring a restatement in August of 2008.   However, as the Court has already discussed, the announcement of the proposed restatement does not establish scienter for the Directors as of the date of the alleged misstatements.

Nor do the Preferred Stock Purchasers present factual allegations sufficient to raise an inference of scienter regarding the 2006 Form 10-K statements of credit losses allowances.   Neither the announced restatement nor the OIG Report support the Preferred Stock Purchasers' allegations of scienter or severe recklessness, as these documents do not establish the falsity of the statements or that the Directors knew, or were severely reckless in not knowing, the falsity of the statements as to the Bank's maintaining credit loss

allowances at an estimated amount sufficient to cover probable losses based on available information as of the date of the 2006 Form 10-K, or that the credit loss estimates did not comply with SFAS No. 5 or No. 14 as of that same date.  To the extent that the Preferred Stock Purchasers' claims are extended to encompass financials for the first three quarters of year 2007, this same reasoning and analysis applies in that they allege no facts establishing scienter as of the applicable dates.

Accordingly, the Preferred Stock Purchasers fail to allege sufficiently a 10b claim against the Directors pursuant to the PSLRA, Rule 9(b), and *ABC Arbitrage*, 291 F.3d at 350.

### 3.    *Control Person Liability Under Section 20(a)*

The Preferred Stock Purchasers  allege that the Directors are liable as control persons under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the pleadings of 10(b) liability are inadequate, no primary liability is established, and the issue of control person liability as to the Directors is moot.

### 4.    *Section 11 Claims*

As with their Section 11 claims against RBC, the Preferred Stock Purchasers allege that the announced restatement and the OIG Report establish the untrue statements and the material omissions.  These claims fail for the same reasons as did those against RBC.

Moreover, and for the same reasons as with their claims against RBC, the Preferred Stock Purchasers do not allege facts sufficient to allege the materiality of any purported untrue statement or omission as of the relevant time frame regarding the Directors.

5.      *Limitations as to Section 11 Claims*

The Directors additionally argue that the Preferred Stock Purchasers' Section 11 claims are barred by the applicable statute of limitations.  The Section 11 claims against the Directors are not barred by limitations for the same reasons as the claims against RBC are not barred by limitations.

6.      *Control Person Liability Under Section 15*

The Preferred Stock Purchasers allege that the Directors are liable as control persons under Section 15 of the Securities Act of 1933.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the Preferred Stock Purchasers' pleadings of a Section 11 claim against the Directors are insufficient to survive the motion to dismiss, no primary liability is established and the issue of Section 15 liability as to the Directors is moot.

D.      Defendant Lewis S. Ranieri

The Preferred Stock Purchasers assert Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against Ranieri.  Ranieri signed the Bank's May 5, 2006, registration statement under which the Preferred Stock Purchasers purchased their shares. The registration statement contained financial statements for fiscal years 2001 through 2005

86

and the first quarter of 2006. The Preferred Stock Purchasers allege that the 2006 registration statement contained material misstatements and omissions and untrue statements in its failure to disclose certain loan portfolio information, loan losses and underwriting standards. Ranieri claims that, because the Preferred Stock Purchasers base these allegations on the August 2008 announcement of the proposed restatement for the entire fiscal year 2006 and the first three quarters of 2007, they fail to allege any specific misstatement or omission or untrue statement appearing in the financial statements for the relevant time frame – the first quarter of 2006.

For the reasons that follow, Ranieri's motion to dismiss (Docket Entry No. 188) is **GRANTED** and the Preferred Stock Purchasers' Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against him are **DISMISSED WITH PREJUDICE**.

### 1. *Material Misrepresentations*

The Preferred Stock Purchasers allege that, by signing the Bank's 2006 Form 10-K, Ranieri intentionally made, or was severely reckless in making, material misrepresentations in the Form 10-K because:

(1)    the Bank's nonperforming loans were understated in 2006 and in each of the first three quarters of 2007;

(2)     the Bank's nonperforming assets were understated in 2006 and in each of the first three quarters of 2007;

(3)    the Bank's real estate owned was understated in 2006 and in the each of the first three quarters of 2007;

(4)     the Bank's net income was overstated in 2006 and in each of the first three quarters of 2007;

(5)     the Bank's earnings per share were overstated in 2006 and in each of the first three quarters of 2007; and

(6)     that Ranieri, by signing the 2006 Form 10-K, is liable for the material misstatement in the report that, "We maintain our allowance for credit losses at the amount estimated by management to be sufficient to absorb probable losses based on available information.  Our estimates of credit losses meet the criteria for accrual of loss contingencies in accordance with SFAS No. 5, "Accounting for Contingencies," as amended by SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."

(Docket Entry No. 240, Appendix of Alleged Misrepresentations, pp. 3-8.)

The Preferred Stock Purchasers also assert that, as to the Bank's November 26, 2007, press release, Ranieri made, or was severely reckless in not knowing the falsity of, the following material misstatement:

In response to unprecedented market condition changes in the past few weeks, management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors . . . . As a result of such evaluation and review, Franklin elected to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax) . . . . Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91% The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while overall commercial loan reserve will increase from 0.61% to 1.33%. . . . Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.

*Id.*, p. 8.  The Preferred Stock Purchasers allege further that Ranieri intentionally made, or was severely reckless making, the following material misrepresentations in the investor conference call of November 26, 2007:

88

We have evaluated these changes [in market conditions] relative to the potential risk inherent in our portfolio and as a result of these changing market conditions [we] have concluded that we are going to increase reserves by approximately $20 million.  We believe this action that we are taking will ensure the level of future earnings, as the annual credit loss should be limited to the expected levels without our guidance.  What we are trying to do here, we believe we are adequately reserved, we have looked at this very hard.  But given the circumstances and I will be happy to elaborate on this later that we are seeing, we are trying within the confines of what the accounting literature will allow us to do.  Take this whole issue of the institution's mortgage portfolio, and its lending to builders off the table with the reserve that will carry us not for a period, but into the future because frankly management and the Board does not want to have to do this again.  These are obviously difficult times, and I and the management are very experienced in this.

*Id.*, p. 9.

No. I – the first part, this is Lewis.  As you know we can't comment on conversations with the regulators.  But neither are we stupid, and I would leave it at that.  *And we remain well capitalized by all standards*.  And we have access to capital, but we would not choose at this stock price . . . . But we have no desire, given that we remain well capitalized by all ratios, to think about diluting shareholders.

*Id.*, emphasis added.

2.  *Scienter*

The Preferred Stock Purchasers allege that the following factual allegations establish a strong inference of scienter as to defendant Ranieri:

(1)    the improper delinquent loan accounting, as disclosed in the July 31, 2008, Form 8-K;

(2)    the improper REO accounting, as disclosed in the July 31, 2008, Form 8-K;

(3)    the improper investment securities accounting, as disclosed in the July 31, 2008, Form 8-K; and

89

(4)     the existence of FDIC "red flags" as referenced in the OIG Report.

(Docket Entry No. 240, pp. 5-16.)

The allegations of, and sources for, scienter as to Ranieri pleaded by the Preferred Stock Purchasers are substantially the same as, or are encompassed within, those alleged against him by the Plaintiffs in the Complaint, and suffer the same fate.  For the same reasons as set forth by the Court in its determination that the Plaintiffs failed to plead facts sufficient to raise a strong inference of scienter, the Court finds that the Preferred Stock Purchasers fail to plead facts sufficient to raise a strong inference of scienter as to Ranieri.  To the extent that the Preferred Stock Purchasers' claims are extended to encompass financials for the first three quarters of year 2007, this same reasoning and analysis applies in that they allege no facts establishing scienter as of the applicable dates.

3.     *Control Person Liability Under Section 20(a)*

The Preferred Stock Purchasers  allege that Ranieri is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the pleadings of 10(b) liability are inadequate, no primary liability is established, and the issue of control person liability as to Ranieri is moot.

4.      *Section 11 Claims*

As with their Section 11 claims against RBC, the Preferred Stock Purchasers allege that the announced restatement and the OIG Report establish the untrue statements and the material omissions.  These claims fail for the same reasons as did those against RBC. Moreover, and for the same reasons as with their claims against RBC, the Preferred Stock Purchasers do not allege facts sufficient to allege the materiality of any purported untrue statement or omission as of the relevant time frame regarding Ranieri.

5.      *Limitations as to Section 11 Claims*

Ranieri additionally argue that the Preferred Stock Purchasers' Section 11 claims are barred by the applicable statute of limitations.  The Section 11 claims against Ranieri are not barred by limitations for the same reasons as the claims against RBC are not barred by limitations.

6.      *Control Person Liability Under Section 15*

The Preferred Stock Purchasers allege that Ranieri is liable as a control person under Section 15 of the Securities Act of 1933.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the Preferred Stock Purchasers' pleadings of a Section 11 claim against Ranieri are insufficient to survive the motion to dismiss, no primary liability is established and the issue of Section 15 liability as to Ranier is moot.

91

### E.    Defendant Russell McCann

The Preferred Stock Purchasers assert Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against McCann.  McCann signed the Bank's May 5, 2006, Registration Statement under which the Preferred Stock Purchasers  purchased their shares. The Registration Statement contained financial statements for fiscal years 2001 through 2005 and the first quarter of fiscal year 2006.  The Preferred Stock Purchasers  allege that the 2006 Registration Statement contained material misstatement and omissions and untrue statements in its failure to disclose certain loan portfolio information, loan losses and underwriting standards.  McCann claims that, because the Preferred Stock Purchasers base this on the proposed August 2008 restatement announcement for the entire year 2006 and the first three quarters of year 2007, they fail to allege any specific misstatement or omission or untrue statement appearing in the financial statements for the relevant time frame – the first quarter of year 2006.

For the reasons that follow, McCann's motion to dismiss (Docket Entry No. 187) is **GRANTED** and the Preferred Stock Purchasers' Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against him are **DISMISSED WITH PREJUDICE**.

### 1.    *Material Misrepresentations*

The Preferred Stock Purchasers  allege that, by signing the Bank's 2006 Form 10-K issued on March 13, 2007, McCann intentionally made, or was severely reckless in making, material misrepresentations in the Form 10-K because

92

(1)     the Bank's nonperforming loans were understated in 2006 and in each of the first three quarters of 2007;

(2)      the Bank's nonperforming assets were understated in 2006 and in each of the first three quarters of 2007;

(3)     the Bank's real estate owned was understated in 2006 and in the each of the first three quarters of 2007;

(4)     the Bank's net income was overstated in 2006 and in each of the first three quarters of 2007;

(5)     the Bank's earnings per share were overstated in 2006 and in each of the first three quarters of 2007; and

(6)     that McCann, by signing the 2006 Form 10-K, is liable for the material misstatement in the report that, "We maintain our allowance for credit losses at the amount estimated by management to be sufficient to absorb probable losses based on available information.  Our estimates of credit losses meet the criteria for accrual of loss contingencies in accordance with SFAS No. 5, "Accounting for Contingencies," as amended by SFAS No. 114, "Accounting by Creditors for Impairment of a Loan."

(Docket Entry No. 240, Appendix of Alleged Misrepresentations, pp. 3-8.)  The Preferred Stock Purchasers assert that McCann repeated the financial overstatements in the Bank's 2007 Form 10-Qs for the first, second, and third quarters of 2007.  *Id.*, pp. 3-7.

The Preferred Stock Purchasers further allege that McCann intentionally made, or was severely reckless in making, the following material misrepresentation in the 2007 Form 10-Qs for the first three quarters of 2007:  "Management believes that the allowances for credit losses is adequate to cover known and inherent risks in the loan portfolio as of [the last date of each relevant quarter]."  *Id.*, p. 8.

93

The Preferred Stock Purchasers also allege that McCann intentionally made, or was severely reckless in making, the following material misrepresentation in the Bank's November 26, 2007, press release:

> In response to unprecedented market condition changes in the past few weeks, management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors . . . . As a result of such evaluation and review, Franklin elected to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax) . . . . Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91% The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while overall commercial loan reserve will increase from 0.61% to 1.33%. . . . Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.

*Id.*, p. 8.

### 2.    *Scienter*

The Preferred Stock Purchasers allege that the following factual allegations establish a strong inference of scienter as to defendant McCann:

(1)    the improper delinquent loan accounting, as disclosed in the July 31, 2008, Form 8-K;

(2)    the improper REO accounting, as disclosed in the July 31, 2008, Form 8-K;

(3)    the improper investment securities accounting, as disclosed in the July 31, 2008, Form 8-K; and

(4)    the existence of FDIC "red flags" as discussed in the OIG Report.

(Docket Entry No. 240, pp. 5-16.)

94

The allegations of, and sources for, scienter as to McCann pleaded by the Preferred Stock Purchasers are substantially the same as, or are encompassed within, those alleged against him by the Plaintiffs in the Complaint, and suffer the same fate.  For the same reasons as set forth by the Court in its determination that the Plaintiffs' failed to plead facts sufficient to raise a strong inference of scienter, the Court finds that the Preferred Stock Purchasers fail to plead facts sufficient to raise a strong inference of scienter as to McCann.  To the extent that the Preferred Stock Purchasers' claims are extended to encompass financials for the first three quarters of year 2007, this same reasoning applies in that they allege no facts establishing scienter as of the applicable dates.

3.      *Control Person Liability Under Section 20(a)*

The Preferred Stock Purchasers allege that McCann is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the pleadings of 10(b) liability are inadequate, no primary liability is established and the issue of control person liability as to McCann is moot.

4.      *Section 11 Claims*

As with their Section 11 claims against RBC, the Preferred Stock Purchasers allege that the announced restatement and the OIG Report establish the untrue statements and the material omissions.  These claims fail for the same reasons as did those against RBC.

Moreover, and for the same reasons as with their claims against RBC, the Preferred Stock Purchasers do not allege facts sufficient to allege the materiality of any purported untrue statement or omission as of the relevant time frame as to McCann.

     5.     *Limitations as to Section 11 Claims*

McCann additionally argues that the Preferred Stock Purchasers' Section 11 claims are barred by the applicable statute of limitations.  The Section 11 claims against McCann are not barred by limitations for the same reasons as the claims against RBC are not barred by limitations.

     6.     *Control Person Liability Under Section 15*

The Preferred Stock Purchasers allege that McCann is liable as a control person under Section 15 of the Securities Act of 1933.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the Preferred Stock Purchasers' pleadings of a Section 11 claim against McCann are insufficient to survive the motion to dismiss, no primary liability is established and the issue of Section 15 liability as to McCann is moot.

     F.     <u>Defendant Anthony Nocella</u>

The Preferred Stock Purchasers assert Section 10(b), Rule 10b-5, Section 20(a), Section 11, and Section 15 claims against Nocella.  As with defendants McCann and Ranieri, Nocella signed the Bank's May 5, 2006, Registration Statement under which the Preferred Stock Purchasers purchased their shares.  The Registration Statement contained financial

statements for fiscal years 2001 through 2005 and the first quarter of fiscal year 2006.  The

Preferred Stock Purchasers  allege that the 2006 Registration Statement contained material

misstatements and omissions and untrue statements in its failure to disclose certain loan

portfolio information, loan losses and underwriting standards.

Nocella claims that, because the Preferred Stock Purchasers base this on the proposed

August 2008 restatement announcement for the entire year 2006 and the first three quarters

of year 2007, they fail to allege any specific misstatement or omission or untrue statement

appearing in the financial statements for the relevant time frame – the first quarter of year

2006.

For the reasons that follow, Nocella's motion to dismiss (Docket Entry No. 192) is

**GRANTED** and the Preferred Stock Purchasers' Section 10(b), Rule 10b-5, Section 20(a),

Section 11, and Section 15 claims against him are **DISMISSED WITH PREJUDICE**.

1.      *Material Misrepresentations*

The Preferred Stock Purchasers allege that, by signing the Bank's 2006 Form 10-K

issued on March 13, 2007, Nocella intentionally made, or was severely reckless in making,

material misrepresentations in the Form 10-K because

(1)     the Bank's nonperforming loans were understated in 2006 and in each of the
        first three quarters of 2007;

(2)      the Bank's nonperforming assets were understated in 2006 and in each of the
        first three quarters of 2007;

97

(3)     the Bank's real estate owned was understated in 2006 and in the each of the
        first three quarters of 2007;

(4)     the Bank's net income was overstated in 2006 and in each of the first three
        quarters of 2007;

(5)     the Bank's earnings per share were overstated in 2006 and in each of the first
        three quarters of 2007; and

(6)     that Nocella, by signing the 2006 Form 10-K, is liable for the material
        misstatement in the report that, "We maintain our allowance for credit losses
        at the amount estimated by management to be sufficient to absorb probable
        losses based on available information.  Our estimates of credit losses meet the
        criteria for accrual of loss contingencies in accordance with SFAS No. 5,
        "Accounting for Contingencies," as amended by SFAS No. 114, "Accounting
        by Creditors for Impairment of a Loan."

(Docket Entry No. 240, Appendix of Alleged Misrepresentations, pp. 3-8.)  The Preferred

Stock Purchasers assert that Nocella repeated the financial overstatements in the Bank's 2007

Forms 10-Q for the first, second, and third quarters of 2007.  *Id*., pp. 3-7.

        The Preferred Stock Purchasers further allege that Nocella intentionally made, or was

severely reckless in making, the following material misrepresentation in the 2007 Form 10-

Qs for the first, second, and third quarters of 2007:  "Management believes that the

allowances for credit losses is adequate to cover known and inherent risks in the loan

portfolio as of [the last date of each relevant quarter]."  *Id.*, p. 8.

        The Preferred Stock Purchasers also allege that Nocella intentionally made, or was

severely reckless in making, the following material misrepresentation in the Bank's

November 26, 2007, press release:

98

In response to unprecedented market condition changes in the past few weeks, management has conducted a complete evaluation of Franklin Bank's loan portfolio and reviewed appropriate qualitative factors . . . . As a result of such evaluation and review, Franklin elected to increase its allowance for credit losses by approximately $20.0 million ($13.5 million after-tax) . . . . Franklin Bank's allowance for credit losses of its total loans will increase from 0.42% to 0.91% The reserve for the builder finance portfolio will increase from 0.52% to 1.72% while overall commercial loan reserve will increase from 0.61% to 1.33%. . . . Franklin's management believes that this effort to anticipate issues, rather than wait for them, should remove the perceived risk to our institution from both the builder finance and mortgage portfolios.

*Id.*, p. 8.

The Preferred Stock Purchasers further allege that defendant Nocella intentionally made, or was severely reckless in making, the following material misrepresentations during 2007 investor conference calls:

(1)     During the investor conference call of January 31, 2007, Nocella stated:

Let me start by stating that our earnings were lower than our expectations for the year [2006] primarily as a result of the inverted yield curve and continued unwillingness to compromise our credit standards by participating in the higher risk, non-traditional mortgage market.

Nocella further stated during the call:

We know that we never had [any exotic products] but that's – we sell them if we ever do anything except for sale, we'd probably broker it thought in fact, it wouldn't even touch our balance sheet.

(2)     During the investor conference call of July 25, 2007, Nocella stated: "We don't have any subprime[.]"

(Docket Entry No. 240, p. 2, compilation.)

The Preferred Stock Purchasers also allege that Nocella intentionally made, or was severely reckless in making, the following material misrepresentation in the Bank's January 31, 2008, press release:

> During the fourth quarter of 2007 we significantly increased our allowance for credit losses by approximately $23.5 million.  While the increase obviously had a negative impact on our quarterly and yearly earnings it was necessary and prudent given the turmoil in the housing markets nationwide, which has negatively impacted our home builder customers, and many single family borrowers.  We believe that this action better positions us to weather the current challenging economic environment.

*Id.*, p. 10.

###### 2.    *Scienter*

The Preferred Stock Purchasers allege that the following factual allegations establish a strong inference of scienter as to defendant Nocella:

(1)    the improper delinquent loan accounting, as disclosed in the July 31, 2008, Form 8-K;

(2)    the improper REO accounting, as disclosed in the July 31, 2008, Form 8-K;

(3)    the improper investment securities accounting, as disclosed in the July 31, 2008, Form 8-K; and

(4)    the existence of FDIC "red flags" as discussed in the OIG Report.

(Docket Entry No. 240, pp. 5-16.)

The allegations of, and sources for, scienter as to Nocella pleaded by the Preferred Stock Purchasers are substantially the same as, or are encompassed within, those alleged against him by the Plaintiffs in the Complaint, and suffer the same fate.  For the same reasons

as set forth by the Court in its determination that the Plaintiffs' failed to plead facts sufficient to raise a strong inference of scienter, the Court finds that the Preferred Stock Purchasers fail to plead facts sufficient to raise a strong inference of scienter as to Nocella.  To the extent that the Preferred Stock Purchasers' claims are extended to encompass financials for the first three quarters of year 2007, this same reasoning and analysis applies in that they allege no facts establishing scienter as of the applicable dates.

3.    *Control Person Liability Under Section 20(a)*

The Preferred Stock Purchasers allege that Nocella is liable as a control person under Section 20(a) of the Securities Exchange Act of 1934.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the pleadings of 10(b) liability are inadequate, no primary liability is established, and the issue of control person liability regarding Nocella is moot.

4.    *Section 11 Claims*

As with their Section 11 claims against RBC, the Preferred Stock Purchasers allege that the announced restatement and the OIG Report establish the untrue statements and the material omissions.  These claims fail for the same reasons as did those against RBC. Moreover, and for the same reasons as with their claims against RBC, the Preferred Stock Purchasers do not allege facts sufficient to allege the materiality of any purported untrue statement or omission as of the relevant time frame regarding Nocella.

101

5.      *Limitations as to Section 11 Claims*

Nocella additionally argue that the Preferred Stock Purchasers' Section 11 claims are barred by the applicable statute of limitations.  The Section 11 claims against Nocella are not barred by limitations for the same reasons as the claims against RBC are not barred by limitations.

6.      *Control Person Liability Under Section 15*

The Preferred Stock Purchasers allege that Nocella is liable as a control person under Section 15 of the Securities Act of 1933.  Control person liability is secondary only and cannot exist absent a primary violation.  *Southland Sec. Corp.*, 365 F.3d at 383.

Because the Court has determined that the Preferred Stock Purchasers' pleadings of a Section 11 claim against Nocella are insufficient to survive the motion to dismiss, no primary liability is established and the issue of Section 15 liability as to Nocella is moot.

## V.  CONCLUSION

The Court reaches its holdings with full sensitivity to the losses suffered by the investors, and the extensive efforts by Plaintiffs' and the Preferred Stock Purchasers' able counsel.  It is never easy, and it should never be easy, to see legitimate expectations violated, and then declare the victims to be beyond the Court's capacity for redress.

The investors were, however, part of a much larger economic paradigm, one that is unprecedented in the lives of all the relevant players.  Mistakes were made, common strategies for growth and even survival did not work, and – hindsight suggests – could not

have worked.  The Bank's acts and omissions, however erroneous, do not give rise to cognizable claims under the exacting law that governs securities litigation.

For these reasons, the motions to dismiss (Docket Entries No. 181, 183, 186, 187, 188, 189, 191, and 192) are **GRANTED** and this class action lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all pending motions not otherwise disposed within this Memorandum Opinion and Order are **DENIED AS MOOT**.  Costs shall be borne by the party incurring same.

The Clerk will provide copies of this order to the parties.

Signed at Houston, Texas, on this the 21st day of March, 2011.

_____                    _____

_____
_____KEITH P. ELLISON
                                        UNITED STATES DISTRICT JUDGE